**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **In Re:** | ) | **Case No. 08-cv-2425** |
| | ) | **(Consolidated)** |
| **RESOURCE TECHNOLOGY CORP.,** | ) | **Hon. Matthew Kennelly** |
| | ) | |
| **Debtor.** | ) | |

**APPELLANT ILLINOIS INVESTMENT TRUST NO. 92-7163'S**

**<u>BRIEF IN SUPPORT OF APPEAL</u>**

Louis D. Bernstein (ARDC # 6192379)
Colleen E. McManus(ARDC # 06243473)
**Much Shelist Denenberg Ament & Rubenstein, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
Phone: (312) 521-2000
Fax:  (312) 521-2595
cmcmanus@muchshelist.com

*Attorneys for Appellant*

# TABLE OF CONTENTS

I.     Statement of Appellate Jurisdiction ................................................................. 1

II.    Statement of Issues and Standard of Review ................................................... 1

III.   Statement of the Case ...................................................................................... 2

IV.   Legal Argument ............................................................................................... 8

     A.     The Bankruptcy Court misapplied the requirement of adequate assurance of future performance. ................................................................................. 8

         1.     The Bankruptcy Court erred in requiring more adequate assurance of future performance than the contracting parties had when they entered into the Landfill Agreements with RTC............................................................. 9

         2.     The Trust's qualified, experienced personnel provide adequate assurance of future performance. ........................................................................... 10

         3.     There was no evidence that Scattered or Chiplease would be likely to breach their obligations under the loan documents................................... 12

         4.     In any event, the contracting parties have adequate remedies ................. 14

             (a)     The Trust is a business trust that can be sued or forced into bankruptcy................................................................................. 15

             (b)     Scattered and Chiplease can be pursued for recovery ................. 16

     B.     The bankruptcy court erred in not accepting as true the unrebutted testimony of the Trust's witnesses............................................................................. 17

     C.     The Bankruptcy Court erred in failing to consider additional evidence of the Trust's adequate assurance of future performance. ............................... 19

     D.     Allied, Sangamon and American Disposal have not established their standing... 21

V.    Conclusion ..................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

CASES

*Bucktown Partners v. Johnson,*
    119 Ill.App.3d 346, 353-55, 456 N.E.2d 703 (1983)..............................................................17

*In re Alipat, Inc.,*
    36 B.R. 274, 278 (Bankr. E.D. Mo. 1984) ..............................................................10

*In re Andreuccetti,*
    975 F.2d 413, 416 (7th Cir. 1992) ......................................................21

*In re Bygaph, Inc.,*
    56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) ......................................................10, 16

*In re The Casual Male Corporation,*
    120 B.R. 256, 265 (Bankr. D. Mass. 1990) ........................................................10

*In re Gurney's Inn Corp. Liquidating Trust,*
    215 B.R. 659, 662 (Bankr. E.D.N.Y. 1997)........................................................15

*In re Natco Indust., Inc.,*
    54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985) ..........................................................9

*In re Prime Motor Inns, Inc.,*
    166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ........................................................8

*In re Sapolin Paints, Inc.,*
    5 B.R. 412, 420-21 (Bankr. E.D.N.Y. 1980) ........................................................9

*In re Wade,*
    991 F.2d 402, 406 (7th Cir. 1993) ........................................................1

*In re Westview 75th Street Drug Corp.,*
    59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986) ........................................................8, 9

*In re Woodbrook Associates,*
    19 F.3d 312, 322 (7th Cir. 1994) ........................................................2

*Monarch Air Serv. V. Solow*
    *(In re Midway Airlines, Inc.),* 383 F.3d 663, 668 (7th Cir. 2004) ..............................................2

*Sweilem v. Illinois Dept. of Revenue,*
    372 Ill.App.3d 475, 485, 865 N.E.2d 459, 468 (1st Dist. 2007).........................................17, 18

ii

**STATUTES**

760 ILCS 5/1, *et seq.*................................................................................................15

760 ILCS 5/3 ...........................................................................................................15

11 U.S.C. § 101(9)(v), (41).....................................................................................15

11 U.S.C. § 109 .......................................................................................................15

11 U.S.C. §365(f)..............................................................................7, 8, 9, 10, 12, 16, 20

28 U.S.C. § 158 .........................................................................................................2

28 U.S.C. § 158(a)(1)...............................................................................................1

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 8001 ............................................................................................1

Fed. R. Bankr. P. 9023 ..........................................................................................19

Fed. R. Civ. P. 59 ..................................................................................................19

**I.      Statement of Appellate Jurisdiction**

The orders being appealed constitute final orders from the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"). *In re Wade*, 991 F.2d 402, 406 (7th Cir. 1993). This Court has jurisdiction over the Illinois Investment Trust No. 92-7163's (the "Trust") appeal pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001.

**II.      Statement of Issues and Standard of Review**

Issues on Appeal[1]

1.      Did the Bankruptcy Court err in finding that the Trust is not a business trust, subject to an involuntary bankruptcy filing?

2.      Did the Bankruptcy Court err in requiring the Trust to provide greater assurance of future performance than the contracting parties were given when the agreements were entered into with RTC?

3.      Did the Bankruptcy Court err in finding that the Trust is a shell with no assets or operating history?

4.      Did the Bankruptcy Court err in finding that there was no adequate assurance of future performance due to the absence of a guaranty that loaned funds would be used only in connection with the contracts to be assigned?

5.      Did the Bankruptcy Court err in finding that there was no adequate assurance of future performance due to the lack of evidence that the proposed lenders had the ability to lend in accordance with the loan documents?

---

[1]      The Trust raised eight distinct issues for appeal but addresses them in combination where there is overlap of facts and argument.

6.    Did the Bankruptcy Court err in finding that there was no effective remedy available to the contracting parties if the lenders failed to lend in accordance with the loan documents, and therefore, adequate assurance of future performance was lacking?

7.    Did the the Bankruptcy Court err in its decision that the evidence at trial failed to show adequate assurance of future performance under Section 365 of the Bankruptcy Code?

8.    Did the the Bankruptcy Court err in its decision to refuse to consider additional evidence to show adequate assurance of future performance under Section 365 of the Bankruptcy Code?

<u>Standard of Review</u>

The United States District Court has jurisdiction to hear appeals from the final rulings of the Bankruptcy Court.  28 U.S.C. § 158.  On appeal, the District Court reviews the factual findings of the Bankruptcy Court under the clearly erroneous standard and reviews the Bankruptcy Court's legal conclusions under the *de novo* standard.  *Monarch Air Serv. V. Solow (In re Midway Airlines, Inc.)*, 383 F.3d 663, 668 (7th Cir. 2004).  The Bankruptcy Court's decision to deny assignment of the Landfill Agreements is reviewed for an abuse of discretion.  *In re Woodbrook Associates*, 19 F.3d 312, 322 (7th Cir. 1994).

**III.    <u>Statement of the Case</u>**

Resource Technology Corporation ("RTC") is a debtor under Chapter 7 of title 11 of the United States Code.  This is an appeal of a decision from the Bankruptcy Court in RTC's case, styled, *In re Resource Technology Corp.*, case no. 99-35434.  On February 14, 2008, the Bankruptcy Court entered an order denying the Chapter 7 Trustee's motion to assume and assign certain contracts to a third-party designee, described more fully below.  On or about March 11, 2008, the Bankruptcy Court denied the Chapter 7 Trustee's motion to consider additional

circumstances related to the proposed assumption and assignment.  The Trust filed a timely appeal of these orders.

Statement of Facts[2]

**The Relevant RTC Contracts**

On December 30, 1996, RTC and Liberty Waste Services of Ohio entered into an agreement by which RTC was granted the right to develop and install landfill-gas-to-energy projects at a landfill in Litchfield, Illinois (the "Litchfield Agreement").  (Trial Exhibit 45)  Allied Waste Industries, Inc. ("Allied") and American Disposal Services of Illinois, Inc. ("American Disposal"), a subsidiary of Allied, claims to be the successor in interest to Liberty Waste Services of Ohio with regard to the Litchfield Agreement.  By order of the Bankruptcy Court dated January 3, 2002, RTC assumed the Litchfield Agreement.  (Dkt. No. 992)

On December 29, 1995, RTC and John Sexton Contractors Co. entered into an agreement by which RTC was granted the right to develop and install landfill-gas-to-energy projects at a landfill in Bloomington, Illinois (the "Bloomington Agreement").  (Trial Exhibit 44)  American Disposal claims to be the successor in interest to John Sexton Contractors Co. with regard to the Bloomington Agreement.

On May 26, 1995, ESG Watts, Inc. and RTC entered into an agreement by which RTC was granted the right to develop and install landfill-gas-to-energy projects at a landfill in Springfield, Illinois (the "Springfield Agreement").  (Trial Exhibit 46)  Sangamon Valley Landfill, Inc. ("Sangamon"), a subsidiary of Allied, claims to be the successor in interest to ESG Watts with regard to the Springfield Agreement.

---

[2]     Citations to the record on appeal will be to the Bankruptcy Court docket number of a particular document ("Dkt. No. ___"); to the transcript of the February 12-13, 2008 trial ("Tr. Part __ at ___"), and to trial exhibits ("Trial Exhibit ___, with page references where necessary.

On November 30, 1995, the City and County of Peoria, Illinois ("Peoria") and RTC entered into an agreement by which RTC was granted the right to develop and install landfill-gas-to-energy projects at a landfill in Peoria, Illinos (the "Peoria Agreement").  (Trial Exhibit 43) The Litchfield Agreement, the Bloomington Agreement, the Springfield Agreement and the Peoria Agreement shall be collectively referred to as the "Landfill Agreements."

**RTC Enters Bankruptcy**

On November 15, 1999, certain creditors of RTC filed an involuntary petition under Chapter 7 of the Bankruptcy Code.  (Dkt. No. 1)  On or about January 18, 2000, RTC consented to entry of an order for relief converting its case to Chapter 11 of the Bankruptcy Code.  (Dkt. No. 52-53)  RTC's case was converted to Chapter 11 as of February 1, 2000.  (Dkt. No. 52)  RTC remained in possession of its assets and operated its business as a debtor-in-possession until August 26, 2003.  (Dkt. No. 1804)

On August 26, 2003, the U.S. Trustee appointed Gregg E. Szilagyi as Chapter 11 trustee for RTC.  *Id.*  Szilagyi operated RTC's business thereafter.  On September 21, 2005, the Bankruptcy Court converted RTC's case to Chapter 7 of the Bankruptcy Code.  (Dkt. No. 2567) Jay A. Steinberg was appointed Chapter 7 trustee (the "Chapter 7 Trustee") for RTC as of September 27, 2005.  (Dkt. No. 2577)

On November 8, 2005, the Chapter 7 Trustee filed a motion to extend time to assume or reject executory contracts and unexpired leases listed in that motion.  (Dkt. No. 2758)  The Court granted the motion in part.  (Dkt. No. 2783)

On February 17, 2006, the Chapter 7 Trustee filed a motion for authority to enter into a settlement agreement with Leon Greenblatt, Banco Panamericano, Chiplease, Inc. ("Chiplease") and Scattered Corporation ("Scattered"; collectively, the "Secured Creditors") to compromise all

disputes between RTC's bankruptcy estate and the Secured Creditors and to convey RTC estate assets, including certain executory contracts and leases, to Scattered and/or Chiplease or their designee (which became the Trust).  (Dkt. No. 3091; Dkt. No. 3170 at Exhibit C)  As part of the settlement with the Secured Creditors, the parties entered into an agreement entitled Designation Rights Agreement pursuant to which Scattered, Chiplease or their designee—ultimately, the Trust--obtained the right to designate executory contracts and unexpired leases of real property for assumption and assignment by RTC's estate.  (Dkt. No. 3170 at Exhibits A, C)  On March 16, 2006, the Bankruptcy Court entered an order approving the settlement between RTC's estate and the Secured Creditors, including approving the terms of the Designation Rights Agreement. (Dkt. No. 3170)

**Designation of the Landfill Agreements**

Pursuant to the Designation Rights Agreement, on May 26, 2006, Chiplease and Scattered filed a motion to compel the Chapter 7 Trustee to seek assumption and assignment of those contracts to its designee.  (Dkt. No. 3327)  On June 29, 2006, the Bankruptcy Court granted in part and denied in part the Trust's motion to compel.  (Dkt. No. 3462)  For the contracts as to which the Bankruptcy Court granted the Trust's motion to compel, the Bankruptcy Court ordered the Chapter 7 Trustee to file a motion to assume and assign those contracts on or before July 7, 2006.  *Id.*  Accordingly, on July 7, 2006, the Chapter 7 Trustee filed the Motion Of Chapter 7 Trustee Pursuant To This Court's Order Compelling Trustee To Assume And Assign Certain Executory Contracts Subject To Court Approval Of (1) Demonstration By the Purchasers Of The Ability To Pay Cure Costs; (2) Demonstration By The Purchasers Of Adequate Assurance Of Future Performance; (3) Assumption; And (4) Assignment (the "Motion To Assign").  (Dkt. No. 3478)  The Motion To Assign included the Landfill Agreements.  *Id.*

Allied and Peoria, among others, filed objections to the Motion To Assign. (Dkt. No. 3495, 3496) On March 13, 2007, Allied, American Disposal, Sangamon, RTC's estate and the Trust entered into a stipulation regarding cure costs relating to assumption and assignment of the Litchfield, Springfield and Bloomington Agreements. (Dkt. No. 3875) On May 9, 2007, Peoria, RTC's estate and the Trust entered into a stipulation regarding cure costs and all other non-monetary disputes between the parties relating to assumption and assignment of the Peoria Agreement. (Trial Exhibit 48)

**Trial on the Landfill Agreements**

As of February 12, 2008, the only remaining issue as to the assumption and assignment of the Bloomington, Litchfield, Peoria and Springfield Agreements was the Trust's ability to provide adequate assurance of future performance. (Dkt. No. 4097) Accordingly, on February 12-13, 2008, the Bankruptcy Court conducted a trial. *Id.* Represented at the trial were the Chapter 7 Trustee, Allied, Peoria and the Trust.

As described in more detail in the argument section below, the Trust sought to establish adequate assurance of future performance under the Landfill Agreements in several respects. First, the Trust was created by a trust agreement, with John Connolly as trustee. (Trial Exhibit 1) Mr. Connolly, president of RTC since 2001, explained his considerable experience in environmental facility management and engineering and his familiarity with the Landfill Agreements.

Connolly testified to the Trust's ability to comply with the stipulations entered into between RTC's estate and each of Peoria, Allied and American Disposal and Sangamon and to perform its obligations under the Landfill Agreements. Connolly provided detail about the tasks, and his preparation to underake those tasks, necessary under the Landfill Agreements.

According to Connolly, two major components formed the foundation of the Trust's performance under the agreements:  First, pursuant to an Amended Loan & Security Agreement dated February 4, 2008, Scattered and Chiplease promised to loan the Trust $3 million.  (Trial Exhibit 52)  Second, Connolly walked the Bankruptcy Court through the detailed pro formas he created to project the revenue at each landfill, taking into account the $3 million loan, the expenses associated with each landfill and other necessary assumptions.  (Trial Exhibits 34-38)

Leon Greenblatt and Andrew Jahelka, the individuals behind Chiplease and Scattered and who also had substantial experience with RTC over the years, testified to their commitment to fund to the Trust under the loan agreement.  They testified to their confidence in Connolly as trustee.  They also described Scattered and Chiplease's other businesses and assets.

**The Bankruptcy Court's Rulings**

At the conclusion of the trial, the Bankruptcy Court ruled that the Chapter 7 Trustee had not met his burden of establishing adequate assurance of future performance of the Trust as required under Bankruptcy Code Section 365(f).  (Tr. Part 2 at 256-258)  The Bankruptcy Court invited the Chapter 7 Trustee and the Trust to propose another arrangement for assumption and assignment of the Landfill Agreements.  (*Id*. at 259-261)  On February 14, 2008, the Bankruptcy Court entered an order denying the Motion To Assign.  (Dkt. No. 4176)

On February 29, 2008, the Chapter 7 Trustee filed a Motion To Allow For The Presentation Of Additional Circumstances For The Stay Of Enforcement Of The Court's Order And To Allow For The Assumption And Assignment Of Contracts (the "Motion To Consider") (Dkt. No. 4182).  In connection with the Motion To Consider, the Chapter 7 Trustee and the Trust submitted to the Bankruptcy Court additional evidence of the Trust's ability to provide adequate assurance of future performance under the Landfill Agreements.  (Dkt. Nos. 4188,

4199)  On March 11, 2008, the Bankruptcy Court denied the Motion To Consider.  (Dkt. No.

4204)

On March 20, 2008, the Trust filed a notice of appeal of the Bankruptcy Court's orders

dated February 14, 2008 and March 11, 2008.  (Dkt. No. 4212)

IV.    **Legal Argument**

A.    **The Bankruptcy Court misapplied the requirement of adequate assurance of future performance.**

The statutory provision at the center of this appeal is Section 365 of the Bankruptcy

Code.  That section provides, in pertinent part:

> (f) (1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if—
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f).

The words "adequate assurance of future performance" are not words of art but words

that Congress intended to be given a practical, pragmatic construction.  *In re Westview 75th Street*

*Drug Corp.*, 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986) (interpreting adequate assurance of future

performance under § 365(b)).  The phrase does not mean absolute insurance that the debtor or its

assignee will thrive and make a profit.  *Id*.  In fact, the degree of assurance necessary falls

considerably short of an absolute guaranty.  *In re Prime Motor Inns, Inc*., 166 B.R. 993, 997

(Bankr. S.D. Fla. 1994) (interpreting adequate assurance of future performance under § 365(b)).

The standard is simply whether it appears that the lease or contract obligations will be met. *Westview*, 59 B.R. at 754.

Certainly some protection of the non-debtor party is due under Section 365(f), but that party is not entitled to an improvement of its position. *Id*. Indeed, the court in *Westview* made clear to the landlord, whose lease was subject to assumption and assignment by the debtor, that Section 365 did not afford relief to him simply because he might be able to rent his premises to someone else at higher rent or otherwise seek to escape the bargain he had made with the debtor. *Id*. at 755; see also, *In re Natco Indust., Inc*., 54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985).

In this case, the Bankruptcy Court improperly held the Trust to a stricter standard than is applicable under "adequate assurance of future performance." The Banrkuptcy Court's standard was more like "future performance beyond a reasonable doubt"--a burden that the Trust could not meet—nor could any proposed assignee. The Bankruptcy Court misapplied this standard in several respects, as discuss below.

> **1.      The Bankruptcy Court erred in requiring more adequate assurance of future performance than the contracting parties had when they entered into the Landfill Agreements with RTC**.

The requirement of adequate assurance of future performance does not entitle the non-debtor contracting party to greater rights than it previously had under the contract. *In re Sapolin Paints, Inc*., 5 B.R. 412, 420-21 (Bankr. E.D.N.Y. 1980).

As the Bankruptcy Court acknowledged at trial, RTC was thinly capitalized and struggled to operate its landfill projects efficiently and profitably. Significantly, the Landfill Agreements required nothing of RTC in the way of security or assurance: They contain no guaranties, no security deposits, and no letters of credit to be posted. (*See* Landfill Agreements, Trial Exhibits 43-46) The Bankruptcy Court erred in requiring more of the Trust than was required of RTC

under the Landfill Agreements.  For instance, the Bankruptcy Court questioned why the same individuals who previously owned RTC and who now own Chiplease and Scattered—*i.e.*, Leon Greenblatt, Andrew Jahelka—did not provide the capital that would have enabled RTC to run the gas systems profitably in earlier years.[3]  (Tr. Part 2 at 209, 212)  Moreover, the Bankruptcy Court made the same mistake when it expressed "hope" that the Trust is in better shape than RTC was when it entered into the Landfill Agreements.  (Tr. Part 2 at 193)

The Bankruptcy Court's hopes and queries miss the mark as to Section 365(f).  The primary question is <u>not</u> whether the assignment of the Landfill Agreements puts the contracting parties in a better position than they were originally under the agreements with RTC but, simply, whether the Trust is likely to perform under the agreements.  *In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986).

### 2.    The Trust's qualified, experienced personnel provide adequate assurance of future performance.

An assignee's experience in the operation of a business similar to the one operated by the debtor/assignor is relevant in the Section 365(f) analysis.  *In re The Casual Male Corporation*, 120 B.R. 256, 265 (Bankr. D. Mass. 1990); *In re Alipat, Inc.*, 36 B.R. 274, 278 (Bankr. E.D. Mo. 1984).  In *Casual Male*, the assignee had recently incorporated.  *Id.*  The non-debtor contracting party objected that the assignee had no operational history upon which it could judge adequate assurance of future performance.  *Id.* at 264.  The bankruptcy court explained that the assignee's owner and chief executive officer had extensive experience in the retail clothing industry and, in essence, could be no worse off financially than the debtor had been at the time it entered into the lease.  *Id.* at 265.  The court approved the assumption and assignment.

---

[3]      Prior to the March 2006 settlement between RTC's estate, Chiplease and Scattered, the latter two entities had no incentive to fund RTC's operations, while the estate intended to pursue claims against them.

Here, the charge that the Trust has no operational history, and thus, cannot show adequate assurance of future performance, is belied by the testimony of John Connolly. The Trust and the individuals affiliated with it could hardly be more qualified to conduct the business of the Trust and to perform under the Landfill Agreements, as exemplified below:

* Connolly's and Robert Fortelka's experience with gas collection and control systems and gas conversion systems total 19 and 17 years, respectively. (Tr. Part 1 at 95-96)

* The Trust is informed and prepared down to the last detail the actions and dollar amounts necessary to cure the alleged defaults in connection with the Landfill Agreements and RTC's estate's stipulations regarding the same. (*Id*. at 96-99, 114-122)

* The Trust has favorable, existing contractual relationships with service providers that it deemed to be best-qualified to complete work in connection with the Landfill Agreements. (*Id*. at 83-93)

* The Trust has substantial experience securing Clean Air Act Permit Program permits at several Illinois landfills. (*Id*. at 99-101)

* The Trust has detailed preparations for securing construction and CAAPP permits in connection with the Landfill Agreements. (*Id*. at 102-12, 118-122; Tr. Part 2 at 177-178)[4]

* The Trust has successfully operated at gas-collection-system landfills without compliance issues or violation notices. (*Id*. at 145-147)

* Scattered and Chiplease were pleased with Mr. Connolly's performance while at RTC and expressed no intention of taking over operations of the Trust's business or removing Connolly as trustee. (*Id*. at 69-70; Tr. Part 2 at 17, 21-23, 45)

---

[4]     The Bankruptcy Court acknowledged that there had been no challenge to the fact the Trust could not be expected already to have obtained—prior to assignment of the Landfill Agreements--the operating permits for the applicable landfills. (Tr. Part 2 at 223).

\*    Patrick Sloan testified (on behalf of Peoria) that RTC's performance at the Peoria landfill declined <u>after</u> the Chapter 11 trustee's appointment in 2003 (Tr. part 2 at 92-93); that he was not aware of any enforcement orders relating to RTC's performance at the Peoria landfill (*Id*. at 103); and that he was not aware of any penalties assessed against RTC relating to its performance at the Peoria landfill.  (*Id*. at 103-104)

\*    Similarly, Connolly testified about the lack of any compliance issues whatsoever regarding RTC's and/or the Trust's performance at the Bloomington landfill and the Litchfield landfill (Tr. part 1 at 144-145) as well as at other landfills, *e.g*., Lansing, Fort Dodge, Greater New Orleans, Kewanee (*Id*. at 145-147).

The foregoing <u>undisputed</u> facts constitute clear indicia of the Trust's ability to perform under the Landfill Agreements.  If the Trust were a mere shell with no experienced personnel in the industry, why and how would it be able to contract with service providers in advance of its taking assignment of the Landfill Agreements?  The Trust could not have done more to demonstrate its willingness, ability and ambition to go forward under the Landfill Agreements prior to assignment.  The Bankruptcy Court should have properly applied the Section 365(f) standard and granted the Motion To Assign in favor of the Trust.

> **3.    There was no evidence that Scattered or Chiplease would be likely to breach their obligations under the loan documents**.

As described more fully in the loan agreement, Scattered and Chiplease agreed to loan the Trust $3 million for its obligations in connection with the Landfill Agreements.  (Trial Exhibit 52)  Chiplease had been a lender to RTC since at least 1999 (Tr. Part 2 at 12, 16).  Significantly, there was <u>no evidence</u> at trial that Chipleas breached its post-1999 loan commitment to RTC.  In fact, Chiplease offered to fund RTC Chapter 11 operations, but the Chatper 11 trustee declined.  (*Id*. at 18-19)

Andrew Jahelka, director of Scattered, testified in the affirmative as to Scattered's and Chiplease's commitment to fund at least $3 million, as follows:

> Q:     Okay.  Now what, if any, obligations does Scattered Corporation have under the amended promissory note?
>
> A:     Well, Scattered—I'm not sure I understand your question.  Under the note, IIT has the obligation to pay back Scattered $3 million.  Scattered under the loan agreement has the obligation to lend $3 million.
>
> Q:     Well, is this intended to be a term note or a line of credit?
>
> A:     It's a revolving line of credit.
>
> Q:     Well, I guess the question is has Scattered made any payments to IIT under this note?
>
> A:     Not yet.
>
> Q:     When do you think it's likely the first advance under the note would be?
>
> A:     I suspect it will be very shortly after these contracts are assumed and assigned to IIT, and IIT needs to make the cure payments on each of Peoria and Springfield.
>
> Q:     Okay.  And does Scattered have the money set aside right now to fund those cure payments?
>
> A:     Not as I sit here right now, but it will—we were talking about roughly a million-two-fifty that will need to be paid in fairly short order, and Scattered will have that within 60 days.
>
> \*   \*   \*
>
> Q:     Okay.  And as part of agreeing to enter into the amended promissory note and the loan and security agreement, amended loan and security agreement, what, if any, financial information did Scattered review regarding these sites?
>
> A:     John Connolly prepared pro forma projections for IIT which were his estimates of the–each of the four sites and how he expected those sites would perform based on certain assumptions he was making.  I review those with Mr. Connolly, and we discussed what—in round numbers when certain sites would be coming online, how much would be required to complete those sites, and laid out a schedule of when advances would be needed to be made.  And it was arrived at that $3 million would be enough to fund the four sites that IIT wishes to develop.
>
> Q:     Okay.  So are you or are you not satisfied that the pro formas are reasonable?
>
> A:     They seemed reasonable.  And Mr. Connolly explained to me where the revenue numbers came from, the estimates, where the expense numbers came from.  And based on his experience, I believe the numbers to be reasonable.
>
> \*   \*   \*
>
> Q:     Okay.  And is there any question in your mind that Scattered has the ability to fund up to $3 million?

A:    There's no question in my mind that Scattered has the ability to fund $3 million.

\* \* \*

Q:    Okay.  Now there's $3 million available.  In the event that that amount proved to be inadequate, and presuming that the properties met the pro formas, what, if any, interest would Scattered have to fund more than $3 million?

A:    If IIT is meeting the pro forma projections, the only way that $3 million would be inadequate for it to fund all those projects would be because the projects are coming online more quickly than IIT estimates they'll be able to come online.  In that case, Scattered would be very willing to extend additional credit in order to complete the projects faster.  If IIT is not meeting its pro formas and the $3 million is inadequate, it's not likely Scattered would be willing to extend any additional credit.

(Tr. Part 1 at p. 37 line 5 – p. 42 line 4)

Moreover, even in light of the alleged compliance issues at two of the landfills, Scattered and Chiplease are still willing to lend to the Trust.  (Tr. Part 2 at 50)  Indeed, they are especially incentivized to lend to the Trust as long as it performs well insofar as they are its beneficiaries. (Tr. Part 2 at 21-22)

As argued more fully below, the Bankruptcy Court was required to accept as true Jahelka's unrebutted, unimpeached testimony.  The Bankruptcy Court improperly held the Trust to an impossible standard of absolute performance rather than taking the Trust's witnesses at their word.

**4.        In any event, the contracting parties have adequate remedies**.

The Bankruptcy Court expressed concern that the Trust, Chiplease and Scattered might not be susceptible to suit or involuntary bankruptcy in the event of a breach.  Both the law and the facts confirm that the contracting parties to the Landfill Agreements have ample recourse in the event of a breach.

(a)     **The Trust is a business trust that can be sued or forced into bankruptcy**.

The Illinois Trust & Trustee Act permits creation of this kind of trust.  760 ILCS 5/1, *et seq.*  The Trust is operating a business, and its trustee, Mr. Connolly, testified at length as to the business activity he intends to conduct in the Trust's name--as opposed to merely holding title to property.  The Trust agreement itself provides the trustee with broad powers, *e.g.*, to enter into leases, to borrow money "for any purpose," to compromise claims and to execute contracts. (Trust Agreement, Trial Exhibit 1 at § 6)  Additionally, under Illinois law, the Trust has the power to prosecute claims.  760 ILCS 5/3.  These claims potentially could include suits against Chiplease and/or Scattered under the loan agreements.

Under bankruptcy law, the definition of a "corporation" includes a business trust and defines a "person" to include a "corporation."  11 U.S.C. § 101(9)(v), (41).  Furthermore, Bankruptcy Code Section 109 renders a business trust eligible to be a debtor under title 11.  In determining whether a trust is a business trust, and thus, eligible to be a debtor, courts look to certain factors, whether the trust, for example, holds title to property, has centralized management and can conduct business and share profits.  *In re Gurney's Inn Corp. Liquidating Trust*, 215 B.R. 659, 662 (Bankr. E.D.N.Y. 1997).  In the instant case, the Trust agreement meets these criteria.  (Trial Exhibit 6)  Moreover, the Trust already has started to conduct business in connection with the Landfill Agreements by entering into contracts with task-specific service providers.  (Trial Exhibits 8-13)  Clearly, the Trust is subject to title 11.

Finally, the Trust has assets that are susceptible to collection by virtue of Chiplease assigning to it the physical assets that RTC assigned to Chiplease in the March 2006 settlement

agreement. (Dkt. No. 3170; *see also*, Memorandum Of Beneficiary Designation between Chiplease, Scattered and the Trust, Trial Ex. 2)

### (b)    Scattered and Chiplease can be pursued for recovery.

There was <u>no evidence</u> at trial that Scattered or Chiplease is thinly capitalized. On the contrary, the testimony reveals assets of Scattered and Chiplease that are available for recovery in the event of a breach, for example:

- Scattered's current assets are $15-16 million (Tr. Part 2 at 12); it has an 85 percent interest in a partnership that owns real property located at 330 South Wells in Chicago, Illinois, in which property there is $3-4 million of equity (Tr. Part 1 at 30-31);

- Scattered receives approximately $700,000 of "free cash flow" per month from its interest in H&M Oil & Gas, LLC (Tr. Part 1 at 32-33)

- Chiplease receives $150,000 per month (after expenses) from its loans and leases (Tr. Part 2 at 14); Chiplease's current liquid assets are approximately $1.2 million (*Id*. at 28).

- Shortly before trial, Chiplease received $1.1 million in cash from Sugar Island Partners, a real estate partnership in which Chiplease is still owed 30 perecent of an approximately $18 million loan. (*Id*. at 36-38)

The Bankruptcy Court held the Trust to an impossibly high standard of essentially guaranteeing, *inter alia*, Chiplease's and Scattered's (i) future performance under the loan agreements and (ii) solvency in the event of a breach.[5] Under Section 365(f), all the Trust is required to show is that it has access to money with which to pay its obligations under the

---

[5]    Moreover, the Bankruptcy Court noted that Chiplease and Scattered are not publicly held companies. (Tr. Part 2 at p. 190) The Trust is not aware of any requirement in the Section 365(f) case law requiring an assignee to obtain a guaranty from a publicly held company.

Landfill Agreements. *Bygaph,* 56 B.R. at 605. The Bankruptcy Court erred, and should be reversed, for failing to recognize applicable law and for refusing to accept the adequate remedies attested to by the Trust's witnesses.

> **B.    The bankruptcy court erred in not accepting as true the unrebutted testimony of the Trust's witnesses.**

In Illinois, a finder of fact may not simply reject unrebutted testimony. *Bucktown Partners v. Johnson*, 119 Ill.App.3d 346, 353-55, 456 N.E.2d 703 (1983); *Sweilem v. Illinois Dept. of Revenue*, 372 Ill.App.3d 475, 485, 865 N.E.2d 459, 468 (1st Dist. 2007). This is true even though the witness may be an interested party or an employee of one of the parties. *Sweilem*, 372 Ill.App.3d at 485. In fact, a judge or jury may not discount witness testimony unless it was impeached, contradicted by positive testimony or circumstances, or found to be inherently improbable. *Id*. Under Illinois law, a witness' testimony is inherently improbable if it contradicts human nature or experience, pushing it beyond the limits of human belief, or if the witness himself demonstrates the falsity of the testimony. *Bucktown Partners*, 119 Ill.App.3d at 354.

In *Sweilem*, the plaintiff/taxpayer testified at trial that he had attended a meeting with his attorneys, the revenue department and an administrative law judge to discuss his tax liability. 372 Ill.App.3d at 479. The department of revenue objected to the mention of a meeting because no procedure or regulatory mechanism existed for it, and thus, it could not have occurred. *Id*. at 480. However, it did not call any witnesses or move to admit any evidence at trial about the lack of a meeting. *Id*. at 481. The trial court ruled against the plaintiff. The appellate court, following the Illinois Supreme Court in *Bucktown*, determined that the fact that the revenue regulations did not provide a specific framework for such a meeting did not render the witness' unrebutted testimony "inherently improbable" or prove that the meeting did not occur. *Id*. at

485. Nor did the absence of documents supporting the occurrence of the meeting persuade the court that the meeting did not occur. *Id.* at 486. The appellate court concluded that the trier of fact should have taken the taxpayer's testimony as true. *Id.* The appellate court reversed and remanded.

In this case, the Bankruptcy Court ignored the unrebutted, unimpeached testimony of the Trust's witnesses, John Connolly, Leon Greenblatt and Andrew Jahelka. Examples abound:

- Jahelka testified without rebuttal or impeachment that they would cause Scattered and Chiplease to make the loan to the Trust pursuant to the loan agreement, *supra*.

- Connolly testified without rebuttal or impeachment that he is taking steps to obtain new operating permits. (*See e.g.*, Tr. Part 2 at 177-178)

- Greenblatt and Jahelka testified without rebuttal or impeachment about Scattered and Chiplease's assets, *supra*.

One particular example is telling. John Connolly testified that the Trust would use the line of credit only to finance operations at the four sites relating to the Landfill Agreements, as follows:

> Q:     Now you've testified that IIT is going to draw on this $3 million line of credit with Scattered and Chiplease to finance its operations at Litchfield, Bloomington, Sangamon, and Peoria?
> A:     That's correct.
> Q:     *Will you use the loan for any other purposes or any other sites?*
> A:     *No. In fact, I think the loan agreement is specific to those four sites*.

(Tr. Part 1 at p. 204 line 17 – p. 205 line 1) (Emphasis added.)

Connolly was neither impeached nor contradicted. But in a colloquy with the Trust's counsel at the end of trial, the Bankruptcy Court implied that it would not accept Connolly's testimony as true, as follows:

Mr. Jordan:     Yes, but you do have the testimony of the witnesses who say that the monies are only going to be used for this purpose.
Court: That's what they say.  I don't know that's—that testimony creates any legal obligation that would be enforceable by Peoria or Allied.
Mr. Jordan:     But there is no counter testimony.  I mean, you know, we can only go off what the testimony is.
Court: That's right.
Mr. Jordan:     We can't go off of what we would like somebody else to say.  And, you know, we are here today looking at the evidence before the court.  And there is no evidence that either of these entities lacks the ability to fund.
Court: Okay.

(Tr. Part 2 at p. 201 line 12 – p. 202 line 12)

The Bankruptcy Court did not provide any rationale or make any finding that Connolly's testimony beyond belief or inherently improbable.  In disregarding this unrebutted, uncontroverted evidence, the Bankruptcy Court made reversible error.

### C.     The Bankruptcy Court erred in failing to consider additional evidence of the Trust's adequate assurance of future performance.

The Bankruptcy Court should have granted the Trust a new trial pursuant to Fed. R. Civ. P. 59 and Fed. R. Bankr. P. 9023, based on new evidence, which very likely would have changed the outcome at trial.

At the conclusion of the trial on the Motion To Assign, the Bankruptcy Court denied the Motion To Assign but invited the Chapter 7 Trustee and the Trust to propose another arrangement for assumption and assignment of the Landfill Agreements.  (Tr. Part 2 at 258-59)  Accordingly, through the Motion To Consider, the Trust provided additional evidence of adequate assurance of future performance (Dkt. No. 4182), only to see the Bankruptcy Court immediately deny the Motion To Consider.

The first of the additional circumstances offered in the Motion To Consider was the Trust's proposed irrevocable assignment of its rights under the Landfill Agreements to Illinois

Generating Station #1 Inc.  (Dkt. No. 4182 at 6; Dkt. No. 4188 at Ex. 2-4; Dkt. No. 4199 at Ex. 9-12)  The assignment would take place following entry of a Bankruptcy Court order granting the Motion To Assign.  (*Id.*)  This circumstance would have alleviated the Bankruptcy Court's stated concern that the Trust, which the court believed not to be a business trust under Illinois law, could not be forced into bankruptcy by its creditors.  Certainly Illinois Generating Station #1 Inc. could be involuntarily placed into a bankruptcy proceeding.

Next, Illinois Generating Station #1 Inc. appointed John Connolly as its sole director and officer and signed him to an employment agreement.  (Dkt. No. 4182 at 6; Dkt. No. 4188 at Ex. 5-6)  This circumstance should have alleviated the Bankruptcy Court's concern that the Trust could never be the subject of a suit for personal liability by its creditors.

Third, Illinois Generating Station #1 Inc. entered into loan agreements with Chiplease and Scattered, which require that the funds to be loaned be used only to fund operations under the Landfill Agreements.  (Dkt. # at 7-8; Dkt. # at 1, 5-6)  Furthermore, these revised loan agreements provide the counterparties to the Landfill Agreements with rights, as third-party beneficiaries, to compel Scattered and Chiplease to fund under the loan agreements in order to satisfy the obligations under the stipulations between the Trust and the contracting parties.  (*Id.*)  This circumstance should have alleviated the Bankruptcy Court's concern that the contracting parties had no remedies in the event that the funds were not loaned to the Trust.

Finally, Scattered and Chiplease delivered $500,000.00 to Illinois Generating Station #1 Inc. for use in funding the obligations under the Landfill Agreements.  (Dkt. # at 8; Dkt. # at Ex. 7)  This circumstance should have alleviated the Bankruptcy Court's concern that Scattered and Chiplease would not release the funds to the Trust.

In sum, after the Bankruptcy Court provided the Trust with a roadmap of the Bankruptcy Court's alleged concerns, the Trust diligently and quickly worked to provide more evidence of adequate assurance of future performance with the concrete evidence discussed above. But then the Bankruptcy Court ignored the new evidence and continued to hold the Trust to a higher, stricter standard than that required under Section 365(f). It seems to the Trust that, under the Bankruptcy Court's interpretation of "adequate assurance of future performance," only Goldman Sachs and Bill Gates can become assignees of executory contracts.

> **D.** **Allied, Sangamon and American Disposal have not established their standing.**

To have standing in a bankruptcy matter, a person must establish that he is directly and adversely affected pecuniarily by an order or by relief. *In re Andreuccetti*, 975 F.2d 413, 416 (7th Cir. 1992).

Allied, Sangamon and American Disposal never established how their pecuniary interests were affected by the Motion To Assign, the order denying assumption and assignment, the Motion To Consider or the order denying the Motion To Consider. To be sure, there are no documents in the record that support the <u>alleged</u> assignments of (i) the Litchfield Agreement from Liberty Waste Service of Ohio to to Allied and American Disposal, (ii) the Bloomington Agreement from John Sexton Contractors Co. to American Disposal, and (iii) the Springfield Agreement from ESG Watts to Sangamon. Accordingly, Sangamon, Allied and American Disposal should not have been permitted to be heard with respect to the Landfill Agreements.

## V.    <u>Conclusion</u>

Based upon the evidence at trial and the foregoing legal precedent, the Trust submits that this Court should enter an order reversing the orders of the Bankruptcy Court and remanding for

a new trial on the additional circumstances presented in connection with the Chapter 7 Trustee's

assumption and assignment of the Landfill Agreements to the Trust.

**ILLINOIS INVESTMENT TRUST
NO. 92-7163**

By:  /s/ Colleen E. McManus
        One of its attorneys

Louis D. Bernstein (ARDC # 6192379)
Colleen E. McManus(ARDC # 06243473)
Much Shelist Denenberg Ament
     & Rubenstein, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, IL  60606
Phone:  312-521-2000
Fax:  312-521-2100
cmcmanus@muchshelist.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on June 27, 2008 she served copies of this

brief on all parties listed below **via messenger**.

Linda M. Kujaca
SmithAmundsen LLC
150 N. Michigan Ave.
Suite 3300
Chicago, IL 60601
**Counsel for City of Peoria and County of**
          **Peoria, Illinois**

Robert S. O'Meara
Ann Pille
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606
**Counsel for Allied Waste Industries,**
          **American Disposal Service of Illinois, Inc.**
          **and Sangamon Valley Landfill, Inc.**

**George P. Apostolides**
**Arnstein & Lehr LLP**
**120 S. Riverside Plaza, Suite 1200**
**Chicago IL 60606**
**Counsel for Jay A. Steinberg, not individually but**
          **as Chapter 7 Trustee for the Estate of Resource**
          **Technology Corporation**

                                        /s/ Colleen E. McManus