**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 08-cv-2425 |
| | ) | (Consolidated) |
| RESOURCE TECHNOLOGY CORPORATION, | ) | Hon. Matthew F. Kennelly |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | Appeal from |
| | ) | Case No. 99 B 35434 |
| | ) | |
| _____ ) | | Hon. Eugene R. Wedoff |

**BRIEF OF APPELLEES ALLIED WASTE INDUSTRIES, INC.,**
**AMERICAN DISPOSAL SERVICES OF ILLINOIS, INC.,**
**AND SANGAMON VALLEY LANDFILL, INC.**

Robert S. O'Meara
Adam R. Chiss
Ann E. Pille
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207-1000

*Attorneys for Allied Waste Industries, Inc.,*
*American Disposal Services of Illinois, Inc., and*
*Sangamon Valley Landfill, Inc.*

# TABLE OF CONTENTS

I.     STATEMENT OF APPELLATE JURISDICTION..................................................1

II.    ISSUES PRESENTED ON APPEAL ...........................................................1

III.   STANDARD OF REVIEW ...........................................................................2

IV.    FACTS RELEVANT TO THE ISSUES PRESENTED FOR REVIEW ...................3

       A.    The Landfill Agreements.....................................................................3

       B.    The Motion To Assume And Assign The Landfill Agreements.........................4

       C.    The Bankruptcy Court Denies The Motion To Assume And Assign
             The Landfill Agreements And The Motion To Consider New Evidence..........6

V.     LEGAL ARGUMENT................................................................................8

       A.    The Bankruptcy Court Applied The Correct Legal Standard For
             Determining Adequate Assurance Of Future Performance. ............................9

             1.    The Bankruptcy Court's Decision That IIT Failed To Provide
                   Adequate Assurance Of Its Financial Ability To Perform
                   Under The Landfill Agreements Was Not Clearly Erroneous. ..........10

                   a.    There was no documentary evidence submitted at trial
                         that Scattered or Chiplease could provide the funding
                         needed by IIT.............................................................11

                   b.    The testimony of Mr. Jahelka and Mr. Greenblatt was
                         unreliable and uncorroborated................................................13

                   c.    The requirement of adequate assurance of future
                         performance under Section 365 of the Bankruptcy Code
                         cannot be satisfied without some showing that the
                         proposed assignee can adequately perform in the future........18

             2.    The Bankruptcy Court Did Not Rule On The Competency Or
                   Qualifications Of IIT's Personnel....................................................20

             3.    IIT Attempts To Improperly Shift Its Burden To Allied. ...................22

             4.    The Bankruptcy Court Did Not Err When It Determined That
                   Inadequate Remedies Existed In The Event Of A Breach By
                   Either The Lenders Or IIT. ................................................23

                   a.    IIT would not sue the Lenders in the event of a breach...........23

        b.      **Because IIT is a common law trust, Allied lacks effective remedies to pursue IIT in the event of a breach under the Landfill Agreements.** ........................................25

  B.    **The Bankruptcy Court Did Not Err In Denying IIT's Motion To Allow For The Presentation Of Addition Circumstances.** .............................28

      1.    **IIT's  Motion To Allow Proposes A Entirely New Transaction Created Post-Trial.** ..............................28

      2.    **The Bankruptcy Court Did Not Abuse Its Discretion When It Denied The Motion to Allow.** ..................29

  C.    **Allied, Sangamon, And American Disposal Have Standing In This Case.** .............................33

      1.    **IIT Cannot Properly Raise A Standing Objection.** .............................33

      2.    **IIT Has Waived Any Objection To Allied's "Standing."** ...................35

      3.    **IIT Has Admitted That Allied Is The Proper Counter-Party To The Landfill Agreements.** .......................37

**VI.**    **CONCLUSION** ............................39

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Bessemer City,*
   470 U.S. 564 (1985)....................................................................................................5

*Bucktown Partners v. Johnson,*
   119 Ill. App. 3d 346 (1st Dist. 1983)........................................................................17

*Bucktown Partners v. Johnson,*
   119 Ill. App. 3d 346, 456 N.E.2d 703 (1st Dist. 1983)..............................................16

C 20351,
   1991 WL 167008 (N.D. Ill. 1991) .....................................................................1, 2, 5

*Duwamish Tribe of Indians v. United States,* 79 Ct. Cl. 530, 576 (Ct. Cl. 1934).........................17

*Dickerson v. Board of Ed.,*
   32 F.3d 1114 (7th Cir. 1994) ....................................................................................34

*Harrington v. City of Chicago,*
   433 F.3d 542 (7th Cir. 2006) ....................................................................................32

*Hickory Farms, Inc. v. Snackmasters, Inc.,*
   509 F. Supp. 2d 716 (N.D. Ill. 2007).........................................................................32

*IPEC, Inc. v. International Lithograph Corp.,*
   869 F.2d 1080 (7th Cir. 1989) ....................................................................................5

*In re Alipat, Inc.,*
   36 B.R. 274 (Bankr. E.D. Mo 1984).........................................................................13

*In re Aurora Home Servs., Inc.,* No. 99 C 7898, 2000 WL 1468314 (N.D. Ill 2000) ..................38

*In re Bon Ton Rest. & Pastry Shop, Inc.,*
   53 B.R. 789 (Bankr. N.D. Ill 1985) ..........................................................................23

*In re Bygaph, Inc.,*
   56 B.R. 596 (Bankr. S.D. N.Y. 1986)........................................................................21

*In re Carter Hawley Hale Stores, No.* LA 91-64140,
   1991 Bankr. LEXIS 2186 (Bankr. C.D. Cal. July 30, 1991) .....................................17

*In re Edwards, No. 89 C 20351, 1991 WL 167008, *3 (N.D. Ill. 1991)*...........................................5

*In re Estate of Assignment for the Benefit of Creditors of Edward Paul May,*
    2008 Bankr. LEXIS 1525 (Bankr. E.D. Mich. May 27, 2008)..............................................28

*In re General Oil Distribs., Inc.,*
    18 B.R. 654 (Bankr. E.D. N.Y. 1982) ................................................................................14

*In re Gurney's Inn Corp. Liquidating Trust,*
    215 B.R. 659 (Bankr. E.D. N.Y. 1997) .............................................................................30

*In Re Natco Industries,*
    54 B.R. 436 (Bankr. S.D. N.Y. 1985)................................................................................21

*In re Prime Motor Inns, Inc.,*
    166 B.R. 993 (Bankr. S.D. Fla. 1994) ...............................................................................22

*In re Prince,*
    85 F.3d 314 (7th Cir. 1996) ...............................................................................................32

*In re Rachels Indus., Inc.,*
    109 B.R. 797 (Bankr. W.D. Tenn 1990)........................................................................13, 21

*In re Resource Tech. Corp.,*
    528 F.3d 467 (7th Cir. 2008) ...............................................................................................4

*In re Texas Health Enters., Inc.,*
    246 B.R. 832 (Bankr E.D. Tex. 2000) ................................................................................13

*In re Texas Health Entes., Inc.,* 72 Fed. Appx. 122 (5th Cir. 2003).......................................13, 16

*In re Westview 74th St. Drug Corp.,*
    59 B.R. 747 (Bankr. S.D.N.Y. 1986)...........................................................................13, 21

*In re Woodbrook Assocs.,*
    19 F.3d 312 (7th Cir. 1994) .................................................................................................5

*International Travelers Cheque Co. v. BankAmerica Corp.,*
    660 F.2d 215 (7th Cir. 1981) .............................................................................................39

*Lee v. Deloitte & Touche LLP,*
    428 F. Supp. 2d 825 (N.D. Ill. 2006)..................................................................................38

*Marshall v. Amalgamated Ins. Agency Servs., Inc.,*
    523 F. Supp. 231 (N.D. Ill. 1981).......................................................................................32

*Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*,
    866 F.2d 228 (7th Cir. 1988) ........................................................................5

*Passamaquoddy Tribe v. United States*,
    82 Fed. Cl. 256 (Fed. Cl. 2008) ...................................................................17

*Peacock v. Board of Sch. Comm'rs*,
    721 F.2d 210 (7th Cir. 1983) ................................................................32, 33

*Rogers v. Samedan Oil Corp.*,
    308 F.3d 477 (5th Cir. 2002) ......................................................................39

*Sternberger v. United States*,
    401 F.2d 1012 (Ct. Cl. 1968) ......................................................................17

*Sweilem v. Illinois Dept. of Revenue*,
    372 Ill. App. 3d 475, 865 N.E.2d 459 (1st Dist. 2007)................................16

*Texas Health Enters. v. Lytle Nursing Home Enters., Inc. (In re Tex. Health Enters.)*, 72
    Fed. Appx. 122, 125 (5th Cir. 2003)..............................................................5

*United Healthcare Corp. v. American Trade Ins. Co.*,
    88 F.3d 563 (8th Cir. 1996) ........................................................................39

## STATUTES

11 U.S.C. § 101(41) ...........................................................................................28

11 U.S.C. § 101(9) .............................................................................................28

11 U.S.C. § 109 ..................................................................................................28

28 U.S.C. § 158(a)(1) ..........................................................................................4

760 ILCS 5/1  ....................................................................................................30

Fed. R. Bankr. P. 8010........................................................................................4

Fed. R. Bankr. P. 8013................................................................................ passim

Fed. R. Civ. P. 59 .................................................................................10, 31, 32

Fed. R. Evid. 201(b)....................................................................................37, 40

## <u>OTHER AUTHORITY</u>

Report of Commission on Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, 93 Cong., 1st Sess. Pt. II 156-57 (1973) ................................................................13

12 *Moore's Federal Practice* § 59.13[4] at 59-95 ............................................32, 33, 34

Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 2808 ................................29

Pursuant to Fed. R. Bankr. P. 8010, Appellees, Allied Waste Industries, Inc., American Disposal Services of Illinois, Inc., and Sangamon Valley Landfill, Inc. (collectively referred to herein as "Allied"), hereby respond to Illinois Investment Trust No. 92-7163's ("IIT") Brief in Support of its Appeal. Although the appellants, Jay A. Steinberg, as Chapter 7 Trustee (the "Trustee") for the estate of Resource Technology Corporation ("RTC"), and IIT filed substantially identical notices of appeal and issues to be presented in this case, only IIT has filed a brief in support of its appeal. Accordingly, Allied's brief addresses the arguments raised by IIT.

## I.    STATEMENT OF APPELLATE JURISDICTION

District courts of the United States have jurisdiction to hear appeals from final judgments, orders and decrees entered by bankruptcy courts. 28 U.S.C. § 158(a)(1). Appeals from orders resulting in a denial of a motion to assume and assign executory contracts have been held to be final orders. *See In re Resource Tech. Corp.*, 528 F.3d 467, 474 (7th Cir. 2008). Accordingly, jurisdiction is proper in this Court.

## II.    ISSUES PRESENTED ON APPEAL

IIT identifies eight (8) issues on appeal. Allied disagrees with IIT's statement of issues number two and eight. As framed by IIT, issue number two erroneously assumes that the Bankruptcy Court required greater assurance of future performance in the proposed assignment to IIT. It did not. Accordingly, Allied restates issue number two as follows:

> 2.    Did the Bankruptcy Court apply the wrong legal standard for determining whether IIT could provide adequate assurance of future performance under Section 365 of the Bankruptcy Code?

With respect to issue number eight, IIT mischaracterizes its post-trial efforts as the presentation of "additional evidence." IIT did not attempt to present additional evidence. Instead, after the Bankruptcy Court ruled against it following a two-day trial, IIT attempted to

place an entirely new transaction with a new proposed assignee before the Bankruptcy Court on

a post-trial basis.  Accordingly, Allied restates issue number eight as follows:

> 8.    Did the Bankruptcy Court err when it denied IIT's post-trial motion to assume
> and assign the Landfill Agreements to a new assignee in a new transaction after
> the deadline for assuming and assigning executory contracts had already expired?

## III.    <u>STANDARD OF REVIEW</u>

The Bankruptcy Court's findings of fact are upheld on appeal unless they are determined

to be clearly erroneous, and due regard must be given to the Bankruptcy Court's evaluation of

witness credibility. Fed. R. Bankr. P. 8013.  Conclusions of law are reviewed *de novo*. *In re*

*Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994). Whether a debtor has provided adequate

assurance of future performance is a finding of fact reviewed under the clearly erroneous

standard.  *Texas Health Enters. v. Lytle Nursing Home Enters., Inc. (In re Tex. Health Enters.)*,

72 Fed. Appx. 122, 125 (5th Cir. 2003).  The clearly erroneous standard is "a tough test" and the

party seeking to demonstrate a lower court's findings of fact as clear error "has a heavy burden

to bear." *In re Woodbrook Assos.*, 19 F.3d at 316; *In re Edwards*, No. 89 C 20351, 1991 WL

167008, *3 (N.D. Ill. 1991), quoting *IPEC, Inc. v. International Lithograph Corp.*, 869 F.2d

1080, 1083 (7th Cir. 1989).

If a lower court's factual findings are plausible when viewing the record as a whole, then

the reviewing court may not reverse even if it is convinced that it would have weighed the

evidence differently if it had been sitting as the trier of fact.  *Anderson v. Bessemer City*, 470

U.S. 564, 573-74 (1985).  As stated another way by the Seventh Circuit, "[t]o be clearly

erroneous, a decision must strike us as . . . wrong with the force of a five-week-old,

unrefrigerated, dead fish."  *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc*., 866 F.2d 228, 233

(7th Cir. 1988).

IV.     **FACTS RELEVANT TO THE ISSUES PRESENTED FOR REVIEW**

    A.     **The Landfill Agreements**

This appeal involves the denial by the Bankruptcy Court of the Trustee's motion to assume and assign three landfill gas-to-energy contracts relating to Allied and one contract involving the City and County of Peoria.

With respect to Allied, the three landfill agreements at issue are: (i) a Landfill Agreement dated December 29, 1995, originally entered into between RTC and John Sexton Contractors Co., that required RTC to construct and operate a landfill gas-to-energy facility at a landfill in located in Bloomington, Illinois (the "Bloomington Agreement") (AW Ex. 6.)[1]; (ii) a Landfill Agreement dated May 26, 1995, originally entered into between RTC and ESG Watts, Inc., that required RTC to construct and operate a landfill gas-to-energy facility at a landfill in Springfield, Illinois (the "Springfield Agreement") (AW Ex. 8); and, (iii) a Landfill Agreement dated December 30, 1996, originally entered into between RTC and Liberty Waste Services of Ohio, that required RTC to construct and operate a landfill gas-to-energy facility at a landfill in Litchfield, Illinois (the "Litchfield Agreement") (AW Ex. 5.)

After RTC entered into contracts with the landfill owner of each site, Allied purchased the Litchfield, Bloomington and Sangamon landfills in separate transactions from ESG Watts, Liberty Waste Services and John Sexton Contractors.  As a result of those purchases, Allied

---

[1]     Citations to the record on appeal will be to the Bankruptcy Court docket number of a particular document ("DN __"); to the transcripts of the February 12-13, 2008 trial, the March 5, 2008 hearing, and the March 11, 2008 hearing ("2/12/08 Tr., p. ___."), and to the trial exhibits contained in Allied's Designation of Additional Items to be Included On Appeal as ("AW Ex. ___".).  For the Court's reference, because the four transcripts are heavily cited, Allied is submitting an appendix in conjunction with its response brief that contains a complete copy of all four transcripts.  In addition, the appendix includes docket numbers 2840, 2976, 3185, 3807, 3819, which were not included in the record on appeal (see footnotes 7 and 11 and accompanying text.)

acquired the rights to the Litchfield and Bloomington contracts, and the rights to enforce the Sangamon contract. (the Bloomington, Litchfield and Sangamon agreements are collectively referred to hereinafter as the "Landfill Agreements").

      B.      **The Motion To Assume And Assign The Landfill Agreements**

In 1999, certain creditors filed an involuntary petition against RTC for relief under Chapter 7 of the Bankruptcy Code. (DN 1.) Thereafter, RTC converted the case to a Chapter 11 reorganization. RTC operated its bankruptcy estate as a debtor in possession until August 26, 2003, at which time the U.S. Trustee appointed Gregg E. Szilagyi as Chapter 11 Trustee for RTC. (DN 1804.) The Chapter 11 Trustee operated the estate until September 21, 2005, when the case was converted back to a Chapter 7 liquidation and Jay A. Steinberg was appointed as the Chapter 7 Trustee. (the "Trustee")(DN 2577.)

On February 17, 2006, the Chapter 7 Trustee filed a motion for authority to enter into a settlement agreement (the "Settlement Agreement") with certain secured creditors including Leon Greenblatt, Banco Panamericano, Chiplease, Inc. and Scattered Corporation. (DN 3091.) Scattered and Chiplease are referred to herein collectively as the "Lenders." As part of the Settlement Agreement, and over the objection of Allied and other landfill owners, the Lenders acquired the fight to designate executory contracts held by the Estate that the Trustee would be required to assume under Section 365 of the Bankruptcy Code and then assign to the Lenders or the Lenders' designee. If the Trustee refused to seek the Bankruptcy Court's approval to assume and assign a contract designated by the lenders, then the Lenders had the right to file a motion to compel the Trustee to do so. (DN 3170 at Exhibits A & C.) The Bankruptcy Court approved the Settlement Agreement on March 16, 2006. (DN 3170.)

On April 28, 2006, the Chapter 7 Trustee filed a motion to assume and assign the Landfill Agreements to the Lenders. (DN 3249.) Following Allied's objection to that motion, the Trustee

refused to assume and assign the Bloomington Agreement absent a motion to compel. Accordingly, on May 26, 2006, the Lenders filed a motion to compel the Chapter 7 Trustee to assume and assign the Bloomington Agreement.  (DN 3327.)  On June 29, 2006, the Bankruptcy Court granted the motion to compel as to the Bloomington Agreement and ordered the Chapter 7 Trustee to file a motion to assume and assign that agreement and all other remaining contracts by the deadline of July 7, 2006.  (DN 3462.)  Thereafter, the Court would allow the counter-parties to any designated contract to file an objection, and each proposed assumption and assignment would be scheduled for discovery and a trial to determine whether the Lenders could pay the cure costs and demonstrate adequate assurance of future performance.  *Id*.

On July 7, 2006, the Trustee filed his last *Motion of Chapter 7 Trustee Pursuant To This Court's Order Compelling Trustee to Assume And Assign Certain Executory Contracts Subject to Court Approval of (1) Demonstration By The Purchasers Of The Ability To Pay Cure Costs; (2) Demonstration By The Purchasers Of Adequate Assurance of Future Performance; (3) Assumption; And (4) Assignment*.  (DN 3478.)  The Bloomington Agreement was included in that motion to assign.  (*Id*.)  Because the Chapter 7 Trustee had not refused to seek the assumption and assignment of the Sangamon and Litchfield Agreements following the filing of his April 28, 2006 motion to assume and assign, those contracts were carried along with the July 7, 2006 motion.  For ease of reference, the April 28, 2006 motion seeking to assume and assign Allied's Litchfield and Sangamon Agreements, and the July 7, 2006 motion seeking to assume and assign the Bloomington Agreement shall hereinafter be referred to as the "Motion to Assign."

Following the filing of the Motion to Assign, the Bankruptcy Court set a scheduling order and a trial date on the issue of cure costs relating to the Landfill Agreements.  The Bankruptcy

- 5 -

Court's preference was to first hold trials on the issue of cure costs and, assuming the Lenders could satisfy a particular contract's cure amount, then hold a trial on adequate assurance of future performance.   On March 13, 2007, prior to the cure cost trial on the Landfill Agreements, Allied and the Lenders' proposed designee, Illinois Investment Trust No. 92-7163, agreed to a Stipulation in Lieu of Trial ("Stipulation"), wherein they stipulated to the amount of cure costs IIT would pay Allied under each Landfill Agreement if and when the Bankruptcy Court granted the Motion to Assign following an adequate assurance trial.  (DN 3875.)

The Stipulation provided that if IIT were to be assigned the Landfill Agreements following an adequate assurance trial, it would pay Allied cure costs of $500,000 relating to the Sangamon Agreement, $449,000 relating to the Bloomington Agreement, and $400,000 relating to the Litchfield Agreement.  (*Id*.)  In addition, the Stipulation required IIT to post a performance bond of $1.375 million at each of the Sangamon and Litchfield sites, and $1.75 million at the Bloomington site.  (*Id*.)  Each of the cure cost payments and performance bonds were a condition precedent to IIT performing any work at the landfill sites under the Landfill Agreements. *(Id.)* IIT entered into a similar stipulation with the City and County of Peoria.

C.    **The Bankruptcy Court Denies The Motion To Assume And Assign The Landfill Agreements And The Motion To Consider New Evidence**

On February 12-13, 2008, the Bankruptcy Court conducted a trial on the Motion to Assign in order to determine whether the Chapter 7 Trustee, and IIT, could demonstrate adequate assurance of future performance relating to the Landfill Agreements (the trial included the City and County of Peoria's landfill agreement).  (DN 4097.)  IIT presented evidence of its corporate structure, its plans for each landfill site, its operations and staffing and, most importantly, its financial needs and a proposed loan agreement with the Lenders, finalized one week before trial,

whereby Scattered and Chiplease were allegedly going to loan IIT up to $3 million dollars in order to meeting its financial obligations under the Landfill Agreements. (2/12/08 – 2/13/08 Tr.)

At the conclusion of the two-day trial, the Bankruptcy Court issued its ruling from the bench denying the Motion to Assign. (2/13/08 Tr. pp. 252-261.) On February 14, 2008, an order was issued denying the Motion to Assign for the reasons stated on the record at trial. (DN 4176.) The principal but not only basis on which the Bankruptcy Court ruled was the lack of assurance that funds necessary to honor IIT's obligations under the Landfill Agreements would actually be available:

> The principle and the basis on which I am rendering my decision today is that the counter-parties to this contract, these contracts, have no ability to assure that the funds necessary for performance by the proposed assignee will actually be made available.

(2/13/08 Tr. p. 261:2-7.)

After the trial, on February 29, 2008, the Trustee and IIT filed a *Motion to Allow for the Presentation Of Additional Circumstances For The Stay of Enforcement Of The Court's Order And To Allow For The Assumption And Assignment Of Contracts* (the "Motion to Allow"). (DN 4182.) ITT's Motion to Allow sought to reopen the proofs in the case or, alternatively, for a new trial, in order to present an entirely new transaction with a new assignee and new loan documents pursuant to Fed. R. Civ. P. 59. It was IIT's intent that this new proposal would satisfy the requirements of adequate assurance where its previous proposal had failed. *(Id.)*

At the initial presentment of the Motion to Allow on March 5, 2008, the Bankruptcy Court again read into the record the detailed reasons why he held at trial that the Trustee and IIT failed to meet their burden in establishing adequate assurance future performance. (3/5/08 Tr. pp. 3-6.) The Bankruptcy Court also explained he was prepared to rule against IIT's Motion to Allow as both untimely and improper under Fed. R. Civ. P. 59 and 60. (3/5/08 Tr. pp. 6-17.)

- 7 -

The Bankruptcy Court briefly continued the Motion to Allow to await the issuance of the trial transcript, and ultimately denied the motion on March 11, 2008.  (3/11/08 Tr. p.8.)   At that hearing, the Bankruptcy Court also dispensed with IIT's argument that the Court had invited IIT to file a new proposal in order to establish adequate assurance after its first attempt was denied at trial.  (3/11/08 Tr. pp.2-8; DN 4188.)  This appeal followed.

## V.    <u>LEGAL ARGUMENT</u>

At trial, IIT's adequate assurance showing consisted of a plan to construct and/or operate landfill gas-to-energy conversion systems at each of the landfills pursuant to the terms of the Landfill Agreements.  By IIT's own estimates, it needed access to approximately $3 million to comply with its cure cost obligations and its obligations under the Landfill Agreements.  As IIT had only $1,000 of recently deposited funds in its bank account, and no real operating history since it was created in 1992, it needed a source of capital to fund its proposed operations.  Thus, while IIT proposed to provide the staffing and operational experience to operate under the Landfill Agreements, Scattered and Chiplease were to provide IIT with the necessary funding via a loan agreement and promissory note to IIT.  As a result of this proposed structure, the question of whether IIT would likely receive the funds from the Lenders was a critical component of demonstrating adequate assurance.

The Bankruptcy Court identified three issues that the Trustee and IIT had the burden of proving by a preponderance of the evidence at trial in order to satisfy the adequate assurance standard.  Those three points were: (1) whether the $3,000,0000 promised by the Lenders in the loan agreement and promissory note would actually be received by IIT; (2) whether that money, if it was received, would be sufficient to operate under the Landfill Agreements, and (3) whether the individuals operating IIT would be able to comply with the obligations imposed by the Landfill Agreements.  (2/13/08 Tr. p. 179:9-19.; 3/5/08 Tr. p. 4:5-13.)

At the close of trial, the Bankruptcy Court concluded that the Trustee and IIT failed in their burden with respect to the first issue, and it was unnecessary to reach a decision on the remaining two issues. (3/5/08 Tr. p. 4:14-18.) In Judge Wedoff's words, the "basis for that determination, that the funding had not been shown to be sufficiently available, was multitudinous." (3/5/08 Tr. p. 4:19-21.)

IIT now challenges the Bankruptcy Court's findings on the basis that the Court misapplied the standard of what was required to show adequate assurance of future performance. IIT also claims that the Bankruptcy Court failed to accept the unchallenged testimony of its witnesses and failed to consider additional evidence of an alternative proposal following its loss at trial. It is IIT that misapplies the legal standard of what constitutes adequate assurance here on appeal and, moreover, ignores the overwhelming evidence that demonstrated that the funds promised to IIT, which IIT needed in order to comply with its obligations under the Landfill Agreements, were not sufficiently available. Accordingly, Judge Wedoff's decision was not clearly erroneous and should be affirmed.

### A.      The Bankruptcy Court Applied The Correct Legal Standard For Determining Adequate Assurance Of Future Performance.

IIT contends that the Bankruptcy Court applied the wrong legal standard in determining whether IIT had set forth adequate assurance of future performance. According to IIT, the Bankruptcy Court erred by (1) requiring an absolute guaranty of performance; (2) disregarding the experience and competence of IIT's personnel; (3) overlooking the fact there was no evidence that Scattered or Chiplease would breach their agreement to loan the funds to IIT, and (4) determining that IIT was a non-business trust that was not eligible for involuntary bankruptcy and could not be sued in its own name. As the evidence offered at trial demonstrates, IIT is wrong on each count. Judge Wedoff applied the correct legal standard, but IIT utterly failed to

meet its burden of proving adequate assurance of future performance by a preponderance of the evidence.

The burden at trial was on the Trustee, and IIT, as the moving party to show that IIT could provide adequate assurance of future performance. This standard requires IIT to have the financial and operational capacity, competence, and willingness to perform under the Landfill Agreements. *See In re Texas Health Entes., Inc.*, 72 Fed. Appx. 122, 126 (5th Cir. 2003). "'The terms adequate assurance of future performance' are not words of art; the legislative history of the [Bankruptcy] Code shows that they were intended to be given a practical, pragmatic construction." *In re Texas Health Enters.*, 72 Fed. Appx. at 126; *see also In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn 1990). According to the legislative history, "the phrase adequate assurance as used in section 365 is traced to the phrase 'adequate assurance' defined in § 2-609 of the Uniform Commercial Code." In re Texas Health Enters., Inc., 246 B.R. 832, 834 (Bankr E.D. Tex. 2000); *see also In re Alipat, Inc.*, 36 B.R. 274 (Bankr. E.D. Mo 1984). "What constitutes adequate assurance is to be determined by factual conditions; the [party] must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary or capricious." *In re Texas Health Enters.*, 246 B.R. at 835 (citing Report of Commission on Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, 93 Cong., 1st Sess. Pt. II 156-57 (1973)).

    1.    **The Bankruptcy Court's Decision That IIT Failed To Provide Adequate Assurance Of Its Financial Ability To Perform Under The Landfill Agreements Was Not Clearly Erroneous.**

Although adequate assurance does not mean absolute insurance that the contract will be performed, the intention is to afford the non-debtor parties "with a measure of protection from having to be saddled with a [party] that may continue to default and return to bankruptcy." *In re*

*Rachels Indus., Inc.* 109 B.R. at 803.  Further, where considerations of public health, safety, and welfare are implicated – such as here, where IIT would be tasked with safely installing and operating gas collection and conversion systems to control methane gas in compliance with all applicable environmental regulations -- the public interest demands a higher standard of assurance of future performance.  *In re General Oil Distribs., Inc.*, 18 B.R. 654, 658 (Bankr. E.D. N.Y. 1982).

> a.  **There was no documentary evidence submitted at trial that Scattered or Chiplease could provide the funding needed by IIT.**

IIT claims that because the original Landfill Agreements did not contain guarantees, security deposits, and letters of credit, the Bankruptcy Court erred at trial when it required IIT to satisfy "an impossible standard of absolute performance." (Appellant's Brief, p. 14.)  Yet the Bankruptcy Court required no such thing from IIT, and IIT can provide no cite to the record where Judge Wedoff applied such a standard.  Instead, as the Bankruptcy Court made abundantly clear, it focused on the evidence of IIT's financial ability to perform the Landfill Agreements and simply found it woefully lacking.

In order to meet its cure cost obligations and operate the Landfill Agreements, IIT needed significant outside funding. (Appellant's Brief, p. 7, 12.)  Rather than seek that funding from a recognized financial institution with millions of dollars in assets, IIT instead sought financing from Scattered and Chiplease, both of which were beneficiaries of IIT.[2]  The testimony of Scattered's and Chiplease's principals, even if it taken at face value, disclosed a distinct lack of

---

2        Mr. Connolly, IIT's trustee, testified that he did not seek out any other avenues of financing, and the sum total of his investigation into whether the Lenders had the financial ability to loan the necessary funds to IIT was that he asked them if they could do it and they said yes. (2/12/08 Tr. p. 206-208.)

liquid assets sufficient to provide the funding required by IIT, and absolutely no corroboration that either entity possessed the assets each claimed it did.

On direct examination, the president of Scattered, Andrew Jahelka, admitted that Scattered had not provided any funding to IIT, and did not have the present ability to do so, but he suspected that it might be able to do so "shortly." (2/12/08 Tr. pp. 37-38.) Mr. Jahelka claimed that Scattered held various assets including an indirect interest in an oil and gas partnership that could provide Scattered with approximately $700,000 a month in free cash flow, as well as an interest in a commercial building that was for sale (and tied up in litigation), and another commercial building allegedly worth millions. Yet, there was not a single iota of documentary evidence introduced at trial -- not a bank statement, a tax return, a financial statement, an appraisal or contract of any kind -- that established that Scattered actually had such assets or that they were worth what Mr. Jahelka claimed they were.

Similarly, Mr. Greenblatt, testified on behalf of Chiplease that it too had millions of dollars in assets and a free monthly cash flow of approximately $150,000 month that it could use to fund IIT. (12/13/08 Tr. p. 12, 14.) But, just like with Mr. Jahelka's testimony, neither Chiplease nor IIT introduced a scrap of documentary evidence that would establish Chiplease's assets, liabilities, cash flows or ability to fund the loan. Although Mr. Jahelka testified that Scattered did not prepare or maintain regular financial statement, income statements, balance sheets or a statement of the sources and uses of cash, Mr. Greenblatt testified that Chiplease did prepare and maintain such financial documents reasonably current. (2/12/08 Tr. pp. 42-43; 2/13/08 Tr. pp. 26:18-27:8.) Yet when asked how Chiplease would fund its obligations to IIT, the sum total of Mr. Greenblatt's explanation was "we would just pay." (2/13/08 Tr. p 15.)

- 12 -

As the Bankruptcy Court correctly summarized during closing arguments, the testimony of Mr. Greenblatt and Mr. Jahelka consisted of nothing more than empty promises:

> Okay.  Let me just point out that the best security you're offering to the counter-parties [i.e. the landfill owners] to these agreements that IIT will have the money that is needed to comply with IIT's obligations is the unsecured promise of Chiplease and Scattered Corporation to honor a loan commitment.  That's the security.
>
>            *                *               *
>
> But beyond that, it is completely unsecured.  They . . . [have to rely] on an unsecured promise by two corporations that are not publicly held, have no documentation that's been produced here as to what their financial circumstances are.  We have only the testimony of two individuals as to what their net worth and ability to make payments are.

(2/13/08 Trial Tr. pp. 189:11-190:14.)

Accordingly, it is was not clearly erroneous for the Bankruptcy Court find that a proposed assignee that fails to set forth any reliable evidence of its ability to satisfy the financial obligations under the contract it seeks to assignee has failed to establish adequate assurance of future performance.  *See e.g.  In re Texas Health Entes., Inc.*, 72 Fed. Appx. 122, 126 (5th Cir. 2003)(one factor is whether a debtor's financial data indicate an ability to generate income sufficient to meet its obligations.)

        **b.**        **The testimony of Mr. Jahelka and Mr. Greenblatt was unreliable and uncorroborated.**

In its opening brief, IIT lists what it purports to be evidence of the Lenders' ability to provide the funds IIT needs to operate under the Landfill Agreements.  IIT argues that this "evidence" is unrebutted and faults the Bankruptcy Court for allegedly disregarding it. (Appellant's Brief, pp. 17-19).  IIT cites *Bucktown Partners v. Johnson*, 119 Ill. App. 3d. 346, 353-55, 456 N.E.2d 703 (1st Dist. 1983) and *Sweilem v. Illinois Dept. of Revenue*, 372 Ill. App. 3d 475, 485, 865 N.E.2d 459, 468 (1st Dist. 2007), for the proposition that unrebutted testimony

- 13 -

cannot be disregarded unless it is impeached, contradicted by positive testimony or circumstances, or found to be inherently improbable.

The cases cited by IIT, however, deal with state law claims and apply state rules of evidence, not the federal rules of evidence. In cases involving bankruptcy law and, specifically, assignments under Section 365, courts will examine documentation of a proposed assignee's financial wherewithal to perform. *See e.g. In re Carter Hawley Hale Stores*, No. LA 91-64140, 1991 Bankr. LEXIS 2186, *11-13 (Bankr. C.D. Cal. July 30, 1991) (holding that assignee provided adequate assurance of future performance by presenting testimony <u>and</u> documentary evidence involving audited financial statements to demonstrate the equity and cash flow sufficient to meet monetary obligations of lease.)

Moreover, "[e]xaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision and errors may all breed disbelief and therefore the disregard of even uncontradicted nonopinion testimony." *Passamaquoddy Tribe v. United States*, 82 Fed. Cl. 256, 273 (Fed. Cl. 2008) (quoting *Sternberger v. United States*, 401 F.2d 1012, 1016-17 (Ct. Cl. 1968)); *Duwamish Tribe of Indians v. United States*, 79 Ct. Cl. 530, 576 (Ct. Cl. 1934) (emphasis added). Even the *Bucktown Partners* case relied upon by IIT holds that testimony may be disregarded if it lacks credence or is unworthy of belief, if it is surrounded by suspicious circumstances, if it is evasive, impossible and equivocal, or if legitimate inferences cause a reasonable doubt upon the truth or accuracy of the testimony. *Bucktown Partners v. Johnson*, 119 Ill. App. 3d. 346, 353-55 (1st Dist. 1983).

Here, the testimony offered by Messrs. Jahelka and Greenblatt was anything but unchallenged. Furthermore, it was unreliable, evasive and uncorroborated by any contemporaneous evidence. For example, Mr. Jahelka's testimony that Scattered, a company

with allegedly millions of dollars in assets, did not keep or maintain any statements reflecting its financial condition or affairs was certainly suspicious under the circumstances. (2/12/08 Tr. pp. 42-43.)  Even if true, it does not explain why Scattered did not prepare such items in advance of trial when one of the threshold issues involved Scattered's ability to fund  IIT.

It addition to being wholly uncorroborated, the testimony of Mr. Jahelka and Mr. Greenblatt was unreliable and evasive.  They simply couldn't get their stories straight.  For example, Mr. Jahelka testified that there was no agreement between Scattered and Chiplease regarding which entity would fund what portion of IIT's needs.  (2/12/08 Tr. p. 40.)  Mr. Greenblatt testified, however, that there was a written agreement that mandated Scattered provide IIT with 75% of the funding and Chiplease the remaining 25% (2/13/08 Tr. p. 24.)  Mr. Jahelka testified that there was no relationship between Scattered and Chiplease other than the loan to IIT.  (2/12/08 Tr. p. 38.)  Yet, on cross-examination, he admitted that Scattered and Chiplease were co-beneficiaries of IIT and that Scattered and Chiplease had common ownership, officers and directors. (2/12/08 Tr. pp. 50-54.)  Moreover, Chiplease and Scattered owned the debtor, RTC, together through another entity Rumpelstiltskin, and had other related business dealings. *(Id.)*

Mr. Greenblatt was similarly less than forthcoming when he testified at trial and was impeached with his deposition answers on the relatively innocuous issue of where Chiplease maintained its offices and whether it pays rent.  (2/13/08 Tr. pp. 30-33.)  In addition, Mr. Greenblatt testified at his deposition two weeks before trial that Chiplease had approximately $100,000 in cash on hand.  (2/13/08 Tr. p. 35.)  But two weeks later at trial, Mr. Greenblatt claimed Chiplease had $1.2 million in its bank account. (2/13/08 Tr. p. 35-36.)  Notwithstanding Mr. Greenblatt's testimony that Chiplease prepares "reasonable current" financial statements,

- 15 -

balance sheets and income statements, none were used in trial, none were admitted as exhibits, and none were produced to Allied to reconcile the inconsistency or otherwise support Mr. Greenblatt's testimony. (*See* 2/13/08 Tr. pp. 232:6-235:20.)

In light of the complete absence of documentary support, and the evasive, unreliable and impeached testimony of Mr. Jahelka and Mr. Greenblatt, the Bankruptcy Court could have reasonably surmised that they were being less than credible in detailing their assets, liabilities, financial condition and intentions. Fed. R. Bankr. P. 8013. It is certainly not clearly erroneous to discount the oral testimony of such witnesses when it is unsupported by contemporaneous documentary evidence of the nature and type that one would expect a business entity to prepare and maintain in the normal course of its business.

As is clear from the Bankruptcy Court's findings, and contrary to IIT's assertions here, the Court was not looking for IIT to provide a guarantee of "absolute performance" in order to satisfy the adequate assurance standard. Instead, the Bankruptcy Court was looking for *any* evidence that IIT would actually receive the funds it needed in order to meet its obligations under the Landfill Agreements:

> [L]et's just come to this point, because I don't think this matter needs to go any further. Any time there is a need to provide adequate assurance of future performance, the first thing that's done is to show the financial ability of the proposed counter-party to provide the services that are necessary and to provide the assurance that that financial ability will continue into the future.
>
> So what does one typically do? One looks at the operating history of the entity, one looks at its balance sheet, one looks for any guarantee of performance that can be offered, and those things provide some kind of adequate assurance that performance is going to be able to be provided.
>
> What do we have here? We have an entity that's never done business before, that has provided no balance sheet, no

income statement, that acknowledges a need to have substantial funds available in the near future.

And the only evidence that is has that those funds will be available is a contract negotiated with the same people on both sides of the contract, and with, as I've just outlined, no ability of the entity who is going to be providing the services to sue for completion of the agreement that's going to provide the financing. The only assurance that we have that this will be done is the statement by Messrs. Jahelka and Greenblatt that they intend to do it.  There is nothing legally enforceable that would required that to be done.

                 \*       \*       \*

The $3 million loan is absolutely essential, based on all of the testimony I have heard, for the performance of these contracts, but there is no effective legal enforcement that the trust would have to obtain payment of that – of those loan proceeds.  I will also add that I don't believe there is sufficient evidence to show the ability of the proposed lenders to make those loan payments.

I would have expected in order to be persuaded of that to see balance sheets, incomes statements and other evidence beyond the oral testimony of the principals of those entities. . . .

(2/13/08 Tr. pp. 253-54; 257; see also Tr. 3/5/08 p. 7.)

Ensuring the availability of funds that a proposed assignee admits it needs in order to perform under the relevant agreements is not an impossibly high hurdle in the context of an adequate assurance determination.  Nor is it tantamount to an absolute guarantee that the contract will be competently performed such that it gives rise to a misapplication of the adequate assurance standard.  Under these circumstances, the Bankruptcy Court did not err in finding that IIT failed to meet the adequate assurance standard when there was no reliable evidence presented that IIT would actually receive the funds it needed to operate from the Lenders.

c.      **The requirement of adequate assurance of future performance under Section 365 of the Bankruptcy Code cannot be satisfied without some showing that the proposed assignee can adequately perform in the future.**

IIT implies that adequate assurance equals the identical assurance offered by RTC when it originally entered into the Landfill Agreements. Therefore, its argument goes, since RTC did not have to show any ability to finance its operations when the Landfill Agreements were originally executed, Allied would be in no worse of a position without such assurance now. Yet this misses the point of section 365, which is specifically designed to provide a non-party debtor "with a measure of protection from having to be saddled with a [party] that may continue to default and return to bankruptcy." *In re Rachels Indu.*, 109 B.R. at 803. Moreover, IIT's interpretation of adequate assurance would render the requirements of section 365 meaningless.

IIT's legal authorities do not support its interpretation of Section 365. IIT cites *In Re Natco Industries*, 54 B.R. 436, 440 (Bankr. S.D. N.Y. 1985), *In re Westview 74th Street Drug Corp.*, 59 B.R. 747, 754-55 (Bankr. S.D. N.Y. 1986), and *In re Sapolin Paints, Inc.*, 5 B.R. 412 (Bankr. E.D. N.Y. 1980) for the general proposition that adequate assurance of future performance does not entitle a counter party to an improved position. These cases, however, all involve unexpired leases where the non-debtor landlord attempted to re-let the premises at higher, market-prevailing prices than what was agreed to in the lease. None of these cases deal with a situation like the one presented here, where the proposed assignee cannot present any evidence that it will receive the funds it needs in order to comply with the contracts.

In fact, IIT contradicts itself when it cites to *In re Bygaph, Inc.*, 56 B.R. 596 (Bankr. S.D. N.Y. 1986), for the proposition that all it has to show under Section 365(f) is "access to money with which to pay its obligations under the Landfill Agreements." (Appellant Brief pp. 16-17). Even under this simple standard, IIT has failed to carry its burden. All IIT had to show was

- 18 -

access to funding; money or assets on hand or, alternatively, some reliable evidence that its proposed lenders actually had the assets and cash flow to provide the funds. That is not a difficult standard, and it is certainly not akin to requiring an absolute guaranty of performance.  Yet, IIT failed to provide evidence of either. If IIT truly wished to receive the assignment of Landfill Agreements, and it had access to legitimate financing, one would have expected it to compile and offer some evidence to support that fact in the year and a half between the time the Trustee filed the Motion to Assign and the trial.  The implication of the omission, of course, is that it did not have legitimate financing lined up.

IIT's reliance on *In re Prime Motor Inns, Inc.*, 166 B.R. 993 (Bankr. S.D. Fla. 1994), is also misplaced as it is inapposite to the facts of this case.  In that case, the debtor-tenant invested $1.5 million in improvements to the landlord's property and had otherwise substantially complied with its obligations under the lease.  The court held that to allow the landlord to terminate the lease and receive the value of those improvements would "materially improve its position" to the significant prejudice of the debtor. *Id.* at 997.  In the situation here, neither the estate of RTC nor IIT made any improvements to the landfill sites that are the subject of the Landfill Agreements.  Quite simply, the denial of the Motion to Assign does not result in a forfeiture by IIT nor does it unjustly enrich Allied.

On the contrary, if the Motion to Assign were granted without some showing of adequate assurance by IIT, Allied would be placed in a worse position than when it (or its predecessors) originally contracted with RTC.   IIT is essentially controlled and operated by the same individuals that owned, operated and bankrupted RTC.  (2/12/08 Tr. p. 181:19-22 (Connolly Cross).)  At the time the original Landfill Agreements were executed, RTC was a new company with a fresh slate, and neither RTC nor the individuals who ran it had the extensive track record

of environmental non-compliance and contract breaches that they now possess. Today, IIT is operated by individuals with a long history of defaults, contract breaches and environmental non-compliance claims under contracts similar to the ones at issue here. Without a showing of adequate assurance, Allied would be in a worse position than when it started with the unknown RTC. A result that section 365 is designed to help avoid. *See In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 793 (Bankr. N.D. Ill 1985).

2.    **The Bankruptcy Court Did Not Rule On The Competency Or Qualifications Of IIT's Personnel.**

IIT also claims that the Bankruptcy Court misapplied the adequate assurance standard because it did not properly credit IIT's "qualified, experienced personnel." (Appellant's Brief, p. 10.) According to IIT, its experienced personnel "provide adequate assurance of future performance" and, therefore, the Bankruptcy Court erred when it did not grant the Motion to Assign on that basis. (*Id.* at pp. 10, 12.) In addition to being entirely conclusory, IIT's argument is the equivalent of tilting at windmills. The Bankruptcy Court never considered the issue of whether IIT's personnel were qualified or had the operational competency and willingness to perform under the Landfill Agreements, and it certainly did not rule against IIT on that basis. Although, had it done so, there was more than enough evidence introduced at trial that demonstrated the lack of competence possessed by IIT's staff. Nevertheless, the Bankruptcy Court explicitly limited its ruling on adequate assurance to the issue of IIT's inability to secure the necessary funding and the lack of effective enforcement options in the event of a breach:

> At the trial then there were three issues to be determined: One, whether the $3 million was available to IIT and would actually be received by IIT; two, whether $3 million would be sufficient and what contingencies were in place for securing additional funding; and, three, whether IIT's personnel would be able to obtain the necessary permits and otherwise operate the site in compliance with all applicable regulations.

> <u>Because the court found that the first issue had to be
> determined against the trustee's motion, the court found that there
> was no reason to find the other issues, determine the other issues</u>.

(3/5/08 Tr. p. 4(emphasis added).)

Accordingly, the Bankruptcy Court's non-existent ruling on the qualifications or competence of IIT's personnel is not capable of being clearly erroneous, and IIT's argument on this issue is irrelevant. However, had the Bankruptcy Court considered such evidence, it would not have been clearly erroneous for it to conclude that IIT personnel lacked the operational competence to comply with the Landfill Agreements.

IIT has no operating history itself, but all of its managers, engineers and employees were previously employed by RTC. (2/12/08 Tr. pp. 77-80, 181.) During their tenure at the debtor, these individuals guided RTC as it accumulated an impressive record of contract breaches and environmental non-compliance claims while operating similar agreements, not to mention landing RTC in bankruptcy court for nine years. These individuals were responsible for operating the debtor when it received numerous violation notices from the Illinois EPA for alleged environmental compliance in operating landfill gas to energy systems. (*See* AW exhibits 23-60; 2/12/08 Tr. pp. 221-254.) The Illinois EPA repeatedly referred RTC to the Illinois Attorney General's office for legal action due to its failure to remedy the environmental violations. *(Id.)*

In addition to RTC's history of environmental problems, the Bankruptcy Court had previously found RTC to have seriously breached its obligations under three different landfill gas contracts similar to those at issue here. (2/12/08 Tr. pp. 254:19-257:16; *see also* 2/13/08 Tr. pp. 248:22-249:15; AW Ex. 49 and 50.) Perhaps most telling of all is that at the time of trial, John Connolly, the former president of the debtor, and the trustee and manager of the proposed

assignee, IIT, had been sued in his individual capacity by the Illinois Attorney General for environmental violations relating to his faulty oversight and management of a RTC gas collection and control system at the McCook landfill. Mr. Connolly estimated his potential personal liability on that claim at approximately $4 million. (2/12/08 Tr. pp. 259:9-260:7-22; AW Ex. 53.)

As is clear from these brief examples, RTC had a long history of environmental non-compliance and contract breaches while being managed and operated by the same slate of employees that made up the staff of IIT. Accordingly, if this history of defaults and breaches _had_ been considered by the Bankruptcy Court, it would not have clearly erroneous for it to conclude that IIT's personnel lacked the operational competence to perform under the Landfill Agreement and, hence, that IIT failed to establish adequate assurance of future performance.

3.    **IIT Attempts To Improperly Shift Its Burden To Allied.**

IIT claims that since there was no evidence that Scattered or Chiplease "would be likely to breach their obligations under the loan documents", the Bankruptcy Court should have found the unsecured promises that they would loan the money to IIT sufficient evidence of adequate assurance. (Appellant's Brief, p. 12.) IIT's argument here hinges on a the assertion that there was no evidence introduced at trial that Chiplease ever breached a loan it allegedly made to RTC back in 1999, and that Mr. Jahelka's testimony that Scattered could loan the funds to IIT was unimpeachable. Once again, IIT missed the point. It was not Allied's burden to establish that Scattered or Chiplease _would_ breach their obligations to IIT. Rather, it was the Trustee's and IIT's burden to establish by a preponderance of the evidence that IIT had access to funds it needed to operate the Landfill Agreements. As discussed at length above, IIT failed miserably in that regard. An alleged loan made by Chiplease to RTC circa 1999 has no bearing on whether IIT had sufficient access to the funds it needed for the Landfill Agreements in 2008 and beyond.

Similarly, the testimony of both Mr. Jahelka and Mr. Greenblatt was far from unimpeached and unrebutted.

> 4.  **The Bankruptcy Court Did Not Err When It Determined That Inadequate Remedies Existed In The Event Of A Breach By Either The Lenders Or IIT.**

In addition to the lack of evidence regarding IIT's ability secure funding to operate, the Bankruptcy Court was also concerned with what it deemed structural impediments that interfered with IIT's ability to enforce breaches by the proposed Lenders and, additionally, Allied's ability to enforce any breaches of the Landfill Agreements by IIT.

> a.  **IIT would not sue the Lenders in the event of a breach.**

Under the structure proposed by the Trustee and IIT, if the Landfill Agreements were assumed and assigned they would be held by IIT as trust property.   John Connolly was the trustee of IIT, having recently replaced Leon Greenblatt as trustee.  (2/12/08 Tr. pp. 56, 182; AW Ex. 2.)  Scattered and Chiplease were the beneficiaries of IIT's res, which was originally created by Scattered.  (2/12/08 Tr. p. 183; AW Ex. 1.)  Mr. Connolly had a long association with the principals of Chiplease and Scattered, as those individuals -- Mr. Jahelka and Mr. Greenblatt -- owned RTC and  employed Mr. Connolly as its president for many years.  (2/12/08 Tr. pp. 52, 61, 77, 207.)  And all of the employee of IIT were former long-term employees at RTC. (2/12/08 Tr. pp. 80, 181.)

As trustee of IIT, Mr. Connolly was obligated to act in the best interest of the trust's beneficiaries, Scattered and Chiplease, which were also the proposed lenders. (AW Ex. 1.) Scattered and Chiplease had the power to remove Mr. Connolly as trustee at will and, furthermore, could simply reacquire trust property by substituting property of what it deemed to be equivalent value.  (AW Ex. 1, §§ 7.3, 1.2.)  Similarly, Mr. Connolly as the trustee could

simply terminate the trust at any time and distribute the property of the trust to the beneficiaries.

(AW Ex. 1, § 5.4.)

In light of these interlocking relationships between Mr. Connolly, Mr. Greenblatt, Mr. Jahelka, IIT, Scattered and Chiplease, the Bankruptcy Court was concerned that IIT would not pursue the Lenders if they failed to fund the loan agreement following an assumption and assignment of the Landfill Agreements:

> [L]et me tell you what the problem is. Whatever Mr. Connolly's situation is, he can be removed [as trustee of IIT]. And his payment, his current employment is entirely in the hands of the very people who would be funding the loans that he needs to operate this business.
>
> If Mr. Greenblatt says to Mr. Connolly, I have decided I am not going to fund this $3 million loan, Mr. Greenblatt is not going to be sued by Mr. Connolly. If Mr. Connolly were to institute a lawsuit against Mr. Greentblatt, Mr. Greenblatt could remove Mr. Connolly from his position as trustee. It's that simple. There is no availability of any effective remedy.

(2/13/08  Tr. pp. 252:23-253:11.)

Mr. Connolly verified that the Court's concerns were well-founded when he admitted on cross-examination that if the Lenders refused to fund IIT pursuant to the loan agreement he would not sue them.  (2/12/08 Tr. p.208:12-15.)  And nothing in the loan agreement introduced in evidence imposed a requirement on Scattered or Chiplease to make the loan, it only imposed an obligation on IIT to repay the loans that it received.  (3/5/08 Tr. p. 5.)  As Allied was neither a party to the loan agreements or an explicit third party beneficiary, it would have no ability to force the Lenders to loan the money to IIT.[3]  Based on that evidence, the nature of the

---

[3]     Much of IIT's brief concerns itself with the Lenders' assets and Allied's remedies against the Lenders.  The Bankruptcy Court, however, focused more on IIT's inability to enforce the Lenders' obligations and Allied's lack of remedies against IIT if IIT subsequently breached the Landfill Agreements.  (2/13/08 Tr. p. 253-258; 3/5/08 Tr. pp. 5-6)

relationship and entities at issue, and the structure of IIT and its trust provisions, the Bankruptcy Court did not err when it concluded that adequate assurance was also lacking because IIT, acting through Mr. Connolly as its trustee, would have no effective means of enforcing the loan obligations.  (2/13/08 Tr. pp. 256-258; 3/5/08 Tr. p. 5-6.)

> **b.** **Because IIT is a common law trust, Allied lacks effective remedies to pursue IIT in the event of a breach under the Landfill Agreements.**

Just as IIT lacked an effective means of enforcing the loan obligations against the Lenders, the Bankruptcy Court was similarly concerned about Allied's ability to pursue IIT if it breached its obligations under the Landfill Agreements.  Nothing in the loan agreements obligated IIT to use any funds it received from the Lenders for the Landfill Agreement. (3/5/08 Tr., p. 6.)  Thus, IIT could simply use the money supplied by the Lenders on something other the Landfill Agreements and refuse to meet its post-assignment obligations to Allied.

Because common law trusts cannot sue or be sued in their own names, in order for Allied to have an effective remedy against IIT in the event of a breach, IIT had to be a business trust. Only business trusts are amenable to lawsuits and, thus, capable of being subject to an involuntary bankruptcy proceeding.  (3/5/08 Tr. p. 6:13-15); see also 11 U.S.C. § 109.[4]

Federal law governs whether a trust is a business trust for purposes of eligibility for a bankruptcy proceeding.  *See In re Estate of Assignment for the Benefit of Creditors of Edward Paul May*, 2008 Bankr. LEXIS 1525, *21 (Bankr. E.D. Mich. May 27, 2008).  Under federal

---

[4] Section 109(a) of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, only a **person** that resides or has a domicile, place of business, or property in the United States … may be a debtor under this title."  (emphasis added).  A "person" is defined to include a "corporation."  *See* 11 U.S.C. § 101(41).  A "corporation" is defined to include, among other things, a "business trust."  *See* 11 U.S.C. § 101(9)(A)(v).  No other provisions of the Bankruptcy Code applies to permit any other type of trust to be a debtor in a bankruptcy proceeding.

law, business trusts are created for the purpose of carrying on some kind of business or commercial activity for profit.  (2/13/08 Tr. p. 182:4-16.)   A business trust is "a voluntary pooling of capital by a number of people who are holders of freely transferable certificates evidencing beneficial interest in the trust estate."  (2/13/08 Tr. pp. 197:23-198:1 (citing AmJr Bankr., § 481).)

To determine whether a trust is a business trust, courts examine the trust agreement to determine whether the trust sells securities, carries on a business in a distinct name, has trade creditors, a board of trustees, or a trustee with management power that is not subject to beneficiaries' consent.  (*See* 2/13/08 Tr. pp. 182:18-183:1 (citing *In re Old Second National Bank of Aurora*, 7 B.R. 37 (Bankr. N.D. Ill 1980).)

Here, the trust agreement that established IIT does not provide for the sale of securities or other beneficial interests in IIT, IIT has no trade creditors, no board of trustees, and while the trustee has the power to manage the trust res without the beneficiaries' consent, the trustee does not have the power to do business in the name of the trust.  (*See* AW Ex. 1, § 6.1.)  When Judge Wedoff examined the trust agreement, he correctly held that it shared more characteristics with an ordinary trust than a business trust.  (2/13/08 Tr. p. 184:14-24.)

IIT argues that it is a business trust because its assets are freely transferable and assignable and that it already does business with third parties.  (2/13/08 Tr. p. 183:6-25; *see also* IIT Brief p. 15.)  As Judge Wedoff determined when he examined IIT's alleged "contracts", they are illusory.  (2/12/08 Tr. pp. 262-263.)[5]

---

[5]     THE COURT:  Well, let me short circuit this.  I took a look at those exhibits as Mr. Jordan was talking to you about them, Mr. Connolly, and they all seem to me to be agreements by the counterparty to the contract to provide services to IIT at its usual costs and charges.

THE WITNESS:  That's correct, Your Honor.

Continued on following page

IIT cites *In re Gurney's Inn Corp. Liquidating Trust*, 215 B.R. 659, 662 (Bankr. E.D. N.Y. 1997) for some of the criteria that courts look for in determining whether a trust is eligible for bankruptcy, including whether it holds title to property, conducts business for profit, and has centralized management.  IIT omits, however, certain other criteria, including whether the trust was created and maintained for the purpose of conducting a business and sharing the profits, whether the beneficial interests are uninterrupted by death of the beneficial owners, and whether beneficial ownership must be transferable without affecting the continuity of the enterprise. *Id.*

Review of the IIT trust agreement shows that IIT was created and maintained for the purpose of administering the trust estate.  (AW Ex. 1.)  Additionally, the continuity of IIT as an "enterprise" is interrupted when a beneficiary ceases to exist.  (AW Ex. 1, § 3.2 ("At such time as the Current Beneficiary ceases to exist, the balance of the trust shall be distributed to the assignee and successors in interest of the Current Beneficiary, pursuant to the Current Beneficiary's plan for liquidation.").)  These provisions mitigate against finding that IIT is a business trust susceptible to lawsuit and eligible for bankruptcy.[6]

---

Continued from previous page

THE COURT:  So, if you went to them without that paper, I assume they would give you precisely what the paper says.  They'd be willing to provide services for you at their usual and customary charges.

THE WITNESS:  I suppose that's the case.  The only –

THE COURT:  What does the paper add?  If you've had a long-standing relationship with these people and they trust you and they like to do business with you, I suppose they would do business with you on the same terms with or without those agreements.

THE WITNESS:  That's probably the case.

(2/12/08 Tr. pp. 262:25-263:20 (Connolly Cross).)

[6]    IIT cites 760 ILC 5/1 for the proposition that a business trust can be created pursuant Illinois law and can sue in the name of the trustee.  The fact that a business trust can be created and can initiate claims does not mean that IIT is a business trust that can be subject to an involuntary bankruptcy proceeding.  Moreover, there is no indication in the Trust that it was created pursuant to 760 ILCS 5/1.  Furthermore,

Continued on following page

Based on the foregoing, it was not clearly erroneously for the Bankruptcy Court to conclude that IIT is not a business trust and, as such, Allied lacked the effective ability to enforce the Landfill Agreements against IIT.

B.      **The Bankruptcy Court Did Not Err In Denying IIT's Motion To Allow For The Presentation Of Addition Circumstances.**

Following the trial and the Bankrtupcy Court's denial of the Motion to Assign, IIT and the Trustee jointly filed the motion titled "Motion to Allow for the Presentation of Additional Circumstances, For the Stay of Enforcement of the Court's Order and to Allow for the Assumption and Assignment of Contracts." ("Motion to Allow") (DN 4182)   That motion was allegedly brought pursuant to Fed. R. Civ. P. 59, made applicable by Fed. R. Bankr. P. 9023, and sought to alter the Bankruptcy Court's judgment and/or reopen the proofs so that IIT could submit additional evidence of a transaction in support of assignment and assumption completely different than the one it had presented at trial.  *(Id.)*

1.      **IIT's  Motion To Allow Proposes A Entirely New Transaction Created Post-Trial.**

The transaction set forth by IIT in its Motion to Allow was an entirely new proposal that shared none of the details of the proposal that it had presented at trial.  For example, the Motion to Allow set forth a different assignee, Illinois Generating Station No. 1 Inc., a new employment agreement between Illinois Generating Station No. 1 Inc. and its alleged president, John Connolly, and new loan documents between Illinois Generating Station No. 1 Inc., and its proposed lenders, Scattered and Chiplease.  (DN 4182.)  After twice supplementing the Motion to Allow with various supporting documents, the motion swelled to include an entirely different

---

Continued from previous page

even if it was a business trust, it does not resolve the more fundamental, practical problem that the IIT would not sue its Lenders for breach of the loan agreement.

proposal, with a new legal entity as the proposed assignee, and no less than twelve new documents involving different loan agreements, board minutes, employment agreements, shareholder resolutions and assignments.  (DN 4182, 4188 and 4199.)  All of the documents relating to the new proposed transaction with Illinois Generating Station No. 1 Inc. were created after the conclusion of the trial on February 13, 2008. (Id.)

> 2. **The Bankruptcy Court Did Not Abuse Its Discretion When It Denied The Motion to Allow.**

A motion to reopen a trial to receive additional evidence pursuant to Fed. R. Civ. P. 59(a)(2), or to alter a judgment pursuant to Rule 59(e), is subject to the sound discretion of the trial court and its denial is reviewed only for abuse of discretion.  *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996); *Marshall v. Amalgamated Ins. Agency Servs., Inc.*, 523 F. Supp. 231, 232 (N.D. Ill. 1981).  It is axiomatic that courts have an interest in seeing that all of the facts that bear on a case are presented at the time of a trial, and litigants have an interest in the finality of a judgment.  (*See* 3/5/08 Tr. p. 9:18-24.)  Accordingly, relief under Rule 59 is appropriate only when the movant can clearly establish: (i) newly discovered evidence, (ii) an intervening change in the law, or (iii) a manifest error of law or fact. *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006); *Hickory Farms, Inc. v. Snackmasters, Inc.*, 509 F. Supp. 2d 716, 719 (N.D. Ill. 2007)(Kennelly, J.).

A Rule 59 motion based on newly discovered evidence must clearly establish that both the newly discovered evidence, as well as the facts that it supports, were in existence at the time of trial.  *Peacock v. Board of Sch. Comm'rs*, 721 F.2d 210, 214 (7th Cir. 1983); Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 2808.  A Rule 59 motion should not be granted "merely because the losing party may be able to present a better case in another trial." 12 *Moore's Federal Practice* § 59.13[4] at 59-95 (Matthew Bender 3d ed.).

Other than merely invoking Rule 59 by name, the Motion to Allow was silent on the grounds for the motion. The motion did not set forth a claim a manifest error of law or fact, nor did it mention an intervening change in the law. Thus, although IIT did not say so directly, either in its Motion to Allow or in its brief on appeal here, it set forth the new proposal as the equivalent of newly discovered evidence. (DN 4812.)

On its face, the Motion to Allow failed to satisfy even the threshold requirements of Rule 59 because it failed to offer a single allegation how the proffered "additional circumstances" constituted "newly discovered evidence." *(Id.)* It is obvious why. Neither the proposal to make Illinois Generating Station No. 1 Inc. the assignee of the Landfill Agreements, nor any of the documents relating to that proposed transaction, were in existence at the time of the trial. This is evident from the exhibits that are attached to the Motion to Allow and its subsequent supplements, all of which demonstrate that they were created *after* the conclusion of the trial on February 13, 2008. (DN 4812, 4188 and 4199.) Thus, the evidence IIT sought to submit was not newly discovered evidence at all. Instead, it was newly *created* evidence that IIT manufactured after the Bankruptcy Court ruled against the original proposal that it presented at trial. Because neither the "additional circumstances" offered by IIT, nor the facts that those circumstances alleged to support were in existence at the time of the trial, they do not qualify as newly discovered evidence under Rule 59. *Peacock v. Board of Sch. Comm'rs*, 721 F.2d 210, 214 (7th Cir. 1983).

In addition to IIT's failure to set forth newly discovered evidence, it would have been inequitable for the Bankruptcy Court to grant the Motion to Allow in light of the parties' dealings and the long expired deadline for bringing motions to assume and assign. By order of court, all remaining motions to assume and assign were to be brought by July 7, 2007. (DN

3462.)  It was pursuant to that order that the Trustee, Scattered and Chiplease ultimately designated IIT as the proposed assignee of the Landfill Agreements in conjunction with the Motion to Assign. (DN 3478.)  After that, Allied and Peoria spent more than a year and a half of time, and considerable expense, conducting extensive discovery and prepping for trial against IIT, the Trustee and the Lenders on the assumption and assignment proposal offered by them. As the Bankruptcy Court correctly recognized, to allow IIT and/or the Trustee to propose an entirely new transaction only after failing to meets its burden at trial on its original proposal, and long after the court imposed deadline of July 7, 2006 had passed for motions to assume and assign, would be improper:

> The fact is that the trustee had an ample period of time to propose what the trustee wanted to propose as an appropriate assignee for the gas rights agreements that were involved in this trial.  The parties spent a substantial amount of time preparing for that trial.  The court spent a substantial amount of time hearing it and ruling on it.
>
> As I indicated earlier, the evidence presented at trial was plainly insufficient to establish the trustee's obligation, burden of proof.  To show adequate assurance of future performance and to allow a new proposal to be presented after the court made the ruling and well after the deadline for making motions to assume or assign had passed would not be appropriate.  The court's discretion then being exercised against, the motion will be denied.

(3/5/08 Tr. p. 11:7-23.) [7]

Under these circumstances the Bankruptcy Court did not abuse its discretion when it denied the Motion to Allow.  *See* 12 *Moore's Federal Practice* § 59.13[4] at 59-95 (Matthew Bender 3d ed.)(Rule 59 motion not proper "merely because the losing party may be able to present a better case in another trial.").  In denying the motion, the Bankruptcy Court also

---

[7]    In addition to analyzing IIT's Motion to Allow under Rule 59, the Bankruptcy Court also addressed the necessary showing of a motion brought pursuant to Rule 60(b).  As IIT's motion failed to satisfy the standard required of a Rule 59 motion, it would also fail to satisfy Rule 60(b), which is an extraordinary remedy granted only in exceptional circumstances.  (*See* 3/5/08 Tr. pp. 8:20-11:23); *Dickerson v. Board of Ed.*, 32 F.3d 1114, 1116 (7th Cir. 1994).

dispensed with IIT's claim, made both below and here on appeal, that the Motion to Allow was appropriate because the Court had "invited" IIT to make a revised proposal:

> In the present [Motion to Allow], the Chapter 7 trustee seeks to reopen the trial to provide additional assurance of future performance to support assumption and assignment. The authority relied on for this new proposal is, quote, 'the court's invitation to the trust to revise its proposal for showing adequate assurance of future performance.' The court made no such invitation.
>
> What I did in commenting on the inadequacy of what was produced as evidence of adequate assurance is to give some idea of what might have been assurance of adequate – excuse me, adequate assurance of future performance. I noted the kinds of alternatives that might have given parties assurance that the funds would actually be deposited. I mentioned an escrow account as a mechanism that might have provided that kind of assurance. But that was not to say that the court would entertain a motion to reopen the trial to allow the trustee or the proposed assignee to create a new transaction that would satisfy the kinds of requirements that the court indicate.
>
> Had there been time to file a new motion to propose a different arrangement than what was proposed at trial, it might very well have been appropriate for such a thing to be proposed. The problem is that the deadline for assumption and assignment of the contracts has long passed. The only transaction that was proposed within that deadline was the one that the court found to be inadequate.

(3/5/08 Tr. pp. 6:22-8:1; *See also* 3/11/08 Tr. pp. 2:23-8:8.)

Finally, even if the Bankruptcy Court had considered the evidence of IIT's alternative proposal, the new proposal failed to address the Bankruptcy Court's original basis for denying the Motion to Assign, i.e. the lack of adequate assurance that IIT could access the funds necessary for it to perform. (2/13/08 Tr. p. 261:2-7.) Not a single document submitted with the Motion to Allow contained a financial or income statement for the Lenders, evidence of their assets, or evidence of their ability to fund the loan. Accordingly, for all of the reasons set forth above, the Bankruptcy Court did not abuse its discretion in denying the Motion to Allow.

C.      **Allied, Sangamon, And American Disposal Have Standing In This Case.**

After approximately three years of litigation, IIT asserts for the first time in its opening brief that Allied lacks standing to contest the Motion to Assign because it has not established its pecuniary interests in all three of the Landfill Agreements.  Tellingly, IIT does not provide a single citation to the record where it raised such an argument below and, moreover, fails to mention to this Court that it has previously acknowledged Allied's interest in all three of the Landfill Agreements.

IIT's standing argument is flawed for three reasons.  First, the Motion to Assign was brought by the Trustee, not IIT, and any argument regarding standing is not IIT's argument to make.  Second, even if IIT could properly make such an argument here, because it failed to do so below, either in the years preceding the trial or during it, the argument is waived.  Third, IIT's own conduct and statements in the Bankruptcy Court demonstrate that IIT has acknowledged Allied as the proper counter-party to the Landfill Agreements.

1.      **IIT Cannot Properly Raise A Standing Objection.**

The Motion to Assign was brought solely by the Trustee. Although the Designation Rights Agreement gave the Lenders the right to designate those contracts they wished the Trustee to assume and assign to them, it was the Trustee's burden to move the Court for the assumption and assignment before it could take place.  This is so because the Landfill Agreements were the property of the bankruptcy estate, notwithstanding the execution of Designation Rights Agreement, *unless and until* the Bankruptcy Court approved the assumption and assignment of those agreement to the Lenders.  Although the Lenders, as the proposed assignees of the Landfill Agreements, were required to demonstrate that they could cure any defaults and provide adequate assurance of future performance pursuant to Section 365, nothing in the Designation Rights Agreement gave them or their proposed designee here, IIT, the right to

raise any other legal claims or constitutional challenges on behalf of the Trustee.  Thus, any argument regarding the standing of the non-debtor parties to the Landfill Agreements is the province of the Trustee, not IIT.

Significantly, the Trustee never challenged Allied's standing either in the case below or on appeal here.  In fact, the opposite is true. The Trustee has repeatedly acknowledged in court filings that Allied is the counter-party to the Landfill Agreements.  As far back as November 30, 2005, the Trustee identified Allied as the counter-party to the Landfill Agreements in an agreed order.  (DN 2840.)  Thereafter, the Trustee unfailingly referred to Allied as the counter-party to the Landfill Agreements in each of his motions and agreed orders seeking to extend the date to assume and assign those agreements leading up to the execution of the Designation Rights Agreement. (DN 2976 and 3185 pp. 3-4.)[8]

Even in the Trustee's first Motion to Assume and Assign filed on April 28, 2006, which was after the Designation Rights Agreement had been signed giving the Lenders the sole authority to identify the contracts to be designated for assumption and assignment, Allied was *specifically* identified as the counter-party to the contracts at the Litchfield, Bloomington and Sangamon landfill sites.   (DN 3249, Ex. A, pgs 1, 5, and 9.)  Thus, the Trustee has never expressed a single doubt about Allied's standing in this case or called into question its status as the non-debtor party to the Landfill Agreements at issue.  To the contrary, as demonstrated

---

8       The agreed orders and motions that comprise Docket Nos. 2840, 2976 and 3185 cited above were not made part of the record on appeal by Allied.  This is due to IIT's failure to raise the standing issue substantively during trial or to identify the issue in its Notice of Appeal.  But for IIT's dilatory conduct, Allied would have designated those items in its supplemental record on appeal.  Notwithstanding the absence in the record on appeal, because they are pleadings found on the Bankruptcy Court's official docket, they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," and this Court can and should take judicial notice of them pursuant to Fed. R. Evid. 201(b).

above, the Trustee has repeatedly and affirmatively represented to the Bankruptcy Court that the opposite is true.

2.     **IIT Has Waived Any Objection To Allied's "Standing."**

Even if IIT had the ability to raise what it deems a standing objection on appeal, its objection has been waived. Although the question of standing is generally not subject to waiver, standing arguments that do not implicate the court's constitutional jurisdiction can be waived. *In re Aurora Home Servs., Inc*., No. 99 C 7898, 2000 WL 1468314, *1 (N.D. Ill 2000); *Lee v. Deloitte & Touche LLP*, 428 F. Supp. 2d 825, 830-31 (N.D. Ill. 2006) (objections to standing based upon prudential considerations such as objections to the real party in interest are waived if not timely raised).

IIT couches its slender, one paragraph argument as a standing objection, yet upon close examination it is clear that IIT's claim is more properly characterized as an objection that Allied is not the proper party in interest to the Landfill Agreements. IIT does not argue that the counter-party to the Landfill Agreements lacks a pecuniary interest in the question of whether those agreements are assumed and assigned to IIT, nor could it in good faith do so. IIT does not directly contend that Allied does not have an interest in the Landfill Agreements.[9] Instead, IIT objects only that there are no documents "*in the record*" supporting Allied's status as the assignee of the Landfill Agreement. (Appellant's Brief p. 21.) But that is a failure of IIT's own making.

---

[9]     Similarly, IIT has never argued, either on appeal or in the case below, that Allied is not the actual owner of the landfills. As the former president of RTC, and IIT's trustee, John Connolly testified at trial that Allied was present at and engaged in work at each site. (2/12/08 Tr. pp. 96:17-98:12.) It follows that if Allied owns each landfill, and is engaged in the work at each landfill, that it would logically hold rights to the Landfill Agreements at each landfill.

Not once did IIT raise the issue of Allied's interest in the Landfill Agreements during the year and a half that the parties engaged in multiple rounds of discovery.   Not once did IIT seek to depose an Allied witness on this issue.   And not once did IIT file a motion in limine or otherwise seek to bring this issue to a ruling before the Bankruptcy Court prior to trial.   IIT never examined a single witness at trial on this issue and, other than a fleeting mention during opening statements relating to just one of the three agreements, IIT never mentioned the issue at trial.[10]

Under these circumstances, IIT has waived any objection to Allied's standing based on a proper party in interest argument.  *International Travelers Cheque Co. v. BankAmerica Corp*., 660 F.2d 215, 224-25 (7th Cir. 1981)("It would be patently unfair for this appellate court to consider the real party in interest argument now, when the parties have developed no factual record on this point and the district court did not have the opportunity to consider it."); *United Healthcare Corp. v. American Trade Ins. Co.*, 88 F.3d 563, 569 (8th Cir. 1996)(objection waived when raised one week before trial); *Rogers v. Samedan Oil Corp*., 308 F.3d 477, 483-84 (5th Cir. 2002)(objection waived when raised one day before trial).

Lastly, IIT's 11th hour "standing" argument is absurd on its face in light of the history of litigation involving the Landfill Agreements.   Before an executory contract can be assumed and assigned under the Code (or the Designation Rights Agreement), a non-debtor party to that contract must be given notice of the proposed assumption. Fed. R. Bankr. P. 6006(c).   IIT has not

---

[10]     The only mention of this issue at trial was a brief reference by IIT's counsel during opening statements questioning Allied's interest in the Springfield agreement (a/k/a Sangamon).   Counsel for Allied responded that because Allied's right to enforce the Sangamon agreement had never been put in controversy during three years of litigation with IIT and the Lenders, evidence of the assignment to Allied was likely not on the exhibit list.   (*See* 2/12/08 Tr. pp. 20:15-21:3.)   The issue was not raised again during trial.   The absence of any objection by IIT's counsel to either of the other two agreements (Bloomington and Litchfield), is at least an implicit admission by IIT that Allied *is* the counter-party to those agreements and reveals the opportunistic nature of IIT's claims about standing brought here on appeal.

identified an entity other than Allied that was given notice of the assumption and assignment of the Landfill Agreements.  Nor has IIT identified an entity other than Allied that has ever appeared in the bankruptcy case during its nine-year term to assert rights relating to the Landfill Agreements or that claimed an interest in them at trial.  Moreover, IIT offers no explanation why, if the Allied entities did not have an interest in the Landfill Agreements, they would have appeared and engaged the Trustee, the Lenders and IIT in costly litigation over many years.  The simple answer is that they did so because their interests were at issue.

3.    **IIT Has Admitted That Allied Is The Proper Counter-Party To The Landfill Agreements.**

IIT has carefully framed its objection to Allied's standing as one premised on the lack of any "documents in the record" that evince an assignment of the Landfill Agreements to Allied. (Appellants Brief, p. 21.)  This is in contrast to a direct claim by IIT that Allied is not the counter-party to those contracts.  IIT has not, and could not, make such an argument in good faith because it knows that it previously admitted, in both pleadings and a stipulation submitted to the Bankruptcy Court, that the Allied entities were, in fact, proper counter-parties to the Landfill Agreements at issue. Accordingly, IIT should be bound to those admissions here notwithstanding its attempt to avoid them now.

In January 2007, IIT and Allied filed a Joint Motion To Extend Trial Date in the Bankruptcy Court.  That motion requested an extension of the trial that was set to commence on the preliminary issue of the cure costs due on the Landfill Agreements. (DN 3807).[11]  At

---

[11]    For the same reasons discussed in footnote 8 above, the Joint Motion To Extend (DN 3807) and the order granting same (DN 3819), were not included in the record on appeal.  Nevertheless, this Court can take judicial notice of that motion pursuant to Fed. R. Evid. 201(b).

paragraph 2 of that motion, which was signed and filed by counsel for IIT, it was represented

that:

> 2.      Specifically, the Trial concerns certain issues relating to the proposed assumption and assignment of the following three contracts into which the Debtor has entered:
>
> a.      An Agreement with ESG Watts relating [to] the Springfield landfill entitled "Agreement", which is dated May 26, 1995.   _Allied Waste Industries, Inc., and Sangamon Valley Landfill, Inc. are the assignees of the rights of ESG Watts under that agreement;_
>
> b.      An agreement _with_ Allied Waste Industries, Inc. and American Disposal Services of Illinois, Inc., relating to the Litchfield landfill entitled "Agreement", which is dated December 30, 1006; and
>
> c.      An agreement with Liberty Waste of Ohio relating to the Bloomington landfill entitled "Agreement" dated December 30, 1995 by and between the DEBTOR and Liberty Waste of Ohio. _Allied Waste Industries, Inc. and American Disposal Services of Illinois are the assignee of the rights of Liberty Waste of Ohio under that agreement._

(DN 3807)(emphasis added).)  This motion was granted by the Bankruptcy Court. (DN 3819.)  In

light of the unequivocal representations made in pleadings by IIT's counsel to the Bankruptcy

Court, it appears that IIT only contests Allied's interest in the Landfill Agreements when it is in

its benefit to do so.

Furthermore, just two months after the filing motion to extend cited above, IIT and Allied

entered into a stipulation relating to all three of the Landfill Agreements.  The Stipulation In Lieu

of Trial, dated March 13, 2007, was an agreement between Allied and IIT as to the cure cost

amounts that IIT would pay to Allied in the event that the Bankruptcy Court determined that

there was adequate assurance of future performance and the Landfill Agreements were assigned

to IIT. (Docket No. 3875.)  Pursuant to the Stipulation, IIT was contractually bound to first

satisfy the terms of the Stipulation as a condition precedent to beginning any work authorized by

the Landfill Agreements.   IIT would not have entered into a stipulation with Allied that

controlled its duties and obligations under the Landfill Agreements, and which was a modification of the Landfill Agreements, unless it understood Allied to hold the rights to those agreements.

Accordingly, IIT should be bound by the admissions it made in the Bankruptcy Court, both in its conduct and its legal filings, and this Court should reject any argument that Allied is not the proper party in interest or lacks standing here in regard to the Landfill Agreements.

**VI.**     **<u>CONCLUSION</u>**

For all of the foregoing reasons, the Bankruptcy Court's decision was not clearly erroneous or an abuse of discretion and should therefore be affirmed.

Dated: August 15, 2008                    Respectfully submitted,

<u>/s/ Robert S.O'Meara</u>
Robert S. O'Meara
Adam R. Chiss
Ann Elizabeth Pille
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207-1000

*Attorneys for Allied Waste Industries, Inc.,*
*American Disposal Services of Illinois, Inc., and*
*Sangamon Valley Landfill, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2008, a copy of the foregoing **Brief of Appellees Allied Waste Industries, Inc., American Disposal Services of Illinois, Inc., and Sangamon Valley Landfill, Inc.** was served by all registered users of the Court's ECF filing system

/s/ Robert S. O'Meara
Robert S. O'Meara

# EXHIBIT A

Page 1

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3

 4   In re:                        )
                                   ) No. 99 B 35434
 5   RESOURCE TECHNOLOGY CORPORATION,)
                                   ) Chicago, Illinois
 6                                 ) February 12, 2008
                       Debtor.     ) 10:30 a.m.
 7                                 )  1:00 p.m.

 8

 9         TRANSCRIPT OF PROCEEDINGS BEFORE THE
               HONORABLE EUGENE R. WEDOFF

10

11   APPEARANCES:

12   MR. PETER SCHMIDT
     MR. GREGORY JORDAN
13   on behalf of Illinois Investment Trust 92-7163;

14   MR. GEORGE APOSTOLIDES
     on behalf of Jay Steinberg, not individually but
15   soley as Chapter 7 trustee;

16   MR. DAVID BOHAN
     MR. ROBERT O'MEARA
17   on behalf of Allied Waste Industries;

18   MR. LINDA KUJACA
     on behalf of the City and County of Peoria.
19

20

21

22

23

24

25
```

1

2                          I N D E X

3

4

5      WITNESS:            DX       CX      REDX      RECX

6      ANDREW JAHELKA      27       42       66        71

7                                   64

8      JOHN CONNOLLY       74      179      271

9                                  264

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Taking up the court's 10:30

2    trial, Resource Technology Corporation, 99 B 35434.

3          MR. SCHMIDT:  Good morning, Your Honor.

4    Peter Schmidt and Gregory Jordan on behalf of

5    Illinois Investment Trust 92-7163.

6          MR. APOSTOLIDES:  Good morning, Your

7    Honor.  George Apostolides on behalf of Jay

8    Steinberg, not individually but soley as Chapter 7

9    trustee.

10          MS. BOHAN:  Good morning, Your Honor.

11    David Bohan on behalf of Allied Waste Industries.

12          MR. O'MEARA:  Robert O'Meara on behalf of

13    Allied as well, Your Honor.

14          MS. KUJACA:  Good morning, Your Honor.

15    Linda Kujaca on behalf of the City and County of

16    Peoria.

17          THE COURT:  Okay.  There are a few

18    matters that need to be taken up preliminary to our

19    trial, these motions in limine.  I am inclined to

20    hear argument on Allied's motion respecting the IEPA

21    documents, if you'd like to address that.

22          MR. JORDAN:  Certainly, Your Honor.  As I

23    understand the situation, Allied's position in the

24    case is that the history of compliance or

25    noncompliance by Resource Technology Corporation and

Page 4

1    its employees is a factor in determining whether

2    adequate assurance of future performance exists or

3    not.  And to the extent that RTC is not unique and

4    that there are -- that this is something that

5    happens -- people, including Allied, then it's

6    probative of -- to the extent of -- or the matters

7    to the weight that Your Honor should place on

8    previous and sometimes extremely old compliance

9    issues that Allied would like to offer, or the City

10   and County of Peoria might want to offer regarding

11   compliance by RTC.

12              Now, I note, Your Honor, that Allied

13   says in its motion in limine that there's a

14   reference to the Livingston landfill and the Pontiac

15   landfill, and that that's not an issue in this case,

16   what happened at the Livingston and Pontiac

17   Landfill.  Well, it's not -- I don't think it's an

18   issue in the case, and I have no problem keeping all

19   of the activities other than the sites in question

20   out of the case.  But you can't have your cake and

21   eat it too.

22              THE COURT:  Well, actually, I think they

23   may be able to, and here's the reason why:  The

24   question of the ability of IIT or its nominee to

25   provide the services required by the contract in

Page 5

1    question here is something that has to be looked at

2    in terms of IIT or its nominee.  What Allied has

3    done in other places really is irrelevant to that

4    question.

5              Even as you make your argument

6    today, Mr. Jordan, what you're talking about is the

7    general difficulty of people in complying with the

8    IEPA or other environmental regulations.  Well, if

9    you want to produce an expert witness to testify

10   about the general difficulty of complying with

11   regulations and the fact that everybody who operates

12   a landfill runs into trouble with environmental

13   regulators, I'd be happy to hear that.  But you

14   really can't establish that general proposition by

15   pointing to the specific difficulties that Allied

16   may have had in a particular landfill.  Simply not

17   relevant, not probative.  I'll sustain this motion,

18   grant the motion.

19             Okay.  Next, we have a motion that

20   is brought by Mr. Jordan to bar testimony regarding

21   certain permits, and I'll hear argument against that

22   if...

23             MS. KUJACA:  Do you want to start?

24             MR. O'MEARA:  Go ahead.

25             MS. KUJACA:  Section 7 and 8 of the

Page 6

1    Peoria lease deals specifically with the ability of

2    RTC to provide adequate permitting for the Peoria

3    site.  And the issue of whether IIT or RTC actually

4    has a valid IEPA permit or will have so in the

5    future is critical to whether they can provide

6    adequate assurance of future performance in this

7    case.

8              THE COURT:  Yeah.  Well, can this witness

9    provide any relevant evidence on that point?

10             MS. KUJACA:  Yes, he can.  He is the

11   CAAPP unit manager regarding the air permits for the

12   Illinois EPA.  He is the guy who can talk about the

13   permitting.

14             THE COURT:  The motion suggests that the

15   information he has is not probative on this point,

16   and cites deposition testimony to establish that.

17             MR. O'MEARA:  Your Honor, if I can add

18   something as well?  Mr. Connolly has testified

19   already at his deposition in this case that these

20   permits are either in effect or have been renewed or

21   will be easily transferred from RTC to IIT.

22   Mr. Reed's testimony is in rebuttal to that, and

23   this is defensive to that, and responds to what Mr.

24   Connolly has already testified about in the case.

25             THE COURT:  Mr. Jordan or --

1          MR. JORDAN:  Well, first of all -- I'll

2     let Mr. Schmidt do it.  But I would note for the

3     record that Mr. Reed is not Allied's witness, and,

4     you know, I'm not quite sure why Allied has any

5     right to speak with regard to Mr. Reed or any

6     testimony he might have.  We're having two trials

7     together for the convenience of the court, but he's

8     not on their witness list, he's not on our witness

9     list, and I don't think Allied has any right to

10    examine him or to offer anything he says regarding

11    anything in the issues regarding the Bloomington,

12    Linchfield, or Sangamon landfills.

13          You can address --

14          MR. SCHMIDT:  I would just add that

15    Allied also did not identify Mr. Reed as an

16    individual with knowledge in their interrogatory

17    responses.

18          But, more fundamentally, Mr. Reed's

19    testimony was that certain applications have been

20    received.  They're sitting on his desk.  He has not

21    made a decision on that.  Or that if applications

22    are made for permits in the future, he doesn't know

23    how he's going to rule on them.  He would have to go

24    through the process.  There's an elaborate process

25    that the IEPA goes through to determine whether or

Page 8

1    not --

2              THE COURT:  Okay.  Let me say this then:

3    If Mr. Reed is going to testify, it appears to me he

4    would be testifying as a rebuttal witness, and I

5    would consider whatever testimony he might give at

6    that time.  I won't grant a motion in limine as far

7    as his ability to testify as a rebuttal witness, but

8    I will not expect him to be called in the case in

9    chief, given the argument that's just been taking

10   place here for either of the nonIIT parties.

11              Okay.  So that will be the ruling on

12   this one.

13              MR. JORDAN:  Thank you, Your Honor.

14              MR. SCHMIDT:  Thank you, Your Honor.

15              MR. O'MEARA:  Thank you.

16              THE COURT:  I think then we are ready to

17   hear opening statements.

18              MR. SCHMIDT:  Your Honor, as has been the

19   habit in these proceedings, we're the real party in

20   interest, so we'll make the opening statement --

21              THE COURT:  Please.

22              MR. JORDAN:  If it please the court, Mr.

23   Schmidt and I represent the Illinois Investment

24   Trust, which I'm going to try to refer to as "the

25   trust" as much as possible because I have a hard

1  time tripping over IIT.

2          THE COURT:  Well, there's an educational

3  institution to the south here that would be possible

4  to confuse with this.

5          MR. JORDAN:  Possibly.  What we're here

6  is in the final part in the process of the

7  assumption and assignment of the contracts between

8  RTC and the City and County of Peoria and RTC and

9  Sangamon Valley Landfill, Inc., the Allied -- or

10 American Disposal and Allied Waste Industries

11 relating to landfills in Litchfield, Illinois,

12 Bloomington, Illinois, and Sangamon, Illinois.

13          The cure issues have been resolved

14 through stipulations by the parties.  So what we're

15 here today is just to talk about whether the

16 assurances that our client can provide are adequate

17 to allow for the assumption and assignment or really

18 the assignment of the contracts.

19          Now, the first site, Litchfield, we

20 have a December 30, '96, contract.  It's a small

21 site.  It's already been assumed by a January 3rd,

22 2002, order, and the trustee is requesting that it

23 be assigned to the trust.  At this time RTC does not

24 need a permit for the Litchfield site.  There are no

25 operations there.  There have never been any

Page 10

1   operations there.

2            After the site, there will be

3   testimony saying -- or after the assignment, there

4   will be testimony indicating that the trust will

5   seek a construction permit to build an energy

6   conversion facility, and that will be after Allied

7   builds the gas control and collection system, the

8   GCCS, at the site.  In the stipulation there's an

9   amount of money that the trust is going to need to

10  pay to Allied, put up a bond.  And to the extent of

11  the timing, there's interest that's earned.

12           The testimony would be that the

13  construction permit process is generally a short

14  process, and that it's anticipated that once Allied

15  is finished, it would be six to twelve months to

16  build.  I think that site is likely to go online in

17  2011, so there's a lot of time between now and then

18  for all of the permitting issues and everything else

19  to get worked out.

20           There will be a CAAPP permit that's

21  needed, a Clean Air Act Permit that's needed.  And I

22  think that the testimony will be that that's a

23  three- to five-year process from application to

24  approval, and that there's actually a permit shield

25  that allows the permit applicant to operate during

1   the process that that is going on.  And the site

2   will be -- need to be built in that time and go

3   online.

4              There will be testimony indicating

5   that there are funds that are going to be offered or

6   loaned by Chiplease and Scattered, primarily

7   Scattered, which is a corporation that Andrew

8   Jahelka, Drew Jahelka, is president of.  They have

9   $3 million now.  The testimony will be that probably

10  there will be draws in tranches about a

11  million-two-fifty this year, and then that will get

12  paid, and then the Litchfield site will go on, there

13  will be another draw, and then that will be paid

14  back.  And then, finally, Bloomington, there will be

15  a draw in about, I think, 2013 or 2015, Mr. Connolly

16  will testify to that, and that will be drawn and

17  paid back.

18              We anticipate that the Peoria site,

19  being the one that is actually operating now, would

20  go on soon.  There's a stipulation.  Testimony will

21  show that there's a stipulation, it's in evidence

22  already and no one objected, between Peoria and IIT.

23  And that stipulation sets forth the various regimes

24  of things that Peoria and IIT agree have to be done

25  in order for this to be successful.

Page 12

1                    And the stipulation has defaults.

2    So if IIT doesn't perform, then the trust is out.

3    That's really the best adequate assurance that they

4    have, in addition to the fact that the money exists,

5    that things are going to happen and that they are

6    not going to have problems.

7                    With regard to the Litchfield site,

8    the plan is for AmerenCILCO to buy gas that's

9    scrubbed and put into a pipeline.  AmerenCILCO and

10   the trust have parameters of an understanding on

11   that.  And, you know, in order to have an agreement

12   on something like this, you kind of have to have the

13   assignment.  So with any luck, this matter on

14   Litchfield will go forward.

15                   With regard to Bloomington, it's a

16   contract between RTC and John Sexton Contractors.

17   It's a relatively small site, but it does have

18   sufficient gas for something to happen.  IIT has

19   requested that the trustee assign the contract to

20   them, and the trustee is willing to do so.

21                   At this time RTC doesn't have, nor

22   does it need a permit at Bloomington.  There are no

23   operations there now.  There's a handful of wells

24   that were run over during a waste filling operation.

25   And what's going to happen in that site is the same

Page 13

1  as with the Litchfield site, Allied would build the

2  gas collection system, IIT will pay for it.

3               Obviously in all three -- this is

4  going to happen at all three sites.  The gas

5  collection control system is going to be built to

6  Allied's specifications since Allied is going to be

7  building the gas collection and control system.

8  Allied is going to need to finish the expansion on

9  this site in Bloomington.  This one is the one

10  that's in the longest horizon because I think Allied

11  indicates that it's going to take them a long time

12  to finish the site.

13               The plan for Bloomington is gas

14  cleanup and medium grade BTU gas sale.  There's an

15  existing Cargill gas line to tap into.  And even if

16  that weren't available, there's a Nicor Gas line to

17  tap into.  And there have been, in fact, several

18  conversations with Nicor in that regard.

19               With regard to Springfield, that was

20  an operating site, and what it was was an agreement

21  between ESG Watts and RTC entered into on May 26th,

22  1995.  As we have indicated to Allied previously,

23  we're not aware of what interest Allied has in the

24  Sangamon Valley landfill.  I'm sure that they can

25  put on some sort of evidence showing that they, in

Page 14

1    fact, have an interest in the Springfield landfill

2    by assignment from ESG Watts because we're not aware

3    of that, and I think we've alerted the court and

4    Allied to that a long time ago.

5                      This is a relatively small site,

6    but, again, there's sufficient gas for something to

7    happen here.  IIT has requested that the trustee

8    assign the contract to it, and the trustee is

9    willing to do so.  RTC holds a permit there at the

10   site now.  However, once the Allied -- what Allied

11   has at the site and what has been a problem with the

12   site is the fact that they don't have a final CAAPP

13   and the site is overheight.  Allied has to chop out

14   or move or whatever these fellows do, move the

15   overheight out.  And when they do that, it takes out

16   the gas collection and control system.

17                      Now, there's some, you know, perhaps

18   disagreement as to whether the trust would need to

19   file for a new permit.  But even if it did, it would

20   be able to file the construction permit and then

21   file a CAAPP permit and work with the IEPA over that

22   process and operate in the permit shield while the

23   permit is pending.

24                      There are some small wells there.

25   There was a fire, as I think Your Honor knows, at

Page 15

```
1    the site.  Certain wells were removed because of the
2    overheight.  As to each of these sites, IIT -- I'm
3    sorry, Mr. Connolly, not IIT, Mr. Connolly has
4    performed visits recently as last week looking at
5    the sites to see the status of the sites, in
6    addition to see the status of the removal of the
7    overheight.
8              The plan for Springfield is to
9    sell -- to create electricity through engines with
10   an alternative plan of selling gas into pipelines,
11   and there is a nearby pipeline.  It's a contract
12   with AmerenCILCO to sell the electricity to them.
13   Our client will have to pay monies to Allied under
14   the stipulation, and they'll have to pay monies,
15   about 300,000 to $500,000, to move engines and get
16   them into running -- permit.  We definitely will
17   need a construction permit.  Allied is going to need
18   to finish the expansion, which I think they think is
19   going to finish this year, and we'll move forward on
20   that.
21             With regard to Peoria, that's a
22   December 30, 1996, contract with RTC and Liberty --
23   I'm sorry, RTC and the City and County of Peoria.
24   It's a medium-sized site and has sufficient gas.
25   IIT has requested the trustee sign it, and the
```

1    trustee is willing to do so.  There is a CAAPP

2    permit, Clean Air Act Permit, there now.  The

3    operations are continuing.

4               There was a change in the site.

5    There was a fellow, Vince Muir, who was operating

6    the site.  And the testimony will be that in

7    December Mr. Muir died, and now a third party

8    unrelated to the trust is managing the site.  And

9    what's going to happen here is that the trust will

10   sell its gas to AmerenCILCO -- or sell electricity,

11   rather, to AmerenCILCO.  Under the stipulation with

12   Peoria, they have to bring another engine on site,

13   and they're working on that, and they think that

14   will be soon completed.  And then once they do that,

15   this summer they're going to bring a third engine on

16   site.  I don't think there are any need for any

17   permits at this site.

18               One of the items that needs to be

19   taken care of at the site is stack testing.  And, in

20   fact, there have been various problems or notices

21   from the IEPA over the years for things like

22   compliance in stack testing.  And the testimony will

23   be is that -- and I don't think it's hugely

24   surprising.  You have a company first that's in

25   bankruptcy and, as a result of a bankruptcy, living

1    on a string, and then with a Chapter 11 trustee, and

2    then with a Chapter 7 trustee.  And so it really

3    lacked the monetary ability to do a lot of the

4    things that the people who were operating or running

5    the company would have liked to do.

6                    And now, when they have a $3 million

7    line of credit with a substantial ability to draw

8    upon it, the idea is is to move forward to create a

9    relationship with the IEPA, to work with the City

10   and County of Peoria, including attending their

11   monthly meetings and meeting with them on a more

12   regular basis to try to make sure to head off any

13   problems in advance, and same with Allied.

14                   One of the -- you know, the reason

15   why I don't, with all due respect to Allied and

16   Peoria, think that the issues regarding compliance

17   in the past are relevant is because I think the

18   evidence is going to show that it was a function of

19   money and, to a certain extent, motivation.  We had

20   trustees, and these trustees were not willing to

21   spend monies in the way in which it was hoped it

22   would.  For instance, $600,000 would have been spent

23   on Congress in early '05.  That could have headed

24   off a lot of the problems there.  And Mr. Szilagyi,

25   the testimony will be, refused to -- the request to

Page 18

1  pay those kinds of monies.

2              IIT has the personnel.  In addition,

3  it has new and other contracts with third parties to

4  operate.  It has the motivation and it has the

5  people who can do it.  So we think -- and it will

6  under the Allied stipulation.  It's required to

7  obtain a performance bond.  And the testimony will

8  be that it will be very easy, actually, for a

9  performance bond to be obtained.

10             And so for that reason, we think the

11 evidence will show that adequate assurance as to

12 each of the four sites is going to be provided, and

13 that these contracts may be assumed and may be

14 assigned.  Thank you very much, Your Honor.

15             THE COURT:  Okay.  Thank you.

16             Mr. Bohan, do you want to go next on

17 behalf of Allied?

18             MS. BOHAN:  I'll try to be very brief,

19 Your Honor.  The burden in this case is on the

20 trustee as the moving party and IIT as its proposed

21 assignee to show that IIT has the financial and

22 operational capacity, competence, and willingness to

23 perform these contracts.  And we think there will be

24 an abject failure of proof on that scope, Your

25 Honor.

1                    IIT is a trust that was formed

2      approximately 15 years ago for the purposes of

3      engaging in a dividend reinvestment program.  It has

4      essentially no history of business operations with

5      respect to the operations of the landfills, the

6      collection of gas, the conversion of gas to

7      electricity.  For that matter, Your Honor, it's

8      never been engaged in any ongoing business

9      operations whatsoever.

10                    So to overcome the failure of -- and

11     it has no assets to speak of until very recently,

12     had no exposure, no experience whatsoever with

13     respect to this entire industry.

14                    To overcome those failures, the

15     persons who controlled Scattered and Chiplease

16     arranged to install as the current trustee of the

17     trust Mr. Connolly, and for him to engage as

18     necessary some former employees of RTC.  But we

19     think, Your Honor, that there will be no proof,

20     certainly none from Mr. Connolly's -- in Mr.

21     Connolly's background that would demonstrate that he

22     individually or with the assistance of his former

23     employees, former comrades from RTC, have the

24     capability to perform these contracts.

25                    Their record is one, Your Honor, of

Page 20

1   environmental noncompliance, consistent, repeated

2   defaults at different landfills of which they've

3   sought to operate.  And as a result, we think the

4   trustee and IIT will fail in their burden of proof.

5                    Your Honor, I have two very minor

6   points to bring up.  I believe Mr. Jordan may have

7   misspoke when he said that the contracts in which

8   Allied has an interest, those involving Litchfield,

9   Bloomington, and Sangamon, have already been

10  assumed.  In fact, the trustee's motion to assume

11  those contracts is what's before the court today.

12  It's the trustee's motion to assume and assign them

13  to the designee of Chiplease and Scattered.  None of

14  those three contracts has been assumed, Your Honor.

15                   And, second, with respect to the

16  Sangamon site, Your Honor, Allied, in fact, did

17  retain the right to enforce that agreement.  And, in

18  fact, although we've been involved in this

19  litigation for, I think, three years or more with

20  Mr. Jordan, our right to enforce that agreement,

21  notwithstanding the asset purchase agreement to

22  Mr. Watts, has never really been in controversy.  If

23  necessary, we will produce the asset purchase

24  agreement and identify for the court the specific

25  clause that reserves to Allied the right to enforce

1    that contract.  But it's never been an issue, Judge.

2    It may not even be on our exhibit list for that

3    reason.  Thank you, Your Honor.

4              THE COURT:  Thank you.

5              Ms. Kujaca.

6              MR. JORDAN:  Your Honor, just to clarify,

7    I said it was a Litchfield contract, and it was

8    unassumed on January 3rd, 2002.

9              MS. KUJACA:  Thank you, Your Honor.  I'll

10   be brief as well, and I don't want to go over the

11   same territory that Mr. Bohan did.

12              Peoria has stipulated with IIT as to

13   what will generally be necessary to cure the

14   monetary and nonmonetary defaults in the lease.  So

15   the question remaining under 365 of the Code is

16   whether IIT can provide the adequate assurance of

17   future performance.  Peoria agrees with Allied that

18   IIT bears the burden of proof in this issue.

19              Presumably Mr. Connolly will testify

20   that IIT will be getting a $3 million loan from

21   Scattered or Chiplease or a related entity, the

22   implication being that 3 million should be

23   sufficient to cure all the defaults and provide

24   future funding on the landfills that IIT seeks to

25   operate.

Page 22

1          However, the evidence will show that

2   various problems with this, including the contingent

3   nature of the funds, the fact that the same people

4   who ran RTC will be running IIT, and that the loan,

5   documented though it may be, will be coming from the

6   same people as well.

7          IIT has no operating history

8   whatsoever.  If the curtain is back, if the legal

9   operating entity is disregarded and the real persons

10  involved in the operations are revealed, these are

11  the same exact persons who drove RTC into bankruptcy

12  and caused noncompliance and substandard conditions

13  at the Peoria landfill.

14          If the entity of IIT is closely

15  scrutinized, it's obvious that little, if anything,

16  has changed from the debtor's previous and

17  continuing operations.  They even work in the same

18  offices.

19          While IIT plans to use outside

20  consultants to work at the landfill, management has

21  not changed.  It will be questionable as to what, if

22  anything, will change between the debtor running the

23  landfills, racking up violations and environmental

24  hazards, and what IIT proposes in the future.  The

25  credibility and the past practices of these people

1  should be a factor in determining whether these

2  contracts can be assumed and assigned.

3                 Peoria will provide the testimony of

4  its engineer to show the status of the landfill and

5  the history of problems caused by the debtor, as

6  well as the projected cost to cure the problems in

7  the future.

8                 Although the parties stipulated as

9  to what the monetary and nonmonetary cure items were

10  going to be, the parties do not agree as to what it

11  will cost to implement such a cure.  Peoria's

12  estimates to cure the nonmonetary defaults for added

13  site far outweigh the estimates of IIT, raising the

14  question of whether IIT will have sufficient capital

15  to maintain all of its sites if IIT's estimates turn

16  out to be low or if its funding dries up.

17                 Peoria also sought to admit the

18  evidence of a gentleman from the Clean Air Act

19  Permit program at the Illinois Environmental Agency

20  regarding the status of IIT's ability to obtain a

21  permit to operate the gas-to-energy facility.  There

22  are several issues regarding the permit, including

23  whether the renewal application was timely

24  submitted, whether the receiver has the ability to

25  execute the application on behalf of RTC, and most

Page 24

```
1    importantly being the compliance issues.  If the

2    landfill is not compliant, the IEPA will not issue a

3    renewal permit.

4              IIT's ability to provide a permit

5    from the IEPA is questionable at best, calling into

6    question whether IIT can provide adequate assurance

7    of future performance.  If IIT cannot show evidence

8    of a valid IEPA permit today, nor the unquestioned

9    ability to get one in the near future, it cannot

10   provide adequate assurance of future performance.

11             Peoria believes that this testimony

12   along with the other evidence provided will show

13   that, given all the tentative and speculative

14   issues, IIT cannot provide adequate assurance of

15   future performance for the Peoria agreements.

16             THE COURT:  Okay.

17             MS. KUJACA:  Thank you.

18             THE COURT:  Thank you.

19             Your first witness, Mr. Jordan.

20             MR. JORDAN:  We would call Andrew

21   Jahelka.  And we would ask that we excuse witnesses.

22             THE COURT:  Yes.  Each party is allowed

23   to have one representative remain in the courtroom

24   to consult with counsel.  If you do have an expert

25   witness, you may also have your expert witness at
```

Page 25

```
 1   counsel table.
 2              Anyone else who is expected to give
 3   testimony in this proceeding is required to leave
 4   the courtroom at this point until you conclude your
 5   testimony, the reason for that being that we don't
 6   want your testimony to be influenced by what you've
 7   heard from the other witnesses who testified.  Of
 8   course once you finish giving your testimony and
 9   you're no longer in a position to have that
10   testimony influenced, you're welcome to stay in the
11   courtroom.
12                    (Witness sworn.)
13        MR. JORDAN:  Your Honor, we would ask
14   that Mr. Sloan, who is not with -- I don't believe
15   he's with the City and County of Peoria, be
16   excluded.
17         MS. KUJACA:  He is my representative from
18   the City and County of Peoria.
19         MR. JORDAN:  He doesn't even work for the
20   City and County of Peoria.  How could he be a
21   representative of the City and County of Peoria?
22   He's just a witness.  He's a --
23          THE COURT:  Do you have any relationship
24   to the city?
25          MR. SLOAN:  Yes.  I'm employed by Foth
```

1  Infrastructure & Environment, and we have a contract

2  for engineering services for the City of Peoria,

3  city and county.

4         MR. JORDAN:  I don't know that makes him

5  a representative of the city.

6         THE COURT:  So you're here as an agent of

7  the city today?

8         MS. KUJACA:  Yes.

9         MR. SLOAN:  And expert witness.

10         MR. JORDAN:  I don't think --

11         THE COURT:  Have you been identified as

12  an expert witness?

13         MS. KUJACA:  He's a fact witness.  He is

14  an agent of the City and County of Peoria.

15         MR. JORDAN:  Your Honor, he's an

16  independent contractor who works -- or he actually

17  works for a company that's employed by the City and

18  County of Peoria, and we established this at the

19  deposition.  In fact, Ms. Kujaca said she didn't

20  represent him at the deposition because he wasn't a

21  representative of the City and County of Peoria at

22  his deposition.  I don't know how that changes

23  today.

24         MS. KUJACA:  I did not represent him

25  individually, no, I did not.  But he is here as an

Page 27

```
 1   agent of the City and County of Peoria to testify on

 2   its behalf regarding the engineering issues.

 3              THE COURT:  Okay.  I'll accept that

 4   representation, and he can remain at counsel table.

 5              MS. KUJACA:  Thank you.

 6              THE COURT:  Go ahead, Mr. Jordan.

 7              MR. JORDAN:  Thank you, Your Honor.

 8              ANDREW JAHELKA, WITNESS, SWORN

 9                   DIRECT EXAMINATION

10   BY MR. JORDAN:

11        Q    Would you please state your name for the

12   record.

13        A    Andrew Jahelka.

14        Q    Have you ever heard of Illinois

15   Investment Trust No. 9 --

16              THE COURT:  You'd better spell your last

17   name, Mr. Jahelka.

18              MR. JORDAN:  I'm sorry.

19              THE WITNESS:  J-a-h-e-l-k-a.

20   BY MR. JORDAN:

21        Q    Mr. Jahelka, have you ever heard of the

22   Illinois Investment Trust No. 92-7163?

23        A    I have.

24        Q    All right.  How is it that you've heard

25   of it?
```

Page 28

1    A    The trust was established -- Scattered

2    Corporation was the original grantor under the

3    trust.  The trust was established in 1992 originally

4    to engage in dividend reinvestment plans.  The trust

5    had a minimal amount of activity in the early '90s,

6    and has essentially sat dormant for the better part

7    of the last 15 years.

8    Q    Okay.  You mentioned Scattered

9    Corporation.  What's your relationship with

10   Scattered Corporation?

11   A    I am its president, I'm a director, and

12   I'm also a shareholder.

13   Q    Okay.  So at the time that the trust was

14   created, were there any other grantors or

15   beneficiaries other than Scattered?

16   A    No, Scattered was the only grantor and

17   the only beneficiary.

18   Q    Okay.  And who served as its first

19   trustee?

20   A    Leon Greenblatt.

21   Q    Okay.  When, if ever, did that change?

22   A    The -- somewhere in, I think, the summer

23   of 2006.

24   Q    Okay.  Would it have been August of 2006?

25   A    That sounds about right.

1        Q    Okay.  And who was -- who became the

2    successor trustee, if you know?

3        A    John Connolly.

4        Q    And why was Mr. Connolly selected?

5        A    The trust was designated to receive

6    certain assets that had previously been owned by RTC

7    and was going to go into the landfill gas business,

8    if you will.  And Mr. Connolly, with his experience

9    in that industry, is far more qualified than

10   Mr. Greenblatt to oversee the trust's operations.

11       Q    So did Mr. Greenblatt resign then?

12       A    I believe so, yes.

13       Q    Okay.  Now, are there any other

14   beneficiaries in the trust now other than Scattered

15   Corporation?

16       A    Yes.  Scattered continues to be a

17   beneficiary.  Chiplease, Inc., has been additionally

18   named as a beneficiary of the trust.

19       Q    Okay.  What's the nature of Scattered's

20   business?

21       A    Scattered is a holding company.  It holds

22   certain real estate investments, oil and gas

23   operations.  It also has purchased two loans, the

24   Caterpillar loan that had been made to RTC and the

25   Aquila loan that had been made to RTC.

Page 30

1          Q    Okay.  And what would the value of those

2    real estate investments be?

3          A    Well, the partnership that owns the Old

4    Colony Building is roughly 85 percent owned by

5    Scattered Corporation, and there is roughly 3 to

6    $4 million worth of equity in that building.

7          Q    So after it paid off debt, Scattered

8    would have a right to 85 percent of 3 to $4 million;

9    is that right?

10         A    That's correct.

11         Q    Okay.  And that would be net of closing

12   costs?

13         A    That would be net of closing costs and

14   the mortgages on the property.

15         Q    Okay.

16         A    Additionally, the 330 South Wells

17   building, which is owned by --

18              THE COURT:  Could I interrupt you just

19   for a second?

20              THE WITNESS:  Yes.

21              THE COURT:  When you say that there is 3

22   to $4 million of equity in this Old Colony Building,

23   what are you assuming is the value of the building

24   and how much of a loan is outstanding on that

25   amount?

Page 31

```
 1            THE  WITNESS:   There's approximately
 2   $10 million in mortgages on the property, and the
 3   partnership has been in negotiations to sell the
 4   property for $13.6 million, although that contract
 5   is still pending.  It has not been executed as I sit
 6   here.
 7            THE COURT:  Okay.
 8            MR. JORDAN:  Thank you.
 9   BY MR. JORDAN:
10        Q    And then you were discussing a different
11   property that Scattered Corporation has an interest
12   in?
13        A    Yes.  The building is located at 330
14   South Wells in Chicago, and it is owned by 200 West
15   Partners Limited Partnership.  Again, Scattered owns
16   approximately 85 percent of that partnership.  That
17   building is -- I think the last appraisal I saw on
18   it was $5.7 million, that was a few years ago, and
19   it has approximately $3 million worth of debt on it.
20        Q    Okay.
21        A    So there's roughly two-and-a-half to
22   $3 million of equity.  I think that's a fairly
23   conservative estimate.
24        Q    Okay.  What's Scattered's percentage of
25   ownership?
```

1          THE COURT:  85, he's already testified.

2          MR. JORDAN:  Oh, I'm sorry.  I missed

3    that.

4    BY MR. JORDAN:

5          Q    And the oil and gas investments that you

6    mentioned, what is the free cash flow that would

7    go -- could go to Scattered for that?

8          A    The entity that operates the oil and gas

9    wells is a company called H&M Oil & Gas, LLC.  The

10   operations are in Texas.  The last financials for

11   that entity that I saw were for the three months

12   ended in December of '07.  And in December, the

13   entity had earnings before interest, depreciation,

14   and amortization of approximately $1.2 million, and

15   has about $500,000 a month of debt service, leaving

16   it with free cash flow of approximately $700,000 a

17   month.

18         Q    And that would be earned -- that would

19   not include taxes because taxes have already been

20   taken out of that?

21         A    Taxes are already paid on that income,

22   yes.  That's earnings before interest, depreciation,

23   and amortization.

24         Q    Okay.  And what, if any, ability does

25   Scattered have to capture that $700,000 and utilize

Page 33

1    it?

2        A    Scattered -- at the present time

3    Scattered owns all of the ordinary membership

4    interests in the LLC, and Scattered also owns all of

5    the preferred interests in the LLC, and this is H&M

6    Oil & Gas, LLC.  So Scattered can exert whatever

7    financial control it would like over those -- that

8    cash flow.  Until now, Scattered has allowed H&M to

9    use that cash flow to continue to complete oil and

10   gas wells, which it has been doing.  Scattered has

11   the ability to marshal all of that cash flow, should

12   it wish, in order to fund its loan commitment to

13   IIT.

14       Q    Okay.  And, similarly, if the property

15   that you refer to is being in negotiation and sold,

16   would Scattered have the ability to utilize those

17   funds to fund?

18       A    Yes.  Scattered would receive its

19   85 percent share of the proceeds on the sale of that

20   building if that sale is consummated.

21       Q    Okay.  Have you ever heard of the

22   landfills in Bloomington, Litchfield, Springfield,

23   and Peoria, Illinois?

24       A    I've heard of them, yes.

25       Q    Okay.  What, if any, is the extent of

Page 34

1    Scattered's familiarity with those landfills?

2         A    Essentially what it has learned through

3    Mr. Connolly.

4         Q    Excuse me.

5                   Is Scattered a party to any

6    contract, the subject matter of which involves in

7    any way those landfills or gas plants at those

8    landfills?

9         A    Only the funding commitment that it has

10   on the loan and security agreement to IIT.

11        Q    And --

12        A    Well, it also owns the Caterpillar loan

13   and the Aquila loan.

14        Q    Okay.  Does Scattered have any

15   liabilities associated with any of these investments

16   that you haven't mentioned before?

17        A    Scattered has no other long-term

18   liabilities on its books.  You know, the partnership

19   has real estate loans associated with the buildings,

20   and H&M Oil & Gas has the line of credit that it

21   used for its operations.  But those are obligations

22   of those entities, not Scattered.

23        Q    Okay.  Now, if we could look at

24   Exhibit 50 and 52.

25                   MR. JORDAN:  Your Honor, I'm kind of new

1  at this.  Do we need to look at them one at a time

2  or can we have them pulled up?

3           THE COURT:  Okay.  Now...

4           MR. JORDAN:  I believe they were in

5  evidence.

6           THE COURT:  Yeah, all of the exhibits are

7  in evidence.

8           MR. JORDAN:  I think, actually, Allied

9  has objected to certain exhibits we have.

10          THE COURT:  It's not coming over again.

11 We didn't test this before.  We should have.  All

12 right.  It doesn't even show judge's computer as one

13 of the possible...

14              Ah, I see the problem.

15          MR. JORDAN:  Your Honor --

16          THE COURT:  This is going to be fine.  I

17 just have to apologize to you.  This is a new

18 system, and we should have tested it before, but I

19 think I see what the difficulty was.  This will take

20 just a second.

21          MR. JORDAN:  Do I need to press anything

22 or --

23          THE COURT:  No, you don't need to do a

24 thing.

25          MR. JORDAN:  Okay.  I screwed things up

Page 36

1  at the Hotel 71 trial when I pushed something, so I

2  don't want to do it again.

3              THE COURT:  All right.  This is

4  Exhibit 50 that you were interested in?

5              MR. JORDAN:  It's 50 and 52, which is the

6  amended note and the amended loan and security

7  agreement.

8              THE COURT:  Okay.  Here is Exhibit 50.

9  Now, if you want me to show both of these side by

10  side, I can do that.  But it's easier to see if you

11  limit it to one at a time.

12              MR. JORDAN:  Let's just limit it to this.

13              THE COURT:  Okay.  Now, 50 and 52, did

14  you say?

15              MR. JORDAN:  52 is the amended loan and

16  security agreement.

17              THE COURT:  Which do you want to look at

18  first?

19              MR. JORDAN:  I think we can just look at

20  the note.  I'm not sure we need the security

21  agreement.

22              THE COURT:  Okay.  I have it if you want

23  it.

24              MR. JORDAN:  Okay.

25              THE COURT:  But here's the note.

Page 37

1    BY MR. JORDAN:

2        Q    Do you see the amended note in front of

3    you?

4        A    I do.

5        Q    Okay.  Now, what, if any, obligations

6    does Scattered Corporation have under the amended

7    promissory note?

8        A    Well, Scattered -- I'm not sure I

9    understand your question.  Under the note, IIT has

10   the obligation to pay back Scattered $3 million.

11   Scattered under the loan agreement has the

12   obligation to lend $3 million.

13       Q    Well, is this intended to be a term note

14   or a line of credit?

15       A    It's a revolving line of credit.

16            THE COURT:  Well, I guess the question is

17   has Scattered made any payments to IIT under this

18   note?

19            THE WITNESS:  Not yet.

20   BY MR. JORDAN:

21       Q    When do you think that it's likely the

22   first advance under the note would be?

23       A    I suspect it will be very shortly after

24   these contracts are assumed and assigned to IIT, and

25   IIT needs to make the cure payments on each of

Page 38

1  Peoria and Springfield.

2      Q    Okay.  And does Scattered have the money

3  set aside right now to fund those cure payments?

4      A    Not as I sit here right now, but it

5  will -- we were talking about roughly a

6  million-two-fifty that will need to be paid in

7  fairly short order, and Scattered will have that

8  within 60 days.

9      Q    Okay.  And that's the time frame within

10 which you understand that the trust would have to

11 make the payments?

12     A    My understanding is that that's quick

13 enough for the trust to make its payments, yes.

14     Q    Okay.  And what, if any, is the nature of

15 the business relationship between Scattered and

16 Chiplease other than this loan?

17     A    There is none.

18     Q    Okay.  How is it that it came about that

19 Chiplease became an additional beneficiary on the

20 Illinois Investment Trust?

21     A    There was a discussion between me,

22 Mr. Greenblatt, and Mr. Nickels, who is the -- the

23 three of us constitute the entire board of Scattered

24 Corporation.  Mr. Greenblatt represented the

25 interest of Chiplease.  Chiplease was the owner of

Page 39

1    certain contracts and equipment that had previously

2    been owned by RTC and was going to contribute those

3    to the trust, and we agreed that Chiplease would be

4    named as an additional beneficiary of the trust at

5    that time.

6         Q   Okay.  And as a part of agreeing to enter

7    into the amended promissory note and the loan and

8    security agreement, amended loan and security

9    agreement, what, if any, financial information did

10   Scattered review regarding these sites?

11        A   John Connolly prepared pro forma

12   projections for IIT which were his estimates of

13   the -- each of the four sites and how he expected

14   those sites would perform based on certain

15   assumptions that he was making.  I reviewed those

16   with Mr. Connolly, and we discussed what -- in round

17   numbers when certain sites would be coming online,

18   how much would be required to complete those sites,

19   and laid out a schedule of when advances would be

20   needed to be made.  And it was arrived at that

21   $3 million would be enough to fund the four sites

22   that IIT wished to develop.

23        Q   Okay.  So are you or are you not

24   satisfied that the pro formas are reasonable?

25        A   They seemed reasonable.  And Mr. Connolly

Page 40

1    explained to me where the revenue numbers came from,

2    the estimates, where the expense numbers came from.

3    And based on his experience, I believe the numbers

4    to be reasonable.

5         Q    Okay.  Of the $3 million under the --

6    your agreement to fund a line of credit, what

7    portion is going to be made available by Scattered

8    and what portion is being made available by

9    Chiplease?

10        A    There's no agreement in place right now

11   as to how much each of those entities is going to

12   extend under the note and security agreement.

13   However, Scattered Corporation is prepared to loan

14   the entire $3 million.

15        Q    Okay.  And is there any question in your

16   mind that Scattered has the ability to fund up to

17   $3 million?

18        A    There's no question in my mind that

19   Scattered has the ability to fund $3 million.

20        Q    Okay.  Did Scattered have any involvement

21   in the operations of Resource Technology Corporation

22   pre-petition?

23        A    Scattered did not, no.

24        Q    Other than as a lender, did Scattered

25   have any involvement in the operations of RTC

1    post-petition?

2        A    No, it did not.

3        Q    Okay.  Does Scattered have an

4    understanding of what individuals or entities would

5    actually operate the gas plants at these sites in

6    the event the contracts are assigned to the trust?

7        A    Only the understanding that Mr. Connolly

8    will be responsible for the individuals or entities

9    that IIT retains to operate those sites.

10       Q    Have you discussed or directed Mr.

11   Connolly regarding hiring or retaining personnel?

12       A    No.  As trustee, Mr. Connolly has that

13   discretion.

14       Q    Okay.  Now, there's $3 million available.

15   In the event that that amount proved to be

16   inadequate, and presuming that the properties met

17   the pro formas, what, if any, interest would

18   Scattered have to fund more than $3 million?

19       A    If IIT is meeting the pro forma

20   projections, the only way that $3 million would be

21   inadequate for it to fund all those projects would

22   be because the projects are coming online more

23   quickly than IIT estimates that they'll be able to

24   come online.  In that case, Scattered would be very

25   willing to extend additional credit in order to

Page 42

1    complete the projects faster.  If IIT is not meeting

2    its pro formas and the $3 million is inadequate,

3    it's not likely Scattered would be willing to extend

4    any additional credit.

5         Q    Okay.  On a going-forward basis, what, if

6    any, involvement is Scattered going to have in the

7    operation of any of these sites?

8         A    Only pursuing its rights under the loan

9    and security agreement.

10        Q    Do you plan on having any -- directing

11   Mr. Connolly what to do or not to do regarding the

12   operations?

13        A    No, not at all.

14             MR. JORDAN:  Thank you.  We'll pass the

15   witness, Your Honor.

16             THE COURT:  Okay.

17                 Mr. Bohan?

18                 CROSS-EXAMINATION

19   BY MS. BOHAN:

20        Q    Scattered Corporation has no balance

21   sheet, does it, sir?

22        A    Scattered does not prepare financial

23   statements on a regular basis like a typical

24   operating entity might, yes.

25        Q    So Scattered doesn't prepare a balance

Page 43

1    sheet, correct?

2        A    Not regularly.

3        Q    Or an income statement, right?

4        A    That's correct.

5        Q    Or a statement of sources and uses of

6    cash, correct?

7        A    It has from time to time, but it does not

8    do it in its ordinary course of business, no.

9        Q    Scattered has two principal assets,

10   correct?

11       A    I would not agree with that, no.

12       Q    Okay.  Well, did you not tell me at your

13   deposition, sir, that Scattered had two principal

14   holdings?  It's a holding company with two principal

15   investment holdings?

16       A    I believe what I testified to at my

17   deposition was that Scattered owned partnership

18   interest in two pieces of real estate, that it owned

19   its interest in H&M Oil & Gas, and that it owned the

20   two notes that were loans to RTC from Caterpillar

21   and from Aquila.

22       Q    Okay.  Well, then let's break it down.

23   Scattered is an indirect owner in the real estate

24   located at 330 South Wells, correct?

25       A    That's correct.

1        Q    Scattered is an indirect owner in another

2   piece of commercial real estate in Chicago, correct?

3        A    That's correct.

4        Q    Now, with respect to the 330 South Wells

5   building, what is your estimate of the equity in

6   that property?

7        A    I believe what I had just testified to

8   was that the building last appraised at

9   $5.7 million, and that it has about $3 million worth

10  of debt on it.

11       Q    And when was that building last

12  appraised, sir?

13       A    I'd have to go back and look.  I believe

14  it was around 2000.

15       Q    Now, with respect to the other commercial

16  real estate in Chicago, what's the address of that

17  building, Mr. Jahelka?

18       A    407 South Dearborn.

19       Q    And if I understood your testimony

20  correctly, the debt -- Scattered is an indirect

21  owner of approximately 85 percent of the equity in

22  that property, correct?

23       A    That's correct.

24       Q    And you estimate that the property is

25  worth $13.6 million?

Page 45

1          A    That's the price that we've been

2     negotiating to try and sell it at.

3          Q    With the debt at about $10 million --

4          A    That's correct.

5          Q    -- right?

6               Now, the property has been up for

7     sale for quite some time, has it not?

8          A    It has, yes.

9          Q    When was it first offered for sale?

10         A    Maybe two years ago.

11         Q    All right.  And, in fact, at that time

12    the property was actually the subject of an executed

13    real estate purchase and sale contract, true?

14         A    That is correct, yes.

15         Q    Which fell through, right?

16         A    That's correct.

17         Q    And as you sit here testifying today,

18    there is no contract for the purchase or sale of

19    that building, is there?

20         A    Well, there is that contract which both

21    sides are trying to enforce in an ongoing

22    litigation.  However, there is no subsequent

23    contract that has been executed.

24         Q    So Scattered is involved in litigation

25    with the prospective purchaser of the building with

Page 46

1    whom it had a contract?

2        A    I believe it's the partnership that is

3    engaged in that litigation --

4        Q    I'm sorry.

5        A    -- yes.

6        Q    Right.

7                 The entity of which Scattered is an

8    85-percent owner, that entity which owns the

9    building is engaged in litigation with the party

10   that signed the purchase sale contract?

11       A    That's correct.

12       Q    All right.  And how long has that case

13   been going on for?

14       A    It was filed shortly after the closing

15   failed to take place.

16       Q    Do either of those two properties on a

17   regular basis generate cash for Scattered?

18       A    Not a significant quantity of cash, no.

19       Q    Does Scattered receive periodically

20   distributions from the entities of which it is an

21   85-percent owner of either of those buildings?

22       A    It has.  I don't recall when it last

23   received one.

24       Q    The other major asset in Scattered's

25   holdings is an indirect ownership interest in a

Page 47

1    company that owns and operates oil and natural gas

2    properties in Texas; is that true?

3         A    Not exactly.

4         Q    Okay.  Correct me then so I get it right.

5         A    Scattered directly owns the preferred

6    membership interest in H&M Oil & Gas.  Scattered,

7    through a wholly-owned subsidiary, owns the ordinary

8    interest in H&M Oil & Gas.

9         Q    And has Scattered's preferred interest in

10   that -- is it a partnership or an LLC?

11        A    It's an LLC.

12        Q    Has Scattered's preferred interest in

13   that LLC been appraised?

14        A    No.

15        Q    And that LLC does not on a regular basis

16   spin off free cash to Scattered?

17        A    It has.  I mean, as recently -- I think

18   the last time was either October or November.

19        Q    Well, let me just ask you the question

20   flat out.  Today as you're sitting here, what are

21   Scattered's liquid assets?  What's the value of the

22   cash, marketable securities, and other liquid assets

23   that are currently owned by Scattered?

24        A    The only assets that Scattered has are

25   the ones that I've identified.  If you want to call

Page 48

1    those liquid or not, I'm not exactly sure.  I don't

2    mean to be argumentative.

3         Q    Well, would you agree with me to kind of

4    torture the use of -- it would torture the meaning

5    of the word "liquid" to call an indirect ownership

6    interest in a Texas oil and gas operation a liquid

7    asset, right?

8         A    Yeah, I don't want to characterize --

9         Q    All right.

10        A    I think I could sell it very quickly at a

11   very nice profit, and I don't have an interest in

12   doing that.  My --

13        Q    Well, let's talk about the profitability

14   of that business venture.  I think you said that as

15   of the end of 2007, it was showing earnings before

16   income, taxes, depreciation, and amortization of

17   about $1.2 million?

18        A    I believe what I testified to was that

19   its earnings before interest, depreciation, and

20   amortization.  This is after tax --

21        Q    Okay.

22             THE COURT:  It was EBIDA, without the T.

23             MS. BOHAN:  Without the T.

24             THE WITNESS:  Yes, EBIDA.

25   BY MS. BOHAN:

Page 49

```
 1        Q    But the free cash then was what?
 2        A    Was approximately $700,000.
 3        Q    And the profitability of that business
 4   depends, in part, on the price of oil and natural
 5   gas, does it not?
 6        A    Yes.
 7        Q    All right.  In fact, the profitability of
 8   that venture depends in significant part on the
 9   price of crude oil and natural gas, right?
10        A    One hundred percent of its revenues are
11   derived from the sale of oil and natural gas.
12        Q    And the figures you gave us were for the
13   end of 2007, correct?
14        A    The numbers I referred to were for
15   December of 2007, yes.
16        Q    At a time when the price of oil was at
17   historic highs, right?
18        A    I don't know what the average price was
19   for the month of December, but oil has hit historic
20   highs in recent months, yes.
21        Q    So when you were asked by Mr. Jordan
22   whether Scattered has funded any portion of this
23   loan to IIT, you answered no, right?
24        A    That's correct.
25        Q    All right.  And today Scattered is not in
```

Page 50

1    a position to fund any portion of that loan, right?

2         A    I think I discussed that Scattered in

3    very short order will be in position to fund the

4    loan.

5         Q    If the property that's been up for sale

6    and is now the subject of litigation, if that is

7    sold, right?

8              THE COURT:  I don't think you need to go

9    through each of the possibilities for their raising

10   cash.

11             MS. BOHAN:  All right.

12   BY MS. BOHAN:

13        Q    Now, you testified that other than as

14   co-lenders to IIT, Scattered had no relationship to

15   Chiplease, has no relationship to Chiplease, right?

16        A    That's correct.

17        Q    Okay.  You are the president of

18   Scattered?

19        A    That's correct.

20        Q    You are a director of Scattered?

21        A    That's correct.

22        Q    And you are a shareholder of Scattered?

23        A    That's correct.

24        Q    The 50-percent shareholder of Scattered,

25   the 50-percent owner of that company is Leon

Page 51

1    Greenblatt?

2         A    That's correct.

3         Q    Leon Greenblatt also owns Chiplease,

4    correct?

5         A    Either directly or indirectly, yes.

6         Q    And he's the president of that company?

7         A    I believe so, yes.

8         Q    And he sits on its board of directors?

9         A    I presume so.

10        Q    And he sits on the board of directors of

11   Scattered?

12        A    Yes, he does.

13        Q    Do you sit on the board of directors of

14   Chiplease?

15        A    I do not.

16        Q    Okay.  And Mr. Greenblatt is also the

17   secretary of Scattered?

18        A    That's correct.

19        Q    All right.  So he's an officer and

20   director and owner of Chiplease, he's an officer and

21   director and owner of Scattered, right?

22        A    Yes.

23        Q    Okay.  And, in fact, you've been in

24   business with the man since the late 1980s, right?

25        A    Yes.

Page 52

1          Q    But the two companies have no

2    relationship?

3          A    There's no business relationship.  The

4    common ownership interest we've discussed at length.

5          Q    All right.  Let's talk also about other

6    entities that are under common control with

7    Scattered and Chiplease.  You're familiar with a

8    company called Rumpelstiltskin?

9          A    I am.

10         Q    Rumpelstiltskin is the owner of RTC,

11   correct?

12         A    Subject to the bankruptcy estate --

13   Rumpelstiltskin owned 100 percent of the stock of

14   RTC, yes.

15         Q    All right.  And you're a director of

16   Rumpelstiltskin?

17         A    I am, yes.

18         Q    And so is Mr. Greenblatt?

19         A    Yes.

20         Q    Who owns Rumpelstiltskin?

21         A    I do along with Mr. Greenblatt and Mr.

22   Nickels.

23         Q    Now, incidentally, regarding the no

24   pre-existing business relationship between Chiplease

25   and Scattered, let me see if I can't jog your memory

1    a little bit about that.  In March of 2006, Judge

2    Wedoff approved a settlement agreement between, on

3    the one hand, the trustee, the Chapter 7 trustee of

4    RTC and, on the other hand, a number of entities

5    including Scattered, Chiplease, Banco PanAmericano,

6    and Mr. Greenblatt.  Do you recall that?

7         A    Honestly not as I sit here.

8         Q    Well, it was by virtue of that settlement

9    agreement and the accompanying designation rights

10   agreement that Scattered and Chiplease acquired from

11   the trustee the right to designate which contracts

12   the trustee -- which executory contracts the trustee

13   should assume and assign from RTC's estate, correct?

14        A    That sounds correct, yes.

15        Q    All right.  So in terms of being a party

16   that could designate which executory contracts for

17   assumption and assignment, Chiplease and Scattered

18   both acquired that right together with Mr.

19   Greenblatt by virtue of the settlement agreement,

20   did they not?

21        A    I believe that's correct, yes.

22        Q    Now, Scattered and Chiplease have

23   identified IIT, that is the Illinois Investment

24   Trust, as the entity that, if the court grants the

25   motion, will be assigned the three contracts that

Page 54

1    are at issue involving my client, Allied Waste

2    Industries; is that true?

3        A    That's correct, yes.

4        Q    All right.  So as the president of

5    Scattered, you were a part of that decision, right?

6        A    I was, yes.

7        Q    All right.  Now, who decided that it

8    would be IIT that would take over these contracts?

9    As between Scattered and Chiplease, which of the two

10   of you or both of you made that decision?

11       A    Both.

12       Q    All right.  And who made the decision on

13   behalf of Scattered?

14       A    Me, Mr. Greenblatt, and Mr. Nickels.

15       Q    And who made the decision on behalf of

16   Chiplease?

17       A    Mr. Greenblatt.

18       Q    And at the time, IIT was an entity of

19   which Mr. Greenblatt was the trustee, correct?

20       A    That's correct.

21       Q    And Scattered had been the grantor of

22   that trust, right?

23       A    That's correct.

24       Q    And was its sole beneficiary?

25       A    That's correct.

Page 55

1    Q    Now, IIT had no prior experience in the

2  landfill gas business, did it?

3    A    That's correct.

4    Q    So on what basis did Chiplease and

5  Scattered identify IIT as the business entity that

6  would be assigned contracts with my client

7  concerning the landfills in Litchfield, Bloomington,

8  and Springfield?

9    A    Upon advice of counsel.

10    Q    Which counsel was that?

11    A    I believe at the time it was Dykema.

12    Q    Was it Mr. Jordan?

13    A    Yes.

14    Q    Okay.  Scattered and Chiplease then

15  entered into -- well, at the time -- I'm sorry.  Let

16  me back up.

17              At the time, IIT had no operations

18  at all, right?

19    A    Correct.

20    Q    It had no money to perform any of these

21  contracts, correct?

22    A    Correct.

23    Q    It certainly had no prior experience in

24  the landfill gas businesses, right?

25    A    That's correct.

Page 56

1          Q    Okay.  And had no personnel, true?

2          A    Also correct, yes.

3          Q    All right.  Now, following that decision,

4     two things happened with respect to the trust.  I

5     want to ask you about each of them.  First, Mr.

6     Greenblatt resigned as trustee, correct?

7          A    I believe that's correct.

8          Q    And Mr. Connolly was installed as the new

9     trustee, right?

10         A    That's correct.

11         Q    Whose decision was that?

12         A    Mr. Greenblatt's, I believe.

13         Q    And, in addition, Chiplease became a

14    beneficiary of the trust, right?

15         A    That's correct.

16         Q    Okay.  Whose decision was that?

17         A    It was Mr. Greenblatt on behalf of

18    Chiplease, and it was consented to by Scattered, and

19    that was agreed to by the board of Scattered, which

20    is me, Mr. Nickels, and Mr. Greenblatt.

21         Q    And under the trust agreement, Scattered

22    and Chiplease as the beneficiaries of the trust have

23    the right to change the trustees anytime they want,

24    right?

25         A    I'm not sure as I sit here.

1          Q    Well, if it would refresh your

2    recollection to see a copy of the trust agreement,

3    I'll show it to you, Mr. Jahelka.  But if you're not

4    sufficiently familiar with the agreement, then I

5    won't.  Would it help to see the agreement?

6          A    I could read the agreement to you if --

7          Q    Well, no.  My question is are you

8    sufficiently familiar with it that if I showed it to

9    you right now, you could look through it and confirm

10   what I'm saying, that Chiplease and Scattered have

11   the right to change trustees?

12         A    Yes.

13         Q    Do you agree with that?

14         A    Yeah, I could read through the agreement

15   and answer your question.

16         Q    All right.  Well, then let me show it to

17   you.

18         A    Please do.

19              THE COURT:  What exhibit?

20              MS. BOHAN:  It's IIT Exhibit 1.

21              THE COURT:  IIT Exhibit 1.  Okay.  Hold

22   on.  I'll have it for you in just a second.

23              MS. BOHAN:  Do you have it in front of

24   you?

25              THE COURT:  Yes.  Although, it's pretty

Page 58

1    small unless I make it bigger than this.  It's not a

2    good copy.  It's also not in text, it's just a

3    photo.

4              MS. BOHAN:  Your Honor, I'm just going to

5    withdraw the question.

6              THE COURT:  All right.

7              MS. BOHAN:  I'll find the exact

8    provision, and we'll take it up with another

9    witness.

10             THE COURT:  That's fine.

11             MS. BOHAN:  All right.

12   BY MS. BOHAN:

13        Q    All right.  Now, when Chiplease and

14   Scattered identified IIT as the proposed assignee of

15   these landfill gas contracts, was that decision

16   memorialized in writing at all?

17        A    Yes.

18        Q    What was the writing?

19        A    The amendments to the trust agreement

20   and --

21        Q    Well, did Chiplease and Scattered -- I'm

22   sorry.  Let me just ask you about Scattered because

23   you're the president of that company.  Has Scattered

24   done anything, signed anything that would prevent it

25   from de-designating the trust and designating

Page 59

1    instead as the counterparty to these landfill gas

2    contracts some other business entity?

3              MR. JORDAN:  Objection.  Irrelevant.

4    We're way past the designation stage, Your Honor.

5    The designation had to do with the trustee assuming

6    and assigning to somebody.

7              THE COURT:  It's overruled.

8              MR. JORDAN:  It's irrelevant.

9              THE WITNESS:  I'm sorry.  Can you read

10   back the question?

11             THE COURT:  Just ask another one.

12             MS. BOHAN:  I will.

13   BY MS. BOHAN:

14        Q    You and Mr. Greenblatt could today leave

15   this courtroom, call Mr. Connolly, tell him the

16   trust is not the designated party to these

17   contracts, instead we've decided to create XYZ

18   Company and have XYZ Company take them over, right?

19        A    I don't know.  I would have to ask a

20   lawyer.

21        Q    Well, as far as you know, are you aware

22   of any restriction on Scattered?  Have you signed

23   any covenants?  Have you signed any contracts that

24   would prevent Scattered from doing exactly that?

25        A    I'm not aware of any, no.

Page 60

1              THE COURT:  All right.  If this is a good

2    place to break, if you're about to start a new

3    topic, we'll resume at 1:00 o'clock.

4              MS. BOHAN:  Thank you, Your Honor.

5                   (Proceedings recess until 1:00.)

6              THE LAW CLERK:  Taking up the court's

7    10:30 trial.

8              THE COURT:  Okay.  We'll resume with the

9    cross-examination.

10             MR. BOHAN:  Thank you.

11              CROSS-EXAMINATION (Resumed.)

12   BY MR. BOHAN:

13        Q   Mr. Jahelka, I'd like to begin by

14   referring you to that provision in the trust

15   agreement that I wanted to direct your attention to

16   earlier this morning to see if it jogs your

17   recollection regarding the power of Chiplease and

18   Scattered under the trust to remove Mr. Connolly as

19   trustee.  Would you -- do you have it before you,

20   IIT Exhibit 1?

21             THE COURT:  What page?

22             MR. BOHAN:  Page 13, paragraph 7.3.  It's

23   the paragraph called "Removal of Trustee."

24             THE COURT:  It's in front of the witness.

25   BY MR. BOHAN:

Page 61

```
 1        Q   Can you read it on the screen?

 2        A   I can read it.

 3        Q   All right.  Would you read that to

 4   yourself and tell me if it refreshes your

 5   recollection.

 6        A   Okay.  I've read it.

 7        Q   Okay.  And does it refresh your

 8   recollection that as the only two beneficiaries of

 9   the trust, Scattered and Chiplease could remove Mr.

10   Connolly as trustee?

11        A   Yes, they can.

12        Q   All right.  Now, before designating

13   Illinois Investment Trust as the proposed assignee

14   of these landfill gas contracts, you knew Mr. -- and

15   naming or appointing Mr. Connolly as trustee of the

16   trust, you knew Mr. Connolly, did you not?

17        A   Yes.

18        Q   For how long have you known him?

19        A   Maybe 10 years.

20        Q   In fact, Scattered is located at 330

21   South Wells, right?

22        A   Yes.

23        Q   And that's the same address as RTC?

24        A   Yes.

25        Q   Does RTC have its office on the same
```

Page 62

1    floor as Scattered?

2         A    Yes.

3         Q    What about Chiplease?  Are they there

4    also?

5         A    Mr. Greenblatt maintains an office there.

6         Q    And my question is, before designating

7    IIT as the proposed assignee of these contracts, did

8    you or anyone else from Scattered as far as you know

9    investigate how successful RTC had been in

10    performing these contracts pre-petition?

11        A    Not to my knowledge.

12        Q    Did you or any other representative of

13   Scattered investigate whether RTC in performing the

14   gas contracts at Litchfield, Bloomington, and

15   Sangamon had remained in compliance with applicable

16   environmental regulations?

17        A    I did not, no.

18        Q    Did you determine whether IIT either had

19   a permit or was qualified to obtain a permit so that

20   it could operate gas-to-energy plants at those

21   locations?

22        A    I did not.

23        Q    Now, what you did do, you told us on

24   direct examination, was examine some pro forma

25   financial statements, correct?

Page 63

1        A    That's correct.

2        Q    All right.  And what was -- tell me what

3   it was you reviewed.

4        A    There was a series of spreadsheets that

5   Mr. Connolly had put together that for each of the

6   four sites projected out the revenue and expenses

7   over I think it was a ten-year period.

8        Q    For what purpose did you review those pro

9   formas?

10       A    To determine the likelihood that

11   Scattered would be repaid on its note.

12       Q    Okay.  Did you regard that information as

13   important in deciding whether or not to commit

14   Scattered to loan money to IIT?

15       A    Yes.

16       Q    But you yourself, Mr. Jahelka, have no

17   prior experience in the landfill gas business,

18   right?

19       A    That's correct.

20       Q    Did you as a result then consult some

21   independent source, an independent third party to

22   determine the reasonableness of Mr. Connolly's

23   estimates of likely revenues and expenses?

24       A    I did not.

25       Q    You relied exclusively on him, right?

Page 64

```
 1        A    That's correct.

 2        Q    Did you conduct any investigation to

 3   determine how accurate Mr. Connolly might have been

 4   in the past when it came to estimating revenues and

 5   expenses from the operation of a gas plant at a

 6   landfill?

 7        A    I did not.

 8        Q    In the event IIT is unable to perform

 9   these contracts, defaults on its loan, Scattered has

10   no contingency plan or plan B, right, to perform

11   these contracts?

12        A    That's correct.

13        Q    It's relying exclusively on Mr. Connolly

14   and the others who used to work for RTC, correct?

15        A    Relying on Mr. Connolly.

16             MR. BOHAN:  I have no other questions,

17   Your Honor.

18             THE COURT:  Ms. Kujaca?

19                Mr. Apostolides, if at some point

20   you want to ask questions on behalf of the trustee,

21   let me know.  Otherwise, I'm going to assume that

22   you do not.

23             MR. APOSTOLIDES:  That's fine, Your

24   Honor.  Thank you.

25                    CROSS-EXAMINATION
```

Page 65

1    BY MS. KUJACA:

2         Q    Mr. Jahelka, just a brief couple of

3    questions.  Did you testify at a deposition on

4    January 25th of this year?

5         A    That sounds about right.

6         Q    At that deposition, did you state that --

7              MR. JORDAN:  Your Honor, I don't think

8    that you can impeach a witness --

9              THE COURT:  She doesn't need to impeach

10   him.  He's a representative of a party, and any

11   statement that he made is a party admission.

12             MR. JORDAN:  He's not a representative of

13   a party, Your Honor.

14             THE COURT:  Well, he is essentially a

15   representative of a party.  You've told me that you

16   are standing in the shoes of the trustee for

17   purposes of presenting this case.

18             MR. JORDAN:  But Mr. Jahelka isn't.

19             THE COURT:  Well, he is a representative,

20   is he not, of IIT?

21             MR. JORDAN:  No.  He's a representative

22   of Scattered.  He's a lender.  In fact, he doesn't

23   have anything to do with IIT.

24             THE COURT:  All right.  You're right.  I

25   stand corrected.

1                 You would need to lay some

2    foundation before you attempt to impeach by a prior

3    inconsistent statement.

4    BY MS. KUJACA:

5         Q    Did you testify earlier that Scattered

6    would fund IIT if its liabilities exceeded

7    $3 million?

8         A    I don't think that's exactly what I had

9    said.  I think I was asked whether Scattered would

10   fund any amounts over $3 million, and I described

11   the scenario in which Scattered would be willing to

12   advance monies over and above the $3 million.  And I

13   also said that if IIT was not performing, that

14   Scattered would not likely be advancing any monies

15   beyond the $3 million.

16              MS. KUJACA:  Okay.  Thank you.

17              THE COURT:  Redirect, Mr. Jordan?

18              MR. JORDAN:  Yes, Your Honor.  Just a few

19   questions just to clarify.

20                   REDIRECT EXAMINATION

21   BY MR. JORDAN:

22        Q    The Peoria stipulation requires a $60,000

23   payment five days after the effective date, which,

24   assuming it was approved tomorrow, that would be 16

25   days from now.  Would Scattered be in a position

Page 67

```
1    to advance $60,000 on the line 16 days from now to

2    pay that very payment?

3         A    Yes.

4         Q    Okay.  I think that we talked about a

5    contract buyer for the 401 property, and there was

6    some litigation when Mr. Bohan was asking you some

7    questions.  Do you recall that?

8         A    The 407 property.

9         Q    Right.  Do you know whether the 407

10   buyers are or are not in bankruptcy right now?

11        A    My understanding is that they recently

12   filed for bankruptcy.

13        Q    Was that a Chapter 7 or a Chapter 11?

14        A    I'm not sure as I sit here.

15        Q    Chapter 7 being a liquidation and Chapter

16   11 being a reorganization.

17        A    I can't as I sit here tell you whether it

18   was a 7 or an 11.

19        Q    Okay.  Is there a trustee in the case?

20        A    I'm not sure.

21        Q    Okay.  Were you offered any opportunity

22   to buy back the contract rights?

23        A    There was an offer to buy them out of the

24   contract rights.

25        Q    How much was that offer?
```

Page 68

```
1          A    I think it was $10,000.

2          Q    Okay.  Who were the buyers who -- check

3     the docket?

4          A    Well, it was an entity.  The

5     principals --

6          Q    No.  The entities are the ones that I

7     need because they're in bankruptcy.

8          A    I can't remember exactly what it's

9     called.  It was something like 407 Company, LLC,

10    or --

11              THE COURT:  What was the purchase price

12    under this contract?

13              THE WITNESS:  I believe it was

14    13.1 million, if I'm not mistaken.

15              THE COURT:  Well, if -- and they didn't

16    perform; is that --

17              THE WITNESS:  That's correct.  They wrote

18    us the earnest money checks.  And when we presented

19    them, they were not honored.

20    BY MR. JORDAN:

21          Q    And what price are you negotiating at

22    now?

23          A    13.6 million.

24          Q    Okay.  Now, I think Mr. Bohan talked to

25    you a little bit about the vagaries of the oil and
```

Page 69

1    gas market.  Do you recall that?

2        A    Yes.

3        Q    What, if any, head strategy does -- is

4    used by that oil company that we were talking about?

5        A    H&M does a couple different hedging

6    strategies involving options.  It does both buys

7    puts and sells calls in order to hedge its oil

8    price.

9        Q    So it locks in its return on a long-term

10   basis?

11       A    It tries to lock in what it feels it will

12   produce over, you know, the next two or three years.

13   My belief is that it has maybe two-thirds of its

14   projected production hedged at this point in time.

15       Q    Okay.  Now, in order to fund the

16   $1.25 million, does Scattered have any plans to

17   accumulate money to do that?

18       A    Yes.  I think I described the plan to

19   accumulate money from H&M.  Scattered has not begun

20   to do that merely because it's awaiting the outcome

21   of this hearing.

22       Q    Okay.  Now, we talked about Illinois

23   Investment Trust's operating history.  Are you

24   relying on Illinois Investment Trust's operating

25   history, or are you relying on John Connolly's

Page 70

1  ability to manage the business?

2      A    I'm relying on John Connolly's abilities.

3      Q    Okay.  There was some conversation about

4  changing the trustee.  Are there any plans to change

5  Mr. Connolly as trustee?

6      A    At the present time?

7      Q    At any time.

8      A    There have been no discussions to which

9  I've been a party concerning replacing Mr. Connolly

10  as trustee.

11      Q    Okay.  Do you anticipate that John

12  Connolly will serve as trustee for the life of the

13  loan to the trust?

14      A    That's my expectation, yes.

15          MR. JORDAN:  Thank you, Your Honor.

16  Nothing further.

17          THE COURT:  Before you step down, Mr.

18  Jahelka, could you tell me whether there is pending

19  any litigation that could cause a piercing of the

20  corporate veil of any of the entities that you've

21  been discussing today?

22          THE WITNESS:  Not of Scattered.  The only

23  litigation I think you could even be referring to

24  would be the Wachovia litigation, but that's against

25  Loop Corp., and that's an attempt to pierce the

Page 71

1    corporate veil of Loop Corp.  Scattered was a party

2    to that, but that was only because Wachovia had

3    believed that certain assets were transferred from

4    Loop to Scattered, and that transfer never took

5    place.  I don't think there's anything in the

6    Wachovia litigation that would affect Scattered.

7              THE COURT:  Okay.

8              MR. BOHAN:  May I ask one question based

9    on --

10             THE COURT:  Go ahead.

11             MR. BOHAN:  -- Your Honor's question?

12                  RE-CROSS EXAMINATION

13    BY MR. BOHAN:

14        Q    Is it not the case that Scattered remains

15    a defendant in the Wachovia litigation?

16        A    That is the case.  It is still a

17    defendant in that litigation.

18        Q    And what's the amount that Wachovia is

19    seeking to recover from Scattered or Loop Corp.?

20             MR. JORDAN:  Objection.  Irrelevant as to

21    Loop Corp., only to Scattered.  I don't know what

22    difference it makes --

23             THE COURT:  Fine.

24    BY MR. BOHAN:

25        Q    What are Wachovia's alleged damages in

Page 72

1    the case?

2        A    Against Scattered?

3        Q    Against whomever.

4        A    Well, I mean --

5            MR. JORDAN:  Objection, Your Honor.  It

6    only matters what they can get from Scattered.  We

7    can inflate the number and it wouldn't have anything

8    to do with Scattered.  It would be irrelevant and

9    prejudicial.

10           THE COURT:  That's sustained.  All that's

11   relevant here would be any claim that could

12   potentially be asserted against Scattered.

13   BY MR. BOHAN:

14       Q    What amount is Wachovia seeking to

15   recover from Scattered?

16       A    It would be seeking to reverse the

17   transfer from Loop Corp.  Again, it's a transfer

18   that never actually took place.

19       Q    But what's the value?  What's the dollar

20   value?

21       A    Of something that never happened?

22       Q    What's the amount that Wachovia is

23   seeking to recover from Scattered, sir?

24       A    Without expressing a legal opinion, I

25   believe it to be zero.

Page 73

```
 1           Q    That's the amount that the plaintiff has

 2    sued Scattered for, zero dollars?

 3           A    Scattered -- again, Scattered -- the only

 4    charge relating to Scattered is to --

 5                THE COURT:  Okay.  Let me see if I can

 6    shorten this up.  I understand that you believe no

 7    transfer was ever made --

 8                THE WITNESS:  Right.

 9                THE COURT:  -- to Scattered that could be

10    recovered by Wachovia.

11                THE WITNESS:  Right.

12                THE COURT:  What does Wachovia allege was

13    transferred to Scattered?

14                THE WITNESS:  Wachovia alleged that stock

15    in a company called EZLinks Golf was transferred

16    from Loop Corp. to Scattered.

17                THE COURT:  And what's the value they

18    allege that stock to be?

19                THE WITNESS:  I believe it's -- I'm

20    trying to remember what they allege was transferred.

21    I think it was the series A preferred stock which --

22    I don't know what the current market value would be

23    on it.  Loop Corp. paid roughly $3 million for it.

24                THE COURT:  Okay.

25                MR. BOHAN:  Thank you.
```

Page 74

```
 1                    THE COURT:  Anything else?
 2                         (No response.)
 3                    THE COURT:  You may step down.   Thank
 4    you.
 5                    THE WITNESS:  Thank you.
 6                         (Witness excused.)
 7                    THE COURT:  Next witness, Mr. Jordan.
 8                    MR. JORDAN:  I'm going to call Mr.
 9    Connolly.
10                         (Witness sworn.)
11              JOHN CONNOLLY, WITNESS, SWORN
12                    DIRECT EXAMINATION
13    BY MR. JORDAN:
14         Q    Would you please state your name and
15    spell your last name for the record.
16         A    Sure.  It's John Connolly,
17    C-o-n-n-o-l-l-y.
18         Q    Mr. Connolly, you're the president of
19    Resource Technology; is that right?
20         A    Correct.
21         Q    Okay.  And you're also trustee of
22    Illinois Investment Trust; is that right?
23         A    That's correct.
24         Q    Okay.  How long have you been trustee of
25    Investment Trust?
```

1       A    Since August '06.

2       Q    Okay.  Why don't we start by just

3   summarizing your educational background for the

4   court.

5       A    Sure.  I obtained a Bachelor of Science

6   degree in mechanical engineering from Michigan Tech

7   University, Houghton, Michigan, 1984.  I've also

8   attended MBA classes at Georgia State University and

9   Northern Illinois University.  I didn't finish that

10  course work, I got halfway through it.  And then I

11  obtained an environmental engineering certificate

12  from Purdue University by way of General Motors

13  Corporation.

14      Q    Okay.  Have you ever taken any courses in

15  finance?

16      A    Sure, yeah.

17      Q    What courses?

18      A    I took Master's levels financial courses

19  at Georgia State University and Northern Illinois

20  University.  I took accounting courses at both

21  schools, Master's levels.

22      Q    Okay.  Can you please summarize your

23  professional experience since college.

24      A    From 1984 through 1989, and it really

25  goes back to '83 because I was a co-op student, but

1    I worked for General Motors Corporation, worked in

2    Lansing, Michigan, until I graduated from college.

3    And then I went to work in Doraville, Georgia, for

4    an assembly plant down there, and I was a plant

5    environmental engineer for about five years.

6                     And then in 1989 I took a position

7    here in the Chicago area with Chemical Waste

8    Management, Inc., which was at the time a

9    wholly-owned sub of Waste Management, Inc., as a

10   senior environmental engineer.  I did that for a

11   couple of years with Chem Waste, and I -- I stayed

12   with Chem Waste, but then I took a site level

13   position at the CID Landfill at 138th Street and

14   Calumet Expressway as the environmental manager for

15   that landfill.

16                     And then I moved on within Chem

17   Waste as an environmental facility manager.  I

18   picked up a couple of sites.  I continued to manage

19   the CID landfill, and then I picked Menomonee Falls'

20   facility for Controlled Waste Division in Wisconsin.

21                     I also was an environmental

22   facility manager for Riverdale Laboratory which was

23   responsible for analyzing waste samples for ultimate

24   disposition.  And then I picked up responsibility

25   for the Geneva Laboratory in Illinois.

Page 77

1                    And then my final assignment was

2     the remediation and close-out and final sale of the

3     Chicago Incinerator, which was a hazardous waste and

4     PCB incinerator on the South Side of Chicago.  We

5     sold that to Clean Harbors.

6                    At that time the company dissolved,

7     Chemical Waste Management, Inc., and in 1995 I took

8     a position with Resource Technology Corporation,

9     served in Resource Technology Corporation as an

10    environmental engineer responsible for permitting

11    primarily and compliance activities.  Then I picked

12    up construction activities for landfill

13    gas-to-energy plants.  I oversaw all those

14    activities as director of the construction and

15    environmental compliance and environmental

16    management.  And then I became a vice president in

17    1999, similar duties.  And then in 2001 I succeeded

18    Mr. Calvert as president of RTC.

19        Q    What did you do after 2001?

20        A    Well, I continued in that regard.  I

21    oversaw day-to-day operations of the company,

22    continued to oversee operations of the landfill

23    gas-to-energy plants.  I was responsible for overall

24    environmental compliance and permitting and

25    construction activities.

1          Q    Okay.  And on an average basis during

2    your presidency, how many people have you managed

3    for -- employees of RTC?

4          A    I'd say on an average eight to ten.

5          Q    Okay.  Have those people changed over

6    time or have you had a lot of continuity?

7          A    Some have changed.  But the ones that are

8    -- would be right now have been continuous since the

9    mid to late '90s.

10         Q    Who would those fellows be that are with

11   you right now?

12         A    Richard Walker.  He's been with me since

13   1997.  He's a construction manager and an operations

14   manager.  And he's got an incredible resume on

15   construction activities, building dams and

16   hydropower projects throughout the world.

17                    Mr. Fortelka.

18         Q    Is that Rob Fortelka?

19         A    Yeah, Mr. Rob Fortelka.  He's a degreed

20   civil engineer out of the University of Wisconsin.

21   And I'll say that in all my experience, he's one of

22   the best intuitive engineers I've ever worked with.

23         Q    What does he do for the company?

24         A    He's an operations manager, and he

25   also --

Page 79

1    Q    What does that mean --

2    A    Well, he --

3    Q    -- for both those fellows?

4    A    Yeah.  He supervises and oversees the

5    actual operations of landfill gas-to-energy plants,

6    and then he also functions as a resident engineer.

7    And he'll review designs before they go in.

8    Q    Okay.

9    A    But, overall, his responsibility is

10   day-to-day operation and maintenance of the fields

11   and the plants.

12   Q    Okay.  Who else is currently on that

13   staff?

14   A    We have Mr. William Johnson.  He's been

15   with us since 1997.  He was construction manager for

16   RTC, built some projects.  But now he's more in the

17   business development area.

18   Q    So you're actually at least for the trust

19   going out there and looking for new business?

20   A    Absolutely.

21   Q    And that would be Mr. Johnson?

22   A    Mr. Johnson, yeah, exactly, would be

23   doing that now.

24   Q    He's going around the country or is he

25   local?

1          A    All around the country.

2          Q    Okay.  Who else is with the company?

3          A    We have Michael Watson.  He's a well

4    field maintenance technician.  He's been with us

5    since either 1999 or 2000, and he reports directly

6    to Mr. Walker.

7                    And then Mr. Weeks, Mr. Phil Weeks,

8    who actually predated me with RTC.  He was working

9    at RTC in 1993 or '4.  And he handles all the

10   environmental compliance duties.  He's the lead

11   person to coordinate with consultants such as

12   Trinity Consultants on the periodic compliance

13   monitoring and reporting.

14         Q    Okay.  You didn't mention how long,

15   because I didn't ask, Mr. Walker and Mr. Fortelka

16   and Mr. Johnson had been with you.

17         A    Mr. Walker has been with me since '97, so

18   we're on 11 years.  Mr. Fortelka has been with me

19   since 1996, so that's 12 years.  And Mr. Johnson

20   since 1997, that's 11 years.

21         Q    Okay.  Is there anybody else that's on

22   your team?

23         A    Nobody that I haven't mentioned.

24         Q    Okay.  What outside companies are you

25   going to -- well, first off, of these people, which

Page 81

1    of these people will be providing services related

2    to any of the four landfills about which we're here

3    for today?  For instance, I would assume that

4    Mr. Weeks would be involved in the compliance for

5    them.

6            A    Well, sure.  Yeah, he will be involved in

7    compliance.  He'll continue to coordinate with

8    Trinity Consultants.  We recently signed a contract

9    with LFR, Inc., which is an international

10   environmental engineering and consulting firm.

11   We're going to expand their role to assist, so he'll

12   coordinate with them.

13                Mr. Fortelka will continue to

14   coordinate with Altorfer, Inc., who does engine

15   maintenance and plant maintenance at Peoria.  We're

16   expanding their role, unfortunately, since the death

17   of Mr. Muir.

18           Q    What was that?  When you refer to the

19   death of Mr. Muir, when did that occur?  Well, first

20   off, who is Mr. Muir?

21           A    Vince Muir was an employee of RTC since

22   1995.  He suffered a stroke in November of last year

23   and then died New Year's Eve.

24           Q    Okay.  Who's actually on-site at Peoria

25   making sure everything is running smoothly?

Page 82

```
 1        A    Yeah.  Vince Muir had that
 2   responsibility.  Now it is Altorfer.  We've expanded
 3   their role to be on-site much more frequently, and
 4   Mr. Fortelka.
 5        Q    And, by the way --
 6        A    Mr. Watson will be a --
 7        Q    -- does Altorfer have any relationship
 8   with Scattered or Chiplease or, you know, ownership
 9   or anything else?
10        A    No, no.  They contracted with IIT.
11        Q    Okay.  You were going to say something
12   about Mr. Fortelka, I think?
13        A    Yeah.  Mr. Fortelka will continue to
14   coordinate directly with Altorfer, Inc.  He's been
15   doing that for about 10 years now and with that
16   relationship.
17                     We have contracts with RS Used Oil.
18   We've had those contracts for about 10 years.  And
19   they handle the oil -- not the oil, but the waste
20   condensate and waste disposal coming off the sites
21   for proper pumping and treatment and disposal.
22                     We have contracts with Lozier Oil
23   for Peoria that provide the oil and coolants for the
24   sites.  We've had that relationship for over 10
25   years.
```

Page 83

1                    I think I mentioned we've got

2    Altorfer for over 10 years.

3                    And then Nelson Oil would assist us

4    in Springfield.  That's their territory for oil.  In

5    addition to Altorfer, they'd assist us for

6    Springfield as well.

7         Q    Okay.  I guess just to go over them,

8    there are a series of contracts that are attached as

9    exhibits, and those would be starting at Exhibit 8

10   and going through Exhibit 13.  I just want to

11   confirm that -- tell me whether these are documents

12   out of your records.

13        A    Okay.  I'm not sure how this works here.

14        Q    Okay.

15        A    So if someone could assist me.

16             THE COURT:  I've got Exhibit 8 here.  Are

17   these all similar?

18             MR. JORDAN:  They're just the various

19   contracts.

20   BY MR. JORDAN:

21        Q    I see this isn't signed by RSU.  So do

22   you have a contract signed by RS Used Oil?

23        A    Oh, yes.

24        Q    Just put the wrong document in our

25   exhibit list.

Page 84

1        A    Right.

2        Q    But this is your agreement with RS Used

3    Oil?

4        A    Yes.

5        Q    Okay.  And how long do you plan on using

6    RS Used Oil?  For the foreseeable future?

7        A    I don't have any end date for them.  It

8    would be ongoing.

9        Q    Okay.  And then the next one is the

10   master consulting services agreement between IIT and

11   LFR?

12            MR. JORDAN:  And I think we've got to

13   page through that.  Maybe we could make it smaller.

14            THE COURT:  You want to see a particular

15   page?

16            MR. JORDAN:  Kind of -- go back to

17   page 2.

18   BY MR. JORDAN:

19       Q    Now, I see at the bottom that the

20   document is signed.  Is this a true and correct copy

21   of the document out of your files?

22       A    Yes, it is.

23       Q    Okay.  Is this a contract that IIT is

24   currently a party to?

25            A    That's correct.

Page 85

1          Q    And what exactly does LFR plan to do with

2    regard to these various sites that we're here on

3    today?

4          A    They can assist us in all regards,

5    environmental permitting, environmental reporting,

6    monitoring.  They can assist in stack testing,

7    virtually anything related to, you know, air, land,

8    water permitting compliance.  They're a very large

9    firm.

10         Q    Now, you indicated they can do that.  Are

11   they going to do that?

12         A    I plan to use them for stack testing, to

13   assist in stack testing.  I do plan to use them on a

14   limited basis for monitoring because Trinity is

15   doing that right now.  But I do plan to use them for

16   environmental compliance --

17         Q    Um-hmm.

18         A    -- work, if you will.  But, again,

19   Trinity is doing the lion's share of that now.

20         Q    Okay.

21         A    But --

22         Q    Anything else you're going to use them

23   for?

24         A    Not at this time.

25         Q    Now, is this a relationship that carries

Page 86

1    over from RTC or is this a new relationship?

2         A    This is new.

3         Q    Okay.  Do you think this makes your

4    business better than the business that RTC had?

5         A    It does.  Well -- yes.  I mean, not to

6    take anything away from Trinity Consultants.  I

7    think they've done a fantastic job.  But what LFR

8    brings is a little bit bigger firm, a larger reach,

9    if you will, more resources.  And if nothing else,

10   it's a backup.  In case Trinity can't perform a

11   certain function, they can come in and do it.

12        Q    Okay.  Now, if we can switch to, I guess,

13   Exhibit 10.  If we could just kind of page through

14   that.

15        A    Okay.

16        Q    Do you have a signed contract with

17   Trinity?

18        A    I do.

19        Q    Okay.  And I see on the bottom here Gene

20   Taylor.

21        A    Right.

22        Q    Gene Taylor has since signed this

23   contract?

24        A    Right.  There's a current contract with

25   them.

Page 87

1      Q    Okay.  What is Trinity going to do for

2   you?

3      A    Trinity will continue with environmental

4   monitoring at the landfills, which means wellhead

5   monitoring, surface scans.  They'll continue with

6   assisting us with permit writing --

7      Q    Um-hmm.

8      A    -- permit renewals, permit transfers, the

9   monthly reporting, the semiannual reporting, the

10  annual reporting, interpretations of regulations,

11  assisting us with the various agencies.  That would

12  be a good summary of their work.

13     Q    Okay.  And so you anticipate continuing

14  with Trinity for as long as you can?

15     A    Absolutely, yes.

16     Q    Okay.  Why don't we look at Exhibit 11.

17  What is this?

18     A    This is an Altorfer Power Systems'

19  general agreement between IIT and Altorfer --

20     Q    Um-hmm.

21     A    -- dated February 9, 2007.

22     Q    Okay.  What sites is Altorfer going to

23  provide services for?

24     A    Primarily Peoria.

25     Q    Okay.

1        A    Primarily Peoria would be the case.

2        Q    Okay.  And that would be the services you

3   referenced previously?

4        A    That's correct.

5        Q    Okay.  And how long do you anticipate

6   using or working with Altorfer?

7        A    I don't see any end in sight.  We've got

8   a very good relationship with them.  Like I say,

9   it's been over 10 years, and we know them really

10  well and they know us really well.  And they've done

11  a fine job.  And it's their equipment.

12       Q    What do you mean?

13       A    It's their -- it's Caterpillar equipment

14  and they're a Caterpillar dealer.  I think they're

15  the best party to work on it.

16       Q    Okay.  All right.  What work are they

17  doing right now on the engines at the site?

18       A    They are doing the monthly preventive

19  maintenance work, which is oil changes, coolant

20  changes, sparkplug gapping, checking for valve wear,

21  checking for head wear, making any valve adjustments

22  that are required.  That's the monthly thing that's

23  done.  Then they've also been working to bring a

24  second engine online for us.  They stripped the

25  heads, they've done all the electrical work, and the

1    next step is to rebuild the manifolds.

2         Q    Okay.  What do you anticipate is going to

3    be the cost of that service for bringing that second

4    engine online from this point forward?

5         A    Well, we spent about 30,000 -- or about

6    25,000, I think, exactly to date.  It will be a

7    margin of maybe 25 or 30,000 to bring it online.

8         Q    Okay.  And then are they going to work on

9    any other engines at the site?

10        A    They will.  Pursuant to the stipulation,

11   we've got to bring a third engine online.

12        Q    At Peoria?

13        A    At Peoria.

14        Q    Okay.

15        A    Right.  And so they'll do that work.

16   They'll bring that third engine online as well.

17        Q    How is that going to -- how does that

18   work?  What do they have to do for that?

19        A    Well, once the second engine is done, and

20   I anticipate that will take them another 30 to 45

21   days, we'll just have them roll right into the third

22   engine.  It will be very similar.  They're going to

23   take off the heads.  They're going to examine for

24   wear, replace any parts that have to be replaced,

25   install any new parts that have to be replaced.  If

Page 90

1    they have to bore the cylinders, they'll bore the

2    cylinders.  They'll do whatever it takes to bring

3    that engine online.

4         Q    Okay.  What do you think that's going to

5    cost?

6         A    I think around $50,000.

7         Q    Okay.  Where are you getting those

8    numbers from?  Are these out of your head or from

9    Altorfer?

10        A    No.  They're from Altorfer, Mr. Fortelka,

11   discussions with both.

12        Q    Okay.  What other work is Altorfer going

13   to do?  Is that it?

14        A    No.  They'll do -- as I say, we're

15   expanding their role, with the death of Mr. Muir, to

16   be on-site much more frequently to check operations,

17   report on an operational basis to Mr. Fortelka.

18        Q    Um-hmm.

19        A    Output numbers and status of operation.

20        Q    Okay.  Now, I understand there was some

21   downtime in January where the engine went down?

22        A    Right.

23        Q    Is that correct?

24        A    Right.

25        Q    If you have another engine online, would

1  that ameliorate that situation?

2       A    Yes.

3       Q    Okay.

4       A    There would be continuous combustion of

5  the landfill gas because the second engine would

6  combust the gas.

7       Q    And so if you had three engines, it would

8  even further ameliorate the situation?

9       A    Right, that's correct.

10       MR. JORDAN:  Okay.  I think we need to

11  look at the next exhibit, Your Honor, which I

12  believe is 11.

13  BY MR. JORDAN:

14       Q    This is an agreement signed by you and

15  someone, it appears, from Lozier Oil.  Is this a

16  contract to which you're a party right now?

17       A    Yes.

18       Q    All right.  Or the trust is a party?

19       A    The trust is a party to this, yes.

20       Q    Now, what exactly are your plans

21  regarding Lozier Oil?

22       A    Well, Lozier, again, they've been

23  providing oil to us for over 10 years at that site

24  in Peoria, and they'll continue to provide new oil

25  services.  They'll take the waste oil off site,

Page 92

1    other lubricants we might need for compressors,

2    compressor oil.  That's primarily it.  From time to

3    time they may provide some coolant services.

4                MR. JORDAN:  Now, if we go to 13, Your

5    Honor.

6    BY MR. JORDAN:

7        Q    What is this contract?  Is this a

8    contract to which the trust is a party?

9        A    Yes, it is.  This is between Nelson Oil

10   Company and IIT, again, primarily for the

11   Springfield site to provide oil similar to Lozier,

12   provide oil services in and out.

13       Q    Okay.  And do you anticipate utilizing

14   all of these various companies for each of the

15   sites, Litchfield, Bloomington, Springfield, and

16   Peoria with the exception of maybe Altorfer?

17       A    Yeah, with the exception of Altorfer.  I

18   would definitely use these guys, the oil guys for

19   Litchfield and Bloomington.  But those are gas

20   scrubbing projects.  Yeah, with the exception of

21   Altorfer I think is a good characterization.

22       Q    Okay.  And do you have any knowledge of

23   the general opinion in the industry of these various

24   companies?

25       A    Just my experience with them.  They're

Page 93

1    very reputable companies.  They've been around a

2    long time providing services.  There's no newbies

3    here.

4         Q    Okay.  Now, as far as the trust, the

5    Illinois Investment Trust, you're the trustee.

6    We've already established that.

7         A    Yes, I'm the trustee.

8         Q    How long do you plan on being the

9    trustee?

10        A    For hopefully a long time.

11        Q    Okay.  Has there ever been any indication

12   that your appointment might be a short-term

13   appointment?

14        A    No.  I would expect it to be long-term.

15   I've been working on these projects for 12 years,

16   and I expect they'll go a lot longer.

17        Q    Do you anticipate, God willing, that you

18   would be in that role through the life of the

19   contracts?

20        A    Yes.  2020, you bet.

21        Q    Okay.  Now, have you ever heard the term

22   gas collection and control system?

23        A    Yes.

24        Q    All right.  How is it you're aware of

25   that term?

1        A    Well, it's a defined term that -- and I'm

2   aware of it through regulatory process, general

3   industry term that's used.  I'm just aware of it.

4        Q    Okay.  Let's break it down.  Gas

5   collection system, what's a gas collection system?

6        A    Gas collection system, it can be a range

7   of things.  But common denominator is usually a well

8   or well systems to extract the gas out of a landfill

9   that has municipal solid waste that's decomposing

10  and produces methane.  It can range from wells in

11  vents to wells in solar-powered flares at the top of

12  the wells, to what we call an active gas collection

13  system which hooks up all the wells to common

14  laterals and headers and extraction devices such as

15  a blower or compressor to take the gas out.  So

16  that's the range of a gas collection system.

17       Q    All right.  What's a gas control system?

18       A    A gas control system hooks up to whatever

19  gas collection system you have.  Again, it can range

20  from solar-powered flares at the top of the wellhead

21  all the way through utility fares, which are the

22  candlestick flares you see from the highway from

23  some of these landfills, to enclosed flares which is

24  just flaring off the gas and the energy there, to

25  running it through engines or turbines to make some

Page 95

1    process out of it.

2         Q    Okay.  You've heard the term gas

3    conversion system?

4         A    Right.

5         Q    What is that?  What's a gas conversion

6    system?

7         A    Well, that's one that you're taking the

8    energy out of the landfill gas and making some type

9    of energy out it.  It can mean direct pipeline

10   injection, pipeline quality standards for natural

11   gas.  It can mean making electricity.  It can mean,

12   you know, making some type of product out of it, or

13   routing it to a manufacturing facility that uses it

14   in its boilers as supplemental fuel.

15        Q    How many years experience do you have

16   with gas collection and control systems and gas

17   conversion systems?

18        A    Nineteen.

19        Q    Okay.  How about the rest of your team in

20   a range?

21        A    Everybody has -- the range would be at 11

22   years on the low end to 15 years on the high.

23   Actually, Mr. Fortelka would be in the same range as

24   me, probably 17 years.

25        Q    Okay.  What, if any, experience do you

1   have with the development of plans and

2   specifications for construction of a gas collection

3   and control system at a landfill?

4        A    Well, we've done many over the years, a

5   number of sites ranging from gas collection system

6   designs, everything I've described, all the way up

7   through the control and conversion systems, energy

8   plants with reciprocating engines, energy plants

9   with turbine engines, BTU scrubbing projects,

10  marketing the gas as a medium BTU to local

11  manufacturing facilities.  I've got a lot of

12  experience with that on many, many sites.

13       Q    Do you have similar experience with gas

14  conversion systems?

15       A    Right, yes.  That would be the same

16  answer.

17       Q    Okay.  Now, as I understand the

18  situation, what, if any, obligation as far as the

19  Litchfield, Bloomington, and Sangamon sites does the

20  trust have for building the gas collection and

21  control system?

22       A    There's a stipulation that was entered

23  into last year between Allied and the trust, and the

24  obligations by site are -- you know, Springfield, we

25  are obligated to make an election at some point in

Page 97

1   time to go on the site and buy the gas collection

2   system for a fixed amount, and that's only after

3   Allied is done with the gas collection system.

4        Q    Okay.

5        A    So that obligation will be to pay

6   $500,000 for that system.  And then we're obligated

7   within 90 days of going on the site to -- wanting to

8   go on the site to build the conversion system to

9   post a performance bond or some security reasonably

10  acceptable to Allied.  And I can't recall the exact

11  amount.  It might be 1.3 million on that site.  So

12  that's Sangamon.

13       Q    What about Litchfield?

14       A    Litchfield, similar arrangement.  We will

15  elect at some point in time and provide a notice of

16  election to Allied to buy the gas collection system

17  for $400,000.  And to be clear, I think there might

18  be a small interest component to that.

19       Q    Okay.

20       A    But for $400,000, and then within 90 days

21  wanting to go on-site to build and construct the

22  conversion plant, which will be a high BTU gas

23  injection plant, we have to provide a performance

24  bond reasonably acceptable to Allied.

25       Q    Okay.  And what about the other site,

Page 98

1    Bloomington?

2         A    Bloomington, again, similar.  When

3    they're done with the collection system, which I'm

4    understanding that's six years out --

5         Q    Um-hmm.

6         A    -- we can make an election after that

7    time to pay $449,000 for that collection system.

8         Q    Plus interest?

9         A    Plus interest.  And then we have to

10   provide a 90-day election to go on-site and build a

11   conversion project and provide, you know, reasonable

12   security through the stipulation.

13        Q    Now, you had indicated time lines.

14   What's your basis for saying, you know -- when do

15   you think the Springfield site is likely to go

16   online?

17        A    This is subject to Allied completing the

18   collection system on the site.  I drove by there

19   last week and it looked like they were close, but

20   not completely done.  But assuming they're going to

21   be done this year -- and I know their expert said

22   they were going to be done last year.  But assuming

23   they're done this year, my expectation will be to go

24   on-site sometime this fall --

25        Q    Um-hmm.

Page 99

1        A    -- and build -- really just upgrade the

2    existing infrastructure and put a couple engines

3    online.

4        Q    Okay.  Does the trust have a permit to

5    operate -- first off, do you know what a CAAPP

6    permit is?

7        A    Yes.

8        Q    What's a CAAPP?  What's that stand for?

9        A    It's a Clean Air Act Permit Program

10   permit issued by Illinois EPA in this case.

11       Q    Okay.  Do you understand that the --

12   whether the debtor, RTC, has a CAAPP permit or not?

13       A    Yes, RTC does have a CAAPP permit at that

14   site.

15       Q    Okay.  Assuming it has a CAAPP permit,

16   how would -- what, if anything, would Illinois

17   Investment Trust do to obtain a CAAPP permit?

18       A    We would perform an administrative

19   modification to that permit pursuant to the regs,

20   filing a notice of transfer of permit transferring

21   that permit from RTC to Illinois Investment Trust.

22       Q    Okay.  And have you ever filed for a

23   transfer of permit before?

24       A    Yes.

25            MR. JORDAN:  Okay.  Looking at our

Page 100

1    exhibits, Your Honor, if we could pull up -- I

2    believe I've lost my place here.  It would be

3    Exhibits 27 and 28.

4    BY MR. JORDAN:

5        Q   Now, looking through and turning to

6    page 2 of 5...

7                THE COURT:  In 28 or 27?

8                MR. JORDAN:  In 27.  I'm sorry.

9    BY MR. JORDAN:

10       Q   And going through there, is this a --

11   what is this?

12               MR. O'MEARA:  Your Honor, I'd object on

13   relevance grounds.  These are applications for

14   transfers for sites that are unrelated to what's at

15   issue today.

16               THE COURT:  Well, the idea is to find out

17   what these permits are like.  That objection will be

18   overruled.

19               MR. JORDAN:  If we could just kind of --

20               THE COURT:  Do you want to see all of the

21   pages?

22               MR. JORDAN:  -- roll through it.  You

23   just kind of roll through, and then Mr. Connolly as

24   he sees it can --

25               THE WITNESS:  Okay.  I've seen it.

Page 101

1                    MR. JORDAN:  Okay.

2   BY MR. JORDAN:

3           Q    And this document, which is, I think, a

4   request relating to the Taylor Ridge facility, who

5   was it filed by?

6           A    This is -- it was filed by RTC and

7   Illinois Investment Trust.

8           Q    Okay.  And so it was submitted to whom?

9           A    Illinois EPA.

10          Q    Okay.  And what's the status of it?

11          A    Well, it's currently deemed approved per

12  the regulation.  It's deemed approved upon

13  submittal, but it's under review by the agency.

14          Q    Is that like a permit shield?

15          A    It's definitely a permit shield.

16          Q    Okay.  And you won't know for some time

17  whether the permit is actually approved or not by

18  the IEPA, correct?

19          A    That's correct.

20          Q    Okay.  But until you hear otherwise, you

21  can operate as IIT at whatever site you would file

22  one of these for, request for ownership change for

23  CAAPP permit, correct?

24          A    Correct.

25                   MR. JORDAN:  Okay.  And then Exhibit 28.

Page 102

1           THE COURT:  Are you finish with 27?

2           MR. JORDAN:  Yes.

3    BY MR. JORDAN:

4           Q    This is a permit for the Ottawa site

5    with -- this assignment document attached is a part

6    of the application?

7           A    Yes.

8           Q    Okay.  It's for both of them?

9           A    Right.

10          Q    Okay.  So this is a document that was

11   filed by whom?

12          A    Well, again, it was filed by IIT and RTC

13   because both parties have to sign off.

14          Q    Okay.  And the party that the ownership

15   change would be in favor of is?

16          A    Illinois Investment Trust.

17          Q    And the status of this request is?

18          A    It's been submitted, it's deemed approved

19   upon submittal per the regulation, and it's under

20   review.

21          Q    Okay.  And do you anticipate doing the

22   same thing for each of the four sites for which

23   we're here today?

24          A    Well, certainly for Springfield and

25   Peoria.  To be clear, on Litchfield and Bloomington,

Page 103

1    those would be new permits.

2         Q    Oh, you're right.  Okay.  So just to --

3    we'll get back to this later.  But Litchfield and

4    Bloomington, there are no permits now, correct?

5         A    There's none for IIT or RTC, no.

6         Q    Are there any needed by IIT or RTC now?

7         A    No.  It wouldn't be timely.  There will

8    be a point in time we'll have to file a construction

9    permit application.  Keep in mind the time limits of

10   that is the construction permits once they're issued

11   expire in one year.  So you don't want to file --

12   get a permit now for something you're going to build

13   five years from now because it will be expired.  So

14   it's a timing issue.  But we will file construction

15   permit applications and the appropriate CAAPP

16   applications for those sites.

17        Q    Okay.  So the trust anticipates filing

18   this type of document for the Sangamon and Peoria

19   sites; is that right?

20        A    Correct.

21        Q    And let's assume that there is no permit

22   at the Sangamon site.  What would you do?

23        A    I'd file a construction permit

24   application and follow it up with a CAAPP

25   application.

Page 104

1          Q    And at this time, since you've already

2     testified that Allied is putting in a new gas

3     collection and control system, can you tell me why

4     it is that Allied is putting in a new gas collection

5     and control system?

6          A    Sure.  It was effectively a condition of

7     Allied buying the landfill back, you know, several

8     years ago from ESG Watts.  My understanding, just in

9     review of the documents, the IEPA required Allied to

10    remove the overheight and overgirth situation.

11         Q    What's overheight?

12         A    Overheight is there's a -- when a

13    landfill is permitted, there's a certain dimension,

14    footprint to the landfill that's allowed, and

15    there's a certain height that's allowed to the

16    landfill.  So overheight means you went over what

17    was allowed, you put too much garbage in.  And

18    overgirth means you went outside your footprint, if

19    you will.  And that's what those two mean.

20         Q    So this was something that ESG Watts did,

21    and Allied bought the site and thereby inherited the

22    problem?

23         A    That's correct.

24         Q    Okay.  And so at some point, the system

25    that RTC has had will be removed?

Page 105

1          A    That's correct.

2          Q    And if that were to terminate the

3    permits, what would you do?

4          A    I would file a construction permit

5    application on behalf of IIT and follow it up with a

6    CAAPP application --

7          Q    Okay.

8          A    -- on behalf of IIT.

9          Q    How many construction permit applications

10   have you been involved with?

11         A    Over my career?

12         Q    Um-hmm.

13         A    Between fifty and a hundred.

14         Q    Okay.  Did you ever have one denied?

15         A    Not -- no.

16         Q    Okay.  And how long does it generally

17   take to get a construction permit?

18         A    Depending on the regulatory structure,

19   it's either 90 days or 180 days.  It just really

20   depends on the size of the project and whether it's

21   a major or minor source.  But those are the time

22   frames.

23         Q    In your experience, what's a likely time

24   frame for a construction permit at Sangamon?

25         A    Ninety.  Ninety days.

Page 106

1        Q    Okay.  And then with regard to -- once

2    this construction permit is filed, can you commence

3    work, or do you have to wait until it's actually

4    issued?

5        A    When you file the construction permit

6    itself, you can commence work on the project once

7    it's issued as far as constructing.

8        Q    Um-hmm.

9        A    But it also allows you to operate usually

10   for at least six months while you debug and stack

11   test.

12       Q    Okay.  Is that what we refer to as a

13   permit shield?

14       A    Loosely defined, yes.  But it's more

15   so -- permit shields are more so to allow you to

16   operate under an existing permit while a permit

17   transfer or permit renewal is pending.

18       Q    Okay.  Now, so you go through this

19   process of constructing, and at some point, assuming

20   you don't have a CAAPP permit, you would file for a

21   CAAPP permit at Sangamon?

22       A    Yes.  Yeah.

23       Q    Okay.  Why -- how many CAAPP permits have

24   you applied for?

25       A    I think seven --

Page 107

1      Q    Okay.

2      A    -- is the number.

3      Q    How many have been approved?

4      A    All of them.

5      Q    Okay.  What's generally the time frame

6   that it takes from begin to end?

7      A    It's been four years.

8      Q    Okay.

9      A    Yeah.

10     Q    And from the point that you file a permit

11  application until it's approved, you have to wait

12  before you start operating?

13     A    Oh, no, no.  The construction permit

14  governs that.  Once a construction permit is issued,

15  you can build it and operate the system for up to

16  180 days, and then you have to go through the

17  debugging.  Then you file for your operating permit

18  all the while -- keep in mind a CAAPP permit is

19  really an umbrella permit.  It's a catchall for all

20  the emission sources at a particular site.  You can

21  absolutely operate while that CAAPP permit is

22  pending.  In fact, we did so on all of our sites

23  while our CAAPP permits were pending.

24     Q    How many sites did you operate while a

25  CAAPP permit application was pending?

1          A    Seven.

2          Q    Okay.  And so presumably you could

3    operate for four years, or am I mistaken, from the

4    time you file that application to the end of the

5    time period that it would be approved or rejected?

6          A    You could operate as long as the agency

7    needed to review that CAAPP application.

8          Q    And that's generally about four years?

9          A    That's been my experience, yes.

10         Q    Okay.  Now, with regard to the -- so the

11   Sangamon site is likely to go online this year.

12   What about the Litchfield site?

13         A    The Litchfield site, what we're going to

14   do is in 2009, that's going to be a design and

15   permitting year.

16         Q    Um-hmm.

17         A    We'll develop the -- we'll probably start

18   developing the permits this year through our

19   consultants, Trinity and LRF.  But we'll design

20   through next year and secure our contracts, and then

21   elect to go on and start building very early in

22   2010.

23         Q    And why 2010?

24         A    Well, the construction permit application

25   process, since it will be a new construction

Page 109

1   application for that site, it's an NSPS site, will

2   be at least 180 days.  It's going to have to be

3   public notice, so that will be within that 180-day

4   time frame.  But it could easily -- that's a full

5   six months.  And then the design takes a few months

6   to get that all squared away, so...

7        Q    When do you anticipate Allied is going to

8   be finished putting the GCCS in?

9        A    At Litchfield?

10       Q    Yeah.

11       A    I don't know the answer to that.

12       Q    Do you have any sense of that?

13       A    I think they're largely complete, but I

14   think they're adding -- they may be adding some

15   wells, but I'm not sure.

16       Q    Okay.  That doesn't affect your time

17   line?

18       A    No.

19       Q    Okay.  And is the -- generally the --

20   well, walk me through how, if at all, the permitting

21   process would differ from what we just described in

22   Sangamon other than the 180 days.

23       A    Well, it's -- Sangamon is an existing

24   permit.

25       Q    Well, let's suppose it's not.

Page 110

1      A    Okay.  Then it wouldn't be much

2  different, really.

3      Q    Okay.

4      A    I mean, it would be a construction permit

5  application.  Sangamon would be quicker because the

6  design is effectively done.  All the infrastructure

7  is in place.

8      Q    And that would be put in there by Allied

9  or by RTC?

10      A    No.  That design for the plant itself

11  would be RTC, right.

12      Q    At which site?  I'm sorry.

13      A    Springfield.

14      Q    Springfield?

15      A    Right.

16      Q    So Allied is building based upon RTC's

17  plan?

18      A    No, no, no, no.  What's happening at

19  Springfield, Allied is finishing up their collection

20  system.

21      Q    Right.

22      A    They're putting a collection system in

23  the newer cell, I believe, too.

24      Q    Right.

25      A    And, you know, once that's at completion,

```
 1   RTC is then allowed by -- or IIT is allowed by the
 2   stipulation to elect to go on and buy that system.
 3   That's step one.
 4        Q    Okay.
 5        A    Okay.
 6        Q    And what's step two?
 7        A    Step two is making the 90-day election to
 8   Allied to post a performance bond and build a
 9   plant --
10        Q    Okay.
11        A    -- at Springfield.
12        Q    All right.  Is it the same process at
13   Litchfield?
14        A    Yes.
15        Q    Okay.  And then Bloomington, what are
16   your plans for Bloomington?
17        A    Well, Bloomington, they just recently
18   were approved a vertical and horizontal expansion.
19        Q    "They" being?
20        A    Allied.
21        Q    Okay.
22        A    I'm sorry.  And the testimony, I believe,
23   of Mr. Bent was it's going to be five or six years
24   before they're done filling that and capping it.
25   It's not a big site.  So the collection system would
```

1  be complete we're anticipating sometime in 2013,

2  maybe 2014.

3        Q    Um-hmm.

4        A    So my plan is to do all the permitting

5  that we have to do a year ahead of that.

6        Q    Um-hmm.

7        A    But to hit the ground running in 2013

8  building that site.

9        Q    Based upon Allied's time line, is there

10 any way you can start earlier?

11       A    No.

12       Q    Okay.  So Allied is really determining

13 the time line for that site?

14       A    Yes.

15       Q    Okay.  And you had indicated that

16 performance on -- what are your plans according to

17 the performance bond?

18       A    Well, we will hire a general contractor.

19 And as I've done with multiple projects over my

20 career, the general contractor will post the

21 performance bond for 110 percent of the amount of

22 the contract.

23       Q    And what's the general cost of that?

24       A    It's between one and four percent of the

25 face value of the bond.

Page 113

1          Q    Okay.  Have you ever had any difficulty

2    obtaining or been involved in a situation where

3    anybody has had difficulty obtaining a performance

4    bond?

5          A    I have not.

6          Q    Okay.  And this would be the performance

7    bond required for each of these sites under the

8    stipulation?

9          A    Right.

10          Q    Okay.  So you don't foresee any problem

11    with that?

12          A    No.

13          MR. JORDAN:  Okay.  Why don't we just --

14    if we could just, Your Honor, have Mr. Connolly take

15    a look at the stipulation and make sure that, you

16    know, we haven't left anything out so that it is

17    taken care of.  And in the midst here, I lost my

18    place.  Why don't we look at Allied Exhibit 47.

19    BY MR. JORDAN:

20          Q    Now, can you tell me where in here --

21    would it be helpful to look at an actual paper copy,

22    Mr. Connolly?  Or can you see it fine on there?

23          A    I can see it.

24          THE COURT:  What do you want him to find,

25    Mr. Jordan?

Page 114

1            MR. JORDAN:  I'm sorry?

2            THE COURT:  Is there a particular part

3    you want him to look at?

4            MR. JORDAN:  Well, what I want him to

5    look at is with regard to the -- the first thing I

6    want to do is look at page 2, commencement of work

7    by IIT.

8            THE COURT:  All right.

9    BY MR. JORDAN:

10        Q    What I want you to do, Mr. Connolly, is

11   just walk me through the agreement with Allied, what

12   the trust needs to do to conform to the requirements

13   of the stipulation.

14        A    Sure.  We have to provide written notice

15   of our intent to Allied, its intent to commence work

16   at least 90 days in advance of the work.

17        Q    Okay.  And with regard to the Sangamon

18   site?

19        A    Right.

20        Q    When are you planning on doing that?

21        A    I would do that very shortly after a

22   successful assignment of this contract.

23        Q    Okay.  And then the other ones obviously

24   would be extended because you have extended time

25   lines for --

Page 115

```
 1        A    That's correct, right.

 2        Q    Okay.  And then what happens next?

 3        A    Well, within 90 days, we have to provide

 4   funds of -- with the attachment B which, I think,

 5   shows the $500,000 for the collection system, plus

 6   any interest.  I think that interest starts on the

 7   effective date, which would be the final

 8   nonappealable order.

 9        Q    So for Sangamon, it's half a million

10   dollars?

11        A    Yeah, about a half a million dollars we

12   have to provide payment to Allied.

13        Q    And you have to post a performance bond

14   for a million-three-seventy-five?

15        A    Yeah.  I'm not looking at that piece, but

16   that makes sense.

17        Q    That's the last --

18        A    Yeah, that's fine, that's fine.

19        Q    And who were you planning on utilizing as

20   a contractor to post that bond?

21        A    For Springfield?

22        Q    Right.

23        A    We would use Encore Energy, would be my

24   first selection.

25        Q    Who are they?
```

1      A    It's a company out of Nevada that builds

2   energy plants.

3      Q    Okay.  And what kind of experience do

4   they have in building energy plants, if you know?

5      A    They built many energy plants throughout

6   the course of their history.  They built some for

7   us.

8      Q    RTC?

9      A    For RTC, some turbine plants, yeah.

10     Q    Okay.  And how -- what's the likely cost

11  of that?

12     A    It's going to be around $500,000.  Again,

13  this is a site where the infrastructure is in place,

14  electrical infrastructure, gas infrastructure is in

15  place.  We just have to bring in the combustion

16  engine devices and hook it up to the existing

17  utility, interconnect.

18     Q    Okay.  What do you base that number on?

19     A    We did some cost studies a couple years

20  back through a company, another company to move an

21  engine down to Springfield and then set it up

22  completely.  That was around $300,000.

23     Q    So you just adjusted the price --

24     A    I adjusted it, right.  There's certainly

25  some economy of scale when you put two engines in

Page 117

1    versus one, but -- so that's about 500,000.

2        Q    When you say for two engines then, what's

3    the plan at Springfield for engines?

4        A    The plan at Springfield is to bring two

5    Jenbacher 320 engines down from the facility in

6    McCook and install them there.  And then ultimately

7    the expert report shows there's enough gas, I

8    believe, beyond 2015 to fire a third engine.  So

9    that's the --

10        Q    That was --

11        A    That's down the road.

12        Q    -- Allied's expert?

13        A    Allied's expert, right.

14        Q    Okay.  And so you anticipate being able

15    to operate this plant well into the future?

16        A    Yes.

17        Q    And the filing of new permits would not

18    be an impediment to acting here; is that correct?

19        A    No, no.

20        Q    Okay.  Now, looking at the stipulation

21    again, what do you have to do after we, you know,

22    gave the notice, after we commenced the work?

23    What's next?  Oh, by the way, the source of funds

24    for all of these items is what?

25        A    Oh, that's the $3 million line of credit

Page 118

1    promissory note loan device that I have from

2    Scattered.

3         Q    Okay.

4         A    Absolutely.

5         Q    Okay.  And how much would you have to pay

6    to draw on that in year one?

7         A    I'm estimating year one, being this year,

8    about 1.25 million.  Again, that's a 500,000 payment

9    to Allied for the collection system, 500,000 to

10   Encore Energy to get the engines moved down and

11   interconnected and running.  And then I've also

12   added in 250,000 for Peoria for this year.

13        Q    Okay.  And we'll get to Peoria --

14        A    Right.

15        Q    -- in a minute.

16             And then what happens then?  The

17   next thing is to -- is to provide the security as

18   you indicated?

19        A    Right.

20        Q    And then the next is to provide evidence

21   that it's obtained all governmental regulatory

22   permits and approvals required?

23        A    Right.

24        Q    And that would be the process that you

25   refer to as the applying for these and submitting

Page 119

1    all of that for the permits and everything else; is

2    that right?

3          A    That's correct.

4          Q    Okay.  And then --

5          THE COURT:  I'm getting the impression,

6    Mr. Jordan, that your running through this exhibit

7    is simply repeating what Mr. Connolly has said

8    without the exhibit.

9          MR. JORDAN:  That's fine, Your Honor.

10   I'll move on.

11   BY MR. JORDAN:

12         Q    All right.  With regard to the Peoria

13   site, what are the plans?

14         A    Well, upon the effective date of this

15   assumption, a few things have to happen per the

16   stipulation.  Within five days, Chiplease has to pay

17   in $60,000 for the royalties.

18         Q    Um-hmm.

19         A    Within 90 days of that date, I've got to

20   have a second engine online.

21         Q    Um-hmm.

22         A    Of course I plan on beating that by a

23   large margin because I'm halfway there already.  And

24   then beyond that, I have to bring a third engine

25   online.  Then I also have to do work -- as IIT, we

Page 120

1    have to work cooperatively with Peoria City, County,

2    Mr. Sloan, and their representatives to address well

3    field issues, which include looking at any settled

4    areas of landfill cap around our features and

5    repairing those.  I mean, it's pretty specific

6    within a certain diameter around a well or within

7    certain feet off that center line on a header.  We

8    have to work with them on their studies on their

9    mounting for leachate and their leachate

10   recirculation area.  We have to do some stack

11   testing on the unit itself.  We plan to do that.  I

12   think that -- without looking at it, I think that

13   summarizes it.

14        Q   Okay.  Is a performance bond or other

15   security required under the stipulation?

16        A   No.

17        Q   Okay.  Now, as far as you know, what's

18   the status of the permit, the CAAPP permit at

19   Peoria?

20        A   The CAAPP permit was renewed.  Actually,

21   I should say an application for renewal was filed

22   timely, October 2nd, 2006.  And so we're operating

23   under a permit shield until such time that the IEPA

24   finally acts on that.  And my understanding, that's

25   going to be a similar time line.

Page 121

1         Q    Okay.  And looking at Exhibits

2    69 through 72, I believe, can you tell me what those

3    are?

4         A    Okay.  All right.  69, page 1, that's the

5    certified mail slip.  I'm not looking at the

6    original, but it looks like October 2nd, 2006.  It

7    shows that we filed by certified mail that permit

8    application for the CAAPP renewal at Peoria,

9    October 2nd, 2006.

10             THE COURT:  Do you want him to go though

11   each one of the exhibits then?

12             MR. JORDAN:  Well, it was an issue, and I

13   just want to make sure that...

14   BY MR. JORDAN:

15        Q    This one -- the next one indicates the

16   date on it of the certified mailing; is that right?

17   And that's February 12?

18        A    Yeah, I saw that pop up.  Yeah.

19             MR. JORDAN:  Your Honor, do you want to

20   review the original to --

21             THE COURT:  No.

22             MR. JORDAN:  -- confirm that it's

23   actually October 2nd?  Okay.

24   BY MR. JORDAN:

25        Q    And when was the permit document due to

Page 122

1    be filed?

2         A    For Peoria it was October 2nd, 2006, and

3    for Springfield it was October 12th, 2007.

4         Q    And is it your understanding --

5         A    I mean February 12th, 2007.  Excuse me.

6         Q    Is it your understanding that the filing

7    for these is similar to the filing for your taxes,

8    that if it's sent on the day, that it's deemed filed

9    timely?

10        A    Yes.

11        Q    What do you base that on?

12        A    Twenty-five years experience filing

13   permit applications for several companies, several

14   different environmental agencies, and the fact that

15   the regulation supports it here in Illinois.  I

16   think it's 35 IAC 100 point something that states

17   it's deemed submitted based on the postmark date or

18   hand delivery date or facsimile date.

19        Q    Okay.  Now, Mr. Connolly, with regard to

20   the Peoria site, it's going online now.  It would be

21   on the effective date you would have certain

22   obligations and then would operate it; is that

23   correct?

24        A    That's correct.

25        Q    Okay.  And -- now, with regard to the

Page 123

1    Peoria site and all the other Allied sites, did

2    have -- have you done any calculations to

3    determine whether the...

4        A    Yes.

5        Q    Okay.  And those would be the pro formas

6    that we have as exhibits here?

7        A    Yes.

8        Q    Okay.  Now, how much experience do you

9    have in preparing pro formas?

10       A    I've done pro formas throughout my entire

11   career on various projects.

12       Q    And how many have you done approximately?

13       A    Well over 50.

14       Q    Okay.

15       A    Maybe over a hundred.

16       Q    Okay.  And have you taken any classes or

17   other matters that help you -- assist you in your

18   ability to prepare those things?

19       A    Well, I know in my engineering course

20   work you had to take engineering economics.  They

21   focused a lot on pro formas.  And certainly the

22   Master's financing level courses and the Master's

23   accounting level courses at Georgia State and

24   Northern Illinois University assisted in that

25   regard.

Page 124

1          Q    Okay.  Now, taking a look at Exhibit 35,

2     if you would.

3               THE COURT:  This has to be rotated.  Hold

4     on.

5     BY MR. JORDAN:

6          Q    Can you see that?

7          A    I'm sorry.  It's blurred.  I see Your

8     Honor is blowing it up.

9          Q    Here we go.

10              Now, looking at this, there are

11    some assumptions at the top?

12         A    Okay.

13         Q    And if you -- are those -- are those

14    assumptions based upon the documents that we have as

15    Exhibits 29, the AmerenCILCO informational sheet,

16    and 30, the NYNEX natural gas quotes?

17         A    I believe that's the case, yes.  I'm not

18    looking at those, but I think that's right.

19         Q    What is the AmerenCILCO -- or CILCO

20    published rates to which you're referring there?

21         A    Well, CILCO, their most recent published

22    rates were August of 2007, and I pulled that right

23    off their website.  There's a PDF.

24         Q    Um-hmm.

25         A    So what CILCO shows, those are the rates

Page 125

1    for summer rates, which are May through September,

2    nonsummer rates, which are the other months, the

3    seven other months.  And then there's also peak

4    rates and nonpeak rates.  So I did a blended average

5    of all the rates to come up with the 5.2 cents per

6    kilowatt hour.

7           Q    Had you used that analysis in preparing

8    the pro formas previously?

9           A    Yes.

10          Q    And, generally, what's been your

11   experience if -- you know, of the final numbers you

12   get to, what's the variance that you would expect?

13          A    On the payment rate from the utility

14   or --

15          Q    No.  On your final number of your pro

16   formas based upon, you know --

17          A    Oh.

18          Q    -- this, what -- would you say it's plus

19   or minus, you know, one percent, plus or minus a

20   hundred percent?

21          A    I'd say throughout my career I've been

22   fairly accurate.  I know when I was a GM I was one

23   of the most accurate engineers there.  But I'd say

24   plus or minus ten percent.

25          Q    Okay.  Now, you have a top line of

Page 126

1    electronic revenue on here.  Now, what -- how would

2    you go about generating electric revenue at the

3    Peoria site?

4         A    Right.  I'll also note this has -- I

5    think this has been modified for the first year,

6    just to be clear, but --

7         Q    Did I pick the wrong pro forma?

8         A    Yeah.

9         MR. JORDAN:  I'm sorry.  Can we get to

10   36, Your Honor?

11        THE WITNESS:  Everything is the same

12   except for the first year.

13        MR. JORDAN:  We had produced initially 35

14   in discovery, so we included it here.  I apologize

15   for that.

16   BY MR. JORDAN:

17        Q    This is the same assumptions as the

18   other --

19        A    Oh, yeah.

20        Q    -- document?

21        A    In 2008, I'm assuming six months of

22   operation with one engine and six months with two.

23        Q    And 5.2 cents per --

24        A    Right.

25        Q    -- kilowatt hour?

Page 127

1          A    Right.

2          Q    And your estimation of revenues from the

3    Peoria site from 35 to 36 changed.  And why was

4    that?

5          A    Because when I did the initial one, it

6    was when the trial was earlier.  I thought we'd be

7    able to run --

8          Q    In December?

9          A    Yeah, it was earlier.  So I just made --

10   based on the stipulation, I've got 90 days from the

11   effective date, say it's sometime in March, to bring

12   that second engine online.  So I thought it was

13   reasonable to assume I'll run two engines six months

14   of the year and two engines -- or one engine six

15   months of the year.  That was the change.  That's

16   it.

17         Q    Okay.

18         A    And then the maintenance drops a little

19   bit, too, proportionately because of that factor.

20   Everything else is pretty much static.

21         Q    And where did you come up with the

22   various numbers for expenses, the mowing expense, et

23   cetera?

24         A    Well, mowing expense is per stipulation.

25   That's something Peoria and IIT agreed to to pay

Page 128

1    them for mowing around our features.  Waste disposal

2    is years of history.  It's roughly a thousand

3    dollars a month, inflation adjusted.  Utility

4    expense, it's been very constant with AmerenCILCO,

5    around 300 bucks a month.  That's for rental of some

6    of their equipment, their fees.

7                        Royalty and other expenses per the

8    contract is six percent of revenue, so that's just a

9    direct calculation.

10                        Equipment maintenance is based on

11    the history with Altorfer, and then the history with

12    Lozier.  So that's Altorfer plus Lozier together.

13                        Supplies and sundries, cleaning

14    supplies, housekeeping stuff on the site.

15                        Landfill gas collection system,

16    O&M, give or take, you know, 3,000 to $3500 a month

17    per site to do that.  And that's just changing out

18    flex hoses, fixing a cracked well, maybe doing some

19    maintenance on an area with a sag line, things like

20    that.

21                        Engineering environmental

22    monitoring, that's pretty static, around $3,000 a

23    month.  That's for Trinity to come out and do the

24    monthly wellhead monitoring and the surface scans.

25    I put more into 2008 because we'd be doing more

Page 129

1    permitting work, and additionally we're going to be

2    doing a stack test, which is about 8 to $10,000.

3            Q    Okay.

4            A    Capital expenditures, those largely lie

5    with the plant itself but can be applied to the

6    collection system as well, but those are usually for

7    the engines and compressors, maybe replacement of a

8    head.  Compressors, maybe replacement of a motor.

9    Some of the higher-dollar features that would not be

10   just normal O&M like changing out the sparkplugs or

11   adjusting the valves.

12                Salaries, this is -- that was Vince

13   Muir's salary.  We paid him 60,000 a year.  You've

14   got to add the payroll tax on that and his health

15   insurance.  So it's just in there like that.

16   Obviously --

17           Q    Just assume that Altorfer is

18   approximately the same thing?

19           A    Right, right.  And so with Altorfer's

20   expanded role, that salary number would just roll

21   into equipment maintenance.

22           Q    Okay.

23           A    Insurance, that's just the prorated

24   amount for general liability, workman's comp, and

25   auto insurance required by the Peoria City, County

1   contract.

2        Q    Does the Illinois Investment Trust

3   actually have an insurance policy in its name as

4   insured as opposed to additional insured or

5   co-insured, anything like that?

6        A    It does.  It definitely does.

7        Q    Okay.  And that covers all four sites

8   here?

9        A    Oh, sure.

10        Q    Okay.

11        A    Yeah.

12        Q    And when did you actually finalize

13   procuring that?

14        A    Well, we had spoken about that with

15   Philman & Philipini, who is our insurance agent a

16   while back, and I believe I had that covered.  I

17   confirmed that with him after my deposition because

18   that issue came up.  And, in fact, they just sent me

19   certificates of insurance I believe yesterday or the

20   day before for IIT to prove that.

21        Q    Okay.  And then with regard to employee

22   reimbursements and bonds, taxes, permits, what did

23   you base that on?

24        A    That's just expenses for, say, Rob

25   Fortelka and myself going down to the site, Mike

Page 131

1    Watson, Richard Walker assisting.  Those are just

2    normal employee expenses.  Bonds, taxes, permits are

3    based on the annual permit fee from IEPA.

4          Q    Okay.  And the $250,000 that we talked

5    about Peoria cost, is that built into this or is

6    that on top of this?

7          A    No.  That would be -- that's on top of

8    this.

9          Q    Okay.

10         A    That's on top.

11         Q    So this is just an operating pro forma?

12         A    Right.

13         Q    Okay.  And then going from year to year,

14   2008 through 2018, how do the numbers change?

15         A    At Peoria or...

16         Q    On this pro forma here.

17         A    Okay.  Well, the numbers change in that

18   in 2009 we're running two engines full time.  And

19   then -- so the revenue number is up based on that to

20   477,000 a year.  And, concurrently, the equipment

21   numbers go up because we're operating another engine

22   for six months more than we did in 2008.

23         Q    Um-hmm.

24         A    Everything else moves up three percent.

25         Q    Okay.  Now, on a comparison with RTC,

Page 132

1    there is substantial capital investments that the

2    trust is making that RTC didn't, correct?

3          A    That's correct.

4          Q    Why was it that RTC didn't make the

5    capital expenditures?  As president, I would expect

6    you would know.

7          A    Well, yeah.  I mean, we definitely had

8    plans to on some the sites to make some pretty

9    significant expenditures.

10         Q    Um-hmm.  Why didn't you?

11         A    In the more recent scenarios, certainly

12   the Chapter 11 trustee, Mr. Szilagyi, and I

13   discussed it, and the money just wasn't there.  It

14   wasn't available to do it.

15         Q    How about in a Chapter 7?

16         A    Well, certainly the money wasn't

17   available then.  Mr. Steinberg was very clear on

18   that.

19         Q    Okay.  And then, you know, after the time

20   that the trustee, Mr. Steinberg, stopped operating

21   it, why was it that there were no capital

22   expenditures other than the -- obviously that's --

23   you know, we're here today at the unknown.

24         A    Sure, sure.  Well, we've operated the

25   site to the best of our ability.

1          Q    Did you have the money to make the

2    capital investments previously?

3          A    No.

4          Q    Okay.  What effect, if any, did the lack

5    of money have on your ability as president of RTC to

6    operate RTC?

7          A    Well, you have to look at it kind of site

8    by site.  But in general --

9          Q    Let's look at it site by site.

10          A    Okay.

11          Q    Let's start with the sites that aren't

12    here, and then we'll switch back to that.

13          A    Okay.

14          Q    What effect did it have on McCook?

15          A    Well, McCook was really an engine issue.

16    If we needed to bring an additional engine online --

17          Q    Um-hmm.

18          A    -- and there was a cost to that to do the

19    maintenance on the engine --

20          Q    Did you have the money to do that?

21          A    No, no.

22          Q    Okay.  Did you ask for the money?

23          A    Yes.

24          Q    And who did you ask?

25          A    Mr. Szilagyi.

Page 134

1    Q    And what did he say?

2    A    Well, he did what he could do.  But there

3  was only limited funds, so...

4    Q    Okay.  Now, I understand that there were

5  some environmental issues at the McCook site.  Can

6  you tell me what that was about?

7    A    Yeah.  They stemmed around -- it wasn't

8  so much the well field itself, but more the plant

9  and the engines.  There was a fundamental dispute of

10  whether the site was classified as NSPS or not, and

11  for years we were trying to find out from the

12  landfill owner whether it was.  After multiple

13  requests, we got nowhere.  We asked the IEPA and

14  the -- it was just a question that was out there,

15  and I know the IEPA was working on that.

16    Q    Is this something Mr. Szilagyi directed

17  you to do?

18    A    Yeah, sure.  So, you know, that's a

19  fundamental issue.  And so sometime in the year

20  2002, we decided, look, we'll endeavor to monitor

21  the site like NSPS even though we don't know the

22  status of it, and we continued to do that.  But

23  there's some fundamental issues with that.  With an

24  NSPS classification, the stack test that I did in

25  1999 did not conform with NSPS performance

Page 135

1    standards, so that was an issue.

2        Q    Okay.  Well, why didn't you do the test

3    that conformed with the NSPS standards for --

4        A    Well, yeah, there's a combination -- you

5    know, the engine was in kind of a tough shape.  I

6    don't think it would have passed.  But it's really a

7    money issue.

8        Q    Okay.

9        A    We would have had to bring the engine up

10   to operating condition to pass that standard, I

11   believe.  Although, I'm speculating that it wouldn't

12   have passed it.

13       Q    You know, in the general, and I'm not

14   talking, you know, specifically for each item --

15       A    Right.

16       Q    -- but the big issues, any other big

17   environmental issues at the McCook site?

18       A    The IEPA wanted a flowmeter, and our

19   position was that we could use the bypass line as an

20   alternative allowed in the regulations.

21       Q    Okay.  What's your plan regarding

22   flowmeters at these sites?

23       A    Well, that's one thing.  We're just going

24   to go ahead and install them.

25       Q    And why is that that you changed that

Page 136

1    position from fighting to installing them?

2         A    I think that -- you know, one of the

3    things I want to do is sit down with the IEPA when

4    this is done and move forward in a positive manner.

5    I think that's one thing I can show them.  Instead

6    of arguing about this, I'll go ahead and spend the

7    $15,000 per site to put in flowmeters.

8         Q    Did you have the 15,000 per site

9    previously to put in the flowmeters?

10        A    No.

11        Q    Okay.  But do you have the 15,000 per

12   site now?

13        A    Sure.

14        Q    Where are you getting that money?

15        A    It will be off the Scattered loan

16   facility.

17        Q    Would you be able to have positive cash

18   flow from the Peoria site to --

19        A    Oh, sure.  Yeah, yeah, that would help,

20   too.

21        Q    In fact, the pro forma that we have here

22   shows positive cash flow, doesn't it?

23        A    It does, yeah.

24             MR. JORDAN:  Now, Your Honor -- well,

25   before we go back to the pro formas.

Page 137

1    BY MR. JORDAN:

2         Q    What other sites are there environmental

3    problems?

4         A    The Pontiac site.

5         Q    What were the big ticket environmental

6    problems at the Pontiac site?

7         A    I think what triggered that was there was

8    a localized fire or a subsurface oxidation in a

9    leachate extraction well that occurred in the summer

10   of 2004.  RTC's position was it was Allied's well,

11   and that, you know, they had a corroded fitting on

12   that well for the compressed air nozzle going down

13   there to operate a pump.  And so with that

14   corrosion, it failed.  Then you have 110 PSI

15   compressed air racing into that well.  At the fire

16   triangle you have heat, oxygen, fuel, up with the

17   fire.  So that was our position.  Obviously, you

18   know, they disagreed.  But the --

19        Q    "They" being Allied --

20        A    -- result of that situation was to shut

21   down a fairly big area of the field, like five or

22   ten acres, shut off wells.  And that was something

23   that required notification of the IEPA, and that

24   resulted, I believe, in NOV there.  That was the big

25   issue.  There's other things that go beyond that.

Page 138

1    We had some fractured wells due to settlement.

2         Q    Did you ever fix those fractured wells?

3         A    No.

4         Q    Why not?

5         A    Well, I think we fixed one of them, yeah.

6         Q    Why didn't you fix the other ones?

7         A    We had a plan in place, you know, after

8    that to spend substantial money, and it -- just the

9    money was never available.

10        Q    Okay.

11        A    Yeah.

12        Q    What other big-picture items at the

13   Pontiac plant?

14        A    I think that's it.  It's really -- you

15   know, the turbine plant ran fine.  There was really

16   no issues there.  We had the flowmeter issue

17   there --

18        Q    Yeah.

19        A    -- and the bypass valve, but...

20        Q    What about the Congress site?  Were there

21   any environmental problems at the Congress site?

22        A    You know, the Congress site, we ran -- we

23   ran that without any violations well into 2005.  It

24   was probably by far the highest maintenance site,

25   you know, the toughest site to run because it was an

Page 139

1    open landfill.  They were continually moving the

2    locations where they were placing the waste.  We

3    would have to take whole sections of our gas

4    collection system out at the direction of the

5    landfill owner to make room for more waste fill.  As

6    a result, you have full sections that you're not

7    collecting gas on.

8              But even with all that, I think we

9    did as good a job as anybody could do right up into

10   2005.  But what happened then was some of the wells

11   started to get silted in because they were used for

12   leachate extraction.  Then we had the compounding

13   problem, though, which is even bigger, that the --

14   we saw a rise of about 40 to 50 feet on leachate

15   levels inside that landfill.  It's inside a quarry.

16   And the water levels inside the well, as you

17   measured it, over time went up 40 to 50 feet.  So it

18   choked off the ability to so extract gas below the

19   saturated zone in the water.  So that was a problem.

20   And so as a result of that, you know, with that high

21   a water level, you almost have to change your design

22   on the collection system in order to extract the

23   gas.

24        Q    What would it cost to change the design

25   in a collection system in order to collect the gas?

Page 140

1        A    Well, in my opinion, we could have done

2    it for around $600,000, put in some shallow wells.

3        Q    Did you ever ask for that money?

4        A    I did ask that of the Chapter 11 trustee.

5        Q    And what did he say?

6        A    He said it was not available.

7        Q    And, in fact, was it available?

8        A    No, I don't think so.

9        Q    Okay.  Were there any other big-ticket

10   items at the Congress site?

11       A    I don't think so, no.

12       Q    Okay.

13       A    I think that was the kind of a big issue.

14       Q    Okay.

15       A    I mean, outside of the fact, you know, of

16   what I said, it's just -- it was an open landfill.

17   And until such time they closed and capped it, that

18   problem wouldn't go away.

19       Q    How about Taylor Ridge?  Were there ever

20   any environmental problems at Taylor Ridge?

21       A    There were some.  I'd put a more of a

22   limited category, but it really revolved around

23   overheight.  About 75 percent of the top area of

24   that landfill was overheight.

25       Q    Who is the owner of that?

Page 141

1          A    ESG Watts, Inc.

2          Q    They seem to have a problem with

3     overheight; is that right?

4          A    He does, yes.

5          Q    So and there's an overheight problem.

6     How did that devolve down to an environmental

7     problem for RTC?

8          A    Well, they were under, you know, order to

9     remove that overheight.  And so that would prevent

10    us from installing any lateral pipes to the wells

11    that are in that affected area because those wells

12    and those pipes would just be ripped out.

13         Q    So is that something that you could have

14    spent the money on but you didn't think that you

15    could, you know, get approval from the trustee or

16    the court on that --

17         A    Yeah.

18         Q    -- or something else?

19         A    We could have spent some money out there.

20    It would have been -- it would have just been for

21    interim compliance purposes, and it would have been

22    money not utilized in the future just because that

23    system would have to go out.

24         Q    Is that during that period before the

25    trustee or during the trusteeship or both?

Page 142

1        A    I'd say it's during the trusteeship.

2        Q    And did the trustee authorize the payment

3    of limited amounts to -- and save it for a limited

4    time to avoid the environmental --

5        A    No, no, no.

6        Q    Do you blame him?

7        A    Not really, no.  I mean, it was just a

8    situation.

9        Q    Now, if you were running the site as IIT

10    with the budget you have, what would you do in that

11    situation?

12        A    Well, you know, I've got money now.

13        Q    Yeah.

14        A    I've got money, I've got capital reserves

15    to spend, and so I could do that.  You know, that

16    type of hypothetical scenario, I can draw on that

17    type of money.

18        Q    Same thing for Congress?

19        A    Right, right.

20        Q    Same thing for McCook?

21        A    Right.

22        Q    Okay.  What other sites, if any, were

23    there environmental violation notices or any NOVs or

24    anything else?  Peoria?

25        A    Beecher.

Page 143

1      Q    Beecher?

2      A    Right.

3      Q    What about Beecher?  What happened at

4   Beecher in a big-picture way?

5      A    Well, big picture, we installed a

6   landfill gas collection system out there and then

7   installed a gas turbine plant --

8      Q    Um-hmm.

9      A    -- in 2002.  And it went fairly well

10  initially, but two things.  One, I think the turbine

11  was a bit oversized for what actually the gas that

12  was there.  Granted it matched up with the models

13  done by all of the independent engineers, so that

14  wasn't an issue.  But when you actually get out

15  there and pull on it, it wasn't enough fuel

16  sufficient to run that turbine.  However -- and then

17  you had a similar issue.  You had kind of literally

18  lakes on top of that landfill.  Water was

19  infiltrating into the garbage, rising leachate

20  levels over the years and squelching off the

21  landfill gas production.

22     Q    What could you have done to ameliorate

23  the problem?

24     A    Well, you would have to change the design

25  somewhat to put in some shallow wells and put your

Page 144

1    perforations closer to the surface so you can get

2    some gas out as opposed to having them down in the

3    saturated zone.  That would cost some money to do

4    so.

5        Q    Did you, in fact, do that?

6        A    No, no.

7        Q    Why not?

8        A    Well, the trustee, Mr. Szilagyi, in, I

9    think it was August of 2004, he structured, I guess,

10   a settlement with Waste Management and John Sexton

11   Contractors to sell the gas rights and the site back

12   for 250,000.

13       Q    And thereby not having to spend the money

14   to --

15       A    Right.

16       Q    Okay.  What other sites that you can

17   recall had compliance issues?

18       A    Outside of the scope of the four here,

19   I'm not recalling any.

20       Q    All right.  For the four here, have there

21   been any compliance issues relating to Litchfield?

22       A    No.

23       Q    Okay.  Have there been any compliance

24   issues related to Bloomington?

25       A    No.

Page 145

1        Q    Okay.  Before we get to the other two,

2   some of the other sites which you've operated, you

3   operated at Fort Dodge; is that right?

4        A    Correct.

5        Q    Have there been any compliance issues at

6   Fort Dodge, Iowa?

7        A    No.

8        Q    Okay.  Greater New Orleans, GNO, did RTC

9   operate there?

10       A    Right.

11       Q    Okay.  IIT operates there now?

12       A    Right.

13       Q    And, in fact, IIT operates at Fort Dodge

14  now, right?

15       A    That's right.

16       Q    Did either RTC or IIT have any compliance

17  issues or violation notice related to GNO?

18       A    No.

19       Q    Did IIT have any related -- has it ever

20  related to Fort Dodge?

21       A    No.

22       Q    Okay.  Now, the Lansing site is a site

23  which RTC operated in -- I'm not sure.  IIT operate

24  there now?

25       A    Right.

Page 146

1          Q    All right.  RTC ever have any compliance

2    issues at the Lansing site?

3          A    No.

4          Q    How about IIT?

5          A    No.

6          Q    Okay.  The Kewanee site, RTC and the

7    trust have both operated at the Kewanee site; is

8    that correct?

9          A    That's right.

10         Q    Did RTC and/or IIT have any compliance

11    issues in any of these sites?

12         A    No.

13         Q    Rather than just go through and waste

14    time, Columbus, Georgia; Wheatland, Kansas; Wyandot,

15    Ohio; Clarion, Pennsylvania; New Haven, Connecticut;

16    Gary, Indiana; Des Plaines, Illinois; Westchester,

17    Illinois; Belleville, Illinois; are those sites at

18    which RTC and the trust operate -- or operated or

19    operate?

20         A    With the exception of 31st Street and

21    Westchester.

22         Q    Okay.

23         A    Right.  Those are no longer --

24         Q    Either RTC --

25         A    -- part of our --

1   Q -- or IIT ever have any compliance issues

2 at any of those sites?

3   A No.

4   Q All right.  And then the two that you

5 mentioned, Westchester and 31st Street, those are

6 sites that only RTC operated?

7   A Right.

8   Q Did RTC ever have any compliance issues

9 at those sites?

10   A No.

11   Q Okay.  Now, with regard to Peoria, what,

12 if any, compliance issues existed or exist?

13   A Well, I think the lion's share of the

14 issue is capacity to consume fuel out there.  We

15 need to bring the second engine online.  I think

16 Mr. Sloan has estimated, and, you know, I tend to

17 agree, there's 600 CFM of gas available out there,

18 and we need two engines to consume all that gas.

19   Q What's the compliance issue for that?

20   A Well, its results -- long-term results in

21 some positive wellhead pressures --

22   Q Um-hmm.

23   A -- out in the well field as opposed --

24 the regulation -- you have to have a vacuum in every

25 well.

Page 148

1        Q    Why didn't RTC fix that?

2        A    Well, you know, we began to fix it, but

3    it's just we didn't have the money to finish to

4    bring the second engine online.

5        Q    What's the trust going to do to fix that?

6        A    The trust is going to continue that work

7    and finish bringing the second engine online.  And

8    then, of course, we talked about the third engine as

9    well, we'll bring that over.

10       Q    And if that occurs, that will ameliorate

11   the problem?

12       A    That will help tremendously.  That's not

13   to say we don't have some work to do out in the

14   field on some -- perhaps abandoning some wells,

15   maybe some wellhead repairs, and perhaps some

16   lateral line adjustments.

17       Q    When is the trust going to jump on that?

18       A    As soon as weather breaks.  You know, the

19   effective date being sometime in March hopefully.

20   As soon as the weather breaks and we get on top of

21   the landfill.

22       Q    Is it possible to do it before then?

23       A    It's possible, very difficult.  You can't

24   fuse pipe below 28 degrees Fahrenheit.  It will

25   fail.

Page 149

1        Q    Okay.  What, if any, other compliance

2   issues exist out of Peoria in which you're aware?

3        A    There are -- there's settlement on the

4   landfill, similar to what I talked about with

5   Beecher, where that needs to be repaired because,

6   otherwise, you know, water can get inside the waste

7   mass and reduce your recovery percentage.  And

8   that's not just with IIT's features.  We believe

9   some of that is with Peoria's features.  And both

10  parties are going to work on that.

11       Q    Why didn't RTC fix that?

12       A    Well, again, it's a function of available

13  cash to go out there and do it.

14       Q    When is the trust going to fix that?

15       A    We'll be working on it as soon as the

16  weather breaks through this summer.

17       Q    Okay.  What about jumper lines?  Do you

18  know what jumper lines are?

19       A    Yes.

20       Q    What are jumper lines?

21       A    Jumper lines are a way to connect to

22  different points of gas extraction, if you will,

23  over an area that may be settled and blocked for gas

24  extraction.  Perhaps you may have a buried pipe

25  that's down deep that's -- the leachate has blocked

Page 150

```
 1    it.  And so you connect at a prior point to the

 2    blockage and an after point to the blockage, almost

 3    like a bypass to your heart, that type of a thing,

 4    where you allow the flow of gas to get around that

 5    blockage, if you will.

 6         Q    Okay.

 7         A    And it's a pipe.  It's normally a

 8    four-inch diameter pipe in order to do that.

 9              THE COURT:  And it's above ground?

10              THE WITNESS:  It's above ground.

11    BY MR. JORDAN:

12         Q    Is that allowed, do you understand it, by

13    the regulations?

14         A    Yeah, we believe it is allowed by the

15    regulations.

16         Q    How do you -- what do you have to do to

17    find out whether it's okay for the IEPA?

18         A    Well, you have to -- we had our

19    consultants contact the EIPA on this issue, and the

20    IEPA did not have any immediate issues with it.

21    However, at the request of Peoria City and County,

22    we did prepare a significate permit modification to

23    request formal approval to have the jumper lines.

24         Q    What's the status of that?

25         A    We're waiting for Peoria City and County
```

Page 151

1    to signed that application.  They haven't signed it.

2         Q    And once they sign it?

3         A    We're going to send it in to the agency,

4    and the agency hopefully will act on it.

5         Q    Why don't you just sign it and send it

6    in?

7         A    From a regulatory perspective, I cannot

8    sign under the land permits.  That can only be done

9    by the owner and operator of the landfill itself.

10        Q    Okay.  What, if any -- I guess we're down

11   to the last site, and then we'll go back to the pro

12   formas.  What, if any, compliance issues exist or

13   have existed in Springfield?

14        A    Well, Springfield, put into category two

15   of available combustion capacity.  I think what

16   causes some issues there, certainly the overheight.

17   There was --

18        Q    What overheight?

19        A    Well, Springfield, the landfill --

20        Q    Oh, I think we did --

21        A    Yeah, it's overheight.  Literally if you

22   went on top of that landfill and scuffed your boot,

23   you'd see garbage.  I mean, that's how bad the cap

24   was.

25        Q    So is there a cap at Springfield?

1          A    I think there is now.  But during our

2    operating years there, it was minimal --

3          Q    Okay.

4          A    -- and continued to be an issue.  The

5    problem with that is if you design your system, you

6    know, to extract gas out of the landfill and you've

7    got -- I mean, it's like a Glad Bag.  If it zips

8    shut, you put a straw in it, you can pull that gas

9    out.  If there is a rip in the Glad Bag, you're not

10   going to be able to pull the gas out without pulling

11   oxygen in, and that's exactly what happens.  Again,

12   it's the fire triangle, oxygen, fire, and heat.  You

13   have a potential for subsurface oxidation.  What

14   that means to us is that we couldn't run a vacuum on

15   the hill without a risk of a fire, so you had to run

16   a positive.

17         Q    Were you cited for too much oxygen at

18   Springfield?

19         A    Yes, and positive wellhead pressure.  And

20   there were some issues with stack testing on the

21   engines.  We were never able to get to full

22   operating capacity such that we could stack test.

23         Q    Okay.  And then, you know, once Allied

24   puts in -- you know, reduces the overheight, reduces

25   overgirth --

Page 153

1        A    Right.

2        Q    -- puts in the cap, puts in the gas

3   collection system and you guys finish it up, what do

4   you anticipate with regard to compliance issues?

5        A    I think we're going to be largely

6   compliant.  With the cap in place there, we won't

7   have the issue of oxygen intrusion.  We won't have

8   the issue of positive pressure.  And certainly with

9   two engines down there running, that's enough to

10  manage the available gas.  So I don't see that as

11  being an ongoing issue.

12        Q    Well, you say "largely compliant."  That

13  implies to me that, you know, maybe you're not going

14  to be compliant in some respect.  I mean, are you

15  just being careful or are there issues, compliance

16  issues that you think are going --

17        A    Well, it's -- I mean, over my career,

18  I've been doing this for 25 years, you're subject to

19  human error.  That's part of it.  You know, people

20  will make mistakes.  Nobody is perfect.  And so

21  you're going to have to address those.  But from a

22  comparative basis, I mean, it's far, far better than

23  it was.

24        Q    Why is that?

25        A    Again, the features are functionally in

Page 154

1   place that weren't there before.  We've got a cap.

2        Q    What difference does it have, the fact

3   that you had money that you didn't have before?

4        A    Well, you know, we can pay for that

5   collection system.  That's within the cap.  We can

6   pay for bringing the two combustion units down and

7   hooking those up to the grid.  And on an operational

8   going-forward basis, we've got the contract with

9   CILCO to pay for the ongoing O&M.

10       Q    And what's the contract from CILCO?

11       A    This is a power purchase agreement with

12  CILCO that we have.  I think it's an agreement for

13  parallel operation.

14       Q    That's for electricity, right?

15       A    Yeah, it's electricity production.

16       Q    And is that the only electricity site and

17  the others are going to be gas pipeline?

18       A    Peoria and Springfield will be

19  electricity.

20       Q    Right.

21       A    And then gas pipeline will be Litchfield

22  and Bloomington.

23       Q    What about Peoria?  I'm sorry.  Is

24  that --

25       A    Peoria is electricity.

Page 155

1        Q    Who do you sell the electricity to for

2    Peoria?

3        A    It's called AmerenCILCO.

4        Q    And same with Springfield?

5        A    Right.

6        Q    And you have a relationship with them

7    that you put this in place?

8        A    I have the relationship with them now and

9    will continue it.

10       Q    And did you just enter into some sort of

11   agreement with them?

12       A    We did.  We entered into a settlement

13   agreement that was entered last week.

14       Q    Okay.

15       A    And, of course, there's also the court

16   order that assigns the contract over to IIT.

17       Q    What court order?  This court's order?

18       A    Yeah.

19       Q    Okay.  And you're in good paper with

20   Ameren, as far as you know?

21       A    Right.

22       Q    Okay.  Now, and then the Bloomington

23   Litchfield sites, the gas goes where?

24       A    Litchfield and --

25       Q    Or to whom, I should say.

Page 156

```
 1        A    Yeah.  Litchfield, the gas is going to go

 2   to the AmerenCILCO.  They have a gas pipeline that

 3   actually bisects the site, so it will be fed into

 4   that line.

 5        Q   Is there an alternative there to

 6   AmerenCILCO?

 7        A    Maybe, but that's the best one.  We've

 8   had multiple conversations with them.  It looks

 9   pretty good.

10        Q    Okay.

11        A    And AmerenCILCO is very creditworthy as

12   far as paying for the fuel, so I'm all for that.

13        Q    And then the last site is Bloomington?

14        A    Bloomington, right.  There's -- the first

15   option would be to tie in -- there's an existing

16   landfill there next to or adjacent to the McLean

17   landfill that's feeding gas into a Cargill plant,

18   landfill gas.  Our hope is to supplement that off of

19   that gas.  If that doesn't work, I've had

20   conversations with Nicor Energy, and they would take

21   the fuel as well.

22        Q    Where is their pipeline in relation --

23        A    I don't recall exactly.  It's in the

24   area.

25        Q    It's in the area of Bloomington?
```

Page 157

1          A    Yeah.

2               MR. JORDAN:   Okay.   Can we look at

3    Exhibit 34, Your Honor?

4               THE COURT:   Yes.

5    BY MR. JORDAN:

6          Q    Okay.   Now, taking a look at this, this

7    is -- what is this?

8          A    This -- I believe this is the Sangamon

9    pro forma that I prepared.

10         Q    Yeah.

11              MR. O'MEARA:   Your Honor, we would

12   object.   Foundation grounds.   And I think it's

13   inadmissible opinion evidence by a nonexpert.

14              THE COURT:   It's overruled.   These are

15   the projections that he, as the chief operating

16   executive officer of this enterprise, is basing his

17   determinations on whether to go forward with a

18   particular proposal.

19   BY MR. JORDAN:

20         Q    Now, the assumptions that you utilized

21   for Sangamon, are they the same in terms of the

22   kilowatt per hour and the CILCO published rates and

23   the inflation adjustments as we looked at with the

24   Peoria landfill?

25         A    Yes.

Page 158

1          Q    Are there any differences in your

2    assumptions?

3          A    Not on the assumptions other than the

4    type of engines that are running.

5          Q    Okay.  I just want to make sure so that

6    the court knows that we're apples and apples.

7          A    Right.

8          Q    That you're being consistent in your pro

9    formas.

10         A    Yes.

11         Q    Right.  So what do you anticipate with

12   regard to -- this is an operating pro forma?

13         A    It is a operating pro forma.

14         Q    Okay.  And what do you -- what do you

15   anticipate in terms of electric revenues starting

16   into 2008 and, you know, how did you arrive at the

17   initial number?

18         A    Well, in '08 my hope is to begin

19   operation in September and run it for four months,

20   so that's a four-month number.  But the baseline

21   into that would be -- I multiply it out, the

22   capacity of each Jenbacher engine, multiple it by a

23   time factor, multiply it by an uptime factor,

24   multiply it by parasitic factor, and multiply it by

25   the rate.  And that's for two engines running.

Page 159

1     Q    How did you figure out the time factor

2   and the parasitic factor and all the other factors

3   that you spoke so quickly I didn't pick them all up?

4     A    Sure.  Experience, industry standards,

5   what we've experienced as a company, what I know in

6   operating these engines.  I know what the parasitic

7   load is for Jenbachers.  I know what the uptime

8   expected is for Jenbachers.  I know what the

9   kilowatt rating is for Jenbachers.

10    Q    Okay.  How long have you worked with

11  Jenbachers?

12    A    Since 1996, so 12 years.

13    Q    Okay.  And, you know, so as not to

14  belabor the court, you have various expense

15  projections here.  And we went over for Peoria the

16  fact that you -- these were historical-based expense

17  numbers.  Do you use a different methodology or the

18  same methodology for this pro forma?

19    A    It was the same.  It was the same.  The

20  expense number, you'll see equipment maintenance is

21  a bit higher for the Jenbachers.  That just goes

22  with the territory.  But it was the same based on my

23  experience --

24    Q    Okay.

25    A    -- with these engines.

Page 160

1         Q    Okay.  And so these are net cash flow

2    positive for each year; is that right?

3         A    Yes.

4         Q    Now, I notice at the bottom of the first

5    two that we looked at, and we might as well address

6    this, it says payment to IIT, ten percent of

7    something, and you're going to explain what that is.

8         A    Yeah.

9         Q    And then payment to lender, 90 percent of

10   something.  Now, that 90 percent number, is that a

11   dividend or is that just the way that you were

12   paying the loan?

13        A    This is -- we call this a cash flow type

14   mortgage.

15        Q    Um-hmm.

16        A    But this is how we're paying the loan, on

17   a percentage basis.  And I'll note that that number

18   will be tweaked.  You know, currently thinking

19   75/25.  But we'll tweak that a bit, so...

20        Q    Now, if the loan gets paid down to zero,

21   do you have to pay anything to the lender?

22        A    No.

23        Q    Okay.  So this is just the mechanism for

24   paying that back?

25        A    Right, right.

Page 161

1        Q    And so --

2        A    The loan agreement says the interest has

3   to be paid first, and any additional principal can

4   be paid, and I can prepay it anytime I want.

5        Q    Okay.  Now, you know, my mortgage on my

6   house, which I'm proud to say is probably lower than

7   anybody else in the room here, I'm a frugal man, I

8   pay a set amount every month.  Do you -- are you

9   required to pay a set amount every month to the

10  lenders here?

11       A    No.

12       Q    Okay.  It just is based upon -- it has to

13  be a positive and then they get paid?

14       A    Right.

15       Q    Okay.  And even if you had a bad month

16  and couldn't pay them, is there -- have you -- do

17  you have any reason to believe you wouldn't be able

18  to continue drawing a line?

19       A    No, no.

20       Q    Okay.

21       A    That's the beauty of this type of

22  arrangement.

23       Q    Okay.  And so is this -- does this sum up

24  along with the other one sum up to some number?  I

25  don't think it's summed, but what is it -- for

Page 162

1    Peoria and for Sangamon, what do you expect over the

2    life of this?  How much, you know, positive cash

3    flow do you expect to receive?

4          A    I'd have to look at it again, but I would

5    expect --

6          Q    Well, here it's -- just -- we'll --

7          A    Yeah.

8          Q    We'll look at --

9          A    Yeah.

10         Q    -- the other two and then --

11         A    I mean, I could tell you for all four.  I

12   remember that number off the top of my head.  But I

13   just don't -- I can't bisect it, you know, into

14   individual sites.

15              MR. JORDAN:  Your Honor, could we look at

16   Exhibit 36, please?  I'm sorry.  37, please.

17   BY MR. JORDAN:

18         Q    And this would be the pro forma for

19   Litchfield; is that correct?

20         A    I think so, yeah.

21              MR. JORDAN:  Can we go all the way to the

22   left, Your Honor, please?  There we go.

23   BY MR. JORDAN:

24         Q    Is this the pro forma for Litchfield?

25              THE COURT:  That's what it says.

Page 163

1                    THE WITNESS:  Yeah.

2                    MR. JORDAN:  Okay.

3    BY MR. JORDAN:

4          Q    And you utilize the same assumptions, the

5    same historical expenses as you did in the other

6    two; is that correct?  The same methodology, rather,

7    not the same expenses.

8          A    Well, similar methodology except that

9    we -- I'm using a -- the NYMEX spot natural gas

10   price.

11         Q    Okay.

12         A    And as far as -- that's the factor that

13   we paid for, so that's -- as opposed to being paid

14   by electrons that you're producing, you're being

15   paid by gas that you're producing.

16         Q    And that's Exhibit 30, that NYMEX, Henry

17   Hub Natural Gas, quotes?

18         A    Right.

19         Q    Where did you get that?

20         A    It's off the NYMEX website.

21         Q    What's NYMEX?

22         A    It's a New York Mercantile Exchange, and

23   they...

24         Q    Okay.

25         A    You know, it's a large mercantile

Page 164

1    exchange that publishes current and forward pricing

2    on various energy futures.

3        Q    Okay.  And so you have that number.  How

4    did you come down to MMBTU?  First off, what's an

5    MMBTU?

6        A    That's 1 million BTUs.

7        Q    Okay.  How did you come down to a price

8    per MMBTU?

9        A    I looked at the forward pricing out eight

10   to ten years.  And it averaged above $8, so I used

11   $8 conservatively.

12       Q    Okay.  And how did you get to the nominal

13   landfill gas production for 50 CFM through 2020?

14       A    This was Carl VanSoustra who is the

15   expert engineer for Allied Waste.

16       Q    That's Allied's -- you're using Allied's

17   numbers now?

18       A    Oh, yeah, yeah.  I used Allied's numbers.

19   And he shows on his estimation that there's -- there

20   will be 450 CFM -- there's more than 450 at some

21   times, but nominally there will be 450 CFM

22   through 2020.

23       Q    All right.  And then without boring the

24   court, that's cash flow positive?

25       A    It is, yeah.

Page 165

1      Q    Because I'm sure that the court has seen

2  far more of these than I ever will.

3                  Looking at Exhibit 38, if you

4  would.  And, again, I think the court is able to

5  read these things just as easy as we can.

6      A    Right.

7      Q    So what we'll do is -- I'm very

8  interested in knowing the assumptions that you

9  utilized and, you know, saying -- I assume all of

10  them uses inflation figures, is that correct, all

11  four?

12      A    Oh, yeah, three percent.

13      Q    Yeah.

14      A    Right.

15      Q    And you utilized the same methodology for

16  utilizing expenses?

17      A    Right.

18      Q    What -- and your assumptions in this

19  particular pro forma were similar to the Litchfield

20  NYMEX price?

21      A    That's correct.

22      Q    Utilized the same methodology in this as

23  the Litchfield pro forma?

24      A    This is Bloomington, right, yeah.

25      Q    Same as --

Page 166

1      A    Right.

2      Q    -- the Litchfield?

3      A    You are correct, yes.

4      Q    Right.  For Bloomington?

5      A    Right.

6      Q    And, in fact, this site is cash flow

7   positive in a big way?

8      A    Yes.

9      Q    All right.  And now I notice that -- when

10   do you think you're going on in Bloomington?

11      A    2013.

12      Q    Okay.  So you have two years here, 2011

13   and 2012.  We can probably discount those?

14      A    Right.

15      Q    Right.  And why did you change your

16   projection?  Was it based upon Terry Benz's

17   testimony or something else?

18      A    Well, no, it's exactly based on Terry

19   Benz's testimony.  I think he said five to six years

20   before they'd be done filling and capping.

21      Q    Who is Terry Benz?

22      A    He's an environmental engineer for Allied

23   Waste Industries.

24      Q    Okay.  So when he testified at his

25   deposition and you had to -- basically you're going

Page 167

1    to lose your first two years?

2          A    Right.

3          Q    Okay.  Now, overall for all of these

4    sites, what are your anticipated draws on line and

5    how are you going to be able to keep yourself within

6    the $3 million.

7          A    Sure.  Well, in 2008, I plan to draw

8    1.25 million.

9          Q    For?

10         A    For Springfield.  That's a million

11   dollars, 250,000 for Peoria.

12         Q    Okay.

13         A    Now, that's going to leave me --

14         Q    When do you plan on drawing that other

15   than the initial $60,000 that's due in about 16

16   days?

17         A    I would draw it -- draw some for the

18   engine real quick.  You know, the plant would be

19   more late summer, early fall.  Probably late summer

20   would be the draw.  So I would say --

21         Q    When you say "the plant," you mean the --

22         A    Yeah, the --

23         Q    -- Springfield plant?

24         A    The Springfiled plant, yeah, would be the

25   two engines.

Page 168

1                      Now, Peoria would be pretty quick.

2    As soon as the weather breaks, we're going to be

3    spending a lot of money out there.

4          Q    Okay.

5          A    So I would say between the effective date

6    of an order and certainly through early fall would

7    be the expenditure time frame --

8          Q    Okay.

9          A    -- for that 1.25 million.

10         Q    Based upon your discussions with

11   Scattered, do you have any reason to believe that

12   you'll have the funds available?

13         A    Oh, absolutely.

14         Q    Okay.  And then so -- so you get the

15   million-two-fifty.  And then based upon those pro

16   formas, what happens to the principal balance?

17         A    Well, what's going to happen, the -- you

18   know, the principal balance on its face would drop

19   to 1.75 million.  However, we're operating through

20   that period.

21         Q    Um-hmm.

22         A    And so you take the amount to the lender

23   and subtract the amount that goes to the lender,

24   subtract the interest that has to be paid based on

25   the amount that's outstanding on the loan.  And in

1    2008, we'd end up paying about $150,000 down on that

2    loan.  So really I'd end up at the end of 2008 with

3    about $1.9 million left.

4          Q    Available?

5          A    Available, right.  So that's '08.

6          Q    '09, what happens?

7          A    '09 is an operating year and a

8    designing -- design and permitting year.  But the

9    operating year for '09 is operating Peoria and

10   Springfield, two engines each.  And what happens

11   there is we obviously have to pay interest on the

12   outstanding balance.  That's going to be close to

13   $100,000.

14         Q    Total?

15         A    Total in '09.  But then by operating

16   Peoria and Springfield and taking the amount to the

17   lender, you subtract the interest that's already

18   paid, we're going to be able to pay down close to

19   $400,000 on that line.

20         Q    So you'll have about 2.3 available?

21         A    Right.  At the end of '09, I'll have

22   about 2.2, 2.3.

23         Q    Okay.

24         A    So then we go into 2010.  And Litchfield,

25   we know I've got to pay 400,000 for the collection

Page 170

1    system, and we estimate $1 million for a 450

2    CFM-type scrubbing plant and infrastructure.  So I'm

3    going to draw $1.4 million new capital down.

4         Q    So you've got about a million?

5         A    Gives me about a million.

6         Q    Yeah.

7         A    Gives me about a million, maybe 900,000.

8    However, again, we're still operating during 2010

9    Peoria and Springfield.

10        Q    Right.

11        A    So you've got to add in that same

12   $400,000 that we did in 2009 to bring that line back

13   up to about 1.4 million.

14        Q    Okay.

15        A    And that's the end of 2010.  So now after

16   2010 we're running three sites.  We're running

17   Litchfield, Peoria, Springfield.  The result of that

18   is I'm able to pay the interest, which ranges

19   between 100 to 150,000 in those two years.  You

20   subtract out that interest, there's still money left

21   over to the tune of about $600,000 each year to pay

22   down on that loan.  So if we were -- you know, we

23   started at 2.2 million, we subtracted the amount

24   needed for Litchfield and you added all those three

25   years of principal payment down, I'm still into

Page 171

1    about $2.6 million as I enter 2003 -- or 2013 of

2    available credit.  So 2013, I've got 2.6 available.

3                    2013, I build Bloomington.  It's a

4    bigger site.  750 CFM plant, so it's $1.5 million

5    for the plant.  And I know I have to pay $450,000

6    for the collection system, so it's 1.95 million.

7    That draws me down to about 7, $800,000 of available

8    credit.  But, again, that's the year I'm running

9    three sites, and so I'll add $600,000 refreshed into

10   the loan.  I'll come out of 2013 with around

11   $1.4 million available on the loan.

12                   And then in 2014, I'm running four

13   sites, and that's when you really pay down the loan

14   fast.  I mean, to the tune of $1.5 million a year.

15   So by the end of 2015, the loan is paid off.  And

16   then we just run the last five years, 2016 to 2020,

17   without debt service.

18       Q   Okay.  Now, there was an issue that came

19   up at the deposition last week, or whenever it was,

20   January 28th, my daughter's birthday, so I know

21   that, Mr. O'Meara remembers, I'm sure, about the

22   standing of RTC in the State of Illinois.

23       A   Oh, okay.

24       Q   And, first off, where is RTC

25   incorporated?

Page 172

1       A    Delaware.

2       Q    Okay.  And is it in good standing as far

3   as you know in Delaware?

4       A    It is.

5       Q    Okay.  And how about in Illinois?

6       A    Well, we looked into that, you know,

7   since my dep, and it is not in --

8       Q    When you went --

9       A    -- good standing.

10      Q    -- into your dep, did you think that they

11  were in good standing?

12      A    I thought it was.

13      Q    Okay.  And what did you find out during

14  your dep?

15      A    I was shown a document that indicated it

16  may not be.

17      Q    So what did you do?

18      A    I went and investigated it and determined

19  it was not.

20      Q    And what do you have to pay to get in

21  good standing?

22      A    I think the number is -- we went to one

23  of the bankruptcy lawyers for the State of Illinois.

24  I think the number was $80,000.

25      Q    Was that Mr. Newbold?

Page 173

1          A    Right, right, right.

2          Q    And if you pay -- what's the $80,000 made

3     up of, do you know?

4          A    It was some State of Illinois payroll

5     taxes for some amount and an excise tax.

6          Q    Okay.  Are these in solid waste then?

7          A    Yeah.

8          Q    And if the court -- well, first off, have

9     you ever gotten any notices or anything else from

10    the IEPA about this?

11         A    No.

12         Q    Have you ever actually heard from the

13    state -- Secretary of State of Illinois about this?

14         A    I have not, no.

15         Q    Okay.  If the court requires as a part of

16    the assumption and assignment that you have to pay

17    this $80,000 on behalf of RTC, would the trust do

18    it?

19         A    Yes.

20         Q    Okay.  Is this a Chapter 7 claim, a

21    Chapter 11 claim, or a pre-petition claim?

22         A    I thought it was Chapter 11.

23         Q    Okay.

24         A    Yeah, I thought it was 2005.

25         Q    Okay.  So if the $80,000 has to be spent

Page 174

1   or, alternatively, if the State of Illinois issued

2   you a notice saying that, you know, RTC has a

3   problem because this situation is revoked and we're

4   going to cancel the permit unless it's remedied,

5   what would Illinois Investment Trust do?

6          A    We would remedy it, pay it.

7          Q    Pay the 80,000?

8          A    Sure.

9          Q    Okay.  But nobody has ever -- nobody from

10  the state has ever said that to you?

11         A    No.

12         Q    Okay.  Just to make sure Mr. Schmidt is

13  right and I'm wrong, what are the costs to repair

14  Peoria?

15         A    We've got to spend about $30,000

16  additional to bring the second engine online.

17         Q    Right.

18         A    I figure about 50,000 to bring the third

19  engine online.  And then I'm estimating in the

20  $100,000 range to go on the landfill and do what we

21  need to do with the crews to take care of the

22  settlement issues and any repairs.  I think that

23  about covers it.

24         Q    Those are all numbers that when you went

25  through that draw on the line scenario that you went

Page 175

1    through, those were included in there?

2         A    Oh, yeah, yeah, drawing on the line,

3    right.

4         Q    Now, there was some conversation about --

5    in one of the depositions, I think, about using a

6    loop system for the GCCS as opposed to a Christmas

7    tree system.  Do you recall that?

8         A    I do.

9         Q    Okay.  And, now, what does RTC -- what

10   did RCC install?

11        A    We installed what's loosely defined as

12   the Christmas tree system.  It's just a spine with

13   laterals and headers as opposed to a loop.  It's a

14   design preference.

15        Q    Who was the CQA person on that when you

16   put that Christmas tree in Peoria?

17        A    It was Mr. Sloan and his staff.

18        Q    And did he approve that?

19        A    Yes.

20        Q    Okay.  So now there is some talk about

21   utilizing a loop system.  What would it cost to put

22   in a loop system?

23        A    Well, it's a whole design change.  I

24   mean, I think it's several hundred thousand dollars

25   to put in a loop system.  Maybe 7 or 800,000.  I see

Page 176

1    some numbers --

2        Q    Okay.

3        A    -- thrown around.

4        Q    Is there a cap on what RTC -- I'm sorry,

5    the trust's share of that would be?

6        A    Yes.

7        Q    What's that cap?

8        A    For the stipulation, it's 500,000.

9        Q    Okay.  So if Peoria chose to rip out

10   the -- you know, get a permit from the IEPA and do

11   everything and change that system, they would have

12   to be out-of-pocket monies to do that; is that

13   correct?

14       A    Sure.

15       Q    Would it change -- based upon your

16   experience, would it change the amount of royalties

17   that Peoria would get?

18       A    No.

19       Q    Okay.  So is there any -- do you

20   anticipate that they're actually going to go through

21   that process?

22       A    I would be surprised.  The system as

23   designed is designed to work fine.

24       Q    Yeah.

25       A    There has to be some changes to and

1    modifications and repairs.  But --

2          Q    That's all the --

3          A    -- from a design standpoint, it should

4    work fine.

5          Q    That's all in the budget, right?

6          A    Right.

7          Q    Okay.  And so the costs -- just to

8    summarize, the cost -- the total cost that IIT has

9    to have to comply with the stipulation at Peoria is

10   what?

11         A    250,000.

12         Q    And that's within the framework that --

13   when you went through the line of credit draws, that

14   money is available?

15         A    Right.

16         Q    And the amount of monies that you need at

17   Springfield under the stipulation are how much?

18         A    $1 million.

19         Q    Okay.  And that's within that draw?

20         A    Yes.

21         Q    And also included in there is all the

22   operating expenses that IIT has for Peoria and

23   Springfield, right?

24         A    Yeah, they're included in the operating

25   pro forma, right.

Page 178

1        Q    Okay.  And then Litchfield, the cost is

2   how much?

3        A    Per the stipulation, it's 400,000.

4        Q    Right.

5        A    And then if I build a plant, obviously I

6   want to build a plant, it's another million.  1.4

7   million.

8        Q    And we went through that?

9        A    Correct.

10        Q    And then Bloomington, the cost under the

11   stipulation is?

12        A    449,000 for the collection system, and

13   I'm estimating $1.5 million for the scrubber plant.

14        Q    And as you wait for the Litchfield and

15   Bloomington, there's an interest cost, right?

16        A    There is.

17        Q    And that's built into your numbers?

18        A    Yes.

19        Q    And you're still cash flow positive?

20        A    Yes.

21             MR. JORDAN:  All right.  We'll pass the

22   witness, Your Honor.

23             THE COURT:  We'll take a ten-minute

24   recess.

25                    (Brief recess.)

Page 179

1            THE COURT:  Go ahead.

2            MR. O'MEARA:  All right.  Good afternoon,

3   Mr. Connolly.

4            THE WITNESS:  Good afternoon.

5                 CROSS-EXAMINATION

6   BY MR. O'MEARA:

7        Q    You've been continuously employed by RTC

8   since 1995, correct?

9        A    Yes.

10       Q    And you've been the president of RTC

11   since 2001?

12       A    Correct.

13       Q    Okay.  Now, it's your position, isn't it,

14   Mr. Connolly, that the RTC of which you're the

15   president right now is not the RTC that's currently

16   in bankruptcy?

17       A    Yes.

18       Q    Okay.  You consider yourself president of

19   what you refer to as the nondebtor RTC?

20       A    Sure.

21       Q    Okay.  And it's true, isn't it, that you

22   started working -- or you claim you started working

23   for the nondebtor RTC in 1995, right?

24       A    That's right.

25       Q    Okay.  And you continued to be employed

Page 180

1    by nondebtor RTC until the bankruptcy filing in this

2    case in 1999?

3         A    Right.

4         Q    And at that time, you ceased working for

5    nondebtor RTC, correct?

6         A    That's right.

7         Q    Okay.  And started working for debtor

8    RTC?

9         A    Sure.  Again, I'm not a bankruptcy

10   lawyer, but I think that makes sense.

11        Q    Okay.

12        A    Yeah.

13        Q    And then when the settlement agreement

14   happened between Chiplease, Scattered, and the

15   Chapter 7 trustee in this case, you ceased working

16   for the debtor RTC and began working for nondebtor

17   RTC again; isn't that right?

18        A    Again, that's my general understanding.

19   I know we went through this in my dep.  And I'll

20   just say I'm not bankruptcy lawyer, but that's my

21   general understanding of how that works.

22        Q    The debtor RTC and nondebtor RTC aren't

23   two separate companies to your knowledge, are they?

24        A    I don't believe so, no.

25        Q    Does the nondebtor RTC have any employees

Page 181

1    other than you?

2         A    Yes.  And, again, as we talked about in

3    my dep, it being transitioned into IIT.  But the

4    answer is yes.

5         Q    And who are they?

6         A    It's myself, Richard Walker, Rob

7    Fortelka, Mike Watson, Johnny Johnson, and Phil

8    Weeks.

9         Q    Okay.  And each of these individuals are

10   also employed by IIT?

11        A    Effectively, yes.  Again, we're

12   transitioning it.

13        Q    You're transitioning it or they're

14   employees?

15        A    They are employees.

16        Q    Does IIT have any employees who weren't

17   also RTC employees?

18        A    I didn't hear the question.

19        Q    Does IIT have -- and I'll refer to it as

20   IIT or the trust.  Does the trust have any employees

21   who weren't also RTC employees?

22        A    No.

23        Q    Okay.  Now, you testified, didn't you,

24   Mr. Connolly, during your deposition that nondebtor

25   RTC is currently operating a landfill gas-to-energy

Page 182

1    project at the Peoria landfill?

2        A    I think that's generally correct.  I

3    think we were referring more into the CILCO contract

4    than anything else there.

5        Q    Okay.  And nondebtor RTC's operations at

6    the Peoria site are generating revenue?

7        A    Yes.

8        Q    Approximately 25,000 a month?

9        A    Give or take.

10       Q    Okay.  Now, in addition to being

11   president of nondebtor RTC, you're also the trustee

12   for the Illinois Investment Trust, correct?

13       A    Right.

14       Q    Before August of 2006, Mr. Connolly, have

15   you ever been the trustee of anything?

16       A    There may have been a board I was on at

17   one time with the Kiwanis Club.  That's just --

18   that's a -- that rings a bell, that I may have been

19   a trustee on a board there.

20       Q    But of any other trusts?

21       A    Not that I'm aware of, no.

22       Q    Okay.  Are you currently a trustee of any

23   other trusts?

24       A    No.

25       Q    Now, Scattered and Chiplease are the

Page 183

1    beneficiaries under the trust agreement; isn't that

2    right?

3         A    That's my understanding, yes.

4         Q    Now, you had testified, I think, during

5    your direct examination with Mr. Jordan that you

6    hoped to remain the trustee for the foreseeable

7    future?

8         A    Sure.

9         Q    But under the trust agreement, that's up

10   to the beneficiaries; isn't that right?

11        A    That's generally true, yes.

12        Q    Okay.  Well, isn't it true that the

13   beneficiaries under the trust can replace you at any

14   time?

15        A    Sure, that's true.  You know, I mean no

16   disrespect to you, Mr. O'Meara.  I mean, Reed Smith

17   could replace you, but I don't think they have plans

18   to.  And I don't think Scattered or Chiplease have

19   plans to replace me.  I mean, it's just a fact

20   that's out there, no --

21        Q    So it's true, though, that Scattered and

22   Chiplease could replace you if they wanted to; isn't

23   that right.

24        A    Sure.

25        Q    Now, Scattered and Chiplease are also the

Page 184

1    guarantors of the trust, correct?

2         A    Yes.

3         Q    Okay.  And you're familiar with the trust

4    provisions?

5         A    Let me -- I don't know that Chiplease is

6    a grantor.  I know that Scattered is.  I'd have to

7    look at the document.

8         Q    Wasn't Chiplease added as a guarantor

9    when they were added as a beneficiary?

10        A    I think that's right, yeah.  I mean, I'll

11   take your word for it.

12        Q    Now, if IIT is successful in obtaining

13   the contracts that we're here on today, they'll

14   become part of the trust property, right?

15        A    Yes.

16        Q    Okay.  And isn't it true, Mr. Connolly,

17   that Scattered and Chiplease can reacquire the trust

18   property at any time they want to by merely

19   substituting equivalent value property?

20        A    That you'd have to point me to in the

21   trust document --

22        Q    Okay.  Let's look at --

23        A    -- to figure that out.

24        Q    -- Allied Exhibit 1.

25             THE COURT:  If that's already in evidence

Page 185

1    and you have the ability to argue from it, what does

2    it add to have him identify the passage you want to

3    argue from?

4              MR. O'MEARA:  All right.  We can move on

5    then, Your Honor.

6    BY MR. O'MEARA:

7         Q   Mr. Connolly, as the trustee of the

8    trust, you've also got broad powers; isn't that

9    right?

10        A   Yes.

11        Q   Now, isn't it true that you can terminate

12   the trust at any time and distribute the property of

13   the trust to the beneficiaries?

14        A   That may be true.  I don't know that

15   that's taken out of context.  I'd like to look at

16   that piece, if we could.

17             THE COURT:  Okay.  This is IIT Exhibit 1,

18   Mr. O'Meara?

19             MR. O'MEARA:  Well, I think it's -- I've

20   got Allied's Exhibit 1, but I'm not sure if it's the

21   same, if IIT's is the same trust agreement.

22             MR. JORDAN:  Your Honor, we --

23             MR. O'MEARA:  We both may have it as

24   Exhibit 1.

25             MR. JORDAN:  -- object to the relevance

Page 186

1    of this.  Unless there's something they can

2    establish here, some intention or likelihood that

3    they're going to terminate the trust and

4    distribute --

5                THE COURT:  It's overruled.

6                    What section do you want to look at?

7                MR. O'MEARA:  It's paragraph 5.4, which,

8    I believe, is on page 13.

9                THE COURT:  Discretionary termination.

10               MR. O'MEARA:  Removal of trustee, 7.3.

11               THE COURT:  You said 7.3?  I thought you

12   said 5.4.

13               MR. O'MEARA:  I think that was when we

14   were talking about equivalent value.  Oh, I'm sorry.

15   Yes, it was 5.4.  I apologize, Your Honor.

16               THE COURT:  Okay.  Oh, I see.

17   Discretionary termination.

18               THE WITNESS:  Okay.  I see that.

19   BY MR. O'MEARA:

20        Q   So do you recall, Mr. Connolly, or does

21   that refresh your recollection that you can

22   terminate this trust at any time in your discretion.

23        A   Yes, it does refresh my recollection,

24   and, yes, I can.

25        Q   Now, prior to August of 2006, Mr.

Page 187

1    Connolly, did the trust operate anything?

2         A    I attended Mr. Jahelka's deposition and I

3    can tell you what he said.  You know, they used it

4    as an investment vehicle for dividend reinvestment.

5    I recall that.  I don't recall anything else he

6    said.

7         Q    To your knowledge, IIT hasn't operated

8    any landfill gas collection or any energy conversion

9    systems prior to August of 2006, correct?

10        A    That's correct.

11        Q    Okay.  And to the best of your knowledge,

12   has IIT had any assets prior to the settlement

13   agreement between Chiplease and the Chapter 7

14   trustee?

15        A    Again, I would answer that as to what

16   I've learned during Mr. Jahelka's deposition.  It

17   sounds like there is some dividend reinvestment

18   assets that were there at one time.

19        Q    Now, IIT is not currently operating a

20   landfill gas-to-energy conversion facility anywhere,

21   is it?

22        A    Can you just define what you mean by

23   "conversion facility"?

24        Q    I mean, are they converting landfill gas

25   to electricity anywhere?

Page 188

1     A    No.

2     Q    Okay.  Now, I think during your direct

3  examination with Mr. Jordan he asked you about

4  different landfill sites where IIT operates?

5     A    Right.

6     Q    I presume that's gas collection systems?

7     A    That's correct.

8     Q    Okay.  So there's no -- there's no

9  gas-to-energy facilities at any of those sites that

10  you talked about?  Well, why don't we just go

11  through each one.

12     A    Yeah, that would be helpful.

13     Q    Fort Dodge, Iowa.  I believe you

14  testified that Fort Dodge, Iowa, IIT operates it?

15     A    That's right.

16     Q    Okay.  And IIT has never gotten any NOVs

17  or compliance issues at that site; isn't that right?

18     A    That's correct.

19     Q    But IIT doesn't operate a gas-to-energy

20  conversion facility at that site, does it?

21     A    No, not yet.

22     Q    Has it ever?

23     A    No.  But we have plans to.

24     Q    How about Greater New Orleans?  I think

25  you testified that IIT operates there.

Page 189

1          A    That's right.

2          Q    Okay.  And there's never been any

3    violations received?

4          A    No.

5          Q    IIT doesn't operate a gas collection

6    energy facility there, though, does it?

7          A    Well, the energy component we do not.  We

8    do operate gas collection.

9          Q    But no energy plant?

10         A    That's right.

11         Q    Never have?

12         A    Never have.

13         Q    Okay.  How about Lansing, Illinois?  I

14   think you testified that IIT operates there?

15         A    That's right.

16         Q    They operate a gas-to-energy conversion

17   facility there?

18         A    Not currently, no.

19         Q    Okay.  Was it Kewanee, Illinois?

20         A    Right.

21         Q    Okay.  I think you testified you've never

22   received any NOVs or compliance problems at that

23   site?

24         A    That's right.

25         Q    Okay.  Does IIT operate a gas-to-energy

Page 190

1    collection facility there?

2         A    No, just gas collection.

3         Q    Have they ever?

4         A    No.

5         Q    I'm going to ask you the same question in

6    regards to -- I believe you testified as to

7    Wheatland, Wyandot, and New Haven.  You testified

8    you never received any compliance or

9    environmental -- never had any environmental

10   compliance problems at any of those sites; is that

11   right?

12        A    Right.

13        Q    IIT has never operated a gas collection

14   conversion facility at any of those sites, has it?

15        A    New Haven it does.  Wheatland and Wyandot

16   it does not.

17        Q    Okay.  How long has it operated a gas

18   collection and conversion facility at New Haven?

19        A    Not the conversion facility, no.  It's

20   just a gas collection facility and flares at New

21   Haven.  Since the assignment order, August 2006.

22        Q    Okay.  So all of these sites that you

23   testified to when Mr. Jordan was asking you

24   regarding compliance issues or notice of violations

25   and you testified you never received any, none of

Page 191

1    these sites ever had a gas-to-energy conversion

2    facility on them, have they?

3         A    That is correct.

4         Q    Okay.

5         A    That is correct.  Except for Lansing had

6    one a while back.

7         Q    Now, I think you did testify -- or you've

8    just testified now that IIT is operating several of

9    these sites that are operating gas collection

10   systems, correct?

11        A    That's right.

12        Q    Now, there's expenses associated with

13   operating at those sites, isn't there?

14        A    Sure.

15        Q    Monitoring expense?  Maintenance

16   expenses?

17        A    Sure.

18        Q    Okay.  Is IIT receiving any revenue from

19   any of these sites?

20        A    Not yet, no.

21        Q    Okay.  And other than the loan agreement,

22   IIT has no other source of funds; isn't that right?

23        A    I wouldn't say that.  But, I mean, right

24   now as I sit here today, we have the loan agreement

25   plus any throw-off from percentages that come off

Page 192

1    the pro formas that go to IIT on the cash-flow-type

2    mortgage.

3           Q    Well, those are projections in the

4    future, right?

5           A    Sure.

6           Q    But as you sit here today, other than the

7    loan agreement with Scattered and Chiplease, IIT has

8    no other source of funds, does it?

9           A    No, that's not correct.

10          Q    What other source of funds does it have?

11          A    Well, we continue to -- we can use funds

12    from Chiplease in this interim period.

13          Q    Does IIT have any money in the bank?

14          A    Yes.

15          Q    How much?

16          A    I'm not sure.  It's less than a thousand

17    dollars.

18          Q    Is this in connection with the checking

19    account that you opened at MB Financial?

20          A    Right.

21          Q    Did you open that checking account with a

22    hundred dollars?

23          A    It may have been.  I can't recall the

24    exact amount.

25          Q    You don't recall testifying to that at

Page 193

1    your deposition?

2         A    I'm trying to remember.  I know it's less

3    than a thousand, so...

4         Q    Now, if IIT doesn't have any funds, how

5    is it paying the operating expenses at the sites we

6    talked about?

7         A    Well, right now we're getting advances

8    through -- from Chiplease over to our RTC employees

9    while we're operating those sites.

10        Q    So Chiplease --

11        A    And Scattered.

12        Q    So Chiplease and Scattered are advancing

13   funds to IIT to cover their operating expenses?

14        A    Effectively, yes.  And the problem I'm

15   having here, we are in a transition phase.  And, you

16   know, it's not black and white.  But while we're

17   going through this transition, we, being the six

18   employees and our subcontractors, are out there

19   operating these sites.  And so we are getting funds.

20        Q    Well, I'm just asking where the money is

21   coming from, Mr. Connolly.

22        A    Right, I understand.

23        Q    Okay.  So is there an agreement other

24   than the loan agreement between Scattered,

25   Chiplease, and IIT to advance these operating costs?

Page 194

 1          A    I believe there is under the Scattered

 2    loan that it procured from Caterpillar Financial

 3    Services Corp. to fund RTC operations.

 4          Q    Those are RTC operations.  We're talking

 5    about IIT's operation here.

 6          A    I understand.  And we're in a transition

 7    phase right now, so...

 8                    The fact is these people are out

 9    there working the sites.  We're doing what we need

10    to do to keep things going until we get through

11    these assumption trials.

12          Q    So is IIT paying your compensation right

13    now for your work as trustee?

14          A    No.

15          Q    Who is?

16          A    Effectively that's nondebtor RTC because

17    that's --

18          Q    So nondebtor RTC is paying your salary,

19    but Chiplease and Scattered are fronting the

20    operating costs?

21          A    Right, right.

22          Q    Is IIT currently paying its employees

23    that you mentioned?

24          A    IIT is not.  IIT is not the payroll

25    company paying the employees presently.  But we do

Page 195

1    plan to do that in very short order.

2         Q    So is it Scattered, Chiplease, or

3    nondebtor RTC who are paying those employees?

4         A    Nondebtor RTC.

5         Q    Is that pursuant to an agreement between

6    nondebtor RTC and IIT?

7         A    No, I'm not aware of any agreement.

8         Q    Is that an oral agreement?

9         A    No.

10        Q    Is that just the way you're doing it

11   because you're the president of nondebtor RTC and

12   you're the trustee?

13        A    Right, that's just the way we're doing it

14   through this transition.  And the plan is after this

15   trial, we will make the formal transition for IIT to

16   be paying the bills.

17        Q    Mr. Connolly, is Scattered or Chiplease

18   obligated to advance the funds for IIT's operating

19   expenses right now?

20        A    Yes.

21        Q    Pursuant to what?

22        A    The loan agreements that are out there

23   that are effective.

24        Q    Which loan agreements?

25        A    The ones we've looked at today, the

1  promissory note, the loan agreement between

2  Scattered, Chiplease, and IIT.

3      Q   Well, what I'm talking about is the

4  operating expenses that IIT is incurring right now.

5  And I think you've already previously testified that

6  you haven't drawn down any money from the loan

7  agreement from Scattered and Chiplease, yet

8  Scattered and Chiplease are advancing on IIT funds.

9      A   Well, that's true, right.

10     Q   Okay.

11     A   That's true.  But I think you'll notice

12  in the loan agreement the date is pretty fresh, and,

13  you know, we'll draw on that when we need to draw on

14  it.

15     Q   Now, you're drawing a salary for

16  nondebtor RTC, I think you testified, correct?

17     A   That's right.

18     Q   And that's both for your work as

19  president of nondebtor RTC and as trustee of the

20  trust?

21     A   Sure.

22     Q   Okay.  Have you previously testified at

23  your deposition that if there's any shortfalls,

24  that's being supplemented by Chiplease?

25          MR. JORDAN:  Objection, Your Honor.  It

1    sounds like improper impeachment.  I'm sure he can

2    just ask a straight question and --

3            THE COURT:  It's overruled.

4            THE WITNESS:  If you could point me to

5    that, it would be helpful.  I could have very

6    well --

7            THE COURT:  If you don't remember, just

8    say you don't remember.

9            THE WITNESS:  I don't remember.

10   BY MR. O'MEARA:

11       Q   Now, IIT has received several --

12           THE COURT:  And just so that I'm clear on

13   this, in this case I don't have any doubt that Mr.

14   Connolly is a representative of a party in interest

15   in this matter.

16           MR. JORDAN:  Oh, he is the trustee --

17           THE COURT:  And he can certainly be asked

18   about prior testimony that he's given.

19           MR. JORDAN:  I'm not denying that.

20           THE COURT:  That's fine.

21           MR. JORDAN:  I thought that he should

22   just ask him a straight question.

23           THE COURT:  That was a straight question,

24   did you testify such-and-such.  It's a leading

25   question.  It asks for a prior statement that he's

Page 198

1    given, and it's entirely appropriate.

2    BY MR. O'MEARA:

3         Q    Regarding the contracts that IIT does

4    possess, we talked about their operations at these

5    other landfills.  Has IIT assigned any of the

6    contracts it received from Chiplease pursuant to the

7    settlement agreement?

8         A    The only one -- the answer is yes.

9         Q    Which one?

10        A    The CILCO power purchase contract was

11   assigned.

12        Q    And who was that assigned from?

13        A    IIT.

14        Q    To?

15        A    Resource Technology.

16        Q    And when was that?

17        A    January 2007.

18        Q    So this CILCO contract was -- fell to

19   Chiplease pursuant to the settlement agreement with

20   the Chapter 7 trustee?

21        A    Oh, no, no, no, that isn't how that

22   worked.

23        Q    How did IIT get the CILCO contract?

24        A    It was through an August 2006 court order

25   in this court --

Page 199

1        Q    Okay.

2        A    -- assigning that contract to IIT.

3        Q    To IIT directly?

4        A    Right.

5        Q    It didn't first go to Chiplease?

6        A    I don't believe so, no.

7        Q    Okay.  And then IIT assigned it to RTC?

8        A    Right.

9        Q    Why?

10       A    The reason for that is the FERK

11  certification is -- it's in the name of RTC.  It's

12  still a qualified facility name or not, but -- and

13  then the contract with CILCO was RTC.  So it aligned

14  with the names and the parties.

15       Q    Do you have plans to assign any other

16  contracts from IIT to RTC?

17       A    No.

18       Q    Any plan to assign any of the contracts

19  at issue today to RTC?

20       A    No.

21       Q    Now, I believe you've testified here

22  today that if the contracts are assigned, it's IIT's

23  intent to install a gas-to-electrical energy plant

24  at Sangamon, which is also known as Springfield,

25  correct?

Page 200

1          A    Well, correct.  And, again, I will say

2    that the major infrastructure is already there for a

3    gas-to-electric plant.  It's not like a greenfield.

4    We're just putting in engines to tie into that

5    system.  But that is correct.

6          Q    And you'd want to do a pipeline,

7    probably?  I think that's what you testified to as

8    to Bloomington and Litchfield, correct?

9          A    Right.

10          Q    Okay.  And then at Peoria, it's also a

11    gas-to-energy project?

12          A    Sure.

13          Q    Okay.  And there's costs associated with

14    these projects, I think you testified to, correct?

15          A    Yes.

16          Q    And part of those costs are the cure

17    amounts under the stipulation between IIT and

18    Allied?

19          A    That's correct.

20          Q    Okay.  Now, there are cure costs

21    identified in that stipulation?  I think you looked

22    at that earlier.

23          A    Yes.

24          Q    Okay.  And there's also -- part of that

25    stipulation requires IIT to put up a performance

Page 201

1   bond at each site if it elects to operate there;

2   isn't that right?

3        A   I think you're taking the language a

4   little bit out of context, but it's required to have

5   a performance bond put up, yes.

6        Q   What part of it do you think I'm taking

7   out of context?

8        A   I think it just says a performance.  I

9   don't know that it says IIT itself has to put up the

10  bond.

11       Q   Well, let's take a look at it.

12       A   Okay.

13           MR. O'MEARA:  Allied Exhibit 7, Your

14  Honor.

15           THE COURT:  Is it the same as IIT?

16           MR. O'MEARA:  I think it is, yes.

17           THE COURT:  So the numbers, if you could

18  give me a section number, ought to be the same.

19  That's on the screen now.

20           MR. O'MEARA:  Okay.  I don't have IIT's

21  exhibit number.  It's the stipulation.  It's going

22  to be...

23           MR. JORDAN:  47?

24           THE COURT:  Okay.  It's IIT 47?

25           MR. JORDAN:  Right.

Page 202

1          THE COURT:  Okay.  All right.  What

2    section?

3          MR. JORDAN:  It starts on page 2.

4    BY MR. O'MEARA:

5          Q   Mr. Connolly, take a look at

6    paragraph 1(b), and then you'll want to scroll over

7    to the next page once we go through it.

8          A   Okay.  I see that.

9          Q   Now, what this contract allows -- strike

10   that.

11               There's nothing in the terms of the

12   stipulation that allows IIT to subcontract out its

13   performance bond requirements, is there?

14         A   I don't see that it precludes that, no.

15   And it's very standard to have a general contractor

16   post performance bonds on these type of projects.

17         Q   Let me direct your attention then to

18   paragraph (b) under Section 1.  "Within 90 days of

19   IIT's written notice to Allied in any event prior to

20   IIT's entry into the site to commence work, IIT

21   shall," and then if you go to subpart (ii), "post a

22   letter of credit, performance bond, or other form of

23   security corresponding to the sites in which IIT is

24   to commence work."

25               A   Right.

Page 203

1         Q    And you think that allows IIT to

2    subcontract out its performance bond requirement?

3         A    Yeah, I do.  I don't -- and, again, I'm

4    not a lawyer reading this language, but it doesn't

5    look to me to be exclusive of that.  And also

6    there's language here, "reasonably acceptable to

7    Allied."  You know, I would think -- if that's the

8    process that I've gone through in my career as far

9    as posting bonds for construction of facilities that

10   have had the GC post those bonds, I would think

11   that's reasonable.

12        Q    You don't know what --

13        A    That's just my read of it.

14        Q    You don't know what Allied considers to

15   be reasonable, do you?

16             THE COURT:  Well, ultimately it would be

17   a question of what a court considers reasonable.

18             THE WITNESS:  Right.

19   BY MR. O'MEARA:

20        Q    In addition to paying the cure costs and

21   the performance bond that we talked about, Mr.

22   Connolly, IIT also has to obtain all necessary

23   permits; isn't that right?

24        A    That's correct.

25        Q    Now, I believe you testified that if you

Page 204

1  were unable to get a permit renewal, you could apply

2  for a construction permit, construct something, then

3  apply for an operating permit, but that you could

4  operate during the interval; isn't that right?

5      A    Not exactly.  But I'm happy to go through

6  the process with you a little bit.

7      Q    Well, my point is is if you look at

8  subpart (3) under (b) --

9      A    Okay.

10     Q    -- the stipulation requires you to have

11 obtained all necessary permits before you begin

12 work; isn't that right?

13     A    It says, "All applicable government

14 regulatory permits or approvals required for IIT's

15 work at such site."  My testimony definitely allows

16 us to work on the site pursuant to the regulations.

17     Q    Now, you've testified that IIT is going

18 to draw on this $3 million line of credit with

19 Scattered and Chiplease to finance its operations at

20 Litchfield, Bloomington, Sangamon, and Peoria,

21 correct?

22     A    That's correct.

23     Q    Will you use the loan for any other

24 purposes or any other sites?

25     A    No.  In fact, I think the loan agreement

Page 205

1    is specific to those four sites.

2         Q    Now, in exchange for this loan, Scattered

3    and Chiplease have a security interest in all of the

4    trust's assets; isn't that right?

5         A    Again, that's generally what I recall

6    without looking at it.  But I'll take your word for

7    it.

8         Q    And that security interests won't include

9    these gas rates that are at issue today if they're

10   assigned to IIT, correct?

11        A    I believe so, yes.

12        Q    So it's true, isn't it, Mr. Connolly,

13   that if IIT defaults on any of its loan obligations,

14   Scattered and Chiplease can foreclose on the

15   property?

16        A    That may be correct, but I'd have to look

17   at the document and come to that conclusion.

18        Q    You're unaware of it?

19        A    Right.  As I sit here today, I'm

20   unaware --

21        Q    Did you negotiate the loan agreement?

22        A    Yes.

23        Q    Did you review it?

24        A    I did.

25        Q    Did you sign it?

Page 206

1          A    Yes.

2          Q    Mr. Connolly, one of the defaults under

3     the loan agreement states that if IIT ever declares

4     bankruptcy, that's a default; isn't that right?

5          A    It does state that, that's correct.

6          Q    Okay.  Does IIT have any plans to declare

7     bankruptcy after these contracts are assigned to it?

8          A    I hope not.  No disrespect.  No,

9     seriously, I just -- there's no plans to do that.  I

10    hope not.

11         Q    Any plans to have a receiver appointed

12    after any of these contracts are assigned to IIT?

13         A    Well, you know there's an existing

14    receiver in place.  We're not -- no plan of

15    appointing a new one.

16         Q    And you've testified IIT hasn't made any

17    draws on the loan, correct?

18         A    That's right.

19         Q    Now, when you were considering funding

20    sources, did you go anywhere else other than to

21    Scattered and Chiplease?

22         A    No.

23         Q    Okay.  What would you do to assure

24    yourself, Mr. Connolly, that Scattered and Chiplease

25    could fund $3 million?

1          A    Well, certainly I've known Mr. Jahelka

2    for a lot of years, over ten years, and I trust and

3    respect him.   Chiplease, I've known Mr. Greenblatt

4    for a long time, trust and respect him.   And if they

5    say they can do it, I believe they can do it.   And,

6    furthermore, Mr. Jahelka's testimony at his dep went

7    through item by item how they can do it.

8          Q    Did you look at any financial documents

9    of Scattered and Chiplease?

10         A    No.

11         Q    Did you ask for any?

12         A    No.

13         Q    Did you look at any bank balances or

14   account statements of Chiplease or Scattered?

15         A    No.

16         Q    And you didn't ask for any either?

17         A    No.

18         Q    So you did no investigation whatsoever

19   whether or not Chiplease or Scattered could actually

20   fund $3 million; isn't that right?

21         A    Well, no.   I would say that's incorrect

22   only because over the course of knowing, you know,

23   the principals for a lot of years, I think that does

24   hold some water, so it's not no investigation.

25         Q    So you asked them whether they could do

Page 208

1    it?

2            A    Right.

3            Q    And they told you yes?

4            A    Yes.

5            Q    What are you going to do if IIT asks for

6    money under this loan agreement and Chiplease and

7    Scattered can't provide?

8            A    Well, first off, I don't think that's

9    going to be the case.  I would be very surprised if

10   that was the case, and so I haven't really

11   investigated that option.

12           Q    Would you sue Scattered and Chiplease for

13   breach of contract?

14           A    Again, I haven't investigated that.  I

15   don't know.  I don't think I would sue them.

16           Q    Well, it would be difficult to sue them

17   since you're the trustee of -- they are the

18   beneficiaries under the trust under which you're the

19   trustee?

20           A    Sure.

21           Q    If you could look at the loan agreement.

22   Well, let me just ask you, Mr. Connolly, the loan

23   agreement between IIT, Scattered, and Chiplease

24   contemplates a deposit control agreement, doesn't

25   it?

Page 209

1        A    Yes.

2        Q    Has there been one entered into?

3        A    Not yet.

4        Q    Okay.  How come?

5        A    We're planning on finalizing that in the

6    near future.  But we're working out the final

7    details of the percentage splits between the lender

8    and IIT on the net project operating revenue.

9        Q    Mr. Connolly, does that mean that there

10    is no loan agreement in place as we sit here today

11    because that deposit agreement hasn't been executed?

12        A    Well, no, that's not the case.

13        Q    Has the loan agreement been executed?

14        A    Yes.

15            MR. O'MEARA:  Is the copy that's

16    submitted to the court executed?

17            MR. JORDAN:  Yes.

18            MR. O'MEARA:  Okay.

19            MR. JORDAN:  The one submitted to you was

20    executed, too.

21            MR. O'MEARA:  We apparently have an

22    unsigned copy, but that's...

23            THE COURT:  That was Exhibit 1, wasn't

24    it?

25            MR. JORDAN:  I think the trust agreement

Page 210

1    was Exhibit 1.  The one that I e-mailed to Mr.

2    O'Meara is the same one as the one that's here.  And

3    there's a --

4              THE COURT:  This copy is executed.

5              MR. O'MEARA:  Okay.

6              MR. JORDAN:  50 and 52.

7    BY MR. O'MEARA:

8         Q    Now, Mr. Connolly, you testified as to

9    what your plans are for each facility.  It's true,

10   isn't it, that --

11             THE COURT:  Excuse me.  I was looking at

12   the wrong document.  What --

13             MR. JORDAN:  50.

14             THE COURT:  50?

15             MR. JORDAN:  50 and 52, the amended

16   promissory note.  We actually have already looked at

17   this.  It's the amended promissory note, which is

18   signed on the fourth page, and the amended loan and

19   security agreement, which is signed on the 15th

20   page, I believe.  No, 14th page.

21             THE COURT:  Okay.  Well, the note is

22   signed.  But the note doesn't impose any obligation

23   to make payments, does it?

24             MR. JORDAN:  Yes, it does.  It's a note.

25             THE COURT:  That doesn't impose any

Page 211

1    obligation on the payor under this note to make a

2    payment.  This is all about repayment.

3              MR. JORDAN:  No.  The amended loan and

4    security agreement --

5              THE COURT:  That's what I was going to

6    say.  So this --

7              MR. JORDAN:  It's 52.

8              THE COURT:  50 is not the relevant

9    document.

10             MR. JORDAN:  Right.  No.  He had asked if

11   50 and 52 were signed, and I just indicated they

12   aren't.  That be page 1 over to page 2.

13             MR. O'MEARA:  Okay.

14             THE COURT:  Okay.  So that is a signed

15   copy of the security agreement.

16   BY MR. O'MEARA:

17        Q   Mr. Connolly, if IIT gets this permit and

18   installs a gas-to-energy facility or completes it

19   with the engines at the Sangamon landfill, ITT will

20   need a Title V permit from the IEPA to operate

21   there, won't they?

22        A   No.  The Title V permit is existing.  We

23   won't need that.  We just need the construction

24   permit to cover the two Jenbacher engines in lieu of

25   the Cat engines.

Page 212

1         Q    You won't need a Title V Clean Air Act

2    Permit to operate at the Sangamon facility?

3         A    The answer is, yes, we'll need one and,

4    yes, we have.

5         Q    I was just asking you whether you would

6    need one.

7         A    You need one.

8         Q    Okay.  Now, RTC has a current permit at

9    the Sangamon facility, correct?

10         A    Correct.

11         Q    And that came up for expiration and

12    needed to be renewed; isn't that right?

13         A    Yes.  And I want to answer further your

14    last question.  Again, the CAAPP permit is not

15    required -- you know, a final issued CAAPP permit is

16    not required to operate.  Otherwise, you know, for

17    example, if General Motors wanted to come in and

18    build an auto plant here, they would have to wait

19    four years to be able to produce automobiles.  They

20    would get a construction permit and an operating

21    permit and file for their CAAPP umbrella permit at

22    the same time and get the permit shield.  Hence,

23    same thing in that scenario with IIT if IIT had to

24    go that route.

25                        So the issuance -- the final

Page 213

1    issuance of the CAAPP permit doesn't preclude you

2    from operating under a construction permit and an

3    operating permit.

4         Q    Well, you operate at the risk that the

5    IEPA will deny the ultimate permit, though, don't

6    you?

7         A    I don't know if that's the case.

8         Q    Well, under the scenario that you've

9    testified about, you can apply for a construction

10   permit, you'll construct something --

11        A    Right.

12        Q    -- you'll install something, you'll

13   operate something, and then you'll apply for a

14   permit, and you'll see if IEPA grants it, which

15   could take a couple of years, correct?

16        A    Yeah.  I'd have to look at the

17   regulations, but I don't -- and I never experienced

18   this either.  If you've got an approved construction

19   permit and you went through the test and got the

20   operating permit, I don't know if there's any avenue

21   for IEPA, or any agency for that matter, to deny the

22   umbrella permit that covers the approved permits

23   that are subsets of it.

24        Q    Well, isn't it possible that you wouldn't

25   get the -- you could get a construction permit but

Page 214

 1    not the operating permit?

 2         A    Possible, but very unlikely.

 3         Q    Now, has the RTC Title V permit at

 4    Sangamon been renewed?

 5         A    Yes.

 6         Q    Okay.  Has the EIPA --

 7         A    I'm sorry.  To be clear, we submitted the

 8    renewal application which gives us the permit shield

 9    until such time as finally acted upon.

10         Q    And who submitted the renewal?

11         A    I did.

12         Q    You did.  Okay.

13         A    I'm sorry.  Let me back up.  Mr.

14    Henderson did as receiver.  He submitted that.

15         Q    And you were working in conjunction with

16    Mr. Henderson?

17         A    Right, I did.

18         Q    And have you received a determination

19    from IEPA regarding the status of that renewal?

20         A    Yes.

21         Q    They've issued a termination of the

22    renewal?

23         A    No, no, no.  They issued a completeness

24    determination of the renewal saying that the renewal

25    is complete and it's -- you know, continues its

Page 215

1    review.

2         Q    So that just means the form is complete.

3    It doesn't mean that the permit has been renewed,

4    though?

5         A    No.

6         Q    Okay.

7         A    And, furthermore, I think they're at

8    three or four years to finally issue those.  So it's

9    going to be a while.

10        Q    Now, if RTC is granted that permit

11   renewal, is it going to then assign it to IIT?

12        A    No.  That's not how it works.

13        Q    How does it work?

14        A    IIT can -- you know, effectively, this

15   assumption will then have the ability to go in and

16   transfer under an administrative permit mod the RTC

17   CAAPP permit to IIT, similar to what I've done at

18   the other sites that have already been approved by

19   this court as far as the contracts going over to

20   IIT.

21        Q    So it would be an administrative transfer

22   from RTC to IIT?

23        A    That's correct, an administrative permit

24   modification.

25        Q    Does that need IEPA approval?

1        A    Ultimately it does, sure.

2        Q    Okay.  Have you talked to the IEPA and

3   asked them whether they were likely to grant such a

4   transfer or not?

5        A    I have not personally talked to them, no.

6        Q    Has anybody talked to them?

7        A    I had our consultant give a call just to

8   see what the status was, and it was just on

9   somebody's desk under review.  They didn't know what

10  the time line was going to be.

11       Q    What are you talking about?  Related to

12  Sangamon or related to --

13       A    Related to Sangamon -- no, not related to

14  Sangamon.  Related to the Taylor Ridge facility.

15       Q    So if the IEPA denies IIT's transfer

16  application for the permits at Taylor Ridge -- and

17  what was the other site?  Ottawa?

18       A    Right.

19       Q    That change your perspective about

20  whether it's likely to grant it at Sangamon?

21       A    I suppose it would, but I don't expect

22  that to be the case.  I haven't heard anything to

23  that knowledge.

24       Q    So what would you do in that situation

25  where the permit was denied, either the renewal was

1    denied or a transfer --

2         A   Well, first off, you know, this is going

3    out of order of what normally happens.  You know, if

4    that happens, there's a draft denial letter that

5    comes out, and the agency by code is required to

6    tell you why they're denying it.  And then you have

7    X amount of time, it's either 15 or 30 days, maybe

8    it's 60 days, to respond and give them additional

9    information, and then they can make a final

10   determination.  If they make a final determination

11   to deny it, then you have appeal rights to the

12   Illinois Pollution Control Board.  And then that

13   takes a period of time.  And then outside of that,

14   you can appeal to a court, so...

15        Q   Now, Mr. Connolly, RTC previously

16   operated a landfill gas-to-energy facility at the

17   Sangamon landfill?

18        A   That's correct.

19        Q   Which is also referred to as Springfield

20   landfill, correct?

21        A   Sure.

22        Q   Okay.  And RTC's equipment there

23   consisted of several turbine engines?

24        A   No, that's not correct.

25        Q   What kind of engines?

1        A    They were reciprocating engines.  And, of

2    course, we had the well field, gas wells, header

3    piping, gas bulk, compressors, electrical

4    infrastructure, all the switchgear, everything that

5    surrounds those engines.  That's the entire

6    facility.  We had all of that.

7        Q    Okay.  How many engines were at the site?

8        A    Five.

9        Q    Now, were those engines in that gas

10    collection system permitted with the IEPA?

11        A    Yes.

12        Q    And that's pursuant to that Title V

13    permit we just talked about?

14        A    Well, yes and no.  I mean, they were

15    permitted back in the mid '90s before Title V was

16    around for that site, so...

17        Q    But the Title V permit also covered those

18    engines and --

19        A    Well, yeah.  I mean, the process is the

20    same.  We had a construction permit, an operating

21    permit --

22        Q    I'm just asking you whether the engines

23    and the well field were --

24        A    Oh.

25        Q    -- covered by the Title V permit.

Page 219

1        A    I'm not trying to be difficult, but

2    you're talking about a 12-year period of time.

3    There's a period of time that Title V didn't cover

4    that site.  That's what I'm trying to be clear on.

5    Ultimately when it became --

6        Q    How about from 2002 forward?

7        A    Yes.

8        Q    Okay.

9        A    That's fine.  I'm sorry.

10        Q    Now, Mr. Connolly, it's true -- let me

11    back up.  You said there were five engines at that

12    site?

13        A    Right.

14        Q    How many engines operated?  What was the

15    greatest amount of engines or how many engines

16    operated at its speak?

17        A    For a while I believe we operated three.

18        Q    Okay.

19        A    But that was a short time.

20        Q    How many engines typically operated?

21    Just one?

22        A    One to two.

23        Q    Okay.  Now, Mr. Connolly, those engines

24    were inoperable for significant periods of time in

25    2004 and 2005; isn't that right?

Page 220

1           A    2005, that's correct.    In 2004, there was

2    some inoperable time.    I don't recall, you know, how

3    much time.

4           Q    Well, weren't the engines at Sangamon

5    inoperable between July 1st, 2004, and December

6    29th, 2004?

7           A    I don't remember.

8                MR. O'MEARA:    Your Honor, I've got all

9    Allied exhibit references --

10                THE COURT:    That's fine.    I have them

11    here.

12                MR. O'MEARA:    Okay.    Allied Exhibit 16.

13                THE COURT:    Well, my only thought was

14    that if you've already identified an exhibit as an

15    IIT exhibit, we might as well continue to use it.

16                MR. O'MEARA:    Right.    It just may not

17    have the -- my outline is not updated.    If we

18    could...

19    BY MR. O'MEARA:

20           Q    Well, Mr. Connolly, do you recognize

21    this?

22           A    Yes.

23           Q    And what is it?

24           A    It's a semiannual monitoring report dated

25    February 28th, 2005, to IEPA.

1        Q    Is this signed by you?

2        A    I'm presuming so, yes.  Yes.

3        Q    What's the purpose of this report?

4        A    This is -- it's reporting monitoring

5    activities for a six-month period pursuant to the

6    permit requirements to report, and so it reports

7    various monitoring parameters for the facility.

8        Q    Now, if we go to the second page under

9    numeral -- number 2, rather, engine operating hours,

10   you'll see the bullet point in the middle.  Does

11   that refresh your recollection whether or not the

12   engines were down for a significant amount of time

13   in 2004?

14       A    Yes.

15       Q    Were they, in fact, down between

16   July 1st, 2004, and December 29th, 2004?

17       A    That's correct.

18       Q    Now, RTC's failure to operate the engines

19   at that time caused surface methane levels to reach

20   above 500 parts per million; isn't that right?

21       A    I'd have to look at this report.  It may

22   have.  I don't remember.

23       Q    Take a look at page 3 and let me know if

24   that refreshes your recollection, the first

25   paragraph.

Page 222

1          A    Okay.  I see that.

2          Q    So it's correct, isn't it, Mr. Connolly,

3    that RTC's failure to operate those engines causes

4    surface methane levels to reach above the 500 parts

5    per million level?

6          A    It could have been a cause, but I'm

7    looking at this and I recall the issue now.  There

8    was a grate that was the responsibility of the

9    landfill owner to seal up, and it wasn't sealed.

10   And so our position was that was a landfill issue

11   they had to fix.  The other one may have been us if

12   that was a gas well.  But you can also say -- LW 3,

13   and there's a grate there, that's a landfill

14   feature.  And then I think we -- it was -- the well

15   was fixed, and so it's not a potential violation if

16   you fix it on the remonitoring, if you look in the

17   third paragraph.  And the grate continued on.  So,

18   you know, was it the engines?  Can't inclusively say

19   that.

20         Q    So the engines being down for

21   five-and-a-half months wouldn't cause surface

22   emissions of methane?

23         A    It would, it's just a question of

24   concentration.

25         Q    Okay.

Page 223

1        A    You have to be over 500 parts per

2    million.  And certainly with no landfill cap,

3    there's a lot of areas for that gas to go out, and

4    so it may disburse it enough to keep it under that

5    concentration.

6        Q    Were there positive pressures experienced

7    as a result of the engines being down for

8    five-and-a-half months?

9        A    Likely, but I don't remember.

10        Q    And would those have been the result of

11    the engines being down?

12        A    Yes.

13            MR. O'MEARA:  Let's look at Exhibit 15,

14    if we could, Your Honor.  Your Honor, there's not a

15    page number here, but we'll go to page 1206.

16    BY MR. O'MEARA:

17        Q    Do you recognize this document, Mr.

18    Connolly?

19        A    Generally, yeah, sure.

20        Q    Okay.  If I can direct your attention

21    to -- I think it's in the form in the middle of the

22    page, it looks like it's number 26, "Describe the

23    suspected or known cause of the incident."  Do you

24    see that?

25        A    Yes.

Page 224

1          Q    So does that refresh your recollection

2    that you believe that RTC -- excuse me.  Does that

3    refresh your recollection that the positive

4    pressures of the wellheads were a result of the

5    engines being down?

6          A    Well, yeah.  I just testified that that's

7    the case.

8          Q    Okay.

9          A    Yeah.

10         Q    Now, did RTC received any NOVs as a

11   result of these engines being down?

12         A    I believe so, yes.

13         Q    Okay.  Do you know how many?

14         A    I don't remember.

15             MR. O'MEARA:  If we could look at

16   Exhibit 14, Your Honor.

17   BY MR. O'MEARA:

18         Q    Do you recognize this document, Mr.

19   Connolly?

20         A    Yes.

21         Q    And is this a copy of an NOV from the

22   IEPA to RTC for its operations at the Sangamon

23   landfill?

24             MR. JORDAN:  Objection to this, Your

25   Honor.  This is a hearsay document.  He would have

Page 225

1   to have somebody from the compliance section, Ms.

2   Armitage, to set a foundation for this document.

3           THE COURT:  It's not being introduced for

4   the truth of the matter asserted.  It's being

5   introduced to indicate that notice was received.

6           THE WITNESS:  Yeah, I mean, I generally

7   recall this.  I mean, I'll note it's almost four

8   years ago, but...

9   BY MR. O'MEARA:

10      Q   And was this for violations that the IEPA

11  alleged relating to the gas collection and control

12  system?

13      A   I don't remember.  I'd have to look at it

14  again.

15          MR. O'MEARA:  And just scroll to the

16  second page, if we could, Your Honor.  Third page.

17          MR. JORDAN:  Your Honor, we -- Your

18  Honor, we object to introduction of allegations.  I

19  mean, Mr. Connolly has already testified regarding

20  matters generally.  But introduction of allegations

21  as some sort of character evidence is improper.  He

22  has to have an actual finding.

23          MR. O'MEARA:  Your Honor, you had

24  addressed this issue well before the trial when we

25  had -- we briefed this issue of the scope of the

Page 226

1    evidence.

2             THE COURT:  The question pending is

3    whether the allegations in this notice had to do

4    with the operation of the Sangamon landfill.  My

5    expectation is I can read the document and come to

6    that conclusion myself.  If you think it's something

7    that I need Mr. Connolly's help in understanding, I

8    would be happy to let you answer the question --

9    have the question answered.

10            MR. O'MEARA:  We can move on to the next

11   one, Your Honor, because there is going to be

12   several.

13            THE COURT:  Well, if they are of the same

14   nature with the content of the exhibit being

15   understandable on its face, then I would urge you to

16   skip it and simply advert to the exhibits in

17   argument.

18            MR. O'MEARA:  Okay.  So -- all right.

19   I'll continue with the examination.  I don't know

20   how many exhibits then we'll need to go through,

21   but...

22   BY MR. O'MEARA:

23       Q   Do you know what the result of that NOV

24   was, Mr. Connolly?

25            A   I don't remember.

Page 227

1      Q    Does that remain open?

2      A    It may.  But I believe that it could be

3   the case.

4      Q    You believe that's the case?

5      A    I believe it is the case.

6      Q    Okay.  Now, following this engine being

7   down from July to December 2004, did RTC ever repair

8   that engine?

9      A    Yes.

10      Q    And did it get operating again?

11      A    Yes.

12      Q    And when was that?

13      A    I think we just read it.  It was late

14   December 2004.

15      Q    Okay.  Did it go down again after that?

16      A    It did.

17      Q    Okay.  Was that in January of 2005?

18      A    Yeah.  I think it was right at the end of

19   January 2005.

20      Q    Approximately a month later, right?

21      A    That's correct.

22      Q    Okay.  Now, that engine went down because

23   there was a fire in RTC's gas plant at the Sangamon

24   facility; isn't that right?

25      A    Well, no.  The root cause was a failed

Page 228

1    rod that hit a gas line that caused a localized, you

2    know, spark and fire around that single engine,

3    that's correct.

4         Q    But it destroyed the engine?

5         A    That engine, yes.

6         Q    The mechanical failure destroyed that

7    engine; isn't that right?

8         A    Right.

9         Q    Were any of the other engines operational

10   at that time?

11        A    We were -- no.  The answer is no.

12        Q    Okay.  Now, RTC never repaired that

13   engine, did it?

14        A    No.

15        Q    RTC never repaired any of the other

16   engines at Sangamon, did they?

17        A    No.  And, again, as we talked about in

18   the dep, I mean, I was informed at this point in

19   time, between 2004 -- early in 2004 to the end of

20   2005 by Mr. McDonald and Mr. Bent, that this system

21   was going to -- the collection system was going to

22   be ripped out in its entirety on the landfill and --

23   which meant all the wells and all the header pipe

24   were going to be gone between the fall of 2004 and

25   the end of 2005.  In fact, they took out some of

Page 229

1    system in the fall of 2004.

2                So the reason for that -- in my

3    consultation with the Chapter 11 trustee, we came to

4    the conclusion there wasn't going to be enough gas

5    during the rip-out to even run a single engine.  We

6    came to that final conclusion and decided it wasn't

7    worth doing.

8        Q    So the answer to my question is, no, the

9    engine was never repaired, right?

10       A    Right.  Sorry.

11       Q    Okay.  Now, isn't it true that the

12   engines are no longer present at the site?

13       A    That's correct.

14       Q    Is that because RTC sold those engines?

15       A    Yeah, RTC sold the engines themselves.

16   Again, all of the infrastructure is still there.

17   The compressors are still there, the switchgear,

18   exhaust stacks.  All the electrical infrastructure

19   is there.

20       Q    And when did RTC sell and remove those

21   engines from the landfill?

22       A    Fall of 2006.

23       Q    Now, Mr. Connolly, isn't it true that at

24   the time the engine went down in January of 2005,

25   RTC was operating under a permit that required

Page 230

1    engines not to shut down for longer than one hour?

2         A    That's correct.

3         Q    And that's the Title V permit, correct?

4         A    Yeah.  You call it Title V, I call it

5    CAAPP.  But that's fine.

6         Q    CAAPP permit.

7                   It's the CAAPP permit that requires

8    that engines not be shut down for longer than one

9    hour; isn't that right?

10        A    Well, it just says that combustion

11   shouldn't be down for more than one hour.

12        Q    So the fact that they were down and never

13   repaired, is that a violation of the CAAPP permit?

14        A    It's an alleged violation.  Again, you

15   know, as we talked about in the dep, it's not a

16   violation until it goes all the way through the

17   process.

18        Q    Were there other environmental problems

19   associated with that engine being permanently shut

20   down at the Sangamon landfill?

21        A    Well, I think we've talked about, you

22   know, the fact that it did cause some positive

23   pressures in the wells.

24        Q    Anything else?

25        A    No.

Page 231

```
 1        Q    Now, in addition to the NOV at Sangamon
 2   that we just talked about in August of 2004, RTC
 3   received other NOVs at that site; isn't that right?
 4        A    I don't remember.
 5             MR. O'MEARA:  Let's look at Allied
 6   Exhibit 11.
 7             THE COURT:  I've got an 11.5.
 8             MR. O'MEARA:  I think it's just 11, Your
 9   Honor.
10             THE COURT:  You do have an 11.5, but
11   that's not what you want me to pull up right now.
12             MR. O'MEARA:  Correct.
13             THE COURT:  Okay.
14             MR. JORDAN:  Your Honor, we object to
15   this document as well.  It's a hearsay document.
16   There is no foundation for it.
17             THE COURT:  Okay.  Again --
18             MR. JORDAN:  He's offering now for the
19   truth of the matter asserted according to --
20             THE COURT:  I don't perceive that.  I
21   think, once again, the question is whether there was
22   a notice received.  And if there's an attempt to
23   introduce this for the truth of the matter asserted,
24   I'll sustain your objection.  But I don't take that
25   to be the thrust of this question.
```

Page 232

1              MR. JORDAN:  What's the -- then it's

2    irrelevant, Your Honor.  It's not for the matter

3    asserted as being true.

4              THE WITNESS:  If Your Honor could scroll

5    down through it so I could look at it, please.

6    Okay.

7                   Could you repeat your question?

8    Sorry.

9    BY MR. O'MEARA:

10        Q    Do you recall receiving another NOV in

11   June 2002 --

12        A    I generally recall this.  I generally

13   recall this one.

14        Q    Okay.  And do you know what the end

15   result of this NOV was, Mr. Connolly?

16        A    Yeah.  We filed the appropriate

17   documentation and permit application I think it

18   referenced in there, and I believe it was resolved.

19        Q    Okay.  You believe this was resolved or

20   does --

21        A    Yes.

22        Q    -- it remain outstanding to --

23        A    No.  I think --

24        Q    -- this day?

25        A    I think that we resolved this.

Page 233

1        Q    Mr. Connolly, do you remember testifying

2   at your deposition at the end of January?

3        A    Yes.

4        Q    Do you recall me asking you about this

5   NOV?

6        A    I can't tell you this particular

7   June 12th, 2002, NOV.  I just can't recall that

8   particular one.

9        Q    Would you like to look at your

10  deposition?

11       A    I would.  I would, please.

12            MR. O'MEARA:  Your Honor, I've got a copy

13  for the witness, although I think you also have a

14  copy.

15            THE COURT:  As I was just discussing a

16  while ago with Mr. Jordan, given that Mr. Connolly

17  is the representative of a party in this case, you

18  are free to ask him about any statement that he's

19  made.  It's a party admission.  You can read it into

20  the record as long as there's no dispute about its

21  authenticity.  I'll be happy to hear it.  You don't

22  need to go through impeachment by prior inconsistent

23  statement.

24            MR. O'MEARA:  Okay.  Thank you, Your

25  Honor.

Page 234

1              THE WITNESS:  Could I ask Your Honor to

2     go to the last page again?  I didn't get a chance to

3     read all of that.

4              THE COURT:  Yes.

5              THE WITNESS:  Thank you.

6              THE COURT:  Do you want that page 3, Mr.

7     Connolly?

8              THE WITNESS:  Yes, sir.  I just wanted to

9     get down to the end part there.

10             THE COURT:  About the recommendation?

11             THE WITNESS:  Please, yeah.  Thanks.

12    Okay.

13    BY MR. O'MEARA:

14        Q    Now, Mr. Connolly, do you recall me

15    asking -- and I'm at page 269 of your deposition

16    from January 28th -- excuse me, January 29th, 2008.

17                 "Regarding the June 2002 NOV, I

18    notice in the re line it's got violation notice

19    A2002-00155.  Is that typically how you track that

20    NOV, based on its number?

21                 "Sure."  That was your answer?

22        A    Yes.

23        Q    And then I asked you, "This one to your

24    knowledge remains outstanding?

25                 You answer was "right"?

Page 235

```
 1        A    Right.

 2        Q    So --

 3        A    Yeah.  And as I've read the bottom of

 4   that page 3, it refreshes my recollection.

 5        Q    Okay.  So this NOV remains outstanding?

 6        A    I believe so.  The only caveat to that,

 7   it may be rolled into the other one we just looked

 8   at.

 9        Q    Now, on or about February 2005, Mr. Harry

10   Henderson started taking responsibility for

11   communicating with the IEPA at RTC's Sangamon site;

12   isn't that right?

13        A    What date was that again?

14        Q    February of 2005.

15        A    No, sir.

16        Q    Excuse me.  In or around 2005.  At some

17   point in 2005?

18        A    Right.

19        Q    Okay.  And you worked with Mr. Henderson

20   to coordinate communicating with the IEPA regarding

21   the permitting issues at that site, right?

22        A    Yes.

23        Q    If Harry Henderson received NOVs from the

24   State of Illinois at that site, would he share them

25   with you?
```

Page 236

1          A    Well, I think we went over this at my

2    dep.  He personally didn't receive them.  I think

3    counsel for him received them.

4          Q    So his counsel would receive them and

5    share them with you?

6          A    Right.

7          Q    And then you would assist in responding

8    to them?

9          A    Right.  To the extent that he received

10   them, right.

11         Q    Okay.  Did RTC through Mr. Henderson

12   receive another NOV in February of 2006?

13         A    I don't remember.  Maybe you can show it

14   to me.

15         Q    Yeah.

16              MR. O'MEARA:  Let's look at Exhibit 19.

17              MR. JORDAN:  I would object on hearsay

18   grounds and relevance, Your Honor.

19              THE COURT:  Same ruling that I made in

20   the past.

21              THE WITNESS:  Okay.

22   BY MR. O'MEARA:

23         Q    Do you recall this NOV?

24         A    I do.

25         Q    And this NOV is related to RTC's gas

Page 237

1    collection and control system at the site?

2         A    It is.

3         Q    Is it related to the gas collection or --

4    excuse me, the engines being down?  Is that part of

5    it?

6         A    Could be.  I'd have to look at which

7    section --

8         Q    Look at number 1.

9         A    Yes.

10        Q    So the engines were the control device at

11   that facility?

12        A    In February 2006, they were not.

13        Q    What was?

14        A    There was a utility flare.

15        Q    Was that a utility flare that Allied had

16   to install because your engines weren't operating?

17        A    Well, it was a utility flare that Allied

18   installed with the agreement with the receiver and a

19   court order allowing that to happen.

20        Q    And that was because RTC's engines

21   weren't operating since January of 2005; isn't that

22   right?

23        A    That in conjunction with the fact there

24   wasn't enough gas to run one of those engines

25   because of the overheight removal.

Page 238

1        Q    RTC didn't get a flare at the site,

2   though?

3        A    No.

4        Q    What's the status of this NOV?

5        A    I believe this one was withdrawn.  And

6   because -- there was a response to that because it

7   was directed to the wrong party.  Scattered

8   Corporation was not a party to this site.  And the

9   receiver's counsel sent a response to the agency on

10  this showing them the court order that the receiver,

11  Harry Henderson, was the proper party that had the

12  authority under that state court order to oversee

13  permits and licenses and hold those things.  So they

14  withdrew that.

15       Q    Did they reissue another one?

16       A    Yes.

17            MR. JORDAN:  Your Honor, I would object

18  to that.  I don't know what the relevance of all

19  this is.  And he's trying to backdoor --

20            THE COURT:  Wait.  What's the basis for

21  the objection?  Relevance?

22            MR. JORDAN:  Relevance --

23            THE COURT:  It's overruled.

24            MR. JORDAN:  -- and hearsay --

25            THE COURT:  It's overruled.

Page 239

1          MR. JORDAN:  -- document he's trying to

2    backdoor in for the truth of the matter asserted.

3    BY MR. O'MEARA:

4          Q    You testified that they issued another

5    NOV; isn't that right, Mr. Connolly?

6          A    I recall that's the case, yes.

7          Q    Okay.  Exhibit 24.

8          MR. JORDAN:  Same objections, Your Honor.

9          THE COURT:  Same rulings.

10          THE WITNESS:  Okay.

11    BY MR. O'MEARA:

12          Q    Is that an NOV that was received relating

13    to RTC's gas collection and control system at the

14    Sangamon facility?

15          A    Generally, yes.

16          Q    Okay.  Did you respond to this with

17    Mr. -- on behalf of or in conjunction with

18    Mr. Henderson?

19          A    Yes.

20          Q    And do you know what the response was?

21          A    I know we did it.  I'd have to look at

22    it.

23          Q    Would you have responded with a

24    compliance commitment agreement?  Was that your

25    typical practice?

Page 240

1          A    Yes.

2          Q    Okay.  Do you know whether that was

3    accepted or rejected by IEPA?

4          A    I don't remember.  I'd have to look at

5    it.

6          Q    Do you know if this NOV remains open?

7               MR. JORDAN:  Your Honor, I object.  Now

8    he -- that's a substantive question regarding --

9               THE COURT:  No.  It's very -- it's a

10   question about the status of a complaint against the

11   landfill gas collection and conversion system as to

12   which there is sought to be an assumption and

13   assignment.  I don't see any problem with asking

14   whether an administrative complaint that's been

15   issued against that operation is still outstanding.

16                    Do you know if it's still

17   outstanding?

18               THE WITNESS:  It would help me to see --

19   if I could answer the prior question to answer this

20   question.

21               THE COURT:  If you don't know, just say

22   you don't know.

23               THE WITNESS:  I'm sorry.  I don't know at

24   this time.

25               MR. O'MEARA:  Okay.

Page 241

1    BY MR. O'MEARA:

2        Q    Mr. Connolly, do you know whether or not

3    any of these NOVs issued that we've discussed today,

4    or any others that we may not have, did you ever

5    receive a notice from the IEPA that they were

6    referring any of these matters to legal action?

7        A    There was a notice of intent to refer to

8    legal action, notice of intent to pursue legal

9    action.  It doesn't state that they're absolutely

10   referring.

11       Q    Okay.

12       A    So, I mean, that's the answer to your

13   question.

14       Q    The answer is, yes, you have received

15   notices like that from IEPA?

16       A    A notice of intent to pursue legal

17   action, yes.

18       Q    Now, Mr. Connolly, as part of your duties

19   and responsibilities while employed at RTC, you

20   received and responded to NOVs at other sites, not

21   just Sangamon; isn't that right?

22       A    Yes.

23       Q    Okay.  RTC operated a gas-to-energy

24   facility at the Hillside landfill, didn't it?

25       A    Yes.

Page 242

1          Q    And they had a permit to operate there

2     from IEPA as well?

3          A    Yes.

4          Q    Now, isn't it true that RTC received an

5     NOV from the IEPA related to its operation of the

6     gas collection and control facility at Hillside?

7          A    Yes.

8          Q    Okay.  Take a look at Exhibit 26, if you

9     will, and let me know if that's a copy of the NOV.

10         A    I believe that's the case, yeah.

11         Q    And that was related to RTC's operation

12    of the gas collection and control system at Hillside

13    landfill?

14         A    I'm looking at that.  It's starting off

15    about analyzing sulfur and nitrogen content of

16    landfill gas.

17         Q    Well, was RTC operating anything other

18    than a gas collection and control system on it?

19         A    No, no, no.

20         Q    Okay.

21         A    I think the general answer to your

22    question is yes.

23         Q    Did you prepare a response to this NOV?

24         A    I did, yes.

25         Q    Okay.  What was your response?

Page 243

1          A    My response was that I was working with

2     the new trustee, Mr. Steinberg, and his

3     environmental engineering firm to establish a

4     response and that, you know, we would be responding

5     shortly.

6          Q    Did you ever submit a compliance

7     commitment agreement?

8          A    I don't believe I did, no.

9          Q    Okay.  Did somebody?

10         A    Yes.

11         Q    Who was that?

12         A    Environ did that on behalf of Jay

13    Steinberg.

14         Q    Do you know the end result of that

15    compliance commitment agreement?  Was it accepted by

16    the IEPA?

17         A    I don't know.

18              MR. O'MEARA:  Let's look at Allied

19    Exhibit 27, if we could, Your Honor.

20              MR. JORDAN:  Your Honor, I object to the

21    relevance.  If Mr. Connolly -- if the theory is that

22    somehow Mr. Connolly is bad because --

23              THE COURT:  What's the objection?

24              MR. JORDAN:  Relevance.

25              THE COURT:  The objection is overruled.

Page 244

1    BY MR. O'MEARA:

2         Q    Have you seen this document, Mr.

3    Connolly?

4         A    You showed it to me at my deposition,

5    but --

6              MR. JORDAN:  Oh, and hearsay, Your Honor,

7    also.

8              THE WITNESS:  You showed it in my dep,

9    but I don't believe I saw it prior to that.

10             MR. O'MEARA:  Okay.

11   BY MR. O'MEARA:

12        Q    It appears, though, that the IEPA

13   rejected the compliance commitment agreement --

14             THE COURT:  That would be -- well, if

15   this document is in evidence, if it's not being

16   objected to on the basis that it's inauthentic, I'll

17   draw my own on conclusion from --

18             MR. JORDAN:  We did object on those

19   grounds, Your Honor.

20             THE COURT:  You have an authenticity

21   objection to this?

22             MR. JORDAN:  Hearsay objection and a

23   relevance objection.

24             THE COURT:  If there's a question about

25   the authenticity of the document, you would need to

Page 245

1    have some foundation laid that this is, in fact, a

2    record of a document received, maintained in the

3    ordinary course, or issued by the IEPA.

4            MR. O'MEARA:  I don't think there is any

5    reasonable objection that this has got an

6    authenticity problem.  It's on IEPA letterhead.

7    It's signed by IEPA and --

8            THE COURT:  Well, that's what it says.

9            MR. O'MEARA:  Right.

10           THE COURT:  But I have no way of knowing

11   whether this was fabricated or not.

12           MR. O'MEARA:  Okay.  Well --

13           THE COURT:  It's not hard to copy a

14   letterhead on a scanner and put it onto another

15   sheet of paper.

16   BY MR. O'MEARA:

17       Q   Mr. Connolly, did you regularly receive

18   correspondence of this type --

19           THE COURT:  So the point that I'm going

20   to make is that pending some foundation being

21   laid -- now, this requires, though, that you have a

22   good faith basis for doubting the authenticity of

23   this document.

24           MR. JORDAN:  The only thing I don't know

25   is it's not addressed to any of my clients.  It's

Page 246

1    addressed to Mr. Steinberg by somebody who is not my

2    client.  You know, I have no reason to doubt Mr.

3    O'Meara got this in discovery.  And we may even have

4    produced it.  I just don't know anything about it.

5    And I don't know how you can ask Mr. Connolly

6    questions about a document that is not addressed to

7    him, not kept by him.  It seems to me that

8    Mr. Steinberg, at the very least, would have to

9    testify, or Ms. Armitage.  But I don't know that I

10   question the authenticity of it.  I just don't know

11   how you can question Mr. Connolly about it.

12            MR. O'MEARA:  That's fine, Your Honor.

13   We can move on.

14            THE COURT:  All right.

15   BY MR. O'MEARA:

16        Q   Mr. Connolly, did RTC operate the Taylor

17   Ridge landfill?

18        A   It operated the gas system on the

19   landfill.  It didn't operate the landfill itself.

20        Q   Oh, I'm sorry.  They operated the gas

21   collection and control system at the Taylor Ridge

22   landfill in Illinois; isn't that right?

23        A   Right.

24        Q   Okay.  And they had a permit to operate

25   there, too?

Page 247

```
1        A    Yes.

2        Q    Okay.  Did RTC ever receive any NOVs

3   related to its operation of the gas collection and

4   control system at Taylor Ridge?

5        A    It did.  As I recall, it came in to the

6   trustee, yeah.

7             MR. O'MEARA:  Let's look at Exhibit 29,

8   Your Honor.

9             MR. JORDAN:  Same objections, Your Honor,

10  for the record.

11            THE COURT:  Yes.

12            MR. JORDAN:  Hearsay and --

13            THE COURT:  Let's have an understanding

14  that you've got a standing objection to all of the

15  correspondence from the IEPA in the nature of

16  violation notices and that I will overrule those

17  objections --

18            MR. JORDAN:  All right.

19            THE COURT:  -- based on the colloquy that

20  we've already had.

21            MR. JORDAN:  I appreciate that.  I'm just

22  trying to do my job.

23  BY MR. O'MEARA:

24       Q    Have you seen Exhibit 29 before, Mr.

25  Connolly?
```

Page 248

1           A    You'll note it's a few years old.

2                      If I could ask Your Honor to scroll

3      through it, please.

4                      Okay.  I've seen this, yes.

5           Q    Okay.  Is this is a violation notice for

6      the failure to submit the annual compliance

7      certification?

8           A    That is correct.  They went out to

9      several sources, as I understood, that year.

10          Q    Okay.  Did you get any --

11          A    Not just us.

12          Q    Were there any other RTC NOVs received at

13     the Taylor Ridge landfill?

14          A    I recall one that was received by the

15     trustee.

16          Q    By the trustee?

17          A    Yeah.  And I'll note on this one, this

18     one was resolved.

19                 MR. O'MEARA:  Let's look at Allied

20     Exhibit 30, if we could, Your Honor.

21     BY MR. O'MEARA:

22          Q    Is this the other NOV you're referring

23     to?

24          A    Yes.

25          Q    And you believe this one to be to the

Page 249

1    trustee and not to you?

2        A    Correct.

3        Q    And why do you think that?

4        A    I recall getting a phone call from Mr.

5    Szilagyi stating that he had received this.

6        Q    Did he ask you for your help in

7    responding to this?

8        A    Yes.

9        Q    Okay.  And was this for violations

10   related to the -- let me back up.  Is this NOV

11   related to RTC's operation of the gas collection and

12   control system at the Taylor Ridge landfill?

13       A    It is, yeah.  It's as I talked about

14   earlier.  We had the overheight situation there, and

15   it was a difficult situation to comply with, given

16   the overheight.

17       Q    And you responded to this NOV with a

18   compliance commitment agreement?

19       A    Yes.

20       Q    Was it accepted by IEPA?

21       A    I'd have to look.  I don't remember.

22       Q    Well, if you look at Exhibit 31, Allied

23   Exhibit 31.  Does this refresh your memory whether

24   or not your compliance commitment agreement was

25   accepted by IEPA?

Page 250

1        A    Can you tell me the date of this letter

2    again?

3        Q    September 27th, 2005.  Let me see if I

4    can make it easier, Mr. Connolly.

5        A    What I'm struggling with is the big gap

6    of time here.  That's what I'm struggling with.

7        Q    This is a letter from the IEPA to you

8    indicating that they're giving you notice of intent

9    to pursue legal action; isn't that right?

10       A    Right.  But I'm looking at the time line.

11   That was September 27th of '05.  That's when the

12   Chapter 7 trustee was appointed, and I don't know if

13   I received this.  Is there anything at the top of

14   this letter, any indication?  No.

15       Q    My question to you is just whether or not

16   your CCA was accepted or rejected by the IEPA.  This

17   seems to indicate that it was rejected.

18            THE COURT:  Okay.  I think it would be

19   helpful to me if you gave me some indication of the

20   relationship between the notice of violation, a

21   compliance commitment agreement, and a notice of

22   intent to pursue legal action.

23            MR. O'MEARA:  Okay.

24   BY MR. O'MEARA:

25       Q    Mr. Connolly, if the IEPA issues a notice

Page 251

1    of violation, the person or entity to whom it's

2    issued has the ability to respond, does it not?

3         A    That's correct.

4         Q    And the person to whom -- the person or

5    entity to whom it's issued can either request a

6    meeting with the IEPA to discuss the violation

7    notice, right?

8         A    That's correct.

9         Q    Or it can respond in writing to the

10   violations alleged, correct?

11        A    That's incorrect.

12        Q    Why is that incorrect?

13        A    You can do both.

14        Q    Okay.

15        A    It's not an or condition.

16        Q    Understood.

17             Now, if you respond to the IEPA in

18   writing, isn't that typically referred to as a

19   compliance commitment agreement?  Or isn't that one

20   of your options in responding to the IEPA?

21        A    More the latter, one of the options.

22        Q    And a compliance commitment agreement

23   typically responds to the violations alleged and

24   sets forth what you're prepared to do to resolve

25   them; isn't that right?

Page 252

1        A    That's correct.  It's item by item, and

2    it either sets forth what you're going to do to

3    resolve them or you outline why you disagree with

4    the agency's allegation.

5        Q    And once the agency receives a compliance

6    commitment agreement like that, it basically -- it

7    can either accept it or reject it; isn't that right?

8        A    That's correct.

9        Q    Okay.  And then following the rejection,

10   I believe the agency still has two choices.  It

11   could just die right there, or they can give

12   indication that they're going to refer you to legal

13   action; isn't that right?

14       A    No, I don't think that's right.

15       Q    So what happens then after a compliance

16   commitment agreement is rejected?

17       A    I'd have to look at the regulations, but

18   I think there's a requirement by a date certain to

19   either issue the notice of intent to pursue legal

20   action or not.

21       Q    Okay.  So they either issue a notice of

22   intent to pursue legal action or they do not?

23       A    That's my general understanding about it,

24   but I'd have to look at the regs again.

25       Q    Mr. Connolly, did RTC operate a gas

Page 253

1    collection and control system at the McCook

2    landfill?

3         A    Yes.

4         Q    Was that owned by American Grading?

5         A    Yes.

6         Q    Okay.  And they have a permit to operate

7    from the IEPA at that landfill?

8         A    Yes.

9         Q    Okay.  Did RTC ever receive a notice of

10   violation related to its operation of the gas

11   collection and control system at that site?

12        A    Yes.

13             MR. O'MEARA:  If we could look at

14   Exhibit 32 briefly.

15             THE COURT:  We are precisely at the point

16   that I had imagined we would be.  I don't think

17   there is anything gained by your going through each

18   of these documents with Mr. Connolly.

19             MR. O'MEARA:  Okay.

20             THE COURT:  To the extent that they're

21   not objected to with some reasonable basis as not

22   being authentic, I will accept them as what they

23   purport to be.  If you want to ask Mr. Connolly

24   whether to his knowledge any notice of violation

25   remains outstanding, unresolved, I'll be happy to

Page 254

1    have you do that.

2              MR. O'MEARA:  Okay.

3              THE COURT:  If you have a notice of

4    intent to pursue legal action, I would assume that

5    means that the matter is still outstanding.

6              MR. O'MEARA:  It does.  Well, then I

7    think I can skip ahead, Your Honor.

8    BY MR. O'MEARA:

9         Q    Now, Mr. Connolly, we've testified, I

10   think -- or you've testified as we've gone through

11   this that RTC has had various contracts to operate

12   at various landfills; isn't that right?

13        A    Sure.

14        Q    Isn't it true, Mr. Connolly, that RTC has

15   been found in the past to have defaulted on gas

16   collection contracts that they've had with landfill

17   owners?

18        A    You'd have to be more specific.

19        Q    RTC previously had a gas collection

20   contract with gas -- excuse me, a landfill gas

21   collection contract with Connecticut Resource

22   Recovery for a landfill in Shelton, Connecticut;

23   isn't that right?

24        A    Right.

25        Q    And isn't it true that this court found

Page 255

1    RTC to have breached that agreement?

2         A    Well, I went through that trial, and we

3    certainly heard the ruling.  I'm not going to opine

4    on Your Honor's ruling.  But as I recall, there were

5    eight points in that, and there were a few points

6    that we were in breach in, and there were a few

7    points of something else.  And I'm not going to say

8    CRA was in breach, but that may have been the case.

9    But it was, I recall, as being a very complicated

10   case, and the ruling --

11        Q    Mr. Connolly, my question was isn't it

12   true that this court found RTC to have breached that

13   contract, yes or no?

14        A    I recall it saying that it was properly

15   terminated.  If you want to -- I don't know how you

16   connect the dots there, but maybe that's connected.

17   I recall the court ruling that the contract was

18   properly terminated.

19        Q    It was properly terminated as a result of

20   a breach?

21        A    My testimony is as it stands.  That's

22   what I recall.  That trial was six years ago.

23             MR. O'MEARA:  I would show him

24   Exhibit 49, Your Honor, but I'll just let that --

25   we'll save that for argument.

Page 256

1    BY MR. O'MEARA:

2         Q    RTC, you've testified earlier, previously

3    had a gas collection contract with Congress

4    Development Company related to the Hillside

5    landfill; isn't that right?

6         A    Right.

7         Q    Okay.  And isn't it true that this court

8    found that RTC breached its obligations under that

9    contract as well?

10        A    I don't remember that.

11        Q    Well, let's look at Exhibit 50 and see if

12   that refreshes your recollection.  The first two

13   pages appear to be an interlocutory order.  And if

14   we skip to the third page, it appears to be a final

15   judgment order.  And I direct your attention, Mr.

16   Connolly, to number one in the final judgment order.

17        A    Okay.

18        Q    Do you see where it says, "Judgment in

19   the amount of $405,000 shall be entered in favor of

20   Congress and against RTC for its breach of

21   contract"?

22        A    I do see that.

23        Q    So does that refresh your recollection

24   that this court found RTC to be in breach of that

25   contract?

Page 257

1          A    It does, yeah.  I'll also note this was a

2    trial six years ago, so...

3          Q    Now, RTC previously had a gas collection

4    and control contract with American Grading at the

5    McCook landfill; isn't that right?

6          A    Right.

7          Q    And RTC was found by this bankruptcy

8    court to have defaulted under that agreement, too;

9    isn't that right?

10          A    Yeah, it was found in default.  What I

11    recall is there was a $100,000 pre-paid royalty that

12    wasn't made, you know, unfortunately by the trustee

13    at the time.

14          Q    And that contract was terminated,

15    correct?

16          A    Right.  It's under appeal.  I know that.

17          Q    But it was terminated?

18          A    I guess that's the terminology if it's

19    under appeal.

20          Q    Now, Mr. Connolly, RTC previously had a

21    gas contract to operate a gas collection and control

22    facility at Allied's Pontiac landfill; isn't that

23    right?

24          A    Right.

25          Q    And isn't it true that RTC and Allied

Page 258

1    entered into a stipulation whereby Allied allowed

2    RTC to assume that contract in this bankruptcy

3    court?

4          A    I'm not certain of the terminology.  I

5    recall there was a stipulation that was done in

6    conjunction with an agreed assumption of that

7    contract.  I recall that, and that was, I believe, a

8    number of years ago, right.

9          Q    Do you recall -- strike that.

10               It's true, Mr. Connolly, that that

11   stipulation identified various defaults --

12               MR. JORDAN:  Objection.  Your Honor, I

13   object.  It's a settlement under Rule 408.  And in

14   footnote 1, it indicates that the parties retain all

15   their defenses, claims, and rights.  He's trying to

16   use a settlement agreement offensively and --

17               MR. O'MEARA:  It's not a settlement

18   agreement, Your Honor.  It's --

19               THE COURT:  Here's the thought that I

20   have:  I have not looked at this recently.  To the

21   extent that you want to make an argument from it,

22   you can make an argument from it.  I don't know that

23   you're gaining anything by asking Mr. Connolly what

24   he remembers about it.

25               MR. O'MEARA:  Okay.

Page 259

1          THE COURT:  And if you make an argument,

2    I'll look at it and I'll draw my own conclusions as

3    to the extent to which there's any admission

4    involved.  And if it is, in fact, what Mr. Jordan

5    says, simply a settlement, then I will not draw any

6    conclusions from it.

7          MR. O'MEARA:  Okay.

8    BY MR. O'MEARA:

9          Q   Mr. Connolly, it's true, isn't it, that

10   you've been sued by the State of Illinois

11   personally?

12         A   Yes.

13         Q   And that lawsuit is pending in Cook

14   County Circuit Court?

15         A   It is pending.  To answer further, my

16   understanding is that there's a settlement with

17   American Grading, and they're planning to dismiss

18   the case against me.

19         Q   Is the lawsuit pending today as we speak?

20         A   I would have to check with counsel.  It

21   may or may not be.

22         Q   That lawsuit is for various environmental

23   violations alleged related to RTC's operation of the

24   gas collection and control system at the McCook

25   landfill; isn't that right?

Page 260

1          A    Right.

2          Q    Have you estimated the potential monetary

3    exposure to you if you're found liable for all of

4    the claims made by the State of Illinois in that

5    lawsuit?

6          A    I don't remember.

7          Q    Well, isn't it true, Mr. Connolly, that

8    you've made a claim in the Jenbacher lawsuit that's

9    pending in this court that valued your potential

10   exposure in the State of Illinois case at

11   approximately $4 million?

12         A    Well, first off, the Jenbacher lawsuit

13   was dismissed.  We settled.

14         Q    That wasn't my question.

15         A    Right.  Well, but whatever claim I put in

16   there is right.  I'd have to look at it.  That

17   sounds right.

18         Q    So it was your estimate that it -- that

19   that State of Illinois lawsuit had a potential

20   exposure of $4 million?

21         A    That's my general recollection without

22   looking at it again.

23         Q    Now, Mr. Connolly, I believe you

24   testified, and correct me if I'm wrong, that at the

25   Litchfield and Bloomington sites, IIT intends to

Page 261

1    send that gas to a pipeline?

2        A    Right.

3        Q    Okay.  Does that involve scrubbing that

4    gas to improve its quality?

5        A    Yes.

6        Q    Okay.  Has RTC ever operated a gas

7    scrubbing pipeline project before?

8        A    Yes.

9        Q    And where was that?

10       A    Mobile, Alabama.

11       Q    Okay.  And this was RTC that operated

12   that, correct?

13       A    That's correct.

14       Q    Okay.  Has IIT ever operated a gas

15   scrubbing --

16       A    No.

17       Q    -- facility?

18            Now, at that Mobile landfill, did

19   RTC put gas into a pipeline?

20       A    Yes.

21       Q    Was it paid for that gas?

22       A    No.

23       Q    And is that because RTC couldn't get the

24   gas quality to meet the standards necessary for sale

25   to the pipeline?

Page 262

1          A    At that time, that's correct.

2          Q    Okay.  Now, Mr. Connolly, you ran through

3    several different agreements with Mr. Jordan related

4    to contracts IIT has entered into with various

5    service providers.  I think you mentioned Altorfer,

6    LFG, etc.  Do you remember those?

7          A    Yes.

8          Q    None of those agreements require IIT to

9    use those consultants, does it?

10         A    I don't understand your question.

11         Q    My question is, you're not obligated to

12   use Altorfer at Sangamon, Litchfield, Bloomington,

13   are you?

14         A    No.  I wouldn't use them at those sites.

15         Q    You could use them, but you're not

16   obligated to; isn't that right?

17         A    Well, sure, I'm not obligated to.  I

18   wouldn't use them there.  They're not doing work on

19   those sites.

20         Q    Well, I'm talking about all those

21   contracts generally that we talked about, RS, I

22   think, Used Oil, Lozier.  None of those contracts

23   obligate IIT to use any of those consultants; isn't

24   that right?

25              THE COURT:  Well, let me short circuit

Page 263

1    this.  I took a look at those exhibits as Mr. Jordan

2    was talking to you about them, Mr. Connolly, and

3    they all seem to me to be agreements by the

4    counterparty to the contract to provide services to

5    IIT at its usual costs and charges.

6            THE WITNESS:  That's correct, Your Honor.

7            THE COURT:  So if you went to them

8    without that paper, I assume they would give you

9    precisely what the paper says.  They'd be willing to

10   provide service for you at their usual and customary

11   charges.

12           THE WITNESS:  I suppose that's the case.

13   The only --

14           THE COURT:  What does the paper add?  If

15   you've had a long-standing relationship with these

16   people and they trust you and they like to do

17   business with you, I suppose they would do business

18   with you on the same terms with or without those

19   agreements.

20           THE WITNESS:  That's probably the case.

21           MR. O'MEARA:  I don't think I have

22   anything further right now, Your Honor.  I'll pass

23   the witness.

24           THE COURT:  On that question of scrubbed

25   landfill gas --

Page 264

1              THE WITNESS:  Yes.

2              THE COURT:  -- have you ever had a

3    successful operation of a sale of scrubbed gas to a

4    utility?

5              THE WITNESS:  I have not.  That's why

6    we're going to contract with Firm Green Fuels.

7    They're out of Ohio.  They've gotten a project going

8    with the Swayco landfill, you can pull up their

9    website, in Ohio, and we're going to contract with

10   those guys.  And we've got a relationship with them,

11   and I'm in the final throes of signing a contract

12   with them at Taylor Ridge, so I'm going to use Firm

13   Green.

14             THE COURT:  Ms. Kujaca, do you have any

15   questions?

16             MS. KUJACA:  Yes, Your Honor.

17                  CROSS-EXAMINATION

18   BY MS. KUJACA:

19        Q    Mr. Connolly, you testified earlier with

20   Mr. Jordan that there are various items which need

21   to be cured on the Peoria site; is that correct?

22        A    That's correct.

23        Q    And correct me if I'm wrong, you

24   testified generally that a lack of funding has

25   prevented RTC from curing some of those defaults; is

1    that correct?

2        A    Right.

3        Q    What were some of those defaults that

4    were hampered by funding?

5        A    Well, I don't know that I would

6    characterize them as defaults.  It's just lack of

7    funding didn't allow us to bring a second engine

8    online.  And there were certain things within the

9    landfill, like some of those settled areas within

10   the cap of the landfill that prevented us from doing

11   that timely.  Although, we did some of that.  But I

12   would say it's more related to the engine itself,

13   that second engine, bringing that second engine

14   online.

15       Q    Before his death, Vince Muir was on the

16   site, wasn't he --

17       A    Yes.

18       Q    -- on a regular basis?

19       A    Yes.

20       Q    He worked on the site for seven years,

21   correct?

22       A    About that, that's right.

23       Q    Was he there daily?

24       A    On a business daily basis, sure.

25       Q    Okay.  After his death, who is on this

Page 266

1    site?

2         A    It's Dave, and his last name starts with

3    a B.  He works for Altorfer, Inc.  Rob Fortelka.

4    And I also have Mike Watson available to come on

5    site, as well as Richard Walker.  But the answer to

6    your question is David from Altorfer, and forgive

7    me, I forgot his last name, is on site, in addition

8    to Rob Fortelka, and Mike Watson as backup.

9         Q    And did you testify earlier that Vince

10   Muir was paid by RTC approximately 60,000 per year

11   to do the work on the Peoria site?

12        A    Yeah, that was his salary, right.

13        Q    Okay.

14        A    In addition to fringe benefits such as

15   his health insurance.

16        Q    Was Mr. Muir in a position to cure any of

17   the default items on the Peoria site while he was

18   there?

19        A    No.  One individual without equipment on

20   the landfill couldn't do it.  You know, you would

21   need a lot of parts to bring that engine back

22   online.  I don't know if Vince could actually

23   install a head.  He probably could.  He probably

24   wouldn't be the best guy to do it.  But he did -- he

25   did what he could do on the site, normal maintenance

Page 267

1    and operation.  But as far as -- you know, the thing

2    I'm focusing in on, the second engine, bringing that

3    engine online, Mr. Muir couldn't do that.

4          Q    And now that Altorfer is on the site with

5    all of the people you mentioned earlier, are they in

6    a position to cure the site?

7          A    Right, they are.  In fact, they're

8    halfway done with the second engine.  They're

9    definitely in a position to cure it.

10         Q    But there's no funding to IIT at this

11   point?

12         A    There is funding to IIT at this point.

13         Q    And where is that funding coming from?

14         A    That's the loan agreements.  I think

15   they're dated pretty fresh.

16         Q    Okay.  You stated earlier that the Peoria

17   site is making approximately 25,000 per month?

18         A    Right.

19         Q    Where are these funds coming from?

20         A    AmerenCILCO.

21         Q    Is it true that AmerenCILCO hasn't paid

22   RTC since December of 2006?

23         A    It was at one point, but that's been

24   settled.  That's done.

25         Q    It's been settled?

Page 268

1      A    That's done.

2      Q    Since when has AmerenCILCO been paying

3  RTC?

4      A    We received a payment to cover all of

5  those months.  It's being exchanged actually

6  tomorrow morning between counsel.  And there was a

7  court order entered I think last Thursday or Friday

8  between the receiver and AmerenCILCO settling the

9  case dismissing the suit.

10     Q    And how much will be paid?

11     A    $212,000 and change, maybe 220.  I can't

12  remember.  224,000.  Thank you.

13     Q    So between December of 2006 and now,

14  AmerenCILCO had not paid RTC anything for the

15  production of energy at the Peoria landfill?

16     A    That's correct.

17     Q    That's correct.

18          Was the engine at the Peoria site

19  shut down between January 4th and January 13th of

20  2008?

21     A    Well, you brought that up at my dep.  I

22  looked into that.  There was some downtime in that

23  period, but it wasn't a full downtime.

24     Q    How long were the engines online during

25  that time?  Or I should say the engine.

Page 269

1          A    I can tell you in January they brought

2    them back online.  You know, we looked at the

3    uptime.  The uptime in December was like 96 percent.

4    In January it dropped to overall month around

5    70 percent because of those days.  But I'll tell you

6    in February we're 100 percent online through the

7    month.

8          Q    I was just asking about January.

9          A    I'm sorry.

10         Q    What was the reason for the downtime in

11   January?

12         A    It was a sensor on -- an engine coolant

13   sensor that failed, and so it shut the engine down

14   automatically as a fail-safe.  And so we had to

15   order a new engine cooler sensor through Altorfer,

16   and they reinstalled it.

17         Q    And what was the price for that?

18         A    I don't recall.  I haven't seen that

19   invoice yet.

20         Q    Will the shutdown, the slowdown in

21   January reduce the amount of revenue that the Peoria

22   site produces for that month?

23         A    Yes.

24         Q    Are reductions such as this accounted for

25   in the Peoria pro formas?

Page 270

1          A    Yes.

2          Q    They are?

3          A    Yes.

4          Q    What percentage are you estimating that

5    the engines run at?

6          A    Ninety-six percent.

7          Q    Ninety-six percent?  How do you come to

8    that amount?

9          A    Well, over the course of the last 10

10    years, we've had uptime over 98 percent.  And

11    96 percent is an industry standard as far as uptime

12    for energy plants.

13         Q    But --

14         A    So we've -- on that plant, we

15    well-exceeded 96 percent over the years.  So

16    96 percent, it's an industry benchmark.  It's a safe

17    number if someone wants to attack it.  In addition,

18    we've been above -- well above 96 percent over the

19    course of 12 years as far as --

20         Q    For the year beginning 2008, would you

21    say you're over that benchmark?

22         A    Well, no.  But that would be skued

23    because you're taking a few days in January into

24    account over a shorter period of time.

25              MS. KUJACA:  Thank you.

Page 271

1          THE COURT:  Redirect, Mr. Jordan?

2          MR. JORDAN:  Briefly, Your Honor.

3              REDIRECT EXAMINATION

4    BY MR. JORDAN:

5      Q   It's my understanding that the IEPA might

6    take the position that the -- taking all of the

7    various items off of the landfill at Springfield

8    would void the permit; is that --

9      A   Yeah.  I've heard that, yeah.

10     Q   If that were to be found, would the trust

11   file a new permit application or do something

12   different?

13     A   Well, we would file a new permit

14   application.

15     Q   Would that change the time line that we

16   were talking about in terms of going online?

17     A   I don't think so, no.  I think it will be

18   90 days.  It could be as much as 180, but that will

19   be it.  It may move it out a couple of months.

20     Q   And if the permit was, in fact, void,

21   then the transfer, the permit transfer would be

22   unnecessary; is that correct?

23     A   That's correct.

24     Q   All right.  And whether the -- I think

25   Mr. O'Meara was kind of bouncing between it being an

Page 272

1    administrative permit and a significant permit

2    modification.  Either way, you would go forward with

3    that process; is that correct?

4         A    Sure.

5         Q    Okay.  Now, you talked about January '05

6    and the engines going down, and then they weren't

7    fixed in Sangamon.  Do you remember that?

8         A    Right.

9         Q    Why was it that they weren't fixed?

10        A    Well, you know, it was a combination of

11   talking with the trustee.  It was -- we had some

12   funding difficulties at the time.  But in addition

13   to that, we were told by Mr. McDonald and Mr. Bent

14   that the entire collection system was going to be

15   ripped out in its entirety between the fall of '04

16   and the end of '05.

17        Q    Who were those two fellows?  Where are

18   they from?

19        A    They work for Allied Waste Industries,

20   Inc., Mr. McDonald and Mr. Bent.

21        Q    They told you what?

22        A    They told me that the entire collection

23   system was going to be ripped out between the fall

24   of 2004 and the end of 2005 in order to correct this

25   overhead problem.  And so between the trustee and I

Page 273

1    discussing that, we realized in early 2005 that if

2    we were to fix an engine, we might get it online

3    for, you know, a month or two, and then we won't

4    have any gas to run it, and that would be the best

5    case scenario.  The more realistic scenario, based

6    on what they represented to us, is that there was

7    going to be no gas for it.

8         Q    And whose decision was that?  Was that

9    your decision or the trustee's?

10        A    Well, ultimately it was the trustee's.

11        Q    Okay.  We went through a lot of various

12   documents and allegations and everything else.  If,

13   in fact -- it all culminates in an enforcement

14   action; is that correct?

15        A    Right.

16        Q    Had there ever been any enforcement

17   actions filed against RTC of which you're aware?

18        A    No.

19             MR. JORDAN:  Thank you.  I have no

20   further questions.

21             THE COURT:  Okay.

22                  Mr. Connolly, you may step down.

23                  (Witness excused.)

24             THE COURT:  We will resume at 10:30

25   tomorrow morning.  You will need to take the

Page 274

1    materials off the desk because we'll be having a

2    motion call tomorrow.  But you can certainly leave

3    them in the courtroom if that's convenient.

4                              (Which were all the proceedings
                              had in the above-entitled cause,
5                              February 12, 2008.)

6

7    I, GARY SCHNEIDER, CSR, RPR, DO HEREBY CERTIFY THAT
     THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
8    PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

abandoning 148:14
abilities 70:2
ability 4:24 6:1 8:7
  17:3,7 23:20,24 24:4
  24:9 32:24 33:11,16
  40:16,19 70:1 123:18
  132:25 133:5 139:18
  185:1 215:15 251:2
abject 18:24
able 4:23 14:20 41:23
  117:14 127:7 136:17
  152:10,21 161:17
  165:4 167:5 169:18
  170:18 212:19
above-entitled 274:4,8
absolutely 79:20 87:15
  107:21 118:4 168:13
  241:9
accept 27:3 252:7
  253:22
acceptable 97:10,24
  203:6
accepted 240:3 243:15
  249:20,25 250:16
accompanying 53:9
account 192:19,21
  207:14 270:24
accounted 269:24
accounting 75:20
  123:23
accumulate 69:17,19
accurate 64:3 125:22
  125:23 274:7
acquired 53:10,18
acres 137:22
act 10:21 16:2 23:18
  99:9 151:4 212:1
acted 120:24
acting 117:18
action 241:6,8,9,17
  250:9,22 252:13,20
  252:22 254:4 273:14
actions 273:17
active 94:12
activities 4:19 77:11,12
  77:14,25 78:15 221:5
activity 28:5
acts 120:24
actual 79:5 113:21
  225:22
add 6:17 7:14 129:14
  170:11 171:9 185:2
  263:14
added 23:12 118:12
  170:24 184:8,9
adding 109:14,14
addition 12:4 15:6 18:2
  56:13 83:5 182:10
  203:20 231:1 266:7
  266:14 270:17 272:12

additional 38:19 39:4
  41:25 42:4 130:4
  133:16 161:3 174:16
  217:8
additionally 29:17
  30:16 129:1
address 3:21 7:13
  44:16 61:23 120:2
  153:21 160:5
addressed 225:24
  245:25 246:1,6
adequate 4:2 6:2,6 9:16
  12:3 18:11 21:16
  24:6,10,14
adjacent 156:16
adjusted 116:23,24
  128:3
adjusting 129:11
adjustments 88:21
  148:16 157:23
administrative 99:18
  215:16,21,23 240:14
  272:1
admission 65:11
  233:19 259:3
admit 23:17
advance 17:13 37:22
  66:12 67:1 114:16
  193:25 195:18
advances 39:19 193:7
advancing 66:14
  193:12 196:8
advert 226:16
advice 55:9
affect 71:6 109:16
afternoon 179:2,4
agencies 87:11 122:14
agency 23:19 101:13
  108:6 151:3,4 213:21
  217:5 238:9 252:5,10
agency's 252:4
agent 26:6,14 27:1
  130:15
ago 14:4 19:2 31:18
  45:10 104:8 225:8
  233:16 255:22 257:2
  258:8
agree 11:24 23:10
  43:11 48:3 57:13
  147:17
agreed 39:3 56:19
  127:25 258:6
agreeing 39:6
agreement 12:11 13:20
  20:17,20,21,24 34:10
  36:7,16,21 37:11 39:8
  39:9 40:6,10,12 42:9
  53:2,9,10,19 56:21
  57:2,4,5,6,14 58:19
  60:15 84:2,10 87:19
  91:14 114:11 154:11
  154:12 155:11,13

161:2 180:13 183:1,9
  185:21 187:13 191:21
  191:24 192:7 193:23
  193:24 195:5,7,8
  196:1,7,12 198:7,19
  204:25 205:21 206:3
  208:6,21,23,24
  209:10,11,13,25
  210:19 211:4,15
  237:18 239:24 243:7
  243:15 244:13 249:18
  249:24 250:21 251:19
  251:22 252:6,16
  255:1 257:8 258:16
  258:18
agreements 24:15
  195:22,24 262:3,8
  263:3,19 267:14
agrees 21:17
Ah 35:14
ahead 5:24 27:6 71:10
  112:5 135:24 136:6
  179:1 254:7
air 6:11 10:21 16:2
  23:18 85:7 99:9
  137:12,15 212:1
Alabama 261:10
alerted 14:3
aligned 199:13
allegation 252:4
allegations 225:18,20
  226:3 273:12
allege 73:12,18,20
alleged 71:25 73:14
  225:11 230:14 251:10
  251:23 259:23
Allied 1:17 3:11,13 4:5
  4:9,12 5:2,15 7:4,9,15
  9:9,10 10:6,10,14
  13:1,6,8,10,22,23
  14:4,10,10,13 15:13
  15:17 17:13,15 18:6
  18:17 20:8,16,25
  21:17 35:8 54:1
  96:23 97:3,10,16,24
  98:17 104:2,4,7,9,21
  109:7 110:8,16,19
  111:8,20 112:12
  113:18 114:11,15
  115:12 118:9 123:1
  137:19 152:23 164:15
  166:22 184:24 200:18
  201:13 202:19 203:7
  203:14 220:9,12
  231:5 237:15,17
  243:18 248:19 249:22
  257:25 258:1 272:19
Allied's 3:20,23 7:3
  13:6 112:9 117:12,13
  137:10 164:16,16,18
  185:20 257:22
allow 9:17 106:15

150:4 265:7
allowed 24:22 33:8
  104:14,15,17 111:1,1
  135:20 150:12,14
  258:1
allowing 237:19
allows 10:25 106:9
  202:9,12 203:1
  204:15
alternative 15:10
  135:20 156:5
alternatively 174:1
Altorfer 81:14 82:2,7
  82:14 83:2,5 87:18,19
  87:22 88:6 90:9,10,12
  92:16,17,21 128:11
  128:12 129:17 262:5
  262:12 266:3,6 267:4
  269:15
Altorfer's 129:19
ameliorate 91:1,8
  143:22 148:10
amended 36:6,6,15
  37:2,6 39:7,8 210:15
  210:17,18 211:3
amendments 58:19
Ameren 155:20
AmerenCILCO 12:8,9
  15:12 16:10,11
  124:15,19 128:4
  155:3 156:2,6,11
  267:20,21 268:2,8,14
American 9:10 253:4
  257:4 259:17
amortization 32:14,23
  48:16,20
amount 10:9 28:5
  30:25 41:15 71:18
  72:14,22 73:1 97:2,11
  112:21 129:24 161:8
  161:9 168:22,23,25
  169:16 170:23 173:5
  176:16 177:16 192:24
  217:7 219:15 221:12
  256:19 269:21 270:8
amounts 66:10 142:3
  200:17
analysis 125:7
analyzing 76:23 242:15
Andrew 2:6 11:7 24:20
  27:8,13
and/or 146:10
annual 87:10 131:3
  248:6
answer 57:15 96:16
  109:11 181:4 187:15
  198:8 212:3,13 226:8
  228:11 229:8 234:21
  234:25 240:19,19
  241:12,14 242:21
  259:15 266:5
answered 49:23 226:9

anticipate 11:18 70:11
  87:13 88:5 89:2,20
  92:13 93:17 102:21
  109:7 117:14 153:4
  158:11,15 176:20
anticipated 10:14
  167:4
anticipates 103:17
anticipating 112:1
anybody 80:21 113:3
  139:9 161:7 216:6
anytime 56:23 161:4
apologize 35:17 126:14
  186:15
Apostolides 1:14 3:6,7
  64:19,23
apparently 209:21
appeal 217:11,14
  257:16,19
appear 256:13
APPEARANCES 1:11
appears 8:3 91:15
  244:12 256:14
apples 158:6,6
applicable 62:15
  204:13
applicant 10:25
application 10:23
  23:23,25 102:6 103:9
  103:24,25 105:5,6
  107:11,25 108:4,7,24
  109:1 110:5 120:21
  121:8 151:1 214:8
  216:16 232:17 271:11
  271:14
applications 7:19,21
  100:13 103:15,16
  105:9 122:13
applied 106:24 129:5
apply 204:1,3 213:9,13
applying 118:25
appointed 206:11
  250:12
appointing 61:15
  206:15
appointment 93:12,13
appraisal 31:17
appraised 44:8,12
  47:13
appreciate 247:21
appropriate 103:15
  198:1 232:16
approval 10:24 141:15
  150:23 215:25
approvals 118:22
  204:14
approve 175:18
approved 53:2 66:24
  101:11,12,17 102:18
  107:3,11 108:5
  111:18 213:18,22
  215:18

**approximately** 19:2
  31:1,16,19 32:14,16
  44:21 49:2 123:12
  129:18 182:8 227:20
  260:11 266:10 267:17
**Aquila** 29:25 34:13
  43:21
**area** 76:7 79:17 120:10
  128:19 137:21 140:23
  141:11 149:23 156:24
  156:25
**areas** 120:4 223:3
  265:9
**argue** 185:1,3
**arguing** 136:6
**argument** 3:20 5:5,21
  8:9 226:17 255:25
  258:21,22 259:1
**argumentative** 48:2
**Armitage** 225:2 246:9
**arranged** 19:16
**arrangement** 97:14
  161:22
**arrive** 158:16
**arrived** 39:20
**aside** 38:3
**asked** 49:21 66:9
  134:13 188:3 197:17
  207:25 211:10 216:3
  234:23
**asking** 67:6 190:23
  193:20 212:5 218:22
  233:4 234:15 240:13
  258:23 269:8
**asks** 197:25 208:5
**assembly** 76:4
**asserted** 72:12 225:4
  231:19,23 232:3
  239:2
**asset** 20:21,23 46:24
  48:7
**assets** 19:11 29:6 43:9
  47:21,22,24 71:3
  187:12,18 205:4
**assign** 12:19 14:8 20:12
  53:13 199:15,18
  215:11
**assigned** 9:23 18:14
  23:2 37:24 41:6
  53:25 55:6 198:5,11
  198:12 199:7,22
  205:10 206:7,12
**assignee** 18:21 58:14
  61:13 62:7
**assigning** 59:6 199:2
**assignment** 9:7,17,18
  10:3 12:13 14:2
  53:17 77:1 102:5
  114:22 173:16 190:21
  240:13
**assigns** 155:16
**assist** 81:11 83:3,5,15

85:4,6,13 123:17
  236:7
**assistance** 19:22
**assisted** 123:24
**assisting** 87:6,11 131:1
**associated** 34:15,19
  191:12 200:13 230:19
**assume** 20:10,12 53:13
  64:21 81:3 103:21
  127:13 129:17 165:9
  254:4 258:2 263:8
**assumed** 9:21 18:13
  20:10,14 23:2 37:24
**assuming** 30:23 59:5
  66:24 98:20,22 99:15
  106:19 126:21
**assumption** 9:7,17
  53:17 119:15 173:16
  194:11 215:15 240:12
  258:6
**assumptions** 39:15
  124:11,14 126:17
  157:20 158:2,3 163:4
  165:8,18
**assurance** 4:2 6:6 12:3
  18:11 21:16 24:6,10
  24:14
**assurances** 9:16
**assure** 206:23
**attached** 83:8 102:5
**attachment** 115:4
**attack** 270:17
**attempt** 66:2 70:25
  231:22
**attended** 75:8 187:2
**attending** 17:10
**attention** 60:15 202:17
  223:20 256:15
**August** 28:24 75:1
  124:22 144:9 182:14
  186:25 187:9 190:21
  198:24 231:2
**authentic** 253:22
**authenticity** 233:21
  244:20,25 245:6,22
  246:10
**authority** 238:12
**authorize** 142:2
**auto** 129:25 212:18
**automatically** 269:14
**automobiles** 212:19
**available** 13:16 40:7,8
  41:14 132:14,17
  138:9 140:6,7 147:17
  149:12 151:15 153:10
  168:12 169:4,5,20
  171:2,2,7,11 177:14
  266:4
**avenue** 213:20
**average** 49:18 78:1,4
  125:4
**averaged** 164:10

**avoid** 142:4
**awaiting** 69:20
**aware** 13:23 14:2 59:21
  59:25 93:24 94:2,3
  149:2 182:21 195:7
  273:17
**a.m** 1:6
**A2002-00155** 234:19

**B**

**b** 1:4 3:2 64:10 115:4
  202:18 204:8 266:3
**Bachelor** 75:5
**back** 11:14,17 22:8
  37:10 44:13 55:16
  59:10 67:22 75:25
  84:16 103:3 104:7
  116:20 130:16 133:12
  136:25 144:11 151:11
  160:24 170:12 191:6
  214:13 218:15 219:11
  249:10 266:21 269:2
**backdoor** 238:19 239:2
**background** 19:21 75:3
**backup** 86:10 266:8
**bad** 151:23 161:15
  243:22
**Bag** 152:7,9
**balance** 42:20,25
  168:16,18 169:12
**balances** 207:13
**Banco** 53:5
**bank** 192:13 207:13
**bankruptcy** 1:1 16:25
  16:25 22:11 52:12
  67:10,12 68:7 172:23
  179:16 180:1,9,20
  206:4,7 257:7 258:2
**bar** 5:20
**base** 116:18 122:11
  130:23
**based** 39:14 40:3 71:8
  110:16 112:9 122:17
  124:14 125:16 127:10
  128:10 131:3,19
  159:22 161:12 166:16
  166:18 168:10,15,24
  176:15 234:20 247:19
  273:5
**baseline** 158:20
**basically** 166:25 252:6
**basing** 157:16
**basis** 17:12 42:5,23
  46:17 47:15 55:4
  69:10 78:1 85:14
  90:17 98:14 153:22
  154:8 160:17 238:20
  244:16 245:22 253:21
  265:18,24
**bears** 21:18
**beating** 119:22
**beauty** 161:21

**Beecher** 142:25 143:1,3
  143:4 149:5
**began** 148:2 180:16
**beginning** 270:20
**begun** 69:19
**behalf** 1:13,14,17,18
  3:4,7,11,12,15 18:17
  23:25 27:2 54:13,15
  56:17 64:20 105:5,8
  173:17 239:17 243:12
**belabor** 159:14
**belief** 69:13
**believe** 20:6 25:14
  29:12 35:4 40:3
  43:16 44:7,13 46:2
  48:18 51:7 53:21
  55:11 56:7,12 68:13
  72:25 73:6,19 91:12
  100:2 110:23 111:22
  117:8 121:2 124:17
  130:16,19 135:11
  137:24 149:8 150:14
  157:8 161:17 168:11
  180:24 186:8 188:13
  190:6 194:1 199:6,21
  203:25 205:11 207:5
  210:20 219:17 224:2
  224:12 227:2,4,5
  232:18,19 235:6
  238:5 242:10 243:8
  244:9 248:25 252:10
  258:7 260:23
**believed** 71:3
**believes** 24:11
**bell** 182:18
**Belleville** 146:17
**benchmark** 270:16,21
**beneficiaries** 28:15
  29:14 56:22 61:8
  183:1,10,13 185:13
  208:18
**beneficiary** 28:17
  29:17,18 38:19 39:4
  54:24 56:14 184:9
**benefits** 266:14
**Bent** 111:23 228:20
  272:13,20
**Benz** 166:21
**Benz's** 166:16,19
**best** 12:3 24:5 78:22
  88:15 132:25 156:7
  187:11 266:24 273:4
**bet** 93:20
**better** 27:16 28:6 86:4
  153:22
**beyond** 66:15 117:8
  119:24 137:25
**big** 111:25 135:16,16
  137:5,21,24 140:13
  143:5 166:7 250:5
**bigger** 58:1 86:8
  139:13 171:4

**big-picture** 138:12
  143:4
**big-ticket** 140:9
**bills** 195:16
**birthday** 171:20
**bisect** 162:13
**bisects** 156:3
**bit** 53:1 68:25 86:8
  127:19 143:11 159:21
  160:19 201:4 204:6
**black** 193:16
**blame** 42:16
**blended** 125:4
**blockage** 150:2,2,5
**blocked** 149:23,25
**Bloomington** 7:11 9:12
  11:14 12:15,22 13:9
  13:13 20:9 33:22
  55:7 62:14 92:15,19
  96:19 98:1,2 102:25
  103:4 111:15,16,17
  144:24 154:22 155:22
  156:13,14,25 165:24
  166:4,10 171:3
  178:10,15 200:8
  204:20 260:25 262:12
**blower** 94:15
**blowing** 124:8
**blurred** 124:7
**board** 38:23 51:8,10,13
  56:19 182:16,19
  217:12
**Bohan** 1:16 3:10,11
  18:16,18 21:11 42:17
  42:19 48:23,25 50:11
  50:12 57:20,23 58:4,7
  58:11,12 59:12,13
  60:4,10,12,22,25
  64:16 67:6 68:24
  71:8,11,13,24 72:13
  73:25
**boilers** 95:14
**bond** 10:10 18:7,9 97:9
  97:24 111:8 112:17
  112:21,25 113:4,7
  115:13,20 120:14
  201:1,5,10 202:13,22
  203:2,21
**bonds** 130:22 131:2
  202:16 203:9,10
**books** 34:18
**boot** 151:22
**bore** 90:1,1
**boring** 164:23
**bottom** 84:19 86:19
  160:4 235:3
**bought** 104:21
**bouncing** 271:25
**breach** 208:13 255:6,8
  255:20 256:20,24
**breached** 255:1,12
  256:8

**break** 43:22 60:2 94:4
**breaks** 148:18,20
 149:16 168:2
**brief** 18:18 21:10 65:2
 178:25
**briefed** 225:21
**briefly** 253:14 271:2
**bring** 16:12,15 20:6
 88:23 89:7,11,16 90:2
 116:15 117:4 119:24
 127:11 133:16 135:9
 147:15 148:4,9
 170:12 174:16,18
 265:7 266:21
**bringing** 89:3 148:7
 154:6 265:13 267:2
**brings** 86:8
**broad** 185:8
**brought** 5:20 268:21
 269:1
**BTU** 13:14 96:9,10
 97:22
**BTUs** 164:6
**bucks** 128:5
**budget** 142:10 177:5
**build** 10:5,16 13:1 97:8
 97:21 98:10 99:1
 103:12 107:15 111:8
 171:3 178:5,6 212:18
**building** 13:7 30:4,6,17
 30:22,23 31:13,17
 33:20 44:5,8,11,17
 45:19,25 46:9 78:15
 96:20 108:21 110:16
 112:8 116:4
**buildings** 34:19 46:21
**builds** 10:7 116:1
**built** 11:2 13:5 79:16
 116:5,6 131:5 178:17
**bulk** 218:3
**bullet** 221:10
**burden** 18:19 20:4
 21:18
**buried** 149:24
**business** 19:4,8 29:7,20
 38:15 43:8 48:14
 49:3 51:24 52:3,24
 55:2,5 59:2 63:17
 70:1 79:17,19 86:4,4
 263:17,17 265:24
**businesses** 55:24
**buy** 12:8 67:22,23 97:1
 97:16 111:2
**buyer** 67:5
**buyers** 67:10 68:2
**buying** 104:7
**buys** 69:6
**bypass** 135:19 138:19
 150:3

**C**

**CAAPP** 6:11 10:20

14:12,21 16:1 99:5,8
99:12,13,15,17
101:23 103:15,24
105:6 106:20,21,23
107:18,21,23,25
108:7 120:18,20
121:8 212:14,15,21
213:1 215:17 230:5,6
230:7,13
**cake** 4:20
**calculation** 128:9
**calculations** 123:2
**call** 24:20 47:25 48:5
 59:15 74:8 94:12
 160:13 216:7 230:4,4
 249:4 274:2
**called** 8:8 32:9 52:8
 60:23 68:9 73:15
 155:3
**calling** 24:5
**calls** 69:7
**Calumet** 76:14
**Calvert** 77:18
**cancel** 174:4
**candlestick** 94:22
**cap** 120:4 151:23,25
 153:2,6 154:1,5 176:4
 176:7 223:2 265:10
**capability** 19:24
**capacity** 18:22 147:14
 151:15 152:22 158:22
**capital** 23:14 129:4
 132:1,5,21 133:2
 142:14 170:3
**capped** 140:17
**capping** 111:24 166:20
**capture** 32:25
**care** 16:19 113:17
 174:21
**career** 105:11 112:20
 123:11 125:21 153:17
 203:8
**careful** 153:15
**Cargill** 13:15 156:17
**Carl** 164:14
**carries** 85:25
**case** 3:24 4:15,18,20
 6:7,19,24 8:8 18:19
 41:24 46:12 65:17
 67:19 71:14,16 72:1
 86:10 88:1 99:10
 124:17 180:2,15
 197:13 208:9,10
 209:12 213:7 216:22
 224:7 227:3,4,5
 233:17 239:6 242:10
 255:8,10 259:18
 260:10 263:12,20
 268:9 273:5
**cash** 32:6,16 33:8,9,11
 43:6 46:17,18 47:16
 47:22 49:1 50:10

136:17,22 149:13
 160:1,13 162:2
 164:24 166:6 178:19
**cash-flow-type** 192:1
**Cat** 211:25
**catchall** 107:19
**category** 140:22 151:14
**Caterpillar** 29:24
 34:12 43:20 88:13,14
 194:2
**cause** 70:19 222:6,21
 223:23 227:25 230:22
 274:4,8
**caused** 22:12 23:5
 221:19 228:1
**causes** 151:16 222:3
**caveat** 235:6
**CCA** 250:16
**ceased** 180:4,15
**cell** 110:23
**center** 120:7
**cents** 125:5 126:23
**certain** 5:21 7:19 15:1
 17:19 29:6,22 35:9
 39:1,14,17 71:3 86:11
 104:13,15 120:6,7
 122:21 252:18 258:4
 265:8
**certainly** 3:22 19:20
 55:23 102:24 116:24
 123:21 132:11,16
 151:16 153:8 168:6
 197:17 207:1 223:2
 255:3 274:2
**certificate** 75:11
**certificates** 130:19
**certification** 199:11
 248:7
**certified** 121:5,7,16
**CERTIFY** 274:7
**cetera** 127:23
**CFM** 147:17 164:13,20
 164:21 171:4
**CFM-type** 170:2
**chance** 234:2
**change** 16:4 22:22
 28:21 56:23 57:11
 70:4 101:22 102:15
 127:15 131:14,17
 139:21,24 143:24
 166:15 175:23 176:11
 176:15,16 216:19
 268:11 271:15
**changed** 22:16,21 78:5
 78:7 127:3 135:25
**changes** 26:22 88:19,20
 176:25
**changing** 70:4 128:17
 129:10
**Chapter** 1:15 3:8 17:1
 17:2 53:3 67:13,13,15
 67:15 132:12,15

140:4 173:20,21,22
 180:15 187:13 198:20
 229:3 250:12
**character** 225:21
**characterization** 92:21
**characterize** 48:8
 265:6
**charge** 73:4
**charges** 263:5,11
**check** 68:2 90:16
 259:20
**checking** 88:20,21
 192:18,21
**checks** 68:18
**Chem** 76:11,12,16
**Chemical** 76:7 77:7
**Chicago** 1:5 31:14 44:2
 44:16 76:7 77:3,4
**chief** 8:9 157:15
**Chiplease** 11:6 19:15
 20:13 21:21 29:17
 38:16,19,25,25 39:3
 40:9 50:15,15 51:3,14
 51:20 52:7,24 53:5,10
 53:17,22 54:9,16 55:4
 55:14 56:13,18,22
 57:10 58:13,21 60:17
 61:9 62:3 82:8
 119:16 180:14 182:25
 183:18,22,25 184:5,8
 184:17 187:13 192:7
 192:12 193:8,10,12
 193:25 194:19 195:2
 195:17 196:2,7,8,24
 198:6,19 199:5
 204:19 205:3,14
 206:21,24 207:3,9,14
 207:19 208:6,12,23
**choices** 252:10
**choked** 139:18
**chop** 14:13
**chose** 176:9
**Christmas** 175:6,12,16
**CID** 76:13,19
**CILCO** 124:19,21,25
 154:9,10,12 157:22
 182:3 198:10,18,23
 199:13
**circuit** 259:14 262:25
**cited** 152:17
**cites** 6:16
**city** 1:18 3:15 4:9 9:8
 15:23 17:9 25:15,18
 25:20,21,24 26:2,3,5
 26:7,14,17,21 27:1
 120:1 129:25 150:21
 150:25
**civil** 78:20
**claim** 72:11 173:20,21
 173:21 179:22 260:8
 260:15
**claims** 258:15 260:4

**clarify** 21:6 66:19
**Clarion** 146:15
**classes** 75:8 123:16
**classification** 134:24
**classified** 134:10
**clause** 20:25
**Clean** 10:21 16:2 23:18
 77:5 99:9 212:1
**cleaning** 128:13
**cleanup** 13:14
**clear** 97:17 102:25
 126:6 132:17 197:12
 214:7 219:4
**CLERK** 3:1 60:6
**client** 9:16 15:13 54:1
 55:6 246:2
**clients** 245:25
**close** 98:19 169:12,18
**closed** 140:17
**closely** 22:14
**closer** 144:1
**close-out** 77:2
**closing** 30:11,13 46:14
**Club** 182:17
**code** 21:15 217:5
**collect** 139:25
**collecting** 139:7
**collection** 10:7 13:2,5,7
 14:16 19:6 93:22
 94:5,5,6,12,16,19
 95:16 96:2,5,20 97:1
 97:3,16 98:3,7,18
 104:3,4 110:19,22
 111:25 115:5 118:9
 128:15 129:6 139:4
 139:22,25 143:6
 153:3 154:5 169:25
 171:6 178:12 187:8
 188:6 189:5,8 190:1,2
 190:13,18,20 191:9
 218:10 225:11 228:21
 237:1,3 239:13
 240:11 242:6,12,18
 246:21 247:3 249:11
 253:1,11 254:16,19
 254:21 256:3 257:3
 257:21 259:24 272:14
 272:22
**college** 75:23 76:2
**colloquy** 247:19
**Colony** 30:4,22
**Columbus** 146:14
**combination** 135:4
 272:10
**combust** 91:6
**combustion** 91:4
 116:15 151:15 154:6
 230:10
**come** 41:24 86:11
 125:5 127:21 128:23
 164:4,7 171:10
 191:25 205:17 209:4

212:17 226:5 266:4
270:7
**comes** 217:5
**coming** 22:5 35:10
39:17 41:22 82:20
193:21 267:13,19
**commence** 106:2,6
114:15 202:20,24
**commenced** 117:22
**commencement** 114:6
**commercial** 44:2,15
**commit** 63:13
**commitment** 33:12
34:9 239:24 243:7,15
244:13 249:18,24
250:21 251:19,22
252:6,16
**common** 52:4,6 94:7,13
**communicating** 235:11
235:20
**comp** 129:24
**companies** 52:1 80:24
92:14,24 93:1 122:13
180:23
**company** 16:24 17:5
26:17 29:21 32:9
43:14 47:1 50:25
51:6 52:8 58:23
59:18,18 68:9 69:4
73:15 77:6,21 78:23
80:2 92:10 116:1,20
116:20 159:5 194:25
256:4
**comparative** 153:22
**comparison** 131:25
**compensation** 194:12
**competence** 18:22
**complaint** 240:10,14
**complete** 33:9 39:18
42:1 109:13 112:1
214:25 215:2
**completed** 16:14
**completely** 98:20
116:22
**completeness** 214:23
**completes** 211:18
**completing** 98:17
**completion** 110:25
**compliance** 3:24 4:8,11
16:22 17:16 24:1
62:15 77:11,15,24
80:10,12 81:4,7 85:8
85:16 141:21 144:17
144:21,23 145:5,16
146:1,10 147:1,8,12
147:19 149:1 151:12
153:4,15 188:17
189:22 190:8,10,24
225:1 239:24 243:6
243:15 244:13 248:6
249:18,24 250:21
251:19,22 252:5,15

**compliant** 24:2 153:6
153:12,14
**complicated** 255:9
**comply** 177:9 249:15
**complying** 5:7,10
**component** 97:18 189:7
**compounding** 139:12
**compressed** 137:12,15
**compressor** 92:2 94:15
**compressors** 92:1
129:7,8 218:3 229:17
**computer** 35:12
**comrades** 19:23
**concentration** 222:24
223:5
**concerning** 55:7 70:9
**conclude** 25:4
**conclusion** 205:17
226:6 229:4,6 244:17
**conclusions** 259:2,6
**concurrently** 131:20
**condensate** 82:20
**condition** 104:6 135:10
251:15
**conditions** 22:12
**conduct** 64:2
**confirm** 57:9 83:11
121:22
**confirmed** 130:17
**conform** 114:12 134:25
**conformed** 135:3
**confuse** 9:4
**Congress** 17:23 138:20
138:21,22 140:10
142:18 256:3,20
**conjunction** 214:15
237:23 239:17 258:6
**connect** 149:21 150:1
255:16
**connected** 255:16
**Connecticut** 146:15
254:21,22
**connection** 192:18
**Connolly** 2:8 6:18,24
11:15 15:3,3 19:17
21:19 29:3,4,8 34:3
39:11,16,25 41:7,11
41:12 42:11 56:8
59:15 60:18 61:10,15
61:16 63:5 64:3,13,15
70:5,9,12 74:9,11,16
74:18 100:23 113:14
113:22 114:10 119:7
122:19 179:3,14
181:24 182:14 184:16
185:7 186:20 187:1
193:21 195:17 197:14
202:5 203:22 205:12
206:2,24 208:22
209:9 210:8 211:17
217:15 219:10,23
220:20 222:2 223:18

224:19 225:19 226:24
229:23 232:15 233:1
233:16 234:7,14
239:5 241:2,18
243:21,22 244:3
245:17 246:5,11,16
247:25 250:4,25
252:25 253:18,23
254:9,14 255:11
256:16 257:20 258:10
258:23 259:9 260:7
260:23 262:2 263:2
264:19 273:22
**Connolly's** 19:20,21
63:22 69:25 70:2
226:7
**consented** 56:18
**conservative** 31:23
**conservatively** 164:11
**consider** 8:5 179:18
**considering** 206:19
**considers** 203:14,17
**consisted** 217:23
**consistent** 20:1 158:8
**constant** 128:4
**constitute** 38:23
**construct** 97:21 204:2
213:10
**constructing** 106:7,19
**construction** 10:5,13
14:20 15:17 77:12,14
77:25 78:13,15 79:15
96:2 103:8,10,14,23
105:4,9,17,24 106:2,5
107:13,14 108:24,25
110:4 203:9 204:2
211:23 212:20 213:2
213:9,18,25 218:20
**consult** 24:24 63:20
**consultant** 216:7
**consultants** 22:20
80:11,12 81:8 86:6
108:19 150:19 262:9
262:23
**consultation** 229:3
**consulting** 81:10 84:10
**consume** 147:14,18
**consummated** 33:20
**contact** 150:19
**contemplates** 208:24
**content** 226:14 242:15
**context** 185:15 201:4,7
**contingency** 64:10
**contingent** 22:2
**continually** 139:1
**continue** 33:9 81:7,13
82:13 87:3,5 91:24
148:6 155:9 161:18
192:11 220:15 226:19
**continued** 76:18 77:20
77:22 134:22 152:4
179:25 222:17

**continues** 29:16 214:25
**continuing** 16:3 22:17
87:13
**continuity** 78:6
**continuous** 78:8 91:4
**continuously** 179:7
**contract** 4:25 9:20
12:16,19 14:8 15:11
15:22 21:1,7 26:1
31:4 34:6 45:13,18,20
45:23 46:1,10 67:5,22
67:24 68:12 81:8
83:22 84:23 86:16,23
86:24 91:16 92:7,8
112:22 114:22 128:8
130:1 154:8,10
155:16 182:3 198:10
198:18,23 199:2,13
202:9 208:13 254:20
254:21 255:13,17
256:3,9,21,25 257:4
257:14,21 258:2,7
263:4 264:6,9,11
**contracted** 82:10
**contractor** 26:16
112:18,20 115:20
202:15
**Contractors** 12:16
144:11
**contracts** 9:7,18 18:3
18:13,23 19:24 20:7
20:11,14 23:2 37:24
39:1 41:6 53:11,12,16
53:25 54:8 55:6,21
58:15 59:2,17,23
61:14 62:7,10,14 64:9
64:11 82:17,18,22
83:8,19 93:19 108:20
184:13 198:3,6
199:16,18,22 206:7
206:12 215:19 254:11
254:16 262:4,21,22
**contribute** 39:2
**control** 10:7 13:5,7
14:16 33:7 52:6
93:22 94:17,18 95:16
96:3,7,21 104:3,5
208:24 217:12 225:11
237:1,10 239:13
242:6,12,18 246:21
247:4 249:12 253:1
253:11 257:4,21
259:24
**controlled** 19:15 76:20
**controversy** 20:22
**convenience** 7:7
**convenient** 274:3
**conversation** 70:3
175:4
**conversations** 13:18
156:8,20
**conversion** 10:6 19:6

95:3,5,17 96:7,14
97:8,22 98:11 187:8
187:20,23 188:20
189:16 190:14,18,19
191:1 240:11
**converting** 187:24
**Cook** 259:13
**coolant** 88:19 92:3
269:12
**coolants** 82:23
**cooler** 269:15
**cooperatively** 120:1
**coordinate** 80:11 81:7
81:12,14 82:14
235:20
**copy** 57:2 58:2 84:20
113:21 209:15,22
210:4 211:15 224:21
233:12,14 242:9
245:13
**Corp** 70:25 71:1,19,21
72:17 73:16,23 194:3
**corporate** 70:20 71:1
**corporation** 1:5 3:2,25
11:7 28:2,9,10 29:15
30:5 31:11 37:6
38:24 40:13,21 42:20
75:13 76:1 77:8,9
238:8
**correct** 30:10 43:1,4,6
43:10,24,25 44:2,3,22
44:23 45:4,14,16
46:11 47:4 49:13,24
50:16,19,21,23 51:2,4
51:18 52:11 53:13,14
53:21 54:3,19,20,23
54:25 55:3,19,21,22
55:25 56:2,6,7,10,15
62:25 63:1,19 64:1,12
64:14 68:17 74:20,23
84:20,25 88:4 90:23
91:9 101:18,19,23,24
103:4,20 104:23
105:1 115:1 117:18
119:3 122:23,24
132:2,3 145:4 146:8
162:19 163:6 165:10
165:21 166:3 176:13
178:9 179:8,12 180:5
182:2,12 184:1 187:9
187:10 188:7,18
191:3,5,10 192:9
196:16 199:25 200:1
200:5,8,14,19 203:24
204:21,22 205:10,16
206:5,17 212:9,10
213:15 215:23 217:18
217:20,24 220:1
221:17 222:2 227:21
228:3 229:13 230:2,3
231:12 248:8 249:2
251:3,8,10 252:1,8

257:15 260:24 261:12
261:13 262:1 263:6
264:21,22,23 265:1
265:21 268:16,17
271:22,23 272:3,24
273:14
**corrected** 65:25
**correctly** 44:20
**correspondence** 245:18
247:15
**corresponding** 202:23
**corroded** 137:11
**corrosion** 137:14
**cost** 23:6,11 89:3 90:5
112:23 116:10,19
131:5 133:18 139:24
144:3 175:21 177:8,8
178:1,10,15
**costs** 30:12,13 174:13
177:7 193:25 194:20
200:13,16,20 203:20
263:5
**counsel** 24:24 25:1 27:4
55:9,10 236:3,4 238:9
259:20 268:6
**counterparty** 59:1
263:4
**country** 79:24 80:1
**county** 1:18 3:15 4:10
9:8 15:23 17:10
25:15,18,20,21 26:3
26:14,18,21 27:1
120:1 129:25 150:21
150:25 259:14
**couple** 65:2 69:5 76:11
76:18 99:2 116:19
213:15 271:19
**course** 25:8 43:8 75:10
116:6 119:22 123:19
148:8 155:15 207:22
218:2 245:3 270:9,19
**courses** 75:14,17,18,20
123:22,23
**court** 1:1 3:17 4:22 6:8
6:14,25 7:7 8:2,16,21
8:22 9:2 14:3 18:15
20:11,24 21:4 24:16
24:18,22 25:23 26:6
26:11 27:3,6,16 30:18
30:21 31:7 32:1 35:3
35:6,10,16,23 36:3,8
36:13,17,22,25 37:16
42:16 48:22 50:8
53:24 57:19,21,25
58:6,10 59:7,11 60:1
60:8,21,24 64:18 65:9
65:14,19,24 66:17
68:11,15 70:17 71:7
71:10,23 72:10 73:5,9
73:12,17,24 74:1,3,7
75:4 83:16 84:14
100:7,16,20 102:1

113:24 114:2,8 119:5
121:10,21 124:3
141:16 150:9 155:15
155:17 157:4,14
158:6 159:14 162:25
164:24 165:1,4 173:8
173:15 178:23 179:1
184:25 185:17 186:5
186:9,11,16 197:3,7
197:12,17,20,23
198:24,25 201:15,17
201:24 202:1 203:16
203:17 209:16,23
210:4,11,14,21,25
211:5,8,14 215:19
217:14 220:10,13
225:3 226:2,13 231:7
231:10,13,17,20
233:15 234:4,6,10
236:19 237:19 238:10
238:12,20,23,25
239:9 240:9,21
243:23,25 244:14,20
244:24 245:8,10,13
245:19 246:14 247:11
247:13,19 250:18
253:15,20 254:3,25
255:12,17 256:7,24
257:8 258:3,19 259:1
259:14 260:9 262:25
263:7,14,24 264:2,14
268:7 271:1 273:21
273:24
**courtroom** 24:23 25:4
25:11 59:15 274:3
**court's** 3:1 60:6 155:17
**covenants** 59:23
**cover** 193:13 211:24
219:3 268:4
**covered** 130:16 218:17
218:25
**covers** 130:7 174:23
213:22
**co-insured** 130:5
**co-lenders** 50:14
**co-op** 75:25
**CQA** 175:15
**CRA** 255:8
**cracked** 128:18
**create** 15:9 17:8 59:17
**created** 28:14
**credibility** 22:25
**credit** 17:7 34:20 37:14
37:15 40:6 41:25
42:4 117:25 171:2,8
177:13 202:22 204:18
**creditworthy** 156:11
**crews** 174:21
**critical** 6:5
**cross-examination**
42:18 60:9,11 64:25
179:5 264:17

**crude** 49:9
**CSR** 274:7
**culminates** 273:13
**cure** 9:13 21:13,23 23:6
23:9,11,12 37:25 38:3
200:16,20 203:20
266:16 267:6,9
**cured** 264:21
**curing** 264:25
**current** 19:16 73:22
86:24 164:1 212:8
**currently** 47:23 79:12
84:24 101:11 160:18
179:15 181:25 182:22
187:19 189:18 194:22
**curtain** 22:8
**customary** 263:10
**CX** 2:5
**cylinders** 90:1,2
**C-o-n-n-o-l-l-y** 74:17

**D**

**D** 2:2
**daily** 265:23,24
**damages** 71:25
**dams** 78:15
**date** 66:23 84:7 89:6
115:7 119:14,19
121:16 122:17,18,18
122:21 127:11 148:19
168:5 196:12 235:13
250:1 252:18
**dated** 87:21 220:24
267:15
**daughter's** 171:20
**Dave** 266:2
**David** 1:16 3:11 266:6
**day** 122:8 130:20
232:24
**days** 38:8 66:23,25 67:1
89:21 97:7,20 105:19
105:19,25 107:16
109:2,22 114:16
115:3 119:16,19
127:10 167:16 202:18
217:7,8 269:5 270:23
271:18
**day-to-day** 77:21 79:10
**dealer** 88:14
**deals** 6:1
**Dearborn** 44:18
**death** 81:16,19 90:15
265:15,25
**debt** 30:7 31:19 32:15
44:10,20 45:3 171:17
**debtor** 1:6 22:22 23:5
99:12 180:7,16,22
**debtor's** 22:16
**debug** 106:10
**debugging** 107:17
**December** 9:20 15:22
16:7 32:12,12 49:15

49:19 127:8 220:5
221:16 227:7,14
267:22 268:13 269:3
**decided** 54:7 59:17
134:20 229:6
**deciding** 63:13
**decision** 7:21 54:5,10
54:12,15 56:3,11,16
58:15 273:8,9
**declare** 206:6
**declares** 206:3
**decomposing** 94:9
**deemed** 101:11,12
102:18 122:8,17
**deep** 149:25
**default** 206:4 257:10
266:17
**defaulted** 254:15 257:8
**defaults** 12:1 20:2
21:14,23 23:12 64:9
205:13 206:2 258:11
264:25 265:3,6
**defendant** 71:15,17
**defenses** 258:15
**defensive** 6:23
**define** 187:22
**defined** 94:1 106:14
175:11
**definitely** 15:16 92:18
101:15 130:6 132:7
204:15 267:9
**degree** 75:6
**degreed** 78:19
**degrees** 148:24
**Delaware** 172:1,3
**delivery** 122:18
**demonstrate** 19:21
**denial** 217:4
**denied** 105:14 216:25
217:1
**denies** 216:15
**denominator** 94:7
**deny** 213:5,21 217:11
**denying** 197:19 217:6
**dep** 172:7,10,14 180:19
181:3 207:6 228:18
230:15 236:2 244:8
268:21
**Depending** 105:18
**depends** 49:4,8 105:20
**deposit** 208:24 209:11
**deposition** 6:16,19
26:19,20,22 43:13,17
65:3,6 130:17 166:25
171:19 181:24 187:2
187:16 193:1 196:23
233:2,10 234:15
244:4
**depositions** 175:5
**depreciation** 32:13,22
48:16,19
**derived** 49:11

**Des** 146:16
**Describe** 223:22
**described** 66:10 69:18
96:6 109:21
**design** 108:14,19 109:5
110:6,10 139:21,24
143:24 152:5 169:8
175:14,23 177:3
**designate** 53:11,16
**designated** 29:5 59:16
**designating** 58:25
61:12 62:6
**designation** 53:9 59:4,5
**designed** 176:23,23
**designee** 20:13
**designing** 169:8
**designs** 79:7 96:6
**desk** 7:20 216:9 274:1
**destroyed** 228:4,6
**details** 209:7
**determination** 214:18
214:24 217:10,10
**determinations** 157:17
**determine** 7:25 62:18
63:10,22 64:3 123:3
**determined** 172:18
**determining** 4:1 23:1
112:12
**develop** 39:22 108:17
**developing** 108:18
**development** 79:17
96:1 256:4
**device** 118:1 237:10
**devices** 94:14 116:16
**devolve** 141:6
**de-designating** 58:25
**diameter** 120:6 150:8
**die** 252:11
**died** 16:7 81:23
**differ** 109:21
**difference** 71:22 154:2
**differences** 158:1
**different** 20:2 31:10
69:5 110:2 122:14
149:22 159:17 188:4
262:3 271:12
**difficult** 148:23 208:16
219:1 249:15
**difficulties** 5:15 272:12
**difficulty** 5:7,10 35:19
113:1,3
**dimension** 104:13
**direct** 27:9 60:15 62:24
74:12 95:9 128:9
183:5 188:2 202:17
223:20 256:15
**directed** 41:10 134:16
238:7
**directing** 42:10
**direction** 139:4
**directly** 47:5 51:5 80:5
82:14 199:3

**director** 28:11 50:20
51:20,21 52:15 77:14
**directors** 51:8,10,13
**disagree** 252:3
**disagreed** 137:18
**disagreement** 14:18
**disburse** 223:4
**discount** 166:13
**discovery** 126:14 246:3
**discretion** 41:13 186:22
**Discretionary** 186:9,17
**discuss** 251:6
**discussed** 39:16 41:10
50:2 52:4 132:13
241:3
**discussing** 31:10 70:21
233:15 273:1
**discussion** 38:21
**discussions** 70:8 90:11
168:10
**dismiss** 259:17
**dismissed** 260:13
**dismissing** 268:9
**disposal** 9:10 82:20,21
128:1
**disposition** 76:24
**dispute** 134:9 233:20
**disregarded** 22:9
**disrespect** 183:16
206:8
**dissolved** 77:6
**distribute** 185:12 186:4
**distributions** 46:20
**DISTRICT** 1:1
**dividend** 19:3 28:4
160:11 187:4,17
**Division** 1:2 76:20
**docket** 68:3
**document** 83:24 84:20
84:21 101:3 102:5,10
103:18 121:25 126:20
172:15 184:7,21
205:17 210:12 211:9
223:17 224:18,25
225:2 226:5 231:15
231:15 239:1 244:2
244:15,25 245:2,23
246:6
**documentation** 232:17
**documented** 22:5
**documents** 3:21 83:11
104:9 124:14 207:8
253:18 273:12
**Dodge** 145:3,6,13,20
188:13,14
**doing** 33:10 48:12
59:24 79:23 82:15
85:15,19 88:17,18
102:21 114:20 128:18
128:25 129:2 153:18
194:9 195:10,13
229:7 262:18 265:10

**dollar** 72:19
**dollars** 73:2 115:10,11
128:3 167:11 175:24
192:17,22
**Doraville** 76:3
**dormant** 28:6
**dots** 255:16
**doubt** 197:13 246:2
**doubting** 245:22
**downtime** 90:21 268:22
268:23 269:10
**draft** 217:4
**draw** 11:13,15 17:7
118:6 142:16 167:7
167:17,17,20 170:3
174:25 177:19 196:13
196:13 204:18 244:17
259:2,5
**drawing** 161:18 167:14
175:2 196:15
**drawn** 11:16 196:6
**draws** 11:10 167:4
171:7 177:13 206:17
**Drew** 11:8
**dries** 23:16
**drop** 168:18
**dropped** 269:4
**drops** 127:18
**drove** 22:11 98:18
**due** 17:15 121:25 138:1
167:15
**duties** 77:17 80:10
241:18
**DX** 2:5
**Dykema** 55:11

---
**E**
---

**E** 2:2
**earlier** 60:16 66:5
112:10 127:6,9
200:22 249:14 256:2
264:19 266:9 267:5
267:16
**early** 17:23 28:5 108:21
167:19 168:6 228:19
273:1
**earned** 10:11 32:18
**earnest** 68:18
**earnings** 32:13,22
48:15,19
**easier** 36:10 250:4
**easily** 6:21 109:4
**EASTERN** 1:2
**easy** 18:8 165:5
**eat** 4:21
**EBIDA** 48:22,24
**economics** 123:20
**economy** 116:25
**educational** 9:2 75:3
**effect** 6:20 133:4,14
**effective** 66:23 115:7
119:14 122:21 127:11

148:19 168:5 195:23
**effectively** 104:6 110:6
181:11 193:14 194:16
215:14
**eight** 78:4 164:9 255:5
**EIPA** 150:19 214:6
**either** 6:20 8:10 46:16
46:21 47:18 51:5
62:18 80:5 105:19
145:16 146:24 207:16
213:18 216:25 217:7
251:5 252:2,7,19,21
272:2
**elaborate** 7:24
**elect** 97:15 108:21
111:2
**election** 96:25 97:16
98:6,10 111:7
**electric** 126:2 158:15
**electrical** 88:25 116:14
218:3 229:18
**electricity** 15:9,12
16:10 19:7 95:11
154:14,15,16,19,25
155:1 187:25
**electronic** 126:1
**electrons** 163:14
**elects** 201:1
**emission** 107:20
**emissions** 222:22
**employed** 25:25 26:17
179:7,25 181:10
241:19
**employee** 81:21 130:21
131:2
**employees** 4:1 19:18,23
78:3 180:25 181:14
181:15,16,17,20,21
193:8,18 194:22,25
195:3
**enclosed** 94:23
**Encore** 115:23 118:10
**endeavor** 134:20
**ended** 32:12
**energy** 10:5 94:24 95:8
95:9 96:7,8 115:23
116:2,4,5 118:10
156:20 164:2 187:8
189:6,7,9 199:23
268:15 270:12
**enforce** 20:17,20,25
45:21
**enforcement** 273:13,16
**engage** 19:17 28:4
**engaged** 19:8 46:3,9
**engaging** 19:3
**engine** 16:12,15 81:14
88:24 89:4,11,16,19
89:22 90:3,21,25 91:5
116:16,21 117:8
119:20,24 126:22
127:12,14 131:21

133:15,16,19 135:5,9
147:15 148:4,7,8
158:22 167:18 174:16
174:19 221:9 227:6,8
227:22 228:2,4,5,7,13
229:5,9,24 230:19
265:7,12,13,13
266:21 267:2,3,8
268:18,25 269:12,13
269:15 273:2
**engineer** 23:4 76:5,10
77:10 78:20 79:6
164:15 166:22
**engineering** 26:2 27:2
75:6,11 81:10 123:19
123:20 128:21 243:3
**engineers** 78:22 125:23
143:13
**engines** 15:9,15 88:17
89:9 91:7 94:25 96:8
96:9 99:2 116:25
117:2,3,5 118:10
127:13,14 129:7
131:18 134:9 147:18
152:21 153:9 158:4
158:25 159:6,25
167:25 169:10 200:4
211:19,24,25 217:23
217:25 218:1,5,7,9,18
218:22 219:11,14,15
219:15,20,23 220:4
221:12,18 222:3,18
222:20 223:7,11
224:5,11 228:9,16
229:12,14,15,21
230:1,8 237:4,10,16
237:20,24 268:24
270:5 272:6
**enter** 39:6 155:10
171:1
**entered** 13:21 55:15
96:22 155:12,13
209:2 256:19 258:1
262:4 268:7
**enterprise** 157:16
**entire** 19:13 38:23
40:14 123:10 218:5
272:14,22
**entirely** 198:1
**entirety** 228:22 272:15
**entities** 34:22 40:11
41:4,8 46:20 52:6
53:4 68:6 70:20
**entity** 21:21 22:9,14
32:8,11,13 42:24 46:7
46:8 53:24 54:18
55:5 59:2 68:4 251:1
251:5
**Environ** 243:12
**Environment** 26:1
**environmental** 5:8,12

20:1 22:23 23:19
62:16 75:11 76:5,10
76:14,17,21 77:10,15
77:15,24 80:10 81:10
85:5,5,16 87:3 122:14
128:21 134:5 135:17
137:2,5 138:21
140:20 141:6 142:4
142:23 166:22 190:9
190:9 230:18 243:3
259:22
**EPA** 6:12 99:10 101:9
**equipment** 39:1 88:11
88:13 128:6,10
129:21 131:20 159:20
217:22 266:19
**equity** 30:6,22 31:22
44:5,21
**equivalent** 184:19
186:14
**error** 153:19
**ESG** 13:21 14:2 104:8
104:20 141:1
**essentially** 19:4 28:6
34:2 65:14
**establish** 5:14 6:16
186:2 243:3
**established** 26:18 28:1
28:3 93:6
**estate** 29:22 30:2 34:19
43:18,23 44:2,16
45:13 52:12 53:13
**estimate** 31:23 44:5,24
170:1 260:18
**estimated** 147:16 260:2
**estimates** 23:12,13,15
39:12 40:2 41:23
63:23
**estimating** 64:4 118:7
174:19 178:13 270:4
**estimation** 127:2
164:19
**et** 127:22
**EUGENE** 1:9
**Eve** 81:23
**event** 41:6,15 64:8
202:19
**everybody** 5:11 95:21
**evidence** 6:9 11:21
13:25 17:18 18:11
22:1 23:18 24:7,12
35:5,7 118:20 157:13
184:25 225:21 226:1
244:15
**exact** 22:11 58:7 97:10
192:24
**exactly** 47:3 48:1 59:24
66:8 68:8 79:22 85:1
89:6 91:20 152:11
156:23 166:18 204:5
**examination** 27:9
62:24 66:20 71:12

74:12 183:5 188:3
226:19 271:3
**examine** 7:10 62:24
89:23
**example** 212:17
**exceeded** 66:6
**exception** 92:16,17,20
146:20
**exchange** 163:22 164:1
205:2
**exchanged** 268:5
**excise** 173:5
**excluded** 25:16
**exclusive** 203:5
**exclusively** 63:25 64:13
**excuse** 24:21 34:4
122:5 210:11 224:2
234:16 235:16 237:4
254:20
**excused** 74:6 273:23
**execute** 23:25
**executed** 31:5 45:12,23
209:11,13,16,20
210:4
**executive** 157:16
**executory** 53:12,16
**exert** 33:6
**exhaust** 229:18
**exhibit** 21:2 34:24 36:4
36:8 57:19,20,21
60:20 83:9,10,16,25
86:13 87:16 91:11
101:25 113:18 119:6
119:8 124:1 157:3
162:16 163:16 165:3
184:24 185:17,20,24
201:13,21 209:23
210:1 220:9,12,14,15
223:13 224:16 226:14
231:6 236:16 239:7
242:8 243:19 247:7
247:24 248:20 249:22
249:23 253:14 255:24
256:11
**exhibits** 35:6,9 83:9
100:1,3 121:1,11
123:6 124:15 226:16
226:20 263:1
**exist** 147:12 149:2
151:12
**existed** 147:12 151:13
**existing** 13:15 99:2
106:16 109:23 116:16
156:15 206:13 211:22
**exists** 4:2 12:4
**expand** 81:11
**expanded** 82:2 129:20
**expanding** 81:16 90:15
**expansion** 13:8 15:18
111:18
**expect** 8:8 93:14,16
125:12 132:5 162:1,3

162:5 216:21
**expectation** 70:14
98:23 226:5
**expected** 25:2 39:13
159:8
**expenditure** 168:7
**expenditures** 129:4
132:5,9,22
**expense** 4:2 127:22,24
128:4 159:14,16,20
191:15
**expenses** 63:6,23 64:5
127:22 128:7 130:24
131:2 163:5,7 165:16
177:22 191:12,16
193:5,13 195:19
196:4
**experience** 19:12 29:8
40:3 55:1,23 63:17
75:23 78:21 92:25
95:15,25 96:12,13
105:23 108:9 116:3
122:12 123:8 125:11
159:4,23 176:16
**experienced** 159:5
213:17 223:6
**expert** 5:9 24:24,25
26:9,12 98:21 117:7
117:12,13 164:15
**expiration** 212:11
**expire** 103:11
**expired** 103:13
**explain** 160:7
**explained** 40:1
**exposure** 19:12 260:3
260:10,20
**expressing** 72:24
**Expressway** 76:14
**extend** 40:12 41:25
42:3
**extended** 114:24,24
**extent** 4:3,6 10:10
17:19 33:25 236:9
253:20 258:21 259:3
**extract** 94:8 139:18,22
152:6
**extraction** 94:14 137:9
139:12 149:22,24
**extremely** 4:8
**EZLinks** 73:15
**e-mailed** 210:1

**F**

**fabricated** 245:11
**face** 112:25 168:18
226:15
**facilities** 96:11 188:9
203:9
**facility** 10:6 23:21
76:17,20,22 95:13
101:4 117:5 136:16
187:20,23 188:20

189:6,17 190:1,14,18
190:19,20 191:2
199:12 210:9 211:18
212:2,9 216:14
217:16 218:6 221:7
227:24 237:11 239:14
241:24 242:6 257:22
261:17
**facsimile** 122:18
**fact** 5:11 12:4 13:17
14:1,12 16:20 20:10
20:16,18 22:3 26:13
26:19 45:11 49:7
51:23 61:20 65:22
107:22 122:14 130:18
136:21 140:7,15
144:5 145:13 154:2
159:16 166:6 183:19
194:8 204:25 221:15
228:25 230:12,22
237:23 245:1 259:4
267:7 271:20 273:13
**factor** 4:1 23:1 127:19
158:23,23,24 159:1,2
163:12
**factors** 159:2
**Fahrenheit** 148:24
**fail** 20:4 148:25
**failed** 46:15 137:14
227:25 269:13
**failure** 18:24 19:10
221:18 222:3 228:6
248:6
**failures** 19:14
**fail-safe** 269:14
**fairly** 31:22 38:7
125:22 137:21 143:9
**faith** 245:22
**fall** 98:24 167:19 168:6
228:24 229:1,22
272:15,23
**Falls** 76:19
**familiar** 52:7 57:4,8
184:3
**familiarity** 34:1
**fantastic** 86:7
**far** 8:6 23:13 29:9
59:21 62:8 93:4
96:18 106:7 120:17
138:24 153:22,22
155:20 156:12 163:12
165:2 172:2 203:8
215:19 267:1 270:11
270:19
**fares** 94:21
**fast** 171:14
**faster** 42:1
**favor** 102:15 256:19
**feature** 222:14
**features** 120:4 128:1
129:9 149:8,9 153:25
**February** 1:6 87:21

121:17 122:5 220:25
235:9,14 236:12
237:12 269:6 274:5
**fed** 156:3
**fee** 131:3
**feeding** 156:17
**feels** 69:11
**fees** 128:6
**feet** 120:7 139:14,17
**fell** 45:15 198:18
**fellow** 16:5
**fellows** 14:14 78:10
79:3 272:17
**FERK** 199:10
**field** 80:4 120:3 134:8
137:21 147:23 148:14
218:2,23
**fields** 79:10
**fifty** 105:13
**fighting** 136:1
**figure** 159:1 174:18
184:23
**figures** 49:12 165:10
**file** 14:19,20,21 101:21
103:8,11,14,23 105:4
106:5,20 107:10,17
108:4 212:21 271:11
271:13
**filed** 46:14 67:12 99:22
101:5,6 102:11,12
106:2 120:21 121:7
122:1,8 232:16
273:17
**files** 84:21
**filing** 99:20 103:17
117:17 122:6,7,12
180:1
**fill** 139:5
**filling** 12:24 111:24
166:20
**final** 9:6 14:12 77:1,2
115:7 125:11,15
209:6 212:15,25
217:9,10 229:6
256:14,16 264:11
**finalize** 130:12
**finalizing** 209:5
**finally** 11:14 120:24
214:9 215:8
**finance** 75:15 204:19
**financial** 18:21 33:7
39:9 42:22 62:25
75:18 192:19 194:2
207:8
**financials** 32:10
**financing** 123:22
**find** 58:7 100:16
113:24 134:11 150:17
172:13
**finding** 225:22
**fine** 35:16 58:10 64:23
71:23 88:11 113:22

115:18,18 119:9
138:15 176:23 177:4
197:20 219:9 220:10
230:5 246:12
**finish** 13:8,12 15:18,19
25:8 75:9 102:1
148:3,7 153:3
**finished** 10:15 109:8
**finishing** 110:19
**fire** 14:25 117:8 137:8
137:15,17 152:12,12
152:15 227:23 228:2
**firm** 81:10 85:9 86:8
243:3 264:6,12
**first** 7:1 9:19 16:24
24:19 28:18 36:18
37:22 45:9 56:5
80:25 81:19 99:5
114:5 115:24 126:5
126:12 156:14 160:4
161:3 164:4 167:1
171:24 173:8 199:5
208:8 217:2 221:24
256:12 260:12
**fitting** 137:11
**five** 66:23 76:5 103:13
111:23 119:16 137:21
166:19 171:16 218:8
219:11
**five-and-a-half** 222:21
223:8
**five-year** 10:23
**fix** 138:2,6 148:1,2,5
149:11,14 222:11,16
273:2
**fixed** 97:2 138:5 222:15
272:7,9
**fixing** 128:18
**flare** 237:14,15,17
238:1
**flares** 94:11,20,22,23
190:20
**flaring** 94:24
**flat** 47:20
**flex** 128:18
**floor** 62:1
**flow** 32:6,16 33:8,9,11
136:18,22 150:4
160:1,13 162:3
164:24 166:6 178:19
**flowmeter** 135:18
138:16
**flowmeters** 135:22
136:7,9
**focused** 123:21
**focusing** 267:2
**follow** 43:10 105:5
**following** 56:3 227:6
252:9
**footnote** 258:14
**footprint** 104:14,18
**foreclose** 205:14

**FOREGOING** 274:7
**foresee** 113:10
**foreseeable** 84:6 183:6
**forgive** 266:6
**forgot** 266:7
**form** 202:22 215:2
  223:21
**forma** 39:11 41:19
  62:24 126:7 131:11
  131:16 136:21 157:9
  158:12,13 159:18
  162:18,24 165:19,23
  177:25
**formal** 150:23 195:15
**formas** 39:24 41:17
  42:2 63:9 123:5,9,10
  123:21 125:8,16
  136:25 151:12 158:9
  168:16 192:1 269:25
**formed** 19:1
**former** 19:18,22,23
**Fort** 145:3,6,13,20
  188:13,14
**Fortelka** 78:17,18,19
  80:15,18 81:13 82:4
  82:12,13 90:10,17
  95:23 130:25 181:7
  266:3,8
**forth** 11:23 251:24
  252:2
**forward** 12:14 15:19
  17:8 89:4 136:4
  157:17 164:1,9 219:6
  272:2
**Foth** 25:25
**found** 254:15,25
  255:12 256:8,24
  257:7,10 260:3
  271:10
**foundation** 66:2 157:12
  225:2 231:16 245:1
  245:20
**four** 18:12 39:13,21
  63:6 81:2 102:22
  107:7 108:3,8 112:24
  130:7 144:18,20
  158:19 162:11 165:11
  171:12 205:1 212:19
  215:8 225:7
**fourth** 210:18
**four-inch** 150:8
**four-month** 158:20
**fractured** 138:1,2
**frame** 38:9 105:24
  107:5 109:4 168:7
**frames** 105:22
**framework** 177:12
**free** 32:6,16 47:16 49:11
  233:18
**frequently** 82:3 90:16
**fresh** 196:12 267:15
**Friday** 268:7

**fringe** 266:14
**front** 37:2 57:23 60:24
**fronting** 194:19
**frugal** 161:7
**fuel** 95:14 137:16
  143:15 147:14 156:12
  156:21
**Fuels** 264:6
**full** 109:4 131:18 139:6
  152:21 268:23
**function** 17:18 86:11
  149:12
**functionally** 153:25
**functions** 79:6
**fund** 33:12,17 38:3
  39:21 40:6,16,19
  41:18,21 50:1,3 66:6
  66:10 69:15 194:3
  206:25 207:20
**fundamental** 134:9,19
  134:23
**fundamentally** 7:18
**funded** 49:22
**funding** 21:24 23:16
  34:9 206:19 264:24
  265:4,7 267:10,12,13
  272:12
**funds** 11:5 22:3 33:17
  115:4 117:23 134:3
  168:12 191:22 192:8
  192:10,11 193:4,13
  193:19 195:18 196:8
  267:19
**further** 70:16 91:8
  212:13 259:15 263:22
  273:20
**furthermore** 207:6
  215:7
**fuse** 148:24
**future** 4:2 6:5,6 7:22
  21:17,24 22:24 23:7
  24:7,9,10,15 84:6
  117:15 141:22 183:7
  192:4 209:6
**futures** 164:2

——————————

**G**

**gained** 253:17
**gaining** 258:23
**gap** 250:5
**gapping** 88:20
**garbage** 104:17 143:19
  151:23
**Gary** 146:16 274:7
**gas** 10:7 12:8,18 13:2,4
  13:7,13,14,15,16 14:6
  14:16 15:10,24 16:10
  19:6,6 29:7,22 32:5,8
  32:9 33:6,10 34:7,20
  41:5 43:19 47:1,6,8
  48:6 49:5,9,11 55:2
  55:24 58:15 59:1

61:14 62:14 63:17
  64:5 69:1 91:5,6
  92:19 93:22 94:4,5,6
  94:8,12,15,16,17,18
  94:19,24 95:2,5,8,11
  95:16,16 96:2,5,10,13
  96:20 97:1,3,16,22
  104:2,4 116:14 117:7
  124:16 128:15 139:3
  139:7,18,23,25 143:6
  143:7,11,21 144:2,11
  147:17,18 149:22,23
  150:4 152:6,8,10
  153:2,10 154:17,21
  155:23 156:1,2,17,18
  156:19 163:9,15,17
  164:13 187:8,24
  188:6 189:5,8 190:2
  190:13,17,20 191:9
  205:9 218:2,3,9
  222:12 223:3 225:11
  227:23 228:1 229:4
  236:25 237:3,24
  239:13 240:11 242:6
  242:12,16,18 246:18
  246:20 247:3 249:11
  252:25 253:10 254:15
  254:19,20,20 256:3
  257:3,21,21 259:24
  261:1,4,6,14,19,21,24
  263:25 264:3 273:4,7
**gas-to-electric** 200:3
**gas-to-electrical**
  199:23
**gas-to-energy** 23:21
  62:20 77:13,23 79:5
  181:25 187:20 188:9
  188:19 189:16,25
  191:1 200:11 211:18
  217:16 241:23
**GC** 203:10
**GCCS** 10:8 109:8
  175:6
**Gene** 86:19,22
**general** 5:7,10,14 75:12
  76:1 87:19 92:23
  94:2 112:18,20,23
  129:24 133:8 135:13
  180:18,21 202:15
  212:17 242:21 252:23
  260:21
**generally** 10:13 21:13
  105:16 107:5 108:8
  109:19 125:10 182:2
  183:11 205:5 223:19
  225:6,20 232:12,12
  239:15 262:21 264:24
**generate** 46:17
**generating** 126:2 182:6
**Geneva** 76:25
**gentleman** 23:18
**George** 1:14 3:7

**Georgia** 75:8,19 76:3
  123:23 146:14
**getting** 21:20 90:7
  119:5 136:14 193:7
  193:19 249:4
**give** 8:5 25:2 128:16
  182:9 201:18 216:7
  217:8 252:11 263:8
**given** 8:9 24:13 197:18
  198:1 233:16 249:15
**gives** 170:5,7 214:8
**giving** 25:8 250:8
**Glad** 152:7,9
**GM** 125:22
**GNO** 145:8,17
**go** 5:24 7:23 10:16 11:2
  11:12,20 12:14 18:16
  21:10 27:6 29:7 32:7
  32:7 44:13 50:8
  71:10 79:7 83:7
  84:16 92:4 93:16
  97:1,8,21 98:10,15,23
  106:18 107:16 108:11
  108:21 111:2 121:10
  124:9 126:2 131:21
  135:24 136:6,25
  137:25 140:18 141:23
  146:13 149:13 151:11
  156:1 157:17 162:21
  162:22 169:24 174:20
  176:20 179:1 188:10
  192:1 199:5 202:7,21
  204:5 206:20 212:24
  215:15 221:8 223:3
  223:15 226:20 227:15
  233:22 234:2 272:2
**God** 93:17
**goes** 7:25 75:25 155:23
  159:21 168:23 230:16
**going** 7:23 8:3,24 10:9
  11:1,5 12:5,6,25 13:4
  13:5,6,8,11 15:17,19
  16:9,15 17:18 18:12
  23:10 29:7 35:16
  39:2 40:7,11 42:6
  46:13 58:4 64:21
  74:8 79:19,24 80:25
  81:11 82:11 83:10
  85:11,22 87:1,22 89:2
  89:8,17,22,23 90:4,12
  97:7 98:20,22 100:10
  103:12 108:13,14
  109:2,7 111:23
  116:12 120:25 122:20
  129:1 130:25 131:13
  135:23 137:12 148:5
  148:6,17 149:10,14
  151:3 152:10 153:5
  153:13,16,21 154:17
  156:1 160:7 166:10
  166:25 167:5,13
  168:2,17 169:12,18

170:3 174:4 176:20
  186:3 190:5 193:17
  194:10 201:21 204:17
  208:5,9 211:5 215:9
  215:11,19 216:10
  217:2 226:11 228:21
  228:21,24 239:4
  245:19 252:2,12
  253:17 255:3,7 264:6
  264:7,9,12 271:16
  272:6,14,23 273:7
**going-forward** 42:5
  154:8
**Golf** 73:15
**good** 3:3,6,10,14 58:2
  60:1 87:12 88:8
  92:21 139:9 155:19
  156:9 172:2,9,11,21
  179:2,4 245:22
**gotten** 173:9 188:16
  264:7
**government** 204:13
**governmental** 118:21
**governs** 107:14
**grade** 13:14
**Grading** 253:4 257:4
  259:17
**graduated** 76:2
**grant** 5:18 8:6 216:3,20
**granted** 143:12 215:10
**grantor** 28:2,16 54:21
  184:6
**grantors** 28:14
**grants** 53:24 213:14
**grate** 22:8,13,17
**Greater** 145:8 188:24
**greatest** 219:15
**Green** 264:6,13
**Greenblatt** 28:20 29:10
  29:11 38:22,24 51:1,3
  51:16 52:18,21 53:6
  53:19 54:14,17,19
  56:6,17,20 59:14 62:5
  207:3
**Greenblatt's** 56:12
**greenfield** 200:3
**Gregory** 1:12 3:4
**grid** 154:7
**ground** 112:7 150:9,10
  236:18 244:19
**grounds** 100:13 157:12
**guarantor** 184:8
**guarantors** 184:1
**guess** 37:16 83:7 86:12
  144:9 151:10 257:18
**guy** 6:12 266:24
**guys** 92:18,18 153:3
  264:10

——————————

**H**

**habit** 8:19
**half** 115:9,11

**halfway** 75:10 119:23
  267:8
**hampered** 265:4
**hand** 53:3,4 122:18
**handful** 12:23
**handle** 82:19
**handles** 80:9
**happen** 12:5,18,25 13:4
  14:7 16:9 119:15
  168:17 237:19
**happened** 4:16 56:4
  72:21 139:10 143:3
  180:14
**happening** 110:18
**happens** 4:5 115:2
  118:16 152:11 168:16
  169:6,10 217:3,4
  252:15
**happy** 5:13 204:5 226:8
  233:21 253:25
**Harbors** 77:5
**hard** 8:25 245:13
**Harry** 235:9,23 238:11
**Haven** 146:15 190:7,15
  190:18,21
**hazardous** 77:3
**hazards** 22:24
**head** 17:12 69:3 88:21
  90:8 129:8 162:12
  266:23
**headed** 17:23
**header** 120:7 218:2
  228:23
**headers** 94:14 175:13
**heads** 88:25 89:23
**health** 129:14 266:15
**hear** 3:20 5:13,21 8:17
  101:20 181:18 233:21
**heard** 25:7 27:14,21,24
  33:21,24 93:21 95:2
  173:12 216:22 255:3
  271:9
**hearing** 69:21
**hearsay** 224:25 231:15
  236:17 238:24 244:6
  244:22 247:12
**heart** 150:3
**heat** 137:16 152:12
**hedge** 69:7
**hedged** 69:14
**hedging** 69:5
**height** 104:15
**help** 57:5 123:17
  136:19 148:12 226:7
  240:18 249:6
**helpful** 113:21 188:12
  197:5 250:19
**Henderson** 214:14,16
  235:10,19,23 236:11
  238:11 239:18
**Henry** 163:16
**he'll** 79:7 81:7,11

**high** 95:22 97:22
  139:20
**higher** 159:21
**higher-dollar** 129:9
**highest** 138:24
**highs** 49:17,20
**highway** 94:22
**hill** 152:15
**Hillside** 241:24 242:6
  242:12 256:4
**hire** 112:18
**hiring** 41:11
**historic** 49:17,19
**historical** 163:5
**historical-based**
  159:16
**history** 3:24 19:4 22:7
  23:5 69:23,25 116:6
  128:2,11,11
**hit** 49:19 112:7 228:1
**hold** 57:21 124:3
  207:24 238:13
**holding** 29:21 43:14
**holdings** 43:14,15
  46:25
**holds** 14:9 29:21
**Honestly** 53:7
**Honor** 3:3,7,10,13,14
  3:22 4:7,12 6:17 8:13
  8:14,18 14:25 18:14
  18:19,25 19:7,19,25
  20:5,14,16 21:3,6,9
  25:13 26:15 27:7
  34:25 35:15 42:15
  58:4 59:4 60:4 64:17
  64:24 65:7,13 66:18
  70:15 72:5 91:11
  92:5 100:1,12 113:14
  119:9 121:19 124:8
  126:10 136:24 157:3
  157:11 162:15,22
  178:22 185:5,22
  186:15 196:25 201:14
  220:8 223:14,14
  224:16,25 225:16,17
  225:18,23 226:11
  231:9,14 232:2,4
  233:12,25 234:1
  236:18 238:17 239:8
  240:7 243:19,20
  244:6,19 246:12
  247:8,9 248:2,20
  254:7 255:24 258:12
  258:18 263:6,22
  264:16 271:2
**HONORABLE** 1:9
**honored** 68:19
**Honor's** 71:11 255:4
**hook** 116:16
**hooking** 154:7
**hooks** 94:13,18
**hope** 156:18 158:18

  206:8,10
**hoped** 17:21 183:6
**hopefully** 93:10 148:19
  151:4
**horizon** 13:10
**horizontal** 111:18
**hoses** 128:18
**Hotel** 36:1
**Houghton** 75:7
**hour** 125:6 126:25
  157:22 230:1,9,11
**hours** 221:9
**house** 161:6
**housekeeping** 128:14
**Hub** 163:17
**hugely** 16:23
**human** 153:19
**hundred** 49:10 105:13
  123:15 125:20 175:24
  192:22
**hydropower** 78:16
**hypothetical** 142:16
**H&M** 32:9 33:5,8
  34:20 43:19 47:6,8
  69:5,19

---

**I**

**IAC** 122:16
**idea** 17:8 100:16
**identified** 26:11 47:25
  53:23 58:14 200:21
  220:14 258:11
**identify** 7:15 20:24
  55:5 185:2
**IEPA** 3:20 5:8 6:4 7:25
  14:21 16:21 17:9
  24:2,5,8 101:18 104:9
  120:23 131:3 134:13
  134:15 135:18 136:3
  137:23 150:17,20
  173:10 176:10 211:20
  213:5,14,21 214:19
  215:25 216:2,15
  218:10 220:25 224:22
  225:10 235:11,20
  240:3 241:5,15 242:2
  242:5 243:16 244:12
  245:3,6,7 247:15
  249:20,25 250:7,16
  250:25 251:6,17,20
  253:7 271:5
**ii** 202:21
**IIT** 4:24 5:2 6:3,21 9:1
  11:22,24 12:2,18 13:2
  14:7 15:2,3,25 18:2
  18:20,21 19:1 20:4
  21:12,16,18,20,24
  22:4,7,14,19,24 23:13
  23:14 24:6,7,14 33:13
  34:10 37:9,17,24,25
  39:12,22 41:9,19,23
  42:1 49:23 50:14

  53:23 54:8,18 55:1,5
  55:17 57:20,21 58:14
  60:20 62:7,18 63:14
  64:8 65:20,23 66:6,13
  82:10 84:10,23 87:19
  92:10 101:21 102:12
  103:5,6 105:5,8 111:1
  114:7 119:25 127:25
  130:20 142:9 145:11
  145:13,16,19,23
  146:4,10 147:1
  155:16 160:6 177:8
  177:22 181:3,10,16
  181:19,20 184:12
  185:17 187:7,12,19
  188:4,14,16,19,25
  189:5,14,25 190:13
  191:8,18,22 192:1,7
  192:13 193:4,13,25
  194:12,22,24,24
  195:6,15 196:2,4,8
  197:11 198:3,5,13,23
  199:2,3,7,16 200:17
  200:25 201:9,15,24
  202:12,20,23 203:1
  203:22 204:17 205:10
  205:13 206:3,6,12,16
  208:5,23 209:8
  211:17 212:23,23
  215:11,14,17,20,22
  220:15 260:25 261:14
  262:4,8,23 263:5
  267:10,12
**IIT's** 23:15,20 24:4
  149:8 185:21 194:5
  195:18 199:22 201:20
  202:19,20 204:14
  216:15
**Illinois** 1:1,5,13 3:5
  6:12 8:23 9:11,12,12
  23:19 27:14,22 33:23
  38:20 53:23 61:13
  69:22,24 74:22 75:9
  75:19 76:25 93:5
  99:10,16,21 101:7,9
  102:16 122:15 123:24
  130:2 146:16,17,17
  171:22 172:5,23
  173:4,13 174:1,5
  182:12 189:13,19
  217:12 235:24 246:22
  259:10 260:4,10,19
**imagined** 253:16
**immediate** 150:20
**impeach** 65:8,9 66:2
**impeachment** 197:1
  233:22
**impediment** 117:18
**implement** 23:11
**implication** 21:22
**implies** 153:13
**important** 63:13

**importantly** 24:1
**impose** 210:22,25
**impression** 119:5
**improper** 197:1 225:21
**improve** 261:4
**inadequate** 41:16,21
  42:2
**inadmissible** 157:13
**inauthentic** 244:16
**incident** 223:23
**incidentally** 52:23
**incinerator** 77:3,4
**inclined** 3:19
**include** 32:19 120:3
  205:8
**included** 126:14 175:1
  177:21,24
**including** 4:5 17:10
  22:2 23:22 53:5
**inclusively** 222:18
**income** 32:21 43:3
  48:16
**inconsistent** 66:3
  233:22
**incorporated** 171:25
**incorrect** 207:21
  251:11,12
**incredible** 78:14
**incurring** 196:4
**independent** 26:16
  63:21,21 143:13
**Indiana** 146:16
**indicate** 225:5 250:17
**indicated** 13:22 85:10
  98:13 112:15 118:18
  172:15 211:11
**indicates** 13:11 121:15
  258:14
**indicating** 10:4 11:4
  250:8
**indication** 93:11
  250:14,19 252:12
**indirect** 43:23 44:1,20
  46:25 48:5
**indirectly** 51:5
**individual** 7:16 162:14
  266:19
**individually** 1:14 3:8
  19:22 26:25
**individuals** 41:4,8
  181:9
**Industries** 1:17 3:11
  9:10 54:2 166:23
  272:19
**industry** 19:13 29:9
  92:23 94:3 159:4
  270:11,16
**infiltrating** 143:19
**inflate** 57:6
**inflation** 128:3 157:23
  165:10
**influenced** 25:6,10

**information** 6:15 39:9
    63:12 217:9
**informational** 124:15
**informed** 228:18
**infrastructure** 26:1
    99:2 110:6 116:13,14
    116:14 170:2 200:2
    218:4 229:16,18
**inherited** 104:21
**initial** 127:5 158:17
    167:15
**initially** 126:13 143:10
**injection** 95:10 97:23
**inoperable** 219:24
    220:2,5
**inside** 139:15,15,16
    149:6
**install** 19:16 89:25
    117:6 135:24 175:10
    199:23 213:12 237:16
    266:23
**installed** 56:8 143:5,7
    175:11 237:18
**installing** 136:1 141:10
**installs** 211:18
**instance** 17:22 81:3
**institution** 9:3
**insurance** 129:15,23,25
    130:3,15,19 266:15
**insured** 130:4,4
**intended** 37:13
**intends** 260:25
**intent** 114:15,15
    199:23 241:7,8,16
    250:8,22 252:19,22
    254:4
**intention** 186:2
**interconnect** 116:17
**interconnected** 118:11
**interest** 8:20 10:11
    13:23 14:1 20:8
    31:11 32:13,22 38:25
    41:17 43:18,19 46:25
    47:6,8,9,12 48:6,11
    48:19 52:4 97:18
    98:8,9 115:6,6 161:2
    168:24 169:11,17
    170:18,20 178:15
    197:14 205:3
**interested** 36:4 165:8
**interests** 33:4,5 205:8
**interim** 141:21 192:12
**interlocutory** 256:13
**international** 81:9
**interpretations** 87:10
**interrogatory** 7:16
**interrupt** 30:18
**interval** 204:4
**introduce** 231:23
**introduced** 225:3,5
**introduction** 225:18,20
**intrusion** 153:7

**intuitive** 78:22
**investigate** 62:9,13
**investigated** 172:18
    208:11,14
**investigation** 64:2
    207:18,24
**investment** 1:13 3:5
    8:23 27:15,22 38:20
    43:15 53:23 61:13
    69:23,24 74:22,25
    93:5 99:17,21 101:7
    102:16 130:2 174:5
    182:12 187:4
**investments** 29:22 30:2
    32:5 34:15 132:1
    133:2
**invoice** 269:19
**involve** 261:3
**involved** 20:18 22:10
    45:24 81:4,6 105:10
    113:2 259:4
**involvement** 40:20,25
    42:6
**involves** 34:6
**involving** 20:8 54:1
    69:6
**Iowa** 145:6 188:13,14
**irrelevant** 5:3 59:3,8
    71:20 72:8 232:2
**issuance** 212:25 213:1
**issue** 4:15,18 6:3 21:1
    21:18 24:2 54:1
    100:15 103:14 121:12
    130:18 133:15 134:19
    135:1,7 137:25
    138:16 140:13 143:14
    143:17 147:14,19
    150:19 152:4 153:7,8
    153:11 171:18 199:19
    205:9 215:8 222:7,10
    225:24,25 252:19,21
**issued** 99:10 103:10
    106:4,7 107:14 174:1
    212:15 214:21,23
    239:4 240:15 241:3
    245:3 251:2,5
**issues** 4:9 7:11 9:13
    10:18 17:16 23:22
    24:1,14 27:2 120:3
    134:5,23 135:16,17
    138:16 144:17,21,24
    145:5,17 146:2,11
    147:1,8,12 149:2
    150:20 151:12,16
    152:20 153:4,15,16
    174:22 188:17 190:24
    235:21 250:25
**item** 135:14 207:7,7
    252:1,1
**items** 16:18 23:9
    117:24 138:12 140:10
    264:20 266:17 271:7

**ITT** 211:19

**J**

**Jahelka** 2:6 11:8,8
    24:21 27:8,13,17,21
    44:17 57:3 60:13
    63:16 65:2,18 70:18
    207:1
**Jahelka's** 187:2,16
    207:6
**January** 9:21 21:8 65:4
    90:21 171:20 198:17
    227:17,19 229:24
    233:2 234:16,16
    237:21 268:19,19
    269:1,4,8,11,21
    270:23 272:5
**Jay** 1:14 3:7 243:12
**Jenbacher** 117:5
    158:22 211:24 260:8
    260:12
**Jenbachers** 159:7,8,9
    159:11,21
**job** 86:7 88:11 139:9
    247:22
**jog** 52:25
**jogs** 60:16
**John** 2:8 12:16 29:3
    39:11 69:25 70:2,11
    74:11,16 144:10
**Johnny** 181:7
**Johnson** 79:14,21,22
    80:16,19 181:7
**Jordan** 1:12 3:4,22 5:6
    5:20 6:25 7:1 8:13,22
    9:5 20:6,20 21:6
    24:19,20 25:13,19
    26:4,10,15 27:6,7,10
    27:18,20 31:8,9 32:2
    32:4 34:25 35:4,8,15
    35:21,25 36:5,12,15
    36:19,24 37:1,20
    42:14 49:21 55:12
    59:3,8 65:7,12,18,21
    66:17,18,21 68:20
    70:15 71:20 72:5
    74:7,8,13 83:18,20
    84:12,16,18 91:10,13
    92:4,6 99:25 100:4,8
    100:9,19,22 101:1,2
    101:25 102:2,3
    113:13,19,25 114:1,4
    114:9 119:6,9,11
    121:12,14,19,22,24
    124:5 126:9,13,16
    136:24 137:1 150:11
    157:2,5,19 162:15,17
    162:21,23 163:2,3
    178:21 183:5 185:22
    185:25 188:3 190:23
    196:25 197:16,19,21
    201:23,25 202:3

209:17,19,25 210:6
    210:13,15,24 211:3,7
    211:10 224:24 225:17
    231:14,18 232:1
    233:16 236:17 238:17
    238:22,24 239:1,8
    240:7 243:20,24
    244:6,18,22 245:24
    247:9,12,18,21
    258:12 259:4 262:3
    263:1 264:20 271:1,2
    271:4 273:19
**Judge** 21:1 53:1
**judge's** 35:12
**judgment** 256:15,16,18
**July** 220:5 221:16
    227:7
**jump** 148:17
**jumper** 149:17,18,20
    149:21 150:23
**June** 232:11 233:7
    234:17
**J-a-h-e-l-k-a** 27:19

**K**

**Kansas** 146:14
**keep** 103:9 107:18
    167:5 194:10 223:4
**keeping** 4:18
**kept** 246:7
**Kewanee** 146:6,7
    189:19
**kilowatt** 125:6 126:25
    157:22 159:9
**kind** 12:12 34:25 48:3
    84:16 86:13 100:19
    100:23 116:3 133:7
    135:5 140:13 143:17
    217:25 271:25
**kinds** 18:1
**Kiwanis** 182:17
**knew** 61:14,16
**know** 7:4,22 12:11
    14:17 17:14 26:4,22
    29:2 34:18 49:18
    59:19,21 62:8 64:21
    67:9 69:12 71:21
    73:22 82:8 85:7 88:9
    88:10 95:12 96:24
    98:11,14,21 99:5
    101:16 104:7 109:11
    110:25 113:16 116:4
    117:21 120:17 123:19
    125:11,16,19,22
    128:16 132:6,19,23
    134:15,18,21 135:5
    135:13,14 136:2
    137:11,18 138:7,15
    138:22,25 139:20
    140:15 141:8,15
    142:12,15 147:16
    148:2,18 149:6,18

152:6,23,24 153:13
    153:19 154:4 155:20
    158:16 159:5,6,7,8,13
    160:18 161:5 162:2
    162:13 163:25 165:9
    167:18 168:18 169:25
    170:22 171:5,20
    172:3,6 173:3 174:2
    176:10 180:19 183:15
    184:5,6 185:14 187:3
    193:2,16 196:13
    201:9 203:7,12,14
    206:13 207:22 208:15
    212:15,16 213:7,20
    214:25 215:14 216:9
    217:2,3 220:2 221:23
    222:18 224:13 226:19
    226:23 228:2 230:15
    230:22 232:14 238:18
    239:20,21 240:2,6,16
    240:21,22,23 241:2
    242:9 243:4,14,17
    245:24 246:2,4,5,9,10
    250:12 255:15 257:12
    257:16 258:22 265:5
    266:20,22 267:1
    269:2 272:10 273:3
**knowing** 165:8 207:22
    245:10
**knowledge** 7:16 62:11
    92:22 180:23 187:7
    187:11 216:23 234:24
    253:24
**known** 61:18 199:24
    207:1,3 223:23
**knows** 14:25 158:6
**Kujaca** 1:18 3:14,15
    5:23,25 6:10 21:5,9
    24:17 25:17 26:8,13
    26:19,24 27:5 64:18
    65:1 66:4,16 264:14
    264:16,18 270:25

**L**

**Laboratory** 76:22,25
**lack** 133:4 264:24
    265:6
**lacked** 17:3
**laid** 39:19 245:1,21
**lakes** 143:18
**land** 85:7 151:8
**landfill** 4:14,15,17 5:12
    5:16 9:9 13:24 14:1
    22:13,20 23:4 24:2
    29:7 55:2,24 58:15
    59:1 61:14 63:17
    64:6 76:13,15,19
    77:12,22 79:5 91:5
    94:8 95:8 96:3 104:7
    104:13,14,16 120:4
    128:15 134:12 139:1
    139:5,15 140:16,24

143:6,18,21 148:21
149:4 151:9,19,22
152:6 156:16,17,18
157:24 164:13 174:20
181:25 182:1 187:8
187:20,24 188:4
211:19 217:16,17,20
222:9,10,13 223:2
224:23 226:4 228:22
229:21 230:20 240:11
241:24 242:13,16
246:17,19,19,22
248:13 249:12 253:2
253:7 254:16,20,22
256:5 257:5,22
259:25 261:18 263:25
264:8 265:9,10
266:20 268:15 271:7
**landfills** 7:12 9:11 19:5
20:2 21:24 22:23
33:22 34:1,7,8 55:7
81:2 87:4 94:23
198:5 254:12
**language** 201:3 203:4,6
**Lansing** 76:2 145:22
146:2 189:13 191:5
**large** 85:8 119:23
163:25
**largely** 109:13 129:4
153:5,12
**larger** 86:8
**late** 51:24 78:9 167:19
167:19 227:13
**lateral** 141:10 148:16
**laterals** 94:14 175:13
**LAW** 60:6
**lawsuit** 259:13,19,22
260:5,8,12,19
**lawyer** 59:20 180:10,20
203:4
**lawyers** 172:23
**lay** 66:1
**leachate** 120:9,9 137:9
139:12,14 143:19
149:25
**lead** 80:10
**leading** 197:24
**learned** 34:2 187:16
**lease** 6:1 21:14
**leave** 25:3 59:14 167:13
274:2
**leaving** 32:15
**left** 113:16 162:22
169:3 170:20
**legal** 22:8 72:24 241:6
241:8,8,16 250:9,22
252:12,19,22 254:4
**lend** 37:12
**lender** 40:24 65:22
160:9,21 168:22,23
169:17 209:7
**lenders** 161:10

**length** 52:4
**Leon** 28:20 50:25 51:3
**letter** 202:22 217:4
250:1,7,14
**letterhead** 245:6,14
**let's** 36:12 43:22 48:13
52:5 94:4 103:21
109:25 133:9,11
184:22 201:11 223:13
231:5 236:16 243:18
247:7,13 248:19
256:11
**level** 76:12 123:22,23
139:21 222:5
**levels** 75:18,21 139:15
139:16 143:20 221:19
222:4
**LFG** 262:6
**LFR** 81:9 84:11 85:1
86:7
**liabilities** 34:15,18 66:6
**liability** 129:24
**liable** 260:3
**Liberty** 15:22
**licenses** 238:13
**lie** 129:4
**lieu** 211:24
**life** 70:12 93:18 162:2
**liked** 17:5
**likelihood** 63:10 186:2
**limine** 3:19 4:13 8:6
**limit** 36:11,12
**limited** 31:15 85:14
134:3 140:22 142:3,3
**limits** 103:9
**Linchfield** 7:12
**Linda** 1:18 3:15
**line** 13:15,16 17:7
34:20 37:14,15 40:6
67:1 109:17 112:9,13
117:25 120:7,25
125:25 128:19 135:19
148:16 156:4 161:18
167:4 169:19 170:12
174:25 175:2 177:13
204:18 216:10 228:1
234:18 250:10 271:15
**lines** 98:13 114:25
149:17,18,20,21
150:23
**lion's** 85:19 147:13
**liquid** 47:21,22 48:1,5
48:6
**liquidation** 67:15
**list** 7:8,9 21:2 83:25
**Litchfield** 9:11,19,24
11:12 12:7,14 13:1
20:8 21:7 33:22 55:7
62:14 92:15,19 96:19
97:13,14 102:25
103:3 108:12,13
109:9 111:13 144:21

154:21 155:23,24
156:1 162:19,24
165:19,23 166:2
169:24 170:17,24
178:1,14 200:8
204:20 260:25 262:12
**literally** 143:17 151:21
**litigation** 20:19 45:22
45:24 46:3,9 50:6
67:6 70:19,23,24 71:6
71:15,17
**little** 22:15 53:1 68:25
86:8 127:18 201:4
204:6
**living** 16:25
**Livingston** 4:14,16
**LLC** 32:9 33:4,5,6
47:10,11,13,15 68:9
**load** 159:7
**loan** 21:20 22:4 29:24
29:25 30:24 33:12
34:10,12,13 36:6,15
37:11 38:16 39:7,8
40:13 42:8 49:23
50:1,4 63:14 64:9
70:13 118:1 136:15
160:12,16,20 161:2
168:25 169:2 170:22
171:10,11,13,15
191:21,24 192:7
193:24 194:2 195:22
195:24 196:1,6,12
204:23,25 205:2,13
205:21 206:3,17
208:6,21,22 209:10
209:13 210:18 211:3
267:14
**loaned** 11:6
**loans** 29:23 34:19
43:20
**local** 79:25 96:10
**localized** 137:8 228:1
**located** 31:13 43:24
61:20
**locations** 62:21 139:2
**lock** 69:11
**locks** 69:9
**long** 13:11 14:4 46:12
61:18 74:24 80:14
84:5 87:14 88:5 93:2
93:8,10 105:16 108:6
159:10 190:17 207:4
233:20 268:24
**longer** 25:9 93:16
146:23 229:12 230:1
230:8
**longest** 13:10
**long-standing** 263:15
**long-term** 34:17 69:9
93:14 147:20
**look** 34:23 35:1 36:17
36:19 44:13 57:9

87:16 91:11 113:15
113:18,21 114:3,5,6
124:1 133:7,9 134:20
157:2,6 162:4,8,15
184:7,22 185:15
186:6 201:11 202:5
203:5 204:7 205:16
207:8,13 208:21
213:16 221:21,23
222:16 223:13 224:15
225:13 231:5 232:5
233:9 236:16 238:6,8
239:21 240:4 242:8
243:18 247:7 248:19
249:21,22 252:17,24
253:13 256:11 259:2
260:16 263:1
**looked** 5:1 98:19
157:23 160:5 164:9
172:6 195:25 200:21
210:16 235:7 258:20
268:22 269:2
**looking** 15:4 79:19
99:25 100:5 115:15
117:20 120:3,12
121:1,5 124:10,18
165:3 205:6 210:11
222:7 242:14 250:10
260:22
**looks** 121:6 156:8
223:22
**loop** 70:25 71:1,4,19,21
72:17 73:16,23 175:6
175:13,21,22,25
**loosely** 106:14 175:11
**lose** 167:1
**lost** 100:2 113:17
**lot** 10:17 17:3,24 78:6
93:16 96:11 123:21
168:3 207:2,23 223:3
266:21 273:11
**low** 23:16 95:22
**lower** 161:6
**Lozier** 82:22 91:15,21
91:22 92:11 128:12
128:12 262:22
**LRF** 108:19
**lubricants** 92:1
**luck** 12:13
**LW** 222:12

---

**M**

**mail** 121:5,7
**mailing** 121:16
**maintain** 23:15
**maintained** 245:2
**maintains** 62:5
**maintenance** 79:10
80:4 81:15,15 88:19
127:18 128:10,19
129:21 133:19 138:24
159:20 191:15 266:25

**major** 46:24 105:21
200:2
**making** 39:15 81:25
88:21 95:8,11,12
111:7 132:2 267:17
**man** 51:24 161:7
**manage** 70:1 76:18
153:10
**managed** 78:2
**management** 22:20
76:8,9 77:7,16 144:10
**manager** 6:11 76:14,17
76:22 78:13,14,24
79:15
**managing** 16:8
**manifolds** 89:1
**manner** 136:4
**manufacturing** 95:13
96:11
**March** 53:1 127:11
148:19
**margin** 89:7 119:23
**market** 69:1 73:22
**marketable** 47:22
**marketing** 96:10
**marshal** 33:11
**mass** 149:7
**master** 84:10
**Master's** 75:18,21
123:22,22
**matched** 143:12
**materials** 274:1
**matter** 12:13 19:7 34:6
197:15 213:21 225:4
231:19,23 232:2
239:2 254:5
**matters** 3:18 4:6 72:6
123:17 225:20 241:6
**MB** 192:19
**MBA** 75:8
**McCook** 117:6 133:14
133:15 134:5 135:17
142:20 253:1 257:5
259:24
**McDonald** 228:20
272:13,20
**McLean** 156:16
**mean** 47:17 48:2 72:4
79:1 86:5 88:12 95:9
95:11,11 104:19
110:4 120:5 122:5
132:7 140:15 142:7
151:23 152:7 153:14
153:17,22 162:11
167:21 171:14 175:24
183:15,16,19 184:10
187:22,24 191:23
209:9 215:3 218:14
218:19 225:6,7,19
228:18 241:12
**meaning** 48:4
**means** 87:4 104:16,18

152:14 215:2 254:5
**meant** 228:23
**measured** 139:17
**mechanical** 75:6 228:6
**mechanism** 160:23
**medium** 13:14 96:10
**medium-sized** 15:24
**meet** 261:24
**meeting** 17:11 41:19
42:1 251:6
**meetings** 17:11
**membership** 33:3 47:6
**memorialized** 58:16
**memory** 52:25 249:23
**Menomonee** 76:19
**mention** 80:14
**mentioned** 28:8 32:6
34:16 80:23 83:1
147:5 194:23 262:5
267:5
**mercantile** 163:22,25
**merely** 69:20 184:18
**met** 41:16
**methane** 94:10 221:19
222:4,22
**methodology** 159:17,18
163:6,8 165:15,22
**Michael** 80:3
**Michigan** 75:6,7 76:2
**mid** 78:9 218:15
**middle** 221:10 223:21
**midst** 113:17
**Mike** 130:25 181:7
266:4,8
**million** 11:9 17:6 21:20
21:22 30:6,8,22 31:2
31:4,18,19,22 32:14
37:10,12 39:21 40:5
40:14,17,19 41:14,18
41:20 42:2 44:9,9,25
45:3 48:17 66:7,10,12
66:15 68:14,23 69:16
73:23 97:11 115:9,11
117:25 118:8 164:6
167:6,8,10 168:9,19
169:3 170:1,3,4,5,7
170:13,23 171:1,4,6
171:11,14 177:18
178:6,7,13 204:18
206:25 207:20 221:20
222:5 223:2 260:11
260:20
**million-three-sevent...**
115:14
**million-two-fifty** 11:11
38:6 168:15
**mind** 40:16,18 103:9
107:18
**minimal** 28:5 152:2
**minor** 20:5 105:21
**minus** 125:19,19,24
**minute** 118:15

**missed** 32:2
**misspoke** 20:7
**mistaken** 68:14 108:3
**mistakes** 153:20
**MMBTU** 164:4,5,8
**Mobile** 261:10,18
**mod** 215:16
**models** 143:12
**modification** 99:19
150:22 215:24 272:2
**modifications** 177:1
**modified** 126:5
**monetary** 17:3 21:14
23:9 260:2
**money** 10:9 12:4 17:19
38:2 55:20 63:14
68:18 69:17,19
132:13,16 133:1,5,20
133:22 135:7 136:14
138:8,9 140:3 141:14
141:19,22 142:12,14
142:17 144:3,13
148:3 154:3 168:3
170:20 177:14 192:13
193:20 196:6 208:6
**monies** 15:13,14 17:21
18:1 66:12,14 176:12
177:16
**monitor** 134:20
**monitoring** 80:13 85:6
85:14 87:4,5 128:22
128:24 191:15 220:24
221:4,7
**month** 32:15,17 49:19
128:3,5,16,23 161:8,9
161:15 182:8 227:20
267:17 269:4,7,22
273:3
**monthly** 17:11 87:9
88:18,22 128:24
**months** 10:15 32:11
49:20 106:10 109:5,5
125:2,3 126:21,22
127:13,15 131:22
158:19 222:21 223:8
268:5 271:19
**morning** 3:3,6,10,14
60:16 268:6 273:25
**mortgage** 160:14 161:5
192:2
**mortgages** 30:14 31:2
**motion** 3:20 4:13 5:17
5:18,19 6:14 8:6
20:10,12 53:25 274:2
**motions** 3:19
**motivation** 17:19 18:4
**motor** 129:8
**Motors** 75:12 76:1
212:17
**mounting** 120:9
**move** 14:14,14 15:15
15:19 17:8 116:20

119:10 136:4 185:4
226:10 246:13 271:19
**moved** 76:16 118:10
**moves** 131:24
**moving** 18:20 139:1
**mowing** 127:22,24
128:1
**Muir** 16:5,7 81:17,19
81:20,21 82:1 90:15
265:15 266:10,16
267:3
**Muir's** 129:13
**multiple** 112:19 134:12
156:8 158:22
**multiply** 158:21,23,24
158:24
**municipal** 94:9

**N**

N 2:2
**name** 27:11,17 74:14
74:15 130:3 199:11
199:12 266:2,7
**named** 29:18 39:4
**names** 199:14
**naming** 61:15
**natural** 47:1 49:4,9,11
95:10 124:16 163:9
163:17
**nature** 22:3 29:19
38:14 226:14 247:15
**near** 24:9 209:6
**nearby** 15:11
**necessary** 19:18 20:23
21:13 203:22 204:11
261:24
**need** 3:18 9:24 10:9
11:2 12:22 13:8
14:18 15:17,17 16:16
35:1,21,23 36:20 38:6
50:8 65:9 66:1 68:7
91:10 92:1 147:15,18
174:21 177:16 194:9
196:13 211:20,23,23
212:1,3,6,7 215:25
226:7,20 233:22
244:25 264:20 266:21
273:25
**needed** 10:21,21 39:20
103:6 108:7 133:16
170:24 212:12
**needs** 16:18 37:25
114:12 149:5
**negotiate** 205:21
**negotiating** 45:2 68:21
**negotiation** 33:15
**negotiations** 31:3
**Nelson** 83:3 92:9
**net** 30:11,13 160:1
209:8
**Nevada** 116:1
**never** 9:25 19:8 20:22

21:1 71:4 72:18,21
138:9 152:21 188:16
189:2,11,12,21 190:8
190:9,13,25 213:17
228:12,15 229:9
230:12
**new** 14:19 18:3 34:25
35:17 56:8 60:2
79:19 81:23 86:1,2
89:25 91:24 103:1
104:2,4 108:25
117:17 145:8 146:15
163:22 170:3 188:24
190:7,15,18,20
206:15 243:2 269:15
271:11,13
**newbies** 93:2
**Newbold** 172:25
**newer** 110:23
**nice** 48:11
**Nickels** 38:22 52:22
54:14 56:20
**Nicor** 13:16,18 156:20
**Nineteen** 95:18
**Ninety** 105:25,25
**Ninety-six** 270:6,7
**nitrogen** 242:15
**nominal** 164:12
**nominally** 164:21
**nominee** 4:24 5:2
**nonappealable** 115:8
**noncompliance** 3:25
20:1 22:12
**nondebtor** 179:19,23
180:1,5,16,22,25
181:24 182:5,11
194:16,18 195:3,4,6
195:11 196:16,19
**nonexpert** 157:13
**nonIIT** 8:10
**nonmonetary** 21:14
23:9,12
**nonpeak** 125:4
**nonsummer** 125:2
**normal** 129:10 131:2
266:25
**normally** 150:7 217:3
**Northern** 1:1 75:9,19
123:24
**note** 4:12 7:2 36:6,20
36:25 37:2,7,9,13,18
37:22 39:7 40:12
63:11 118:1 126:4
160:17 196:1 210:16
210:17,21,22,24
211:1 225:7 248:1,17
257:1
**notes** 43:20
**notice** 97:15 99:20
109:3 114:14 117:22
145:17 196:1 210:16
174:2 190:24 196:11

202:19 225:5 226:3
231:22 234:18,18
241:5,7,8,16 248:5
250:8,20,21,25 251:7
252:19,21 253:9,24
254:3
**notices** 16:20 142:23
173:9 241:15 247:16
**notification** 137:23
**notwithstanding** 20:21
**NOV** 137:24 224:21
226:23 231:1 232:10
232:15 233:5,7
234:17,20 235:5
236:12,23,25 238:4
239:5,12 240:6 242:5
242:9,23 248:22
249:10,17
**November** 47:18 81:22
**NOVs** 142:23 188:16
189:22 224:10 231:3
235:23 241:3,20
247:2 248:12
**nozzle** 137:12
**NSPS** 109:1 134:10,21
134:24,25 135:3
**number** 53:4 72:7 96:5
107:2 116:18 125:15
129:20 131:19 158:17
158:20 159:20 160:10
160:17 161:24 162:12
164:3 172:22,24
201:18,21 221:9
223:15,22 234:20
237:8 256:16 258:8
270:17
**numbers** 39:17 40:1,2
40:3 49:14 90:8,19
125:11 127:22 131:14
131:17,21 159:17
164:17,18 174:24
176:1 178:17 201:17
**numeral** 221:9
**NYMEX** 163:9,16,20
163:21 165:20
**NYNEX** 124:16

**O**

**object** 100:12 157:12
185:25 225:18 231:14
236:17 238:17 240:7
243:20 244:18 258:13
**objected** 11:22 35:9
244:16 253:21
**objection** 59:3 71:20
72:5 100:17 196:25
224:24 231:24 238:21
243:23,25 244:21,22
244:23 245:5 247:14
258:12
**objections** 239:8 247:9
247:17

**obligate** 262:23
**obligated** 96:25 97:6 195:18 262:11,16,17
**obligation** 37:10,12 96:18 97:5 210:22 211:1
**obligations** 34:21 37:5 96:24 122:22 205:13 256:8
**obtain** 18:7 23:20 62:19 99:17 203:22
**obtained** 18:9 75:5,11 118:21 204:11
**obtaining** 113:2,3 184:12
**obvious** 22:15
**obviously** 13:3 114:23 129:16 132:22 137:17 169:11 178:5
**occur** 81:19
**occurred** 137:9
**occurs** 148:10
**October** 47:18 120:22 121:6,9,23 122:2,3
**offensively** 258:16
**offer** 4:9,10 7:10 67:23 67:25
**offered** 11:5 45:9 67:21
**offering** 231:18
**office** 61:25 62:5
**officer** 51:19,20 157:16
**offices** 22:18
**Oh** 32:2 83:23 103:2 107:13 117:23,25 125:17 126:19 130:9 136:19 151:20 164:18 165:12 168:13 171:23 175:2 186:14,16 197:16 198:21 218:24 244:6 246:20
**Ohio** 146:15 264:7,9
**oil** 29:22 32:5,8,9 33:6 33:9 34:20 43:19 47:1,6,8 48:6 49:4,9 49:11,16,19 68:25 69:4,7 82:17,19,19,22 82:23 83:3,4,22 84:3 84:6 88:19 91:15,21 91:23,24,25 92:2,9,11 92:12,18 262:22
**okay** 3:17 5:19 8:2,11 18:15 24:16 27:3 28:8,13,18,21,24 29:1 29:13,19 30:1,11,15 31:7,20,24 32:24 33:14,21,25 34:14,23 35:3,25 36:8,13,22,24 37:5 38:2,9,14,18 39:6,23 40:5,15,20 41:3,14 42:5,16 43:12 43:22 47:4 48:21 50:17 51:16,23 55:14 56:1,16 57:21 60:8 61:6,7 63:12 66:16 67:4,19,21 68:2,24 69:15,22 70:3,11 71:7 73:5,24 74:21,24 75:2 75:14,22 78:1,5 79:8 79:12 80:2,14,21,24 81:24 82:11 83:7,13 83:14 84:5,9,23 85:20 86:3,12,15,19 87:1,13 87:16,22,25 88:2,5,16 89:2,8,14 90:4,7,12 90:20 91:3,10 92:13 92:22 93:4,11,21 94:4 95:2,19,25 96:17 97:4 97:19,25 99:4,11,15 99:22,25 100:25 101:1,8,10,16,20,25 102:8,10,14,21 103:2 103:17 104:24 105:7 105:14,16 106:1,12 106:18,23 107:1,5,8 108:2,10 109:16,19 110:1,3 111:4,5,10,15 111:21 112:12,15 113:1,6,10,13 114:17 114:23 115:2 116:3 116:10,18 117:14,20 118:3,5,13 119:4 120:14,17 121:1,4,23 122:19,25 123:5,8,14 123:16 124:1,12 125:25 127:17 129:3 129:22 130:7,10,21 131:4,9,13,17,25 132:19 133:4,10,13 133:22 134:4 135:2,8 135:21 136:11 138:10 140:9,12,14 142:22 144:16,23 145:1,8,11 145:22 146:6,22 147:11 149:1,17 150:6,17 151:10 152:3,23 155:14,19 155:22 156:10 157:2 157:6 158:5,14 159:10,13,24 160:1 160:23 161:5,12,15 161:20,23 163:2,11 163:24 164:3,7,12 166:12,24 167:3,12 168:4,8,14 169:23 170:14 171:18,23 172:2,5,13 173:6,15 173:20,23,25 174:9 174:12 175:9,20 176:2,9,19 177:7,19 178:1 179:13,18,21 179:25 180:7,11 181:9,23 182:5,10,22 183:12 184:3,16,22 185:17 186:16,18 187:11 188:2,8,16 189:2,13,19,21,25 190:17,22 191:4,18 191:21 193:23 196:10 196:22 199:1,7 200:10,13,20,24 201:12,20,24 202:1,8 204:9 206:6,23 209:4 209:18 210:5,21 211:13,14 212:8 214:6,12 215:6 216:2 217:22 218:7 219:8 219:18,23 220:12 222:1,25 223:20 224:8,13 226:18 227:6,15,17,22 228:12 229:11 231:13 231:17 232:6,14,19 233:24 234:12 235:5 235:19 236:11,21 239:7,10,16 240:2,25 241:11,23 242:8,20 242:25 243:9 244:10 245:12 246:24 247:2 248:4,5,10 249:9 250:18,23 251:14 252:9,21 253:6,9,19 254:2 256:7,17 258:25 259:7 261:3,6 261:11,14 262:2 265:25 266:13 267:16 272:5 273:11,21
**old** 4:8 30:3,22 248:1
**once** 10:14 14:10 16:14 25:8 89:19 103:10 106:1,6 107:14 110:25 151:2 152:23 202:7 231:21 252:5
**ones** 47:25 68:6 78:7 114:23 138:6 195:25
**ongoing** 19:8 45:21 84:8 153:11 154:9
**online** 10:16 11:3 39:17 41:22,24 88:24 89:4,7 89:11,16 90:3,25 98:16 99:3 108:11 119:20,25 122:20 127:12 133:16 147:15 148:4,7 174:16,19 265:8,14 266:22 267:3 268:24 269:2,6 271:16 273:2
**on-site** 81:24 82:3 90:16 97:21 98:10,24
**open** 139:1 140:16 192:21 227:1 240:6
**opened** 192:19
**opening** 8:17,20
**operate** 10:25 14:22 18:4 20:3 21:25 23:21 41:5,9 62:20 99:5 101:21 106:9,16 107:15,21,24 108:3,6 117:15 122:22 133:6 137:13 145:9,23 146:18,19 187:1 188:19 189:5,8,16,25 201:1 204:4 211:20 212:2,16 213:4,13 221:18 222:3 242:1 246:16,19,24 252:25 253:6 254:11 257:21
**operated** 132:24 145:2 145:3,23 146:7,18 147:6 187:7 190:13 190:17 217:16 219:14 219:16,17,20 241:23 246:18,20 261:6,11 261:14
**operates** 5:11 32:8 47:1 145:11,13 188:4,14 188:25 189:14
**operating** 11:19 13:20 16:5 17:4 22:7,9 42:24 69:23,24 107:12,17 120:22 131:11,21 132:20 135:10 152:2,22 157:15 158:12,13 159:6 168:19 169:7,9 169:9,15 170:8 177:22,24 181:25 187:19 191:8,9,13 193:5,9,13,19,25 194:20 195:18 196:4 204:3 209:8 212:20 213:2,3,20 214:1 218:20 221:9 227:10 229:25 237:16,21 242:17
**operation** 12:24 42:7 48:6 64:5 79:10 90:19 126:22 154:13 158:19 194:5 226:4 240:15 242:5,11 247:3 249:11 253:10 259:23 264:3 267:1
**operational** 18:22 90:17 154:7 228:9
**operations** 9:25 10:1 12:23 16:3 19:4,5,9 22:10,17 29:10,23 32:10 34:21 40:21,25 42:12 55:17 77:21,22 78:13,24 79:5 90:16 182:5 194:3,4 198:4 204:19 224:22
**operator** 151:9
**opine** 255:3
**opinion** 72:24 92:23 140:1 157:13
**opportunity** 67:21
**opposed** 130:4 144:2 147:23 163:13 175:6 175:13
**option** 156:15 208:11
**options** 69:6 251:20,21
**oral** 195:8
**order** 9:22 11:25 12:11 33:12 38:7 41:25 50:3 69:7,15 115:8 139:22,25 141:8 150:8 155:16,17,17 168:6 190:21 195:1 198:24 217:3 237:19 238:10,12 256:13,15 256:16 268:7 269:15 272:24
**ordinary** 33:3 43:8 47:7 245:3
**original** 28:2 121:6,20
**originally** 28:3
**Orleans** 145:8 188:24
**Ottawa** 102:4 216:17
**ought** 201:18
**outcome** 69:20
**outline** 220:17 252:3
**Output** 90:19
**outside** 22:19 80:24 104:18 140:15 144:18 217:13
**outstanding** 30:24 168:25 169:12 232:22 234:24 235:5 240:15 240:17 253:25 254:5
**outweigh** 23:13
**out-of-pocket** 176:12
**overall** 77:23 79:9 167:3 269:4
**overcome** 19:10,14
**overgirth** 104:10,18 152:25
**overhead** 272:25
**overheight** 14:13,15 15:2,7 104:10,11,12 104:16 140:23,24 141:3,5,9 151:16,18 151:21 152:24 237:25 249:14,16
**overrule** 247:16
**overruled** 59:7 100:18 157:14 186:5 197:3 238:23,25 243:25
**oversaw** 77:13,21
**oversee** 29:10 77:22 238:12
**oversees** 79:4
**oversized** 143:11
**owned** 29:6 30:4,17 31:14 39:2 43:17,18 43:19 47:23 52:13 253:4
**owner** 38:25 43:23 44:1 44:21 46:8,21 50:25 51:20,21 52:10 134:12 139:5 140:25

151:9 222:9
**owners** 254:17
**ownership** 31:25 46:25
48:5 52:4 82:8
101:22 102:14
**owns** 30:3 31:15 33:3,4
34:12 46:8 47:1,5,7
51:3 52:20
**oxidation** 137:8 152:13
**oxygen** 137:16 152:11
152:12,17 153:7
**O&M** 128:16 129:10
154:9
**o'clock** 60:3
**O'Meara** 1:16 3:12,12
5:24 6:17 8:15
100:12 157:11 171:21
179:2,6 183:16 185:4
185:6,18,19,23 186:7
186:10,13,19 197:10
198:2 201:13,16,20
202:4 203:19 209:15
209:18,21 210:2,5,7
211:13,16 220:8,12
220:16,19 223:13,16
224:15,17 225:9,15
225:23 226:10,18,22
231:5,8,12 232:9
233:12,24 234:13
236:16,22 239:3,11
240:25 241:1 243:18
244:1,10,11 245:4,9
245:12,16 246:3,12
246:15 247:7,23
248:19,21 250:23,24
253:13,19 254:2,6,8
255:23 256:1 258:17
258:25 259:7,8
263:21 271:25

**P**

**page** 60:21,22 84:13,15
84:17 86:13 100:6
114:6 121:4 186:8
202:3,7 210:18,20,20
211:12,12 221:8,23
223:15,15,22 225:16
225:16 234:2,6,15
235:4 256:14
**pages** 100:21 256:13
**paid** 11:12,13,17 30:7
32:21 38:6 73:23
129:13 160:20 161:3
161:4,13 163:13,13
163:15 168:24 169:18
171:15 261:21 266:10
267:21 268:10,14
**PanAmericano** 53:5
**paper** 113:21 155:19
245:15 263:8,9,14
**paragraph** 60:22,23
186:7 202:6,18

221:25 222:17
**parallel** 154:13
**parameters** 12:10
221:7
**parasitic** 158:24 159:2
159:6
**part** 9:6 28:6 39:6 49:4
49:8 54:5 102:5
114:2 146:25 153:19
173:15 184:14 200:16
200:24 201:6 234:9
237:4 241:18
**particular** 5:16 84:14
107:20 114:2 157:18
165:19 233:6,8
**parties** 8:10 9:14 18:3
23:8,10 102:13
149:10 199:14 258:14
**Partners** 31:15
**partnership** 30:3 31:3
31:15,16 34:18 43:17
46:2 47:10
**parts** 89:24,25 221:20
222:4 223:1 266:21
**party** 8:19 16:7 18:20
24:22 34:5 46:9
53:15 59:16 63:21
65:10,11,13,15 70:9
71:1 84:24 88:15
91:16,18,19 92:8
102:14 197:14 233:17
233:19 238:7,8,11
**pass** 42:14 135:10
178:21 263:22
**passage** 185:2
**passed** 135:6,12
**pay** 10:10 13:2 15:13
15:14 18:1 37:10
67:2 97:5 98:7 118:5
119:16 127:25 154:4
154:6,9 160:21 161:8
161:9,16 169:11,18
169:25 170:18,21
171:5,13 172:20
173:2,16 174:6,7
**paying** 156:12 160:12
160:16,24 169:1
193:5 194:12,18,22
194:25 195:3,16
203:20 268:2
**payment** 66:23 67:2
115:12 118:8 125:13
142:2 160:6,9 170:25
211:2 268:4
**payments** 37:17,25
38:3,11,13 210:23
**payor** 211:1
**payroll** 129:14 173:4
194:24
**PCB** 77:4
**PDF** 124:23
**peak** 125:3

**pending** 14:23 31:5
70:18 106:17 107:22
107:23,25 226:2
245:20 259:13,15,19
260:9
**Pennsylvania** 146:15
**people** 4:5 5:7 17:4
18:5 22:3,6,25 78:2,5
80:25 81:1 153:19
194:8 263:16 267:5
**Peoria** 1:18 3:16 4:10
6:1,2 9:8 11:18,22,24
15:21,23 16:12 17:10
17:16 21:12,17 22:13
23:3,17 24:11,15
25:15,18,20,21 26:2
26:14,18,21 27:1
33:23 38:1 66:22
81:15,24 82:23 87:24
88:1 89:12,13 91:24
92:16 102:25 103:18
118:12,13 119:12
120:1,19 121:8 122:2
122:20 123:1 126:3
127:3,25 129:25
131:5,15 136:18
142:24 147:11 149:2
150:21,25 154:18,23
154:25 155:2 157:24
159:15 162:1 167:11
168:1 169:9,16 170:9
170:17 174:14 175:16
176:9,17 177:9,22
182:1,6 200:10
204:20 264:21 266:11
266:17 267:16 268:15
268:18 269:21,25
**Peoria's** 23:11 149:9
**perceive** 231:20
**percent** 30:4,8 31:16
33:19 44:21 49:10
52:13 112:21,24
125:19,20,24 128:8
131:24 140:23 160:6
160:9,10 165:12
269:3,5,6 270:6,7,10
270:11,15,16,18
**percentage** 31:24 149:7
160:17 209:7 270:4
**percentages** 191:25
**perfect** 153:20
**perforations** 144:1
**perform** 12:2 18:23
19:24 39:14 55:20
64:8,10 68:16 86:10
99:18
**performance** 4:2 6:6
18:7,9 21:17 24:7,10
24:15 97:9,23 111:8
112:16,17,21 113:3,6
115:13 120:14 134:25
200:25 201:5,8

202:13,16,22 203:2
203:21
**performed** 15:4
**performing** 62:10,13
66:13
**period** 63:7 108:5
141:24 168:20 192:12
217:13 219:2,3 221:5
268:23 270:24
**periodic** 80:12
**periodically** 46:19
**periods** 219:24
**permanently** 230:19
**permit** 6:4 9:24 10:5,13
10:20,21,24,25 12:22
14:9,19,20,21,22,23
15:16,17 16:2,2 23:19
23:21,22 24:3,4,8
62:19,19 87:6,8,8
99:4,6,9,10,12,13,15
99:17,19,20,21,23
101:14,15,17,23
102:4 103:9,12,15,21
103:23 105:4,9,17,24
106:2,5,13,15,16,16
106:17,20,21 107:10
107:13,14,17,18,19
107:21,25 108:24
109:24 110:4 120:18
120:18,20,23 121:7
121:25 122:13 131:3
150:22 174:4 176:10
204:1,2,3 211:17,20
211:22,24 212:2,8,14
212:15,20,21,21,22
213:1,2,3,5,10,14,19
213:20,22,25 214:1,3
214:8 215:3,10,16,17
215:23 216:25 218:13
218:17,20,21,25
221:6 229:25 230:3,6
230:7,13 232:17
242:1 246:24 253:6
271:8,11,13,20,21
272:1,1
**permits** 5:21 6:11,20
7:22 16:17 100:17
103:1,4,10 105:3
106:23 107:23 108:18
117:17 118:22 119:1
130:22 131:2 151:8
203:23 204:11,14
213:22 216:16 238:13
**permitted** 104:13
218:10,15
**permitting** 6:2,13
10:18 77:10,24 85:5,8
108:15 109:20 112:4
121:1 169:8 235:21
**person** 80:11 175:15
251:1,4,4
**personally** 216:5 236:2

259:11
**personnel** 18:2 41:11
56:1
**persons** 19:15 22:9,11
**perspective** 151:7
216:19
**Peter** 1:12 3:4
**phase** 193:15 194:7
**Phil** 80:7 181:7
**Philipini** 130:15
**Philman** 130:15
**phone** 249:4
**photo** 58:3
**pick** 126:7 159:3
**picked** 76:18,19,24
77:11
**picture** 143:5
**piece** 44:2 115:15
185:16
**pieces** 43:18
**pierce** 70:25
**piercing** 70:19
**pipe** 148:24 149:24
150:7,8 228:23
**pipeline** 12:9 15:11
95:9,10 154:17,21
156:2,22 200:6 261:1
261:7,19,25
**pipelines** 15:10
**pipes** 141:10,12
**piping** 218:3
**place** 4:7 8:10 40:10
46:15 60:2 71:5
72:18 100:2 110:7
113:18 116:13,15
138:7 153:6 154:1
155:7 206:14 209:10
**places** 5:3
**placing** 139:2
**Plaines** 146:16
**plaintiff** 73:1
**plan** 12:8 13:13 15:8,10
42:10 64:10,10 69:18
84:5 85:1,12,13,15
93:8 110:17 112:4
117:3,4 119:22
120:11 135:21 138:7
167:7,14 195:1,14
199:18 206:14
**planning** 114:20
115:19 209:5 259:17
**plans** 22:19 28:4 69:16
70:4 91:20 96:1
111:16 112:16 119:13
132:8 183:17,19
188:23 199:15 206:6
206:9,11 210:9
**plant** 64:5 76:4,4 81:15
97:22,23 110:10
111:9 117:15 129:5
134:8 138:13,15
143:7 156:17 167:18

167:21,23,24 170:2
171:4,5 178:5,6,13
189:9 199:23 200:3
212:18 227:23 270:14
**plants** 34:7 41:5 62:20
77:13,23 79:5,11 96:8
96:8 116:2,4,5,9
270:12
**please** 8:21,22 27:11
57:18 74:14 75:22
162:16,16,22 232:5
233:11 234:11 248:3
**plus** 98:8,9 115:5
125:18,19,24 128:12
191:25
**point** 6:9,15 25:4 64:19
69:14 89:4 96:25
97:15 103:8 104:24
106:19 107:10 122:16
150:1,2 184:20 197:4
204:7 221:10 228:18
235:17 245:19 253:15
267:11,12,23
**pointing** 5:15
**points** 20:6 149:22
255:5,5,7
**policy** 130:3
**Pollution** 217:12
**Pontiac** 4:14,16 137:4,6
138:13 257:22
**pop** 121:18
**portion** 40:7,8 49:22
50:1
**position** 3:23 25:9 50:1
50:3 66:25 76:6,13
77:8 135:19 136:1
137:10,17 179:13
222:10 266:16 267:6
267:9 271:6
**positive** 136:4,17,22
147:21 152:16,19
153:8 160:2 161:13
162:2 164:24 166:7
178:19 223:6 224:3
230:22
**possess** 198:4
**possibilities** 50:9
**possible** 8:25 9:3 35:13
148:22,23 213:24
214:2
**Possibly** 9:5
**post** 97:9 111:8 112:20
115:13,20 202:16,21
203:10
**posting** 203:9
**postmark** 122:17
**post-petition** 41:1
**potential** 152:13
222:15 260:2,9,19
**potentially** 72:12
**power** 60:17 87:18
154:11 198:10

**powers** 185:8
**practice** 239:25
**practices** 22:25
**precisely** 253:15 263:9
**preclude** 213:1
**precludes** 202:14
**predated** 80:8
**preference** 175:14
**preferred** 33:5 47:5,9
47:12 73:21
**prejudicial** 72:9
**preliminary** 11:8
**prepare** 42:22,25
123:18 150:22 242:23
**prepared** 39:11 40:13
157:9 251:24
**preparing** 123:9 125:7
**prepay** 161:4
**present** 33:2 70:6
229:12
**presented** 68:18
**presenting** 65:17
**presently** 194:25
**presidency** 78:2
**president** 11:8 28:11
50:17 51:6 54:4
58:23 74:18 77:16,18
132:5 133:5 179:10
179:15,18 182:11
195:11 196:19
**press** 35:21
**pressure** 152:19 153:8
**pressures** 147:21 223:6
224:4 230:23
**presumably** 21:19
108:2
**presume** 51:9 188:6
**presuming** 41:16 221:2
**pretty** 57:25 120:5
127:20 128:22 132:8
156:9 168:1 196:12
267:15
**prevent** 58:24 59:24
141:9
**prevented** 264:25
265:10
**preventive** 88:18
**previous** 4:8 22:16
**previously** 13:22 29:6
39:1 88:3 125:8
133:2 136:9 196:5,22
217:15 254:19 256:2
257:3,20
**pre-existing** 52:24
**pre-paid** 257:11
**pre-petition** 40:22
62:10 173:21
**price** 45:1 49:4,9,16,18
68:11,21 69:8 116:23
163:10 164:7 165:20
269:17
**pricing** 164:1,9

**primarily** 11:6 77:11
87:24 88:1 92:2,10
**principal** 43:9,13,14
161:3 168:16,18
170:25
**principals** 68:5 207:23
**prior** 55:1,23 63:17
66:2 150:1 186:25
187:9,12 197:18,25
202:19 233:22 240:19
244:9
**pro** 39:11,24 41:17,19
42:2 62:24 63:8
123:5,9,10,21 125:8
125:15 126:7 131:11
131:16 136:21,25
151:11 157:9 158:8
158:12,13 159:18
162:18,24 165:19,23
168:15 177:25 192:1
269:25
**probably** 11:9 95:24
108:17 138:24 161:6
166:13 167:19 200:7
263:20 266:23,23
**probative** 4:6 5:17 6:15
**problem** 4:18 14:11
35:14 104:22 113:10
139:13,19 140:18
141:2,5,7 143:23
148:11 152:5 174:3
193:14 240:13 245:6
272:25
**problems** 12:6 16:20
17:13,24 22:2 23:5,6
137:3,6 138:21
140:20 189:22 190:10
230:18
**proceeding** 25:3
**proceedings** 1:8 8:19
60:5 274:4,8
**proceeds** 33:19
**process** 7:24,24 9:6
10:13,14,23 11:1
14:22 94:2 95:1
106:19 108:25 109:21
111:12 118:24 176:21
203:8 204:6 218:19
230:17 272:3
**procured** 194:2
**procuring** 130:13
**produce** 5:9 20:23
69:12 212:19
**produced** 126:13 246:4
**produces** 94:10 269:22
**producing** 163:14,15
**product** 95:12
**production** 69:14
143:21 154:15 164:13
268:15
**professional** 75:23
**profit** 48:11

**profitability** 48:13 49:3
49:7
**program** 19:3 23:19
99:9
**project** 98:11 105:20
106:6 182:1 200:11
209:8 261:7 264:7
**projected** 23:6 63:6
69:14
**projection** 166:16
**projections** 39:12
41:20 157:15 159:15
192:3
**projects** 41:21,22 42:1
78:16 79:16 92:20
93:15 96:9 112:19
123:11 200:14 202:16
**promissory** 37:7 39:7
118:1 196:1 210:16
210:17
**proof** 18:24 19:19 20:4
21:18
**proper** 82:21 238:11
**properly** 255:14,18,19
**properties** 41:16 46:16
47:2
**property** 30:14 31:2,4
31:11 33:14 44:6,22
44:24 45:6,12 50:5
67:5,8 184:14,18,19
185:12 205:15
**proportionately** 127:19
**proposal** 157:18
**proposed** 18:20 58:14
61:13 62:7
**proposes** 22:24
**proposition** 5:14
**prorated** 129:23
**prospective** 45:25
**proud** 161:6
**prove** 130:20
**proved** 41:15
**provide** 4:25 6:2,5,9
9:16 21:16,23 23:3
24:4,6,10,14 82:23
87:23 91:24 92:3,11
92:12 97:15,23 98:10
98:11 114:14 115:3
115:12 118:17,20
208:7 263:4,10
**provided** 18:12 24:12
**providers** 262:5
**providing** 81:1 91:23
93:2
**provision** 58:8 60:14
**provisions** 184:4
**PSI** 137:14
**public** 109:3
**published** 124:20,21
157:22
**publishes** 164:1
**pull** 100:1 143:15 152:8

**profitability** 152:10 231:11 264:8
**pulled** 35:2 124:22
**pulling** 152:10
**pump** 137:13
**pumping** 82:21
**purchase** 20:21,23
45:13,18 46:10 68:11
154:11 198:10
**purchased** 29:23
**purchaser** 45:25
**Purdue** 75:12
**purport** 253:23
**purpose** 63:8 221:3
**purposes** 19:2 65:17
141:21 204:24
**pursuant** 89:10 99:19
195:5,21 198:6,19
204:16 218:12 221:5
**pursue** 241:8,16 250:9
250:22 252:19,22
254:4
**pursuing** 42:8
**pushed** 36:1
**put** 10:10 12:9 13:25
63:5 83:24 99:2
104:17 110:8 116:25
128:25 136:7,9 140:2
140:21 143:25,25
151:14 152:8 155:7
175:16,21,25 200:25
201:5,9 245:14
260:15 261:19
**puts** 69:7 152:24 153:2
153:2
**putting** 104:2,4 109:8
110:22 200:4
**p.m** 1:7

---

**Q**

**qualified** 29:9 62:19
199:12
**quality** 95:10 261:4,24
**quantity** 46:18
**quarry** 139:15
**question** 4:19,24 5:1,4
21:15 23:14 24:6
37:9,16 40:15,18
47:19 57:7,15 58:5
59:10 62:6 71:8,11
134:14 181:18 190:5
197:2,22,23,25
203:17 212:14 222:23
226:2,8,9 229:8
231:21,25 232:7
240:8,10,19,20
241:13 242:22 244:24
246:10,11 250:15
255:11 260:14 262:10
262:11 263:24 266:6
**questionable** 22:21
24:5
**questions** 64:16,20

65:3 66:19 67:7
246:6 264:15 273:20
**quick** 38:12 167:18
168:1
**quicker** 110:5
**quickly** 41:23 48:10
159:3
**quite** 7:4 45:7
**quotes** 124:16 163:17

**R**

**R** 1:9
**racing** 137:15
**racking** 22:23
**raising** 23:13 50:9
**ran** 22:4 138:15,22,23
262:2
**range** 94:6,10,16,19
95:20,21,23 174:20
**ranges** 170:18
**ranging** 96:5
**rate** 125:13 158:25
**rates** 124:20,22,25
125:1,2,4,4,5 157:22
205:9
**rating** 159:9
**RCC** 175:10
**reach** 86:8 221:19
222:4
**reacquire** 184:17
**read** 57:6,14 59:9 61:1
61:2,3,6 165:5 203:13
226:5 227:13 233:19
234:3 235:3
**reading** 203:4
**ready** 8:16
**real** 8:19 22:9 29:22
30:2 34:19 43:18,23
44:2,16 45:13 167:18
**realistic** 273:5
**realized** 273:1
**really** 5:3,14 9:17 12:3
17:2 20:22 75:24
88:9,10 99:1 105:19
107:19 110:2 112:12
133:15 135:6 138:14
138:15 140:22 142:7
169:2 171:13 208:10
**reason** 4:23 17:14
18:10 21:3 25:5
161:17 168:11 199:10
229:2 246:2 269:10
**reasonable** 39:24,25
40:4 98:11 127:13
203:11,15,17 245:5
253:21
**reasonableness** 63:22
**reasonably** 97:9,24
203:6
**rebuild** 89:1
**rebuttal** 6:22 8:4,7
**recall** 46:22 53:6 67:7

69:1 97:10 144:17
156:23 175:7 186:20
187:5,5 192:23,25
205:5 220:2 222:7
225:7 232:10,12,13
233:4,7 234:14
236:23 239:6 247:5
248:14 249:4 255:4,9
255:14,17,22 257:11
258:5,7,9 269:18
**recalling** 144:19
**receive** 29:5 33:18
46:19 162:3 236:2,4
236:12 241:5 245:17
247:2 253:9
**received** 7:20 46:23
189:3,22 190:8,25
197:11 198:6 214:18
224:10 225:5 231:3
231:22 235:23 236:3
236:9 239:12 241:14
241:20 242:4 245:2
248:12,14 249:5
250:13 268:4
**receiver** 23:24 206:11
206:14 214:14 237:18
238:10 268:8
**receiver's** 238:9
**receives** 252:5
**receiving** 191:18
232:10
**recess** 60:5 178:24,25
**reciprocating** 96:8
218:1
**recirculation** 120:10
**recognize** 220:20
223:17 224:18
**recollection** 57:2 60:17
61:5,8 186:21,23
221:11,24 224:1,3
235:4 256:12,23
260:21
**recommendation**
234:10
**record** 7:3 19:25 27:12
74:15 233:20 245:2
247:10
**records** 83:12
**recover** 71:19 72:15,23
**recovered** 73:10
**recovery** 149:7 254:22
**RECX** 2:5
**Redirect** 66:17,20
271:1,3
**reduce** 149:7 269:21
**reduces** 152:24,24
**reductions** 269:24
**REDX** 2:5
**Reed** 7:3,5,15 8:3
183:16
**Reed's** 6:22 7:18
**refer** 8:24 33:15 81:18

106:12 118:25 179:19
181:19 241:7 252:12
**reference** 4:14
**referenced** 88:3 232:18
**references** 220:9
**referred** 49:14 217:19
251:18
**referring** 60:14 70:23
124:20 182:3 241:6
241:10 248:22
**refresh** 57:1 61:7
186:21,23 221:11
224:1,3 249:23
256:23
**refreshed** 171:9
**refreshes** 61:4 221:24
235:4 256:12
**refused** 17:25
**regard** 7:5 12:7,15
13:18,19 15:21 63:12
77:20 85:2 106:1
108:10 114:5,17
119:12 122:19,25
123:25 130:21 147:11
153:4 158:12
**regarding** 4:10 5:20
6:11 7:10,11 17:16
23:20,22 27:2 39:10
41:11 42:11 52:23
60:17 91:21 135:21
190:24 198:3 214:19
225:19 234:17 235:20
240:8
**regards** 85:4 190:6
**regimes** 11:23
**regs** 99:19 252:24
**regular** 17:12 42:23
46:17 47:15 265:18
**regularly** 43:2 245:17
**regulation** 101:12
102:19 122:15 147:24
**regulations** 5:8,11
62:16 87:10 135:20
150:13,15 204:16
213:17 252:17
**regulators** 5:13
**regulatory** 94:2 105:18
118:21 151:7 204:14
**reimbursements**
130:22
**reinstalled** 269:16
**reinvestment** 19:3 28:4
187:4,17
**reissue** 238:15
**reject** 252:7
**rejected** 108:5 240:3
244:13 250:16,17
252:16
**rejection** 252:9
**related** 21:21 81:1 85:7
144:24 145:17,19,20
216:11,12,13,13,14

236:25 237:3 242:5
242:11 247:3 249:10
249:11 253:10 256:4
259:23 262:3 265:12
**relating** 9:11 73:4
101:4 144:21 225:11
239:12
**relation** 156:22
**relationship** 17:9 25:23
28:9 38:15 50:14,15
52:2,3,24 82:7,16,24
85:25 86:1 88:8
155:6,8 250:20
263:15 264:10
**relatively** 12:17 14:5
**relevance** 100:13
185:25 236:18 238:18
238:21,22 243:21,24
244:23
**relevant** 5:17 6:9 17:17
72:11 211:8
**relied** 63:25
**relying** 64:13,15 69:24
69:25 70:2
**remain** 24:23 27:4
183:6 227:1 232:22
**remained** 62:15
**remaining** 21:15
**remains** 71:14 234:24
235:5 240:6 253:25
**remediation** 77:2
**remedied** 174:4
**remedy** 174:6
**remember** 68:8 73:20
162:12 193:2 197:7,8
197:9 220:7 221:22
223:9 224:14 225:13
226:25 231:4 233:1
236:13 240:4 249:21
256:10 260:6 262:6
268:12 272:7
**remembers** 171:21
258:24
**remonitoring** 222:16
**removal** 15:6 60:23
186:10 237:25
**remove** 60:18 61:9
104:10 141:9 229:20
**removed** 15:1 104:25
**renewal** 23:23 24:3
106:17 120:21 121:8
204:1 214:8,10,19,22
214:24,24 215:11
216:25
**renewals** 87:8
**renewed** 6:20 120:20
212:12 214:4 215:3
**rental** 128:5
**reorganization** 67:16
**repaid** 63:11
**repair** 174:13 227:7
**repaired** 149:5 228:12

228:15 229:9 230:13
**repairing** 120:5
**repairs** 148:15 174:22
177:1
**repayment** 211:2
**repeat** 232:7
**repeated** 20:1
**repeating** 119:7
**replace** 89:24 183:13
183:17,19,22
**replaced** 89:24,25
**replacement** 129:7,8
**replacing** 70:9
**report** 90:17 117:7
220:24 221:3,6,21
**reporting** 80:13 85:5
87:9,9,10 221:4
**reports** 80:5 221:6
**represent** 8:23 26:20
26:24
**representation** 27:4
**representative** 24:23
25:17,21 26:5,21
62:12 65:10,12,15,19
65:21 197:14 233:17
**representatives** 120:2
**represented** 38:24
273:6
**reputable** 93:1
**request** 17:25 101:4,22
102:17 150:21,23
251:5
**requested** 12:19 14:7
15:25
**requesting** 9:22
**requests** 134:13
**require** 262:8
**required** 4:25 18:6
25:3 39:18 88:22
104:9 113:7 118:22
120:15 129:25 137:23
161:9 201:4 204:14
212:15,16 217:5
229:25
**requirement** 203:2
252:18
**requirements** 114:12
202:13 221:6
**requires** 66:22 173:15
200:25 214:10 230:7
245:21
**reserves** 20:25 142:14
**resident** 79:6
**resign** 29:11
**resigned** 56:6
**resolve** 251:24 252:3
**resolved** 9:13 232:18
232:19,25 248:18
**Resource** 1:5 3:2,25
40:21 74:19 77:8,9
198:15 254:21
**resources** 86:9

**respect** 17:15 19:5,13
  20:15 44:4,15 56:4
  153:14 207:3,4
**respecting** 3:20
**respond** 217:8 239:16
  251:2,9,17
**responded** 239:23
  241:20 249:17
**responding** 236:7
  243:4 249:7 251:20
**responds** 6:23 251:23
**response** 74:2 238:16
  239:20 242:23,25
  243:1,4
**responses** 7:17
**responsibilities** 241:19
**responsibility** 76:24
  79:9 82:2 222:8
  235:10
**responsible** 41:8 76:23
  77:10,23
**rest** 95:19
**restriction** 59:22
**result** 16:25 20:3 63:20
  137:20 139:6,20
  170:17 223:7,10
  224:4,11 226:23
  232:15 243:14 255:19
**resulted** 137:24
**results** 147:20,20
**resume** 60:3,8 78:14
  273:24
**Resumed** 60:11
**retain** 20:17 258:14
**retaining** 41:11
**retains** 41:9
**return** 69:9
**revealed** 22:10
**revenue** 40:1 63:6
  126:1,2 128:8 131:19
  182:6 191:18 209:8
  269:21
**revenues** 49:10 63:23
  64:4 127:2 158:15
**reverse** 72:16
**review** 39:10 63:8 79:7
  101:13 102:20 104:9
  108:7 121:20 205:23
  215:1 216:9
**reviewed** 39:15 63:3
**revoked** 174:3
**revolved** 140:22
**revolving** 37:15
**RE-CROSS** 71:12
**Richard** 78:12 131:1
  181:6 266:5
**Ridge** 101:4 140:19,20
  216:14,16 246:17,21
  247:4 248:13 249:12
  264:12
**right** 7:5,9 20:17,20,25
  27:24 28:25 30:8,9

35:12 36:3 38:3,4
  40:10 43:3 45:5,11,15
  46:6,12 47:4 48:7,9
  49:7,9,17,23,25 50:1
  50:7,11,15 51:19,21
  51:24 52:5,15 53:11
  53:15,18 54:4,5,7,12
  54:22 55:18,24 56:3,9
  56:14,23,24 57:9,11
  57:16 58:6,11,13
  59:18 60:1 61:3,12,21
  63:2,18,25 64:10 65:5
  65:24,24 67:9,10 73:8
  73:11 74:19,22 78:8
  78:11 84:1 85:15
  86:21,24 88:16,17
  89:15,21 90:22,24
  91:9,16,18 93:24
  94:17 95:4 96:15
  102:9 103:2,19
  110:11,15,21,24
  111:12 113:9 114:8
  114:19 115:1,22
  116:24 117:13 118:14
  118:19,23 119:2,12
  121:4,16 124:18,22
  126:4,24 127:1
  129:19,19 131:12
  135:15 139:9 141:3
  142:19,19,21 143:2
  144:15,20 145:3,10
  145:12,14,15,25
  146:1,9,23 147:4,7
  153:1 154:14,20
  155:5,21 156:14
  158:7,11 160:2,25,25
  161:14 163:18 164:23
  165:6,14,17,24 166:1
  166:4,5,9,14,15 167:2
  169:5,21 170:10
  173:1,1,1 174:13,17
  175:3 177:5,6,15,23
  177:25 178:4,15,21
  179:2,15,23,24 180:3
  180:6,17 182:13
  183:2,10,23 184:10
  184:14 185:4,9 188:5
  188:15,17 189:1,10
  189:15,20,24 190:11
  190:12 191:11,22,23
  192:4,20 193:7,22
  194:7,12,21,21
  195:13,19 196:4,9,17
  199:4,8 200:9 201:2
  201:25 202:1,25
  203:18,23 204:4,12
  205:4,19 206:4,18
  207:20 208:2 211:10
  212:12 213:11 214:17
  216:18 219:13,25
  220:16 221:20 226:18
  227:18,20,24 228:7,8

229:9,10 230:9 231:3
  231:11 234:25 235:1
  235:12,18,21 236:6,9
  236:10 237:22 239:5
  241:21 245:9 246:14
  246:22,23 247:18
  250:9,10 251:7,25
  252:7,11,13,14
  254:12,23,24 256:5,6
  257:5,6,9,16,23,24
  258:8 259:25 260:1
  260:15,16,17 261:2
  262:16,24 263:22
  265:2,22 266:12
  267:7,18 271:24
  272:8 273:15
**rights** 42:8 53:9 67:22
  67:24 144:11 217:11
  258:15
**rings** 182:18
**rip** 152:9 176:9
**ripped** 141:12 228:22
  272:15,23
**rip-out** 229:5
**rise** 139:14
**rising** 143:19
**risk** 152:15 213:4
**Riverdale** 76:22
**road** 117:11
**Rob** 78:18,19 130:24
  181:6 266:3,8
**Robert** 1:16 3:12
**rod** 228:1
**role** 81:11,16 82:3
  90:15 93:18 129:20
**roll** 89:21 100:22,23
  129:20
**rolled** 235:7
**room** 139:5 161:7
**root** 227:25
**rotated** 124:3
**roughly** 30:4,5 31:21
  38:5 73:23 128:2
**round** 39:16
**route** 212:24
**routing** 95:13
**royalties** 119:17 176:16
**royalty** 128:7 257:11
**RPR** 274:7
**RS** 82:17 83:22 84:2,6
  262:21
**RSU** 83:21
**RTC** 4:3,11 6:2,3,21
  9:8,8,23 12:16,21
  13:21 14:9 15:22,23
  19:18,23 22:4,11
  23:25 29:6,24,25 39:2
  40:25 43:20 52:10,14
  53:4 61:23,25 62:9,13
  64:14 77:18 78:3
  79:16 80:8,9 81:21
  86:1,4 99:12,13,21

101:6 102:12 103:5,6
  104:25 110:9,11
  111:1 116:8,9 131:25
  132:2,4 133:5,6 141:7
  145:8,16,23 146:1,6
  146:10,18,24 147:6,8
  148:1 149:11 171:22
  171:24 173:17 174:2
  175:9 176:4 179:7,10
  179:14,15,19,23
  180:1,5,8,16,17,22,22
  180:25 181:17,21,25
  182:11 193:8 194:3,4
  194:16,18 195:3,4,6
  195:11 196:16,19
  199:7,11,13,16,19
  212:8 214:3 215:10
  215:16,22 217:15
  224:2,10,22 227:7
  228:12,15 229:14,15
  229:20,25 231:2
  236:11 238:1 241:19
  241:23 242:4,17
  246:16 247:2 248:12
  252:25 253:9 254:11
  254:14,19 255:1,12
  256:2,8,20,24 257:3,7
  257:20,25 258:2
  261:6,11,19,23
  264:25 266:10 267:22
  268:3,14 273:17
**RTC's** 53:13 110:16
  137:10 182:5 217:22
  221:18 222:3 227:23
  235:11 236:25 237:20
  239:13 242:11 249:11
  259:23
**rule** 7:23 258:13
**ruling** 8:11 236:19
  255:3,4,10,17
**rulings** 239:9
**Rumpelstiltskin** 52:8
  52:10,13,16,20
**run** 12:24 127:7,13
  138:25 143:16 152:14
  152:15 158:19 171:16
  229:5 237:24 270:5
  273:4
**running** 15:16 17:4
  22:4,22 81:25 94:25
  112:7 118:11 119:6
  131:18 142:9 153:9
  158:4,25 170:16,16
  171:8,12
**runs** 5:12

_____
S
_____

**safe** 270:16
**sag** 128:19
**Salaries** 129:12
**salary** 129:13,20
  194:18 196:15 266:12

**sale** 13:14 33:19,20
  45:7,9,13,18 46:10
  49:11 50:5 77:2
  261:24 264:3
**samples** 76:23
**Sangamon** 7:12 9:9,12
  13:24 20:9,16 62:15
  96:19 97:12 103:18
  103:22 105:24 106:21
  108:11 109:22,23
  110:5 114:17 115:9
  157:8,21 162:1
  199:24 204:20 211:19
  212:2,9 214:4 216:12
  216:13,14,20 217:17
  220:4 224:22 226:4
  227:23 228:16 230:20
  231:1 235:11 239:14
  241:21 262:12 272:7
**sat** 28:6
**satisfied** 39:24
**saturated** 139:19 144:3
**save** 142:3 255:25
**saw** 31:17 32:11 121:18
  139:14 244:9
**saying** 10:3 57:10
  98:14 165:9 174:2
  214:24 255:14
**says** 4:13 7:10 160:6
  161:2 162:25 201:8,9
  204:13 230:10 245:8
  256:18 259:5 263:9
**scale** 116:25
**scanner** 245:14
**scans** 87:5 128:24
**Scattered** 11:6,7 19:15
  20:13 21:21 28:1,8,10
  28:15,16 29:14,16,21
  30:5,7 31:11,15 32:7
  32:25 33:2,3,4,6,8,10
  33:16,18 34:5,11,17
  34:22 37:6,8,10,11,17
  38:2,7,15,23 39:10
  40:7,13,16,19,20,23
  40:24 41:3,18,24 42:3
  42:6,20,22,25 43:9,13
  43:17,23 44:1,20
  45:24 46:7,17,19 47:5
  47:6,16,23,24 49:22
  49:25 50:2,14,18,20
  50:22,24 51:11,17,21
  52:7,25 53:5,10,17,22
  54:5,9,13,21 55:5,14
  56:18,19,21 57:10
  58:14,21,22,23 59:22
  59:24 60:18 61:9,20
  62:1,8,13 63:11,14
  64:9 65:22 66:5,9,11
  66:14,25 69:16,19
  70:22 71:1,4,6,14,19
  71:21 72:2,6,8,12,15
  72:23 73:2,3,3,4,9,13

73:16 82:8 118:2
136:15 168:11 180:14
182:25 183:18,21,25
184:6,17 192:7
193:11,12,24 194:1
194:19 195:2,17
196:2,7,8 204:19
205:2,14 206:21,24
207:9,14,19 208:7,12
208:23 238:7
**Scattered's** 29:19 31:24
34:1 46:24 47:9,12,21
**scenario** 66:11 142:16
174:25 212:23 213:8
273:5,5
**scenarios** 132:11
**schedule** 39:19
**Schmidt** 1:12 3:3,4 7:2
7:14 8:14,18,23
174:12
**SCHNEIDER** 274:7
**schools** 75:21
**Science** 75:5
**scope** 18:24 144:18
225:25
**screen** 61:1 201:19
**screwed** 35:25
**scroll** 202:6 225:15
232:4 248:2
**scrubbed** 12:9 263:24
264:3
**scrubber** 178:13
**scrubbing** 92:20 96:9
170:2 261:3,7,15
**scrutinized** 22:15
**scuffed** 151:22
**seal** 222:9
**sealed** 222:9
**second** 20:15 30:19
35:20 57:22 88:24
89:3,19 91:5 119:20
127:12 147:15 148:4
148:7 174:16 221:8
225:16 265:7,13,13
267:2,8
**secretary** 51:17 173:13
**section** 5:25 186:6
201:18 202:2,18
225:1 237:7
**sections** 139:3,6
**secure** 108:20
**securities** 47:22
**security** 34:10 36:6,16
36:20 39:8,8 40:12
42:9 97:9 98:12
118:17 120:15 202:23
205:3,8 210:19 211:4
211:15
**see** 15:5,6 35:14,19
36:10 37:2 52:25
57:2,5 60:16 73:5
83:21 84:14,19 86:19

88:7 94:22 100:20
113:22,23 124:6,7
151:23 153:10 159:20
175:25 186:16,18
202:8,14 213:14
216:8 221:10 222:1
223:24 240:13,18
250:3 256:11,18,22
**seek** 10:5
**seeking** 71:19 72:14,16
72:23
**seeks** 21:24
**seen** 100:25 165:1
244:2 247:24 248:4
269:18
**sees** 100:24
**selected** 29:4
**selection** 115:24
**sell** 15:9,12 16:10,10
31:3 45:2 48:10
144:11 155:1 229:20
**selling** 15:10
**sells** 69:7
**semiannual** 87:9
220:24
**send** 151:3,5 261:1
**senior** 76:10
**sense** 109:12 115:16
180:10
**sensor** 269:12,13,15
**sent** 122:8 130:18
238:9
**separate** 180:23
**September** 125:1
158:19 250:3,11
**series** 63:4 73:21 83:8
**seriously** 206:9
**serve** 70:12
**served** 28:18 77:9
**service** 32:15 89:3
171:17 262:5 263:10
**services** 4:25 26:2 81:1
84:10 87:23 88:2
91:25 92:13,12 93:2
194:3 263:4
**set** 38:3 116:21 161:8,9
225:2
**sets** 11:23 251:24 252:2
**settled** 120:3 149:23
260:13 265:9 267:24
267:25
**settlement** 53:2,8,19
138:1 144:10 149:3
155:12 174:22 180:13
187:12 198:7,19
258:13,16,17 259:5
259:16
**settling** 268:8
**seven** 106:25 108:1
125:3 265:20
**Sexton** 12:16 144:10
**shallow** 140:2 143:25

**shape** 135:5
**share** 33:19 85:19
147:13 176:5 235:24
236:5
**shareholder** 28:12
50:22,24
**sheet** 42:21 43:1 124:15
245:15
**Shelton** 254:22
**shield** 10:24 14:22
101:14,15 106:13
120:23 212:22 214:8
**shields** 106:15
**shoes** 65:16
**short** 10:13 38:7 50:3
195:1 219:19 262:25
**shorten** 73:6
**shorter** 270:24
**shortfalls** 196:23
**shortly** 37:23 46:14
114:21 243:5
**short-term** 93:12
**show** 11:21 17:18 18:11
18:21 22:1 23:4 24:7
24:12 35:12 36:9
57:3,16 136:5 236:13
255:23
**showed** 57:8 244:4,8
**showing** 13:25 48:15
238:10
**shown** 172:15
**shows** 115:5 117:7
121:7 124:25 136:22
164:19
**shut** 137:20,22 152:8
230:1,8,19 268:19
269:13
**shutdown** 269:20
**side** 36:9,10 77:4
**sides** 45:21
**sight** 88:7
**sign** 15:25 102:13
151:2,5,8 205:25
**signed** 46:10 58:24
59:22,23 81:8 83:21
83:22 84:20 86:16,22
91:14 151:1,1 210:18
210:19,22 211:11,14
221:1 245:7
**significant** 46:18 49:8
132:9 219:24 221:12
272:1
**significate** 150:22
**signing** 264:11
**silted** 139:11
**similar** 77:17 83:17
89:22 92:11 96:13
97:14 98:2 120:25
122:7 143:17 149:4
163:8 165:19 215:17
**similarly** 33:14
**simply** 5:16 119:7

226:16 259:5
**single** 228:2 229:5
**sir** 42:21 43:13 44:12
72:23 234:8 235:15
**sit** 31:5 38:4 45:17
51:13 53:7 56:25
67:14,17 136:3
191:24 192:6 205:19
209:10
**site** 6:3 9:19,21,24 10:2
10:8,16 11:1,12,18
12:7,17,25 13:1,9,12
13:20 14:5,10,11,12
14:13 15:1,24 16:4,6
16:8,12,16,17,19
20:16 23:13 76:12
88:17 89:9 91:23,25
92:11 96:24 97:1,7,8
97:11,25 98:15,18
99:14 101:21 102:4
103:22 104:21 107:20
108:11,12,13 109:1,1
110:12 111:25 112:8
112:13 114:18 116:13
119:13 122:20 123:1
126:3 127:3 128:14
128:17 130:25 132:25
133:7,8,9,9 134:5,10
134:21 135:17 136:7
136:8,12,18 137:4,6
138:20,21,22,24,25
140:10 142:9 144:11
145:22,22 146:2,6,7
151:11 154:16 156:3
156:13 166:6 171:4
182:6 188:17,20
189:23 201:1 202:20
204:15,16 216:17
218:7,16 219:4,12
229:12 231:3 235:11
235:21,24 237:1
238:1,8 253:11
264:21 265:16,20
266:1,5,7,11,17,25
267:4,6,17 268:18
269:22
**sites** 4:19 13:4 15:2,5,5
18:12 23:15 39:10,13
39:14,17,18,21 41:5,9
42:7 63:6 76:18
82:20,24 85:2 87:22
92:15 96:5,12,19
100:14 102:22 103:16
103:19 107:22,24
113:7 123:1 130:7
132:8 133:11 135:22
137:2 142:22 144:16
145:2 146:11,17
147:2,6,9 155:23
162:14 167:4 170:16
171:9,13 188:4,9
190:10,14,22 191:1,9

191:13,19 193:5,9,19
194:9 202:23 204:24
205:1 215:18 241:20
260:25 262:14,19
**sits** 51:8,10
**sitting** 7:20 47:20
**situation** 3:23 91:1,8
96:18 104:10 113:2
137:20 142:8,11
174:3 216:24 249:14
249:15
**six** 10:15 98:4 106:10
109:5 111:23 126:21
126:22 127:13,14
128:8 131:22 166:19
193:17 255:22 257:2
**six-month** 221:5
**size** 105:20
**skip** 226:16 254:7
256:14
**skued** 270:22
**slip** 121:5
**Sloan** 25:14,25 26:9
120:2 147:16 175:17
**slowdown** 260:24
**small** 9:20 12:17 14:5
14:24 58:1 97:18
**smaller** 84:13
**Smith** 183:16
**smoothly** 81:25
**solar-powered** 94:11
94:20
**sold** 33:15 50:7 77:5
229:14,15
**sole** 54:24
**soley** 1:15 3:8
**solid** 94:9 173:6
**somebody** 59:6 225:1
243:9 246:1
**somebody's** 216:9
**somewhat** 143:14
**soon** 11:20 16:14
148:18,20 149:15
168:2
**sorry** 15:3,23 27:18
32:2 46:4 55:15
58:22 59:9 100:8
110:12 111:22 114:1
124:7 126:9 154:23
162:16 176:4 186:14
214:7,13 219:9
229:10 232:8 240:23
246:20 269:9
**sort** 13:25 155:10
225:21
**sought** 20:3 23:17
240:12
**sounds** 28:25 53:14
65:5 187:17 197:1
260:17
**source** 63:21 105:21
117:23 191:22 192:8

192:10
**sources** 43:5 107:20
  206:20 248:9
**south** 9:3 30:16 31:14
  43:24 44:4,18 61:21
  77:4
**spark** 228:2
**sparkplug** 88:20
**sparkplugs** 129:10
**speak** 7:5 19:11 219:16
  259:19
**specific** 5:15 20:24
  120:5 205:1 254:18
**specifically** 6:1 135:14
**specifications** 13:6 96:2
**speculating** 135:11
**speculative** 24:13
**spell** 27:16 74:15
**spend** 17:21 136:6
  138:8 142:15 144:13
  174:15
**spending** 168:3
**spent** 17:22 89:5
  141:14,19 173:25
**spin** 47:16
**spine** 175:12
**splits** 209:7
**spoke** 159:3
**spoken** 130:14
**spot** 163:9
**spreadsheets** 63:4
**Springfield** 13:19 14:1
  15:8 33:22 38:1 55:8
  83:4,6 92:11,15 96:24
  98:15 102:24 110:13
  110:14,19 111:11
  115:21 116:21 117:3
  117:4 122:3 151:13
  151:14,19,25 152:18
  154:18 155:4 167:10
  167:23 169:10,16
  170:9,17 177:17,23
  199:24 217:19 271:7
**Springfiled** 167:24
**squared** 109:6
**squelching** 143:20
**stack** 16:19,22 85:6,12
  85:13 106:10 120:10
  129:2 134:24 152:20
  152:22
**stacks** 229:18
**staff** 79:13 175:17
**stage** 59:4
**stand** 65:25 99:8
**standard** 135:10
  202:15 270:11
**standards** 95:10 135:1
  135:3 159:4 261:24
**standing** 65:16 171:22
  172:2,9,11,21 247:14
**standpoint** 177:3
**stands** 255:21

**start** 5:23 60:2 75:2
  107:12 108:17,21
  112:10 133:11
**started** 139:11 170:23
  179:22,22 180:7
  235:10
**starting** 83:9 158:15
  242:14
**starts** 115:6 202:3
  266:2
**state** 27:11 65:6 74:14
  75:8,19 123:23
  171:22 172:23 173:4
  173:13,13 174:1,10
  206:5 235:24 238:12
  241:9 259:10 260:4
  260:10,19
**stated** 267:16
**statement** 8:20 43:3,5
  65:11 66:3 197:25
  233:18,23
**statements** 8:17 42:23
  62:25 207:14
**states** 1:1 122:16 206:3
**static** 127:20 128:22
**stating** 249:5
**status** 15:5,6 23:4,20
  90:19 101:10 102:17
  120:18 134:22 150:24
  214:19 216:8 238:4
  240:10
**stay** 25:10
**stayed** 76:11
**Steinberg** 1:14 3:8
  132:17,20 243:2,13
  246:1,8
**stemmed** 134:7
**step** 70:17 74:3 89:1
  111:3,6,7 273:22
**stipulated** 21:12 23:8
**stipulation** 10:8 11:20
  11:21,23 12:1 15:14
  16:11 18:6 66:22
  89:10 96:22 98:12
  111:2 113:8,15
  114:13 117:20 119:16
  120:15 127:10,24
  176:8 177:9,17 178:3
  178:11 200:17,21,25
  201:21 202:12 204:10
  258:1,5,11
**stipulations** 9:14
**stock** 52:13 73:14,18,21
**stopped** 132:20
**straight** 197:2,22,23
**strategies** 69:6
**strategy** 69:3
**straw** 152:8
**Street** 76:13 146:20
  147:5
**strike** 202:9 258:9
**string** 17:1

**stripped** 88:24
**stroke** 81:22
**structure** 105:18
**structured** 144:9
**struggling** 250:5,6
**student** 75:25
**studies** 116:19 120:8
**stuff** 128:14
**sub** 76:9
**subcontract** 202:12
  203:2
**subcontractors** 193:18
**subject** 34:6 45:12 50:6
  52:12 98:17 153:18
**submit** 243:6 248:6
**submittal** 101:13
  102:19
**submitted** 23:24 101:8
  102:18 122:17 209:16
  209:19 214:7,10,14
**submitting** 118:25
**subpart** 202:21 204:8
**subsequent** 45:22
**subsets** 213:23
**subsidiary** 47:7
**substandard** 22:12
**substantial** 17:7 132:1
  138:8
**substantive** 240:8
**substituting** 184:19
**subsurface** 137:8
  152:13
**subtract** 168:23,24
  169:17 170:20
**subtracted** 170:23
**succeeded** 77:17
**successful** 11:25 62:9
  114:22 184:12 264:3
**successor** 29:2
**such-and-such** 197:24
**sue** 208:12,15,16
**sued** 73:2 259:10
**suffered** 81:22
**sufficient** 12:18 14:6
  15:24 21:23 23:14
  143:16
**sufficiently** 57:4,8
**suggests** 6:14
**suit** 268:9
**sulfur** 242:15
**sum** 161:23,24
**summarize** 75:22 177:8
**summarizes** 120:13
**summarizing** 75:3
**summary** 87:12
**summed** 161:25
**summer** 16:15 28:22
  125:1 137:9 149:16
  167:19,19
**sundries** 128:13
**supervises** 79:4
**supplement** 156:18

**supplemental** 95:14
**supplemented** 196:24
**supplies** 128:13,14
**supports** 122:15
**suppose** 109:25 216:21
  263:12,17
**sure** 7:4 13:24 17:12
  36:20 37:8 48:1
  56:25 67:14,20 74:16
  75:5,16 81:6,25 83:13
  104:6 109:15 113:15
  114:14 121:13 130:9
  132:24,24 134:18
  136:13,19 145:23
  158:5 159:4 165:1
  167:7 171:21 174:8
  174:12 176:14 179:20
  180:9 183:8,15,24
  185:20 191:14,17
  192:5,16 196:21
  197:1 200:12 208:20
  216:1 217:21 223:19
  234:21 254:13 262:17
  265:24 272:4
**surface** 87:5 128:24
  144:1 221:19 222:4
  222:21
**surprised** 176:22 208:9
**surprising** 16:24
**surrounds** 218:5
**suspect** 37:23
**suspected** 223:23
**sustain** 5:17 231:24
**sustained** 72:10
**Swayco** 264:8
**switch** 86:12 133:12
**switchgear** 218:4
  229:17
**sworn** 25:12 27:8 74:10
  74:11
**system** 10:7 13:2,5,7
  14:16 35:18 93:22
  94:5,5,6,13,16,17,18
  94:19 95:3,6 96:3,5
  96:21 97:2,3,6,8,16
  98:3,7,18 104:3,5,24
  107:15 110:20,22
  111:2,25 115:5 118:9
  128:15 129:6 139:4
  139:22,25 141:23
  143:6 152:5 153:3
  154:5 170:1 171:6
  175:6,7,12,21,22,25
  176:11,22 178:12
  200:5 218:10 225:12
  228:20,21 229:1
  237:1 239:13 240:11
  242:12,18 246:18,21
  247:4 249:12 253:1
  253:11 259:24 272:14
  272:23
**systems** 87:18 94:8

95:16,17 96:7,14
  187:9 188:6 191:10
**Szilagyi** 17:24 132:12
  133:25 134:16 144:8
  249:5

—————— T ——————

**T** 48:22,23
**table** 25:1 27:4
**take** 13:11 35:19 46:15
  54:8 58:8 59:18 86:6
  89:20,23 91:25 94:15
  105:17 113:14 123:20
  128:16 139:3 156:20
  168:22 174:21 178:23
  182:9 184:11 201:11
  202:5 205:6 213:15
  221:23 231:24 242:8
  271:6 273:25
**taken** 3:18 16:19 32:20
  75:14 113:17 123:16
  185:15
**takes** 14:15 90:2 107:6
  109:5 217:13
**talk** 6:12 9:15 48:13
  52:5 175:20
**talked** 67:4 68:24 69:22
  131:4 148:8 149:4
  181:2 188:10 193:6
  198:4 203:21 216:2,5
  216:6 218:13 228:17
  230:15,21 231:2
  249:13 262:21 272:5
**talking** 5:6 38:5 69:4
  135:14 186:14 194:4
  196:3 216:11 219:2
  262:20 263:2 271:16
  272:11
**tap** 13:15,17
**tax** 48:20 129:14 173:5
**taxes** 32:19,19,21 48:16
  122:7 130:22 131:2
  173:5
**Taylor** 86:20,22 101:4
  140:19,20 216:14,16
  246:16,21 247:4
  248:13 249:12 264:12
**team** 80:22 95:19
**Tech** 75:6
**technician** 80:4
**Technology** 1:5 3:2,25
  40:21 74:19 77:8,9
  198:15
**tell** 43:12 59:15 61:4
  63:2 67:17 70:18
  83:11 104:3 113:20
  121:2 134:6 162:11
  187:3 217:6 233:6
  250:1 269:1,5
**ten** 78:4 125:24 137:22
  160:6 164:10 207:2
**tend** 147:16

**tentative** 24:13
**ten-minute** 178:23
**ten-year** 63:7
**term** 37:13 93:21,25
  94:1,3 95:2
**terminate** 105:2 185:11
  186:3,22
**terminated** 255:15,18
  255:19 257:14,17
**termination** 186:9,17
  214:21
**terminology** 257:18
  258:4
**terms** 5:2 53:15 157:21
  158:15 202:11 263:18
  271:16
**territory** 21:11 83:4
  159:22
**Terry** 166:16,18,21
**test** 35:11 106:11 129:2
  134:24 135:2 152:22
  213:19
**tested** 35:18
**testified** 6:18,24 25:7
  32:1 43:16 44:7
  48:18 50:13 104:2
  166:24 181:23 183:4
  188:14,25 189:14,21
  190:6,7,23,25 191:8
  196:5,16,22 199:21
  200:7,14 203:25
  204:17 206:16 210:8
  213:9 224:6 225:19
  239:4 254:9,10 256:2
  260:24 264:19,24
**testify** 5:9 8:3,7 11:16
  21:19 27:1 65:3 66:5
  191:7 197:24 246:9
  266:9
**testifying** 8:4 45:17
  192:25 233:1
**testimony** 5:20 6:16,22
  7:6,19 8:5 10:3,4,12
  10:22 11:4,9,20 16:6
  16:22 17:25 18:7
  23:3 24:11 25:3,5,6,8
  25:10 44:19 111:22
  166:17,19 197:18
  204:15 207:6 255:21
**testing** 16:19,22 85:6
  85:12,13 120:11
  152:20
**Texas** 32:10 47:2 48:6
**text** 58:2
**Thank** 8:13,14,15
  18:14,15 21:3,4,9
  24:17,18 27:5,7 31:8
  42:14 60:4,10 64:24
  66:16 70:15 73:25
  74:3,5 233:24 234:5
  268:12 270:25 273:19
**Thanks** 234:11

**theory** 243:21
**they'd** 83:5 166:20
  263:9
**thing** 35:24 88:22
  102:22 114:5 118:17
  129:18 135:23 136:5
  142:18,20 150:3
  212:23 245:24 267:1
**things** 11:24 12:5 16:21
  17:4 35:25 56:4 94:7
  119:15 123:18 128:19
  136:3 137:25 143:10
  165:5 194:10 238:13
  265:8
**think** 4:17,22 7:9 8:16
  10:16,22 11:15 13:10
  14:3,25 15:18,18
  16:13,16,23 17:16,17
  18:5,10,23 19:19 20:3
  20:19 26:10 28:22
  31:17,22 35:8,19
  36:19 37:21 47:17
  48:10,14 50:2,8 63:7
  65:7 66:8,9 67:4 68:1
  68:24 69:18 70:23
  71:5 73:21 82:12
  83:1 84:12 86:3,7
  88:14 89:6 90:4,6
  91:10 92:21 97:17
  98:15 101:3 106:25
  109:13,14 115:4,6
  120:12,12 122:16
  124:18 126:5 135:6
  136:2,5 137:7 138:5
  138:14 139:8 140:8
  140:11,13 141:14
  143:10 144:9 147:13
  147:15 151:15,20
  152:1 153:5,16
  154:12 157:12 161:25
  162:20 165:4 166:10
  166:19 172:10,22,24
  174:22 175:5,24
  180:10 182:2,3 183:4
  183:17,18 184:10
  185:19 186:13 188:2
  188:24 189:14,21
  191:7 196:5,11,16
  200:7,14,21 201:3,6,8
  201:16 203:1,7,10
  204:25 207:23 208:8
  208:15 209:25 215:7
  222:14 223:21 226:6
  227:13,18 230:21
  231:8,21 232:17,23
  232:25 233:13 236:1
  236:2 242:21 245:4
  249:3 250:18 252:14
  252:18 253:16 254:7
  254:10 262:5,22
  263:21 267:14 268:7
  271:17,17,24

**thinking** 160:18
**third** 16:7,15 18:3
  63:21 89:11,16,21
  117:8 119:24 148:8
  174:18 222:17 225:16
  256:14
**thought** 127:6,12
  172:12 173:22,24
  186:11 197:21 220:13
  258:19
**thousand** 128:2 175:24
  192:16 193:3
**three** 10:23 13:3,4
  20:14,19 32:11 38:23
  53:25 69:12 91:7
  131:24 165:12 170:16
  170:24 171:9 215:8
  219:17
**throes** 264:11
**thrown** 176:3
**throw-off** 191:25
**thrust** 231:25
**Thursday** 268:7
**ticket** 137:5
**tie** 156:15 200:4
**time** 8:6 9:1,23 10:17
  11:2 12:21 13:11
  14:4 28:13 33:2 35:1
  36:11 38:9 39:5 43:7
  43:7 45:7,11 47:18
  49:16 54:18 55:11,15
  55:17 69:14 70:6,7
  76:8 77:6 78:6 85:24
  92:2,3 93:2,10 97:1
  97:15 98:7,13 101:16
  103:8,9 104:1 105:21
  105:23 107:5 108:4,5
  109:4,16 112:9,13
  114:24 120:23,25
  131:18 132:19 139:17
  140:17 142:4 146:14
  158:23 159:1 168:7
  180:4 182:17 183:14
  184:18 185:12 186:22
  187:18 207:4 212:22
  214:9 216:10 217:7
  217:13 219:2,3,19,24
  220:2,3 221:12,19
  228:10,19 229:24
  240:24 250:6,10
  257:13 262:1 268:25
  270:24 271:15 272:12
**timely** 23:23 103:7
  120:22 122:9 265:11
**times** 164:21
**timing** 10:11 103:14
**Title** 211:20,22 212:1
  214:3 218:12,15,17
  218:25 219:3 230:3,4
**today** 5:6 9:15 20:11
  24:8 26:7,23 45:17
  47:20 49:25 59:14

70:21 81:3 85:3
  100:15 102:23 132:23
  184:13 191:24 192:6
  195:25 199:19,22
  205:9,19 209:10
  241:3 259:19
**told** 62:23 65:15 208:3
  272:13,21,22
**tomorrow** 66:24 268:6
  273:25 274:2
**top** 94:11,20 124:11
  125:25 131:6,7,10
  140:23 143:18 148:20
  151:22 162:12 250:13
**topic** 60:3
**torture** 48:4,4
**total** 169:14,15 177:8
**tough** 135:5
**toughest** 138:25
**track** 234:19
**tranches** 11:10
**TRANSCRIPT** 1:8
  274:7
**transfer** 71:4 72:17,17
  73:7 99:20,23 106:17
  215:16,21 216:4,15
  217:1 271:21,21
**transferred** 6:21 71:3
  73:13,15,20
**transferring** 99:20
**transfers** 87:8 100:14
**transition** 193:15,17
  194:6 195:14,15
**transitioned** 181:3
**transitioning** 181:12,13
**treatment** 82:21
**tree** 175:7,12,16
**tremendously** 148:12
**trial** 3:2,19 36:1 60:7
  127:6 195:15 225:24
  255:2,22 257:2
**trials** 7:6 194:11
**triangle** 137:16 152:12
**tries** 69:11
**triggered** 137:7
**Trinity** 80:12 81:8
  85:14,19 86:6,10,17
  87:1,3,14 108:19
  128:23
**tripping** 9:1
**trouble** 5:12
**true** 45:13 47:2 54:2
  56:1 84:20 179:21
  183:11,12,15,21
  184:16 185:11,14
  196:9,11 205:12
  210:9 219:10 229:11
  229:23 232:3 242:4
  254:14,25 255:12
  256:7 257:25 258:10
  259:9 260:7 267:21
  274:7

**trust** 1:13 3:5 8:24,25
  9:23 10:4,9 12:2,10
  14:18 16:8,9 19:1,17
  27:15,22 28:1,3,3,4
  28:13 29:5,14,18
  38:10,13,20 39:3,4
  41:6 53:24 54:22
  56:4,14,21,22 57:2
  58:19,25 59:16 60:14
  60:18 61:9,13,16
  70:13 74:22,25 79:18
  91:18,19 92:8 93:4,5
  96:20,23 99:4,17,21
  101:7 102:16 103:17
  114:12 130:2 132:2
  146:7,18 148:5,6,17
  149:14 173:17 174:5
  181:20,20 182:12
  183:1,9,13 184:1,3,14
  184:17,21 185:8,12
  185:13,21 186:3,22
  187:1 196:20 207:2,4
  208:18 209:25 263:16
  271:10
**trustee** 1:15 3:9 9:22
  12:19,20 14:7,8 15:25
  16:1 17:1,2 18:20
  19:16 20:4 28:19
  29:2 41:12 53:3,3,11
  53:12,12 54:19 56:6,9
  59:5 60:19,23 61:10
  61:15 64:20 65:16
  67:19 70:4,5,10,12
  74:21,24 93:5,7,9
  132:12,20 140:4
  141:15,25 142:2
  144:8 180:15 182:11
  182:15,19,22 183:6
  185:7 186:10 187:14
  194:13 195:12 196:19
  197:16 198:20 208:17
  208:19 229:3 243:2
  247:6 248:15,16
  249:1 250:12 257:12
  272:11,25
**trustees** 17:20,20 56:23
  57:11
**trusteeship** 141:25
  142:1
**trustee's** 20:10,12
  273:9,10
**trusts** 182:20,23
**trust's** 29:10 69:23,24
  176:5 205:4
**truth** 225:4 231:19,23
  239:2
**try** 8:24 17:12 18:18
  45:2
**trying** 45:21 73:20
  134:11 193:2 219:1,4
  238:19 239:1 247:22
  258:15

tune 170:21 171:14
turbine 96:9 116:9
    138:15 143:7,10,16
    217:23
turbines 94:25
turn 23:15
turning 100:5
tweak 160:19
tweaked 160:18
twelve 10:15
Twenty-five 122:12
two 7:6 20:5 29:23 43:9
    43:13,14,18,20 45:10
    46:16 52:1 54:9 56:4
    61:8 69:12 104:19
    111:6,7 116:25 117:2
    117:4 126:22 127:13
    127:14 131:18 143:10
    145:1 147:4,18
    151:14 153:9 154:6
    158:25 160:5 162:10
    163:6 166:12 167:1
    167:25 169:10 170:19
    180:23 211:24 219:22
    252:10 256:12 272:17
    273:3
two-and-a-half 31:21
two-thirds 69:13
type 95:8,12 103:18
    142:16,17 150:3
    158:4 160:13 161:21
    202:16 245:18
typical 42:23 239:25
typically 219:20 234:19
    251:18,23

                U
ultimate 76:23 213:5
ultimately 117:6
    203:16 216:1 219:5
    273:10
umbrella 107:19
    212:21 213:22
Um-hmm 85:17 87:7
    87:20 90:18 98:5,25
    105:12 106:8 108:16
    112:3,6 119:18,21
    124:24 131:23 132:10
    133:17 143:8 147:22
    160:15 168:21
unable 64:8 204:1
unassumed 21:8
unaware 205:18,20
understand 3:23 37:9
    38:10 73:6 90:20
    96:17 99:11 134:4
    150:12 193:22 194:6
    262:10
understandable 226:15
understanding 12:10
    38:12 41:4,7 67:11
    98:4 104:8 120:24

122:4,6 180:18,21
    183:3 226:7 247:13
    252:23 259:16 271:5
understood 44:19
    248:9 251:16
unfortunately 81:16
    257:12
unique 4:3
unit 6:11 120:11
UNITED 1:1
units 154:6
University 75:7,8,9,12
    75:19,20 78:20
    123:24
unknown 132:23
unnecessary 271:22
unquestioned 24:8
unrelated 16:8 100:14
unresolved 253:25
unsigned 209:22
updated 220:17
upgrade 99:1
uptime 158:23 159:7
    269:3,3 270:10,11
urge 226:15
use 22:19 33:9 48:4
    85:12,13,15,22 92:18
    115:23 135:19 159:17
    192:11 204:23 220:15
    258:16 262:9,12,14
    262:15,18,23 264:12
uses 43:5 95:13 165:10
usual 263:5,10
usually 94:7 106:9
    129:6
utility 94:21 116:17
    125:13 128:3 237:14
    237:15,17 264:4
utilize 32:25 33:16
    163:4
utilized 141:22 157:20
    165:9,15,22
utilizing 92:13 115:19
    165:16 175:21

                V
V 211:20,22 212:1
    214:3 218:12,15,17
    218:25 219:3 230:3,4
vacuum 147:24 152:14
vagaries 68:25
valid 6:4 24:8
Valley 9:9 13:24
value 30:1,23 47:21
    72:19,20 73:17,22
    112:25 184:19 186:14
valued 260:9
valve 88:20,21 138:19
valves 129:11
VanSoustra 164:14
variance 125:12
various 11:23 16:20

22:2 83:18 85:2
    87:11 92:14,23
    123:11 127:22 159:14
    164:2 221:7 254:11
    254:12 258:11 259:22
    262:4 264:20 271:7
    273:11
vehicle 187:4
veil 70:20 71:1
vents 94:11
venture 48:14 49:8
versus 117:1
vertical 111:18
vice 77:16
Vince 16:5 81:21 82:1
    129:12 265:15 266:9
    266:22
violation 142:23 145:17
    222:15 230:13,14,16
    234:18 247:16 248:5
    250:20 251:1,6
    253:10,24
violations 22:23 138:23
    189:3 190:24 225:10
    249:9 251:10,23
    259:23
virtually 85:7
virtue 53:8,19
visits 15:4
void 271:8,20

                W
Wachovia 70:24 71:2,6
    71:15,18 72:14,22
    73:10,12,14
Wachovia's 71:25
wait 106:3 107:11
    178:14 212:18 238:20
waiting 150:25
walk 109:20 114:11
Walker 78:12 80:6,15
    80:17 131:1 181:6
    266:5
want 4:10 5:9,23 18:16
    21:10 25:6 36:2,9,17
    36:22 47:25 48:8
    56:5,23 64:20 83:10
    84:14 100:20 103:11
    113:24 114:3,4,6,10
    121:10,13,19 136:3
    158:5 161:4 178:6
    184:18 185:2 186:6
    200:6 202:6 212:13
    231:11 234:6 253:23
    255:15 258:21
wanted 60:15 135:18
    183:22 212:17 234:8
wanting 97:7,21
wants 270:17
wasn't 26:20 132:13,14
    132:16 134:7 143:14
    143:15 184:8 209:23

222:9 229:4,6 237:24
    257:12 260:14 265:16
    268:23
waste 1:17 3:11 9:10
    12:24 54:1 76:7,9,11
    76:12,17,20,23 77:3,7
    82:19,20 91:25 94:9
    128:1 139:2,5 144:10
    146:13 149:6 164:15
    166:23 173:6 272:19
water 85:8 139:16,19
    139:21 143:18 149:6
    207:24
Watson 80:3 82:6
    131:1 181:7 266:4,8
Watts 13:21 14:2 20:22
    104:8,20 141:1
way 17:21 34:7 41:20
    59:4 75:12 82:5
    94:21 96:6 112:10
    117:23 143:4 149:21
    160:11 162:21 166:7
    195:10,13 230:16
    245:10 272:2
wear 88:20,21 89:24
weather 148:18,20
    149:16 168:2
website 124:23 163:20
    264:9
Wedoff 1:9 53:2
week 15:4 98:19 155:13
    171:19
Weeks 80:7,7 81:4
    181:8
weight 4:7
welcome 25:10
wellhead 87:4 94:20
    128:24 147:21 148:15
    152:19
wellheads 224:4
wells 12:23 14:24 15:1
    30:16 31:14 32:9
    33:10 43:24 44:4
    61:21 94:10,11,12,13
    109:15 137:22 138:1
    138:2 139:10 140:2
    141:10,11 143:25
    148:14 218:2 228:23
    230:23
well-exceeded 270:15
went 76:3 90:21 100:16
    104:18 139:17 143:9
    151:22 159:15 172:8
    172:18,22 174:24,25
    177:13 178:8 180:19
    207:6 213:19 227:22
    229:24 236:1 248:8
    255:2 263:7 273:11
weren't 13:16 154:1
    181:16,21 220:4
    237:16,21 272:6,9
West 31:14

Westchester 146:16,21
    147:5
we'll 8:20 15:19 42:14
    58:8 60:3,8 89:21
    103:3,8 108:17,17,19
    118:13 133:12 134:20
    148:9 149:15 151:11
    160:19 162:6,8 165:7
    178:21,23 196:13
    212:3 223:15 226:20
    255:25 274:1
we're 7:6 8:19 9:5,14
    13:23 14:2 59:4
    80:18 81:2,11,15 85:2
    90:14 97:6 102:23
    108:13 112:1 120:22
    129:1 131:18,21
    132:23 135:23 150:25
    151:3,10 153:5 158:6
    160:16 168:2,19
    169:18 170:8,16,16
    174:3 181:11 184:13
    193:7,9,16 194:4,6,9
    195:13 200:4 206:14
    209:5,6 264:6,9 269:6
we've 14:3 20:18 45:1
    52:4 59:17 82:2,18,24
    83:1 84:12 88:7
    89:11 93:6 96:4
    132:24 154:1,8 156:7
    159:5 174:15 195:25
    230:21 241:3 247:20
    254:9,10 264:10
    270:10,14,18
whatsoever 19:9,12
    22:8 207:18
Wheatland 146:14
    190:7,15
white 193:16
wholly-owned 47:7
    76:9
William 79:14
willing 12:20 14:9 16:1
    17:20 41:25 42:3
    66:11 93:17 263:9
willingness 18:2
Wisconsin 76:20 78:20
wish 33:12
wished 39:22
withdraw 58:5
withdrawn 238:5
withdrew 238:14
witness 2:5 5:9 6:8 7:3
    7:8,8 8:4,7 24:19,25
    24:25 25:12,22 26:9
    26:12,13 27:8,19
    30:20 31:1 37:19
    42:15 48:24 58:9
    59:9 60:24 65:8
    68:13,17 70:22 73:8
    73:11,14,19 74:5,6,7
    74:10,11 100:25

126:11 150:10 163:1
178:22 179:4 186:18
197:4,9 203:18 225:6
232:4 233:13 234:1,5
234:8,11 236:21
239:10 240:18,23
244:8 263:6,12,20,23
264:1,5 273:23
**witnesses** 24:21 25:7
**word** 48:5 184:11
205:6
**work** 14:21 17:9 22:17
22:20 25:19 64:14
75:10 76:3 85:18
87:12 88:15,16,19,25
89:8,15,18 90:12
106:3,6 114:6,15,16
117:22 119:25 120:1
120:8 123:20 129:1
148:6,13 149:10
156:19 176:23 177:4
194:13 196:18 202:20
202:24 204:12,15,16
215:13 262:18 266:11
272:19
**worked** 10:19 76:1,1
78:22 159:10 198:22
235:19 265:20
**working** 16:13 80:8
88:6,23 93:15 134:15
149:15 179:22,22
180:4,7,15,16 194:9
209:6 214:15 243:1
**workman's** 129:24
**works** 26:16,17 83:13
180:21 215:12 266:3
**world** 78:16
**worth** 30:6 31:19 44:9
44:25 229:7
**wouldn't** 72:7 103:7
110:1 135:11 140:18
161:17 191:23 213:24
222:21 262:14,18
266:24
**writing** 58:16,18 87:6
251:9,18
**written** 114:14 202:19
**wrong** 83:24 126:7
174:13 210:12 238:7
260:24 264:23
**wrote** 68:17
**Wyandot** 146:14 190:7
190:15

---
**X**
---
**X** 2:2 217:7
**XYZ** 59:17,18

---
**Y**
---
**yeah** 6:8 35:6 48:8
57:14 75:16 78:19
79:4,22 81:6 82:1,13

92:17,20 106:22
107:9 109:10 115:11
115:15,18 116:9
121:18,18 126:8,19
127:9 130:11 132:7
134:7,18 135:4
136:19,19,23 138:5
138:11,18 141:17
142:13 150:14 151:21
154:15 155:18 156:1
157:1,10 160:8 162:7
162:9,20 163:1
164:18,18,25 165:12
165:13,24 167:22,24
170:6 173:7,24 175:2
175:2 176:24 177:24
180:12 184:10 188:12
203:3 213:16 218:19
223:19 224:6,9 225:6
227:18 229:15 230:4
232:16 234:11 235:3
236:15 242:10 247:6
248:17 249:13 257:1
257:10 266:12 271:9
271:9
**year** 11:11 15:19 65:4
81:22 96:23 98:21,22
98:23 103:11 108:11
108:15,18,20 112:5
118:6,7,7,12 126:5,12
127:14,15 129:13
131:13,13,20 134:19
160:2 169:7,8,9
170:21 171:8,14
248:9 266:10 270:20
**years** 16:21 19:2 20:19
28:7 31:18 45:10
61:19 69:12 76:5,11
80:18,19,20 82:15,18
82:25 83:2 88:9
91:23 93:15 95:15,22
95:22,24 96:4 98:4
103:13 104:8 107:7
108:3,8 111:23
116:19 122:12 128:2
134:11 143:20 152:2
153:18 159:12 164:10
166:12,19 167:1
170:19,25 171:16
207:2,2,23 212:19
213:15 215:8 225:8
248:1 255:22 257:2
258:8 265:20 270:10
270:15,19
**Year's** 81:23
**yesterday** 130:19
**York** 163:22

---
**Z**
---
**zero** 72:25 73:2 160:20
**zips** 152:7
**zone** 139:19 144:3

---
**$**
---
**$1** 170:1 177:18
**$1.2** 32:14 48:17
**$1.25** 69:16
**$1.4** 170:3 171:11
**$1.5** 171:4,14 178:13
**$1.9** 169:3
**$10** 31:2 45:3
**$10,000** 68:1 129:2
**$100,000** 169:13
174:20 257:11
**$13.6** 31:4 44:25
**$15,000** 136:7
**$150,000** 169:1
**$2.6** 171:1
**$212,000** 268:11
**$250,000** 131:4
**$3** 11:9 17:6 21:20
31:19,22 37:10,12
39:21 40:5,14,17,19
41:14,18,20 42:2 44:9
66:7,10,12,15 73:23
117:25 167:6 204:18
206:25 207:20
**$3,000** 128:22
**$30,000** 174:15
**$300,000** 116:22
**$3500** 128:16
**$4** 30:6,8,22 260:11,20
**$400,000** 97:17,20
169:19 170:12
**$405,000** 256:19
**$449,000** 98:7
**$450,000** 171:5
**$5.7** 31:18 44:9
**$50,000** 90:6
**$500,000** 15:15 32:15
97:6 115:5 116:12
**$60,000** 66:22 67:1
119:17 167:15
**$600,000** 17:22 140:2
170:21 171:9
**$700,000** 32:16,25 49:2
**$8** 164:10,11
**$80,000** 172:24 173:2
173:17,25
**$800,000** 171:7

---
**0**
---
**04** 272:15
**05** 17:23 250:11 272:5
272:16
**06** 75:1
**07** 32:12
**08** 158:18 169:5
**09** 169:6,7,9,15,21

---
**1**
---
**1** 57:20,21 60:20 121:4
164:6 184:24 185:17
185:20,24 202:18

209:23 210:1 211:12
237:8 258:14
**1st** 220:5 221:16
**1(b)** 202:6
**1.25** 168:8 167:8 168:9
**1.3** 97:11
**1.4** 170:13 178:6
**1.75** 168:19
**1.95** 171:6
**1:00** 1:7 60:3,5
**10** 61:19 82:15,18,24
83:2 86:13 88:9
91:23 270:9
**10:30** 1:6 3:1 60:7
273:24
**100** 52:13 122:16
170:19 269:6
**11** 17:1 67:13,16,18
80:18,20 87:16 91:12
95:21 132:12 140:4
173:21,22 229:3
231:6,8
**11.5** 231:7,10
**110** 112:21 137:14
**12** 1:6 80:19 93:15
121:17 159:12 270:19
274:5
**12th** 122:3,5 233:7
**12-year** 219:2
**1206** 223:15
**13** 60:22 83:10 92:4
186:8
**13th** 268:19
**13.1** 68:14
**13.6** 68:23
**138th** 76:13
**14** 224:16
**14th** 210:20
**15** 19:2 28:7 95:22
217:7 223:13
**15th** 210:19
**15,000** 136:8,11
**150,000** 170:19
**16** 66:24 67:1 167:15
220:12
**17** 95:24
**179** 2:8
**180** 105:19 107:16
109:2,22 271:18
**180-day** 109:3
**19** 236:16
**1980s** 51:24
**1984** 75:7,24
**1989** 75:24 76:6
**1992** 28:3
**1993** 80:9
**1995** 13:22 77:7 81:22
179:8,23
**1996** 15:22 80:19
159:12
**1997** 78:13 79:15 80:20
**1999** 77:17 80:5 134:25

180:2

---
**2**
---
**2** 84:17 100:6 114:6
202:3 211:12 221:9
**2nd** 120:22 121:6,9,23
122:2
**2.2** 169:22 170:23
**2.3** 169:20,22
**2.6** 171:2
**200** 31:14
**2000** 44:14 80:5
**2001** 77:17,19 179:11
**2002** 9:22 21:8 134:20
143:9 219:6 232:11
233:7 234:17
**2003** 171:1
**2004** 137:10 144:9
219:25 220:1,5,6
221:13,16,16 227:7
227:14 228:19,19,24
229:1 231:2 272:24
**2005** 138:23 139:10
173:24 219:25 220:1
220:25 227:17,19
228:20,25 229:24
235:9,14,16,17
237:21 250:3 272:24
273:1
**2006** 28:23,24 53:1
120:22 121:6,9 122:2
182:14 186:25 187:9
190:21 198:24 229:22
236:12 237:12 267:22
268:13
**2007** 48:15 49:13,15
87:21 122:3,5 124:22
198:17
**2008** 1:6 126:21 128:25
131:14,22 158:16
167:7 169:1,2 234:16
268:20 270:20 274:5
**2009** 108:14 131:18
170:12
**2010** 108:22,23 169:24
170:8,15,16
**2011** 10:17 166:12
**2012** 166:13
**2013** 11:15 112:1,7
166:11 171:1,2,3,10
**2014** 112:2 171:12
**2015** 11:15 117:8
171:15
**2016** 171:16
**2018** 131:14
**2020** 93:20 164:13,22
171:16
**220** 268:11
**224,000** 268:12
**24** 239:7
**25** 89:7 153:18
**25th** 65:4

**25,000** 89:6 182:8
   267:17
**250,000** 118:12 144:12
   167:11 177:11
**26** 223:22 242:8
**26th** 13:21
**264** 2:9
**269** 234:15
**27** 2:6 100:3,7,8 102:1
   243:19
**27th** 250:3,11
**271** 2:8
**28** 100:3,7 101:25
   148:24
**28th** 171:20 220:25
   234:16
**29** 124:15 247:7,24
**29th** 220:6 221:16
   234:16

---
**3**

**3** 21:22 30:5,8,21 204:8
   221:23 222:12 234:6
   235:4
**3rd** 9:21 21:8
**3,000** 128:16
**30** 9:20 15:22 89:20
   124:16 163:16 217:7
   248:20
**30,000** 89:5,7
**300** 128:5
**300,000** 15:15
**31** 249:22,23
**31st** 146:20 147:5
**32** 253:14
**320** 117:5
**330** 30:16 31:13 43:24
   44:4 61:20
**34** 157:3
**35** 122:16 124:1 126:13
   127:3
**35434** 1:4 3:2
**36** 126:10 127:3 162:16
**365** 21:15
**37** 162:16
**38** 165:3

---
**4**

**4** 80:9
**4th** 268:19
**40** 139:14,17
**400,000** 169:25 178:3
**401** 67:5
**407** 44:18 67:8,9 68:9
**408** 258:13
**42** 2:6
**449,000** 178:12
**45** 89:20
**450** 164:20,20,21 170:1
**47** 113:18 201:23,24
**477,000** 131:20
**49** 255:24

---
**5**

**5** 100:6
**5.2** 125:5 126:23
**5.4** 186:7,12,15
**50** 34:24 36:4,5,8,13
   123:13 139:14,17
   164:13 210:6,13,14
   210:15 211:8,11
   256:11
**50,000** 174:18
**50-percent** 50:24,25
**500** 221:20 222:4 223:1
**500,000** 117:1 118:8,9
   176:8
**52** 34:24 36:5,13,15
   210:6,15 211:7,11

---
**6**

**60** 38:8 217:8
**60,000** 129:13 266:10
**600** 147:17
**64** 2:7
**66** 2:6
**69** 121:2,4

---
**7**

**7** 1:15 3:8 5:25 17:2
   53:3 67:13,15,18
   132:15 171:7 173:20
   175:25 180:15 187:13
   198:20 201:13 250:12
**7.3** 60:22 186:10,11
**70** 269:5
**71** 2:6 36:1
**72** 121:2
**74** 2:8
**75** 140:23
**75/25** 160:19
**750** 171:4

---
**8**

**8** 5:25 83:9,16 129:2
**80,000** 174:7
**800,000** 175:25
**83** 75:25
**85** 30:4,8 31:16 32:1
   33:19 44:21
**85-percent** 46:8,21

---
**9**

**9** 27:15 87:21
**90** 97:7,20 105:19
   114:16 115:3 119:19
   127:10 160:9,10
   202:18 271:18
**90s** 28:5 78:9 218:15
**90-day** 98:10 111:7
**900,000** 170:7
**92-7163** 1:13 3:5 27:22
**96** 9:20 269:3 270:11
   270:15,16,18

**97** 80:17
**98** 270:10
**99** 1:4 3:2

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Resource Technology Corporation,) No. 99 B 35434
                                 ) Chicago, Illinois
                                 ) 9:30 a.m.
                        Debtor.   ) February 13, 2008


TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF


APPEARANCES:


For the Trustee:              Mr. George Apostolides;


For IIT:                      Mr. Gregory Jordan;
                              Mr. Peter Schmidt;

For Allied:                   Mr. David Bohan;
                              Mr. Robert O'Meara;

For the City and County
of Peoria:                    Ms. Linda Kujaca;




Court Reporter:               Amy Doolin, CSR, RPR
                              U.S. Courthouse
                              219 South Dearborn
                              Room 661
                              Chicago, IL  60604.

```
 1                    I N D E X

 2

 3

 4    Witness:           DX      CX      REDX     RECX

 5

 6    Leon Greenblatt     10      23       48

 7    Patrick Sloan       54      91      106

 8    Michael Reed       123     167      176

 9                       165

10    John Connolly      177

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    THE CLERK:  Taking up the court's

2    10:30 set matter, Resource Technology Corporation,

3    99 B 35434.

4                    MR. JORDAN:  Your Honor, Mr.

5    Apostolides and I had a conversation after court.

6    And Mr. Apostolides, correctly I think, wanted to

7    clarify something with me.

8                    Mr. Connolly testified that he was

9    getting paid by RTC.  It's not the debtor.  It's not

10   the same FEIN number.  It is not any of the parties

11   to this proceeding.  But Mr. Apostolides, I think

12   wisely, wanted to make sure that there wasn't anybody

13   on the side incurring debts on behalf of the debtor.

14   And that's not the case.  No payroll is being paid

15   under the FEIN, no payroll tax liabilities are being

16   incurred.

17                   THE COURT:  At earlier stages in this

18   case, the question of what happens to a corporate

19   debtor when a trustee is appointed was raised but

20   never resolved the issue became moot, and at some

21   point I may be called upon to resolve it.

22                   But in the meantime, I understand that

23   the former owners, who are owners of the debtor, take

24   the position that the debtor, the entity, continues

25   to exist, even though there is a bankruptcy pending

Page 4

1    with the debtor's estate.  I am not sure how that

2    works, but I understand that's their position, and I

3    understand that the payments made to Mr. Connolly in

4    the name of RTC are not coming out of this bankruptcy

5    estate.

6              MR. JORDAN:  No.  It's not even coming

7    out of the same FEIN numbers.

8              THE COURT:  I understand.

9              MR. JORDAN:  It's not even coming out

10   of the same corporation.

11             MR. APOSTOLIDES:  It's not coming from

12   the debtor.

13             MR. JORDAN:  Right.  But at some

14   point, I at least sense that you are interested in

15   that -- in nothing more than an academic issue,

16   that's fine.  I am interested in that issue, too.  So

17   at some point I think we -- I would like to resolve

18   that issue because I think it's fascinating.

19             THE COURT:  Well, if it comes up in a

20   context that requires its resolution, I'll do it.

21   But I have too many real disputes to resolve to

22   engage in merely academic ones.

23             MR. JORDAN:  I'm not saying that we

24   are going to have an advisory opinion.

25             THE COURT:  Okay.

Page 5

1          MR. JORDAN:  I'm just saying I am

2  interested in the issue.

3          THE COURT:  Now, in a similar vein of

4  understanding precisely what entities we're dealing

5  with, I did want to get clarification on one point.

6  Illinois Investment Trust is a common law trust; is

7  that not correct?

8          MR. JORDAN:  You know, I'm not a trust

9  lawyer.  It's a business trust, I guess, or a common

10 law -- I mean, it's a trust created under the laws of

11 Illinois with all the powers that a trust created

12 under the law of Illinois have.

13         THE COURT:  Let me check something.

14         Is this trust created pursuant to any

15 statutory provisions of the state of Illinois or is

16 it merely an Illinois common law trust?

17         MR. JORDAN:  I have no idea.  I would

18 -- I would call it an Illinois common law trust.  We

19 can brief the issue.  I could check on that.  It's

20 never been raised by any of the parties here.  It may

21 be created under a statute.  I just don't know.

22         THE COURT:  Well, I think it may be

23 very important to find out whether this trust has the

24 capacity to sue or be sued, and whether this trust is

25 amenable to an involuntary bankruptcy proceeding.  If

1    it's a common law trust, my understanding is that it

2    does not have the capacity to sue or be sued, it

3    could only take action in the name of the trustee,

4    and that it would not be subject to an involuntary

5    bankruptcy proceeding.

6             MR. JORDAN:  You know, I'm not -- I

7    haven't updated the chapter that I'm writing on

8    involuntary bankruptcies yet, but I'm not sure that

9    even a statutory trust would be subject to an

10   involuntary bankruptcy.

11            THE COURT:  Well, that may be an

12   important consideration in coming to a conclusion as

13   to whether Illinois Investment Trust can give

14   adequate assurance of future performance, in that if

15   it fails to do that, it may not be amenable to suit.

16   And if it fails to make payments, it may be

17   impossible for creditors, such as the counter-parties

18   to these agreements that are sought to be assumed, to

19   marshal its assets in an involuntary proceeding.

20   So...

21            MR. JORDAN:  I'm not sure -- I would

22   respectfully disagree that they don't have the right

23   to sue the trust to which they have the contract.

24            THE COURT:  It certainly raises a

25   question.  To me it is a real concern.  If, for

Page 7

1    example, the creditors of the Illinois Investment

2    Trust could only attempt to sue the trustee for

3    whatever assets were in the trust as trustee, and the

4    trust had no assets because it had not received loan

5    proceeds from the entities, Scattered Corporation,

6    that have some contractual obligation to make those

7    loan proceeds, it might be impossible for the

8    creditors to take action that would force the trustee

9    to collect whatever rights it had.

10                MR. JORDAN:  That's fine, Your Honor.

11    So what we will do is we'll agree that since the

12    contract's freely assignable, that one time -- and

13    there is no intentions of doing it otherwise -- we

14    will set up a corporation to accept the assets.  It

15    will be called, you know, assuming the name is

16    available, Illinois Investment Trust Corporation.

17    And John Connolly will be the sole officer and

18    director of that entity.

19                And that way it can sue, it can be

20    sued and it can be brought into an involuntary

21    bankruptcy case.  But it remains -- it will be in the

22    same position.  And I presume that its shareholders

23    would be Scattered Corporation and Chiplease, Inc.

24    And that way we are dealing with the same parameters

25    that we have previously.

Page 8

```
 1                    THE COURT:  Well, I just raised the
 2    question.
 3                    MR. JORDAN:  That's fine.  We will
 4    agree to that.
 5                    MR. O'MEARA:  Your Honor, we'd
 6    obviously object to that.  We're in the middle of
 7    trial.  It's their burden of proof, and they want to
 8    change, you know, everything in the middle of the
 9    case.
10                    MR. JORDAN:  Actually, we are not
11    changing to their detriment.  We are changing to
12    their benefit, so I don't know what objection they
13    could possibly have.
14                    MR. O'MEARA:  Well, we were first told
15    this was going to be Scattered and Chiplease who were
16    taking these contracts.  Then it was IIT.  Now we're
17    talking about an unknown entity under an unknown
18    agreement.  Obviously we would object to this.
19                    MR. JORDAN:  Actually --
20                    THE COURT:  I am not going to try to
21    resolve the question right now.  I just raised the
22    issue.
23                    MR. O'MEARA:  Okay.  Thank you.
24                    THE COURT:  And if it is not dealt
25    with in a way that gives me comfort that there would
```

Page 9

1   be a potential for enforcement by counter-parties,

2   then I would find a lack of adequate assurance.  So

3   we will see.

4              MR. O'MEARA:  Thank you.

5              MR. JORDAN:  That is, by the way,

6   agreeable to Mr. Connolly.  We will take that action,

7   assuming that the assignment is made, the assumption

8   is made and the assignment is made.

9              THE COURT:  All right.  Anything else

10  to take up before we resume with the testimony?

11             MR. JORDAN:  No, Your Honor.

12             MR. APOSTOLIDES:  Judge, I just wanted

13  to clarify, we had -- I had discussed with Mr. Jordan

14  putting Mr. Connolly on the stand to raise this issue

15  of his employment and the FEIN of the entity that's

16  paying him.  I assume that Your Honor is comfortable

17  with this discussion?

18             THE COURT:  I will take that

19  representation if that's not in dispute among the

20  parties.

21             MR. O'MEARA:  No objection.

22             MS. KUJACA:  No objection.

23             THE COURT:  All right.  That's fine.

24             MR. APOSTOLIDES:  Thank you, Judge.

25

Page 10

1                    THE COURT:  Your next witness then,

2    Mr. Jordan.

3                    MR. JORDAN:  Leon Greenblatt.

4                    (Witness sworn.)

5                    MR. JORDAN:  Your Honor, just to

6    clarify, because it became an issue at the NEC

7    deposition, Mr. Greenblatt actually does have an eye

8    condition, and he has difficulty with bright lights.

9    He had sunglasses on in court.  He has taken them off

10   so he can testify.  But that is the reason that Mr.

11   Greenblatt had his sunglasses on.

12                   THE COURT:  Okay.  Go ahead.

13              LEON GREENBLATT, WITNESS, SWORN

14                    DIRECT EXAMINATION

15   BY MR. JORDAN:

16        Q    Can you please state your name and spell

17   your last name for record.

18        A    Leon Greenblatt, G-r-e-e-n-b-l-a-t-t.

19        Q    Mr. Greenblatt, have you ever heard of

20   Illinois Investment number 92-7163?

21        A    Yes.

22        Q    It's my understanding that you have a

23   relationship with Chiplease, Inc.; is that correct?

24        A    Yes.

25        Q    And are you the sole director and officer

Page 11

1    of Chiplease, Inc.?

2        A    Yes.

3        Q    And is Chiplease, Inc., a beneficiary of

4    the Illinois Investment Trust number 92-7163?

5        A    Yes.

6        Q    And it's my understanding that you're a

7    director and majority shareholder of Scattered

8    Corporation; is that correct?

9        A    I'm a director.  I'm not a majority

10   shareholder.

11       Q    Okay.  Are you agreeable to, as a director

12   of Scattered Corporation and as sole officer and

13   director of Chiplease, to transferring assets from

14   Illinois Investment Trust to a new corporation along

15   the lines that I outlined with the court a moment

16   ago?

17       A    That would be fine.

18              MS. KUJACA:  Your Honor, I can't hear

19   the witness.  Could we have him speak into the

20   microphone perhaps.

21              THE WITNESS:  That would be fine.

22   BY MR. JORDAN:

23       Q    Mr. Greenblatt, what is the nature of

24   Chiplease's business?

25       A    Chiplease is a lender and lessor.

Page 12

1      Q    And can you tell me whether it has been a

2   lender since at least 1999 or not?

3      A    Yes.

4      Q    Okay.  And can you tell me whether it was a

5   lender to Resource Technology Corporation?

6      A    It was.

7      Q    And at the time of the filing of the case,

8   was it, along with you and Banco Panamericana, the

9   sole secured lender?

10     A    Yes.

11     Q    Okay.  Has it been a lessor since the year

12  2000 or not?

13     A    Yes.

14     Q    Okay.  To whom is Chiplease a lessor?

15     A    Chiplease is a lessor to dry cleaning

16  shops.

17     Q    Okay.  How long has it been a lessor to dry

18  cleaning shops?

19     A    Since its inception.

20     Q    How long has it -- I'm sorry.

21          Approximately how much are its current

22  assets?

23     A    About 15, 16 million.

24     Q    Now, yesterday in court Mr. Jahelka

25  testified with regard to a lawsuit relating to the

Page 13

1    401 South Dearborn property.  And I am wondering

2    whether you're aware of that lawsuit?

3         A    Yes.

4         Q    Okay.  And can you tell me whether the

5    counter-parties to that contract sued for specific

6    performance or did they sue for something else?

7         A    They sued for specific performance.

8         Q    Have you ever heard of Gold Coast Realty,

9    LLC?

10        A    Yes.

11        Q    Who is that?

12        A    They are one of the plaintiffs or actually

13   defendants who filed a counter...

14        Q    Have you ever heard of 407 South Dearborn,

15   LLC?

16        A    Yes.

17        Q    Who are they?

18        A    Likewise, they are one of the plaintiffs in

19   the --

20        Q    And C&L Holdings, Inc., do you know who

21   that is?

22        A    Yes.

23        Q    Who is that?

24        A    They are a defendant in one of our

25   complaints against those other two parties.

Page 14

1        Q     Okay.  And do you know what the status of
2   those entities are at the current time?
3        A     They filed Chapter 7.
4        Q     Okay.  Have you -- has 401 Dearborn owners
5   ever heard from the trustee in their cases?
6        A     Yes.
7        Q     And what was the purpose of that
8   communication?
9        A     They offered to settle the specific
10  performance suit for $10,000.
11       Q     Okay.  Is that acceptable to the owners of
12  the 401 South Dearborn property?
13       A     No.  We are just going to wait the 60 days.
14       Q     Okay.  Approximately how much each month
15  does Chiplease receive from its loans and leases?
16       A     $150,000.
17       Q     Okay.  And after expenses, what's the net
18  amount available to Chiplease to lend or what's
19  available after expenses?
20       A     That was after expenses.
21       Q     Oh, okay, $150,000 a month?
22       A     Yes.
23       Q     It's my understanding that Chiplease is a
24  party to a loan agreement with the trust; is that
25  correct?

Page 15

1    A    Yes.

2    Q    What, if any, commitments has it made to

3    the trust as a lender under those agreements?

4    A    We agreed to loan up to 25 percent or other

5    amount as we might agree to of the total amount.

6    Q    How would you fund that 25 percent?

7    A    Cash flow.

8    Q    Okay.  And have you reviewed the

9    projections from Mr. Connolly regarding the timing of

10   when the cash flow is needed?

11   A    Yes.

12   Q    Do you have any doubt that Chiplease would

13   be able to meet its obligations?

14   A    No.

15   Q    How will it meet those obligations and

16   coming up with whatever, a quarter, $3 million or

17   750,000?

18   A    We would just pay.

19   Q    Are you going to accumulate cash?

20   A    If necessary.

21   Q    Okay.  Now, Chiplease, when did it become a

22   beneficiary of the Illinois Investment Trust?

23   A    A year or two ago.  I don't remember

24   exactly.

25   Q    Would it have been in August '06?

Page 16

```
 1      A     Sure.

 2      Q     Okay.  What, if anything, did Chiplease

 3 contribute to the trust when it became beneficiary?

 4      A     Property from the estate.

 5            THE COURT:  Beneficiaries don't

 6 contribute property to trusts.  Settlors do.

 7 BY MR. JORDAN:

 8      Q     Is it a settlor?

 9      A     Yes.

10            MR. JORDAN:  Okay.  I apologize, Your

11 Honor.  Thank you.

12 BY MR. JORDAN:

13      Q     What did you do, if anything, to determine

14 that it was a reasonable investment for Chiplease to

15 make to agree to fund up to 25 percent or so much

16 other as determined to loan to the trust?

17      A     We reviewed the cash flows of the project.

18      Q     Okay.  And based upon those cash flows,

19 what was your conclusion?

20      A     That it was a worthwhile project to do.

21      Q     Okay.  Now, you have an extended history

22 dealing with RTC as a lender; is that correct?

23      A     Yes.

24      Q     Now, from a lender's perspective, taking

25 aside the role of any of the trustees, have those
```

Page 17

1    sites been managed well, poorly or somewhere in

2    between in your view?

3         A    Giving the constraints, they were managed

4    well.

5         Q    Okay.  Do you know John Connolly, the

6    president of RTC?

7         A    Yes.

8         Q    From a lender's perspective, has John

9    Connolly's overall management of these sites been

10   performed well, poorly or somewhere in between?

11        A    Given the conditions, he has performed very

12   well.

13        Q    Okay.  What do you base that on?

14        A    His knowledge of the events and his ability

15   to describe them to third parties and his actions

16   during the same.

17        Q    Okay.  As a lender, do you have any

18   problems with the leadership Mr. Connolly has

19   provided to RTC?

20        A    No.

21        Q    Okay.  Are you familiar with any of the RTC

22   employees?

23        A    Yes.

24        Q    From a lender's perspective, have RTC's

25   employees performed well, poorly or somewhere in

Page 18

 1  between?

 2      A    They have performed well.

 3      Q    Okay.  Do you know Greg Szilagyi, the

 4  former Chapter 11 trustee of RTC?

 5      A    Unfortunately.

 6      Q    As a lender, did you have any problems with

 7  the leadership that Mr. Szilyagi provided?

 8      A    Yes.

 9      Q    What were those problems?

10           MR.  BOHAN:   Objection on the grounds

11  of relevance, Your Honor.

12           THE  COURT:  It's overruled.

13           MR.  JORDAN:   Well, Your Honor --

14           THE  COURT:  It's overruled.

15           THE  WITNESS:  He was more interested

16  in seeing that his law firm was paid than to properly

17  handle the assets of the estate.

18  BY MR. JORDAN:

19      Q    Okay.  When, if ever, did Mr. Szilagyi

20  request that Chiplease or you or Banco Panamericana

21  advance any monies to fund operations?

22      A    Even though we offered, he never did.

23      Q    What did you offer?

24      A    We offered to fund the ongoing requirements

25  of RTC, provided that the $3 million from

Page 19

```
 1    Commonwealth Edison's electric generation was used to

 2    pay the bills.

 3         Q     What bills?

 4         A     The bills that the estate had incurred

 5    during operations of the sites.

 6         Q     And what did Mr. Szilyagi do?

 7         A     He did a settlement with Aquila and NEC to

 8    pay them a large portion of the money and then had

 9    them agree to allow him to do whatever he wanted with

10    the rest of the funds.

11         Q     What happened with the rest of the funds?

12         A     The court approved the settlement, but

13    didn't allow Szilagyi to use the funds without its

14    approval.

15         Q     Do you know whether those funds were ever

16    used for the operations or were they used for legal

17    fees or were they used for something else?

18         A     I can't tell you.

19         Q     Okay.  Do you know Jay Steinberg, the

20    Chapter 7 trustee of RTC?

21         A     Yes.

22         Q     As a lender did you have any problems with

23    the leadership that Mr. Steinberg provided to RTC?

24         A     No.

25         Q     Okay.  Why is that?
```

Page 20

1     A    He was there to liquidate the estate, and

2  that's what he did.

3     Q    Okay.  When, if ever, did you have any

4  conversations with Mr. Steinberg about advancing

5  funds for operations?

6     A    Never.

7     Q    Okay.  Have you ever heard of landfills in

8  Bloomington, Litchfield, Springfield or Peoria?

9     A    Yes.

10     Q    Have you ever been there?

11     A    I have been to Peoria.

12     Q    The landfill?

13     A    Yeah.

14     Q    Have you ever taken any role in the

15  management or operations of RTC, its business?

16     A    Not in the last ten years.

17     Q    Okay.  Does Chiplease have any plans to

18  direct IIT or any of its personnel concerning the

19  development or operation of landfill gas collection

20  facilities at any of those landfills?

21     A    No.

22     Q    Okay.  Does Chiplease have any plans

23  regarding the construction, installation, managing,

24  maintaining or operating of any gas-to-energy

25  conversion projects at any of the landfills?

Page 21

1      A      No, we are a lender.

2      Q      As beneficiary of the trust or shareholder

3   of the new corporation, what, if any, involvement do

4   you anticipate you will have in directing John

5   Connolly, the I think trustee or soon to be president

6   and sole officer of the new corporation, regarding

7   the operation of the business?

8      A      None.

9      Q      All right.  Is that a commitment on your

10  behalf?

11     A      That I don't want to do anything about

12  that?  Yes, absolutely.

13     Q      Okay.  Has Chiplease ever before financed

14  the construction, installation or operation of a gas

15  collection and control system?

16     A      Yes.

17     Q      Has it ever financed the construction,

18  installation or operation of a gas-to-energy plant?

19     A      Yes.

20     Q      How many times has Chiplease done that,

21  those things?

22     A      However many times RTC has built them.

23     Q      Now, my understanding is the maximum amount

24  under the line of credit is $3 million.  If the

25  business does well, would Chiplease consider making

Page 22

1    additional advances?

2        A    If it does well, we would.  If it does

3    poorly, we wouldn't.

4        Q    Okay.  Is the purpose of the loan to the

5    trust or the new corporation to fund just these sites

6    or something else?

7        A    It's to fund projects.

8        Q    Just these projects?

9        A    I believe so.

10        Q    Okay.  What's Chiplease's understanding as

11    to who will make the decisions regarding the

12    people -- person or people who will operate these

13    facilities?

14        A    John Connolly.

15        Q    Okay.  On what do you base this statement?

16        A    On the fact that he's the trustee or the

17    manager or the president of the new corporation.

18        Q    In the event the gas contracts pertaining

19    to these various sites are assigned, to your

20    knowledge on behalf of the trustee, does the new --

21    does the entity have sources of funds to use to

22    perform its service independent of the loans from

23    Scattered or Chiplease?

24        A    Yes.

25        Q    What would those be?

Page 23

1    A    Its greenhouse gas credits and its electric

2   revenue.

3    Q    The electric revenue from these sites?

4    A    Yes.

5    Q    Now, it's my understanding that the

6   renewable energy credits from these sites are very

7   minimal; is that correct?

8    A    I have no idea.

9    Q    You've never investigated that?

10    A    I don't recall.

11    Q    Okay.  Mr. Greenblatt, in the event that

12   these contracts are assigned, does Chiplease or do

13   you anticipate having any role in the operation of

14   the gas plants?

15    A    No.

16    Q    Does Chiplease or you have any interest in

17   making or advising on any operational decisions?

18    A    No.

19              MR. JORDAN:  Thank you.  Pass the

20   witness.

21                   CROSS-EXAMINATION

22   BY MR. BOHAN:

23    Q    Mr. Greenblatt, did you testify on direct

24   examination that Chiplease's obligation to fund the

25   loan to IIT was limited by a 25 percent participation

Page 24

1    in that loan?

2        A    I said that it was 25 percent or such other

3    amount as we would agree to.

4        Q    Well, there's been no agreement between

5    Chiplease and Scattered as to which of the two

6    companies will contribute which portion of the loan,

7    true?

8        A    That's not my understanding.

9        Q    Isn't that what you told me when I took

10   your deposition last week?

11       A    That was last week and this is now.

12       Q    Well, is there an agreement?  Has Chiplease

13   entered into an agreement with Scattered in the last

14   seven days regarding the portion of the loan that

15   each of the two would contribute?

16       A    Yes.

17       Q    All right.  And what's the agreement?

18       A    Twenty-five percent or such other amount as

19   the two parties may agree.

20       Q    Is that agreement between Chiplease and

21   Scattered memorialized in any document?

22       A    I believe so.

23       Q    Who negotiated it on behalf of Chiplease?

24       A    I did.

25       Q    Who negotiated it on behalf of Scattered?

Page 25

1      A    Mr. Jahelka.

2      Q    When?

3      A    In the last week.

4      Q    You signed an agreement with Scattered by

5   which Chiplease is on the hook for no more than

6   25 percent of the loan unless otherwise agreed?

7      A    I believe the agreement says that we would

8   do 25 percent or such other amount as we would agree

9   to.

10              MR. BOHAN:  Your Honor, I have to move

11   to strike that testimony, because we've made requests

12   for those document, as you can imagine, from the

13   very -- you know, for the last several months.  And

14   we have no -- we have never been provided any updated

15   agreement between Chiplease and Scattered regarding

16   the fundamental question who is going to fund this

17   trust.  It seems --

18              THE COURT:  Do you have a copy of this

19   document?

20              MR. JORDAN:  I don't think there's a

21   document.  I don't think he said there's a document,

22   and I haven't seen one, if there is.

23              THE WITNESS:  There is a loan

24   agreement.

25              MR. JORDAN:  Oh, it's in the loan --

Page 26

1                    I think Mr. Greenblatt is mistaken.

2                    THE COURT:  Well, I don't want to hear

3    your testimony on a subject like that, Mr. Jordan.  I

4    simply asked if you had a document and the answer to

5    that question should have been no.

6                    MR. JORDAN:  It was no.

7                    THE COURT:  Without an elaboration

8    suggesting that the witness might want to change his

9    testimony.

10                   MR. JORDAN:  Your Honor -- sorry.

11                   THE COURT:  That's really very

12   problematic as far as I am concerned.

13                   In any event, I am not going to strike

14   the testimony.  You can ask another question.

15                   MR. BOHAN:  I will.  Thank you, Your

16   Honor.

17   BY MR. BOHAN:

18       Q    Does Chiplease prepare financial

19   statements?

20       A    Yes.

21       Q    Does Chiplease have a current balance

22   sheet?

23       A    Reasonably current.

24       Q    Does it have a current income statement?

25       A    Yes.

Page 27

```
1        Q    How about a statement summarizing the

2   sources and uses of its cash?

3        A    Yes.

4        Q    How current are those financial statements?

5        A    Either through mid -- the third quarter of

6   last year.

7        Q    The third calendar quarter 2007?

8        A    Yes.

9        Q    All right.  What is your relationship with

10   Rumplestiltskin Corporation?

11        A    I am believe I'm the 50 percent

12   shareholder.

13        Q    Who owns the other 50 percent?

14        A    Mr. Jahelka, and I think Mr. Nichols'

15   family partnership.

16        Q    Are you also a director of Rumplestiltskin?

17        A    I may be.  I don't recall.

18        Q    Are you an officer of that company?

19        A    I don't actually recall, but I might be.

20        Q    Is it the sole owner of RTC?

21        A    Yes.

22        Q    When Chiplease negotiated its loan to RTC,

23   who negotiated on behalf of Chiplease?

24        A    I would have.

25        Q    Who negotiated on behalf of RTC?
```

Page 28

1      A    I have no recollection.

2      Q    Well, what role, if any, did you play in

3  the approval by RTC of that loan agreement?

4      A    Which loan agreement?

5      Q    The one you testified to on direct

6  examination, the very first loan that Chiplease

7  entered into with RTC.

8      A    I have no recollection.

9      Q    Did you say Chiplease has current assets of

10  15 to $16 million?

11      A    Yes.

12      Q    What do you mean by current assets?

13      A    Assets that it has now.

14      Q    Okay.  So let me ask you the question:  Are

15  you including then lease payments receivable as a

16  current asset?

17      A    I am including all of the assets that it

18  currently has.

19      Q    Does that include obligations to Chiplease

20  under its leases to dry cleaning companies?

21      A    Yes.

22      Q    All right.  Well, what are Chiplease's

23  current liquid assets?

24      A    About $1.2 million.

25      Q    And that's cash or marketable securities?

1      A    Yes.

2      Q    Chiplease has obligated itself in this

3  bankruptcy proceeding, has it not, to pay the

4  operating -- the Chapter 7 operating expenses of the

5  debtor beyond $150,000, correct?

6      A    Yes.

7      Q    And how much has Chiplease paid pursuant to

8  that obligation?

9      A    I have no idea.

10     Q    That's an ongoing obligation of Chiplease,

11  correct?

12     A    To the extent there are operating expenses,

13  yes.

14     Q    And is it reflected -- is that obligation

15  reflected as a liability on Chiplease's balance

16  sheet?

17     A    No, because we don't believe there is any

18  further operating expenses of something that's

19  disposed of all its assets.

20     Q    So there is no -- so Chiplease has no

21  reserve or created no allowance for the payment of

22  Chapter 7 operating expenses beyond the $150,000 that

23  were the responsibility of the trustee or debtor?

24     A    Chiplease has not reserved anything for any

25  further expenses because it doesn't believe there are

Page 30

1    any.

2        Q    While you were the trustee of the trust,

3    did the trust own any tax credits?

4        A    No.

5        Q    To your knowledge, has the trust ever

6    offered to compensate vendors of services or goods

7    using tax credits?

8        A    The trust, no.

9        Q    You have no knowledge about the trust ever

10   owning tax credits that it could use in the conduct

11   of its business?

12       A    That's what I just said, yes.

13       Q    Chiplease occupies space at 330 South

14   Wells, true?

15       A    Yes.

16       Q    It occupies space that's leased by Banco

17   Panamericana, correct?

18       A    No.

19       Q    All right.  Whose space is it in?

20       A    It's in its own space.

21       Q    Does it pay rent for that space?

22       A    Yes.

23       Q    To whom?

24       A    To 200 West Partners (sic).

25       Q    Isn't it true, sir, that Chiplease is a

```
 1   subtenant of Banco Panamericana?

 2        A    No.

 3        Q    All right.  Mr. Greenblatt --

 4             MR. JORDAN:  Objection.  I think

 5   that --

 6             THE COURT:  There's no question

 7   pending.

 8   BY MR. BOHAN:

 9        Q    Mr. Greenblatt, did you sit for your

10   deposition in this case as a 30(b)(6) representative

11   of Chiplease, Inc., on January 28th of this year?

12        A    Yes.

13        Q    And at your deposition, were you sworn to

14   tell the truth on behalf of Chiplease?

15        A    Yes.

16        Q    And at your deposition, sir, did I put

17   these questions to you and did you give me these

18   answers, page 26, line 15:

19             (As read)

20             "Question:  Where is its, Chiplease's,

21   place of business?

22             "Answer:  I beg your pardon?

23             "Question:  Where does it conduct its

24   business?

25             "Answer:  330 South Wells.
```

Page 32

1                    "Question:  Does it own its space

2      there?

3                    "Answer:  No.

4                    "Question:  From whom does it lease?

5                    "Answer:  I believe it has a sublease

6      from Banco Panamericana.  And I would say that it has

7      a sublease.  It occupies a space of Banco

8      Panamericana."

9                    MR. JORDAN:  Your Honor --

10     BY MR. BOHAN:

11        Q    Did you give those answers in response to

12     my questions?

13                   MR. JORDAN:  Your Honor, we object.

14     In order to impeach, he has to impeach on a material

15     fact.  And whether they lease from a building owner

16     or Banco Panamericano is not material to anything.

17                   THE COURT:  Overruled.

18                   THE WITNESS:  The space that we may

19     sublease from Banco Panamericana is not in Banco

20     Panamericana's space.  It is a different floor.

21     BY MR. BOHAN:

22        Q    Did you not tell me, sir, under oath just

23     two weeks ago Chiplease occupies to use your words,

24     "space of Banco Panamericano?"

25        A    That's correct, but it's not the space that

Page 33

1    Banco Panamericana is currently in.  It's the space

2    that Banco Panamericana used to be in.

3        Q    Now, did you say that Chiplease rents its

4    space at that location?

5        A    Yes.

6        Q    Did you not tell me this just two weeks

7    ago:

8                  (As read)

9                  "Question:  Does it pay rent for that

10   space; namely, Chiplease?

11                 "Answer:  No."

12       A    That's true that I said that, yes.

13       Q    Okay.  So tell us what the truth is.

14   Chiplease either does rent space and pay money for

15   that space at 330 South Wells or it doesn't, but

16   which of the two is it?

17       A    Well, it -- it does rent space and it does

18   not pay rent on the space currently because it is

19   owed money by the lessor, and the credits it's loaned

20   from the lessor for the space.

21       Q    Could you read the last portion of the

22   answer for me, please.

23                 (Record read.)

24   BY MR. BOHAN:

25       Q    Which credits are those?

Page 34

1     A     Credits on the loan.

2     Q     Does Chiplease loan own any assets other

3  than loans and leases?

4     A     Yes.

5     Q     But those assets it's written off, has it

6  not?

7     A     No.

8     Q     Mr. Greenblatt, at your deposition

9  January 28th, did I ask this question and did you

10  give me this answer under oath:

11            (As read)

12            "Question:  Does Chiplease own any

13  assets other than its loans and leases?

14            "Answer:  It may.  But if it has, it

15  doesn't.  It has written them off."

16     A     That was true on January 28th, but since

17  then we have purchased shares of stock.

18     Q     Pardon me?

19     A     Since then we have purchased shares of

20  stock.

21     Q     In what corporation?

22     A     Home Financial Bank Corp.

23     Q     And what's its ownership interest in that

24  company?

25     A     9,216 shares.

Page 35

1    Q    And what's the market value?

2    A    $40,000.

3    Q    As of what date did Chiplease have cash or

4    cash equivalents in the amount of $1.2 million?

5    A    Right now.

6    Q    The family trust that owns Chiplease owns

7    all of Banco Panamericana, correct?

8              MR. JORDAN:  Objection.  Relevance,

9    Your Honor.  Banco Panamericana is not a lender here.

10             THE COURT:  It's overruled.

11             THE WITNESS:  What's your question?

12   BY MR. BOHAN:

13   Q    The entity or entities that own Chiplease,

14   own all of the shares of Chiplease, also own all the

15   outstanding shares of Banco Panamericana?

16   A    Yes.

17   Q    What is your salary at Chiplease?

18   A    It varies, but I generally get about

19   $10,000 a month.

20   Q    Is your salary Chiplease's only expense?

21   A    Probably not, but it is the major portion

22   of it.

23   Q    Now, as of January 28th, Chiplease had on

24   hand approximately a hundred thousand dollars in

25   cash, correct?

Page 36

1      A    That's correct.

2      Q    All right.  And so between January 28th and

3  today's date, where did Chiplease come up with the

4  $1.1 million that it now has on hand in cash or cash

5  equivalents?

6      A    It received a principal payment from the

7  purchasers of Sugar Island Partners.

8      Q    Sugar Island Partners?

9      A    Uh-huh.  Yes.

10     Q    What's the nature of that business?

11     A    It's real estate.

12     Q    Do you have an ownership -- do you have an

13  ownership in Sugar Island Partners independent of

14  Chiplease's?

15     A    No.  They are the debtor.

16     Q    What role did you play in having Chiplease

17  become a beneficiary of the trust?

18     A    I had Chiplease become the beneficiary of

19  the trust.

20     Q    Pardon me?

21     A    I was the principal agent.

22     Q    Was it your idea?

23     A    I don't recall.

24     Q    At the time Chiplease became a beneficiary

25  of the trust, you were just resigning as trustee of

Page 37

```
 1   the trust, correct?

 2        A    Yes.

 3        Q    And whose idea was it that you would resign

 4   and Mr. Connolly would be appointed the new trustee?

 5        A    I have no idea.  I don't recall.

 6        Q    Did you say Sugar Island is in bankruptcy?

 7        A    No.

 8        Q    Oh, I'm sorry.  I misunderstood you.

 9             Is it a creditor of a bankrupt?

10        A    I have no idea.

11             THE COURT:  Is Sugar Island unrelated

12   to you?

13             THE WITNESS:  Yes.  Sugar Island is

14   just the debtor, not in the bankruptcy sense, in the

15   general sense.

16   BY MR. BOHAN:

17        Q    A debtor to Chiplease?

18        A    Yes.

19        Q    Does it still have a debt to Chiplease or

20   has that been extinguished now by the payment of the

21   money that you talked about earlier?

22        A    It still has a debt.

23        Q    What's the amount of that debt?

24        A    I don't recall exactly.  The aggregate

25   amount is -- was 25 million to start.  I think it is
```

```
 1   18 million now.  We own 30 percent of the debt.

 2        Q    Who owns the other 70 percent?

 3        A    I have no idea.

 4        Q    Is Chiplease currently funding the

 5   operations of the RTC?

 6        A    No.

 7        Q    Well, who is paying Mr. Connolly's salary?

 8        A    I think Resource Technology of South

 9   Dakota.

10        Q    And who is funding -- to your knowledge,

11   who is funding the operations of RTC?

12        A    I don't know the exact details.

13             MR. APOSTOLIDES:  Judge, I just want

14   to object to the extent there is a question about

15   which RTC is Mr. --

16             MR. BOHAN:  I'll try to be as precise

17   as I can.  Unless I am mistaken -- well, never mind.

18   BY MR. BOHAN:

19        Q    To your knowledge, Chiplease today is not

20   funding the operations of the nondebtor RTC of which

21   Mr. Connolly is an employee; is that true?

22        A    Chiplease -- you're asking me if Chiplease

23   is funding Resource Technology of Delaware; is that

24   the one you're asking me?  Is that what you're asking

25   me?
```

Page 39

```
 1        Q     The nondebtor RTC.

 2        A     Chiplease is not funding the nondebtor RTC

 3   of Delaware.

 4        Q     To your knowledge who is?

 5        A     I don't believe that it has any operations.

 6        Q     Well, isn't it true, sir, that RTC's

 7   employees are -- Connolly and the rest of the

 8   employees are being paid by RTC notwithstanding that

 9   they are purporting to represent -- rendering

10   services for IIT?

11                   MR. APOSTOLIDES:  Same objection.

12                   THE WITNESS:  They are not being paid

13   by RTC, the corporation which was a Chapter 11 and

14   Chapter 7 debtor.  They are employed by a separate

15   corporation, which is not a debtor.

16                   THE COURT:  What's the name of that

17   corporation?

18                   THE WITNESS:  I believe it's Resource

19   Technology of South Dakota.

20   BY MR. BOHAN:

21        Q     All right.  Well, who is funding the

22   operation of that entity?

23        A     Resource Technology of South Dakota.  I

24   have no idea.

25        Q     What's your relationship with that company?
```

Page 40

```
 1       A      I don't know.

 2       Q      Is it owned by Rumplestiltskin?

 3       A      I have no idea.

 4       Q      Are you an officer or director?

 5       A      I don't believe so, but I couldn't tell

 6  you.

 7       Q      Do you own any equity in it?

 8       A      I don't believe so.

 9       Q      Directly or indirectly?

10       A      If I owned it through Rumplestiltskin, then

11  I would own it directly -- indirectly, but I have no

12  idea.

13       Q      Whose idea was it for Chiplease and

14  Scattered to designate as the proposed assignee of

15  the Sangamon, Litchfield and Bloomington gas

16  contracts the Illinois Investment Trust?

17       A      I don't actually recall.

18       Q      Were you -- did you have any

19  decision-making role?

20       A      I may have.  I have no recollection.

21       Q      What was the purpose of that?

22       A      Since I don't remember doing it, I don't

23  remember any purpose if I did it.

24       Q      What, if any, consideration flowed to

25  Scattered and Chiplease from Illinois Investment
```

Page 41

```
 1    Trust at the time Illinois Investment Trust was

 2    designated by those two companies to be the assignee

 3    of these gas contracts?

 4         A    What?

 5         Q    What, if anything, of value, what benefit

 6    flowed to Chiplease or Scattered as a result of their

 7    decision to designate Illinois Investment Trust as

 8    the proposed assignee of the gas contracts that are

 9    at issue in this trial?

10         A    Well, I don't exactly understand what

11    you're asking, but to the extent that we were

12    settlors, we became beneficiaries.

13         Q    To your knowledge is Chiplease under any

14    legal obligation that would prevent it from

15    de-designating Illinois Investment Trust as the

16    proposed assignee of the contract?

17         A    What?

18         Q    Did you not hear or did you not understand?

19         A    I didn't understand what you're asking me.

20         Q    Okay.  You're the president of Chiplease?

21         A    That's correct.

22         Q    Are you aware of any -- are you aware of

23    any legal impediment to Chiplease deciding to

24    de-designate Illinois Investment Trust as its

25    designee for these contracts and instead designate
```

Page 42

1    someone else or itself?

2        A    I don't know.

3        Q    You have no idea?

4        A    I don't know.  I'm not an attorney.  I have

5    no idea.

6        Q    Who negotiated the loan among Chiplease,

7    Scattered and IIT on behalf of Chiplease?

8        A    I did.

9        Q    And who negotiated on behalf of Scattered?

10       A    Mr. Jahelka.

11       Q    Who negotiated on behalf of the trust?

12       A    Mr. Connolly.

13       Q    And you and Mr. Jahelka could remove Mr.

14   Connolly as trustee of that trust at any time,

15   correct?

16       A    I don't know.

17       Q    Chiplease -- I'm sorry.

18            If it turn outs that Illinois

19   Investment Trust is incapable of performing these

20   contracts, even with the $3 million that Chiplease

21   and Scattered say they have committed to fund its

22   operation, then what will happen to the contracts?

23       A    I don't know.  That depends on the

24   circumstances.

25       Q    Well, do you have a contingency plan?

Page 43

1      A    My contingency plan is to fund further if

2  it is worthwhile and not to fund further if it's not

3  worthwhile.

4      Q    But do you have any alternative operators

5  or managers of the contracts, persons other than Mr.

6  Connolly or other former employees of Resource

7  Technology?

8      A    I have no contingencies that the lender has

9  planned for, no.

10     Q    Now, you were asked questions about Mr.

11  Connolly's performance and the performance of RTC

12  from the vantage point of a lender, Chiplease acting

13  as lender; do you recall that?

14     A    Yes.

15     Q    Insofar as RTC was obligated to perform gas

16  contracts where the counter-parties where the

17  landfill owners, do you have any assessment of

18  whether or not Mr. Connolly and RTC did a good job of

19  that or not?

20     A    My assessment is that the landfill owners

21  set out to exercise their rights in a zero sum game

22  to take all of the rights that RTC had back under any

23  circumstance.

24     Q    Do you have any knowledge as a lender to

25  RTC or as someone who has an opinion regarding Mr.

Page 44

1  Connolly regarding any of the circumstances that gave

2  rise to defaults by RTC under its gas contracts with

3  the landfill owners?

4            MR. JORDAN:  Objection.  Foundation.

5            THE COURT:  Overruled.

6            THE WITNESS:  Well, I'm not aware of

7  the defaults that RTC might have with the landfill

8  owners.  I'm aware of several things that the

9  landfill owners did themselves to cause their own

10  problems.

11            For example, in the collection system

12  in Peoria, the landfill owners refused to sign the

13  land permit to put in the -- the jumper system to

14  alleviate the gas migration problem.  In Springfield,

15  the landowners didn't put on a proper cap and ripped

16  the cap out and caused all sorts of gas migration

17  problems.

18            In Congress, the landfill owners

19  consistently operated the landfill after their

20  purported closing date and only put in enough so that

21  they could continually fill in to settle.  And in

22  such a case, no landfill system will take gas out of

23  the -- or smell out of the new refuse because it

24  wasn't there when it was designed and approved.

25  BY MR. BOHAN:

Page 45

1      Q    And what, if any, investigations, sir, have

2  you done regarding problems at the Congress Landfill?

3      A    I receive reports from the various parties

4  and I understand the amount of waste that has gone

5  into the Congress Landfill since the collection

6  system was installed.

7      Q    So from your vantage point then, and you

8  tell me if I'm wrong, but from your vantage point,

9  RTC showed itself perfectly capable of performing

10  those landfill gas contracts; is that true?

11      A    I believe that that is a mischaracter -- I

12  never used the word perfectly, but it is capable of

13  performing when it is not interfered with.

14      Q    And are all of the defaults that RTC has

15  been found guilty of with respect to its performance

16  under landfill gas contracts, are those all the

17  faults of the -- the fault of the landfill owners?

18      A    I'm not aware of all the defaults that

19  you're talking about.

20      Q    Do you have any opinion of Mr. Connolly's

21  ability to discharge the obligations of RTC under

22  these landfill gas contracts in a way that's

23  consistent with the requirements of the Illinois

24  Environmental Protection Agency?

25      A    I believe that he is capable of doing that,

Page 46

1   yes, because he has been.

2        Q    And are you aware of all of the notices of

3   violation that have been issued to RTC and/or the

4   landfill owners as a result of RTC's failure to keep

5   itself in compliance with applicable environmental

6   regulations?

7        A    Well, I would say that your statement that

8   it's a result of RTC's failure, it's not a result of

9   RTC's failure.  It's a result of the failure of the

10  landfill owners.

11       Q    All right.

12       A    And, in fact, it would be the landfill

13  owners that we dealt with have tens if not hundreds

14  of thousands of notices of violations for their sites

15  in Illinois that are completely unrelated to RTC.

16       Q    Then let me put it to you this way:  Are

17  you aware of any notice of violation that was

18  actually issued by IEPA to RTC that was the fault of

19  RTC as opposed to a landfill owner?

20       A    Yes.

21       Q    And what notices of violation are those?

22       A    There was a notice of violation to fail an

23  emissions test.  On the other hand, there's a total

24  difference between a notice of a violation and a

25  finding that RTC has been -- violated regulations or

1  the law, which it's never been found to have done,

2  unlike your clients.

3          MR. BOHAN:  Your Honor, I move to

4  strike the nonresponsive portion of his answer.

5          THE COURT:  There is really little

6  point in moving to strike since there is no jury

7  here.

8          MR. BOHAN:  Understood.

9  BY MR. BOHAN:

10     Q    You were asked about your impression or

11 your opinions of Mr. Szilyagi's service as Chapter 11

12 trustee in this case, right?

13     A    I don't believe I'd use the word service,

14 but yes.

15     Q    Okay.  And, similarly, you were asked about

16 I guess your impressions of Mr. Steinberg, who has

17 served as Chapter 7 trustee, right?

18     A    Yes.

19     Q    And I believe you testified that you had no

20 problems with Mr. Steinberg or no problems with the

21 way he conducted himself as the Chapter 7 trustee?

22     A    That's correct.

23     Q    Okay.  So then you had no problems with the

24 lawsuit that Mr. Steinberg initiated against you

25 personally, Mr. Greenblatt, as well as your

Page 48

1  affiliates for, among other things, misappropriating

2  assets of the estate?

3      A    Well, that's a claim that he tried to make

4  and decided not to pursue.  And as a matter of fact,

5  it's the same complaint that Mr. Szilyagi filed after

6  he found -- he accused me of taking assets from the

7  estate that were in the account that he had control

8  of.  So for the fact that the trustee filed, refiled

9  a complaint under which Mr. Szilyagi filed a

10 knowingly false pleading, you know, that's business.

11 BY MR. JORDAN:

12     Q    And you have no problem with that?

13     A    I have been sued many times and I have been

14 a plaintiff many times.  I don't care.

15             MR. BOHAN:  May I have a minute, Your

16 Honor?

17             THE COURT:  Yes.

18             MR. BOHAN:  I have nothing further,

19 Your Honor.

20             MS. KUJACA:  I have no questions, Your

21 Honor.

22                 REDIRECT EXAMINATION

23 BY MR. JORDAN:

24     Q    Mr. Greenblatt, Sugar Island, whatever you

25 referred to them as, when you say they're a debtor do

Page 49

1    you mean they're a borrower?

2        A    Yes.

3        Q    Now, can we look at Exhibit 50, IIT Exhibit

4    50.

5                    THE COURT:  Yes.

6                    MR. JORDAN:  I apologize for

7    interjecting before, Your Honor.

8                    Your Honor, I have a paper copy.

9                    THE COURT:  That's what you're going

10   to have to do, unfortunately.  This is -- this is

11   just infuriating.  There is no reason for this not to

12   work.

13                   MR. JORDAN:  May I approach, Your

14   Honor?

15                   THE COURT:  Yes, go ahead.

16                   MR. JORDAN:  I provided this to your

17   clerk and a copy to the witness.  God willing, this

18   will be my only exhibit.

19                   THE COURT:  All right.

20   BY MR. JORDAN:

21       Q    Now, Mr. Greenblatt, I have laid in front

22   of you exhibit Illinois Investment Trust No. 50.  And

23   what I would like you to do, you had referenced a

24   75 percent number before.

25                   Can you take a look at the payment

Page 50

1   terms paragraph on the first page.  Let me know when

2   you find it.

3        A    Yes.

4        Q    Okay.  Is that the 75 percent to which you

5   referred earlier?

6        A    Yes.

7        Q    Okay.  You're apparently quite aware of the

8   various compliance issues in the case.  How did you

9   become aware of those issues?

10       A    They were referred to me by John Connolly

11  and other parties in the bankruptcy.

12       Q    What was the reason for their referring

13  those matters to you?

14       A    I was the senior secured creditor.

15       Q    Okay.  And despite your knowledge of all

16  these compliance issues, is Chiplease and is

17  Scattered still willing to lend to the new entity

18  that we're going to set up to accept the assignment?

19       A    Yes.

20            THE COURT:  Okay.  I'm still looking

21  at this amended promissory note.  You asked Mr.

22  Greenblatt if his understanding of Chiplease's

23  payment obligation came from paragraph three?

24            MR. JORDAN:  Right.  It is -- I don't

25  want to testify, but Mr. Greenblatt were you --

Page 51

```
 1                  THE COURT:  Well, wait a second, no,
 2    no, don't testify.  I just want to make sure that was
 3    your question.
 4                  MR. JORDAN:  Yeah.
 5                  THE COURT:  Mr. Greenblatt, this
 6    provision has to do with the amount that Illinois
 7    Investment Trust has to pay to the payees of the
 8    note?
 9                  THE WITNESS:  That's right.
10                  THE COURT:  And you say that this is
11    what you had in mind when you said that Chiplease had
12    an obligation to pay 25 percent of the obligations
13    under a loan agreement to Illinois Investment Trust?
14                  THE WITNESS:  No.
15                  THE COURT:  Well, that's what
16    Mr. Jordan thought he was asking you.
17                  MR. JORDAN:  That's what I thought I
18    was asking you.
19                  THE COURT:  So why don't you clarify
20    that.
21    BY MR. JORDAN:
22        Q    Is there any document anywhere that -- or
23    any agreement anywhere that says that Chiplease is
24    going to provide 25 percent and Scattered is going to
25    provide 75 percent?
```

Page 52

```
 1        A     I thought that there was, but apparently it
 2    is 25, 75 for a different term.
 3                THE COURT:  Now, wait a second.  Did
 4    you have negotiations with Mr. Jahelka in the last
 5    week determining what part of the obligations on the
 6    loan agreement to Illinois Investment Trust would be
 7    paid by Scattered and what would be paid by
 8    Chiplease?
 9                THE WITNESS:  Yes, but it's always
10    been 75/25.
11                THE COURT:  Okay.  In the last week
12    you had negotiations with Mr. Jahelka regarding that
13    question.  Were your negotiations memorialized in any
14    document?
15                THE WITNESS:  I believe that they were
16    memorialized in this document.
17                THE COURT:  This is a promissory note
18    defining the obligation of Illinois Investment Trust
19    to pay money to Chiplease and Scattered.  It does not
20    define in any way the obligation of Scattered or
21    Chiplease to pay money to Illinois Investment Trust;
22    do you understand that?
23                THE WITNESS:  I understand that
24    exactly.  What I was trying to say is that it was my
25    belief that the -- the pay -- the recipients of the
```

Page 53

1    payments were defined in this note to be 75/25.

2    Apparently I am mistaken.

3                   THE COURT:  Go ahead.

4    BY MR. JORDAN:

5        Q    So, in fact, there's no written agreement;

6    is that correct, just --

7        A    I thought that there was.  I think --

8        Q    Is there a written agreement --

9        A    I still believe that there is, but

10   apparently I can't see that there is any.

11                  MR. JORDAN:  Okay.  That's fine.  We

12   have no further questions, Your Honor.

13                  THE COURT:  You may step down, Mr.

14   Greenblatt.

15                  (Witness excused.)

16                  THE COURT:  Your next witness,

17   Mr. Jordan.

18                  MR. JORDAN:  I guess if possible we

19   would like to recall Mr. Connolly just to clarify the

20   issue with regard to his willingness to set up a new

21   corporation.

22                  MR. O'MEARA:  Your Honor, we would

23   object.  We don't see any reason for Mr. Connolly's

24   testimony.

25                  THE COURT:  No.  That would not be

Page 54

1    appropriate.  You called him in your case in chief

2    and finished with him.  If there is a need to call

3    him in rebuttal, you can do that.

4                   MR. JORDAN:  Okay.

5                   THE COURT:  Do you have any other

6    witnesses?

7                   MR. JORDAN:  No, Your Honor.

8                   THE COURT:  Okay.

9                   MS. KUJACA:  Your Honor, at this time

10   I would like to move for a motion, a motion for a

11   directed verdict.

12                  THE COURT:  No, I will hear whatever

13   evidence you have to present.

14                  MS. KUJACA:  Thank you.

15                  Then I call Pat Sloan.

16                  (Witness sworn.)

17                  THE COURT:  You've determined that you

18   want to go before Mr. Bohan.

19                  MS. KUJACA:  Yes.

20                  THE COURT:  Okay.

21              PATRICK SLOAN, WITNESS, SWORN

22                    DIRECT EXAMINATION

23   BY MS. KUJACA:

24       Q    Mr. Sloan, would you state your name and

25   spell your last name for record, please.

Page 55

1    A    Patrick Sloan, S-l-o-a-n.

2    Q    Where are you currently employed?

3    A    Foth infrastructure & Environmental, LLC.

4    Q    And if we could briefly go through your

5    educational background.  Do you have a college

6    degree?

7    A    Yes, I do.

8    Q    From where?

9    A    I have a bachelor of science degree in

10   civil engineering from the University of Illinois,

11   and a master's degree in agricultural engineering

12   from the University of Kentucky.

13   Q    Have you done any post-graduate work?

14   A    Yes, I have.

15   Q    What post-graduate work have you done?

16   A    Well, I'm sorry.  Not post -- not

17   post-graduate but training as a course of engineering

18   business.

19   Q    Do you have any certifications?

20   A    I have a professional engineering license

21   in the state of Illinois.

22   Q    And do you have any continuing education

23   requirements that you're required to fulfill?

24   A    Yes.  Illinois requires 30 professional

25   development hours every two years.

Page 56

1      Q      Do you do any of those continuing education

2   requirements regarding landfills?

3      A      Yes, I do.

4      Q      How many have you done in the last say five

5   years?

6      A      Probably two to four per year, different

7   programs.

8      Q      When did you first become involved with the

9   Peoria landfill?

10     A      Probably shortly after 1986 when I became

11   employed by Dailey & Associates Engineers.

12     Q      Dailey & Associates later merged with Foth

13   where you work now, correct?

14     A      Correct.  On September 15th, 2005 Dailey

15   merged with Foth.

16     Q      Was Foth ever employed RTC?

17     A      As Dailey & Associates we were when they

18   became the contractor for Peoria Landfill.

19     Q      What Foth's -- excuse me, Dailey's duties

20   at that time?

21     A      We assisted them in obtaining the

22   construction permit from the Division of Air,

23   Illinois Environmental Protection Agency.  I believe

24   we also helped prepare the Bureau of Land permit

25   application for the same improvements.  And then

Page 57

1    later we provided construction quality assurance for

2    the improvements in the gas collection system.

3         Q    And that's what's commonly referred to as a

4    CQA?

5         A    Yes.  CQA is construction quality

6    assurance.  It's a requirement of 811 of Title 35.

7    Its purpose is to verify that all improvements have

8    been installed as designed.

9         Q    When did Dailey's employment with RTC end?

10        A    Well, at the conclusion of the submittal of

11   the CQA document, which is a permit application, to

12   the agency, I don't believe we did any work for them

13   after that point.

14        Q    Would you say that was around 1999 or so?

15        A    That sounds about right.

16        Q    Okay.  When did -- excuse me.  Strike that.

17             What is your current position in

18   regards to the Peoria Landfill?

19        A    I am project manager for the City of

20   Peoria, County of Peoria.  We have an

21   intergovernmental agreement, and they own the

22   landfill basically 50/50.  That agreement dates back

23   to 1975.  And Dailey and/or Foth has provided

24   engineering since the inception of that agreement.

25        Q    How long have you personally been the

Page 58

1   project manager for the Peoria Landfill?

2       A    Probably on the order of 15 years.

3       Q    What are your current job requirements

4   regarding the Peoria Landfill?

5       A    We have basically an annual agreement with

6   the city and county with -- the official name is the

7   joint city of Peoria County, Peoria Solid Waste

8   Disposal Facility Board.  And under that annual

9   agreement, we provide engineering services at their

10  request.

11              For landfill number 1, the closed

12  landfill, which RTC is operating on, we are mostly

13  dealing with post-closure care.  And they have

14  landfill number 1, which is operated by Waste

15  Management, which is active.  And we review all their

16  documents, all permit applications and verify that

17  those are appropriate for the committee or the board.

18      Q    And just to clarify for the court, the only

19  landfill that we are talking about in regards to RTC

20  is landfill number 1; is that correct?

21      A    Correct.  The lease or the gas rights

22  issued to RTC only deal with landfill number 1.

23      Q    Thank you.

24              Do you communicate with RTC?

25      A    Yes, on occasion.  More earlier than later.

Page 59

1    Q    Who do you talk to at RTC?

2    A    John Connolly, Rob Fortelka.  And I have

3  had conversations with Vince Muir when he was alive.

4    Q    Have you had any communications with Harry

5  Henderson?

6    A    No.

7    Q    Do you know who he is?

8    A    Yes.  And I just want to clarify, I do

9  receive communications in writing that are signed by

10  Harry Henderson.  I have never met him.

11    Q    And what is your understanding as to his

12  role in regards to the Peoria Landfill?

13    A    I believe that the correspondence is -- the

14  letterhead says receiver for Peoria collateral

15  possibly.

16    Q    Okay.  What is currently on the Peoria

17  Landfill Number 1?  What does the site consist of?

18    A    Peoria Landfill Number 1 is approximately a

19  hundred acre landfill.  It operated from 1975 until

20  1998.  Operation at the beginning was conducted by

21  the City of Peoria, then the County of Peoria, then

22  Brown & Ferris Industries, and then finally Peoria

23  Disposal Company, which finished out the landfill and

24  put the final cover on that.

25                    And since that time, the Peoria

Page 60

1    Disposal Company has no other obligations.  Under the

2    Waste Management contract, which was entered into in,

3    I believe, 1996, they provide normal post-closure

4    maintenance to the landfill.  And then, of course,

5    RTC, in 1995 I believe, the city and county entered

6    into a contract for them to provide gas collection

7    and disposal services.

8         Q    What is currently on the site?  How many

9    wells are there?

10        A    There's approximately 140 gas collection

11   wells and then a -- the gas-to-electric facility I

12   believe -- it's been a while since I've been inside

13   the building, but there were five Caterpillar engines

14   in there.

15        Q    How many are currently working?

16        A    The last I checked, probably within the

17   last week, there is one engine working.

18        Q    Okay.  Do you have any responsibilities

19   regarding the permitting process with IEPA on

20   Peoria's behalf currently?

21        A    Yes.

22        Q    And what are those responsibilities?

23        A    Well, we -- as the city/county's engineers,

24   we review all permit applications by all contractors,

25   whether they are from RTC, Waste Management, PVC,

Page 61

1    whatever they may be.  We do prepare some directly as

2    well.

3                  For example -- well, I mentioned the

4    RTC contracts.  We had prepared -- and when we worked

5    for contractors at that site, it's with the approval

6    of both -- primarily the city and county and the

7    contractor, to avoid any conflict of interest issues.

8                  But the ones we prepared directly for

9    the city and county deal primarily with ground water

10   assessments.  We normally have at least one under

11   review at any given time.  I think there is one in

12   Springfield now concerning ground water assessment on

13   landfill number 1 that's under review.

14        Q    Have you prepared what we have been calling

15   CAAPP permits?

16        A    Yes.

17        Q    For whom?

18        A    For -- we have assisted with Peoria,

19   city/county landfill.  We've also assisted -- or we

20   did prepare Knox County Landfill in Galesburg.

21        Q    Okay.  What other documentation have you

22   prepared in connection with these permits?

23        A    In connection with those permits?

24        Q    Yes.

25        A    Well, there's significant monitoring and

Page 62

1    record keeping and reporting requirements under a

2    CAAPP permit at least semi-annual; NSPS new source

3    performance standard; six month annual reports;

4    annual compliance certifications.

5        Q    And you've been involved in preparing such

6    documents?

7        A    Yes.  And I was just going to clarify

8    something that may not be clear in the testimony

9    previously.  There is actually two major regulatory

10   avenues, a land and an air CAAPP --

11             MR. SCHMIDT:  Your Honor, I'm sorry to

12   interrupt.  We would object.  Ms. Kujaca made it

13   clear at the start of the trial that Mr. Sloan is a

14   fact witness.  This is now in the nature of opinion

15   testimony.

16             THE COURT:  No more than Mr.

17   Connolly's testimony.  The objection is overruled.

18   To the extent that he has knowledge bearing on the

19   work that he has done for the City and County of

20   Peoria, he can testify to that.

21             MR. SCHMIDT:  Thank you.

22             THE WITNESS:  The Bureau of Land

23   issues permits for the landfill itself, but also the

24   gas collection system and disposal system.  That

25   predated the CAAPP program.  New source standards for

Page 63

1    municipal solid waste land fills enacted by U.S. EPA

2    and CAAPP deals more specifically then with those

3    systems.  But there is still dual regulatory

4    oversight, if you will, on those issues.  So we deal

5    with both of those permit avenues.

6                    MS. KUJACA:  Your Honor, I would like

7    to show Peoria Exhibit No. 3.  Is this still not

8    working?

9                    THE COURT:  No.  I've tried everything

10   I can think of to get this to work.  Actually, I was

11   going to break at noon for lunch anyway.  So let's

12   break now.  I have a conference call at 1:30 that I

13   expect to be brief.  So let's resume at 1:45.

14                   MS. KUJACA:  Okay.  Thank you.

15                   (Lunch Recess.)

16                   THE CLERK:  Recalling Resource

17   Technology Corporation.  Continued trial.

18                   THE COURT:  Okay.  Mr. Sloan, if you

19   would resume the witness stand, we'll recommence your

20   direct examination.

21                   We do have the --

22                   MS. KUJACA:  Excellent.  Thank you.

23                   THE COURT:  -- exhibit display working

24   again.

25                   You wanted your Exhibit 3 --

Page 64

1                    MS. KUJACA:  Yes, Your Honor.

2                    THE COURT:  -- if I remember

3      correctly.

4                    MS. KUJACA:  Yes.

5                    THE COURT:  So let me do that.  Okay.

6                    DIRECT EXAMINATION (Resumed)

7      BY MS. KUJACA:

8          Q    Mr. Sloan, I have in front of you what is

9      Peoria Exhibit No. 3.  Are you familiar with this

10     document?

11         A    Yes.

12         Q    What is it?

13                   MR. SCHMIDT:  Excuse me, Your Honor.

14     We would just restate our objection, same objection

15     as we made yesterday with regard to this type of

16     document on the grounds of hearsay and relevance.

17                   MS. KUJACA:  These are --

18                   THE COURT:  And let me make the same

19     offer to you that I made to Mr. Jordan, which is to

20     say that you may have a standing objection to all

21     notices of violation or other communications from the

22     IEPA based on hearsay and relevance.  And I am

23     overruling those objections on the ground that in my

24     opinion they do not go to the truth of the matter

25     asserted in them, but go to the overall question of

Page 65

1    the ability of IIT to perform under these leases.

2                    MR. SCHMIDT:  Thank you, Your Honor.

3                    MS. KUJACA:  Additionally, Your Honor,

4    I would note that these are business records under

5    rule -- Federal Rule of Evidence 8038 of a

6    government --

7                    THE COURT:  Well, that would get them

8    over one --

9                    MS. KUJACA:  Hearsay.

10                    THE COURT:  Well, not for the truth of

11   the matter contained therein, but it doesn't matter.

12                    MS. KUJACA:  Okay.

13                    THE COURT:  I am overruling the

14   objection on the basis that I just stated.

15                    MS. KUJACA:  Thank you.

16   BY MS. KUJACA:

17       Q    I believe I asked you if you were familiar

18   with this.  What is this document?

19       A    This document is the CAAPP permit for the

20   RTC engine plant at Peoria, Illinois.

21       Q    Did you review this permit when it was

22   originally issued?

23       A    Yes, I did.

24       Q    And when was that?

25       A    I believe 2002.

Page 66

1      Q    Are you sent copies of documents such as

2 these once they are submitted to the IEPA?

3      A    The lease requires that we get copies of

4 all documents, permit documents, between any

5 contractors, including RTC and EPA.  And that's why I

6 received a copy of this one.

7      Q    So you review permits such as these at the

8 Peoria Landfill as a routine part of your duties,

9 correct?

10     A    Yes, I do.

11     Q    To your knowledge, are these permits

12 documents which are routinely recorded or filed in

13 the offices of the IEPA?

14     A    Yes, they are.

15     Q    What exactly is a CAAPP permit, a C-A-A-P-P

16 CAAPP permit?

17     A    Well, the Clean Air Act regulates sources

18 or potential sources of air pollution.  This one here

19 was issued because of the size of the engines.  They

20 are considered a source under the Clean Air Act

21 Program requiring a permit as a major source.

22               Also, Peoria Landfill is required to

23 have a CAAPP permit because it is a landfill over a

24 certain size.

25     Q    So RTC and Peoria have a separate CAAPP

1   permit; is that correct?

2       A    There's two separate CAAPP permits.  They

3   are cross-referenced in the permits because under the

4   act, the Clean Air Act has to be an umbrella or

5   issued to a contiguous source.  And Peoria is the

6   contiguous source.  And as such, the overall permit

7   is issued in Peoria's name, and it's referenced in

8   this document later on, page three or so.

9       Q    Okay.  And this specific permit that we're

10  looking at right now, Exhibit No. 3, this just deals

11  with the engine plant; is that correct?

12      A    I believe so.  If we can scroll down, I can

13  verify that.  In item one, it's a preamble, if you

14  will.  Back.  There we go.  Thank you.

15              Yes, it states that right there, that

16  the source utilizes gas from landfill number 1, which

17  has permitted under double A, double AD.  I'll just

18  abbreviate.  That's a separate permit.  And this one

19  is only for the engines.

20      Q    Okay.  Thank you.

21              And as we discussed earlier, Peoria's

22  own permit for land covers both landfills 1 and 2,

23  correct?

24      A    Correct.  And their CAAPP -- they have a

25  land permit for landfill 1, and the CAAPP permit

Page 68

1    covers both landfill number 1 and number 2.

2        Q    Do you know when this permit was set to

3    expire?

4        A    They typically have a five-year term.  If

5    you go back to the first page, I think it will say

6    that it expires in 2007.  I don't remember the exact

7    date, but it would tell us.  Okay.  Expiration date

8    July 2nd, 2007.

9        Q    So what to your knowledge is the current

10   status of this CAAPP permit?

11                   MR. SCHMIDT:  Objection.  Foundation.

12                   THE COURT:  That's overruled.

13                   THE WITNESS:  I believe that RTC

14   submitted a renewal application.  I don't recall ever

15   receiving a copy of that.

16   BY MS. KUJACA:

17       Q    And to your knowledge, what is the status

18   of that renewal?

19       A    I believe it is still under review.

20       Q    Okay.  Were there problems with RTC's work

21   on the Peoria Landfill prior to the filing of its --

22   RTC's bankruptcy case?

23       A    Yes, there was.

24       Q    What problems were there?

25       A    The primary problem of most concern was

Page 69

1    compliance issues on operation of the gas collection

2    system.  Secondary problems were more appearances,

3    for example, mowing and upkeep of the features that

4    they were required to upkeep.

5        Q    Were there any repairs that didn't comply

6    with the CQA?

7        A    Yes.  The repairs that they did

8    periodically to certain features, drip, condensate,

9    drip legs, were not reconstructed in compliance with

10   CQA.

11       Q    What problems arose during the bankruptcy

12   case after RTC's bankruptcy filing?

13       A    Well, the compliance issues gradually

14   worsened a little, I guess.  The gas collection

15   system basically continued to degrade.

16       Q    Was there a fire at the site after RTC

17   filed for bankruptcy?

18       A    Yes.  I think it was in 2003 there was a

19   grass fire on the landfill number 1 final cover.  It

20   damaged some of the vegetative system and it damaged

21   some of the RTC wells.

22       Q    In broad terms, what are the current

23   problems with the Peoria site?

24       A    Well, the gas collection, only about

25   one-third of 140 wells are currently operational.

Page 70

1   And these items are -- there are compliance issues

2   that have risen to the attention of EPA, and they

3   have issued a violation notice on it.  It doesn't

4   appear that they have sufficient engine capacity to

5   dispose of the gasses being generated by the

6   landfill.

7       Q    Are there any other current problems with

8   the landfill?

9       A    There is minor problems with, again,

10  mowing, waste collection, proper disposal of

11  contaminated soil.

12      Q    And you mentioned earlier NOVs or VNs.  Do

13  you receive copies of VNs issued by the IEPA

14  regarding the Peoria Landfill?

15      A    Yes, I do.

16      Q    Do you review these documents routinely as

17  a part of your duties for the Peoria Landfill?

18      A    Yes, I do.  That's one of our jobs as

19  environmental engineers, is to assist our clients in

20  maintaining compliance, and when there's a violation

21  notice, then coming up with a compliance commitment.

22      Q    To your knowledge, are VNs routinely

23  recorded or filed in the IEPA offices?

24      A    Yes, they are when they observe them and

25  decide to issue them.

Page 71

1      Q     Are you aware of any NOVs issued to RTC?

2      A     I believe there have been some.  I don't

3  know specifically if I've received copies of all of

4  them.

5      Q     Okay.  I would like to start looking at

6  some of these, Peoria Exhibit No. 4.  I show you a

7  document from the Illinois Environmental Protection

8  Agency dated May 22nd, 2003.  Are you familiar with

9  this document?

10     A     Yes.

11     Q     What is it?

12     A     This is a violation notice issued to Peoria

13 concerning the final cover and gas wells being

14 inoperable.  As I mentioned earlier, it was primarily

15 the result of grass fires.

16     Q     To your knowledge, what is the status of

17 this?

18     A     We assisted in negotiations with EPA in

19 writing the compliance commitment agreement and

20 worked with the two contractors on site, Waste

21 Management and RTC, to fix the gas wells that were

22 damaged.  So it's basically resolved.

23            MS. KUJACA:  If we could go to Peoria

24 Exhibit No. 5, Your Honor.

25            That's Allied's No. 5.

Page 72

1                    THE COURT:  Oh, excuse me.

2                    MS. KUJACA:  Thank you.

3    BY MS. KUJACA:

4        Q    I show you what is labeled as Peoria

5    Exhibit No. 5.  Are you familiar with this document?

6        A    If you can just scroll down real quick to

7    verify.  To the best of my recollection, the first

8    time I saw this was over lunch when we were looking

9    at the exhibits.

10       Q    Were you supposed to receive a copy of this

11   VN once it was issued?

12       A    As I mentioned, we should get copies,

13   Peoria should get copies of all correspondence

14   between RTC and the regulatory agency.

15       Q    But to your knowledge, you never received a

16   copy?

17       A    I don't recall ever seeing this.

18                    MS. KUJACA:  If we could move to

19   Peoria Exhibit No. 7, Your Honor.  Thank you.

20   BY MS. KUJACA:

21       Q    In front you is a letter dated May 4, 2005,

22   from the Illinois Environmental Protection Agency to

23   John Connolly at RTC.  Are you familiar with this

24   document?

25       A    I think I have the same answer as the

Page 73

1    previous one, that the first time I saw it was a half

2    hour to an hour ago.

3        Q    So this is a document that should have been

4    sent to you, but you did not receive a copy to the

5    best of your knowledge?

6        A    Correct.

7                MS. KUJACA:  If we could move to

8    Peoria Exhibit No. 11, Your Honor.

9    BY MS. KUJACA:

10       Q    Are you familiar with this document?

11       A    Yes.

12       Q    What is this?

13       A    This was a violation notice issued by the

14   agency to Peoria in 2005.

15       Q    And you received a copy of this?

16       A    Yes, I did.

17       Q    What are the violations in this notice?

18       A    If we can -- there we go.  That page.

19                There is four violations.  The first

20   one deals with the gas collection system, and the

21   fact that the collection system isn't working through

22   half to two-thirds of the landfill that --

23                MR. SCHMIDT:  Objection, Your Honor.

24   It seems to me now they are trying to introduce the

25   substance of the document for the truth of the matter

Page 74

1    asserted.

2              THE COURT:  I don't think so.  The

3    objection is overruled.

4              THE WITNESS:  So this deals with --

5    CAAPP requires that GCCS collect landfill gas that's

6    generated by the landfill throughout.  So item one is

7    just saying that they are not doing that, not able to

8    provide vacuum.  Some of the monitoring reports that

9    we get also indicate that oxygen levels are not

10   appropriate.  And that's also listed.

11             Item number two deals with control of

12   the non-methane organic concentrations, which

13   basically relates to the new source performance

14   standards.  It's not being collected and disposed of

15   correctly.

16             Item three, John Connolly testified to

17   that yesterday, and said that they would install gas

18   metering devices now.  And so that item could get

19   resolved if it was carried out.

20             And then item four is basically a

21   catch-all which the agency does on occasion that

22   catches all the miscellaneous items on the CAAPP

23   permit.

24   BY MS. KUJACA:

25       Q    Now, correct me if I'm wrong, but this

Page 75

1   violation notice was issued to Peoria for the gas

2   collection and control system because RTC's permit

3   just covered the engine plant; is that correct?

4        A    Correct.  The gas collection system is

5   covered by this permit issued to Peoria.  In the

6   Peoria permit, it does cross reference the engine

7   plant.  It also mentions that RTC has a contractor to

8   operate the gas collection system.

9                    MS. KUJACA:  Thank you.

10                   If we could flip to Exhibit 13, Your

11   Honor.

12  BY MS. KUJACA:

13       Q    I show you what's marked as Peoria Exhibit

14  No. 13, which is a letter from the Illinois

15  Environmental Protection Agency which is dated

16  January 13, 2006.

17                   Have you ever seen this violation

18  notice?

19       A    I don't recall ever seeing this document.

20       Q    And, again, this is a document that should

21  have been delivered to you as an engineer for Peoria?

22       A    Correct.

23       Q    Do you know the status of this VN by any

24  chance?

25       A    No, I do not.

Page 76

1          MS. KUJACA:  And if we could flip to

2   Exhibit 16, Your Honor.

3   BY MS. KUJACA:

4       Q    I show you what's labeled as Peoria Exhibit

5   No. 16, which appears to be correspondence from Harry

6   Henderson to the Illinois IEPA issued August 2nd,

7   2006, that seems to indicate that there is another

8   violation notice issued to Harry Henderson.

9               Are you familiar with that?

10      A    No, not that I recall.

11      Q    Have you seen this document?

12      A    Today was the first time that I have seen

13  it.

14      Q    If there was in fact another NOV issued to

15  Harry Henderson, would that be something you should

16  have received a copy of?

17      A    Yes.

18      Q    Is the Peoria Landfill currently in

19  compliance with all IEPA regulations?

20      A    No.

21          MS. KUJACA:  If we could flip to

22  Exhibit 21, Your Honor.

23  BY MS. KUJACA:

24      Q    I show you Peoria Exhibit No. 21.  Are you

25  familiar with this document?

Page 77

1      A    I do not believe that I have seen -- I

2   don't recall seeing this document.

3      Q    Does this document appear to be RTC's

4   renewal application for its CAAPP permit?

5              MR. SCHMIDT:  Objection, Your Honor.

6   He just said he had never seen it before.

7              MS. KUJACA:  But he can speak to what

8   it appears to be, Your Honor.

9              THE COURT:  If he's an expert witness.

10             MS. KUJACA:  Okay.

11             THE COURT:  Objection sustained.

12  BY MS. KUJACA:

13     Q    To the extent that RTC has submitted a

14  renewal application for its CAAPP permit to the IEPA,

15  did anyone at Peoria approve that application prior

16  to the submission?

17     A    I don't recall that we've approved an

18  application.

19     Q    Did you approve a renewal application on

20  behalf of Peoria prior to submission to the IEPA?

21     A    No.

22     Q    Do you know if it's a requirement of the

23  lease between RTC and that Peoria approve all IEPA

24  applications prior to submittal?

25     A    Essentially I don't recall the exact

Page 78

1    wording in the lease, but that is the intent.

2        Q    Was the one operating engine at Peoria shut

3    down for several days last month?

4        A    Yes, it was.

5        Q    How did you know that?

6        A    As part of our duties, we visit Peoria

7    Landfill on the average at least weekly.  So one of

8    the people on my team that was there mentioned the

9    engines were not running.

10        Q    How was that determined?

11        A    You can tell that from the outside of the

12    building.

13        Q    Was anyone from Peoria able to get into the

14    building to assess the problems?

15        A    There was no one present when our people

16    were there.

17        Q    Are you able get onto the site generally if

18    you need to?

19        A    We are able to inspect the gas collection

20    system, but the building is locked, and we are not

21    able to get in there without prior arrangements.

22        Q    And the building is what contains the

23    engines?

24        A    The engines, correct.

25        Q    Is it a violation of the IEPA regulations

Page 79

1    for the engines to be unoperational for several days?

2                    MR. SCHMIDT:   Objection, Your Honor.

3    This is expert testimony.   He's a fact witness.

4                    THE COURT:   That's overruled.

5                    THE WITNESS:   The CAAPP requires that

6    engines should be operating pretty much a hundred

7    percent of the time.   If they are down for a certain

8    amount of the time, that recognized in the act.   What

9    it does, is you need to make steps to correct the

10   problem.   So if it's a one-time event, it is not

11   necessarily a compliance issue as long as they are

12   fixed and continue running.

13   BY MS. KUJACA:

14        Q    Can the IEPA assess a monetary penalty?

15        A    Yes.   It's my understanding under the act

16   they can assess up to $25,000 per day.

17        Q    Is there a danger of fires on the site if

18   the gas isn't removed, collected or flared?

19        A    The primary danger from fires at the

20   landfill or in the landfill would be when the gas

21   collection system is being operated incorrectly.

22        Q    Do you know what was fixed at the site in

23   January to make it operational?

24        A    No, not directly.   Just I heard what Mr.

25   Connolly testified to yesterday.

Page 80

1      Q     You didn't know before that time?

2      A     No, I did not.

3      Q     Do you know who IIT is?

4      A     Just in these legal dealings, and I guess

5   in talking about -- with counsel about the

6   stipulation.

7      Q     Is it your understanding that many of the

8   RTC employees will be involved with IIT?

9      A     Yes.

10     Q     If IIT is able to assume the Peoria

11  Landfill lease, do you expect anything with

12  management to change?

13     A     Well, based -- all I can base that on is

14  prior history pre-bankruptcy through bankruptcy.  And

15  that experience is that steps were not taken to

16  maintain compliance.

17     Q     Are you familiar with the stipulation

18  between Peoria and IIT?

19     A     Yes.

20     Q     Do you believe that the stipulation between

21  the parties will change anything regarding compliance

22  issues?

23     A     Well --

24           MR. SCHMIDT:  Objection.  Relevance.

25           THE COURT:  That's overruled.

Page 81

1              THE WITNESS:  The stipulation

2  basically backs up the lease that RTC is required to

3  operate the facility in compliance at all times.

4  BY MS. KUJACA:

5      Q    Has RTC had an opportunity in the past to

6  bring the second, third, fourth engine on line?

7      A    Yes, they have, and we have encouraged them

8  to bring sufficient capacity on site or repair the

9  engines that are there to dispose of gas correctly.

10     Q    And how many engines total are there?

11     A    The last time I was in the building there

12  was five engines there.

13     Q    But only one is operational?

14     A    That's my understanding.

15     Q    John Connolly has testified that it will

16  cost 200 to $250,000 to cure all the defaults at the

17  Peoria site.  Do you agree with that assessment?

18              MR. SCHMIDT:  Objection, Your Honor.

19  I have to object to this.  He is a fact witness who

20  has not been identified as an expert, and this is

21  certainly expert testimony.

22              THE COURT:  Was Mr. Connolly

23  identified as an expert witness?

24              MR. SCHMIDT:  He was identified as an

25  expert witness certainly to Peoria.

Page 82

1              MS. KUJACA:  We never got an expert

2    report, Your Honor.

3              MR. SCHMIDT:  An expert report is not

4    required under contested matters under Rule 9014.

5              MS. KUJACA:  I wasn't aware that Mr.

6    Connolly was listed as an expert witness.

7              MR. SCHMIDT:  It's in our

8    interrogatory responses.

9              THE COURT:  I'm going to overrule the

10   objection.  I don't see any real difference between

11   his testifying on this subject and Mr. Connolly's

12   testifying on this subject.

13             You can answer the question.

14   BY MS. KUJACA:

15     Q    The question was whether you agree with the

16   testimony that it will cost between 200 and $250,000

17   to cure the defaults at the Peoria site?

18     A    No.

19     Q    Why?

20     A    Well, we've conducted cost estimates in

21   discussions with other contractors and vendors.

22     Q    What do you believe it will cost to bring

23   the site into compliance?

24             MR. SCHMIDT:  Objection, Your Honor.

25   Can I just have a continuing objection on the grounds

Page 83

1    that this is opinion testimony, as to this line of

2    questioning?

3                    THE COURT:  You may have a continuing

4    objection, yes.

5                    MR. SCHMIDT:  Thank you.

6    BY MS. KUJACA:

7        Q    You've prepared estimates regarding how

8    much it will cost to bring the site into compliance?

9        A    Yes, we have.

10       Q    And what are those estimates?

11                   THE COURT:  Let me ask this:  Have you

12   supplied these estimates to counsel for --

13                   MS. KUJACA:  Yes, we have.

14                   THE COURT:  All right.

15                   THE WITNESS:  The estimates vary

16   because we do not have access to the gas collection

17   system to identify all the problems.  The current

18   estimates to take care of the gas collection system

19   and the engine plant varies between $840,000 and

20   $1.8 million.  Currently the budget is for half a

21   million dollars for this year.

22   BY MS. KUJACA:

23       Q    Do you believe it is necessary to have a

24   flare on the premises?

25       A    Yes, at this time, especially because

Page 84

1    sufficient engine capacity isn't available.

2        Q    What does that cost?

3        A    We took -- Peoria took bids on this last

4    year, and I think the low bidder was approximately

5    $200,000.  It was between 150 and $200,000.

6        Q    Peoria has an IEPA permit to operate a

7    flare; is that correct?

8        A    We have a permit to construct a flare;

9    that's correct.

10        Q    Construct a flare.

11             There was some discussion and

12    testimony with John Connolly regarding the existing

13    branch system at Peoria, whether it needs to be

14    converted to a loop system.  Did you agree with that?

15        A    Well, it is a design approach, I guess.  As

16    we currently see the system and understand it,

17    installations of a loop or additional pipes would be

18    the most effective way to achieve compliance

19    basically to collect gas from the entire 100-acre

20    fill.

21        Q    And that's factored into the 840,000 and

22    $1.8 million estimate?

23        A    Yes.  That's one of the items in that $1.8

24    million estimate.

25        Q    I would like to show you what's referred to

Page 85

1    as IIT Exhibit 36, if I could.

2                 MS. KUJACA:  Thank you.

3    BY MS. KUJACA:

4        Q    You've reviewed the various pro formas

5    prepared by IIT regarding the projected income to be

6    generated by the Peoria site?

7        A    Yes, I have.

8        Q    And we've seen a few of these, haven't we?

9    It's been modified a couple of times since you

10   originally saw it?

11       A    Yes.

12       Q    Do you agree with the assumptions?

13       A    No, I do not.

14       Q    Why?

15                MR. SCHMIDT:  Your Honor, I object.

16   This testimony was disclosed.  We did not receive any

17   documentation --

18                THE COURT:  This is rebuttal.  He's

19   simply responding to Mr. Connolly.

20                MR. SCHMIDT:  Thank you.

21   BY MS. KUJACA:

22       Q    Why not?

23       A    First of all, in the revenue line, it

24   appears that it was assumed that it's based on two

25   engines operating at the rated capacity of 800

1    kilowatts per hour.  And the purchase rate of 5.2

2    cents per kilowatt hour is an average for this year.

3    But it is unknown whether it would increase three

4    percent per year or not.  It stayed at the prior rate

5    of 1.9 cents for a long time.  And that's probably

6    controlled by the Illinois Commerce Commission.

7        Q    You said earlier the engine capacity, am I

8    correct?

9        A    Yes.

10       Q    You said this assumption or this proforma

11   uses the assumption that the engine is operating at

12   what capacity?

13       A    800 kilowatt hours.

14       Q    Is that what the Peoria engine is currently

15   performing at?

16       A    No, it is not.

17       Q    What is it performing at?

18       A    The most recent -- in January the Ameren

19   metering records indicate that it is operating

20   between -- the one engine is operating between 500 to

21   600 kilowatt hours.  That's basically what they are

22   putting on the grid and being paid for.

23       Q    Do you agree with the projections?

24       A    The other problem as far as assumptions on

25   the proforma would be on the expense side for the

Page 87

1    landfill gas collection system O&M, which is the

2    middle.  And I believe this -- these expenses are too

3    low, especially if the tree -- existing tree system

4    is maintained.  There is many, many laterals, pipes,

5    drip legs that need to be made operational.

6         Q    So revenue as listed in this proforma is

7    dependent on the GGCS being repaired and properly

8    operated?

9         A    Precisely.  You can't run the engines

10   unless you have gas delivered from the landfill.

11        Q    Is the Peoria site capable of producing the

12   amount of gas projected by IIT?

13        A    It could produce that amount of gas.

14   Probably the best estimate was done by Rust in 1995,

15   which indicates it should be producing 600 to

16   700 cubic feet per minute right now.  But since there

17   is no meter at the site, we have no way to directly

18   measure it.  We just estimate it based on the amount

19   of electrical -- electricity sold.

20        Q    And is that number you just told me

21   different from what's estimated in this proforma?

22        A    Well, yes, since, I mean -- their engine is

23   only -- current engine is only producing 500 to 600.

24   If they had two -- it's basically 75 percent of

25   revenue that they are projecting on this proforma.

Page 88

1          MS. KUJACA:  Okay.  Your Honor, if we

2     could flip to Peoria Exhibit No. 33.

3          THE COURT:  Which number?

4          MS. KUJACA:  Peoria 33.

5     BY MS. KUJACA:

6          Q    Mr. Sloan, are you familiar with this

7     document?

8          A    Yes.

9          Q    What is it?

10          A    It is a memorandum that I issued to the --

11     to Peoria in January, providing them an update of the

12     status on the gas collection system on landfill

13     number 1.

14          Q    And do you routinely provide such memoranda

15     as part of your duties for the Peoria Landfill?

16          A    Yes, I do.

17          MS. KUJACA:  If we could move to page

18     two, Your Honor.

19     BY MS. KUJACA:

20          Q    You're familiar with this chart?

21          A    Yes, I am.

22          Q    Who prepared this chart?

23          A    Well, I know it started with me.  There may

24     have been some other people in my office working on

25     it.  But basically I updated it and reissued it for

Page 89

1    this memo.

2        Q    What does this show?

3        A    Well, as I had mentioned, there is no

4    metering and measuring of gas directly.  But we can

5    measure the amount of electricity sold and landfill

6    gas -- well, the concentrations of methane is

7    measured, and we know what the performance is of the

8    engines.  So we can back calculate basically the

9    amount of gas being produced and collected.  The

10   upper, dark stair stepping line is the Rust gas

11   prediction made in 1995.

12       Q    What is that?

13       A    Rust is an engineering company.  In 1995 we

14   wrote the RFP to secure a gas contractor.  As part of

15   the RFP, Dailey & Associates hired Rust to generate

16   the gas curve, if you will, this prediction.  And

17   that appears to be the best estimate that I've seen.

18   And then basically -- the square symbols and the

19   jagged line is the projection of RTC -- RTC

20   operations in Peoria.

21       Q    So the Rust model predicts basically that

22   the gas flow from the Peoria Landfill will decrease

23   over time?

24       A    Yes, it does.  Landfill gas comes from

25   decomposition, and it's highest when the gas -- when

Page 90

1    the waste is first generated and then it decreases

2    with time.

3                MS. KUJACA:  If we could flip to the

4    next page.

5    BY MS. KUJACA:

6        Q    And what is this document?

7        A    This is Ameren's metering records from mid

8    December until, oh, mid January basically.  Well, I

9    have that on the bottom, December 15th to

10   January 7th.  At that time we weren't able to get a

11   hold of RTC.  So indirectly we got these records for

12   operation.  And as it indicates -- it indicates the

13   actual performance --

14               MR. SCHMIDT:  Objection.  This is a

15   hearsay document.  He didn't prepare this document.

16               THE COURT:  Well, how is this not

17   hearsay?

18               MS. KUJACA:  That's fine, Your Honor.

19               THE COURT:  The objection is

20   sustained.

21               MS. KUJACA:  I have nothing further.

22               THE COURT:  Mr. Bohan, did you have

23   any questions of this witness?

24               MR. BOHAN:  Not at this time.

25               THE COURT:  Go ahead.

Page 91

1                         CROSS-EXAMINATION

2   BY MR. SCHMIDT:

3        Q    Now, you testified your company was

4   employed by RTC prior to the bankruptcy case being

5   filed, correct?

6        A    That's correct.

7        Q    Was Foth Infrastructure paid in full for

8   that work?

9        A    No, we were not.

10       Q    How much was left unpaid?

11       A    Well, there is probably some discrepancy,

12   and this court has our claim, which might be in the

13   30 to $40,000 range.

14       Q    Do you believe the amount unpaid was

15   greater than that?

16       A    Well, a prior agreement in state court

17   would have been higher.

18       Q    Agreement between who?

19       A    RTC and Dailey & Associates.

20       Q    I see.  And you have not received any

21   payments from RTC since the bankruptcy case was

22   filed, correct?

23       A    Not to my knowledge, no.

24       Q    What is your ownership interest in Fought?

25       A    It's less than one percent.

Page 92

1      Q    Now, you mentioned a grass fire that

2  resulted in an NOV.  The grass fire was not caused by

3  RTC, correct?

4      A    No, it was not.

5      Q    And the NOV issued from the Bureau of Land,

6  correct?

7      A    Yes.

8      Q    And isn't it true that the city/county is

9  responsible for final cover obligations for the

10  Bureau of Land?

11      A    Primarily.  There are some final cover

12  requirements for the gas collection system as well.

13      Q    And after this fire the wells were

14  repaired, correct?

15      A    Yes, they were.

16      Q    You also mentioned drums of contaminated

17  soil.  Now, isn't it true you have no personal

18  knowledge as to whether the materials in the drums on

19  the site is RTC's material?

20      A    I don't have any personal knowledge, no, I

21  do not.

22      Q    Now, isn't it true that RTC's performance

23  at the landfill regarding technical matters

24  deteriorated following the appointment of the Chapter

25  11 trustee in 2003?

Page 93

1      A    They have continued to contribute.  What

2  was your word again?

3                  THE COURT:  Deteriorate.

4                  THE WITNESS:  Deteriorate.  I don't

5  know.  I have not thought with ascribing it to its

6  status in bankruptcy court.

7                  THE COURT:  It's a temporal question.

8  Has the performance declined during that period?

9                  THE WITNESS:  They have declined.

10  BY MR. SCHMIDT:

11     Q    Now, there was discussion regarding the

12  stipulation.

13                  MR. SCHMIDT:  Your Honor, if we could

14  see Peoria Exhibit I believe it is 22.

15  BY MR. SCHMIDT:

16     Q    If we could go to paragraph four.  All

17  right.  I would like to walk you through some

18  elements of this stipulation.

19                  Now, paragraph 4(a) of the stipulation

20  calls for RTC to bring a second and a third engine on

21  line at Peoria, correct?

22     A    I believe so.

23     Q    And you have not estimated the cost to RTC

24  for bringing these engines on line, correct?

25     A    No.

Page 94

1                    MS. KUJACA:  Objection.  That's not

2    what he testified.

3                    THE COURT:  No, that's an improper

4    objection.  If the witness wants to say that that's

5    not his testimony, he's certainly free to do that,

6    but he shouldn't be encouraged by an objection.

7                    MS. KUJACA:  I apologize.

8    BY MR. SCHMIDT:

9        Q    I'm sorry, your answer was you have not?

10       A    No, I have not.

11       Q    Okay.  If we could go to paragraph 4(b).

12   Now, paragraph 4(b) calls for well field repairs to

13   be made by IIT.  Now, isn't it true that at your

14   deposition on November 15th of 2007 you gave the

15   following testimony when we were discussing this

16   stipulation:

17                    (As read)

18                    "Question:  Next page, page 6 of 15

19   subparagraph (B), well field repairs.  First,

20   sentence, IIT will make any and all necessary repairs

21   to the GGCS to provide landfill gas conveyance

22   capacity to the plant in compliance with applicable

23   regulations.  Have you formed any opinion as to what

24   the cost of that would be?

25                    "Answer:  Yes.

Page 95

1                    "Question:  And what would the cost of

2    that be?

3                    "Answer:  Well, we have not been able

4    to conduct a full assessment of the state of

5    disrepair; therefore, the cost estimates range from

6    roughly 250,000 up to $840,000."

7                    Was that your testimony?

8        A     Apparently, yes.

9        Q     And you provided a budget to the

10   city/county for $500,000 for well field repairs,

11   final cover repair and a flare, correct?

12       A     Yes.  The $500,000 budget includes 250,000

13   for well head collection system repairs, plus the

14   amount of money for the flare, adding up to 500,000.

15       Q     Well, didn't you testify at your deposition

16   that of that $500,000, $200,000 was for a flare,

17   300,000 was for well field repairs and final cover

18   repairs?

19       A     I thought you -- could you read that to me,

20   because I don't recall.

21       Q     That's fine.  I will move on.  I will move

22   on.

23                    Now, the purpose of a flare is to back

24   up engines in case of a failure, correct?

25       A     Partially.  It's also for the purpose of

Page 96

1    cleaning -- the CAAPP, Clean Air Act, requires you to

2    destroy all the gas collected to remain in

3    compliance.  It could be, as often the case, that

4    there is not sufficient engine capacity at all

5    points.  So during that point you will be running

6    both a flare and the engines.

7        Q    Now, the stipulation between Peoria and IIT

8    calls for IIT to bring a third engine on line

9    specifically to back up the two primary engines,

10   correct?

11       A    I believe that's what the stipulation says.

12       Q    Okay.  So then if there is a third back-up

13   engine to back up two existing engines, there is no

14   need for a flare as a back-up, correct?

15       A    We don't know the -- that's not correct.

16   We don't know the total amount of gas being produced.

17   If it's like the curve that I showed earlier, two

18   engines would not be sufficient, and you would need a

19   third engine to make up the difference or a flare to

20   make up the difference.

21       Q    And so in that situation the third engine

22   would be available to burn that additional gas?

23       A    Yes, and there would be no back-up for gas

24   plant.

25       Q    Now, of the $840,000 high end of the

Page 97

1    estimate that you gave at your deposition, 500,000

2    was for a new header system, correct?

3         A    I believe that is correct.  I can't

4    remember if I was referring to notes during my

5    deposition or not.

6         Q    And the remaining 340,000 was your high-end

7    estimate for repair of the well field and final

8    cover, correct?

9         A    Yes.

10        Q    Now, there was some discussion regarding

11   the engineering preference of redesigning the header

12   system.  When RTC put in the current Christmas tree

13   system, isn't it true that you were the CQA officer

14   who signed off on that design?

15        A    Partially.  We -- I -- we were the CQA

16   officers, but that is not for the purpose of signing

17   off on the design.  It's for the purpose of signing

18   off on construction that has been constructed

19   according to the design.

20        Q    Okay.  But you did -- you executed the CQA

21   certification?

22        A    Yes, we -- the system was constructed as

23   designed.

24        Q    Now, the $250,000 estimate that you gave

25   for well field repairs at your deposition, that is

Page 98

1    the cost to correct known deficiencies in the system,

2    correct?

3        A    That's right.

4        Q    Now, you believe there are repairs needed

5    to the header system because monitoring reports show

6    an inability to exert vacuum in the header system

7    throughout the landfill, correct?

8        A    That is correct.

9        Q    Now, the inability to exert vacuum could be

10   due to a blockage in the header system, valves being

11   turned off, failure of a pipe or a condensate

12   handling system that's not working, correct?  Any of

13   those are possibilities?

14       A    Correct.

15       Q    So correction of the condensate handling

16   system could very well solve any problems without

17   replacing the entire header system, correct?

18       A    It could.

19       Q    And isn't it true you've had difficulty

20   estimating the cost for repair of the GGCS due to

21   your inability to evaluate the system?

22       A    Correct.  We are not able to gather data on

23   the gas wells or condensate drip legs.

24       Q    And, in fact, the $840,000 high estimate

25   that you provided at your deposition, that was simply

Page 99

1    verbally provided to you by Waste Management,

2    correct?

3        A    Yes.  That came through negotiations on

4    contingency planning.

5                MR. SCHMIDT:  If we could look at

6    paragraph 7(c).

7    BY MR. SCHMIDT:

8        Q    Looking again at Peoria Exhibit 22,

9    paragraph 4(c), isn't it true you have formed no

10   opinion regarding the cost for IIT to comply with

11   subparagraph 4(c)?

12               Let me withdraw that.  Let me withdraw

13   it.  I will just read from your deposition

14   transcript.  Beginning on page 129, paragraph 11:

15               (As read)

16               "Let me ask you, have you formed" --

17   this is a question.

18               "Let me ask you, have you formed an

19   opinion as to what the cost would be for IIT to

20   comply with subparagraph (c)?

21               "Answer:  No, not for IIT to comply

22   with it."

23       A    Yeah, I -- I don't recall.  I was just

24   reading through trying to remember what the second

25   half of the paragraph dealt with.

Page 100

1      Q    Now, you testified regarding certain NOVs

2  that you did not receive that you should have

3  received, correct?

4      A    Yes.  That's correct.

5           MR. SCHMIDT:  If we could look at -- I

6  apologize, Your Honor.

7  BY MR. SCHMIDT:

8      Q    Now, isn't it true that under the lease

9  notices are supposed to be sent to the City of

10  Peoria, Director, Department of Public Works?

11     A    That is correct.

12     Q    With a copy to the Peoria County

13  Administrator?

14     A    Correct.

15     Q    And you are not the Director of Department

16  of Public Works for the City of Peoria or the Peoria

17  Country Administrator, correct?

18     A    Correct.

19     Q    So when you say you did not receive them,

20  isn't it true that you did not receive them from the

21  city or county?

22     A    That's correct.  I just want to add, I do

23  receive some documents directly from RTC and Harry

24  Henderson.

25     Q    There is no question pending.

Page 101

1                    And now under the stipulation, the

2    stipulation provides for what RTC -- I'm sorry.  I

3    apologize.

4                    What IIT needs to do to cure any

5    defaults.  This stipulation does not require IIT to

6    put in a new design of a header system, correct?

7        A    That's correct.  It just requires

8    compliance with the Clean Air Act.

9        Q    And you mentioned a Rust estimate of

10   landfill gas?

11       A    Correct.

12       Q    Now, that estimate is ten years old,

13   correct?

14       A    It's probably 13 years old.

15       Q    And so as you sit here now, you have no

16   basis to say whether or not that estimate is accurate

17   of current gas flow at the landfill, correct?

18       A    It is the most accurate I have seen.  I

19   have seen later estimates that are less correct than

20   that one is.

21       Q    Now, there is no gas flow metering at the

22   site, correct?

23       A    I have seen gas predictions that are less

24   accurate than the 1995 estimate.

25       Q    That wasn't my question.  There is no gas

Page 102

1    flow metering on the site, correct?

2        A    No, there is not.

3        Q    Okay.  Now, with regard to John Connolly's

4    pro forma, you base in part your disagreement with

5    the pro forma on your analysis of the electricity

6    being sold, correct?

7        A    Yes.

8        Q    And I believe you said you backed out from

9    that number to determine how much gas is available?

10       A    That's right.

11       Q    Okay.  Now, didn't you just testify that a

12   substantial portion of the wells at the Peoria well

13   field are not operable?

14       A    That's right.

15       Q    Okay.  And under the stipulation, IIT is

16   required to make the wells operable and bring the

17   system into compliance, correct?

18       A    That's right.

19       Q    So wouldn't that not increase the amount of

20   gas available for conversion to electricity?

21       A    Yes, it will.  That curve -- and I think

22   Mr. Connolly testified yesterday, he agrees there's

23   600 PSM being generated.  If it's not being

24   generated, then it ends up being a compliance problem

25   one way or another.  So there definitely needs to be

Page 103

1    more capacity on site.

2         Q    Okay.  But you would agree with my

3    proposition that increasing the efficiency of the

4    well field may very well increase the amount of gas

5    available from the well field to be turned into

6    electricity?

7         A    Yes.  We've been saying that for a number

8    of years to RTC.

9         Q    And, in fact, you just testified that there

10   may be so much gas there that a third engine is

11   needed --

12        A    Correct.

13        Q    -- to turn the gas.

14             Were any NOVs issued relating to RTC's

15   operations prior to the bankruptcy case?

16        A    I do not recall.

17        Q    Do you know if RTC ever received any

18   enforcement orders relating to its operation at

19   Peoria?

20        A    I am not aware of any.

21        Q    Now, you testified that penalties can be

22   assessed relating to NOVs, correct?

23        A    That is correct.

24        Q    Are you aware of any penalties that are

25   being assessed against RTC relating to the Peoria

Page 104

1    site?

2        A    No.

3            MR. SCHMIDT:    One moment, Your Honor.

4    BY MR. SCHMIDT:

5        Q    Are you familiar with an Anchor Engineering

6    model estimating the landfill gas at the Peoria site?

7        A    I saw a copy of one last week, I think

8    connected to the Connolly deposition.

9        Q    And did you look at that estimate to see --

10   to compare it to the Rust model regarding estimates

11   of how much gas is available?

12       A    Basically, yes.    I looked at it for the

13   assumptions that were in it.

14       Q    And the Anchor Energy model showed a

15   greater amount of gas than the Rust model, correct?

16       A    Yes, but it had incorrect assumptions in

17   it.

18       Q    Did you look at an estimate from SCS

19   Engineers?

20       A    I think that was included in the same

21   deposition.

22       Q    Okay.    And isn't it true the SCS Engineers

23   estimate predicted a higher flow of gas at the Peoria

24   site than did the Rust model?

25       A    Yes, it did, but it had incorrect

Page 105

1   assumptions in the model.

2       Q    Now, you testified that there very well may

3   be enough gas to operate a third engine.  Doesn't

4   that mean that Mr. Connolly's estimate in his pro

5   forma would be low because he's only assuming

6   operation of two engines?

7       A    It is possible that that revenue could be

8   generated from three engines.  And the reason I say

9   that is because three engines operating at 500 to

10  600 kilowatts are roughly equivalent to two engines

11  operating at 800 kilowatts, which he assumed.

12      Q    Now, the gas model that you're relying on

13  does not go beyond 2008, correct?

14      A    That is correct.

15      Q    Okay.  So you're testifying about Mr.

16  Connolly's assumptions for how much gas will be

17  available.  We're in 2008 right now, and the contract

18  is going to go out for, I don't know, another 12

19  years or so.  So isn't it true that based upon the

20  model you're relying upon, you don't know how much

21  gas is going to be at the site after 2008?

22      A    Not exactly from that model, but gas

23  production in the landfill never increases.

24              MR. SCHMIDT:  I have no more

25  questions.

Page 106

1                    THE COURT:  Thank you, Mr. Schmidt.

2              Ms. Kujaca.

3                    REDIRECT EXAMINATION

4    BY MS. KUJACA:

5         Q    Mr. Sloan, there was some discussion about

6    your recommendation of the implementation of a

7    Christmas tree system when you were a CQA officer; is

8    that correct?

9         A    Yes.

10        Q    When was that?

11        A    The original design of the Christmas tree

12   layout would have been in 1996.  RTC had another

13   engineer working for them at that time.

14        Q    Have there been any changes to the Peoria

15   Landfill system in those 12 intervening years?

16        A    The second phase was designed by Dailey &

17   Associates.  It added 10 to 20 wells.  That was the

18   only change to the gas collection system.

19        Q    What do you estimate it will cost to bring

20   two more engines on line?

21                    MR. SCHMIDT:  Objection.  He just

22   testified he didn't have an estimate.

23                    THE COURT:  That's true.

24   BY MS. KUJACA:

25        Q    Why did you suggest that a loop system may

Page 107

1    be preferable to Peoria?

2                    MR. SCHMIDT:  Objection.  Relevance.

3                    MS. KUJACA:  It was asked on cross.

4                    THE COURT:  Well, no, the question

5    really would be if -- if it's necessary, not whether

6    it is desirable.  As I read the stipulation, there's

7    no requirement for IIT under this agreement to

8    reimburse Peoria for something that's merely

9    desirable.  In the well field maintenance section, it

10   says IIT shall reimburse Peoria for Peoria's

11   necessary repairs.

12   BY MS. KUJACA:

13       Q    Are there any benefits to having a loop

14   system?

15                   THE COURT:  Again, that would not be

16   relevant.

17                   MS. KUJACA:  Okay.

18                   THE COURT:  If you want to ask him

19   whether a loop is necessary, you can certainly do

20   that.

21   BY MS. KUJACA:

22       Q    Do you believe a loop system is necessary?

23       A    I believe -- I believe it's necessary and

24   would recommend it if the Peoria city/county was to

25   operate it, because it is easier to balance, tune the

Page 108

1    well field and maintain -- most importantly maintain

2    compliance with the Clean Air Act.

3        Q    Why do you have difficulties gathering

4    information regarding the GGCS?

5        A    I don't know if I know the answer to that.

6    It is required under the lease, but we have --

7    information has not always been forthcoming or

8    timely.

9        Q    Forthcoming or timely from whom?

10       A    RTC.

11       Q    There was a question as to whether you

12   received VNs regarding the Peoria Landfill.  There is

13   a question as to whether Peoria received them in lieu

14   of you.  Does --

15              MR. SCHMIDT:  Objection.  That

16   question was not asked.

17              THE COURT:  That's true.  That wasn't

18   the question.

19              MS. KUJACA:  Okay.

20   BY MS. KUJACA:

21       Q    Does Peoria typically forward you documents

22   regarding the landfill?

23       A    Yes, they do.

24       Q    Is there any reason Peoria would not

25   forward you documents regarding the landfill?

Page 109

1                     MR. SCHMIDT:  Objection.  Foundation.

2                     THE COURT:  Overruled.

3                     THE WITNESS:  No, there would be no

4    reason.

5    BY MS. KUJACA:

6         Q    To your knowledge, is there any reason why

7    the penalties have not been assessed against Peoria

8    by the IEPA?

9                     MR. SCHMIDT:  Objection.  Foundation.

10                    THE COURT:  Overruled.

11                    THE WITNESS:  We have talked --

12   discussed the issue with EPA, negotiated with EPA.

13   As a public body, there may be more leniency.  I do

14   not know.  But public bodies are able to call on

15   legislators, for example, and have -- may have more

16   access to regulators than private firms do.

17   BY MS. KUJACA:

18        Q    There was discussion regarding various

19   models for gas production.  Which model do you find

20   the most reliable as to the historical gas production

21   in Peoria?

22        A    The 1995 Rust model.

23        Q    What would that -- if you know, what would

24   that Rust model suggest after the year 2008?

25                    MR. SCHMIDT:  Objection, Your Honor.

Page 110

1    He didn't prepare that model, and counsel is asking

2    him to speculate as to what the people who did

3    prepare the model would have said it --

4                    THE COURT:  No, I don't think so.

5    Based on his understanding of well field gas

6    production, he can testify what the implication is in

7    the model past 2008.  The objection is overruled.

8                    THE WITNESS:  The regulations and

9    Clean Air Act specify using the first order decay

10   equation for gas -- predicting gas.  So it continues

11   to decrease and decay.  In this area of the curve,

12   it's fairly linear.  So a first estimate would be

13   just linear decreases, extension of the Rust

14   production past 2008.

15                   MS. KUJACA:  Thank you.  Nothing

16   further, Your Honor.

17                   THE COURT:  Okay.  You may step down

18   Mr. Sloan.

19                   THE WITNESS:  Thank you.

20

21                   (Witness excused.)

22                   THE COURT:  Any other witnesses, Ms.

23   Kujaca?

24                   MS. KUJACA:  We would like to call

25   Mr. Reed as a rebuttal witness.

Page 111

1                    MR. JORDAN:  If she could identify the

2    areas of rebuttal, because I'm not sure --

3                    MS. KUJACA:  Mr. Connolly testified

4    that RTC has a valid CAAPP permit and Mr. Reed is

5    here to rebut that.

6                    MR. JORDAN:  I'm sorry.  He did what?

7                    MS. KUJACA:  Mr. Connolly testified

8    that RTC has a valid CAAPP permit at this time.

9                    THE COURT:  At Peoria?

10                   MS. KUJACA:  Yes.

11                   THE COURT:  I don't think there is any

12   dispute about the status of the CAAPP permit at

13   Peoria.  The one that had been approved is now

14   terminated, but there is an application for a new one

15   pending.

16                   Is he going to say anything different

17   than that?

18                   MS. KUJACA:  Mr. Reed can testify that

19   both the permit and application shields have expired,

20   leading to the fact that RTC has no current permit to

21   operate at the Peoria site.

22                   MR. JORDAN:  He could, but he

23   testified at his deposition that it's sitting on the

24   desk and there are 150 permits before it.

25                   THE COURT:  I will hear what he has to

Page 112

1    say on that point.

2              MR. JORDAN:  Now, are we going to have

3    him on once or twice?

4              THE COURT:  Why would he be on twice?

5              MR. JORDAN:  Well, because Allied

6    hasn't gone forward, and I just want to make sure --

7              MR. BOHAN:  Your Honor, I would --

8    Your Honor -- what I would suggest is that we do our

9    direct of Mr. Reed, which is going to be I think very

10   short after Ms. Kujaca does her direct.

11             THE COURT:  That's fine.  That would

12   make the most sense.  I think that's what Mr. Jordan

13   is suggesting would be the best way.

14             MR. JORDAN:  Now, with regard to

15   Allied, just to be clear, we took Mr. Reed's

16   deposition last Friday, and due to a problem with

17   transcription, Mr. O'Meara and I got a useless

18   transcript over the weekend.  And I think we both

19   received it on Monday.

20             And I read Mr. Reed's transcript last

21   night.  And we would like to eliminate the need for

22   Mr. Reed's testimony as to Allied on the core issue

23   since Allied removed the GGCS from the Springfield

24   site when Allied removed the over-height and

25   over-girth at the Springfield Landfill.

Page 113

1              Mr. Reed is expected to testify that

2    the Springfield CAAPP permit is void.  And as such,

3    we are willing to stipulate that the trust will not

4    seek a transfer of the CAAPP permit and instead file

5    a new construction permit application and a new CAAPP

6    permit application for the conduct of business at the

7    Springfield site.

8              And given that stipulation, I don't

9    know what Allied would have to rebut with regard to

10   the issue of validity of the existing permit at the

11   Springfield site because we are not going forward on

12   a transfer of that for the trust.

13             MR. BOHAN:  Well, Your Honor, I think

14   that goes a long way to answering some of what I

15   was -- a lot of what I was going to be asking

16   Mr. Reed.  It directly rebuts Mr. Connolly's

17   testimony that there is a valid permit in place in

18   the name of RTC.  That's just not true.  That permit

19   is void because RTC removed those two engines and

20   that caused the permit by its own terms to --

21             THE COURT:  Well, if you have a

22   stipulation to that effect, do you need to question

23   the witness on it?

24             MR. BOHAN:  The only other questions I

25   would ask him, Your Honor, are primarily foundation

Page 114

1  questions for the introduction of the NOVs under Rule

2  803, the public records exception.

3           THE COURT:  Well, again, you're not

4  going to introduce them for the truth of the matter

5  asserted, and I've already allowed their introduction

6  for the notice that they give.

7           MR. BOHAN:  Well, Your Honor, I

8  believe they are admissible, actually, for the truth

9  of the matter because they are public records.  They

10  are made by someone charged by public law to make the

11  observations that they contain.  And I believe they

12  are -- I believe they fit very comfortably within the

13  public records exception, in addition to the business

14  records exception.

15           MR. JORDAN:  Your Honor, actually,

16  that's not true, because all of these items are

17  allegations as opposed to findings.  And so --

18           THE COURT:  What federal rule of

19  evidence do you --

20           MR. JORDAN:  It's 803.

21           MR. BOHAN:  803 --

22           THE COURT:  I just am highly dubious

23  of that proposition.  You might just as well say that

24  every indictment ought to be admitted for the truth

25  of the matter asserted.

Page 115

 1              MR. BOHAN:  The rule, Your Honor,

 2  actually speaks to criminal charges, and they are not

 3  within the rule.  Rule 803 provides as follows:

 4  803(8), "A report in any form of a public office or

 5  agency setting forth, (b) matters observed pursuant

 6  to duty imposed by law as to which matters there was

 7  a duty to report" -- and then there's the exclusion

 8  for criminal cases -- "fit within the exception."

 9              That's exactly what we have here, an

10  observation is made by someone charged by law with

11  making the observation and reporting on it.

12              MS. KUJACA:  That's what I was

13  referring to earlier, Your Honor --

14              MR. JORDAN:  However, he isn't

15  referring --

16              THE COURT:  Wait a second, wait a

17  second, wait a second.  It's actually the sub (c) of

18  that that perhaps is relevant here, reports or

19  statements in civil actions and proceedings, in such

20  civil actions and proceedings, factual findings

21  resulting from an investigation made pursuant to

22  authority granted by law, unless the sources of

23  information or other circumstances indicate lack of

24  trustworthiness.

25              MR. JORDAN:  Actually --

Page 116

1                    THE COURT:  Well, actually, what I am

2    going to do, I will take a brief recess and look at

3    whether Rule 803(8)(c) would cover notices of

4    violation in a civil enforcement proceeding by an --

5                    MR. JORDAN:  Can I just highlight one

6    fact, which is that the documents take reports that

7    are filed by other people outside of the agency and

8    then submit it against that.  It's not that the --

9    it's not the investigation of the agency that would

10   be within these various items.

11                   And they're allegations.  And so the

12   relevance of allegations unproven, the prejudicial

13   value far outweighs the probative value of that, in

14   addition to which, Mr. Reed is in the permit section

15   and not in the compliance section.

16                   THE COURT:  You're giving me, I think,

17   a showing that the sources of information or other

18   circumstances indicate a lack of trustworthiness.  I

19   expect that's what you're arguing now.

20                   MR. JORDAN:  Well, I think we are

21   really arguing admission issues as opposed to Mr.

22   Reed's testimony issues at this point.  But, yes, I

23   am arguing that.

24                   THE COURT:  All right.  I will take a

25   brief recess and review this.

Page 117

```
 1                    (Brief Recess.)

 2                    THE CLERK:  Court is reconvened.

 3                    THE COURT:  Do we have everyone here?

 4                    MR. SCHMIDT:  Mr. Jordan stepped out

 5    for just a moment.

 6                    (Brief pause.)

 7                    MR. JORDAN:  Sorry, Your Honor.  I

 8    went down the hall.

 9                    THE COURT:  As it turns out, Rule

10    803(8) has in fact been used to allow the admission

11    of reports very similar to the ones that are being

12    sought to be introduced now.  In particular, as

13    reflected in a Law Review article, 33 Arizona State

14    Law Journal 265, EEOC preliminary determinations have

15    routinely been admitted under Rule 803.

16                    And a University of Kansas Law Review

17    article, 38 University of Kansas Law Review 767,

18    1990, collects a large number of authorities

19    regarding the admission of government fact findings

20    under Rule 803(8)(c).  And although the article

21    opines that the rule should be more stringently

22    limited, it does indicate substantial authority for

23    the proposition that matters of this sort are

24    admissible.

25                    However, as I indicated earlier, the
```

Page 118

1   rule itself provides an exception to admissibility in

2   situations where the circumstances would indicate

3   that the findings of fact set forth in the

4   administrative complaint are not trustworthy.  So if

5   you would like to make an argument on that point, I

6   would hear it, Mr. Jordan.

7                   MR. JORDAN:  Sure.

8                   THE COURT:  But otherwise I'd overrule

9   your objection.

10                   MR. JORDAN:  My research has disclosed

11  that the factors to review are the timeliness of the

12  investigation, special skills or experience of the

13  official, and whether a hearing was held and the

14  level at which it was conducted.

15                   Now, I would note that the Law Review

16  articles that you cite I don't have a quibble with

17  because what they relate to are actual fact finding.

18  And what these reports are are submissions to a party

19  seeking a response saying we heard about this and we

20  want to know what your position is on it and that

21  maybe we didn't like your report, in addition to

22  which this witness being in the permit section and

23  not in the compliance section wouldn't be able to

24  cast any evidence with regard to these reports in any

25  event.

1            As I said, really it's an admission

2   question.  But since there is no hearing, since we

3   have no knowledge as to the special skill or

4   experience of the officials who prepared them, and

5   since the matters don't -- did not, in any event,

6   relate to an order of enforcement that was entered

7   and an indication that the allegations were valid,

8   then their probative value is far outweighed by the

9   prejudice our client would suffer because our client

10  is in the reflective glare of these unsupported

11  allegations which have never gone to an enforcement,

12  even though if, in fact, there was a basis for

13  enforcement, one would expect that enforcement would

14  follow.

15            Thank you, Your Honor.

16            MR. BOHAN:  Your Honor, I believe the

17  rule creates its own exception.  As Your Honor noted,

18  the exception is sources of information or other

19  circumstances indicating a lack of trustworthiness.

20  There are none here.  Mr. Jordan hasn't been able to

21  identify any.  As a result, we're squarely within

22  803(8).

23            Now, he does make a Rule 403 argument,

24  Your Honor.  But in my view his Rule 403 argument

25  more goes to the weight of the evidence rather than

Page 120

1   its admissibility.  He's going to argue that you

2   should take into consideration not just the notices

3   of violation, but RTC's response to the notice in

4   which it routinely blamed the landfill owners.  Your

5   Honor should consider that, I guess.  But these

6   documents themselves are squarely admissible under

7   Rule 803(8).

8                 THE COURT:  I am just looking, as an

9   example, at Peoria Exhibit 11, which states in the

10  cover letter that this is a violation notice based

11  upon a review of available information and an

12  investigation by representatives of the Illinois

13  Environmental Protection Agency.

14                Then attachment A says, "per

15  observations by Matthew Cookinghan and Wayne Kahela,"

16  who in context would appear to be representatives of

17  the IEPA, "the following facts are true," and these

18  are not, from what I can tell, opinions as much as

19  they are factual observations:  "That interior

20  wellheads in the collection system were not all

21  operated at an oxygen level less then than five

22  percent."  That would appear to indicate a reading of

23  a wellhead oxygen level by the IEPA representatives

24  here.

25                Let me just see if there is anything

Page 121

1   else that would be other than actual observations of

2   fact by IEPA authorities.  Well, certainly when they

3   say that there is a failure to comply with all the

4   conditions, that's not an observation.  But to the

5   extent that these violation reports reflect

6   observations or readings made by IEPA officials, I

7   would find no lack of trustworthiness.

8              MR. JORDAN:  Well, you know, really

9   the problem with that is that Peoria, Allied,

10  whomever, had the ability to bring these people

11  forward.  So we don't have the ability to

12  cross-examine these people as to the underlying

13  nature of their observations.

14             THE COURT:  That would be true with

15  regard to every document that would be admissible

16  under Rule 803(8).  In each case the document would

17  be admitted in lieu of live testimony by the person

18  who made the observation.  So that can't be a basis

19  for denying admission.

20             I think what this reflects is

21  something that, contrary to the potential conclusion

22  of a lack of trustworthiness, actually indicates a

23  substantial degree of trustworthiness in that we

24  would be dealing which a discrete measurement made by

25  an official of the agency who would be expected to be

Page 122

1    able to use the measurement equipment appropriately.

2    So without a reason to believe that they would have

3    measured improperly or improperly recorded their

4    measurements, I would find observations of this sort

5    to be admissible.

6                Now, if there are other violation

7    reports that are based on something other than

8    observations by IEPA officials, if there is something

9    in which the violation notice is based upon some

10   report made to the IEPA by someone else, I would have

11   a different determination.  But where what we have

12   appear to be reflections of actual readings made by

13   IEPA employees in the scope of their responsibilities

14   as employees, I'd admit the documents over the

15   objection.

16                MR. BOHAN:  Your Honor, having then

17   heard Your Honor's ruling, based on Mr. Jordan's

18   statement in open court that IIT will no longer and

19   is no longer asserting the position that there is a

20   valid CAAPP permit at the Sangamon Valley Landfill,

21   we will not be calling Mr. Reed to rebut that portion

22   of Mr. Connolly's testimony.

23                THE COURT:  All right.  Ms. Kujaca,

24   whatever brief testimony you want to elicit, you may

25   do so.

Page 123

1                    MS. KUJACA:  Okay.  I call Mr. Michael

2    Reed.

3                    (Witness sworn.)

4               MICHAEL REED, WITNESS, SWORN

5                    DIRECT EXAMINATION

6    BY MS. KUJACA:

7         Q    Mr. Reed, state your name and spell your

8    last name for the record, please.

9         A    My name is Michael Reed.  Last name spelled

10   R-e-e-d.

11        Q    Where are you currently employed?

12        A    I am currently employed with the State of

13   Illinois Environmental Protection Agency.

14        Q    Briefly, what is your educational

15   background?

16        A    My educational background is I have a

17   master's degree in environmental engineering, and I

18   have a bachelor's degree in electrical engineering.

19        Q    How long have you been employed with IEPA?

20        A    I have been employed with the Illinois EPA

21   for a total of nine years, six of those years with

22   the Bureau of Air Field Operations and three of those

23   years in my current position which is the Bureau of

24   Air Permit section.

25        Q    And between those six and three year

Page 124

1    periods, you were employed in private practice,

2    correct?

3         A    Yes, I was.  I was employed at the Robbins

4    Resource Recovery facility in Robbins, Illinois, as

5    well as Midwest Generation in Pekin, Illinois.

6         Q    And what were your roles at those

7    facilities?

8         A    The environmental compliance manager.

9         Q    Thank you.

10               What is your current title again?

11        A    My current title is CAAPP, Clean Air Permit

12   Program, CAAPP, unit manager.

13        Q    What does that job entail?  What are your

14   duties?

15        A    My duties are to ensure that the CAAPP

16   program is implemented properly in the State of

17   Illinois.  I assign permits to the 11 engineers that

18   work under me to draft those.  I review those permits

19   that they draft.  We also consult with other sections

20   of the bureau in regards to technical issues that may

21   come up.  And I write policy and procedure to ensure

22   that the CAAPP program is implemented properly, as

23   well as making interpretations as well on applicable

24   requirements.

25        Q    Who do you report to?

Page 125

1        A     I report directly to Ed Bakowski, the

2     permit section manager.

3        Q     And you said you have 11 staff engineers

4     that report to you?

5        A     Yes.  That's correct.

6        Q     Do you have any other staff members that

7     report to you?

8        A     No, I do not.

9        Q     Okay.  You are only involved with air

10     permitting requirements relating to the landfills,

11     correct?

12        A     That is correct.

13        Q     You have no involvement whatsoever with the

14     land permits, right?

15        A     No.

16        Q     Okay.  Are you the person at the IEPA who

17     determines whether a CAAPP permit is granted?

18        A     Yes.

19        Q     Do you issue violation notices?

20        A     I do not issue violation notices.

21        Q     Are you aware of them?

22        A     Yes, I am aware of them.

23        Q     Do you receive and review them in the

24     course of your work for the IEPA?

25        A     Yes, I do, as well as my engineers.  There

1    is what we call a co-review of those.  When our field

2    operations identifies a violation or when we identify

3    a violation, our compliance unit will draft up that

4    violation notice and then it will come back to the

5    permit section for a co-review to see if there is any

6    input.  And it also goes out to other sections of the

7    bureau as well for co-review before a final draft is

8    provided to the source.

9        Q    Okay.  Do you keep copies of the VNs in

10   your files?

11               MR. JORDAN:  Your Honor, objection.  I

12   mean, this is not rebuttal.  We already know of the

13   VNs and the other documents, so this can't be in

14   rebuttal to that.

15               THE COURT:  That's sustained.

16               MS. KUJACA:  That's fine, Your Honor.

17   I will move on.

18   BY MS. KUJACA:

19       Q    What type of CAAPP applications, permit

20   applications and modifications are there?  There's a

21   new application, correct?

22       A    Yes.  We have what we call new or initial

23   permit applications.  Then there are renewal

24   applications, and then there are three different

25   types of modifications.  One is an administrative

Page 127

1    amendment, one is a minor modification, and the other

2    is a significant modification.

3         Q    Will IEPA review the compliance history of

4    a permit applicant when determining whether to issue

5    a new application?

6                   MR. JORDAN:  Objection, Your Honor.

7    Again --

8                   THE COURT:  Sustained.  That's not

9    rebuttal.

10   BY MS. KUJACA:

11        Q    Are you familiar with the Peoria Landfill?

12        A    Yes.  I am familiar from reviewing the

13   permit application.

14        Q    When did you first have permitting issues

15   with the Peoria Landfill?

16        A    Shortly after the renewal application came

17   in.  I couldn't give you an exact date.

18        Q    Were you aware that RTC was in bankruptcy

19   beginning in 1999?

20        A    I became aware of that at some point in

21   time.  The exact date I couldn't tell you.

22        Q    Did the bankruptcy filing have any effect

23   on the permit status with your office?

24                   MR. JORDAN:  Objection, Your Honor.

25   Again, this is not in rebuttal to anything.

Page 128

1                    THE COURT:  No.  To the extent that

2     it's rebutting testimony that there is a permit in

3     place, it may very well be relevant -- rebuttal,

4     excuse me.  The question can stand.

5                    MS. KUJACA:  The question is what?

6     I'm sorry.

7                    THE COURT:  The question may stand.

8                    MS. KUJACA:  Oh, the question may

9     stand.

10                    THE COURT:  You can answer the

11    question.

12                    THE WITNESS:  Generally a bankruptcy

13    does not impact any permitting status.

14    BY MS. KUJACA:

15        Q    Are the IEPA CAAPP permits generally

16    transferable?

17        A    IEPA permits are not transferable.

18        Q    Are they considered property?

19        A    No, they are not.

20        Q    What is the standard procedure used to

21    transfer the interest in a CAAPP permit?

22        A    Well, a permit is not transferable.

23    However, a source can make an ownership change or a

24    name change on that permit, and that would be done

25    through two potential avenues.  One would be an

Page 129

1   administrative amendment or the other would be a

2   significant modification.  And the way you determine

3   which one of those is dependent upon the compliance

4   status of the source at the time.

5       Q    Does the new permit holder have to meet the

6   same requirements to hold the permit as the original

7   holder?

8       A    We have to know who the source is, what

9   type of application they are applying for, what their

10  compliance status is at the time, what applicable

11  requirements we may have to modify or address for

12  that type of application, what type of process it is

13  that we are permitting, a description of that, as

14  well as a whole slew of other miscellaneous

15  activities as well.

16      Q    Can a noncompliant landfill generally do an

17  administrative name change?

18          MR. JORDAN:  Your Honor, I am not sure

19  if there is any testimony about the administrative

20  name change or anything else.  I don't know what this

21  is in rebuttal to.

22          THE COURT:  No, the question is

23  whether there is currently a CAAPP permit or permit

24  shield in place at Peoria, and I believe this

25  question is relevant to that issue, and so the

Page 130

1   objection is overruled.

2                    THE WITNESS:  Could you repeat the

3   question.

4                    MS. KUJACA:  Certainly.

5   BY MS. KUJACA:

6       Q    Can a noncompliant landfill do an

7   administrative name change as we just discussed?

8       A    A noncompliant source would have to have a

9   compliance scheduled that's approvable by the

10  Illinois EPA and that would require a significant

11  modification.

12                   THE COURT:  What constitutes an

13  applicant being noncompliant?

14                   THE WITNESS:  That is when we have

15  outstanding violation notices in our file and those

16  have been referred to the attorney general's office.

17  That's what we generally determine to be

18  noncompliant.

19  BY MS. KUJACA:

20      Q    I would like to refer you to Peoria Exhibit

21  No. 3.  Mr. Reed, are you familiar with this

22  document?

23      A    Is that the document in front of me on the

24  screen?

25      Q    Yes, it is.

Page 131

1      A    Okay.  Yes.  It is hard to -- hard to see

2  it -- if I had the whole document in front of me --

3  but it appears to be the -- the Clean Air Act Permit

4  Program and Title 1 permit for Resource Technology

5  Corporation.  Yes, that's fine.

6      Q    And you routinely --

7      A    It's the CAAPP permit.

8      Q    I'm sorry.

9              -- you routinely review CAAPP permit

10  documentation such as this in the course of your

11  duties at the IEPA, correct?

12      A    Yes, I do.

13      Q    Are permit documents such as this routinely

14  recorded or filed in the offices of the IEPA?

15      A    Could you repeat the question.

16      Q    Are permit documents such as the one in

17  front of you routinely recorded or filed in the

18  offices of the IEPA?

19      A    Yes.  We keep a copy of this in the permit

20  file for the source.

21      Q    And CAAPP permits such as this are

22  authorized by the IEPA regulations, correct?

23      A    That is correct.

24      Q    Okay.  Did you review this document in the

25  course of your duties?

Page 132

```
 1                    I'm sorry.  You already answered that.

 2                    You keep a copy of this in your files

 3     as CAAPP unit manager; is that correct?

 4         A    Yes.  Well, I don't have a personal file,

 5     but this is kept in the permit file for the source.

 6         Q    Okay.  Who originally applied for this

 7     permit, if you can tell?

 8         A    The original applicant would be the

 9     permittee, and that was identified as Resource

10     Technology Corporation.

11         Q    This permit was solely held by Resource

12     Technology Corporation and not Peoria; is that

13     correct?

14         A    Yes.  That's correct.

15         Q    And it looks like this was submitted in

16     September of 1999; is that correct?

17         A    Yes.  We received the application for this

18     permit on September 13th, 1999.

19         Q    If you could briefly walk me through the

20     process of obtaining a permit such as this, what is

21     required?

22         A    Yes.  This is -- this would have been the

23     initial permit, CAAPP permit, for the source at the

24     time.  I was not involved in the direct issuance of

25     this permit, but I can explain to you the process
```

Page 133

1    because it has not changed.

2                An applicant will submit an

3    application to the Illinois Environmental Protection

4    Agency.  That application will go through what we

5    call an administrative completeness determination

6    where a clerical will evaluate to make sure that all

7    of the forms are present for us to continue our

8    review of that application.

9                Once that has been determined to be

10   complete, we would issue a completeness determination

11   letter to the source.  And then that permit would

12   come to me as the manager of that unit.  And I would

13   assign it to one of my engineers.  And they would do

14   what we call a technical review.

15               And in that technical review, we

16   determine the substance of the application and what

17   is included on those forms, making sure that all the

18   applicable requirements have been identified

19   correctly, all record keeping and reporting has been

20   identified, testing, monitoring, that sort of thing.

21               Once that is done, the engineer will

22   draft the permit, and then he will turn it in to me,

23   the CAAPP unit manager, and I will review it to make

24   sure that he has done his job properly, that all the

25   elements necessary for a CAAPP permit are present.

1          Once I am done reviewing it, the

2   permit will then go to public notice.  Public notice,

3   that is generally a 30-day time period.  In that

4   30-day time period, that allows the public, the

5   source, U.S. EPA, any interested parties, to make any

6   comments on that permit, identify any errors that we

7   may have made, any suggestions to make the permit

8   more enforceable, that sort of thing.

9          During that 30-day time period, we can

10  also obtain a request for a hearing.  If we obtain a

11  request for a hearing, we have to get approval from

12  the director in order to hold that hearing.

13         Once we do that, we have to notice the

14  date and time and place of the hearing 45 days in

15  advance.  And then once the hearing is held, we have

16  to extend the public comment period another 30 days

17  beyond that date.

18         Once we have gone through the public

19  notice period, we receive any comments from any

20  hearings or any written comments submitted by any

21  interested party.  We would evaluate those comments,

22  either make changes to the permit, if that is

23  required based upon the comment, or we would write a

24  response to responsiveness summary addressing all the

25  comments that we did not make changes to the permit

1    on and why we did not make those changes.

2              Once that is complete, the permit then

3    goes up to U.S. EPA for a 45-day review period by the

4    U.S. EPA.  At that time the U.S. EPA can object to

5    the permit or they can allow the permit to be issued.

6    If they object to the permit, the permit then is

7    remanded back to us and we have to correct all the

8    deficiencies that they've identified.  If they don't

9    object, then we would issue the permit.

10       Q    And this whole process takes some time,

11   doesn't it?

12       A    Yes, it does.

13       Q    Because it looks like the date received on

14   this was 1999, but the date issued was 2002; is that

15   correct?

16       A    Yes.  That's correct.

17       Q    Does it typically take nearly three years

18   to grant a permit?

19       A    Yes.  We are generally looking at three to

20   five years for us to get a permit done.

21       Q    Okay.  When was this permit set to expire?

22       A    The expiration date on this permit is

23   July 2nd, 2007.

24       Q    What exactly is a responsible official on

25   an IEPA permit?

Page 136

1      A    A responsible official is identified and

2    defined in the Environmental Protection Act.

3                    MR. JORDAN:  Your Honor, I think this

4    is terrific we're finding out about permits, but none

5    of this goes to whether the permit is in place or

6    not.

7                    THE COURT:  That is the question, Ms.

8    Kujaca.

9                    MS. KUJACA:  Actually, it does,

10   because the wrong person, somebody who was not the

11   responsible official, signed the renewal permit,

12   which makes it --

13                   THE COURT:  Okay.

14                   MS. KUJACA:  -- void in the IEPA's

15   offices.

16                   THE COURT:  If this is preliminary to

17   that --

18                   MS. KUJACA:  Yes, it is.

19                   THE COURT:  -- then I'll allow it.

20   That's fine.

21   BY MS. KUJACA:

22      Q    Does your office accept documents submitted

23   by someone who isn't a designated person?

24      A    No, we do not.

25      Q    If a document is submitted by someone who

Page 137

1    is not a designated person, is it considered a valid

2    submission then?

3       A    If the person that submitted the

4    application is not the responsible official that has

5    been identified in the issued permit, then we would

6    have to reconcile that.  So, yes, we do not -- we do

7    not determine that to be valid.

8       Q    Thank you.

9            Peoria is considered a single source

10   permit, correct?

11      A    Yes.  That is correct.

12      Q    What does that mean?

13      A    A single source is where a facility is -- a

14   source is considered to be the same as another source

15   or entity operating on a contingent or adjacent

16   property, under common control or a support facility

17   or has the same major group SIC code number.

18            And Resource Technology and Peoria

19   County Landfill have been identified as a single

20   source.  They meet all those criteria.  And when they

21   are a single source, what has to be done is the

22   emissions from each entity has to be added together

23   to determine what type of permitting action takes

24   place either construction or operating.

25      Q    Thank you.

Page 138

1                    Under what circumstances are these

2    permits renewable?

3         A    Under what circumstances?

4         Q    Are these permits generally renewable?

5         A    Yes, they are.

6         Q    What has to be done in order to obtain a

7    renewal permit?

8         A    A permit has to be -- the application for

9    that renewal permit has to be submitted or received,

10   in our case, at the -- in the permit section, nine

11   months prior to the expiration date.

12        Q    And it can be up to 12 months prior; is

13   that correct?

14        A    Yes.  Some of the older permits have that

15   condition.  The newer permits, we've taken the 12

16   months out.

17        Q    Does your office ever deny a CAAPP permit

18   renewal?

19        A    We have not denied any renewals to this

20   point.  However, one of my engineers is currently

21   working on a notice of intent to deny.  Renewals are

22   just now coming in, so we have not been issuing a lot

23   of them.

24        Q    What is a permit shield?

25        A    A permit shield is a shield that allows the

Page 139

1    source to operate in compliance with this permit such

2    that it's not in violation of the act until such --

3    during the pendency of the permit.

4                   Now, an application shield is a little

5    bit different.  And that is what is given to a source

6    if they have a timely and complete application that

7    has been received or submitted to the agency.  That

8    protects the source from having their existing CAAPP

9    permit expire.  So it's such that they are not

10   operating without a CAAPP permit until the agency

11   would issue a renewed permit.

12       Q    Did RTC have a permit shield under this

13   permit?

14       A    I would have to see when we received the

15   renewal application.

16       Q    Okay.  Would it have an application shield?

17   Is that the same --

18       A    I would have to see when it was received.

19       Q    Okay.  We'll look at that in a moment.

20                   MS. KUJACA:  If we could move to

21   Peoria Exhibit 21, Your Honor.

22   BY MS. KUJACA:

23       Q    On your screen is Peoria Exhibit No. 21.

24   Are you familiar with this document?

25       A    Yes, I am.  This is a CAAPP application

Page 140

1    completeness determination letter.

2        Q    Did you review this document in the course

3    of your duties at IEPA?

4        A    Yes, I did.

5        Q    Did you actually sign this?

6        A    Yes, I did sign this on behalf of my direct

7    supervisor.

8        Q    And those are your initials, MTR?

9        A    Yes.  That is correct.

10       Q    What is a certificate of completeness?

11       A    Well, there is no such thing as a

12   certificate of completeness.  But the completeness

13   determination letter basically states that we have

14   reviewed the application and we have determined that

15   it is administratively complete for us to continue

16   the process to determine out -- you know, towards

17   issuance of the permit.

18       Q    Does it have anything to do with whether it

19   was submitted timely?

20       A    No, it does not.

21       Q    Does it have anything to do with whether it

22   will eventually be renewed?

23       A    No, it does not.

24       Q    Attached to this document --

25               MS. KUJACA:  If we could scroll down,

Page 141

1    Your Honor.

2    BY MS. KUJACA:

3        Q    Attached to this is the renewal

4    application; is that correct?

5        A    The renewal application for Resource

6    Technology Corporation.

7        Q    When was this renewal for the RTC -- excuse

8    me.

9            When was the renewal for the RTC

10   permit received by your office?

11       A    I'm looking for the date stamp.

12       Q    Should we scroll up?

13       A    Probably down.  It's going to probably be

14   on the 200 form.

15            MS. KUJACA:  You know what, I will

16   withdraw that question and we will get back to that

17   in a moment.

18            THE WITNESS:  I think I saw a date

19   stamp somewhere.

20            MS. KUJACA:  I'm sorry, what page?

21            I apologize, Your Honor.  I thought I

22   had this marked.

23            THE WITNESS:  I think if you go to the

24   end of the file.  This is the actual permit itself.

25            MS. KUJACA:  I believe it is an

Page 142

1  exhibit to the renewal, if I am not mistaken.

2              If I had a hard copy, I could --

3  BY MS. KUJACA:

4      Q    Presuming your office determined that this

5  was received on -- I'm sorry.

6              If we go to the first page of the

7  CAAPP application, completeness determination.  There

8  is a date received on there.

9      A    Yes.  That is correct.

10     Q    I'm sorry.  Can we use that as the date --

11             THE COURT:  What page?

12             MS. KUJACA:  The very first one.

13             THE WITNESS:  Yes.  That date would be

14  consistent with the date that we stamped it as being

15  received.

16             MS. KUJACA:  Thank you.  I apologize

17  for the confusion.

18             THE WITNESS:  And that date is

19  October 4th, 2006.

20  BY MS. KUJACA:

21     Q    So your office determined that the renewal

22  application was received on that date, correct?

23     A    We actually made the determination on

24  December 5th, 2006.  But the date received of the

25  application was October 4th, 2006.

Page 143

1    Q    How does mail get stamped received at the

2    IEPA?  How is that date determined?

3    A    When an application is mailed in to us, it

4    comes through our mailroom and goes directly to a

5    logging clerk that date stamps everything that came

6    in for that day.

7    Q    If the -- has a permit shield expired if a

8    renewal application is received two days late?

9    A    A permit shield would expire if the permit

10   expired.  An application shield really does not

11   expire per se.

12   Q    Okay.

13   A    It could go away at any time, given the

14   response to additional information requests.

15   Q    And do you know when the RTC renewal

16   application was due in your office?

17   A    Yes.  You would look at the expiration date

18   and count back nine months from the expiration date.

19   Q    And that being in Exhibit 3, that

20   expiration date was July 2nd, 2007, correct?

21   A    Yes.  That's correct.

22   Q    So when was this application due in your

23   office?

24   A    It was due in our office on October 2nd,

25   2006.

Page 144

1        Q     But the date received by your office is

2   October 4th, correct?

3        A     Yes.  That is correct.

4        Q     Can a renewal application be accepted if

5   it's proven to your office that it was in the mail on

6   the renewal date?

7        A     We actually accept all applications.

8   Whether or not an application is timely is, like I

9   have said, based upon the date received.  What would

10  then happen is once -- if we deem a source to be

11  untimely in their submittal, eventually a VN would be

12  issued, a violation notice would be issued for an

13  untimely application once that permit expires.  And

14  then at that time our division of legal counsel would

15  evaluate any additional proof or evidence that has

16  been tendered to the agency to make a determination

17  as to whether or not it was actually timely.

18       Q     Has any of that proof been tendered to the

19  IEPA?

20       A     No, not to my knowledge.

21             THE COURT:  Well, the proof would only

22  be tendered after a violation notice, right?

23             THE WITNESS:  Yes.  That's generally

24  the case, sir.

25  BY MS. KUJACA:

Page 145

1      Q     Is it your understanding that that

2    violation notice has gone out?

3      A     I am not aware that a violation notice for

4    that has gone out.

5            MS. KUJACA:  If you could give me one

6    moment, Your Honor.

7            THE COURT:  Well, just so I'm clear on

8    this point.  If evidence were presented indicating

9    that the application was mailed prior to the due

10   date, would that suffice for purposes of creating a

11   timely application?

12           THE WITNESS:  Yes, it would, sir.

13   BY MS. KUJACA:

14     Q     Has that documentation been received?

15           THE COURT:  Well, you already asked

16   that question.

17           MS. KUJACA:  Okay.

18           THE COURT:  I think he answered no.

19   But that's why I asked if it would ordinarily be

20   submitted prior to a violation notice.  And you went

21   through that whole subject.  So I think I understand

22   the situation now.

23   BY MS. KUJACA:

24     Q     Is that your determination to make?

25     A     At this point it is no longer the permit

Page 146

1   section's determination to make.

2       Q    Where does that determination go to at that

3   point?

4       A    It would go to our division of legal

5   counsel.

6       Q    Okay.  If I can show you the certified mail

7   receipts labeled as IIT Exhibits 69 and 70.  Have you

8   seen this document?

9       A    No, I have not.

10      Q    It purports to be the certified mail

11  receipts for the renewal for the RTC application.

12  Can you tell me what the date is of the stamp on

13  this?

14           THE COURT:  You're just asking him to

15  read the document.

16           MS. KUJACA:  I am.

17           THE COURT:  Anybody can do that, to

18  the extent it can be done.  It's pretty hard to read.

19           MR. JORDAN:  That was a document that

20  originally we offered you yesterday, Your Honor.  You

21  indicated that it said -- we agreed it said

22  October 2nd.

23           THE COURT:  Well, it says -- it's

24  typed 10-2-2006 down here.  What I'm showing on the

25  screen now reflects that.

1            MR. JORDAN:  Right.

2    BY MS. KUJACA:

3        Q    Do you know what document or documents were

4    sent via this certified mail?

5        A    Can I see the whole thing?

6            THE COURT:  I am trying to get a

7    different tool.

8            THE WITNESS:  That's good.

9    BY MS. KUJACA:

10       Q    Is there any indication on this receipt

11   what documents were sent?

12       A    No, there is not.

13       Q    Do you know for certain that this was a

14   renewal application for a CAAPP permit?

15       A    No, I do not.

16       Q    This certified receipt has numbers written

17   over typed entries; is that correct?

18       A    Yes.  For the amount of postage and

19   certified fee and return receipt, there appears to be

20   handwritten numbers over typewritten numbers.

21       Q    Do you know why that is?

22       A    No, I do not.

23            MS. KUJACA:  If we could scroll to the

24   next page, Your Honor.

25            THE COURT:  It's only one page.  Did

Page 148

1    you want the other exhibit?

2                MS. KUJACA:  Oh, then it would be

3    number 70.  Yes, please.

4    BY MS. KUJACA:

5        Q    This is the certified mail return card, is

6    it not, to your knowledge?

7        A    Yes.  To the best of my knowledge, this

8    would appear to be what we call a green card.

9        Q    Okay.  Who signed the receipt on behalf of

10   the IEPA?

11       A    There is no signature on this card.

12       Q    Do you even know that this certified mail

13   was received by your office?

14       A    No, I do not.

15       Q    As of now does the IEPA deem this renewal

16   application untimely?

17       A    Yes.  The permit section has deemed the

18   application to be untimely.

19       Q    What is the effect of that?

20       A    The effect of that is the application

21   shield does not exist, and since the expiration date

22   on the permit has passed, the permit has also

23   expired.

24                THE COURT:  Well, Mr. Reed, going back

25   to what you said earlier, a notice of violation would

Page 149

1  be issued here?

2              THE WITNESS:  Yes.  That's not my

3  decision to issue --

4              THE COURT:  I understand, but that's

5  what would happen in the ordinary course?

6              THE WITNESS:  That's correct.

7              THE COURT:  And at that point the

8  applicant would be able to present evidence that the

9  application was in fact submitted in a timely

10 fashion?

11             THE WITNESS:  Yes.  That's correct.

12             THE COURT:  And if there were proof

13 presented satisfactory to the legal department that

14 the application was timely, the application shield

15 would be retroactively --

16             THE WITNESS:  Yes.  That is correct.

17             THE COURT:  -- replaced.

18             MS. KUJACA:  Okay.  Given your

19 understanding of that matter, I suppose I don't need

20 to introduce the violation notice regarding the --

21             THE COURT:  No.

22             MS. KUJACA:  Okay.  Thank you, Your

23 Honor.

24             Going back to Exhibit Peoria 21, if we

25 could.  If we could go to page IIT Peoria No. 1024.

Page 150

 1                    THE COURT:  You don't know what page

 2   that is of the exhibit?

 3                    MS. KUJACA:  They are Bates stamped.

 4                    THE COURT:  No, but if you could tell

 5   me which one of the 134 pages, it would be easier for

 6   me to get it than scrolling through until I find that

 7   one.

 8                    MS. KUJACA:  It looks like 21.

 9   BY MS. KUJACA:

10       Q    Mr. Reed, who signed this permit renewal

11   application?

12       A    The signature in the signature block is

13   Harry Henderson, not individually, but solely as

14   receiver.

15       Q    Who is this?

16       A    I don't know.

17       Q    Who would have been permit -- who would

18   have been expected to sign the permit renewal

19   application?

20       A    That would have been the responsible

21   official designated on the permit.

22       Q    And that was John Connolly?

23       A    Yes.

24       Q    Presuming all other items to be correct and

25   timely, can the IEPA accept the RTC permit renewal

Page 151

1    application with this signature?

2        A    No, we cannot.

3        Q    Why not?

4        A    Because the responsible official designated

5    that has the authority to request the permit be

6    renewed or modified is not the same on this

7    application.

8        Q    Are you aware in your duties with IEPA of

9    any orders issued by the Circuit Court of Cook County

10   regarding whether Harry Henderson can sign this

11   renewal on behalf of RTC?

12       A    No, I am not.

13       Q    Are you aware of any orders issued by the

14   Circuit Court of Cook County regarding whether Harry

15   Henderson can sign this renewal on behalf of IIT?

16       A    No, I am not.

17       Q    Was the IEPA permit section given notice of

18   any orders regarding whether Harry Henderson can sign

19   or submit a renewal application?

20       A    No, we have not.

21       Q    Are you aware of any documents in your

22   files regarding whether the IEPA is required to

23   accept the signature of Harry Henderson as an

24   authorized person on behalf of RTC?

25       A    No, I am not.  Any request, any change in

Page 152

1    the responsible official requires a modification to

2    the permit, and we don't have any intervening request

3    to modify the permit.

4         Q    Who would make that determination whether

5    Harry Henderson is a valid authorized person?

6         A    The permit section makes that determination

7    by comparing who was identified on the initial or

8    most previous current permit as the responsible

9    official to the person submitting the application.

10        Q    Has that determination been made?

11        A    Yes.

12        Q    What is that determination?

13        A    This is not the same responsible official

14   as identified on the existing permit.

15             MS. KUJACA:  You're going to make me

16   count pages again.  I want to go to Bates stamp page

17   1022.  It looks like maybe another additional 20

18   pages in, Your Honor.  If you can scroll down, I can

19   see the Bates stamp.  I want 1022 -- so let's go back

20   -- wait.  That doesn't make any sense.  That's it.

21   BY MS. KUJACA:

22        Q    Are there any issues regarding the permit

23   renewal application on its face?  For example, on

24   this page there is a variety of check boxes.

25             MR. JORDAN:  You know, I object, Your

1    Honor.  Now what we are doing is we are getting into

2    substantive testimony regarding the permit that, as

3    we indicated in our motion, granted they haven't even

4    started reviewing yet.

5              MS. KUJACA:  These are additional

6    items why this permit is not --

7              THE COURT:  The objection is

8    overruled.

9              MR. JORDAN:  I thought the reason for

10   rebuttal was timeliness, Your Honor.

11             THE COURT:  No, it's validity.  The

12   question was whether there is currently a permit or

13   permit shield, or as has been explained now, an

14   application shield in place.  And to the extent that

15   there is not one, that is relevant.

16             But I would have to say, though, Ms.

17   Kujaca, whether or not the permit is going to

18   ultimately be approved probably is not relevant to

19   the question of whether there is a permit shield or

20   application shield in place now, is it?

21             MS. KUJACA:  I can ask him the final

22   question.

23             THE COURT:  I guess that is a question

24   for Mr. Reed.  The ultimate determination of the

25   merits of an application does not impact the question

Page 154

1  of whether an application shield is in place, does

2  it?

3              THE WITNESS:  No, it does not.

4              MS. KUJACA:  Okay.

5              THE COURT:  Then I'll sustain the

6  objection.

7              MS. KUJACA:  Okay.

8  BY MS. KUJACA:

9      Q    Will a permit be considered if the site is

10  not put into compliance?

11              THE COURT:  I think we've already

12  gotten an answer to that question.

13              MS. KUJACA:  Okay.

14  BY MS. KUJACA:

15      Q    Presuming that everything was timely and

16  filed and the renewal had been accepted from your

17  office, how long would it take RTC to get a renewal

18  permit to operate?

19      A    We are generally operating on a

20  three-to-five year time period.

21              THE COURT:  Both for initial

22  applications and for reviews -- renewals?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  Okay.

25  BY MS. KUJACA:

Page 155

1     Q    So what is the current status of RTC's

2    CAAPP permit?

3     A    As it stands right now today, the permit

4    has expired.

5     Q    Is IIT authorized -- excused.

6               Is RTC authorized by the IEPA to

7    operate a gas to energy conversion system at the

8    Peoria Landfill?

9     A    No, it would not be authorized at this

10    time.

11     Q    What are the ramifications of operating

12    without a permit from your office?

13     A    The ramifications would be that the source

14    could be cited for a violation for operating without

15    the appropriate construction and operating permits.

16     Q    Could Peoria be fined?

17     A    Yes, the landfill could also be fined

18    because they are considered a single source.

19     Q    How high can those fines go?

20     A    Those numbers are identified in the act.  I

21    don't know what they are off the top of my head.

22               MS. KUJACA:  I have no further

23    questions.

24               THE COURT:  Do you have any questions,

25    Mr. Bohan?

Page 156

1              MR. BOHAN:  Your Honor, I had only one

2    and that was the witness referred to --

3              MR. JORDAN:  You know what, Your

4    Honor, we object.  They're not a party to the Peoria

5    proceedings and so they --

6              THE COURT:  They listed him as a

7    witness.  The question that we addressed earlier with

8    your stipulation obviated the need to ask any

9    questions.  If Mr. Bohan has come to the conclusion

10   that there is still a question that he wants to ask

11   Mr. Reed within the scope of the subject matter that

12   he had identified, I'm going to let him do it.

13              The stipulation, I really appreciate,

14   saves time.  But you can't -- you can't foreclose

15   questioning of the witness by tendering a stipulation

16   if there is another fact that he wants to ask him

17   about.  Again, if it's within the scope of what was

18   identified.

19              MR. JORDAN:  If it relates to the

20   Allied/Springfield permit or the Peoria?

21              THE COURT:  Well, we'll find out.  If

22   you have another basis for objection after the

23   question is asked, that's fine.  But your objection

24   based on the fact that you entered into that

25   stipulation I'll overrule.

Page 157

1                     CROSS-EXAMINATION

2    BY MR. BOHAN:

3        Q    Mr. Reed, I just have a couple of

4    questions.

5                  You testified, you used the words in

6    your answer either first round or first go round in

7    the context of renewal applications.  Do you remember

8    that?

9        A    Yes.

10       Q    This is our first round or this is our

11   first go around.  I can't remember which words you

12   used, but would you explain what you meant by that

13   first round of renewal applications.

14       A    Yes.  We issue an initial permit to a

15   source.  The term of that permit is five years.  At

16   five years that permit would expire.  This is the

17   first renewal application that we are receiving from

18   all the sources that are CAAPP sources in Illinois.

19                  MR. JORDAN:  All right.  Now we move

20   to strike that since there is no renewal in question

21   as to Allied.

22                  THE COURT:  Well, you know what, all

23   that Mr. Bohan did here, Mr. Jordan, was clarify

24   something that was something I thought was quite

25   implicit in the earlier testimony.  I understood the

Page 158

1    first round to indicate that this was the first time

2    that renewal applications were coming in on a bunch

3    of or a batch of applications that had initially been

4    approved by the agency.  So I don't -- there is

5    nothing to strike here.  That's a clarification that

6    may not even have been necessary.

7              MR. BOHAN:  All right.  I have one

8    other question.

9    BY MR. BOHAN:

10    Q    In reviewing a permit application as a

11    member of the permit section, does IEPA consider the

12    permit applicant's history of regulatory compliance

13    or noncompliance?

14              MR. JORDAN:  Again, Your Honor --

15              THE COURT:  Is that within the scope

16    of your examination?

17              MR. BOHAN:  Yes, it is.

18              MR. JORDAN:  It's in rebuttal to

19    nothing, Your Honor.

20              THE COURT:  No, no, it doesn't need to

21    be rebuttal.  In contrast to Peoria, my understanding

22    is that Allied had identified Mr. --

23              MR. JORDAN:  No, just opposite.

24    Peoria --

25              MR. BOHAN:  No, Your Honor, we --

1          MR. JORDAN:  Peoria identified

2    Mr. Reed and Mr. Bohan did not, which is why you

3    granted our motion.

4          THE COURT:  All right.  I had it

5    backwards then.

6          MR. BOHAN:  Your Honor, may I address

7    that?  We didn't identify Mr. Reed on our witness

8    list.  We identified, however -- not by name.  We

9    identified all witnesses that were being identified

10   by the City of Peoria not -- we did not identify him

11   by name.  But we did specifically reserve our right

12   to call as witnesses all witnesses identified by

13   Peoria.

14         MR. JORDAN:  And there were no --

15         THE COURT:  All right.  If your

16   question -- if your question is whether there is a

17   need to clear up notices of violation before a permit

18   is issued, is that essentially your question?

19         MR. BOHAN:  No, Your Honor.  My

20   question is simply in reviewing a permit application,

21   does the IEPA consider the permit applicant's history

22   of environmental regulatory compliance or

23   noncompliance.

24         MR. JORDAN:  That's in rebuttal to

25   nothing, Your Honor.

Page 160

1                    THE COURT:  All right.  I granted a

2    motion in limine.  I just signed an order granting

3    that motion in limine.  It appears to me that the

4    motion in limine was directed against your effort to

5    ask Mr. Reed questions that were beyond rebuttal.

6    And if you're asking me now to reconsider that

7    ruling, I guess I can ask -- I can address that.  But

8    otherwise I'm going to enforce the order that I just

9    entered.  And if this is not rebuttal, I am going to

10   deny your request to ask that question.

11                   MR. BOHAN:  I haven't read Your

12   Honor's order, but this is -- this directly rebuts

13   Mr. Connolly's testimony at length that the matter of

14   obtaining the necessary permit approvals from IEPA

15   was purely ministerial.  In fact, it is their burden,

16   as we've said in our opening statement, Your Honor,

17   to prove that IIT can provide adequate assurance of

18   future performance.

19                   My offer of proof would be that this

20   witness would testify that in fact the employees of

21   IIT, their prior history of regulatory noncompliance

22   is indeed a factor that IEPA not only can but must

23   consider in determining whether or not to issue an

24   application.

25                   MR. JORDAN:  First off, Your Honor --

1          MR. BOHAN:  To issue a permit.

2          MR. JORDAN:  I'm sorry.  I keep

3    thinking Mr. Bohan is finished.  I apologize.  Mr.

4    Connolly didn't say that a CAAPP permit is

5    ministerial.  You know, it's a three-to-five year

6    process is what he said.  I don't think that -- I

7    think we are -- that is not at all what is intended

8    or meant by Mr. Connolly's testimony.  It can't be

9    when he says it's a three-to-five year process that

10   it's just a ministerial thing.

11         THE COURT:  The notes I have reflect

12   that Mr. Connolly testified that RTC has a permit now

13   and that transferring that permit to IIT would be a

14   ministerial matter.

15         MR. JORDAN:  Right.  But we've already

16   determined we are not transferring the permit at

17   Springfield.  We have to apply for a new permit.  So

18   this -- we are talking apples and oranges.

19         THE COURT:  Well, if there's no -- all

20   right.  I will take that.  But realize that it's your

21   burden of proof to establish the ability of IIT to

22   obtain a permit.  And if you don't meet that burden

23   of proof, I'm going to have to find that you haven't

24   satisfied a fairly essential element in your ability

25   to provide adequate assurance of future performance.

Page 162

1              MR. JORDAN:  Actually, Your Honor, I

2    don't know why I would possibly need to do that

3    because there is no one who could possibly determine

4    that for three to five years.  Even Allied couldn't

5    show that they could do that.  All we need to do is

6    show that we have the ability to do it.  And that's a

7    different thing.  But that doesn't rebut -- none of

8    this rebuts Mr. Connolly's testimony.

9              THE COURT:  If Mr. Connolly did not

10   testify that it was likely that IIT would be able to

11   obtain a permit here, then he -- then I would like to

12   know how you have satisfied your burden of showing

13   that IIT will be able to perform under the agreements

14   that you're seeking to assume.

15             MR. JORDAN:  You're right.  I

16   misstated.  But this question here is rebuttal to

17   nothing Mr. Connolly said.

18             THE COURT:  All right.  Well, the

19   point I'm trying to make is that if there's nothing

20   Mr. Connolly said that this would rebut, I believe

21   IIT will have failed to establish that it can

22   adequate -- that it can provide adequate assurance.

23             MR. JORDAN:  The question of whether

24   they can review the compliance history or not?

25             THE COURT:  I believe -- now, let me

Page 163

1    put this in a technically correct fashion -- that the

2    trustee will have to establish that IIT is likely to

3    be able to obtain a valid CAAPP.

4              And if that cannot be done or has not

5    been done, then the trustee will have failed to

6    establish that IIT can provide adequate assurance of

7    performance under the contracts sought to be assumed

8    here since those contracts require the counter-party

9    to Peoria and Allied to be able to obtain all

10   necessary permits.

11             MR. JORDAN:  We can show a likelihood,

12   but we can't provide a guarantee.

13             THE COURT:  Of course.  But what I'm

14   telling you is that unless Mr. Connolly gave

15   testimony that would establish that likelihood --

16             MR. JORDAN:  Which he did.

17             THE COURT:  Well, then --

18             MR. JORDAN:  In my view.

19             THE COURT:  -- then if Mr. Bohan wants

20   to obtain testimony from Mr. Reed that calls that

21   likelihood into question, it's entirely appropriate

22   by way of rebuttal.  The objection is overruled.

23             MS. KUJACA:  Your Honor, given that, I

24   was prevented from going down this line of

25   questioning as well as to whether IIT submitting

Page 164

1    administrative --

2                    THE COURT:  Yes, and that was due to

3    my misunderstanding.  I thought that the motion in

4    limine was directed toward you.  And I have just been

5    disabused of that mistake.  So if you want to resume

6    your testimony on that, I'll let you do that after

7    Mr. Bohan finishes.

8                    MS. KUJACA:  Thank you.

9                    MR. BOHAN:  Do you remember my

10   question?

11                   THE WITNESS:  No, if you could repeat

12   it, please.

13   BY MR. BOHAN:

14        Q    In reviewing a CAAPP permit application,

15   does IEPA consider the applicant's history of

16   regulatory compliance or noncompliance?

17        A    Yes, we do.

18        Q    All right.  And how does the applicant's

19   regulatory history enter into the determination by

20   IEPA whether to grant or deny a permit application?

21        A    One of the factors, the requirements in

22   this particular instance is under Section 39(i) of

23   the Environmental Protection Act, which requires us

24   to review any past compliance capabilities of the

25   source in regards to the entities that own it, as

Page 165

1   well as any employees that work for those entities or

2   have worked for those entities.

3                    MR. BOHAN:  No other questions, Your

4   Honor.

5                    MS. KUJACA:  I will be brief, Your

6   Honor.  Thank you.

7                    FURTHER DIRECT EXAMINATION

8   BY MS. KUJACA:

9        Q    Does IIT currently have any permits with

10   your office?

11       A    No.  IIT -- well, excuse me.  IIT currently

12   has --

13       Q    I'm sorry.  Let me clarify.  In relation to

14   the Peoria site.

15       A    In relation to the Peoria site, no, they do

16   not.

17       Q    What would have to happen for IIT to -- for

18   RTC to transfer the name of the permit from RTC to

19   IIT?  What would have to happen?

20       A    Well, first, we would have to have a timely

21   application.  We would have to resolve that issue.

22   And then there would have to be a significant

23   modification come in requesting that name change.

24   That significant modification would have to contain

25   an approvable compliance schedule to demonstrate that

Page 166

1    the source would come back into compliance within a

2    certain time period, as well as any other

3    deficiencies that an engineer may note during his --

4    the pendency of his review.

5         Q    So it would not be as simple as an

6    administrative name change; is that correct?

7         A    Yes.  That's correct.

8         Q    The underlying source would have to be in

9    compliance?

10        A    Yes.  We have a requirement that before we

11   can issue any permits to a source they have to be in

12   compliance or there has to be an approvable

13   compliance plan demonstrating that they can come back

14   into compliance.

15                  MS. KUJACA:  Thank you.

16                  THE COURT:  Before there is any

17   further questioning of this witness, what I would

18   like to do is ask Mr. Reed, this may be obvious, but

19   if a permit is issued to one entity, would another

20   entity with a similar name be able to operate under

21   that permit?

22                  THE WITNESS:  No, they would not.

23                  THE COURT:  So if there is a change in

24   legal entity, even though the name is similar, there

25   would have to be some kind of modification?

Page 167

1                THE WITNESS:  Yes.  That is correct.

2                THE COURT:  Okay.

3                MS. KUJACA:  Thank you, Your Honor.

4                THE COURT:  Go ahead, Mr. Jordan.

5                     CROSS-EXAMINATION

6     BY MR. JORDAN:

7          Q     Good afternoon, Mr. Reed.  I just want to

8     clarify a few things.

9                It's my understanding from your

10    testimony that if the applicant could demonstrate a

11    CAAPP renewal permit was in fact -- was physically in

12    the mail on the date, it would be deemed timely even

13    if received after that date, correct?

14         A     Yes.  That is correct.

15         Q     Okay.  So that determination has not been

16    made here; is that correct?

17         A     The permit section has made a

18    determination.  The legal determination based on any

19    evidence tendered has not been made.

20         Q     Right, because they haven't requested the

21    evidence yet?

22         A     That's correct.

23         Q     And if the evidence provided that, then it

24    could be deemed timely?

25         A     Yes.  That is correct.

Page 168

1      Q    Okay.  And the evidence would be that

2  someone could provide testimony or documents --

3              THE COURT:  I think I have all I need

4  on this particular point, Mr. Jordan.

5              MR. JORDAN:  That's fine.

6  BY MR. JORDAN:

7      Q    Now, with regard to your comments with

8  regard to Mr. Henderson, I think you indicated that

9  because the state didn't have notice before the

10  filing of the application, that there was some

11  problem with Mr. Henderson signing the application?

12     A    Yes, that would be a significant flaw to

13  the application.

14     Q    Okay.  But if, in fact, Mr. Henderson was

15  authorized by a court in the state of Illinois, has

16  the determination been made that that is insufficient

17  for the Illinois Environmental Protection Agency?

18     A    No, that determination has not.  Any court

19  orders stating anything of that nature would have to

20  go to our division of legal counsel for review.

21     Q    Okay.  And a factor weighing in favor of

22  that would be that the Illinois Environmental

23  Protection Agency was given a copy of that order

24  prior to the filing of the renewal application,

25  correct?

Page 169

1      A     Could you repeat that one more time.

2      Q     A factor weighing in favor of determining

3   that it was an appropriate renewal application would

4   be that the copy of the court order was provided to

5   the IEPA prior to the submission of the renewal

6   application, correct?

7      A     Yes, if that is the case.

8      Q     Okay.  Can you look at our Exhibit 16,

9   please.

10                THE COURT:  IIT Exhibit 16?

11                MR. JORDAN:  That's correct.

12                THE COURT:  Okay.

13  BY MR. JORDAN:

14     Q     I'm sorry.  Peoria Exhibit 16.  I had the

15  binder in front of me and I should have looked at the

16  color.

17                Now, looking at the first page and the

18  first paragraph there, first off, who is Jasmine

19  Kepner, do you know?

20     A     Yes, I do know Jasmine.

21     Q     Jasmine.  She is with the Environmental

22  Protection -- Illinois Environmental Protection

23  Agency, correct?

24     A     Yes.  She currently works in the compliance

25  unit.

Page 170

1      Q    Okay.  And she offices -- she accepts mail

2   at the address listed here?

3      A    Yes.  That's correct.

4      Q    Okay.  And this is a letter indicating

5   that, Mr. Henderson is -- indicating that there is a

6   court order entered authorizing to, and among other

7   things, to file applications, correct?

8      A    Yes.  It does state that a court order was

9   entered.

10      Q    Okay.  In fact, attached at what I would

11   perceive to be probably page six would be a copy of a

12   court order that was entered authorizing Mr.

13   Henderson to submit the application, correct?

14      A    I would have to read it to see if it says

15   that he is allowed to submit the application.

16      Q    Okay.  I think that's more a matter for

17   argument.  This would have been an item that was

18   attached to a letter.  That's fine.  We will move on.

19              Now, it is my understanding that based

20   upon your -- what we talked about last week, that

21   right now it's premature to say whether the permit

22   application is going to be approved or denied, the

23   permit renewal application is going to be approved or

24   denied?

25      A    Yes.  That's correct.  We have not entered

Page 171

1  into our full review of this application at this

2  time.

3      Q    Okay.  And with regard to any commitment or

4  compliance issues, what happens is that a letter goes

5  out from the IEPA to the applicant and the applicant

6  submits documents to meet the requirement, the four

7  corners of the requirements for compliance that the

8  IEPA sets forth, right?

9      A    Yes.  We have authority to request

10  additional information.  We can do that in one of

11  three ways.  We can do that through a phone call or

12  an e-mail.  We can do that through what we call a

13  request for additional information letter or we can

14  also do that through a notice of intent to deny

15  letter.

16      Q    Okay.  And, in fact, the IEPA would spell

17  out exactly what it wants in terms of a compliance

18  request?

19      A    Yes.  That is correct.  We would be

20  specific in what is required.

21      Q    Okay.  And then you have seen many

22  instances in which either one of those three things

23  happened and people submit the compliance information

24  and the application goes through, correct?

25      A    Yes.  That is correct.

Page 172

1    Q    Okay.  So you have no reason to believe as

2  we sit here today that a compliance commitment

3  agreement can't be -- or compliance portion of the

4  permit cannot be provided, correct?

5    A    Are you asking in regards to whether a

6  compliance schedule could be --

7    Q    Right.

8    A    I could not answer that question at this

9  time because, yes, we have not seen any response from

10  the applicant.

11    Q    Right, because in --

12    A    Nor have we requested anything from the

13  applicant.

14    Q    Right.  And there is about 150 applications

15  in front this one anyway, right?

16    A    Yes.  That is correct.

17    Q    And you indicated that there was some level

18  of heightened scrutiny relating to compliance

19  history; is that correct?

20    A    Yes.  That's correct.

21    Q    And the additional item that that puts in

22  is a public hearing, chiefly a public hearing; isn't

23  that right?

24    A    Are you referring to the process of when we

25  go out to public notice with the permit?

Page 173

1    Q    Right.

2    A    Yes.  Anybody, any interested party can

3    request a public hearing or the agency can actually

4    hold a hearing on its own behalf if we deem there to

5    be a significant public interest.

6    Q    Right.  And, for instance, the site, the

7    Allied site, was transferred -- the ownership change

8    or ownership name, whatever you referred to, and I

9    know I'm going to get it wrong, transferred from USG

10   Watts to Allied while there was an over-height and

11   over-girth notice of violation out at the time,

12   right?

13   A    Yes.  Yes, that's my understanding that

14   there was a land violation regarding over-height.

15   Q    And that wasn't any impediment to the

16   approval of that transfer, correct?

17   A    Are you asking in regards to the land

18   permits?  I couldn't answer that.  I don't know

19   anything about the land permit process.

20   Q    That's fine.

21        Now, when we talked about the granting

22   of permits, likely granting of permits, isn't it a

23   fact that Section 39 of the act, which is I think

24   applicable, indicates that in making its

25   determination on permit applications under this

Page 174

1    section, the agency may consider prior adjudications

2    of noncompliance with this act by the applicant that

3    involved the release of contaminant into the

4    environment, correct?

5        A    I would need to see where you're reading

6    from in order to answer that.

7                    MR. JORDAN:  May I approach, Your

8    Honor?

9                    THE COURT:  Well, you're talking about

10   a provision of an Illinois statute.

11                   MR. JORDAN:  415 ILCS 5/39.  We can

12   save this for argument, Your Honor.

13                   THE COURT:  Okay.

14   BY MR. JORDAN:

15       Q    There has not been an adjudication of

16   noncompliance against RTC, has there been?

17       A    To my knowledge there has not been anything

18   adjudicated at this time.

19       Q    And there has not been an adjudication of

20   noncompliance against any employee of RTC, has there

21   been?

22       A    I am not really sure how to answer that

23   question.

24       Q    You don't know of any adjudication of

25   noncompliance against any employee of RTC?

Page 175

1      A     The only thing I know of is --

2      Q     I'm asking for adjudications.

3      A     Not to my knowledge, no.

4      Q     Okay.  Now, a permit holder could employ

5   third parties to operate -- all right.  I'm sorry.

6                  The responsible officer under a permit

7   could employ third parties to operate at a landfill

8   site, couldn't they?

9      A     I'm not sure I am following your question.

10     Q     John Connolly is the responsible officer on

11  the Peoria permit, correct?

12     A     Yes.  That's correct.

13     Q     And he could employ anybody, whether it was

14  employees of Resource Technology Corporation or

15  Resource Technology Corporation of South Dakota or

16  Altorfer to work under that permit, couldn't he?

17     A     You mean to physically do work?

18     Q     Right.

19     A     Yes, he can allow anybody.

20     Q     Okay.  And there is no requirement that he

21  employ people from Resource Technology to do work on

22  that site, is there?

23     A     No, there is not.

24                  MR. JORDAN:  We'll withdraw our

25  objection to Peoria Exhibit 16.  No more questions.

Page 176

1                    THE COURT:  Redirect?

2                    REDIRECT EXAMINATION

3    BY MS. KUJACA:

4         Q    I just have one quick question, Mr. Reed.

5    Putting all hypotheticals aside, what today as we sit

6    here is the current status of the RTC CAAPP permit

7    for the Peoria facility?

8         A    The current status as of today is that the

9    permit has expired.

10                   MS. KUJACA:  Thank you.

11                   THE COURT:  Do you have anything else,

12   Mr. Bohan.

13                   MR. BOHAN:  No, Your Honor.

14                   THE COURT:  You may step down,

15   Mr. Reed.  Thank you.

16                   THE WITNESS:  Thank you.

17                   (Witness excused.)

18                   MS. KUJACA:  Any other witnesses?

19                   MR. BOHAN:  Your Honor, we had one

20   other witness, but actually we've decided not to call

21   him.  So...

22                   THE COURT:  Okay.  Fine.

23                   MS. KUJACA:  No.  We're finished.

24                   THE COURT:  Okay.  Fine.  Did you have

25   any rebuttal, Mr. Jordan?

Page 177

1              MR. JORDAN:  Yes.  We call John

2   Connolly.

3              THE COURT:  Mr. Connolly, you're still

4   under oath.

5          JOHN CONNOLLY, WITNESS, PREVIOUSLY SWORN

6                  DIRECT EXAMINATION

7   BY MR. JORDAN:

8       Q    Mr. Connolly, can you tell me when the

9   application, renewal application for the Peoria

10  Landfill CAAPP permit was mailed?

11      A    It was mailed certified mail October 2nd,

12  2006, sometime midday, probably around lunch time.

13      Q    Do you know when the time and date that it

14  needed to be filed was?

15      A    Well, the regulation states timeliness is

16  4:30 p.m. that day that it's due.

17      Q    Okay.  So it was posted prior to the date

18  and time it was due?

19      A    Yes.

20      Q    How it what posted?

21      A    It was posted certified mail at the U.S.

22  Post Office.

23      Q    Okay.  And was a green card returned?

24      A    Oh, sure.  It's certified mail, return

25  receipt requested.

Page 178

1      Q    And how could one determine that it was

2  actually received?  Would they go on the --

3      A    Oh, sure.

4      Q    What could they do?

5      A    Well, you could look at the receipt itself.

6  You can look at that 20 digit number that's on the

7  receipt and they match up the receipt and the green

8  card.  Those numbers match up.  You can go on line

9  with the United States Post Office and verify it.

10     Q    Is that www.USPS.gov?

11     A    I believe so, yeah.

12     Q    And you could look on there and determine

13  it was actually delivered, when it was delivered?

14     A    Right.

15          MR. JORDAN:  All right.  No further

16  questions.

17          THE COURT:  You may step down, Mr.

18  Connolly.

19          (Witness excused.)

20          THE COURT:  All right.  What is your

21  preference regarding argument?  If you are ready to

22  argue now, I will take a five-minute recess and come

23  back and hear your argument.

24          MR. BOHAN:  In what order would you

25  like us to argue, Your Honor?

Page 179

1                    THE COURT:  As we have indicated, Mr.

2      Jordan has the burden of proof, so he and Mr. Schmidt

3      should go first.  You should respond, and he'll have

4      an opportunity to rebut.

5                    MR. BOHAN:  Thank you.

6                    THE COURT:  Okay.

7                    (Brief Recess.)

8                    THE CLERK:  Court is reconvened.

9                    THE COURT:  Mr. Jordan, before you

10     begin, it would be helpful to me if you could address

11     three main issues.  Number one, the likelihood that

12     the $3 million set out in the loan agreement and

13     promissory note would actually be received by IIT;

14     secondly, the likelihood that that amount of money

15     will be sufficient to assure compliance with the

16     agreement sought to be assumed and assigned; and

17     third, the likelihood that the individuals who would

18     be running IIT would be able to comply with those

19     obligations imposed by those agreements.

20                    And again, I would think that in order

21     to provide the adequate assurance of future

22     performance required here each one of those three

23     things would have to be shown to be likely.

24                    MR. JORDAN:  All right.  Thank you,

25     Your Honor.

```
 1                    With all due respect to the court,

 2    before I proceed I need to talk a little bit about

 3    this whole trust business or trust issue, because

 4    with again all due respect, Your Honor is not

 5    correct.  Business trust is a part of Section 101(9)

 6    under corporations.

 7                    THE COURT:  What's a business trust?

 8                    MR. JORDAN:  A business trust is a

 9    trust that has been formed for the purpose of

10    conducting an ongoing activity as opposed to

11    maintaining a res -- or not formed, but operates.

12    This business -- this operates as a business.  And so

13    under Section 303 of the Bankruptcy Code it could

14    be --

15                    THE COURT:  What provision of Illinois

16    law creates an entity known as a business trust

17    that's separate from a common law trust?

18                    MR. JORDAN:  It's just -- no, there is

19    -- a common law trust actually is a term that is used

20    for what are really schemes, with the concept somehow

21    of common law trust is that it -- it diverts

22    liability.

23                    Illinois state trust law provides for

24    the -- for trusts, and the bankruptcy law provides

25    that a trust that's formed for operation of a -- not
```

Page 181

1    formed for the operation of business, but operates an

2    ongoing business, is considered under the bankruptcy

3    a business trust, and, therefore, would be

4    susceptible to an involuntary bankruptcy.

5                    And the state law would provide that

6    -- and there is a citation -- pardon me.  I have to

7    come over and look at it on my screen.  I believe I

8    have it up here.  That state law provides that it may

9    -- the trustee -- the trust is sued through suing the

10   trustee.  And that's the normal and acceptable manner

11   allowed under the Illinois state law.  And the term

12   business trust is in 101(9).

13                    THE COURT:  Hold on just a second.

14                    All right.  You wanted to give me a

15   citation?

16                    MR. JORDAN:  To -- I would, except

17   that I can't get Internet connectivity right now.  I

18   have three cases and -- or two cases -- three cases,

19   if you count like a 1905 or whatever case I have -- I

20   can -- see if I can -- I don't know whether I can

21   bring them on my -- I doubt it because I think they

22   were internal references that were sent to me.

23                    But as far as those cases, Your

24   Honor -- the Illinois Trust & Trustee Act is at 760

25   ILCS 5/1, which allows a person to establish a trust

Page 182

1  specifically.  And 760 ILCS 5/3 gives powers to the

2  trustee to prosecute claims.

3          THE COURT:  All right.  The question

4  here is dealt with at length in the case of in re Old

5  Second National Bank of Aurora, 7 B.R. 37, a

6  bankruptcy court decision from 1980.  And it draws

7  the distinction between trusts and business trusts

8  and states that business trusts are created for the

9  purpose of carrying on some kind of business or

10  commercial activity for profit.

11          The object of a nonbusiness trust is

12  to protect and preserve the trust res.  It is the

13  business trust's similarity to a corporation that

14  permits it to be a debtor in bankruptcy.  In re

15  Treasure Island Land Trust, 5 BCD 1246 at 1247, 2

16  B.R. 332.

17          Then the Old Second National Bank case

18  goes on to say, "An examination of the trust

19  agreement convinces the court that it's not a

20  business trust.  Old Second has not sold securities,

21  has no trade creditors, does not carry on business

22  under a distinct name.  There is no board of

23  trustees, the trustee has no management power without

24  written concept of the beneficiary, there are no

25  certificates of participation.  The primary purpose

Page 183

1    of the trust is merely to hold title to property."

2              Now, what we would have to do in

3    applying that kind of rationale to this trust

4    agreement is determine if this is more like a

5    corporation or more like a trust.

6              MR. JORDAN:  I don't think there's any

7    real question, Your Honor, that this trust is

8    operating, holding itself out -- is not operating to

9    just protect the res, but is in fact conducting a

10   business activity and would be a business trust.  And

11   even in that event, we have the testimony of Mr.

12   Greenblatt, who is the sole director and officer of

13   Chiplease, Inc., and the majority control of

14   Scattered Corporation, indicated that if the court

15   required it, the assets would be transferred into

16   Illinois Investment Trust Corporation, which I would

17   note is available under the Secretary of State's

18   website.  So we could make that a condition.

19              And I would also note that Allied and

20   Peoria could not complain to that because each of the

21   leases which are in evidence are freely assignable.

22   And it is not proper under 365 to put additional

23   conditions of that sort on the proposed assignee to

24   write terms into an agreement that the original

25   parties did not bargain for.

Page 184

```
 1                    THE COURT:  I have not read every word

 2    of the powers of the trustee set forth in Section 6.1

 3    of this agreement, but I see nothing here allowing

 4    the trustee to operate a business in the name of the

 5    trust.  And to the contrary, I see a provision that

 6    allows the trustee to purchase, acquire or retain a

 7    business interest as shareholder, security holder,

 8    creditor, partner, proprietor or otherwise.  I guess

 9    maybe that does it.  He's a proprietor.  Perhaps he

10    can operate a business that way.

11                    MR. JORDAN:  In addition, Section 12

12    allows him to execute contracts and enter into

13    agreements.

14                    THE COURT:  But, boy, this certainly

15    looks much more like an ordinary trust than it does a

16    business trust.  It is not titled business trust, and

17    there is nothing in here that anticipates the

18    carrying on of a business in the name of the trust.

19    It gives the trustee broad authority to create a res

20    to -- to administer a res.

21                    I would have to say, Mr. Jordan, that

22    the question of whether this agreement is a business

23    trust as opposed to an ordinary trust is certainly

24    one that's not free from doubt.

25                    MR. JORDAN:  Well, I respectfully
```

Page 185

1    disagree, but that's fine.

2                    Now, you indicated --

3                    THE COURT:  What business does this

4    business, this alleged business trust, purport to

5    carry out?  Anything the trustee wants?

6                    MR. JORDAN:  You know, Your Honor, we

7    were here for two days.  The trust -- the trustee

8    testified that -- the exact business that they are

9    going to enter into.  Now, what I think you are doing

10   is you're making a finding --

11                   THE COURT:  No, I am not asking you

12   what they said they are going to do.  I know what

13   they are going to do, what they propose to do.  The

14   concern I raised with you earlier today was whether

15   this agreement is one that would make the trust as an

16   entity amenable to suit and amenable to an

17   involuntary bankruptcy proceeding if that were

18   required.

19                   And to the extent that it's not a

20   business trust with the gloss put on it by the in re

21   Old Second National Bank case or other authority to

22   the same effect, it would not be amenable to an

23   involuntary bankruptcy proceeding, which might bear

24   importantly on the question of whether that

25   $3 million would ultimately be received, because

Page 186

1    there might not be an opportunity for the

2    counter-parties to the agreement to bring the trust

3    into an involuntary bankruptcy proceeding in the

4    event that the trustee declined to enforce whatever

5    contract rights that trust had.

6                  MR. JORDAN:  I can't conjecture as to

7    what's going to happen in the future.

8                  THE COURT:  Let me just put the

9    question to you this way:  Let us assume that

10   Scattered and Chiplease decline to honor their loan

11   agreement, and the trustee, since Scattered and

12   Chiplease are beneficiaries of the trust, declines to

13   sue them under the loan agreement, even if he had the

14   capacity to sue.  I guess as trustee he would.  But

15   what would then the options of the counter-parties

16   be?

17                  They can't -- they can't force -- act

18   as -- bring some kind of derivative action on in the

19   name of this trust against the parties with whom the

20   trustee has executed a contract.

21                  MR. JORDAN:  Actually, based upon the

22   testimony of Mr. Jahelka and Mr. Greenblatt, they

23   could make a very strong argument and a winning

24   argument that these loan agreements are not created

25   for the benefit or -- the only benefit of the

Page 187

1  trustee.

2              And, in fact, since they were created

3  to show that the trust had the ability to operate

4  and, therefore -- and perform its duties, and

5  therefore, allow for the assumption and assignment of

6  the contracts, that they are an intended third-party

7  beneficiary of that contract, and so they would have

8  a direct right to go and sue Scattered, and they

9  would have a direct right to go and sue Chiplease,

10  because it is clear from their own testimony from

11  their own mouths that these people over here are

12  intended third-party beneficiaries of that contract.

13              And I don't know how they could ever

14  get around that, because they sat there and they

15  raised their right hand and they said we're going to

16  do this.  And these people fought vigorously.  And

17  then it turns out they are not going to fund?  They

18  have damage there and I think --

19              THE COURT:  Okay.  Then what do they

20  do if at the time they might want to sue there are no

21  assets in Scattered or Chiplease?

22              MR. JORDAN:  Well, you know, if we had

23  a -- if we had had a loan commitment from Citicorp

24  and it had another quarter where it lost the kind of

25  money that it lost last quarter, the ten billion or

Page 188

1    so, and then it had another quarter like that, at

2    some point Citicorp could fail.

3                    But what we have today is we have an

4    active corporation which is Scattered Corporation,

5    which is getting -- has a right to get $700,000 a

6    month, plus it only has to come up with a portion of

7    that money this year, even though Mr. Jahelka said he

8    was willing to come up with the hundred percent, the

9    $3 million.

10                   And Mr. Greenblatt, who has the

11   million dollars from Sugar Loaf, whatever they are,

12   and I really have no idea who they are, he can come

13   up with the monies this year, which are $1,250,000.

14   Between them they have far in excess of capacity.  In

15   addition to which -- now, I don't know that Scattered

16   Corporation could sell the 401 South Dearborn

17   property tomorrow.  But since the next time that

18   money comes up it is owing is 2010, it is almost

19   unbelievable to think that an office building in

20   Chicago could not be sold in two years, on top of the

21   $700,000 a month that Scattered is getting, and in a

22   market in which energy prices are rising.

23                   And, frankly, since they are not

24   making any more of it, there is no reason to think

25   that energy prices are going to decline any time

Page 189

1    soon.  And there is no testimony to hear to indicate

2    that there is any reason to question the cash flows

3    of Scattered Corporation or Chiplease's ability.

4                    Mr. Greenblatt testified that there is

5    $150,000 a month clear that is coming out of

6    Chiplease after expenses.  And between those things

7    that -- you know, that adds up to some serious money.

8    And on top of that, Chiplease has lent substantial

9    sums of money to RTC over the years such that its

10   ability to operate as a lender has been shown.

11                   THE COURT:  Okay.  Let me just point

12   out that the best security you're offering to the

13   counter-parties to these agreements that IIT will

14   have the money that is needed to comply with IIT's

15   obligations is the unsecured promise of Chiplease and

16   Scattered Corporation to honor a loan commitment.

17   That's the security.

18                   There is no lien on the property that

19   you referred to.  There is no guarantee that if that

20   property is sold that the funds will remain in

21   Scattered Corporation or Chiplease.  And there is no

22   opportunity, as I can see, for -- or at best a

23   lawsuit under a third-party beneficiary theory when

24   they are not a named third-party beneficiary in the

25   agreement.

Page 190

1                    So although you're very confident that

2    would be successful, they might reasonably be less

3    confident.  Ordinarily third-party beneficiaries are

4    named in the agreements that they seek to enforce as

5    third-party beneficiaries.  Now, it may not be always

6    the case, but it certainly would have given them a

7    great deal more comfort if they had been named.

8                    But beyond that, it is completely

9    unsecured.  They are relying on an unsecured promise

10   by two corporations that are not publicly held, have

11   no documentation that's been produced here as to what

12   their financial circumstances are.  We have only the

13   testimony of two individuals as to what their net

14   worth and ability to make payments are.

15                    MR. JORDAN:  And I'm sure that in the

16   two years that Allied and two years that Peoria has

17   had to investigate these people and these things and

18   the time that has passed, that if they had

19   information to rebut the fact that Scattered

20   Corporation had the ability, they would have brought

21   that forward.

22                    And if they had the ability, not

23   just -- we are talking about Allied and Chiplease,

24   and we're talking about somebody who has been in a

25   case almost since the beginning and has been dealing

Page 191

1    with Chiplease since then.  If they have something

2    that could show Chiplease's inability to act as a

3    lender, I would imagine that they would have found

4    that and they would have brought that forward in this

5    trial.

6             It is rebutted, their ability to

7    obtain those monies.  Now, I can't do -- you know, I

8    don't know how anyone can do more than provide

9    unrebutted testimony as to a party's ability --

10            THE COURT:  Let me make a suggestion

11   as to how someone could do more.  Someone could have

12   an entity proposed to be the counter-party to these

13   agreements that would have sufficient capital of its

14   own to comply with the agreements, an entity that has

15   some track record of generating a profit in its

16   business operations.

17            Instead, we have a shell, the only

18   assets of which will be these contracts and the loan

19   agreement that they have with Scattered and with

20   Chiplease.  That's it.  There is no other security

21   here.  Isn't that right?

22            MR. JORDAN:  Are you referring to the

23   trust?

24            THE COURT:  I am talking about IIT.

25   It's a shell containing only the agreements sought to

Page 192

1    be assumed and the loan proceeds.

2                    MR. JORDAN:  No.  That's incorrect.

3                    THE COURT:  What else?

4                    MR. JORDAN:  Because Your Honor has

5    already transferred -- first off, Mr. Connolly, I

6    believe, testified that the assets the -- and Mr.

7    Greenblatt confirmed that all of the physical assets

8    that Resource Technology Corporation had which were

9    assigned to Chiplease under the settlement agreement

10   that you approved on March 16, 2006, were assigned

11   from the trustee to Chiplease, Chiplease to Illinois

12   Investment Trust.  So they have all the same -- all

13   the physical assets, in addition to which --

14                   THE COURT:  They have a number of

15   other operating agreements.

16                   MR. JORDAN:  Your Honor, in August of

17   '06, you entered an order authorizing the transfer of

18   contracts.  And then in January of '07 you entered

19   another order authorizing transfer of contracts.  So,

20   yes, there are other assets that are available.  And

21   Mr. Connolly, I believe, testified that there were

22   plans to put other sites on line independent of

23   these.

24                   And so there would be other assets

25   that in the event that Allied or the event that

Page 193

1    Peoria sued, that they could not just look to the

2    assets here, but assets elsewhere.  So they have

3    the --

4                THE COURT:  We don't have any balance

5    sheet showing what the -- what the results of any

6    operations of the trust have been since the time it

7    was transferred?

8                MR. JORDAN:  No, we don't have it.

9                THE COURT:  No income statements or

10   anything of that sort?

11               MR. JORDAN:  No, we don't.

12               THE COURT:  Okay.

13               MR. JORDAN:  I think that -- I mean,

14   what we have is -- actually, what we do have is we

15   have an entity that's in better shape than RTC was

16   when it entered into these agreements.

17               THE COURT:  Well, I hope so.

18               MR. JORDAN:  It has a track record

19   through the efforts of Mr. Connolly and the various

20   other employees.  And I don't think Your Honor is not

21   mindful of the fact of the difficulties of operating

22   not just in this bankruptcy case, but in any

23   bankruptcy case, and particularly a bankruptcy case

24   in which there is a Chapter 11 trustee.  There are

25   serious constraints.  There are rules that are not

Page 194

1    available in the ordinary discourse of business.

2                    THE COURT:  Let's see if we can get

3    each one of these items taken care of separately.  So

4    we've got the question of whether this money will be

5    available.

6                    MR. JORDAN:  Right.

7                    THE COURT:  Now, is there anything

8    that requires the $3 million loaned by Chiplease and

9    Scattered to be used exclusively for complying with

10   the obligations under the contracts sought to be

11   assumed here, those with Allied and with Peoria?

12                   MR. JORDAN:  Mr. Connolly testified,

13   Mr. Jahelka testified -- and I don't think I have the

14   agreement in front of me.  I would have to look to

15   see whether there is a provision in the agreement

16   that indicates that it is for these sites.  But it

17   very likely would be.  But we have the testimony of

18   Mr. Jahelka.

19                   And by the way, on the flip side, we

20   have your comment.  It is kind of like looking at

21   your hand.  And you're saying my palm.  And I'm

22   saying use the back of my hand here.  And you're

23   saying, well, what incentive does these people have

24   because of whatever?  But they are the ones who are

25   the beneficiaries of the trust also, and so it is

Page 195

1   their investment.  They have a substantial incentive

2   to advance funds and to maintain the investment that

3   they have had.

4               You know, and there is a substantial

5   amount of monies that have gone in just in this whole

6   process.  And they are indicating plans to go

7   forward, and there are -- you know, the pro formas

8   indicate substantial cash flows.  They have every

9   incentive in the world based on the cash flows that

10  come through.  And I do have for Your Honor a

11  demonstrative document that indicates the flow of

12  funds based upon Mr. Connolly's testimony as to

13  timing and utilization just --

14              THE COURT:  Okay.  You're moving into

15  the second question, whether $3 million would be

16  enough, and I do want to get to that.

17              MR. JORDAN:  Well, I'm trying to

18  show --

19              THE COURT:  But I want to deal with

20  the first question first.  Assuming, as has been

21  testified, that $3 million or something close to

22  $3 million is going to be required at the outset of

23  the contractual relationships that are planned here

24  pursuant to the cure schedule that's laid out, what

25  real assurance is there that that money will be

Page 196

1    available for that purpose?

2                So the first question is will that --

3    is there any way of guaranteeing that Scattered and

4    Chiplease will put that money into IIT pursuant to

5    their loan agreement?  And the question of the status

6    of the trust bears on that question.  If they choose

7    not to, is there going to be any legally enforceable

8    right that could be imposed -- could be asserted

9    against them?  That's a question.

10                The next question is if they did make

11    the payment to IIT as required, is there anything

12    that requires IIT to use that money for the purpose

13    of complying with its contractual obligations under

14    these contracts, or if it was finding itself being

15    pressed by one of its other contracts, would it be

16    free to use the money in that situation and hope that

17    perhaps cash flow would improve in the future?

18                MR. JORDAN:  So if, for instance -- I

19    want to make sure of your question.  You're saying is

20    there any assurance that the monies will actually be

21    -- that it's solely related to these sites?  That's

22    the first question?

23                THE COURT:  See, what usually happens

24    in a situation like this where there is some question

25    about the ability of someone to perform under a

1    contract, there is something that is presented to

2    give the counter-party assurance that there are funds

3    available to comply with the obligation.

4              And if all that we have here to

5    provide that assurance is a loan agreement with some

6    questionable ability of those third parties to

7    enforce the loan agreement, and with no guarantee

8    that any funds received by that loan agreement will

9    actually be used for their contracts, there may be

10   some question about the degree of assurance that

11   they're being offered.

12             MR. JORDAN:  Well, let me just ask

13   Your Honor whether if -- and I don't have the

14   authority to do this because you're raising questions

15   right now.  And, you know, maybe if these questions

16   had been raised when they were on the stand, it might

17   have been dealt with, but, you know, neither one of

18   us has a time machine.

19             THE COURT:  Okay.  I have been aided

20   by my law clerk who has found a citation from AmJur

21   Bankruptcy, Section 481.  And I will read the

22   quotation that she has found.  48?  Okay.

23             "A business trust is a voluntary

24   pooling of capital by a number of people who are

25   holders of freely transferable certificates

Page 198

1    evidencing beneficial interests in the trust estate."

2                MR. JORDAN:  That may be in that case,

3    but there are other cases --

4                THE COURT:  That's their definition of

5    business trust.  And as I was saying, when I looked

6    at this trust agreement, it looked like a pretty

7    standard common law trust with expanded powers of the

8    trustee, but it didn't look like a business trust to

9    me.

10               In any event, that's an issue that may

11   have to be addressed by further research.  I raised

12   the question.  You have given me your answer.  We'll

13   move on to something else.  But --

14               MR. JORDAN:  And I've also had

15   willingness to provide -- you know, if we -- if the

16   order is conditional upon the assets from the

17   Illinois Investment Trust being placed into a

18   corporation --

19               THE COURT:  But let's see --

20               MR. JORDAN:  Hold on.  I'm getting

21   into the -- into where -- what you talked about.

22               And if the order was conditioned upon

23   the filing of a stipulation saying that the monies

24   under this loan agreement would only be related to

25   these sites, and if Your Honor made it conditional

Page 199

1    upon the filing of a stipulation indicating that

2    Allied, American Disposal and Sangamon Valley and

3    Peoria were third-party beneficiaries of the loan

4    agreement, then you can certainly make those

5    conditions of the approval.  And --

6                    THE COURT:  Well, see, this is a

7    little bit like let's make a deal.  What I am

8    supposed to do here is to pass on whether the

9    transaction that you're proposing, the assignee that

10   you're proposing is offering adequate assurance,

11   rather than to speculate about what might be adequate

12   assurance in lieu of what or in addition to what's

13   actually being proposed.

14                    I could speculate that it might be

15   much better if you set up an escrow account and put

16   $3 million into the escrow account and had some kind

17   of agreement that money could only be drawn out of

18   the escrow account for purposes relating to

19   performance under this agreement.  That would be

20   better than what we have right now.  It might provide

21   more adequate assurance than what we have right now.

22                    But I don't think I want to speculate

23   with you about what alternatives to what's being

24   offered now would provide adequate assurance.  I

25   think what I am required to do is make a

Page 200

1    determination as to whether what is being proposed

2    now meets the requirements of Section 365 or not.

3                MR. JORDAN:  Well, see, I think, Your

4    Honor, with all due respect, the problem is what

5    you're looking for is you're looking to provide these

6    people with a guarantee.  And we're taking the word

7    adequate out of adequate assurance of future

8    performance.  And they don't have -- they are not

9    entitled to an assurance of future performance.  And

10   they are not entitled to an assurance that the monies

11   are going to --

12                THE COURT:  You mean guarantee.  They

13   are entitled to adequate assurance.

14                MR. JORDAN:  No, I said I'm taking the

15   word adequate out.  If it's an assurance, it would be

16   a guarantee.  Is that what you said?

17                THE COURT:  No.  And let me make it

18   clear that at this point I am simply exploring with

19   you the extent to which assurance is given on each of

20   the three points that we're talking about.  So if

21   there is anything more you want to say about the

22   extent to which it is assured that $3 million will

23   actually be available for the purpose of funding the

24   obligations that IIT proposes to take under these

25   assumed agreements, we can move on to the next point.

Page 201

1                    But at this point, I think I

2    understand what the situation is.  We have a trust

3    which may or may not be a business trust, with

4    whatever assets it has, which are not in evidence as

5    far as their value is concerned, together with a loan

6    agreement that may or may not -- we haven't gotten

7    into that yet -- specified any limitations on the use

8    of the funds that are provided pursuant to that loan

9    agreement, and without a designation of either Allied

10    or Peoria as a third-party beneficiary under the loan

11    agreement.

12                    MR. JORDAN:  Yes, but you do have the

13    testimony of the witnesses who say that the monies

14    are only going to be used for this purpose.

15                    THE COURT:  That's what they say.  I

16    don't know that's -- that testimony creates any legal

17    obligation that would be enforceable by Peoria or

18    Allied.

19                    MR. JORDAN:  But there is no counter

20    testimony.  I mean, you know, we can only go off what

21    the testimony is.

22                    THE COURT:  That's right.

23                    MR. JORDAN:  We can't go off of what

24    we would like somebody else to say.  And, you know,

25    we are here today looking at the evidence before the

Page 202

1    court.  And there is no evidence that either of these

2    entities lacks the ability to fund.

3                    THE COURT:  Okay.

4                    MR. JORDAN:  Quite the opposite.  Both

5    of them have presented evidence of their ability to

6    fund, and fund from various sources, substantial cash

7    flows from dry cleaning leases and from loans,

8    including a million dollars coming in in the last few

9    days to Chiplease.  We have got testimony, which is

10   more than reasonable, that an oil and gas operation,

11   substantial one in Texas, turns out $700,000 --

12                   THE COURT:  Okay.

13                   MR. JORDAN:  -- EBIDA, without the T,

14   that that -- and those monies are going to be

15   available to pay these.

16                   Now, as far as the --

17                   THE COURT:  I'll just ask you one more

18   question on that score.  Both Mr. Jahelka and

19   Mr. Greenblatt were asked why choose Illinois

20   Investment Trust as the vehicle for operating these

21   entities, as opposed to Chiplease or Scattered, the

22   entities that actually have this cash flow and have

23   these assets.  And there was -- I did not perceive

24   any answer to that that gave a business basis for

25   that decision.

Page 203

1              MR. JORDAN:  I actually don't recall

2    that Mr. Greenblatt was asked that question.  I think

3    you asked that question of Mr. Jahelka.  And I am not

4    sure, but I don't know really what difference that

5    makes, particularly given Mr. Greenblatt's testimony

6    that they would -- you know, to the extent that it

7    created difficulty in the court, that they would turn

8    things into a transfer and assign it into the

9    corporation, which, by the way, as each of the

10   contracts are fairly assignable, that would be no

11   impediment to the assumption and assignment of the

12   contracts.

13             It would only be an impediment if

14   there was some indication that they would assign it

15   further.  And there is none of that.  In fact, quite

16   the opposite.  The testimony of Mr. Jahelka was that

17   they didn't have any interest.  They wanted to have

18   this entity presented.  And that alternative was just

19   to assuage Your Honor's feeling with regard to the

20   trust.

21             THE COURT:  Go ahead.

22             MR. JORDAN:  Now, I think the

23   likelihood of sufficiency to assure compliance is the

24   second issue that you raised.

25             THE COURT:  Is $3 million going to be

Page 204

```
 1   enough?

 2              MR. JORDAN:  Right.

 3              THE COURT:  Assuming that that

 4   actually is made available to --

 5              MR. JORDAN:  I did provide this

 6   demonstration here, which I thought was valuable in

 7   terms of both one and two.  One, for the fact that

 8   there is an indication of a total of $14.5 million in

 9   pretax profits that Illinois Investment Trust should

10   throw off, such that there is an incentive to fund

11   because of this.

12              In addition, to -- and this is just a

13   derivation of the numbers off of the loan documents

14   and off of Mr. Connolly's pro formas.  So this isn't

15   creating anything new, but it's just putting it in a

16   different fashion, anticipating that Your Honor might

17   be confused with regard to the timing of the funds

18   and the payback.

19              Because if you will recall, Mr.

20   Connolly did testify as to the fact that they were

21   going to start with Springfield and with Peoria, and

22   then move on to Litchfield and then to Bloomington.

23   And that was based upon information that they were --

24   as far as the Allied sites, that they received from

25   Allied.
```

1                    And this shows a flow of funds such

2      that although it's $3 million in gross, it's not $3

3      million at any one time because the interest

4      payments, the principal pay down, the amount

5      remaining on the line of credit goes through on this

6      such that there is operations to pay down, that at

7      any one time there is less monies available, and the

8      less money available makes the likelihood of actually

9      advancing on those things greater.

10                    So in 2008 there's a $1,250,000

11     pay-down, and there's $58,333.33 of interest -- I'm

12     sorry.  Principal advance.

13                    THE COURT:  Okay.  I don't have any

14     question about the sufficiency of the $3 million if

15     Mr. Connolly's projections are correct.

16                    MR. JORDAN:  Right.

17                    THE COURT:  You've just recast the

18     numbers that he put on his projection.

19                    MR. JORDAN:  Right.

20                    THE COURT:  But he gave testimony.  I

21     wrote the numbers down as he was giving the

22     testimony.  His numbers work.

23                    MR. JORDAN:  Right.

24                    THE COURT:  The question is whether

25     his numbers are right.  And the challenge came in the

Page 206

1   testimony from Mr. Sloan to the effect that his

2   assumptions regarding the amount of gas that would be

3   able to be converted into electricity were likely to

4   be inaccurate, and that the costs involved in

5   operating the plant were likely to be too low.

6               MR. JORDAN:  Right.  Yeah.  But I

7   think that misstates Mr. Sloan's testimony, because

8   what Mr. Sloan said was that, well, if they're only

9   running one engine now, so the revenue number is too

10  high.  And then he said if -- if -- in fact, when Mr.

11  Schmidt talked to him or questioned him, he said if

12  you put three machines on, then you should be able to

13  pull the gas because each machine coming on will pull

14  more gas.

15              And he indicated in response to Mr.

16  Schmidt's questioning that a substantial number of

17  the wells were not in service.  And when they were

18  put into service, that his testimony regarding the

19  amount of gas availability would not be accurate

20  because those -- the trapped gas that is in there,

21  because they are not going anyplace, would be able to

22  be utilized.

23              Now, I will acknowledge that gas may

24  dissipate over time.  But if, in fact, it is not

25  mined out, then I don't think that the curves that

Page 207

1    he's talking about make any sense, because he

2    admitted that there was a substantial number of wells

3    that were out of commission.  And those commission --

4    those are going to be commissioned.

5                    And, therefore, I think the testimony

6    of Mr. Sloan is not credible with regard to the gas

7    line based upon his own testimony when challenged.

8    In addition to which, he didn't really challenge the

9    expenses.  What he said was is that these $40,000 O&M

10   costs seemed low.  But what he ignored was the fact

11   that they had the $70,000 salary cost from Mr. --

12   that was Mr. Muir's salary that's on there still.

13   But that combined with the $40,000 isn't $40,000.

14   Obviously it's $110,000.  So if anything, Mr.

15   Connolly overestimated.

16                    And I will also note that Allied did

17   not in any fashion challenge the pro formas for the

18   three sites that they have, Springfield, Litchfield

19   and Bloomington.  And so there is no evidence before

20   us that indicates there is anything -- those pro

21   formas as far as Bloomington, Litchfield and Sangamon

22   are anything other than solid gold.

23                    THE COURT:  Okay.

24                    MR. JORDAN:  And as far as Mr. Sloan's

25   testimony, I am not sure how Your Honor could find

Page 208

1    that credible based upon his own report that he

2    really didn't have any gas flows, and he had a

3    general sense of what was going on after '08, but the

4    Rust report ended in '08, and his own admission of

5    all the wells out.

6              So he contradicted his own testimony

7    when called on cross-examination.  So I really don't

8    know that his testimony did anything to undercut Mr.

9    Connolly's pro forma, particularly with three engines

10   on line.

11             THE COURT:  Okay.

12             MR. JORDAN:  Which is the testimony.

13             THE COURT:  Okay.  Then the final

14   point is whether the individual involved here would

15   be able to -- would likely be able to comply with the

16   obligations of IIT, if IIT is allowed to accept an

17   assignment of these contracts.

18             MR. JORDAN:  You know, with all due

19   respect to Your Honor, I think that's the easiest

20   burden to take, because what we have is we have Mr.

21   Connolly, who has over 15 years of experience here,

22   and in addition, experience with respect to chemical

23   waste management before that.  We have Mr. Fortelka

24   who has over ten years' experience.  Mr. Weeks has

25   over ten years' experience.  Mr. Watson, Mr. Vallas.

Page 209

1    All of the individuals have substantial experience in

2    the field.

3            Now, the difference is working for a

4    company which is working on a shoestring, working on

5    a limp along.  They are not miracle workers, and they

6    cannot change the fact that they are using duct tape

7    and --

8            THE COURT:  Now, let me back up here.

9    Throughout the entire history of RTC, it was owned by

10   Mr. Greenblatt, Mr. Jahelka, Mr. Nichols in some

11   combination through Rumplestiltskin or whatever.  And

12   if these individuals had the ability to run methane

13   gas-to-electricity conversion systems in an

14   efficient, efficient and profitable manner, and all

15   they needed was capital to do it, why weren't they

16   given the capital that they could have used to do

17   that?

18           MR. JORDAN:  I think because Your

19   Honor appointed a Chapter 11 trustee.  And I think it

20   is apparent that the Chapter 11 trustee --

21           THE COURT:  The debtor in possession

22   operated for years before a Chapter 11 trustee was

23   appointed.

24           MR. JORDAN:  But the violations --

25           THE COURT:  With financing by Banco

Page 210

1    Panamericano.

2                    MR. JORDAN:  That may be, but what --

3    what I think is important is Your Honor review the

4    violation notices and notices of violation.  And what

5    you will find is as Mr. Sloan testified.  The

6    problems with the site did not occur until after the

7    Chapter 11 trustee.

8                    Please, take time to review all of

9    the -- not for the facts, but just for the dates of

10   the documents from the IEPA.  And you will see that

11   the violation notices and the NOVs are almost

12   exclusively for the period of time in which the

13   Chapter 11 trustee operated.

14                   THE COURT:  I'm not talking about --

15                   MR. JORDAN:  And by the way --

16                   THE COURT:  -- violation notices.  I

17   am talking about the ability to generate substantial

18   amounts of positive cash flow.  Had that occurred

19   during the operation of RTC as debtor in possession,

20   we wouldn't have gotten to the point where a Chapter

21   11 trustee had to be appointed.  There were

22   difficulties in making cash flow, making this company

23   work, generating a situation where a Chapter 11 plan

24   could have been confirmed during the operation of the

25   debtor in possession.

```
 1                    MR. JORDAN:  I think both Mr. Sloan
 2   and Mr. Connolly testified to the nature of the
 3   rising prices of gas and electricity.  And with all
 4   due respect, Your Honor, the unit prices of those
 5   items make all the difference in the world.  And what
 6   we have is a situation in which we didn't have China
 7   on -- eating up energy like we do now.  And we don't
 8   have India eating up energy the way we do now.
 9                    And anyone -- I would subscribe to the
10   idea that anyone who says that energy prices are
11   going down, given the fact that India and China are
12   now huge producers and working their way into the
13   first world, is just kidding themselves.
14                    And what we had was we had a different
15   period of time in which the purchase rate prices were
16   substantially different, and it changes totally the
17   metric for determining the profitability.  And I
18   would think that in a world in which energy prices
19   are on the rise, that does two things.  It increases
20   the likelihood of funding, because H&M Oil & Gas
21   would, therefore, generate more monies, which would
22   make it more likely that Scattered would have more
23   money to lend, which would make it more likely that
24   Scattered would lend, in addition to which, they're
25   selling gas at sites and they're selling electricity
```

Page 212

1    at sites.

2             And the prices of those commodities

3    have increased substantially, and are, I think,

4    reasonable to assume aren't going down given the

5    emergence of China and India into the markets and

6    just the emerging world in general.

7             Now, we will have other problems, but

8    it certainly won't be falling energy prices.  There

9    is no basis to believe that.  So if they had during

10   the period before the Chapter 11 trustee the China

11   factor, if you will, then I am sure they could have

12   generated substantial --

13            THE COURT:  Okay.  The point that I am

14   making is simply this, and perhaps you've answered

15   it:  Messrs. Greenblatt, Jahelka and Nichols through

16   their various entities determined not to provide

17   whatever financing RTC would have needed during the

18   course of the Chapter 11 case to avoid the shoestring

19   operations you talked about prior to the appointment

20   of a Chapter 11 trustee.  Who knows what their

21   reasons were at that time.

22            But what you're suggesting is now in

23   an environment where energy prices are higher, it

24   will be in their interest to make those investments

25   and so we can count on them to fund the $3 million

Page 213

1    that's called for here.

2                    MR. JORDAN:  Well, Your Honor, I mean

3    it's a difficult burden that you're asking since I

4    never had -- would have heard of Mr. Greenblatt's

5    name prior to my initial phone call -- and I didn't

6    come to this case until 2000, October of '05 -- and

7    what happened before that.

8                    But I think Your Honor is taking a

9    huge leap to say well, because Leon Greenblatt

10   operates a company, Chiplease, Inc., that has 15 to

11   $16 million worth of assets and $150,000 worth of

12   free cash flow, that he must have had those same

13   assets in the period prior to the appointment of the

14   Chapter 11 trustee.

15                   I certainly don't know that, and I

16   don't have any testimony to back that up.  I wasn't

17   here.  I mean, I came into the case, and there are

18   days that I've regretted that, but I am here, and I

19   don't have any idea what went on then.

20                   Scattered Corporation, Scattered

21   Corporation was not a lender to -- with the exception

22   of the Caterpillar loan that it purchased relating to

23   Peoria, and it did purchase and it was on the record

24   of $7 million --

25                   THE COURT:  Okay, let me -- you're

1   entirely right in that to some extent what we are

2   talking about is speculation.  I am simply reacting

3   to the idea that all of the problems here came about

4   because of a lack of funding that could have been

5   ameliorated if only the Chapter 11 trustee had

6   accepted the generous offers that Mr. Greenblatt was

7   making at the time to provide the funds necessary to

8   run RTC appropriately.

9                   And my reaction to that is that Mr.

10  Greenblatt's entities were entirely in control of

11  RTC, both as operators and as lenders, prior to the

12  appointment of the Chapter 11 trustee.

13                  MR. JORDAN:  Well, first off, I really

14  don't know that.  But, second, it's immaterial

15  because that was not the testimony that we elicited

16  from Mr. Connolly.  I know because I asked the

17  question, and I asked the question several times.

18  And what I said is, is there -- questions that

19  related to whether he -- you know, he got

20  authorization from the Chapter 11 trustee to do

21  certain things.

22                  And I asked him whether he blamed the

23  Chapter 11 trustee.  And, frankly, only because it's

24  not any great surprise, I knew the answer to that.  I

25  knew what Mr. Connolly was going to say.  I actually

Page 215

1    talked to him before the hearing.  And I knew that he

2    was going to say that he didn't blame the Chapter 11

3    trustee because you can't blame the Chapter 11

4    trustee.

5              Now, Mr. Greenblatt, you know, he has

6    his own issues.  And I don't know why we went off on

7    the little jag.  But the reality is Mr. Connolly

8    worked with Mr. Szilyagi.  And he understands that

9    Mr. Szilyagi had a tough job.  And Mr. Szilyagi had

10   limited monies and he's a Chapter 11 trustee.

11             But we can't ignore the fact that this

12   entity was in a limp-along.  And we can't ignore the

13   fact, as Mr. Greenblatt testified, and he testified

14   correctly I'm sure, as Your Honor will attest, the

15   Chapter 11 trustee was fighting with him and involved

16   in litigation.

17             And so it's hardly -- it would be more

18   surprising than not that Mr. Greenblatt would have

19   been even as magnanimous, and I use that term

20   extremely loosely, to come up with a $600,000 offer.

21   They were fighting.  Mr. Greenblatt didn't have a

22   huge incentive to make Mr. Szilyagi's life easy, but

23   Mr. Szilagyi certainly did nothing to make Mr.

24   Greenblatt's life easy either.

25             THE COURT:  Okay.  Let's get off this.

Page 216

 1    Is there anything else you wanted to argue?

 2              MR. JORDAN:  I want to highlight the

 3    fact that the people that are running the operations

 4    are not these fellows, Jahelka and Greenblatt.  They

 5    are engineers.  You know, they have substantial

 6    experience.  They are real people who will go out

 7    there and do jobs, and they do use duct tape and

 8    pliers.

 9              But you can't -- I just cannot imagine

10    that the efforts that these people put in under these

11    difficult circumstances, if they have financing, that

12    they can't provide the ability to comply with the

13    Illinois Environmental Protection Agency.

14              And I would note that when we looked

15    at Section 39, that with all due respect to Mr. Reed,

16    that there aren't any enforcement items, and that

17    that scrutiny that he talked about I don't think

18    applies based upon my reading of the statute.  There

19    are going to be applications that are going to be

20    filed by people who have an incentive to fix

21    problems, who have an incentive to sit down --

22              THE COURT:  Why don't you give me the

23    citation to the statute.

24              MR. JORDAN:  I think it was 4.5

25    Illinois ILCS 5/39.

Page 217

1                    THE COURT:  415 ILCS.

2                    MR. JORDAN:  5/39.

3                    THE COURT:  5/39.

4                    MR. JORDAN:  Right.  And also for 415

5      ILCS 5/39.5 and specifically Section 10.

6                    THE COURT:  415 ILCS --

7                    MR. JORDAN:  Those are two different

8      sections, and they relate to two different issues

9      that we can address.

10                   THE COURT:  Okay.  I've got Section

11     39.  What's the subsection?

12                   MR. JORDAN:  Thirty-nine?

13                   THE COURT:  Yeah.

14                   MR. JORDAN:  Thirty-nine is a --

15                   THE COURT:  It's issuance of permits,

16     but there's several subsections.  What's the one that

17     deals with the consideration of adjudications of

18     environmental violations?

19                   MR. JORDAN:  Let me find my notes,

20     Your Honor.  I had it printed out and then I went --

21     I have to find --

22                   THE COURT:  It goes A through P, so it

23     will take a long time to read the entire section.

24                   MR. JORDAN:  I had it as part of my --

25     in A it indicates, Section A, about 40 percent of the

Page 218

1    way down, "In making its determinations on permit

2    applications under this section, the agency may

3    consider prior adjudications of noncompliance with

4    this Act by the applicant that involved the release

5    of the contaminant into the environment."  And

6    Mr. Reed confirmed Mr. Connolly's testimony that

7    there have not been any prior adjudications of

8    noncompliance.

9              THE COURT:  Okay.

10             MR. JORDAN:  So that relates to the

11   manner in which these permit applications will

12   proceed.  And in addition to which, Mr. Connolly had

13   testified that they were going to be moving forward

14   and being proactive in meeting with the Illinois

15   Environmental Protection Agency to try to get in

16   front of these issues, as opposed to what I think

17   they had been doing previously, which is playing

18   catch-up.

19             And the fact that they have this

20   incentive is bolstered by the fact that they can go

21   to meetings and they actually have money to fix

22   problems.  And you can't ignore the fact that there's

23   -- it is very difficult to make commitments without a

24   budget.  And this entity has certainly been in a huge

25   limp along during the period from March 16th, 2006,

Page 219

1    forward, given the fact that the permits, the

2    agreements have been in limbo as to what's going to

3    happen to them.

4              And it's not surprising that no one

5    would advance funds to pay for substantial

6    investments in properties without knowing that they

7    were actually going to be assumed and actually be

8    assigned.

9              THE COURT:  Okay.  Anything else?

10             MR. JORDAN:  Give me just one second,

11   Your Honor.

12             (Brief pause.)

13             MR. JORDAN:  I think looking at -- in

14   re Prime Motors, Inc., 166 B.R. 993, the court stated

15   that --

16             THE COURT:  Give me the citation

17   again.

18             MR. JORDAN:  166 B.R. 993.  It is the

19   Bankruptcy Court out of the Southern District of

20   Florida, 1994.  And it indicates -- and although they

21   reference 365(b)(1)(C), I think that it applies for

22   apparent reasons to 365(f) as well.  It says,

23   "Moreover the phrase adequate assurance of future

24   performance, for purposes of Section 365(b)(1)(C) is

25   to be given practical, pragmatic construction based

Page 220

1    upon... the circumstances of the case."  And there

2    are citations omitted.

3              Finally, "The assurance of future

4    performance is adequate if performance is likely;

5    i.e., more probable than not."

6              THE COURT:  Yes.  That's exactly what

7    I was asking you in each of the three areas that I --

8              MR. JORDAN:  Right.  And I'm trying to

9    show that it is more probable than not.  I'm not --

10   and it indicates that as in that case, I think, where

11   the Prime debtors met their burden, I think that

12   we've made our burden here.  And that as the Westview

13   74 Street Drug Corp. case, which is 59 B.R. 747,

14   which is a bankruptcy case out of the Southern

15   District of New York, 1986 -- again, that's 59 B.R.

16   727.

17             The court explained that the words

18   "adequate assurance of future performance is designed

19   by Congress to not mean absolute insurance that the

20   debtor will thrive and make a profit.  The words

21   adequate assurance of future performance are not

22   words of art, but are intended by Congress to be

23   given a practical, pragmatic construction."

24             And that what we have here is the idea

25   that we have a source of funds.  We have a profitable

1    business.  We have the ability to make repairs to

2    make compliance a reality.  We have individuals who

3    are operating who can comply.  And with all due

4    respect to Mr. Reed, I think that if one were in --

5    if the court were to review the court order, which is

6    Exhibit 73, you will note that there are three

7    separate sections in that order that are provided

8    that give Mr. Henderson the right to do that which he

9    did, which is to file the permit by direction of the

10   court.

11              And one of the sections, and I believe

12   it's -- and I have to turn to it here, if you give me

13   just one second.  Section G, Section H and Section K,

14   which all indicate that in various fashions giving

15   Mr. Henderson the right -- including a section that

16   indicates that he has a right to enter into permits

17   and licenses.

18              What we have here is that I am not

19   aware and there is nothing that we've seen that

20   indicates any issue of compliance -- of something

21   coming out from the IEPA.  The IEPA can only issue a

22   notice of intent to deny.  And that's what 415 ILCS

23   5/39.5 indicates.  And there's -- and Section 10,

24   final agency action, they have the right to file --

25   deliver a notice of intent, and then the

Page 222

1    counter-party has 15 days to reply.

2                    And in this case, given the fact that

3    the evidence is pretty clear, and Mr. Reed was fair

4    and gave his testimony, indicating that if, in fact,

5    it can be shown by evidence that the items were

6    mailed on the day prior to the time that the office

7    closed, that the agency's position is that's timely.

8                    And he indicated that if, in fact, a

9    court order was provided, that that very well could

10   be appropriate as -- for Mr. Henderson to file as a

11   responsible party.  And in response to Your Honor's

12   indication, indicated that there was no difficulty,

13   by the way, having the people who are on the payroll

14   of RTC South Dakota operating on behalf of the

15   responsible party in operating these permits.

16                    I think that in summary what we have

17   here looking at -- and again, it is a different

18   section, but it's the same concept.  What we have is

19   a situation in which Allied and Peoria can only ask

20   for the benefit of their bargain.  And they are

21   getting a better bargain with a -- than they did in

22   1995 and 1996 when they entered into these

23   agreements.  They are -- they are entering into the

24   assignment that will be an agreement with a

25   well-capitalized company, with experienced personnel.

Page 223

1                        Now, the other thing is that as far as

2     Peoria, taking that aside, and Sangamon, what has to

3     happen is that RTC -- I'm sorry, the trust has to

4     file for a permit and proceed after the Sangamon --

5     under the stipulation, after the Sangamon Landfill is

6     finished by Allied, made in accordance with their

7     constructions (sic).

8                        And there is a requirement in there

9     that our client have the permits or other approvals

10    that are required.  So they are back-stopped by their

11    own items.  In addition to which the Litchfield

12    agreement, our client has two years, to 2010, to

13    proceed under that because it isn't even -- that's

14    our projected date.  But the contracts go well after

15    that.  And then in Bloomington, it goes out even

16    farther in accordance with the plan.

17                       THE COURT:  Yes.  I don't think that's

18    been challenged.

19                       MR. JORDAN:  I'm sorry.

20                       THE COURT:  That has not been

21    challenged.

22                       MR. JORDAN:  No.  So it is not as if

23    our client has to show permits now.  What they have

24    to show is that they have the ability to get permits

25    in the future.  They have the personnel and they have

Page 224

1    the capital and they have the ability.  And they have

2    other sites that are operating in the State of

3    Illinois, Taylor Ridge, Viola, Ottawa, that will

4    provide the base line to make the likelihood of

5    obtaining the permits in Sangamon and in Litchfield

6    and in Bloomington a reality.  And the stipulation

7    says that our client has to have that.

8              Now Allied is no -- you can't say that

9    it is disadvantaged by that, by its own stipulation,

10   particularly because --

11             THE COURT:  Rather than argue against

12   Allied's argument now, why don't you save that for

13   rebuttal.

14             MR. JORDAN:  All right.  Thank you,

15   Your Honor.

16             THE COURT:  All right.  Who would like

17   to proceed first?

18             MR. APOLSTOLIDES:  Judge, if I may for

19   just a moment just to make the record.  Your Honor,

20   George Apostolides on behalf of the trustee.

21             THE COURT:  Yes, Mr. Apostolides.

22             MR. APOLSTOLIDES:  I didn't make an

23   opening statement.  I didn't really participate in

24   the evidence.  But it is the trustee's motion and I

25   don't think it needs to be said that --

Page 225

1                    THE COURT:  That you adopt the

2    argument that Mr. Jordan has made.

3                    MR. APOLSTOLIDES:  Well, under the

4    motion it is the responsibility of the designee to

5    prove adequate assurance.  And so for the record, the

6    trustee is here.  The trustee is the movant, but, of

7    course, IIT is the one that has put in all the

8    evidence and made all the arguments.

9                    THE COURT:  Yes.

10                    MR. APOLSTOLIDES:  Thank you.

11                    THE COURT:  Again, who would like to

12    go first?

13                    MR. BOHAN:  Your Honor, I will proceed

14    in whatever order the court thinks appropriate.  But

15    let me begin, because I think when Mr. Reed was on

16    the stand, I thought the section of the statute that

17    he referred to was 39(i), not 39(a).  And according

18    to --

19                    THE COURT:  Well, let me check 39(i).

20                    MR. BOHAN:  All right.  And I would

21    refer you to (i)(1).

22                    THE COURT:  I don't know that this

23    refers to the kind of permit we are talking about

24    here.

25                    MR. BOHAN:  Your Honor, I believe (i)

Page 226

1    is the provision that he referred to.

2                    THE COURT:  Yes, but what I am saying

3    is that (i) refers to RCRA permits.  What's that?

4                    MR. BOHAN:  Well, a RCRA permit, Your

5    Honor.  That's not what we have here.  But I believe

6    that the permit --

7                    THE COURT:  This isn't a permit for a

8    waste storage site, is it?

9                    MR. BOHAN:  No, Your Honor, but I

10   think -- Your Honor, he wasn't asked specifically

11   which words he was relying on.

12                   THE COURT:  Well, see, I just don't

13   know that subsection (i), as I look at it now, refers

14   to the CAAPP permits that he was testifying to.

15                   MR. BOHAN:  I thought --

16                   THE COURT:  As opposed to -- as

17   opposed to (a) that refers to any permit for

18   operation of any type of facility.  It looks like (i)

19   is more narrowly tailored.  And again, I am no expert

20   on this, but it just -- as you asked me to read it,

21   it refers to waste treatment facilities, waste

22   storage sites and RCRA permits, and so I am not clear

23   that that applies to a CAAPP permit, which is what

24   you're challenging their ability to obtain.

25                   MR. BOHAN:  I am, Your Honor, based on

Page 227

1    the testimony of Mr. Reed, because it was my --

2    perhaps I'm mistaken, but when he was on the stand I

3    thought he specifically mentioned (i) as being the

4    source of the agency's authority in reviewing this

5    CAAPP permit to take into consideration these

6    repeated violations of environmental regulations.

7             THE COURT:  Well, maybe that's right,

8    because sanitary landfill is in here.  So if CAAPP is

9    a permit for a sanitary landfill, perhaps that's

10   right.  Then the relevant language that you're

11   looking for is, "The agency may deny such a permit if

12   the prospective owner or operator or any employee or

13   officer has a history of repeated violations of

14   federal, state or local laws or there is proof of

15   gross carelessness or incompetence."

16            But, again, this looks to me like it

17   is dealing with something else, gross incompetence in

18   handling, storing, processing or disposing of wastes.

19   I think this is -- this is more -- this is directed

20   at something other than CAAPP.

21            MR. BOHAN:  Well --

22            THE COURT:  And even then, repeated

23   violations would require some kind of determination

24   that there had been a repeated violation.

25            MR. BOHAN:  Well, Your Honor, there

Page 228

1  have been certainly a multitude of notices of

2  violation.  Mr. Connolly, you know, and RTC were put

3  on notice that their performance was in violation of

4  applicable environmental rules, not just at our

5  sites, but at the Peoria site and a host of other

6  sites, as Your Honor has heard.

7              THE COURT:  Do you agree with

8  Mr. Jordan's observation that all of that took place

9  while RTC was operating under a trustee?

10             MR. BOHAN:  Absolutely not, Your

11 Honor.  Absolutely not.  I believe some of those

12 violations took place while they were operating as

13 debtor in possession.

14             MR. JORDAN:  I said -- I didn't say

15 all of them.  I said the vast majority.

16             THE COURT:  Okay.

17             MR. BOHAN:  And in response to the

18 argument how are we any worse off, I mean, one

19 obvious way in which we are worse off is now we are

20 dealing with a counter-party that although Your Honor

21 correctly described it as a shell, but cut through

22 the shell.  We're really dealing with RTC.

23             And we are dealing with the RTC now

24 that in its interactions with the IEPA has one long

25 established and ugly track record of environmental

Page 229

1    compliance.  And so that affects our ability to

2    extract the value from these gas contracts that we

3    thought we had when we entered them, with RTC in the

4    first place.

5                   Now, let me go back to the beginning.

6    On the question whether it's a business trust or not,

7    Your Honor is absolutely correct, that record will

8    bear out.  I put the question directly to Mr. Jahelka

9    and to Mr. Greenblatt and neither one of them gave an

10   answer.

11                  Why?  Why was the trust interposed

12   between these contracts and Scattered and Chiplease?

13   Why was the decision made, Mr. Jahelka, on behalf of

14   Scattered?  And why was the decision made,

15   Mr. Greenblatt, on behalf of Chiplease to designate a

16   trust as, you know, the repository for these

17   contracts?

18                  And Mr. Greenblatt's answer was I

19   don't exactly remember.  Mr. Jahelka said something

20   like it must have been on the advice of counsel.  So

21   that's the -- those are the responses we have to the

22   fundamental question whether this trust is an

23   appropriate entity through which to operate or

24   perform these contracts in the first place.

25                  Now, it is actually -- I would like to

Page 230

1    say that what they really want to do is take us back

2    to the future, right, because it is the same

3    employees, with the same -- operating out of the same

4    location, doing the same things under the control of

5    the same entities and ultimately the same

6    individuals, Mr. Greenblatt, using the same source of

7    funding, Chiplease.

8            So why in the world would any of us

9    think that the result is going to be any different

10   than the result we've already witnessed.  It is worse

11   than that, though, because they've created this

12   Potemkin village of Illinois Investment Trust and

13   interposed the trust between the contracts and

14   Scattered and Chiplease.  The trust, which has never

15   conducted any business of any sort, has never had any

16   employees, no assets, no operating history, no

17   permits of its own, no employees of its own, no

18   location of its own.

19           How in the world does that constitute

20   adequate assurance?  How does that make my client

21   more certain of performance than if we had been

22   dealing with ITC (sic) in the first place ten years

23   ago?  And it's worse than that because we really

24   don't know who is going to have these contracts.  The

25   trust can be revoked.  Mr. Connolly can be removed as

Page 231

1    trustee by Mr. Jahelka and Mr. Greenblatt tonight

2    over a beer at the corner saloon, and he would have

3    no recourse.

4              And so when we talk about a loan

5    agreement between on the one hand Scattered and

6    Chiplease, and on the other hand IIT, we could walk

7    out of the courtroom tonight, Judge, and discover

8    tomorrow morning that all three of those parties

9    decided to mutually release and absolve each other of

10   any obligations under that instrument.  There is no

11   obligation for Scattered or Chiplease to do anything

12   other than what they want to do.  It's entirely

13   illusory.  It's a complete sham.

14             I asked them is it the trust?  I mean,

15   are we certain now that we're dealing with the trust?

16   Because when this process started more than a year

17   ago, we asked Scattered who is the designee?  And it

18   is now the trust.

19             But under no circumstances have they

20   irrevocably committed to have the trust perform these

21   contracts.  They could de-designate the trust

22   tomorrow and designate Loop Corp or the -- you know,

23   one of the other many Greenblatt-controlled entities,

24   and we would have no recourse.  And this whole

25   proceeding would have been just a charade.

Page 232

 1                    Now, I object strongly to the argument

 2     that I think was implicit in much of what Mr. Jordan

 3     said, and that is that I have the burden of proving

 4     anything, all right, including the financial

 5     condition of either Scattered or Chiplease.

 6                    THE COURT:  No.  His argument was that

 7     they had met their burden by the testimony of Mr.

 8     Jahelka and Mr. Greenblatt that these were highly

 9     profitable and well-financed organizations.

10                    MR. BOHAN:  Okay.  But he went

11     further, Your Honor, because what he said was we've

12     been going at it for so long don't you think for a

13     minute that if Allied had been scouring the

14     backgrounds of these individuals, had come up with

15     any information contrary to what they said on the

16     witness stand, we would have come forward with that

17     evidence.  I object to that.

18                    I took Greenblatt's deposition two

19     weeks ago, at a time when he told me that the bank

20     account of Chiplease had in it $150,000.  Now he

21     comes to court without any documents whatsoever and

22     tells me that the bank account has a balance of

23     $1.2 million.  What am I supposed to do with that?

24     How credible is that?

25                    A company that he says does prepare

Page 233

1    balance sheets.  None were produced.  None were used

2    in trial.  None were marked as exhibits.  A company

3    that he says does generate income statements.  Where

4    is any of them, much less the most recent one?  A

5    funds flow statement.  We haven't seen anything.  We

6    haven't seen anything.

7              Jahelka, on behalf of Scattered,

8    Jahelka freely admits that the company has no liquid

9    assets.  It happens to be an owner in a commercial

10   real estate in a commercial building that's up for

11   sale.  Well, that's not terribly unique.  This isn't

12   the perfect market in which to be trying to sell real

13   estate, even assuming that he intended to apply the

14   proceeds of that sale to this venture.  There is no

15   evidence of that.

16             And the other, the oil and gas

17   interests in Texas that he says are spinning off

18   hundreds of thousands of dollars, where is the proof

19   of that?  I mean, where are the documents?  Where is

20   anything?

21             There is not one iota of corroboration

22   for the testimony of what either of them said about

23   the financial health of their respective businesses.

24   And so what he's asking you to do is to rely on

25   Jahelka and rely on Greenblatt, and I think that's

Page 234

1   not such a hot idea.

2              Jahelka is the guy who said -- told me

3   on the witness stand under oath that other than being

4   co-lenders to IIT, there is no business relationship

5   between Chiplease and Scattered.  How plausible is

6   that?  I mean, why didn't he just say we're all

7   controlled by Greenblatt.

8              Everyone knows that.  Greenblatt is on

9   my board of directors, he owns 50 percent of my

10  shares.  I sit on his board of directors.  We both

11  sit on the board of Rumplestiltskin.  Through

12  Rumpelstiltskin we collectively control RTC.

13             How hard would it have been to fess up

14  to that.  Why was it necessary for him to, you know,

15  argue with me and contend that the two companies are

16  completely unrelated?  It diminishes his credibility.

17  And so when he tells you that he's got assets with

18  which to fund this $3 million loan, that's certainly

19  something you should take into consideration.

20             Now, as for Mr. Greenblatt, I won't

21  even begin, you know, to go through the litany of

22  inconsistencies and outright falsehoods we heard from

23  him when he was on the witness stand changing his

24  testimony from just two weeks ago.

25             You asked, must the money being --

Page 235

1    let's assume it's funded.  Let's assume that the

2    3 million -- you know, the building is sold, the oil

3    and gas wells prove profitable, you know, the

4    mysterious real estate transaction for Chiplease

5    comes in, and now there's $3 million.  Will it be

6    used by Chiplease and Scattered to fund the loan?

7    Who knows.  Who knows.

8                    But Your Honor is correct that if it's

9    not, there is no recourse because the person who

10   controls on the other side of that contract is their

11   puppet.  They control whether or not that agreement

12   is ever going to be enforced.  No one else.  So if a

13   new business venture finds its way onto Mr.

14   Greenblatt's desk tomorrow morning, you know, how

15   seriously is he going to take this loan agreement?

16                   And even if the money were made

17   available to IIT, there is absolutely no obligation

18   under the loan agreement that IIT apply a dollar much

19   less all three million to these four sites.  In fact,

20   it says something just the opposite.

21                   THE COURT:  What exhibit are we

22   talking about?

23                   MR. BOHAN:  I am talking about --

24                   THE COURT:  What is the exhibit

25   number?

Page 236

1                    MR. BOHAN:  IIT 52.

2                    THE COURT:  I suppose I can put that

3      on the screen.

4                    MR. BOHAN:  Well, Your Honor, I'm not

5      sure it is worth it.  It is a minor point.  But on

6      page 5, paragraph 2.3, section 2.3, use of the

7      proceeds, you see it includes -- it identifies it as

8      a business loan presumably to take it out of the

9      Illinois usury statute.

10                    But it is almost drafted in a way that

11     specifically reserves IIT's right to use it however

12     it sees fit.  There is no requirement whatever that

13     any of the loan proceeds be applied to use -- to the

14     performance of any of our contracts.

15                    THE COURT:  Okay.

16                    MR. BOHAN:  All right.  And Your Honor

17     just scrolled past another paragraph.  I wasn't going

18     to say anything about it, but because I saw it, now

19     it jogs my memory.  It is the agreement that is yet

20     to be negotiated or executed.  And that is the

21     lockbox agreement, it's called in the agreement.  I

22     think the deposit control agreement.  It is up --

23     yeah, there it is, 3.12.  No evidence of an

24     executed -- now, why is that important?

25                    Well, that's important because the

1    money isn't going to go to IIT.  The money is going

2    to go into a lockbox.  And assuming everything plays

3    out as they would like you to believe, and some

4    portion is going to go to the lenders, and some

5    portion is going to stay with IIT, well, who gets

6    what?  Who knows.  All of Connolly's projections

7    depend on Connolly -- on IIT having a source of

8    available cash, some of which is going to arise from

9    IIT's performance of these contracts.  But who knows

10   what portion is going to be made available to IIT.

11                   Is it 90 percent that goes to the

12   lenders, 75 percent, 50 percent?  Who knows.  It's

13   all speculation right now, and that's not adequate

14   assurance.  Put it this way, if they're asking you to

15   rely on essentially the good faith of Mr. Jahelka and

16   Mr. Greenblatt, I say, Your Honor, they've failed in

17   their burden.

18                   Now, I am not going to -- I am not

19   going to dwell on the pro formas.  It is true we

20   didn't offer any contrary evidence.  We didn't offer

21   evidence directly impeaching the pro formas, because

22   I don't get past -- I am nowhere near the pro formas

23   yet, Your Honor.

24                   I am at a more fundamental level.

25   Like how about this:  Who pays the salary of John

Page 238

1    Connolly?  Connolly is employed by RTC, but

2    apparently he and his cohorts are on loan to IIT.

3    But who pays their salary?  It seems like a pretty

4    fundamental question.

5                  And before he starts talking about pro

6    formas for IIT, right, let's figure out what the

7    source of the funding for his salary and

8    Mr. Fortelka's salary is.  When he was asked the

9    question, he says that, well, Peoria is, you know,

10   earning money.  And if we need to, then we draw on

11   monies made available by Chiplease.

12                 But when I asked Greenblatt about

13   that, he denied that Chiplease was funding the

14   operations of pre-petition RTC or that -- or IIT.  So

15   before we get to Mr. Connolly's pro formas, I would

16   like to know just right off the bat who is paying

17   their salaries today.  It would seem like -- you

18   know, it would seem a pretty fundamental question,

19   one that any one of them could easily answer.  But at

20   the end of this trial, it's still a mystery.

21                 And as I said, so much depends on

22   exactly what portion of the revenues are going to be

23   retained by IIT, what portion is going to go to the

24   lender, and that's then left up in the air.  I think

25   on the question of -- Your Honor asked the question,

Page 239

1    a good question about the individuals.  Who is really

2    going to do the work?  Who is going to be responsible

3    for performing these contracts?

4                And what we know is that the team that

5    is in place now -- and keep in mind, it could be a

6    very different team tomorrow -- but the one that's in

7    place now is the one that was responsible for the

8    history of defaults by RTC in the performance of its

9    contracts, not just with my client, the Allied

10   entities, but Peoria and other landfills as well.

11               And, you know, some fairly

12   significant, from my point of view, environmental

13   noncompliances, including -- we saw one of them.  I

14   think it was our -- I can't remember which exhibit it

15   was, but having to do with the methane concentration

16   at the surface of the Sangamon Landfill which was,

17   you know, 2500 parts per million instead of 500 parts

18   per million.  So the exceedance was a 400-percent

19   exceedance.

20               I think we have real question, real

21   concern, reason to doubt that Mr. Connolly and his

22   team can perform these contracts any better than they

23   have in the past.  Now, I would suggest it goes

24   further, because I think they come into the courtroom

25   understanding that -- understanding that they have

Page 240

1    got some -- they are carrying some baggage with them.

2    And so what we see is another illusion of assurance.

3    We see these contracts.

4              You know, that it's not us really.

5    We've contracted with X, Y, Z oil company to pick up

6    our waste oil.  We've contracted with Trinity

7    Consulting to perform environmental monitoring.  We

8    have contracted with whomever.  And there are a whole

9    series of them right at the start of their exhibit

10   book.

11             But you look at any one of these

12   contracts -- and I heard Your Honor pick one at

13   random, Exhibit 11 or --

14             THE COURT:  You really don't have to

15   belabor that.  I discussed -- I discussed that with

16   Mr. Jahelka at the very -- or, no, Mr. Connolly at

17   the very outset.  These are contracts that merely

18   indicate the willingness of the counter-party to

19   provide services or goods to IIT at its usual and

20   customary rate.

21             MR. BOHAN:  It's an illusion, Your

22   Honor.  That's my point.  He testifies they have

23   contracts but there's no -- it's like his testimony

24   that we have a permit at Sangamon.  That's not true.

25   Now they stipulate to that.

Page 241

1                        You know, it's an illusion.  You

2    scratch the surface and there is nothing there.

3    There is no meat there.  There is no operating permit

4    at Sangamon.  They have to apply for a permit, and

5    who knows when that will be granted.  And in the

6    first six months of this operation, if things go as

7    Mr. Connolly has suggested, they need $1.3 million.

8    Where is that money coming from and when?

9                        Your Honor, the burden is theirs.  And

10   the proof that they've offered is insufficient.  It's

11   insufficient certainly by a preponderance standard.

12   I don't know what standard it does meet.  But you'd

13   have to lower the bar pretty low, it seems to me, for

14   the testimony in this case to prove on their behalf

15   adequate assurance of future performance.

16                        THE COURT:  All right.

17                        MS. KUJACA:  I will try not to belabor

18   the points that have already been talked about.  But

19   I would like to start off by saying that I take

20   particular offense to the idea put forward by Mr.

21   Jordan that the onus was somehow upon counsel for the

22   landfills to obtain basically negative information on

23   the Greenblatt entities, that we have had two years

24   in which to dig this up and we haven't presented any

25   today, so therefore there must not be any.

Page 242

1                    Frankly, the trustee's motion to

2    assume and assign the Peoria lease has been pending

3    for months.  This trial has been rescheduled several

4    times.  IIT has had months to obtain concrete

5    financing, shore up its permit issues and obtain

6    compliance on its landfills, and it has chosen not to

7    do so.  Given that the same general parties are

8    involved in the debtor, IIT, and the party giving the

9    loan, IIT could have started this work long ago.

10                   In fact, they were contractually

11   obligated to do so.  They claim they didn't have

12   sufficient funds to fix the defaults at the various

13   landfills, but they had had, however, the money to

14   pay several workers.  I believe there was testimony

15   as to six workers, people to go to the landfill on a

16   daily basis, but apparently not to fix any of the

17   defaults while they were there.

18                   And there was testimony that Chiplease

19   makes over 150,000 per month, but they didn't choose

20   to put any funds into the entity until now.  John

21   Connolly testified that the Peoria site is making

22   $25,000 per month.

23                   But when I questioned him on the

24   stand, he said that RTC has not been paid by

25   AmerenCILCO since 2006.  Peoria doesn't know where

Page 243

1   $25,000 a month is coming from.  The gas being

2   produced is so variant right now that we don't know

3   that Ameren is getting anything.  And Ameren --

4                    THE COURT:  Mr. Connolly testified

5   that they were going to get a settlement --

6                    MS. KUJACA:  They were going to get a

7   settlement.  But he's also testified that they have

8   been getting $25,000 a month from Peoria.  Where that

9   money is coming from we have no idea.  It's just the

10  financial equivalent of a shell game.  And it is

11  exceedingly difficult for me or for anybody here to

12  actually follow the ball in that game.

13                   None of the additional indicia of

14  financial wherewithal have been produced in this

15  case, as Your Honor has pointed out.  We haven't seen

16  balance sheets.  We haven't seen income statements,

17  tax returns, financial statements, bank account

18  documentation.

19                   We haven't seen any of that.  We

20  haven't seen a listing agreement for the Old Colony

21  Building, if one actually exists.  We haven't seen

22  any agreements between Chiplease and Scattered.  All

23  we have is documentation regarding a loan from

24  insiders to insiders.

25                   One thing I actually want to bring up

Page 244

1  before I forget is that Mr. Jordan discussed energy

2  prices in relation to when it was feasible for RTC to

3  -- profitable for RTC to fund this or the Greenblatt

4  entities to come and fund RTC.  RTC was being paid

5  the retail rate up until not too long ago.  They were

6  actually making more money from the sale of energy

7  than they are now, 6.7 --

8              THE COURT:  Is that in evidence here?

9              MS. KUJACA:  No, it is not.

10             THE COURT:  Then you can't argue that.

11             MS. KUJACA:  Okay.  The testimony says

12 that approximately 75 percent of the funding may or

13 may not be from Scattered's sale of a building, a

14 partial interest in a building that is involved in

15 litigation, has been on the market for two years in a

16 bad real estate market.

17             It's just another example of various

18 contingencies in this case.  There is a whole set of

19 contingencies as to whether IIT is going to get a

20 permit; whether the agency will find that it was

21 timely; that Harry Henderson has the ability to sign

22 the document; whether it can be transferred; whether

23 they can meet the compliance issues; whether those

24 can all be cured, another set of contingencies.

25             Additionally, there is more

Page 245

1   contingencies as to whether IIT's projections are

2   correct.  As Mr. Sloan testified, he doesn't agree

3   with them.  Whether they cross-examine him and

4   confuse him and get different testimony out of him,

5   his testimony is -- his base testimony was that he

6   did not agree with them.

7               THE COURT:  I have to tell you, Ms.

8   Kujaca, I didn't find that testimony in the end

9   persuasive.  To the extent that the real question was

10  the amount of gas that would be able to be converted

11  to electricity, I think Mr. Sloan's testimony that

12  you needed two engines to deal with all the gas and a

13  flare as a backup would indicate that there is a lot

14  of gas there.

15              And, therefore, the idea that two

16  engines would not be able to produce the energy that

17  was contemplated by Mr. Connolly's pro formas is

18  probably not refuted.

19              MS. KUJACA:  Be that as it may, in the

20  Texas Health Enterprises case, 246 B.R. 832, which

21  was an Eastern District of Texas case --

22              THE COURT:  246 B.R. what?

23              MS. KUJACA:  832.

24              THE COURT:  Okay.

25              MS. KUJACA:  In this case the court

Page 246

1    found that there was no adequate assurance of future

2    performance.  The court viewed ample evidence of

3    nonperformance of duties both pre and post-petition.

4    The court found that the parties had a poor working

5    relationship and poor communication, including

6    blatant disregard of duties under the contract.

7              The historical relationship between

8    these parties impacted on the assurance of future

9    performance.  The court also found significant

10   credible evidence of Medicare and Medicaid

11   violations.

12             In that case the court discussed the

13   official comment 3 to the UCC in the 1972 edition.

14   They found that what constitutes adequate assurance

15   of future performance is to be determined by factual

16   conditions.

17             The seller must exercise good faith

18   and observe commercial standards.  Satisfaction must

19   be based upon reason and must not be arbitrary or

20   capricious.  Peoria's objection to the assumption and

21   assignment of the lease are neither arbitrary nor

22   capricious.

23             Our objections are based upon years of

24   substandard operations resulting in environmental and

25   health hazards, the failure of IIT to change the core

Page 247

1    management of the assuming entity, the failure of IIT

2    to show adequate funding, sufficient permitting, and

3    other elements necessary for a safe, compliant

4    operation of the gas-to-energy conversion system.

5                In Professional Sales Corp., 56 B.R.

6    753, which was in the District Court of the Northern

7    District of Illinois, 1985, in reversing a stay under

8    Section 105, the district court stated that upholding

9    the stay would allow the debtor to operate its

10    facilities as a hazardous waste site despite

11    noncompliance with the Resource Conservation and

12    Recovery Act.

13                The court stated, "Neither the

14    Bankruptcy Code nor RCRA is intended to promote such

15    preferential treatments for Chapter 11 debtors."  Id

16    at 764.

17                Further, the court found that the

18    bankruptcy court's order by suspending the EPA limits

19    on the debtor's future use of the property "does not

20    preserve the status quo but expands the debtor's

21    property rights beyond what they would be outside of

22    Chapter 11."  Id.

23                In this case, the debtor has had

24    rights far exceeding those of a tenant outside the

25    bankruptcy context.  In any other context this tenant

Page 248

1    would have been gone a long time ago.

2              The last case I would like to cite is

3    a Judge Schmetterer opinion.  In the 2005 case of in

4    re Repurchase Corporation, 332 B.R. 336, Judge

5    Schmetterer in the context of determining the

6    feasibility of a Chapter 11 plan, stated, "Optimistic

7    but hollow declarations from debtor's president about

8    hopes for funding did not satisfy its burden of

9    proof." Id at 343.  The debtor's president in this

10   case was, of course, Leon Greenblatt, the same Leon

11   Greenblatt involved in this litigation.

12             In this case I sincerely hope that

13   optimistic but hollow declarations from the debtor's

14   president about hopes for funding again do not

15   satisfy the burden of proof.  Thanks.

16             THE COURT:  Mr. Jordan.

17             MR. JORDAN:  Thanks again, Your Honor.

18   I just want to reiterate that there were few

19   violations of NOVs, VNs, prior to the appointment of

20   the Chapter 11 trustee.  That is very clear --

21             THE COURT:  Okay.  Let me just point

22   out one thing.  One of the violations that was

23   referred to in the testimony here is the violation at

24   the Connecticut Resource Recovery Administration site

25   that was the subject of a very long trial before me,

Page 249

1    in which I heard any number of witnesses, including

2    large numbers and volumes of scientific evidence,

3    documents.

4                And the conclusion that I came to as a

5    result of that was that RTC, operating under no

6    constraints imposed by bankruptcy trustees, failed

7    substantially to comply with its obligations and as a

8    result allowed a very substantial migration of

9    methane gas from that landfill into adjoining

10   property, causing a very substantial problem for the

11   health and welfare of that community.  And so the

12   notion that there were no problems and that

13   everything went very smoothly is at the very least

14   contradicted by the evidence that I took in that

15   particular case.

16               MR. JORDAN:  I keep trying to say most

17   of the problems came after the appointment.  And I

18   keep getting the sense that everyone is hearing me

19   say all the problems.  They're in bankruptcy.  You

20   know, they have -- they had financial problems.  They

21   did -- RTC obviously had some problems because they

22   wouldn't have had an involuntary bankruptcy case

23   filed against them.

24               But the fact is that the trend -- you

25   know, clearly I wasn't involved in the CRRA case, and

Page 250

1    I have -- I am a hundred percent sure that you are a

2    hundred percent correct that there were problems and

3    that it had nothing to do with the Chapter 11

4    trustee.  I am just trying to show the progression,

5    but I am not saying that I am coming from a point of

6    zero.

7                I am saying that substantially the

8    problems -- because there is a large part, unlike

9    everyone else who might believe this, is that I have

10   a strong identification with Mr. Connolly and these

11   fellows who are working there and they are being

12   castigated on a personal basis for somehow being

13   indifferent or uncaring or incompetent.  My argument

14   is that they are competent and they are caring -- and

15   that they can do the job if they have the resources.

16               Now, we have already gone over the

17   source of the resources, but these people can perform

18   given the opportunity.  And I don't think there is

19   any basis -- and I know that Your Honor has seen

20   these people over the years.

21               But, you know, the plan that is put

22   up, the fact that, you know, they had the ability to

23   go to people and say we know you have contracts with

24   Altorfer and Moser, but we want to put something in

25   front of the court just to make sure that they know

Page 251

1    that you're committed, and these people all stepped

2    up and signed these agreements and said, yeah, we're

3    going to continue to do business with you.

4              That's an indication of people in

5    their community that are willing to do business with

6    them.  And, you know, there are people who will say,

7    no, we are not going to do business with you.  You

8    know, we don't like the way you do business.  We're

9    not going to do it.

10             These people, solid -- Trinity

11   Consultants, Firm Green Energy, the company that

12   they're talking to about putting together the energy

13   conversion plant, Altorfer, who is working right now

14   contrary to what Ms. Kujaca said.

15             The evidence is that Altorfer is there

16   right now.  Maybe not literally, since we're after

17   6:00 o'clock in the evening, but figuratively, fixing

18   the second engine to put it on.  These are people who

19   are working with Mr. Connolly and Mr. Fortelka and

20   the other people there.

21             And now getting back to where we are.

22   The idea that Mr -- you know, that the straw man that

23   Mr. Bohan puts up that Mr. Connolly can be removed,

24   for God's sake, he's been there from '95 forward.

25   Mr. Jahelka testified he had no plans in changing

Page 252

1    him.

2              There is no reason to think that if he

3    has been there for 13 years that he's suddenly going

4    to be gone tomorrow, or Mr. Fortelka who has been

5    there I think 12 years, or any of the other people,

6    Watson, Weeks, Vallis, Johnson, who have been there

7    over ten years.  I mean, these people are -- and it

8    is more probable than not that that cord is there and

9    that they will do the job.  And they even have, as

10   Mr. Connolly testified, Mr. Johnson doing business

11   development.

12              THE COURT:  Go ahead.

13              MR. JORDAN:  They have Mr. Johnson

14   doing business development work.  They don't have any

15   plans to just throw this thing to the wind.  That was

16   the testimony of Mr. Connolly as to what Mr. Johnson

17   was doing.  In addition to his other items, he was

18   doing business development.

19              This idea that Mr. Bohan says well,

20   isn't it a fact that you could redesignate to confuse

21   Mr. Jahelka, you know, Mr. Jahelka testified and --

22              THE COURT:  Okay.  You know, I don't

23   want to spend a lot more time on this.  Let me tell

24   you what the problem is.  Whatever Mr. Connolly's

25   situation is, he can be removed.  And his payment,

Page 253

1    his current employment is entirely in the hands of

2    the very people who would be funding the loans that

3    he needs to operate this business.

4              If Mr. Greenblatt says to Mr.

5    Connolly, I have decided I am not going to fund this

6    $3 million loan, Mr. Greenblatt is not going to be

7    sued by Mr. Connolly.  If Mr. Connolly were to

8    institute a lawsuit against Mr. Greenblatt, Mr.

9    Greenblatt could remove Mr. Connolly from his

10   position as trustee.  It's that simple.  There is no

11   availability of any effective remedy.

12             Let's just come to this point, because

13   I don't think this matter needs to go any further.

14   Any time there is a need to provide adequate

15   assurance of future performance, the first thing

16   that's done is to show the financial ability of the

17   proposed counter-party to provide the services that

18   are necessary and to provide the assurance that that

19   financial ability will continue into the future.

20             So what does one typically do?  One

21   looks at the operating history of the entity, one

22   looks at its balance sheet, one looks for any

23   guarantee of performance that can be offered, and

24   those things provide some kind of adequate assurance

25   that performance is going to be able to be provided.

Page 254

1                     What do we have here?  We have an

2    entity that's never done business before, that has

3    provided no balance sheet, no income statement, that

4    acknowledges a need to have substantial funds

5    available in the near future.

6                     And the only evidence that it has that

7    those funds will be available is a contract

8    negotiated with the same people on both sides of the

9    contract, and with, as I've just outlined, no ability

10   of the entity who is going to be providing the

11   services to sue for completion of the agreement

12   that's going to provide the financing.

13                    The only assurance that we have that

14   this will be done is the statement by Messrs. Jahelka

15   and Greenblatt that they intend to do it.  There is

16   nothing legally enforceable that would require that

17   to be done.

18                    MR. JORDAN:  Well, first off, Your

19   Honor, you can make your order conditional upon that.

20   But, second, I think if we looked at the case of in

21   re Casual Male Corp., 120 B.R -- and you know what, I

22   have the cite here because -- it's 120 B.R. 256 at

23   265, in which the court said that -- to paraphrase,

24   because I just had this as a paraphrase -- that

25   because the trust in this case, the corporation in

Page 255

1    that case, is in essence a newly-formed entity, its

2    operating performance is obviously nonexistent.  But

3    contrary to the counter-parties' assertions, this

4    does not prevent assumption of the contract.

5                   As noted by the court in that case,

6    any judgment concerning the strength of the newly

7    formed entity's operating performance necessarily

8    depends upon the business experience of the chief

9    executive officer.

10                   All right.  And I think that with all

11   due respect, I don't know that you can really

12   question Mr. Connolly's abilities as a chief

13   executive officer.  Now, in that case I will say --

14                   THE COURT:  Let me have the citation

15   of the Casual Male case.  Let me have the citation

16   again.

17                   MR. JORDAN:  It's 120 B.R. 256.  In

18   that case the chief executive officer was also the

19   owner.  But I don't know that that makes a

20   substantial difference, particularly if Your Honor

21   puts in conditions regarding the ability to provide

22   funding.

23                   And I would note, Your Honor, that in

24   the recitals to the loan agreement, it does indicate

25   that the loan is for these four sites.  And contrary

Page 256

1    to Mr. Bohan's assertion with regard to the amount of

2    money and the -- to be determined between the trust

3    and the lenders, that was a section that we put in

4    front of Mr. Greenblatt, so it was highlighted to

5    you, in that 75 percent of the monies go to the

6    lenders and 25 percent of it goes to IIT.

7                    And it's set up to prevent default

8    because it's based -- repayment out of revenues,

9    rather than have a fixed payment on a monthly basis

10   which could be susceptible to default.  They're

11   saying that they are trying to lessen --

12                   THE COURT:  Yes.  I am not concerned

13   about that provision.  I am concerned about the

14   ability of the trust to enforce the loan agreement

15   against the parties who are providing the only source

16   of payment for the obligations that are going to be

17   assumed and assigned.

18                   And what I am telling you is that

19   based on everything I've heard, I have come to the

20   conclusion that that assurance is not present here,

21   that we have an entity with no operating history and

22   with no enforceable obligation to obtain the funds

23   that it needs to comply with these agreements.

24                   Now, you're telling me that I could

25   impose conditions that might change that

Page 257

1    circumstance.  That's not the obligation of the

2    court.  As I said earlier --

3                    MR. JORDAN:  I did not say you're

4    obligated --

5                    THE COURT:  -- the obligation of the

6    court is to look at the agreement -- excuse me, to

7    look at the circumstances that are presented by the

8    proposed assignee and make a determination as to

9    whether those circumstances as presented to the court

10   provide adequate assurance of future performance.

11   And what I have found here is that the circumstances

12   do not.

13                   The $3 million loan is absolutely

14   essential, based on all the testimony I have heard,

15   for the performance of these contracts, but there is

16   no effective legal enforcement that the trust would

17   have to obtain payment of that -- of those loan

18   proceeds.  I will also add that I don't believe there

19   is sufficient evidence to show the ability of the

20   proposed lenders to make those loan payments.

21                   I would have expected in order to be

22   persuaded of that to see balance sheets, income

23   statements and other evidence beyond the oral

24   testimony of the principals of those entities, but

25   that's not the principal problem.

Page 258

 1                     The principal problem is that those

 2      entities, their principals, Mr. Jahelka and Mr.

 3      Greenblatt, could determine at any point that they

 4      chose not to fund the loan, and Mr. Connolly would

 5      have no effective means of enforcing the obligation.

 6      And the counter-parties would have even less of an

 7      opportunity to enforce the obligation because they

 8      are given no rights under any of these agreements.

 9                     You may be right that there might be

10      some implicit right as a third-party beneficiary, but

11      I think that would be a very slender read on which to

12      base a finding of adequate assurance of future

13      performance.

14                     So on that basis, that the funds

15      necessary to allow for an effective performance under

16      the contract sought to be assumed here cannot be

17      given without some assurance of an ability to enforce

18      the loan agreement that is the only basis for the

19      funds necessary to perform, I have to find that the

20      trustee, through you, has not met its burden, his

21      burden, in the matter presently before the court.

22      And, therefore, I will deny the motion.

23                     Now, if you want to come up with some

24      other arrangement, it may be that you have the

25      opportunity to do that, and you can present that to

Page 259

1    the court.  But there has not been a showing of

2    adequate assurance that would enable me to allow the

3    assignment that's being proposed now.

4                   MR. JORDAN:  You know what, Your

5    Honor, I appreciate it.  And perhaps what we'll do is

6    come up with a different arrangement and file a

7    motion to reconsider, and then Your Honor can

8    determine what --

9                   THE COURT:  Well, it wouldn't be a

10   motion to reconsider.  It would be a motion to

11   consider a new arrangement.

12                  MR. JORDAN:  That's fine.

13                  THE COURT:  And if you want to do

14   that, and if that's timely, I will certainly consider

15   that.  But this arrangement, for the reasons I have

16   just given, does not meet the requirements of that.

17                  MR. JORDAN:  Because of the

18   indirectness in particular?

19                  THE COURT:  Well, and, you know, I

20   could go through in more detail.  I do believe --

21                  MR. JORDAN:  I would actually much

22   prefer that you go into great detail --

23                  THE COURT:  Well, I have already

24   outlined some of --

25                  MR. JORDAN:  -- so we don't do this

Page 260

1    three or four times.

2              THE COURT:  The fact is I believe this

3    is not a business trust.  I believe this is a common

4    law trust, and that as a common law trust it cannot

5    be brought into an involuntary bankruptcy, which is

6    just another indication that the counter-parties to

7    these agreements would not have an effective way of

8    enforcing any right that the trust might have to

9    payment of these loans.

10             I am concerned that there is nothing

11   in the loan agreement that requires the funds that

12   are required to be loaned to be used for the purposes

13   of performance under these particular landfill gas

14   conversion agreements.

15             And I do have some concern about the

16   permit situation.  I believe, based upon Mr. Reed's

17   testimony, that the problems that exist now are

18   likely to be able to be fixed.  But we didn't have an

19   opportunity to thoroughly explore the statutory

20   provisions.

21             I don't know that the provision in the

22   sub (i) section that Mr. Bohan cited is not

23   applicable.  And it may be that a history of

24   violations, even if they have not resulted in

25   adjudications, might be a problem here.  I would have

Page 261

1    to do research to find that out.

2                    But the principle and the basis on

3    which I am rendering my decision today is that the

4    counter-parties to this contract, these contracts,

5    have no ability to assure that the funds necessary

6    for performance by the proposed assignee will

7    actually be made available.

8                    And if another provision -- another

9    arrangement were submitted to the court that gave

10   those kinds of assurances, it is possible that this

11   transaction, these transactions, could be approved.

12                   MR. JORDAN:  Thank you.

13                   (Which were all the proceedings had in

14                   the above-entitled cause, February 13,

15                   2008, 9:30 a.m.)

16   I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
17   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.

18

19

20

21

22

23

24

25

**A**

**abbreviate** 67:18
**abilities** 255:12
**ability** 17:14 45:21
    65:1 121:10,11
    161:21,24 162:6
    187:3 189:3,10
    190:14,20,22 191:6,9
    196:25 197:6 202:2,5
    209:12 210:17 216:12
    221:1 223:24 224:1
    226:24 229:1 244:21
    250:22 253:16,19
    254:9 255:21 256:14
    257:19 258:17 261:5
**able** 15:13 74:7 78:13
    78:17,19,21 80:10
    90:10 95:3 98:22
    109:14 118:23 119:20
    122:1 149:8 162:10
    162:13 163:3,9
    166:20 179:18 206:3
    206:12,21 208:15,15
    245:10,16 253:25
    260:18
**above-entitled** 261:14
**absolute** 220:19
**absolutely** 21:12
    228:10,11 229:7
    235:17 257:13
**absolve** 231:9
**academic** 4:15,22
**accept** 7:14 50:18
    136:22 144:7 150:25
    151:23 208:16
**acceptable** 14:11
    181:10
**accepted** 144:4 154:16
    214:6
**accepts** 170:1
**access** 83:16 109:16
**account** 48:7 199:15,16
    199:18 232:20,22
    243:17
**accumulate** 15:19
**accurate** 101:16,18,24
    206:19 261:16
**accused** 48:6
**achieve** 84:18
**acknowledge** 206:23
**acknowledges** 254:4
**acquire** 184:6
**acre** 59:19
**act** 66:17,20 67:4,4
    79:8,15 96:1 101:8
    108:2 110:9 131:3
    136:2 139:2 155:20
    164:23 173:23 174:2
    181:24 186:17 191:2
    218:4 247:12
**acting** 43:12

**action** 6:3 7:8 9:6
    137:23 186:18 221:24
**actions** 17:15 115:19
    115:20
**active** 58:15 188:4
**activities** 129:15
**activity** 180:10 182:10
    183:10
**actual** 90:13 118:17
    121:1 122:12 141:24
**AD** 67:17
**add** 100:22 257:18
**added** 106:17 137:22
**adding** 95:14
**addition** 114:13 116:14
    118:21 184:11 188:15
    192:13 199:12 204:12
    207:8 208:22 211:24
    218:12 223:11 252:17
**additional** 22:1 84:17
    96:22 143:14 144:15
    152:17 153:5 171:10
    171:13 172:21 183:22
    243:13
**Additionally** 65:3
    244:25
**address** 129:11 159:6
    160:7 170:2 179:10
    217:9
**addressed** 156:7
    198:11
**addressing** 134:24
**adds** 189:7
**adequate** 6:14 9:2
    160:17 161:25 162:22
    162:22 163:6 179:21
    199:10,11,21,24
    200:7,7,13,15 219:23
    220:4,18,21 225:5
    230:20 237:13 241:15
    246:1,14 247:2
    253:14,24 257:10
    258:12 259:2
**adjacent** 137:15
**adjoining** 249:9
**adjudicated** 174:18
**adjudication** 174:15,19
    174:24
**adjudications** 174:1
    175:2 217:17 218:3,7
    260:25
**administer** 184:20
**Administration** 248:24
**administrative** 118:4
    126:25 129:1,17,19
    130:7 133:5 164:1
    166:6
**administratively**
    140:15
**Administrator** 100:13
    100:17
**admissibility** 118:1

120:1
**admissible** 114:8
    117:24 120:6 121:15
    122:5
**admission** 116:21
    117:10,19 119:1
    121:19 208:4
**admit** 122:14
**admits** 233:8
**admitted** 114:24
    117:15 121:17 207:2
**adopt** 225:1
**advance** 18:21 134:15
    195:2 205:12 219:5
**advances** 22:1
**advancing** 20:4 205:9
**advice** 229:20
**advising** 23:17
**advisory** 4:24
**affiliates** 48:1
**afternoon** 167:7
**agency** 45:24 56:23
    57:12 71:8 72:14,22
    73:14 74:21 75:15
    115:5 116:7,9 120:13
    121:25 123:13 133:4
    139:7,10 144:16
    158:4 168:17,23
    169:23 173:3 174:1
    216:13 218:2,15
    221:24 227:11 244:20
**agency's** 222:7 227:4
**agent** 36:21
**aggregate** 37:24
**ago** 11:16 15:23 32:23
    33:7 73:2 230:21
    231:17 232:19 234:24
    242:9 244:5 248:1
**agree** 7:11 8:4 15:5
    16:15 19:9 24:3,19
    25:8 81:17 82:15
    84:14 85:12 86:23
    103:2 228:7 245:2
**agreeable** 9:6 11:11
**agreed** 15:4 25:6
    146:21
**agreement** 8:18 14:24
    24:4,12,13,17,20 25:4
    25:7,15,24 28:3,4
    51:13,23 52:6 53:5,8
    57:21,22,24 58:5,9
    71:19 91:16,18 107:7
    172:3 179:12,16
    182:19 183:4,24
    184:3,22 185:15
    186:2,11,13 189:25
    191:19 192:9 194:14
    194:15 196:5 197:5,7
    197:8 198:6,24 199:4
    199:17,19 201:6,9,11
    222:24 223:12 231:5
    235:11,15,18 236:19

236:21,21,22 243:20
    254:11 255:24 256:14
    257:6 258:18 260:11
**agreements** 6:18 15:3
    162:13 179:19 184:13
    186:24 189:13 190:4
    191:13,14,25 192:15
    193:16 200:25 219:2
    222:23 243:22 251:2
    256:23 258:8 260:7
    260:14
**agrees** 102:22
**agricultural** 55:11
**ahead** 10:12 49:15 53:3
    90:25 167:4 203:21
    252:12
**aided** 197:19
**air** 56:22 62:10 66:17
    66:18,20 67:4 96:1
    101:8 108:2 110:9
    123:22,24 124:11
    125:9 131:3 238:24
**alive** 59:3
**allegations** 114:17
    116:11,12 119:7,11
**alleged** 185:4
**alleviate** 44:14
**Allied** 1:13 112:5,15,22
    112:23,24 113:9
    121:9 157:21 158:22
    162:4 163:9 173:7,10
    183:19 190:16,23
    192:25 194:11 199:2
    201:9,18 204:24,25
    207:16 222:19 223:6
    224:8 232:13 239:9
**Allied's** 71:25 224:12
**Allied/Springfield**
    156:20
**allow** 19:9,13 117:10
    135:5 136:19 175:19
    187:5 247:9 258:15
    259:2
**allowance** 29:21
**allowed** 114:5 170:15
    181:11 208:16 249:8
**allowing** 184:3
**allows** 134:4 138:25
    181:25 184:6,12
**alternative** 43:4 203:18
**alternatives** 199:23
**Altorfer** 175:16 250:24
    251:13,15
**ameliorated** 214:5
**amenable** 5:25 6:15
    185:16,16,22
**amended** 50:21
**amendment** 127:1
    129:1
**Ameren** 86:18 243:3,3
**AmerenCILCO** 242:25
**Ameren's** 90:7

**American** 199:2
**AmJur** 197:20
**amount** 14:18 15:5,5
    21:23 24:3,18 25:8
    35:4 37:23,25 45:4
    51:6 79:8 87:12,13,18
    89:5,9 91:14 95:14
    96:16 102:19 103:4
    104:15 147:18 179:14
    195:5 205:4 206:2,19
    245:10 256:1
**amounts** 210:18
**ample** 246:2
**Amy** 1:18 261:16
**analysis** 102:5
**Anchor** 104:5,14
**and/or** 46:3 57:23
**annual** 58:5,8 62:3,4
**answer** 26:4 31:22,25
    32:3,5 33:11,22 34:10
    34:14 47:4 72:25
    82:13 94:9,25 95:3
    99:21 108:5 128:10
    154:12 157:6 172:8
    173:18 174:6,22
    198:12 202:24 214:24
    229:10,18 238:19
**answered** 132:1 145:18
    212:14
**answering** 113:14
**answers** 31:18 32:11
**anticipate** 21:4 23:13
**anticipates** 184:17
**anticipating** 204:16
**anybody** 3:12 146:17
    173:2 175:13,19
    243:11
**anyplace** 206:21
**anyway** 63:11 172:15
**apologize** 16:10 49:6
    94:7 100:6 101:3
    141:21 142:16 161:3
**APOLSTOLIDES**
    224:18,22 225:3,10
**Apostolides** 1:10 3:5,6
    3:11 4:11 9:12,24
    38:13 39:11 224:20
    224:21
**apparent** 209:20
    219:22
**apparently** 50:7 52:1
    53:2,10 95:8 238:2
    242:16
**appear** 70:4 77:3
    120:16,22 122:12
    148:8
**appearances** 1:8 69:2
**appears** 76:5 77:8
    85:24 89:17 131:3
    147:19 160:3
**apples** 161:18
**applicable** 46:5 94:22

124:23 129:10 133:18
173:24 228:4 260:23
**applicant** 127:4 130:13
132:8 133:2 149:8
167:10 171:5,5
172:10,13 174:2
218:4
**applicant's** 158:12
159:21 164:15,18
**application** 56:25
57:11 68:14 77:4,14
77:15,18,19 111:14
111:19 113:5,6
126:21 127:5,13,16
129:9,12 132:17
133:3,4,8,16 137:4
138:8 139:4,6,15,16
139:25 140:14 141:4
141:5 142:7,22,25
143:3,8,10,16,22
144:4,8,13 145:9,11
146:11 147:14 148:16
148:18,20 149:9,14
149:14 150:11,19
151:1,7,19 152:9,23
153:14,20,25 154:1
157:17 158:10 159:20
160:24 164:14,20
165:21 168:10,11,13
168:24 169:3,6
170:13,15,22,23
171:1,24 177:9,9
**applications** 58:16
60:24 77:24 126:19
126:20,23,24 144:7
154:22 157:7,13
158:2,3 170:7 172:14
173:25 216:19 218:2
218:11
**applied** 132:6 236:13
**applies** 216:18 219:21
226:23
**apply** 161:17 233:13
235:18 241:4
**applying** 129:9 183:3
**appointed** 3:19 37:4
209:19,23 210:21
**appointment** 92:24
212:19 213:13 214:12
248:19 249:17
**appreciate** 156:13
259:5
**approach** 49:13 84:15
174:7
**appropriate** 54:1 58:17
74:10 155:15 163:21
169:3 222:10 225:14
229:23
**appropriately** 122:1
214:8
**approvable** 130:9
165:25 166:12

**approval** 19:14 28:3
61:5 134:11 173:16
199:5
**approvals** 160:14 223:9
**approve** 77:15,19,23
**approved** 19:12 44:24
77:17 111:13 153:18
158:4 170:22,23
192:10 261:11
**approximately** 12:21
14:14 35:24 59:18
60:10 84:4 244:12
**Aquila** 19:7
**arbitrary** 246:19,21
**area** 110:11
**areas** 111:2 220:7
**argue** 120:1 178:22,25
216:1 224:11 234:15
244:10
**arguing** 116:19,21,23
**argument** 118:5 119:23
119:24 170:17 174:12
178:21,23 186:23,24
224:12 225:2 228:18
232:1,6 250:13
**arguments** 225:8
**Arizona** 117:13
**arose** 69:11
**arrangement** 258:24
259:6,11,15 261:9
**arrangements** 78:21
**art** 220:22
**article** 117:13,17,20
**articles** 118:16
**ascribing** 93:5
**aside** 16:25 176:5 223:2
**asked** 26:4 43:10 47:10
47:15 50:21 65:17
107:3 108:16 145:15
145:19 156:23 202:19
203:2,3 214:16,17,22
226:10,20 231:14,17
234:25 238:8,12,25
**asking** 38:22,24,24
41:11,19 51:16,18
110:1 113:15 146:14
160:6 172:5 173:17
175:2 185:11 213:3
220:7 233:24 237:14
**asserted** 64:25 74:1
114:5,25 196:8
**asserting** 122:19
**assertion** 256:1
**assertions** 255:3
**assess** 78:14 79:14,16
**assessed** 103:22,25
109:7
**assessment** 43:17,20
61:12 81:17 95:4
**assessments** 61:10
**asset** 28:16
**assets** 6:19 7:3,4,14

11:13 12:22 18:17
28:9,12,13,17,23
29:19 34:2,5,13 48:2
48:6 183:15 187:21
191:18 192:6,7,13,20
192:24 193:2,2
198:16 201:4 202:23
213:11,13 230:16
233:9 234:17
**assign** 124:17 133:13
203:8,14 242:2
**assignable** 7:12 183:21
203:10
**assigned** 22:19 23:12
179:16 192:9,10
219:8 256:17
**assignee** 40:14 41:2,8
41:16 183:23 199:9
257:8 261:6
**assignment** 9:7,8 50:18
187:5 203:11 208:17
222:24 246:21 259:3
**assist** 70:19
**assisted** 56:21 61:18,19
71:18
**Associates** 56:11,12,17
89:15 91:19 106:17
**assuage** 203:19
**assume** 9:16 80:10
162:14 186:9 212:4
235:1,1 242:2
**assumed** 6:18 85:24
105:11 163:7 179:16
192:1 194:11 200:25
219:7 256:17 258:16
**assuming** 7:15 9:7
105:5 195:20 204:3
233:13 237:2 247:1
**assumption** 9:7 86:10
86:11 187:5 203:11
246:20 255:4
**assumptions** 85:12
86:24 104:13,16
105:1,16 206:2
**assurance** 6:14 9:2
57:1,6 160:17 161:25
162:22 163:6 179:21
195:25 196:20 197:2
197:5,10 199:10,12
199:21,24 200:7,9,10
200:13,15,19 219:23
220:3,18,21 225:5
230:20 237:14 240:2
241:15 246:1,8,14
253:15,18,24 254:13
256:20 257:10 258:12
258:17 259:2
**assurances** 261:10
**assure** 179:15 203:23
261:5
**assured** 200:22
**attached** 140:24 141:3

170:10,18
**attachment** 120:14
**attempt** 7:2
**attention** 70:2
**attest** 215:14
**attorney** 42:4 130:16
**August** 15:25 76:6
192:16
**Aurora** 182:5
**authorities** 117:18
121:2
**authority** 115:22
117:22 151:5 171:9
184:19 185:21 197:14
227:4
**authorization** 214:20
**authorized** 131:22
151:24 152:5 155:5,6
155:9 168:15
**authorizing** 170:6,12
192:17,19
**availability** 206:19
253:11
**available** 7:16 14:18,19
84:1 96:22 102:9,20
103:5 104:11 105:17
120:11 183:17 192:20
194:1,5 196:1 197:3
200:23 202:15 204:4
205:7,8 235:17 237:8
237:10 238:11 254:5
254:7 261:7
**avenues** 62:10 63:5
128:25
**average** 78:7 86:2
**avoid** 61:7 212:18
**aware** 13:2 41:22,22
44:6,8 45:18 46:2,17
50:7,9 71:1 82:5
103:20,24 125:21,22
127:18,20 145:3
151:8,13,21 221:19
**a.m** 1:4 261:15

**B**

**b** 1:3 3:3 94:19 115:5
261:16
**bachelor** 55:9
**bachelor's** 123:18
**back** 43:22 57:22 67:14
68:5 89:8 95:23 96:9
96:13 126:4 135:7
141:16 143:18 148:24
149:24 152:19 166:1
166:13 178:23 194:22
209:8 213:16 229:5
230:1 251:21
**backed** 102:8
**background** 55:5
123:15,16
**backgrounds** 232:14
**backs** 81:2

**backup** 245:13
**backwards** 159:5
**back-stopped** 223:10
**back-up** 96:12,14,23
**bad** 244:16
**baggage** 240:1
**Bakowski** 125:1
**balance** 26:21 29:15
107:25 193:4 232:22
233:1 243:16 253:22
254:3 257:22
**ball** 253:10
**Banco** 12:8 18:20 30:16
31:1 32:6,7,16,19,19
32:24 33:1,2 35:7,9
35:15 209:25
**bank** 34:22 182:5,17
185:21 232:19,22
243:17
**bankrupt** 37:9
**bankruptcies** 6:8
**bankruptcy** 1:1 3:25
4:4 5:25 6:5,10 7:21
29:3 37:6,14 50:11
68:22 69:11,12,17
80:14 91:4,21 93:6
103:15 127:18,22
128:12 180:13,24
181:2,4 182:6,14
185:17,23 186:3
193:22,23,23 197:21
219:19 220:14 247:14
247:18,25 249:6,19
249:22 260:5
**bar** 241:13
**bargain** 183:25 222:20
221:21
**base** 17:13 22:15 80:13
102:4 224:4 245:5
258:12
**based** 16:18 64:22
80:13 85:24 87:18
105:19 110:5 120:10
122:7,9,17 134:23
144:9 156:24 167:18
170:19 186:21 195:9
195:12 204:23 207:7
208:1 216:18 219:25
226:25 246:19,23
256:8,19 257:14
260:16
**basically** 57:22 58:5
69:15 71:22 74:13,20
81:2 84:19 86:21
87:24 88:25 89:8,18
89:21 90:8 104:12
140:13 241:22
**basis** 65:14 101:16
119:12 121:18 156:22
202:24 212:9 242:16
250:12,19 256:9
258:14,18 261:2

**bat** 238:16
**batch** 158:3
**Bates** 150:3 152:16,19
**BCD** 182:15
**bear** 185:23 229:8
**bearing** 62:18
**bears** 196:6
**beer** 231:2
**beg** 31:22
**beginning** 59:20 99:14
  127:19 190:25 229:5
**behalf** 3:13 21:10 22:20
  24:23,25 27:23,25
  31:14 42:7,9,11 60:20
  77:20 140:6 148:9
  151:11,15,24 173:4
  222:14 224:20 229:13
  229:15 233:7 241:14
**belabor** 240:15 241:17
**belief** 52:25
**believe** 22:9 24:22 25:7
  27:11 29:17,25 32:5
  39:5,18 40:5,8 45:11
  45:25 47:13,19 52:15
  53:9 56:23 57:12
  59:13 60:3,5,12 65:17
  65:25 67:12 68:13,19
  71:2 77:1 80:20
  82:22 83:23 87:2
  91:14 93:14,22 96:11
  97:3 98:4 102:8
  107:22,23,23 114:8
  114:11,12 119:16
  122:2 129:24 141:25
  162:20,25 172:1
  178:11 181:7 192:6
  192:21 212:9 221:11
  225:25 226:5 228:11
  237:3 242:14 250:9
  257:18 259:20 260:2
  260:3,16
**beneficial** 198:1
**beneficiaries** 16:5
  41:12 186:12 187:12
  190:3,5 194:25 199:3
**beneficiary** 11:3 15:22
  16:3 21:2 36:17,18,24
  182:24 187:7 189:23
  189:24 201:10 258:10
**benefit** 8:12 41:5
  186:25,25 222:20
**benefits** 107:13
**best** 72:7 73:5 87:14
  89:17 112:13 148:7
  189:12,22
**better** 193:15 199:15
  199:20 222:21 239:22
**beyond** 29:5,22 105:13
  134:17 160:5 190:8
  247:21 257:23
**bidder** 84:4
**bids** 84:3

**billion** 187:25
**bills** 19:2,3,4
**binder** 169:15
**bit** 139:5 180:2 199:7
**blame** 215:2,3
**blamed** 120:4 214:22
**blatant** 246:6
**block** 150:12
**blockage** 98:10
**Bloomington** 20:8
  40:15 204:22 207:19
  207:21 223:15 224:6
**board** 58:8,17 182:22
  234:9,10,11
**bodies** 109:14
**body** 109:13
**Bohan** 1:13 18:10
  23:22 25:10 26:15,17
  31:8 32:10,21 33:24
  35:12 37:16 38:16,18
  39:20 44:25 47:3,8,9
  48:15,18 54:18 90:22
  90:24 112:7 113:13
  113:24 114:7,21
  115:1 119:16 122:16
  155:25 156:1,9 157:2
  157:23 158:7,9,17,25
  159:2,6,19 160:11
  161:1,3 163:19 164:7
  164:9,13 165:3
  176:12,13,19 178:24
  179:5 225:13,20,25
  226:4,9,15,25 227:21
  227:25 228:10,17
  232:10 235:23 236:1
  236:4,16 240:21
  251:23 252:19 260:22
**Bohan's** 256:1
**bolstered** 218:20
**book** 240:10
**borrower** 49:1
**bottom** 90:9
**boxes** 152:24
**boy** 184:14
**branch** 84:13
**break** 63:11,12
**brief** 5:19 63:13 116:2
  116:25 117:1,6
  122:24 165:5 179:7
  219:12
**briefly** 55:4 123:14
  132:19
**bright** 10:8
**bring** 81:6,8 82:22 83:8
  93:20 96:8 102:16
  106:19 121:10 181:21
  186:2,18 243:25
**bringing** 93:24
**broad** 69:22 184:19
**brought** 7:20 190:20
  191:4 260:5
**Brown** 59:22

**budget** 83:20 95:9,12
  218:24
**building** 32:15 60:13
  78:12,14,20,22 81:11
  188:19 233:10 235:2
  243:21 244:13,14
**built** 21:22
**bunch** 158:2
**burden** 8:7 160:15
  161:21,22 162:12
  179:2 208:20 213:3
  220:11,12 232:3,7
  237:17 241:9 248:8
  248:15 258:20,21
**bureau** 56:24 62:22
  92:5,10 123:22,23
  124:20 126:7
**burn** 96:22
**business** 5:9 11:24
  20:15 21:7,25 30:11
  31:21,24 36:10 48:10
  55:18 65:4 113:6
  114:13 180:3,5,7,8,12
  180:12,16 181:1,2,3
  181:12 182:7,8,9,13
  182:20,21 183:10,10
  184:4,7,10,16,16,18
  184:22 185:3,4,4,8,20
  191:16 194:1 197:23
  198:5,8 201:3 202:24
  221:1 229:6 230:15
  234:4 235:13 236:8
  251:3,5,7,8 252:10,14
  252:18 253:3 254:2
  255:8 260:3
**businesses** 233:23
**B.R** 182:5,16 219:14,18
  220:13,15 245:20,22
  247:5 248:4 254:21
  254:22 255:17

_____

**C**

**c** 99:20 115:17
**CAAPP** 61:15 62:2,10
  62:25 63:2 65:19
  66:15,16,23,25 67:2
  67:24,25 68:10 74:5
  74:22 77:4,14 79:5
  96:1 111:4,8,12 113:2
  113:4,5 122:20
  124:11,12,15,22
  125:17 126:19 128:15
  128:21 129:23 131:7
  131:9,21 132:3,23
  133:23,25 138:17
  139:8,10,25 142:7
  147:14 155:2 157:18
  161:4 163:3 164:14
  167:11 176:6 177:10
  226:14,23 227:5,8,20
**calculate** 89:8
**calendar** 27:7

**call** 5:18 54:2,15 63:12
  109:14 110:24 123:1
  126:1,22 133:5,14
  148:8 159:12 171:11
  171:12 176:20 177:1
  213:5
**called** 3:21 7:15 54:1
  208:7 213:1 236:21
**calling** 61:14 122:21
**calls** 93:20 94:12 96:8
  163:20
**cap** 44:15,16
**capabilities** 164:24
**capable** 45:9,12,25
  87:11
**capacity** 5:24 6:2 70:4
  81:8 84:1 85:25 86:7
  86:12 94:22 96:4
  103:1 186:14 188:14
**capital** 191:13 197:24
  209:15,16 224:1
**capricious** 246:20,22
**card** 148:5,8,11 177:23
  178:8
**care** 48:14 58:13 83:18
  194:3
**carelessness** 227:15
**caring** 250:14
**carried** 74:19
**carry** 182:21 185:5
**carrying** 182:9 184:18
  240:1
**case** 3:14,18 7:21 8:9
  12:7 31:10 44:22
  47:12 50:8 54:1
  68:22 69:12 91:4,21
  95:24 96:3 103:15
  121:16 138:10 144:24
  169:7 181:19 182:4
  182:17 185:21 190:6
  190:25 193:22,23,23
  198:2 212:18 213:6
  213:17 220:1,10,13
  220:14 222:2 241:14
  243:15 244:18 245:20
  245:21,25 246:12
  247:23 248:2,3,10,12
  249:15,22,25 254:20
  254:25 255:1,5,13,15
  255:18
**cases** 14:5 115:8 181:18
  181:18,18,23 198:3
**cash** 15:7,10,19 16:17
  16:18 27:2 28:25
  35:3,4,25 36:4,4
  189:2 195:8,9 196:17
  202:6,22 210:18,22
  213:12 237:8
**cast** 118:24
**castigated** 250:12
**Casual** 254:21 255:15
**catches** 74:22

**catch-all** 74:21
**catch-up** 218:18
**Caterpillar** 60:13
  213:22
**cause** 44:9 261:14,17
**caused** 44:16 92:2
  113:20
**causing** 249:10
**cents** 86:2,5
**certain** 66:24 69:8 79:7
  100:1 147:13 166:2
  214:21 230:21 231:15
**certainly** 6:24 81:21,25
  94:5 107:19 121:2
  130:4 184:14,23
  190:6 199:4 212:8
  213:15 215:23 218:24
  228:1 234:18 241:11
  259:14
**certificate** 140:10,12
**certificates** 182:25
  197:25
**certification** 97:21
**certifications** 55:19
  62:4
**certified** 146:6,10
  147:4,16,19 148:5,12
  177:11,21,24
**CERTIFY** 261:16
**challenge** 205:25 207:8
  207:17
**challenged** 207:7
  223:18,21
**challenging** 226:24
**chance** 75:24
**change** 8:8 26:8 80:12
  80:21 106:18 128:23
  128:24 129:17,20
  130:7 151:25 165:23
  166:6,23 173:7 209:6
  246:25 256:25
**changed** 133:1
**changes** 106:14 134:22
  134:25 135:1 211:16
**changing** 8:11,11
  234:23 251:25
**chapter** 6:7 14:3 18:4
  19:20 29:4,22 39:13
  39:14 47:11,17,21
  92:24 193:24 209:19
  209:20,22 210:7,13
  210:20,23 212:10,18
  212:20 213:14 214:5
  214:12,20,23 215:2,3
  215:10,15 247:15,22
  248:6,20 250:3
**charade** 231:25
**charged** 114:10 115:10
**charges** 115:2
**chart** 88:20,22
**check** 5:13,19 152:24
  225:19

checked 60:16
chemical 208:22
Chicago 1:4,20 188:20
chief 54:1 255:8,12,18
chiefly 172:22
China 211:6,11 212:5
    212:10
Chiplease 7:23 8:15
    10:23 11:1,3,13,25
    12:14,15 14:15,18,23
    15:12,21 16:2,14
    18:20 20:17,22 21:13
    21:20,25 22:23 23:12
    23:16 24:5,12,20,23
    25:5,15 26:18,21
    27:22,23 28:6,9,19
    29:2,7,10,20,24 30:13
    30:25 31:11,14 32:23
    33:3,10,14 34:2,12
    35:3,6,13,14,17,23
    36:3,16,18,24 37:17
    37:19 38:4,19,22,22
    39:2 40:13,25 41:6,13
    41:20,23 42:6,7,17,20
    43:12 50:16 51:11,23
    52:8,19,21 183:13
    186:10,12 187:9,21
    189:6,8,15,21 190:23
    191:1,20 192:9,11,11
    194:8 196:4 202:9,21
    213:10 229:12,15
    230:7,14 231:6,11
    232:5,20 234:5 235:4
    235:6 238:11,13
    242:18 243:22
Chiplease's 11:24
    22:10 23:24 28:22
    29:15 31:20 35:20
    36:14 50:22 189:3
    191:2
choose 196:6 202:19
    242:19
chose 258:4
chosen 242:6
Christmas 97:12 106:7
    106:11
Circuit 151:9,14
circumstance 43:23
    257:1
circumstances 42:24
    44:1 115:23 116:18
    118:2 119:19 138:1,3
    190:12 216:11 220:1
    231:19 257:7,9,11
citation 181:6,15
    197:20 216:23 219:16
    255:14,15
citations 220:2
cite 118:16 248:2
    254:22
cited 155:14 260:22
Citicorp 187:23 188:2

city 1:15 57:19 58:6,7
    59:21 60:5 61:6,9
    62:19 100:9,16,21
    159:10
city/county 61:19 92:8
    95:10 107:24
city/county's 60:23
civil 55:10 115:19,20
    116:4
claim 48:3 91:12
    242:11
claims 182:2
clarification 5:5 158:5
clarify 3:7 9:13 10:6
    51:19 53:19 58:18
    59:8 62:7 157:23
    165:13 167:8
Clean 66:17,20 67:4
    96:1 101:8 108:2
    110:9 124:11 131:3
cleaning 12:15,18
    28:20 96:1 202:7
clear 62:8,13 112:15
    145:7 159:17 187:10
    189:5 200:18 222:3
    226:22 248:20
clearly 249:25
clerical 133:6
clerk 3:1 49:17 63:16
    117:2 143:5 179:8
    197:20
client 119:9,9 223:9,12
    223:23 224:7 230:20
    239:9
clients 47:2 70:19
close 195:21
closed 58:11 222:7
closing 44:20
Coast 13:8
code 137:17 180:13
    247:14
cohorts 238:2
collateral 59:14
collect 7:9 74:5 84:19
collected 74:14 79:18
    89:9 96:2
collection 20:19 21:15
    44:11 45:5 57:2 60:6
    60:10 62:24 69:1,14
    69:24 70:10 73:20,21
    75:2,4,8 78:19 79:21
    83:16,18 87:1 88:12
    92:12 95:13 106:18
    120:20
collectively 234:12
collects 117:18
college 55:5
Colony 243:20
color 169:16
combination 209:11
combined 207:13
come 36:3 124:21

126:4 133:12 156:9
    165:23 166:1,13
    178:22 181:7 188:6,8
    188:12 195:10 213:6
    215:20 232:14,16
    239:24 244:4 253:12
    256:19 258:23 259:6
comes 4:19 89:24 143:4
    188:18 232:21 235:5
comfort 8:25 190:7
comfortable 9:16
comfortably 114:12
coming 4:4,6,9,11 6:12
    15:16 70:21 138:22
    158:2 189:5 202:8
    206:13 221:21 241:8
    243:1,9 250:5
comment 134:16,23
    194:20 246:13
comments 134:6,19,20
    134:21,25 168:7
Commerce 86:6
commercial 182:10
    233:9,10 246:18
commission 86:6 207:3
    207:3
commissioned 207:4
commitment 21:9
    70:21 71:19 171:3
    172:2 187:23 189:16
commitments 15:2
    218:23
committed 42:21
    231:20 251:1
committee 58:17
commodities 212:2
common 5:6,9,16,18
    6:1 137:16 180:17,19
    180:21 198:7 260:3,4
commonly 57:3
Commonwealth 19:1
communicate 58:24
communication 14:8
    246:5
communications 59:4,9
    64:21
community 249:11
    251:5
companies 24:6 28:20
    41:2 234:15
company 27:18 34:24
    39:25 59:23 60:1
    89:13 91:3 209:4
    210:22 213:10 222:25
    232:25 233:2,8 240:5
    251:11
compare 104:10
comparing 152:7
compensate 30:6
competent 250:14
complain 183:20
complaint 48:5,9 118:4

complaints 13:25
complete 133:10 135:2
    139:6 140:15 231:13
completely 46:15 190:8
    234:16
completeness 133:5,10
    140:1,10,12,12 147:7
completion 254:11
compliance 46:5 50:8
    50:16 62:4 69:1,9,13
    70:1,20,21 71:19
    76:19 79:11 80:16,21
    81:3 82:23 83:8
    84:18 94:22 96:3
    101:8 102:17,24
    108:2 116:15 118:23
    124:8 126:3 127:3
    129:3,10 130:9 139:1
    154:10 158:12 159:22
    162:24 164:16,24
    165:25 166:1,9,12,13
    166:14 169:24 171:4
    171:7,17,23 172:2,3,6
    172:18 179:15 203:23
    221:2,20 229:1 242:6
    244:23
compliant 247:3
comply 69:5 99:10,20
    99:21 121:3 179:18
    189:14 191:14 197:3
    208:15 216:12 221:3
    249:7 256:23
complying 194:9
    196:13
concentration 239:15
concentrations 74:12
    89:6
concept 180:20 182:24
    222:18
concern 6:25 68:25
    185:14 239:21 260:15
concerned 26:12 201:5
    256:12,13 260:10
concerning 20:18 61:12
    71:13 255:6
conclusion 6:12 16:19
    57:10 121:21 156:9
    249:4 256:20
concrete 242:4
condensate 69:8 98:11
    98:15,23
condition 10:8 138:15
    183:18 232:5
conditional 198:16,25
    254:19
conditioned 198:22
conditions 17:11 121:4
    183:23 199:5 246:16
    255:21 256:25
conduct 30:10 31:23
    95:4 113:6
conducted 47:21 59:20

82:20 118:14 230:15
conducting 180:10
    183:9
conference 63:12
confident 190:1,3
confirmed 192:7
    210:24 218:6
conflict 61:7
confuse 245:4 252:20
confused 204:17
confusion 142:17
Congress 44:18 45:2,5
    220:19,22
conjecture 186:6
connected 104:8
Connecticut 248:24
connection 61:22,23
connectivity 181:17
Connolly 2:10 3:8 4:3
    7:17 9:6,14 15:9 17:5
    17:18 21:5 22:14
    37:4 38:21 39:7
    42:12,14 43:6,18 44:1
    50:10 53:19 59:2
    72:23 74:16 79:25
    81:15,22 82:6 84:12
    85:19 102:22 104:8
    111:3,7 150:22 161:4
    161:12 162:9,17,20
    163:14 175:10 177:2
    177:3,5,8 178:18
    192:5,21 193:19
    194:12 204:20 207:15
    208:21 211:2 214:16
    214:25 215:7 218:12
    228:2 230:25 237:7
    238:1,1 239:21
    240:16 241:7 242:21
    243:4 250:10 251:19
    251:23 252:10,16
    253:5,7,7,9 258:4
Connolly's 17:9 38:7
    43:11 45:20 53:23
    62:17 82:11 102:3
    105:4,16 113:16
    122:22 160:13 161:8
    162:8 195:12 204:14
    205:15 208:9 218:6
    237:6 238:15 245:17
    252:24 255:12
Conservation 247:11
consider 21:25 120:5
    158:11 159:21 160:23
    164:15 174:1 218:3
    259:11,14
consideration 6:12
    40:24 120:2 217:17
    227:5 234:19
considered 66:20
    128:18 137:1,9,14
    154:9 155:18 181:2
consist 59:17

consistent 45:23 142:14
consistently 44:19
constitute 230:19
constitutes 130:12
    246:14
constraints 17:3 193:25
    249:6
construct 84:8,10
constructed 97:18,22
construction 20:23
    21:14,17 56:22 57:1,5
    97:18 113:5 137:24
    155:15 219:25 220:23
constructions 223:7
consult 124:19
Consultants 251:11
Consulting 240:7
contain 114:11 165:24
contained 65:11
containing 191:25
contains 78:22
contaminant 174:3
    218:5
contaminated 70:11
    92:16
contemplated 245:17
contend 234:15
contested 82:4
context 4:20 120:16
    157:7 247:25,25
    248:5
contiguous 67:5,6
contingencies 43:8
    244:18,19,24 245:1
contingency 42:25 43:1
    99:4
contingent 137:15
continually 44:21
continue 79:12 133:7
    140:15 251:3 253:19
continued 63:17 69:15
    93:1
continues 3:24 110:10
continuing 55:22 56:1
    82:25 83:3
contract 6:23 13:5
    41:16 60:2,6 105:17
    186:5,20 187:7,12
    197:1 235:10 246:6
    254:7,9 255:4 258:16
    261:4
contracted 240:5,6,8
contractor 56:18 61:7
    75:7 89:14
contractors 60:24 61:5
    66:5 71:20 82:21
contracts 8:16 22:18
    23:12 40:16 41:3,8,25
    42:20,22 43:5,16 44:2
    45:10,16,22 61:4
    163:7,8 184:12 187:6
    191:18 192:18,19

194:10 196:14,15
197:9 203:10,12
208:17 223:14 229:2
229:12,17,24 230:13
230:24 231:21 236:14
237:9 239:3,9,22
240:3,12,17,23
250:23 257:15 261:4
contractual 7:6 195:23
    196:13
contractually 242:10
contract's 7:12
contradicted 208:6
    249:14
contrary 121:21 184:5
    232:15 237:20 251:14
    255:3,25
contrast 158:21
contribute 16:3,6 24:6
    24:15 93:1
control 21:15 48:7
    74:11 75:2 137:16
    183:13 214:10 230:4
    234:12 235:11 236:22
controlled 86:6 234:7
controls 235:10
conversation 3:5
conversations 20:4
    59:3
conversion 20:25
    102:20 155:7 209:13
    247:4 251:13 260:14
converted 84:14 206:3
    245:10
conveyance 94:21
convinces 182:19
Cook 151:9,14
Cookinghan 120:15
copies 66:1,3 70:13
    71:3 72:12,13 126:9
copy 25:18 49:8,17
    66:6 68:15 72:10,16
    73:4,15 76:16 100:12
    104:7 131:19 132:2
    142:2 168:23 169:4
    170:11
cord 252:8
core 112:22 246:25
corner 231:2
corners 171:7
Corp 34:22 220:13
    231:22 247:5 254:21
corporate 3:18
corporation 1:3 3:2
    4:10 7:5,14,16,23
    11:8,12,14 12:5 21:3
    21:6 22:5,17 27:10
    34:21 39:13,15,17
    53:21 63:17 131:5
    132:10,12 141:6
    175:14,15 182:13
    183:5,14,16 188:4,4

188:16 189:3,16,21
190:20 192:8 198:18
203:9 213:20,21
248:4 254:25
corporations 180:6
    190:10
correct 5:7 10:23 11:8
    14:25 16:22 23:7
    29:5,11 30:17 32:25
    35:7,25 36:1 37:1
    41:21 42:15 47:22
    53:6 56:13,14 58:20
    58:21 66:9 67:1,11,23
    67:24 73:6 74:25
    75:3,4,22 78:24 79:9
    84:7,9 86:8 91:5,6,22
    92:3,6,14 93:21,24
    95:11,24 96:10,14,15
    97:2,3,8 98:1,2,7,8,12
    98:14,17,22 99:2
    100:3,4,11,14,17,18
    100:22 101:6,7,11,13
    101:17,19,22 102:1,6
    102:17 103:12,22,23
    104:15 105:13,14
    106:8 124:2 125:5,11
    125:12 126:21 131:11
    131:22,23 132:3,13
    132:14,16 135:7,15
    135:16 137:10,11
    138:13 140:9 141:4
    142:9,22 143:20,21
    144:2,3 147:17 149:6
    149:11,16 150:24
    163:1 166:6,7 167:1
    167:13,14,16,22,25
    168:25 169:6,11,23
    170:3,7,13,25 171:19
    171:24,25 172:4,16
    172:19,20 173:16
    174:4 175:11,12
    180:5 205:15 229:7
    235:8 245:2 250:2
correction 98:15
correctly 3:6 64:3
    74:15 81:9 133:19
    215:14 228:21
correspondence 59:13
    72:13 76:5
corroboration 233:21
cost 81:16 82:16,20,22
    83:8 84:2 93:23
    94:24 95:1,5 98:1,20
    99:10,19 106:19
    207:11
costs 206:4 207:10
counsel 80:5 83:12
    110:1 144:14 146:5
    168:20 229:20 241:21
count 143:18 152:16
    181:19 212:25
counter 13:13 201:19

counter-parties 6:17
    9:1 13:5 43:16 186:2
    186:15 189:13 255:3
    258:6 260:6 261:4
counter-party 163:8
    191:12 197:2 222:1
    228:20 240:18 253:17
Country 100:17
county 1:15 57:20 58:6
    58:7 59:21 60:5 61:6
    61:9,20 62:19 100:12
    100:21 137:19 151:9
    151:14
couple 85:9 157:3
course 55:17 60:4
    125:24 131:10,25
    140:2 149:5 163:13
    212:18 225:7 248:10
court 1:1,18 3:5,17 4:8
    4:19,25 5:3,13,22
    6:11,24 8:1,20,24 9:9
    9:18,23 10:1,9,12
    11:15 12:24 16:5
    18:12,14 19:12 25:18
    26:2,7,11 31:6 32:17
    35:10 37:11 39:16
    44:5 47:5 48:17 49:5
    49:9,15,19 50:20 51:1
    51:5,10,15,19 52:3,11
    52:17 53:3,13,16,25
    54:5,8,12,17,20 58:18
    62:16 63:9,18,23 64:2
    64:5,18 65:7,10,13
    68:12 72:1 74:2 77:9
    77:11 79:4 80:25
    81:22 82:9 83:3,11,14
    85:18 88:3 90:16,19
    90:22,25 91:12,16
    93:3,6,7 94:3 106:1
    106:23 107:4,15,18
    108:17 109:2,10
    110:4,17,22 111:9,11
    111:25 112:4,11
    113:21 114:3,18,22
    115:16 116:1,16,24
    117:2,3,9 118:8 120:8
    121:14 122:18,23
    126:15 127:8 128:1,7
    128:10 129:22 130:12
    136:7,13,16,19
    142:11 144:21 145:7
    145:15,18 146:14,17
    146:23 147:6,25
    149:21 150:1,4 151:9
    151:14 153:7,11,23
    154:5,11,21,24
    155:24 156:6,21
    157:22 158:15,20
    159:4,15 160:1
    161:11,19 162:9,18
    162:25 163:13,17,19

164:2 166:16,23
167:2,4 168:3,15,18
169:4,10,12 170:6,8
170:12 174:9,13
176:1,11,14,22,24
177:3 178:17,20
179:1,6,8,9 180:1,7
180:15 181:13 182:3
182:6,19 183:14
184:1,14 185:3,11
186:8 187:19 189:11
191:10,24 192:3,14
193:4,9,12,17 194:2,7
195:14,19 196:23
197:19 198:4,19
199:6 200:12,17
201:15,22 202:1,3,12
202:17 203:7,21,25
204:3 205:13,17,20
205:24 207:23 208:11
208:13 209:8,21,25
210:14,16 212:13
213:25 215:25 216:22
217:1,3,6,10,13,15,22
218:9 219:9,14,16,19
220:6,17 221:5,5,10
222:9 223:17,20
224:11,16,21 225:1,9
225:11,14,19,22
226:2,7,12,16 227:7
227:22 228:7,16
232:6,21 235:21,24
236:2,15 240:14
241:16 243:4 244:8
244:10 245:7,22,24
245:25 246:2,4,9,12
247:6,8,13,17 248:16
248:21 250:25 252:12
252:22 254:23 255:5
255:14 256:12 257:2
257:5,6,9 258:21
259:1,9,13,19,23
260:2 261:9
Courthouse 1:19
courtroom 231:7
239:24
court's 3:1 247:18
cover 59:24 69:19
    71:13 92:9,11 95:11
    95:17 97:8 116:3
    120:10
covered 75:3,5
covers 67:22 68:1
co-lenders 234:4
co-review 126:1,5,7
CQA 57:4,5,11 69:6,10
    97:13,15,20 106:7
create 184:19
created 5:10,11,14,21
    29:21 182:8 186:24
    187:2 203:7 230:11
creates 119:17 180:16

201:16
**creating** 145:10 204:15
**credibility** 234:16
**credible** 207:6 208:1
232:24 246:10
**credit** 21:24 205:5
**creditor** 37:9 50:14
184:8
**creditors** 6:17 7:1,8
182:21
**credits** 23:1,6 30:3,7,10
33:19,25 34:1
**criminal** 115:2,8
**criteria** 137:20
**cross** 75:6 107:3
**cross-examination**
23:21 91:1 157:1
167:5 208:7
**cross-examine** 121:12
245:3
**cross-referenced** 67:3
**CRRA** 249:25
**CSR** 1:18 261:16
**cubic** 87:16
**cure** 81:16 82:17 101:4
195:24
**cured** 244:24
**current** 12:21 14:2
26:21,23,24 27:4 28:9
28:12,16,23 57:17
58:3 68:9 69:22 70:7
83:17 87:23 97:12
101:7 111:20 123:23
124:10,11 152:8
155:1 176:6,8 253:1
**currently** 28:18 33:1
33:18 38:4 55:2
59:16 60:8,15,20
69:25 76:18 83:20
84:16 86:14 123:11
123:12 129:23 138:20
153:12 165:9,11
169:24
**curve** 89:16 96:17
102:21 110:11
**curves** 206:25
**customary** 240:20
**cut** 228:21
**CX** 2:4
**C&L** 13:20
**C-A-A-P-P** 66:15

**D**

**D** 2:1
**Dailey** 56:11,12,14,17
57:23 89:15 91:19
106:16
**Dailey's** 56:19 57:9
**daily** 242:16
**Dakota** 38:9 39:19,23
175:15 222:14
**damage** 187:18

**damaged** 69:20,20
71:22
**danger** 79:17,19
**dark** 89:10
**data** 98:22
**date** 35:3 36:3 44:20
68:7,7 127:17,21
134:14,17 135:13,14
135:22 138:11 141:11
141:18 142:8,10,13
142:14,18,22,24
143:2,5,17,18,20
144:1,6,9 145:10
146:12 148:21 167:12
167:13 177:13,17
223:14
**dated** 71:8 72:21 75:15
**dates** 57:22 210:9
**David** 1:13
**day** 79:16 143:6 177:16
222:6
**days** 14:13 24:14 78:3
79:1 134:14,16 143:8
185:7 202:9 213:18
222:1
**deal** 58:22 61:9 63:4
190:7 195:19 199:7
245:12
**dealing** 5:4 7:24 16:22
58:13 121:24 190:25
227:17 228:20,22,23
230:22 231:15
**dealings** 80:4
**deals** 63:2 67:10 73:20
74:4,11 217:17
**dealt** 8:24 46:13 99:25
182:4 197:17
**Dearborn** 1:19 13:1,14
14:4,12 188:16
**debt** 37:19,22,23 38:1
**debtor** 1:5 3:9,13,19,23
3:24 4:12 29:5,23
36:15 37:14,17 39:14
39:15 48:25 182:14
209:21 210:19,25
220:20 228:13 242:8
247:9,23
**debtors** 220:11 247:15
**debtor's** 4:1 247:19,20
248:7,9,13
**debts** 3:13
**decay** 110:9,11
**December** 90:8,9
142:24
**decide** 70:25
**decided** 48:4 176:20
231:9 253:5
**deciding** 41:23
**decision** 41:7 149:3
182:6 202:25 229:13
229:14 261:3
**decisions** 22:11 23:17

**decision-making** 40:19
**declarations** 248:7,13
**decline** 186:10 188:25
**declined** 93:8,9 186:4
**declines** 186:12
**decomposition** 89:25
**decrease** 89:22 110:11
**decreases** 90:1 110:13
**deem** 144:10 148:15
173:4
**deemed** 148:17 167:12
167:24
**default** 256:7,10
**defaults** 44:2,7 45:14
45:18 81:16 82:17
101:5 239:8 242:12
242:17
**defendant** 13:24
**defendants** 13:13
**deficiencies** 98:1 135:8
166:3
**define** 52:20
**defined** 53:1 136:2
**defining** 52:18
**definitely** 102:25
**definition** 198:4
**degrade** 69:15
**degree** 55:6,9,11
121:23 123:17,18
197:10
**Delaware** 38:23 39:3
**deliver** 221:25
**delivered** 75:21 87:10
178:13,13
**demonstrate** 165:25
167:10
**demonstrating** 166:13
**demonstration** 204:6
**demonstrative** 195:11
**denied** 138:19 170:22
170:24 238:13
**deny** 138:17,21 160:10
164:20 171:14 221:22
227:11 258:22
**denying** 121:19
**department** 100:10,15
149:13
**depend** 237:7
**dependent** 87:7 129:3
**depends** 42:23 238:21
255:8
**deposit** 236:22
**deposition** 10:7 24:10
31:10,13,16 34:8
94:14 95:15 97:1,5,25
98:25 99:13 104:8,21
111:23 112:16 232:18
**derivation** 204:13
**derivative** 186:18
**describe** 17:15
**described** 228:21
**description** 129:13

**design** 84:15 97:14,17
97:19 101:6 106:11
**designate** 40:14 41:7
41:25 229:15 231:22
**designated** 41:2 136:23
137:1 150:21 151:4
**designation** 201:9
**designed** 44:24 57:8
97:23 106:16 220:18
**designee** 41:25 225:4
231:17
**desirable** 107:6,9
**desk** 111:24 235:14
**despite** 50:15 247:10
**destroy** 96:2
**detail** 259:20,22
**details** 38:12
**Deteriorate** 93:3,4
**deteriorated** 92:24
**determination** 122:11
133:5,10 140:1,13
142:7,23 144:16
145:24 146:1,2 152:4
152:6,10,12 153:24
164:19 167:15,18,18
168:16,18 173:25
200:1 227:23 257:8
**determinations** 117:14
218:1
**determine** 16:13 102:9
129:2 130:17 133:16
137:7,23 140:16
162:3 178:1,12 183:4
258:3 259:8
**determined** 16:16
54:17 78:10 133:9
140:14 142:4,21
143:2 161:16 212:16
246:15 256:2
**determines** 125:17
**determining** 52:5 127:4
160:23 169:2 211:17
248:5
**detriment** 8:11
**development** 20:19
55:25 252:11,14,18
**devices** 74:18
**de-designate** 41:24
231:21
**de-designating** 41:15
**difference** 46:24 82:10
96:19,20 203:4 209:3
211:5 255:20
**different** 32:20 52:2
56:6 87:21 111:16
122:11 126:24 139:5
147:7 162:7 204:16
211:14,16 217:7,8
222:17 230:9 239:6
245:4 259:6
**difficult** 213:3 216:11
218:23 243:11

**difficulties** 108:3
193:21 210:22
**difficulty** 10:8 98:19
203:7 222:12
**dig** 241:24
**digit** 178:6
**diminishes** 234:16
**direct** 10:14 20:18
23:23 28:5 54:22
63:20 64:6 112:9,10
123:5 132:24 140:6
165:7 177:6 187:8,9
**directed** 54:11 160:4
164:4 227:19
**directing** 21:4
**direction** 221:9
**directly** 40:9,11 61:1,8
79:24 87:17 89:4
100:23 113:16 125:1
143:4 160:12 229:8
237:21
**director** 7:18 10:25
11:7,9,11,13 27:16
40:4 100:10,15
134:12 183:12
**directors** 234:9,10
**disabused** 164:5
**disadvantaged** 224:9
**disagree** 6:22 185:1
**disagreement** 102:4
**discharge** 45:21
**disclosed** 85:16 118:10
**discourse** 194:1
**discover** 231:7
**discrepancy** 91:11
**discrete** 121:24
**discussed** 9:13 67:21
109:12 130:7 240:15
240:15 244:1 246:12
**discussing** 94:15
**discussion** 9:17 84:11
93:11 97:10 106:5
109:18
**discussions** 82:21
**display** 63:23
**disposal** 58:8 59:23
60:1,7 62:24 70:10
199:2
**dispose** 70:5 81:9
**disposed** 29:19 74:14
**disposing** 227:18
**dispute** 9:19 111:12
**disputes** 4:21
**disregard** 246:6
**disrepair** 95:5
**dissipate** 206:24
**distinct** 182:22
**distinction** 182:7
**district** 1:1 219:19
220:15 245:21 247:6
247:7,8
**diverts** 180:21

**division** 1:2 56:22
  144:14 146:4 168:20
**document** 24:21 25:12
  25:19,21,21 26:4
  51:22 52:14,16 57:11
  64:10,16 65:18,19
  67:8 71:7,9 72:5,24
  73:3,10,25 75:19,20
  76:11,25 77:2,3 88:7
  90:6,15,15 121:15,16
  130:22,23 131:2,24
  136:25 139:24 140:2
  140:24 146:8,15,19
  147:3 195:11 244:22
**documentation** 61:21
  85:17 131:10 145:14
  190:11 243:18,23
**documents** 58:16 62:6
  66:1,4,4,12 70:16
  100:23 108:21,25
  116:6 120:6 122:14
  126:13 131:13,16
  136:22 147:3,11
  151:21 168:2 171:6
  204:13 210:10 232:21
  233:19 249:3
**doing** 7:13 40:22 45:25
  74:7 153:1 185:9
  218:17 230:4 252:10
  252:14,17,18
**dollar** 235:18
**dollars** 35:24 83:21
  188:11 202:8 233:18
**Doolin** 1:18 261:16
**double** 67:17,17
**doubt** 15:12 181:21
  184:24 239:21
**draft** 124:18,19 126:3,7
  133:22
**drafted** 236:10
**draw** 238:10
**drawn** 199:17
**draws** 182:6
**drip** 69:8,9 87:5 98:23
**Drug** 220:13
**drums** 92:16,18
**dry** 12:15,17 28:20
  202:7
**dual** 63:3
**dubious** 114:22
**duct** 209:6 216:7
**due** 98:10,20 112:16
  143:16,22,24 145:9
  164:2 177:16,18
  180:1,4 200:4 208:18
  211:4 216:15 221:3
  255:11
**duties** 56:19 66:8 70:17
  78:6 88:15 124:14,15
  131:11,25 140:3
  151:8 187:4 246:3,6
**duty** 115:6,7

**dwell** 237:19
**DX** 2:4

**E**

**E** 2:1
**earlier** 3:17 37:21 50:5
  58:25 67:21 70:12
  71:14 86:7 96:17
  115:13 117:25 148:25
  156:7 157:25 185:14
  257:2
**earning** 238:10
**easier** 107:25 150:5
**easiest** 208:19
**easily** 238:19
**Eastern** 1:2 245:21
**easy** 215:22,24
**eating** 211:7,8
**EBIDA** 202:13
**Ed** 125:1
**Edison's** 19:1
**edition** 246:13
**education** 55:22 56:1
**educational** 55:5
  123:14,16
**EEOC** 117:14
**effect** 113:22 127:22
  148:19,20 185:22
  206:1
**effective** 84:18 253:11
  257:16 258:5,15
  260:7
**efficiency** 103:3
**efficient** 209:14,14
**effort** 160:4
**efforts** 193:19 216:10
**either** 27:5 33:14
  134:22 137:24 157:6
  171:22 201:9 202:1
  215:24 232:5 233:22
**elaboration** 26:7
**electric** 19:1 23:1,3
**electrical** 87:19 123:18
**electricity** 87:19 89:5
  102:5,20 103:6 206:3
  211:3,25 245:11
**element** 161:24
**elements** 93:18 133:25
  247:3
**elicit** 122:24
**elicited** 214:15
**eliminate** 112:21
**emergence** 212:5
**emerging** 212:6
**emissions** 46:23 137:22
**employ** 175:4,7,13,21
**employed** 39:14 55:2
  56:11,16 91:4 123:11
  123:12,19,20 124:1,3
  238:1
**employee** 38:21 174:20
  174:25 227:12

**employees** 17:22,25
  39:7,8 43:6 80:8
  122:13,14 160:20
  165:1 175:14 193:20
  230:3,16,17
**employment** 9:15 57:9
  253:1
**enable** 259:2
**enacted** 63:1
**encouraged** 81:7 94:6
**ended** 208:4
**ends** 102:24
**energy** 23:6 104:14
  155:7 188:22,25
  211:7,8,10,18 212:8
  212:23 244:1,6
  245:16 251:11,12
**enforce** 160:8 186:4
  190:4 197:7 256:14
  258:7,17
**enforceable** 134:8
  196:7 201:17 254:16
  256:22
**enforced** 235:12
**enforcement** 9:1
  103:18 116:4 119:6
  119:11,13,13 216:16
  257:16
**enforcing** 258:5 260:8
**engage** 4:22
**engine** 60:17 65:20
  67:11 70:4 75:3,6
  78:2 81:6 83:19 84:1
  86:7,11,14,20 87:22
  87:23 93:20 96:4,8,13
  96:19,21 103:10
  105:3 206:9 251:18
**engineer** 75:21 106:13
  133:21 166:3
**engineering** 55:10,11
  55:17,20 57:24 58:9
  89:13 97:11 104:5
  123:17,18
**engineers** 56:11 60:23
  70:19 104:19,22
  124:17 125:3,25
  133:13 138:20 216:5
**engines** 60:13 66:19
  67:19 78:9,23,24 79:1
  79:6 81:9,10,12 85:25
  87:9 89:8 93:24
  95:24 96:6,9,13,18
  105:6,8,9,10 106:20
  113:19 208:9 245:12
  245:16
**ensure** 124:15,21
**entail** 124:13
**enter** 164:19 184:12
  185:9 221:16
**entered** 24:13 28:7
  60:2,5 119:6 156:24
  160:9 170:6,9,12,25

  192:17,18 193:16
  222:22 229:3
**entering** 222:23
**Enterprises** 245:20
**entire** 84:19 98:17
  209:9 217:23
**entirely** 163:21 214:1
  214:10 231:12 253:1
**entities** 5:4 7:5 14:2
  35:13 164:25 165:1,2
  202:2,21,22 212:16
  214:10 230:5 231:23
  239:10 241:23 244:4
  257:24 258:2
**entitled** 200:9,10,13
  261:17
**entity** 3:24 7:18 8:17
  9:15 22:21 35:13
  39:22 50:17 137:15
  137:22 166:19,20,24
  180:16 185:16 191:12
  191:14 193:15 203:18
  215:12 218:24 229:23
  242:20 247:1 253:21
  254:2,10 255:1
  256:21
**entity's** 255:7
**entries** 147:17
**environment** 174:4
  212:23 218:5
**environmental** 45:24
  46:5 55:3 56:23
  70:19 71:7 72:22
  75:15 120:13 123:13
  123:17 124:8 133:3
  136:2 159:22 164:23
  168:17,22 169:21,22
  216:13 217:18 218:15
  227:6 228:4,25
  239:12 240:7 246:24
**EPA** 63:1 66:5 70:2
  71:18 109:12,12
  123:20 130:10 134:5
  135:3,4,4 247:18
**equation** 110:10
**equipment** 122:1
**equity** 40:7
**equivalent** 105:10
  243:10
**equivalents** 35:4 36:5
**errors** 255:1
**escrow** 199:15,16,18
**especially** 83:25 87:3
**essence** 255:1
**essential** 161:24 257:14
**essentially** 77:25
  159:18 237:15
**establish** 161:21 162:21
  163:2,6,15 181:25
**established** 228:25
**estate** 4:1,5 16:4 18:17
  19:4 20:1 36:11 48:2

  48:7 198:1 233:10,13
  235:4 244:16
**estimate** 84:22,24
  87:14,18 89:17 97:1,7
  97:24 98:24 101:9,12
  101:16,24 104:9,18
  104:23 105:4 106:19
  106:22 110:12
**estimated** 87:21 93:23
**estimates** 82:20 83:7,10
  83:12,15,18 95:5
  101:19 104:10
**estimating** 98:20 104:6
**EUGENE** 1:7
**evaluate** 98:21 133:6
  134:21 144:15
**evening** 251:17
**event** 22:18 23:11
  26:13 79:10 118:25
  119:5 183:11 186:4
  192:25,25 198:10
**events** 17:14
**eventually** 140:22
  144:11
**evidence** 54:13 65:5
  114:19 118:24 119:25
  144:15 145:8 149:8
  167:19,21,23 168:1
  183:21 201:4,25
  202:1,5 207:19 222:3
  222:5 224:24 225:8
  232:17 233:15 236:23
  237:20,21 244:8
  246:2,10 249:2,14
  251:15 254:6 257:19
  257:23
**evidencing** 198:1
**exact** 38:12 68:6 77:25
  127:17,21 185:8
**exactly** 15:24 37:24
  41:10 52:24 66:15
  105:22 115:9 135:24
  171:17 220:6 229:19
  238:22
**examination** 10:14
  23:24 28:6 48:22
  54:22 63:20 64:6
  106:3 123:5 158:16
  165:7 176:2 177:6
  182:18
**example** 7:1 44:11 61:3
  69:3 109:15 120:9
  152:23 244:17
**exceedance** 239:18,19
**exceeding** 247:24
**exceedingly** 243:11
**Excellent** 63:22
**exception** 114:2,13,14
  115:8 118:1 119:17
  119:18 213:21
**excess** 188:14
**exclusion** 115:7

**exclusively** 194:9
  210:12
**excuse** 56:19 57:16
  64:13 72:1 128:4
  141:7 165:11 257:6
**excused** 53:15 110:21
  155:5 176:17 178:19
**execute** 184:12
**executed** 97:20 186:20
  236:20,24
**executive** 255:9,13,18
**exercise** 43:21 246:17
**exert** 98:6,9
**exhibit** 49:3,3,18,22
  63:7,23,25 64:9 67:10
  71:6,24 72:5,19 73:8
  75:10,13 76:2,4,22,24
  85:1 88:2 93:14 99:8
  120:9 130:20 139:21
  139:23 142:1 143:19
  148:1 149:24 150:2
  169:8,10,14 175:25
  221:6 235:21,24
  239:14 240:9,13
**exhibits** 72:9 146:7
  233:2
**exist** 3:25 148:21
  260:17
**existing** 84:12 87:3
  96:13 113:10 139:8
  152:14
**exists** 243:21
**expanded** 198:7
**expands** 247:20
**expect** 63:13 80:11
  116:19 119:13
**expected** 113:1 121:25
  150:18 257:21
**expense** 35:20 86:25
**expenses** 14:17,19,20
  29:4,12,18,22,25 87:2
  189:6 207:9
**experience** 80:15
  118:12 119:4 208:21
  208:22,24,25 209:1
  216:6 255:8
**experienced** 222:25
**expert** 77:9 79:3 81:20
  81:21,23,25 82:1,3,6
  226:19
**expiration** 68:7 135:22
  138:11 143:17,18,20
  148:21
**expire** 68:3 135:21
  139:9 143:9,11
  157:16
**expired** 111:19 143:7
  143:10 148:23 155:4
  176:9
**expires** 68:6 144:13
**explain** 132:25 157:12
**explained** 153:13

220:17
**explore** 260:19
**exploring** 200:18
**extend** 134:16
**extended** 16:21
**extension** 110:13
**extent** 29:12 38:14
  41:11 62:18 77:13
  121:5 128:1 146:18
  153:14 185:19 200:19
  200:22 203:6 214:1
  245:9
**extinguished** 37:20
**extract** 229:2
**extremely** 215:20
**eye** 10:7
**e-mail** 171:12

**F**

**face** 152:23
**facilities** 20:20 22:13
  124:7 226:21 247:10
**facility** 58:8 60:11 81:3
  124:4 137:13,16
  176:7 226:18
**fact** 22:16 32:15 46:12
  48:4,8 53:5 62:14
  73:21 76:14 79:3
  81:19 98:24 103:9
  111:20 116:6 117:10
  117:19 118:3,17
  119:12 121:2 149:9
  156:16,24 160:15,20
  167:11 168:14 170:10
  171:16 173:23 183:9
  187:2 190:19 193:21
  203:15 204:7,20
  206:10,24 207:10
  209:6 211:11 215:11
  215:13 216:3 218:19
  218:20,22 219:1
  222:2,4,8 235:19
  242:10 249:24 250:22
  252:20 260:2
**factor** 160:22 168:21
  169:2 212:11
**factored** 84:21
**factors** 118:11 164:21
**facts** 120:17 210:9
**factual** 115:20 120:19
  246:15
**fail** 46:22 188:2
**failed** 162:21 163:5
  237:16 249:6
**fails** 6:15,16
**failure** 46:4,8,9,9 95:24
  98:11 121:3 246:25
  247:1
**fair** 222:3
**fairily** 161:24
**fairly** 110:12 203:10
  239:11

**faith** 237:15 246:17
**falling** 212:8
**false** 48:10
**falsehoods** 234:22
**familiar** 17:21 64:9
  65:17 71:8 72:5,23
  73:10 76:9,25 80:17
  88:6,20 104:5 127:11
  127:12 130:21 139:24
**family** 27:15 35:6
**far** 26:12 86:24 116:13
  119:8 181:23 188:14
  201:5 202:16 204:24
  207:21,24 223:1
  247:24
**farther** 223:16
**fascinating** 4:18
**fashion** 149:10 163:1
  204:16 207:17
**fashions** 221:14
**fault** 45:17 46:18
**faults** 45:17
**favor** 168:21 169:2
**feasibility** 248:6
**feasible** 244:2
**features** 69:3,8
**February** 1:5 261:14
**federal** 65:5 114:18
  227:14
**fee** 147:19
**feeling** 203:19
**fees** 19:17
**feet** 87:16
**FEIN** 3:10,15 4:7 9:15
**fellows** 216:4 250:11
**Ferris** 59:22
**fess** 234:13
**field** 94:12,19 95:10,17
  97:7,25 102:13 103:4
  103:5 107:9 108:1
  110:5 123:22 126:1
  209:2
**fighting** 215:15,21
**figuratively** 251:17
**figure** 238:6
**file** 113:4 130:15
  131:20 132:4,5
  141:24 170:7 221:9
  221:24 222:10 223:4
  259:6
**filed** 13:13 14:3 48:5,8
  48:9 66:12 69:17
  70:23 91:5,22 116:7
  131:14,17 154:16
  177:14 216:20 249:23
**files** 126:10 132:2
  151:22
**filing** 12:7 68:21 69:12
  127:22 168:10,24
  198:23 199:1
**fill** 44:21 84:20
**fills** 63:1

**final** 59:24 69:19 71:13
  92:9,11 95:11,17 97:7
  126:7 153:21 208:13
  221:24
**finally** 59:22 220:3
**financed** 21:13,17
**financial** 26:18 27:4
  34:22 190:12 232:4
  233:23 243:10,14,17
  249:20 253:16,19
**financing** 209:25
  212:17 216:11 242:5
  254:12
**find** 5:23 9:2 50:2
  109:19 121:7 122:4
  150:6 156:21 161:23
  207:25 210:5 217:19
  217:21 244:20 245:8
  258:19 261:1
**finding** 46:25 118:17
  136:4 185:10 196:14
  258:12
**findings** 114:17 115:20
  117:19 118:3
**finds** 235:13
**fine** 4:16 7:10 8:3 9:23
  11:17,21 53:11 90:18
  95:21 112:11 126:16
  131:5 136:20 156:23
  168:5 170:18 173:20
  176:22,24 185:1
  259:12
**fined** 155:16,17
**fines** 155:19
**finished** 54:2 59:23
  161:3 176:23 223:6
**finishes** 164:7
**fire** 69:16,19 92:1,2,13
**fires** 71:15 79:17,19
**firm** 18:16 251:11
**firms** 109:16
**first** 8:14 28:6 50:1
  56:8 68:5 72:7 73:1
  73:19 76:12 85:23
  90:1 94:19 110:9,12
  127:14 142:6,12
  157:6,6,10,11,13,17
  158:1,1 160:25
  165:20 169:17,18,18
  179:3 192:5 195:20
  195:20 196:2,22
  211:13 214:13 224:17
  225:12 229:4,24
  230:22 241:6 253:15
  254:18
**fit** 114:12 115:8 236:12
**five** 56:4 60:13 81:12
  120:21 135:20 157:15
  157:16 162:4
**five-minute** 178:22
**five-year** 68:4
**fix** 71:21 216:20 218:21

242:12,16
**fixed** 79:12,22 256:9
  260:18
**fixing** 251:17
**flare** 83:24 84:7,8,10
  95:11,14,16,23 96:6
  96:14,19 245:13
**flared** 79:18
**flaw** 168:12
**flip** 75:10 76:1,21 88:2
  90:3 194:19
**floor** 32:20
**Florida** 219:20
**flow** 15:7,10 89:22
  101:17,21 102:1
  104:23 195:11 196:17
  202:22 205:1 210:18
  210:22 213:12 233:5
**flowed** 40:24 41:6
**flows** 16:17,18 189:2
  195:8,9 202:7 208:2
**follow** 119:14 243:12
**following** 92:24 94:15
  120:17 175:9
**follows** 115:3
**force** 7:8 186:17
**foreclose** 156:14
**FOREGOING** 261:16
**forget** 244:1
**form** 115:4 141:14
**forma** 102:4,5 105:5
  208:9
**formas** 85:4 195:7
  204:14 207:17,21
  237:19,21,22 238:6
  238:15 245:17
**formed** 94:23 99:9,16
  99:18 180:9,11,25
  181:1 255:7
**former** 3:23 18:4 43:6
**forms** 133:7,17
**Fortelka** 59:2 208:23
  251:19 252:4
**Fortelka's** 238:8
**forth** 115:5 118:3 171:8
  184:2
**forthcoming** 108:7,9
**forward** 108:21,25
  112:6 113:11 121:11
  190:21 191:4 195:7
  218:13 219:1 232:16
  241:20 251:24
**Foth** 55:3 56:12,15,16
  57:23 91:7
**Foth's** 56:19
**fought** 91:24 187:16
**found** 45:15 47:1 48:6
  191:3 197:20,22
  246:1,4,9,14 247:17
  257:11
**foundation** 44:4 68:11
  109:1,9 113:25

four 56:6 73:19 74:20
93:16 171:6 235:19
255:25 260:1
fourth 81:6
frankly 188:23 214:23
242:1
free 94:5 184:24 196:16
213:12
freely 7:12 183:21
197:25 233:8
Friday 112:16
front 49:21 64:8 72:21
130:23 131:2,17
169:15 172:15 194:14
218:16 250:25 256:4
fulfill 55:23
full 91:7 95:4 171:1
fund 15:6 16:15 18:21
18:24 22:5,7 23:24
25:16 42:21 43:1,2
187:17 202:2,6,6
204:10 212:25 234:18
235:6 244:3,4 253:5
258:4
fundamental 25:16
229:22 237:24 238:4
238:18
funded 235:1
funding 38:4,10,11,20
38:23 39:2,21 200:23
211:20 214:4 230:7
238:7,13 244:12
247:2 248:8,14 253:2
255:22
funds 19:10,11,13,15
20:5 22:21 189:20
195:2,12 197:2,8
201:8 204:17 205:1
214:7 219:5 220:25
233:5 242:12,20
254:4,7 256:22
258:14,19 260:11
261:5
further 29:18,25 43:1,2
48:18 53:12 90:21
110:16 155:22 165:7
166:17 178:15 198:11
203:15 232:11 239:24
247:17 253:13
future 6:14 160:18
161:25 179:21 186:7
196:17 200:7,9
219:23 220:3,18,21
223:25 230:2 241:15
246:1,8,15 247:19
253:15,19 254:5
257:10 258:12

**G**

G 221:13
Galesburg 61:20
game 43:21 243:10,12

gas 20:19 21:14 22:18
23:1,14 40:15 41:3,8
43:15 44:2,14,16,22
45:10,16,22 57:2
58:21 60:6,10 62:24
67:16 69:1,14,24
71:13,21 73:20 74:5
74:17 75:1,4,8 78:19
79:18,20 81:9 83:16
83:18 84:19 87:1,10
87:12,13 88:12 89:4,6
89:9,10,14,16,22,24
89:25 92:12 94:21
96:2,16,22,23 98:23
101:10,17,21,23,25
102:9,20 103:4,10,13
104:6,11,15,23 105:3
105:12,16,21,22
106:18 109:19,20
110:5,10,10 155:7
202:10 206:2,13,14
206:19,20,23 207:6
208:2 211:3,20,25
229:2 233:16 235:3
243:1 245:10,12,14
249:9 260:13
gasses 70:5
gas-to-electric 60:11
gas-to-electricity
209:13
gas-to-energy 20:24
21:18 247:4
gather 98:22
gathering 108:3
GCCS 74:5
general 37:15 208:3
212:6 242:7
generally 35:18 78:17
128:12,15 129:16
130:17 134:3 135:19
138:4 144:23 154:19
general's 130:16
generate 89:15 210:17
211:21 233:3
generated 70:5 74:6
85:6 90:1 102:23,24
105:8 212:12
generating 191:15
210:23
generation 19:1 124:5
generous 214:6
George 1:10 224:20
getting 3:9 153:1 188:5
188:21 198:20 222:21
243:3,8 249:18
251:21
GGCS 87:7 94:21
98:20 108:4 112:23
give 6:13 31:17 32:11
34:10 114:6 127:17
145:5 181:14 197:2
216:22 219:10,16

221:8,12
given 17:11 61:11
113:8 139:5 143:13
149:18 151:17 163:23
168:23 190:6 198:12
200:19 203:5 209:16
211:11 212:4 219:1
219:25 220:23 222:2
242:7 250:18 258:8
258:17 259:16
gives 8:25 182:1 184:19
giving 17:3 116:16
205:21 221:14 242:8
glare 119:10
gloss 185:20
go 10:12 49:15 53:3
54:18 55:4 64:24,25
67:14 68:5 71:23
73:18 90:25 93:16
94:11 105:13,18
133:4 134:2 141:23
142:6 143:13 146:2,4
149:25 152:16,19
155:19 157:6,11
167:4 168:20 172:25
178:2,8 179:3 187:8,9
195:6 201:20,23
203:21 216:6 218:20
223:14 225:12 229:5
234:21 237:1,2,4
238:23 241:6 242:15
250:23 252:12 253:13
256:5 259:20,22
God 49:17
God's 251:24
goes 113:14 119:25
126:6 135:3 136:5
143:4 171:4,24
182:18 205:5 217:22
223:15 237:11 239:23
256:6
going 4:24 8:15,20
14:13 15:19 25:16
26:13 49:9 50:18
51:24,24 62:7 63:11
82:9 105:18,21
111:16 112:2,9
113:11,15 114:4
116:2 120:1 141:13
148:24 149:24 152:15
153:17 156:12 160:8
160:9 161:23 163:24
170:22,23 173:9
185:9,12,13 186:7
187:15,17 188:25
195:22 196:7 200:11
201:14 202:14 203:25
204:21 206:21 207:4
208:3 211:11 212:4
214:25 215:2 216:19
216:19 218:13 219:2
219:7 230:9,24

232:12 235:12,15
236:17 237:1,1,4,5,8
237:10,18,19 238:22
238:23 239:2,2 243:5
243:6 244:19 251:3,7
251:9 252:3 253:5,6
253:25 254:10,12
256:16
gold 13:8 207:22
good 43:18 147:8 167:7
237:15 239:1 246:17
goods 30:6 240:19
gotten 154:12 201:6
210:20
government 65:6
117:19
gradually 69:13
grant 135:18 164:20
granted 115:22 125:17
153:3 159:3 160:1
241:5
granting 160:2 173:21
173:22
grass 69:19 71:15 92:1
92:2
great 190:7 214:24
259:22
greater 91:15 104:15
205:9
green 148:8 177:23
178:7 251:11
Greenblatt 2:6 10:3,7
10:11,13,18,19 11:23
23:11,23 26:1 31:3,9
34:8 47:25 48:24
49:21 50:22,25 51:5
53:14 183:12 186:22
188:10 189:4 192:7
202:19 203:2 209:10
212:15 213:9 214:6
215:5,13,18,21 216:4
229:9,15 230:6 231:1
232:8 233:25 234:7,8
234:20 237:16 238:12
241:23 244:3 248:10
248:11 253:4,6,8,9
254:15 256:4 258:3
Greenblatt's 203:5
213:4 214:10 215:24
229:18 232:18 235:14
Greenblatt-controlled
231:23
greenhouse 23:1
Greg 18:3
Gregory 1:12
grid 86:22
gross 205:2 227:15,17
ground 61:9,12 64:23
grounds 18:10 64:16
82:25
group 137:17
guarantee 163:12

189:19 197:7 200:6
200:12,16 253:23
guaranteeing 196:3
guess 5:9 47:16 53:18
69:14 80:4 84:15
120:5 153:23 160:7
184:8 186:14
guilty 45:15
guy 234:2
G-r-e-e-n-b-l-a-t-t
10:18

**H**

H 221:13
half 73:1,22 83:20
99:25
hall 117:8
hand 35:24 36:4 46:23
187:15 194:21,22
231:5,6
handle 18:17
handling 98:12,15
227:18
hands 253:1
handwritten 147:20
happen 42:22 144:10
149:5 165:17,19
186:7 219:3 223:3
happened 19:11 171:23
213:7
happens 3:18 171:4
196:23 233:9
hard 131:1,1 142:2
146:18 234:13
Harry 59:4,10 76:5,8
76:15 100:23 150:13
151:10,14,18,23
152:5 244:21
hazardous 247:10
hazards 246:25
head 95:13 155:21
header 97:2,11 98:5,6
98:10,17 101:6
health 233:23 245:20
246:25 249:11
hear 11:18 26:2 41:18
54:12 111:25 118:6
178:23 189:1
heard 10:19 13:8,14
14:5 20:7 79:24
118:19 122:17 213:4
228:6 234:22 240:12
249:1 256:19 257:14
hearing 118:13 119:2
134:10,11,12,14,15
172:22,22 173:3,4
215:1 249:18
hearings 134:20
hearsay 64:16,22 65:9
90:15,17
heightened 172:18
held 118:13 132:11

134:15 190:10
**helped** 56:24
**helpful** 179:10
**Henderson** 59:5,10
76:6,8,15 100:24
150:13 151:10,15,18
151:23 152:5 168:8
168:11,14 170:5,13
221:8,15 222:10
244:21
**he'll** 179:3
**high** 96:25 98:24
155:19 206:10
**higher** 91:17 104:23
212:23
**highest** 89:25
**highlight** 116:5 216:2
**highlighted** 256:4
**highly** 114:22 232:8
**high-end** 97:6
**hired** 89:15
**historical** 109:20 246:7
**history** 16:21 80:14
127:3 158:12 159:21
160:21 162:24 164:15
164:19 172:19 209:9
227:13 230:16 239:8
253:21 256:21 260:23
**hold** 90:11 129:6
134:12 173:4 181:13
183:1 198:20
**holder** 129:5,7 175:4
184:7
**holders** 197:25
**holding** 183:8
**Holdings** 13:20
**hollow** 248:7,13
**Home** 34:22
**honor** 3:4 7:10 8:5 9:11
9:16 10:5 11:18
16:11 18:11,13 25:10
26:10,16 32:9,13 35:9
47:3 48:16,19,24 49:7
49:8,14 53:12,22 54:7
54:9 62:11 63:6 64:1
64:13 65:2,3 71:24
72:19 73:8,23 75:11
76:2,22 77:5,8 79:2
81:18 82:2,24 85:15
88:1,18 90:18 93:13
100:6 104:3 109:25
110:16 112:7,8
113:13,25 114:7,15
115:1,13 117:7
119:15,16,17,24
120:5 122:16 126:11
126:16 127:6,24
129:18 136:3 139:21
141:1,21 145:6
146:20 147:24 149:23
152:18 153:1,10
156:1,4 158:14,19,25

159:6,19,25 160:16
160:25 162:1 163:23
165:4,6 167:3 174:8
174:12 176:13,19
178:25 179:25 180:4
181:24 183:7 185:6
186:10 189:16 192:4
192:16 193:20 195:10
197:13 198:25 200:4
204:16 207:25 208:19
209:19 210:3 211:4
213:2,8 215:14
217:20 219:11 224:15
224:19 225:13,25
226:5,9,10,25 227:25
228:6,11,20 229:7
232:11 235:8 236:4
236:16 237:16,23
238:25 240:12,22
241:9 243:15 248:17
250:19 254:19 255:20
255:23 259:5,7
**HONORABLE** 1:7
**Honor's** 122:17 160:12
203:19 222:11
**hook** 25:5
**hope** 193:17 196:16
248:12
**hopes** 248:8,14
**host** 228:5
**hot** 234:1
**hour** 73:2,2 86:1,2
**hours** 55:25 86:13,21
**huge** 211:12 213:9
215:22 218:24
**hundred** 35:24 59:19
79:6 188:8 250:1,2
**hundreds** 46:13 233:18
**hypotheticals** 176:5
**H&M** 211:20

I

**Id** 247:15,22 248:9
**idea** 5:17 23:8 29:9
36:22 37:3,5,10 38:3
39:24 40:3,12,13 42:3
42:5 188:12 211:10
213:19 214:3 220:24
234:1 241:20 243:9
245:15 251:22 252:19
**identification** 250:10
**identified** 81:20,23,24
132:9 133:18,20
135:8 136:1 137:5,19
152:7,14 155:20
156:12,18 158:22
159:1,8,9,9,12
**identifies** 126:2 236:7
**identify** 83:17 111:1
119:21 126:2 134:6
159:7,10
**IEPA** 46:18 60:19

64:22 66:2,13 70:13
70:23 76:6,19 77:14
77:20,23 78:25 79:14
84:6 109:8 120:17,23
121:2,6 122:8,10,13
123:19 125:16,24
127:3 128:15,17
131:11,14,18,22
135:25 140:3 143:2
144:19 148:10,15
150:25 151:8,17,22
155:6 158:11 159:21
160:14,22 164:15,20
169:5 171:5,8,16
210:10 221:21,21
228:24
**IEPA's** 136:14
**ignore** 215:11,12
218:22
**ignored** 207:10
**IIT** 1:12 8:16 20:18
23:25 39:10 42:7
49:3 65:1 80:3,8,10
80:18 85:1,5 87:12
94:13,20 96:7,8 99:10
99:19,21 101:4,5
102:15 107:7,10
122:18 146:7 149:25
151:15 155:5 160:17
160:21 161:13,21
162:10,13,21 163:2,6
163:25 165:9,11,11
165:17,19 169:10
179:13,18 189:13
191:24 196:4,11,12
200:24 208:16,16
225:7 231:6 234:4
235:17,18 236:1
237:1,5,7,10 238:2,6
238:14,23 240:19
242:4,8,9 244:19
246:25 247:1 256:6
**IIT's** 189:14 236:11
237:9 245:1
**IL** 1:20
**ILCS** 174:11 181:25
182:1 216:25 217:1,5
217:6 221:22
**Illinois** 1:1,4 5:6,11,12
5:15,16,18 6:13 7:1
7:16 10:20 11:4,14
15:22 40:16,25 41:1,7
41:15,24 42:18 45:23
46:15 49:22 51:6,13
52:6,18,21 55:10,21
55:24 56:23 65:20
71:7 72:22 75:14
76:6 86:6 120:12
123:13,20 124:4,5,17
130:10 133:3 157:18
168:15,17,22 169:22
174:10 180:15,23

181:11,24 183:16
192:11 198:17 202:19
204:9 216:13,25
218:14 224:3 230:12
236:9 247:7
**illusion** 240:2,21 241:1
**illusory** 231:13
**imagine** 25:12 191:3
216:9
**immaterial** 214:14
**impact** 128:13 153:25
**impacted** 246:8
**impeach** 32:14,14
**impeaching** 237:21
**impediment** 41:23
173:15 203:11,13
**implementation** 106:6
**implemented** 124:16
124:22
**implication** 110:6
**implicit** 157:25 232:2
258:10
**important** 5:23 6:12
210:3 236:24,25
**importantly** 108:1
185:24
**impose** 256:25
**imposed** 115:6 179:19
196:8 249:6
**impossible** 6:17 7:7
**impression** 47:10
**impressions** 47:16
**improper** 94:3
**improperly** 122:3,3
**improve** 196:17
**improvements** 56:25
57:2,7
**inability** 98:6,9,21
191:2
**inaccurate** 206:4
**incapable** 42:19
**incentive** 194:23 195:1
195:9 204:10 215:22
216:20,21 218:20
**inception** 12:19 57:24
**include** 28:19
**included** 104:20 133:17
**includes** 95:12 236:7
**including** 28:15,17
66:5 202:8 221:15
232:4 239:13 246:5
249:1
**income** 26:24 85:5
193:9 233:3 243:16
254:3 257:22
**incompetence** 227:15
227:17
**incompetent** 250:13
**inconsistencies** 234:22
**incorrect** 104:16,25
192:2
**incorrectly** 79:21

**increase** 86:3 102:19
103:4
**increased** 212:3
**increases** 105:23
211:19
**increasing** 103:3
**incurred** 3:16 19:4
**incurring** 3:13
**independent** 22:22
36:13 192:22
**India** 211:8,11 212:5
**indicate** 74:9 76:7
86:19 115:23 116:18
117:22 118:2 120:22
158:1 189:1 195:8
221:14 240:18 245:13
255:24
**indicated** 117:25
146:21 153:3 168:8
172:17 179:1 183:14
185:2 206:15 222:8
222:12
**indicates** 87:15 90:12
90:12 121:22 173:24
194:16 195:11 207:20
217:25 219:20 220:10
221:16,20,23
**indicating** 119:19
145:8 170:4,5 195:6
199:1 222:4
**indication** 119:7
147:10 203:14 204:8
222:12 251:4 260:6
**indicia** 243:13
**indictment** 114:24
**indifferent** 250:13
**indirectly** 40:9,11
90:11
**indirectness** 259:18
**individual** 208:14
**individually** 150:13
**individuals** 179:17
190:13 209:1,12
221:2 230:6 232:14
239:1
**Industries** 59:22
**information** 108:4,7
115:23 116:17 119:18
120:11 143:14 171:10
171:13,23 190:19
204:23 232:15 241:22
**infrastructure** 55:3
91:7
**infuriating** 49:11
**initial** 126:22 132:23
152:7 154:21 157:14
213:5
**initially** 158:3
**initials** 140:8
**initiated** 47:24
**inoperable** 71:14
**input** 126:6

**inside** 60:12
**insiders** 243:24,24
**Insofar** 43:15
**inspect** 78:19
**install** 74:17
**installation** 20:23
  21:14,18
**installations** 84:17
**installed** 45:6 57:8
**instance** 164:22 173:6
  196:18
**instances** 171:22
**institute** 253:8
**instrument** 231:10
**insufficient** 168:16
  241:10,11
**insurance** 220:19
**intend** 254:15
**intended** 161:7 187:6
  187:12 220:22 233:13
  247:14
**intent** 78:1 138:21
  171:14 221:22,25
**intentions** 7:13
**interactions** 228:24
**interest** 23:16 34:23
  61:7 91:24 128:21
  173:5 184:7 203:17
  205:3,11 212:24
  244:14
**interested** 4:14,16 5:2
  18:15 134:5,21 173:2
**interests** 198:1 233:17
**interfered** 45:13
**intergovernmental**
  57:21
**interior** 120:19
**interjecting** 49:7
**internal** 181:22
**Internet** 181:17
**interposed** 229:11
  230:13
**interpretations** 124:23
**interrogatory** 82:8
**interrupt** 62:12
**intervening** 106:15
  152:2
**introduce** 73:24 114:4
  149:20
**introduced** 117:12
**introduction** 114:1,5
**investigate** 190:17
**investigated** 23:9
**investigation** 115:21
  116:9 118:12 120:12
**investigations** 45:1
**investment** 5:6 6:13 7:1
  7:16 10:20 11:4,14
  15:22 16:14 40:16,25
  41:1,7,15,24 42:19
  49:22 51:7,13 52:6,18
  52:21 183:16 192:12

195:1,2 198:17
  202:20 204:9 230:12
**investments** 212:24
  219:6
**involuntary** 5:25 6:4,8
  6:10,19 7:20 181:4
  185:17,23 186:3
  249:22 260:5
**involved** 56:8 62:5 80:8
  125:9 132:24 174:3
  206:4 208:14 215:15
  218:4 242:8 244:14
  248:11 249:25
**involvement** 21:3
  125:13
**iota** 233:21
**irrevocably** 231:20
**Island** 36:7,8,13 37:6
  37:11,13 48:24
  182:15
**issuance** 132:24 140:17
  217:15
**issue** 3:20 4:15,16,18
  5:2,19 8:22 9:14 10:6
  41:9 53:20 70:25
  79:11 109:12 112:22
  113:10 125:19,20
  127:4 129:25 133:10
  135:9 139:11 149:3
  157:14 160:23 161:1
  165:21 166:11 180:3
  198:10 203:24 221:20
  221:21
**issued** 46:3,18 58:22
  65:22 66:19 67:5,7
  70:3,13 71:1,12 72:11
  73:13 75:1,5 76:6,8
  76:14 88:10 92:5
  103:14 135:5,14
  137:5 144:12,12
  149:1 151:9,13
  159:18 166:19
**issues** 50:8,9,16 61:7
  62:23 63:4 69:1,13
  70:1 80:22 116:21,22
  124:20 127:14 152:22
  171:4 179:11 215:6
  217:8 218:16 242:5
  244:23
**issuing** 138:22
**ITC** 230:22
**item** 67:13 74:6,11,16
  74:18,20 170:17
  172:21
**items** 70:1 74:22 84:23
  114:16 116:10 150:24
  153:6 194:3 211:5
  216:16 222:5 223:11
  252:17
**i.e** 220:5

——————— **J** ———————

**jag** 215:7
**jagged** 89:19
**Jahelka** 12:24 25:1
  27:14 42:10,13 52:4
  52:12 186:22 188:7
  194:13,18 202:18
  203:3,16 209:10
  212:15 216:4 229:8
  229:13,19 231:1
  232:8 233:7,8,25
  234:2 237:15 240:16
  251:25 252:21,21
  254:14 258:2
**January** 31:11 34:9,16
  35:23 36:2 75:16
  79:23 86:18 88:11
  90:8,10 192:18
**Jasmine** 169:18,20,21
**Jay** 19:19
**job** 43:18 58:3 124:13
  133:24 215:9 250:15
  252:9
**jobs** 70:18 216:7
**jogs** 236:19
**John** 2:10 7:17 17:5,8
  21:4 22:14 50:10
  59:2 72:23 74:16
  81:15 84:12 102:3
  150:22 175:10 177:1
  177:5 237:25 242:20
**Johnson** 252:6,10,13
  252:16
**joint** 58:7
**Jordan** 1:12 3:4 4:6,9
  4:13,23 5:1,8,17 6:6
  6:21 7:10 8:3,10,19
  9:5,11,13 10:2,3,5,15
  11:22 16:7,10,12
  18:13,18 23:19 25:20
  25:25 26:3,6,10 31:4
  32:9,13 35:8 44:4
  48:11,23 49:6,13,16
  49:20 50:24 51:4,16
  51:17,21 53:4,11,17
  53:18 54:4,7 64:19
  111:1,6,22 112:2,5,12
  112:14 114:15,20
  115:14,25 116:5,20
  117:4,7 118:6,7,10
  119:20 121:8 126:11
  127:6,24 129:18
  136:3 146:19 147:1
  152:25 153:9 156:3
  156:19 157:19,23
  158:14,18,23 159:1
  159:14,24 160:25
  161:2,15 162:1,15,23
  163:11,16,18 167:4,6
  168:4,5,6 169:11,13
  174:7,11,14 175:24
  176:25 177:1,7
  178:15 179:2,9,24

180:8,18 181:16
  183:6 184:11,21,25
  185:6 186:6,21
  187:22 190:15 191:22
  192:2,4,16 193:8,11
  193:13,18 194:6,12
  195:17 196:18 197:12
  198:2,14,20 200:3,14
  201:12,19,23 202:4
  202:13 203:1,22
  204:2,5 205:16,19,23
  206:6 207:24 208:12
  208:18 209:18,24
  210:2,15 211:1 213:2
  214:13 216:2,24
  217:2,4,7,12,14,19,24
  218:10 219:10,13,18
  220:8 223:19,22
  224:14 225:2 228:14
  232:2 241:21 244:1
  248:16,17 249:16
  252:13 254:18 255:17
  257:3 259:4,12,17,21
  259:25 261:12
**Jordan's** 122:17 228:8
**Journal** 117:14
**Judge** 9:12,24 38:13
  224:18 231:7 248:3,4
**judgment** 255:6
**July** 68:8 135:23
  143:20
**jumper** 44:13
**jury** 47:6

——————— **K** ———————

**K** 221:13
**Kahela** 120:15
**Kansas** 117:16,17
**keep** 46:4 126:9 131:19
  132:2 161:2 239:5
  249:16,18
**keeping** 62:1 133:19
**Kentucky** 55:12
**Kepner** 169:19
**kept** 132:5
**kidding** 211:13
**kilowatt** 86:2,13,21
**kilowatts** 86:1 105:10
  105:11
**kind** 166:25 182:9
  183:3 186:18 187:24
  194:20 199:16 225:23
  227:23 253:24
**kinds** 261:10
**knew** 214:24,25 215:1
**know** 5:8,21 6:6 7:15
  8:8,12 13:20 14:1
  17:5 18:3 19:15,19
  25:13 38:12 40:1
  42:2,4,16,23 48:10
  50:1 59:7 68:2 71:3
  75:23 77:22 78:5

79:22 80:1,3 88:23
  89:7 93:5 96:15,16
  103:17 105:18,20
  108:5,5 109:14,23
  113:9 118:20 121:8
  126:12 129:8,20
  140:16 141:15 143:15
  147:3,13,21 148:12
  150:1,16 152:25
  155:21 156:3 157:22
  161:5 162:2,12
  169:19,20 173:9,18
  174:24 175:1 177:13
  181:20 185:6,12
  187:13,22 188:15
  189:7 191:7,8 195:4,7
  197:15,17 198:15
  201:16,20,24 203:4,6
  208:8,18 213:15
  214:14,16,19 215:5,6
  216:5 225:22 226:13
  228:2 229:16 230:24
  231:22 234:14,21
  235:2,3,14 238:9,16
  238:18 239:4,11,17
  240:4 241:1,12
  242:25 243:2 249:20
  249:25 250:19,21,22
  250:23,25 251:6,8,22
  252:21,22 254:21
  255:11,19 259:4,19
  260:21
**knowing** 219:6
**knowingly** 48:10
**knowledge** 17:14 22:20
  30:5,9 38:10,19 39:4
  41:13 43:24 50:15
  62:18 66:11 68:9,17
  70:22 71:16 72:15
  73:5 91:23 92:18,20
  109:6 119:3 144:20
  148:6,7 174:17 175:3
**known** 98:1 180:16
**knows** 212:20 234:8
  235:7,7 237:6,9,12
  241:5
**Knox** 61:20
**Kujaca** 1:15 9:22 11:18
  48:20 54:9,14,19,23
  62:12 63:6,14,22 64:1
  64:4,7,17 65:3,9,12
  65:15,16 68:16 71:23
  72:2,3,18,20 73:7,9
  74:24 75:9,12 76:1,3
  76:21,23 77:7,10,12
  79:13 81:4 82:1,5,14
  83:6,13,22 85:2,3,21
  88:1,4,5,17,19 90:3,5
  90:18,21 94:1,7 106:2
  106:4,24 107:3,12,17
  107:21 108:19,20
  109:5,17 110:15,23

110:24 111:3,7,10,18
112:10 115:12 122:23
123:1,6 126:16,18
127:10 128:5,8,14
130:4,5,19 136:8,9,14
136:18,21 139:20,22
140:25 141:2,15,20
141:25 142:3,12,16
142:20 144:25 145:5
145:13,17,23 146:16
147:2,9,23 148:2,4
149:18,22 150:8,9,19
152:15,21 153:5,17
153:21 154:4,7,8,13
154:14,25 155:22
163:23 164:8 165:5,8
166:15 167:3 176:3
176:10,18,23 241:17
243:6 244:9,11 245:8
245:19,23,25 251:14

**L**

**labeled** 72:4 76:4 146:7
**lack** 9:2 115:23 116:18
119:19 121:7,22
214:4
**lacks** 202:2
**laid** 49:21 195:24
**land** 44:13 56:24 62:10
62:22 63:1 67:22,25
92:5,10 125:14
173:14,17,19 182:15
**landfill** 20:12,19 43:17
43:20 44:3,7,9,12,18
44:19,22 45:2,5,10,16
45:17,22 46:4,10,12
46:19 56:9,18 57:18
57:22 58:1,4,11,12,14
58:19,20,22 59:12,17
59:18,19,23 60:4
61:13,19,20 62:23
66:8,22,23 67:16,25
68:1,21 69:19 70:6,8
70:14,17 73:22 74:5,6
76:18 78:7 79:20,20
80:11 87:1,10 88:12
88:15 89:5,22,24
92:23 94:21 98:7
101:10,17 104:6
105:23 106:15 108:12
108:22,25 112:25
120:4 122:20 127:11
127:15 129:16 130:6
137:19 155:8,17
175:7 177:10 223:5
227:8,9 239:16
242:15 249:9 260:13
**landfills** 20:7,20,25
56:2 67:22 125:10
239:10 241:22 242:6
242:13
**landowners** 44:15

**language** 227:10
**large** 19:8 117:18 249:2
250:8
**late** 143:8
**laterals** 87:4
**law** 5:6,10,12,16,18 6:1
18:16 47:1 114:10
115:6,10,22 117:13
117:14,16,17 118:15
180:16,17,19,21,23
180:24 181:5,8,11
197:20 198:7 260:4,4
**laws** 5:10 227:14
**lawsuit** 12:25 13:2
47:24 189:23 253:8
**lawyer** 5:9
**layout** 106:12
**leadership** 17:18 18:7
19:23
**leading** 111:20
**leap** 213:9
**lease** 28:15 32:4,15
58:21 66:3 77:23
78:1 80:11 81:2
100:8 108:6 242:2
246:21
**leased** 30:16
**leases** 14:15 28:20 34:3
34:13 65:1 183:21
202:7
**left** 91:10 238:24
**legal** 19:16 41:14,23
80:4 144:14 146:4
149:13 166:24 167:18
168:20 201:16 257:16
**legally** 196:7 254:16
**legislators** 109:15
**legs** 69:9 87:5 98:23
**lend** 14:18 50:17
211:23,24
**lender** 11:25 12:2,5,9
15:3 16:22 17:17
18:6 19:22 21:1 35:9
43:8,12,13,24 189:10
191:3 213:21 238:24
**lenders** 214:11 237:4
237:12 256:3,6
257:20
**lender's** 16:24 17:8,24
**length** 160:13 182:4
**leniency** 109:13
**lent** 189:8
**Leon** 2:6 10:3,13,18
213:9 248:10,10
**lessen** 256:11
**lessor** 11:25 12:11,14
12:15,17 33:19,22
**letter** 72:21 75:14
120:10 133:11 140:1
140:13 170:4,18
171:4,13,15
**letterhead** 59:14

**let's** 63:11,13 152:19
194:2 198:19 199:7
215:25 235:1,1 238:6
253:12
**level** 118:14 120:21,23
172:17 237:24
**levels** 74:9
**liabilities** 3:15
**liability** 29:15 180:22
**license** 55:20
**licenses** 221:17
**lien** 189:18
**lieu** 108:13 121:17
199:12
**life** 215:22,24
**lights** 10:8
**likelihood** 163:11,15,21
179:11,14,17 203:23
205:8 211:20 224:4
**Likewise** 13:18
**limbo** 219:2
**limine** 160:2,3,4 164:4
**limitations** 201:7
**limited** 23:25 117:22
215:10
**limits** 247:18
**limp** 209:5 218:25
**limp-along** 215:12
**Linda** 1:15
**line** 21:24 31:18 81:6
83:1 85:23 89:10,19
93:21,24 96:8 106:20
163:24 178:8 192:22
205:5 207:7 208:10
224:4
**linear** 110:12,13
**lines** 11:15
**liquid** 28:23 233:8
**liquidate** 20:1
**list** 159:8
**listed** 74:10 82:6 87:6
156:6 170:2
**listing** 243:20
**litany** 234:21
**Litchfield** 20:8 40:15
204:22 207:18,21
223:11 224:5
**literally** 251:16
**litigation** 215:16
244:15 248:11
**little** 47:5 69:14 139:4
180:2 199:7 215:7
**live** 121:17
**LLC** 13:9,15 55:3
**Loaf** 188:11
**loan** 7:4,7 14:24 15:4
16:16 22:4 23:25
24:1,6,14 25:6,23,25
27:22 28:3,4,6 34:1,2
42:6 51:13 52:6
179:12 186:10,13,24
187:23 189:16 191:18

192:1 196:5 197:5,7,8
198:24 199:3 201:5,8
201:10 204:13 213:22
231:4 234:18 235:6
235:15,18 236:8,13
238:2 242:9 243:23
253:6 255:24,25
256:14 257:13,17,20
258:4,18 260:11
**loaned** 33:19 194:8
260:12
**loans** 14:15 22:22 34:3
34:13 202:7 253:2
260:9
**local** 227:14
**location** 33:4 230:4,18
**lockbox** 236:21 237:2
**locked** 78:20
**logging** 143:5
**long** 12:17,20 57:25
79:11 86:5 113:14
123:19 154:17 217:23
228:24 232:12 242:9
244:5 248:1,25
**longer** 122:18,19
145:25
**look** 49:3,25 99:5 100:5
104:9,18 116:2
139:19 143:17 169:8
178:5,6,12 181:7
193:1 194:14 198:8
226:13 240:11 257:6
257:7
**looked** 104:12 169:15
198:5,6 216:14
254:20
**looking** 50:20 67:10
71:5 72:8 99:8 120:8
135:19 141:11 169:17
194:20 200:5,5
201:25 219:13 222:17
227:11
**looks** 132:15 135:13
150:8 152:17 184:15
226:18 227:16 253:21
253:22,22
**loop** 84:14,17 106:25
107:13,19,22 231:22
**loosely** 215:20
**lost** 187:24,25
**lot** 113:15 138:22
245:13 252:23
**low** 84:4 87:3 105:5
206:5 207:10 241:13
**lower** 241:13
**lunch** 63:11,15 72:8
177:12

**M**

**machine** 197:18 206:13
**machines** 206:12
**magnanimous** 215:19

**mail** 143:1 144:5 146:6
146:10 147:4 148:5
148:12 167:12 170:1
177:11,21,24
**mailed** 143:3 145:9
177:10,11 222:6
**mailroom** 143:4
**main** 179:11
**maintain** 80:16 108:1,1
195:2
**maintained** 87:4
**maintaining** 20:24
70:20 180:11
**maintenance** 60:4
107:9
**major** 35:21 62:9 66:21
137:17
**majority** 11:7,9 183:13
228:15
**making** 21:25 23:17
115:11 124:23 133:17
173:24 185:10 188:24
210:22,22 212:14
214:7 218:1 242:21
244:6
**Male** 254:21 255:15
**man** 251:22
**managed** 17:1,3
**management** 17:9
20:15 58:15 60:2,25
71:21 80:12 99:1
182:23 208:23 247:1
**manager** 22:17 57:19
58:1 124:8,12 125:2
132:3 133:12,23
**managers** 43:5
**managing** 20:23
**manner** 181:10 209:14
218:11
**March** 192:10 218:25
**marked** 75:13 141:22
233:2
**market** 35:1 188:22
233:12 244:15,16
**marketable** 28:25
**markets** 212:5
**marshal** 6:19
**master's** 55:11 123:17
**match** 178:7,8
**material** 32:14,16
92:19
**materials** 92:18
**matter** 3:2 48:4 64:24
65:11,11 73:25 114:4
114:9,25 149:19
156:11 160:13 161:14
170:16 253:13 258:21
**matters** 50:13 82:4
92:23 115:5,6 117:23
119:5
**Matthew** 120:15
**maximum** 21:23

**mean** 5:10 28:12 49:1
  87:22 105:4 126:12
  137:12 175:17 193:13
  200:12 201:20 213:2
  213:17 220:19 228:18
  231:14 233:19 234:6
  252:7
**means** 258:5
**meant** 157:12 161:8
**measure** 87:18 89:5
**measured** 89:7 122:3
**measurement** 121:24
  122:1
**measurements** 122:4
**measuring** 89:4
**meat** 241:3
**Medicaid** 246:10
**Medicare** 246:10
**meet** 15:13,15 129:5
  137:20 161:22 171:6
  241:12 244:23 259:16
**meeting** 218:14
**meetings** 218:21
**meets** 200:2
**member** 158:11
**members** 125:6
**memo** 89:1
**memoranda** 88:14
**memorandum** 88:10
**memorialized** 24:21
  52:13,16
**memory** 236:19
**mentioned** 61:3 70:12
  71:14 72:12 78:8
  89:3 92:1,16 101:9
  227:3
**mentions** 75:7
**merely** 4:22 5:16 107:8
  183:1 240:17
**merged** 56:12,15
**merits** 153:25
**Messrs** 212:15 254:14
**met** 59:10 220:11 232:7
  258:20
**meter** 87:17
**metering** 74:18 86:19
  89:4 90:7 101:21
  102:1
**methane** 89:6 209:12
  239:15 249:9
**metric** 211:17
**Michael** 2:8 123:1,4,9
**microphone** 11:20
**mid** 27:5 90:7,8
**midday** 177:12
**middle** 8:6,8 87:2
**Midwest** 124:5
**migration** 44:14,16
  249:8
**million** 12:23 15:16
  18:25 21:24 28:10,24
  35:4 36:4 37:25 38:1

42:20 83:20,21 84:22
  84:24 179:12 185:25
  188:9,11 194:8
  195:15,21,22 199:16
  200:22 202:8 203:25
  204:8 205:2,3,14
  212:25 213:11,24
  232:23 234:18 235:2
  235:5,19 239:17,18
  241:7 253:6 257:13
**mind** 38:17 51:11
  239:5
**mindful** 193:21
**mined** 206:25
**minimal** 23:7
**ministerial** 160:15
  161:5,10,14
**minor** 70:9 127:1 236:5
**minute** 48:15 87:16
  232:13
**miracle** 209:5
**misappropriating** 48:1
**miscellaneous** 74:22
  129:14
**mischaracter** 45:11
**misstated** 162:16
**misstates** 206:7
**mistake** 164:5
**mistaken** 26:1 38:17
  53:2 142:1 227:2
**misunderstanding**
  164:3
**misunderstood** 37:8
**model** 89:21 104:6,10
  104:14,15,24 105:1
  105:12,20,22 109:19
  109:22,24 110:1,3,7
**models** 109:19
**modification** 127:1,2
  129:2 130:11 152:1
  165:23,24 166:25
**modifications** 126:20
  126:25
**modified** 85:9 151:6
**modify** 129:11 152:3
**moment** 11:15 104:3
  117:5 139:19 141:17
  145:6 224:19
**Monday** 112:19
**monetary** 79:14
**money** 19:8 33:14,19
  37:21 52:19,21 95:14
  179:14 187:25 188:7
  188:18 189:7,9,14
  194:4 195:25 196:4
  196:12,16 199:17
  205:8 211:23 218:21
  234:25 235:16 237:1
  237:1 238:10 241:8
  242:13 243:9 244:6
  256:2
**monies** 18:21 188:13

191:7 195:5 196:20
  198:23 200:10 201:13
  202:14 205:7 211:21
  215:10 238:11 256:5
**monitoring** 61:25 74:8
  98:5 133:20 240:7
**month** 14:14,21 35:19
  62:3 78:3 188:6,21
  189:5 242:19,22
  243:1,8
**monthly** 256:9
**months** 25:13 138:11
  138:12,16 143:18
  241:6 242:3,4
**moot** 3:20
**morning** 231:8 235:14
**Moser** 250:24
**motion** 54:10,10 153:3
  159:3 160:2,3,4 164:3
  224:24 225:4 242:1
  258:22 259:7,10,10
**Motors** 219:14
**mouths** 187:11
**movant** 225:6
**move** 25:10 47:3 54:10
  72:18 73:7 88:17
  95:21,21 126:17
  139:20 157:19 170:18
  198:13 200:25 204:22
**moving** 47:6 195:14
  218:13
**mowing** 69:3 70:10
**MTR** 140:8
**Muir** 59:3
**Muir's** 207:12
**multitude** 228:1
**municipal** 63:1
**mutually** 231:9
**mysterious** 235:4
**mystery** 238:20

────────

**N**

**N** 2:1
**name** 4:4 6:3 7:15
  10:16,17 39:16 54:24
  54:25 58:6 67:7
  113:18 123:7,8,9,9
  128:24 129:17,20
  130:7 159:8,11
  165:18,23 166:6,20
  166:24 173:8 182:22
  184:4,18 186:19
  213:5
**named** 189:24 190:4,7
**narrowly** 226:19
**National** 182:5,17
  185:21
**nature** 11:23 36:10
  62:14 121:13 168:19
  211:2
**near** 237:22 254:5
**nearly** 135:17

**NEC** 10:6 19:7
**necessarily** 79:11 255:7
**necessary** 15:20 83:23
  94:20 107:5,11,19,22
  107:23 133:25 158:6
  160:14 163:10 214:7
  234:14 247:3 253:18
  258:15,19 261:5
**need** 54:2 78:18 79:9
  87:5 96:14,18 112:21
  113:22 149:19 156:8
  158:20 159:17 162:2
  162:5 168:3 174:5
  180:2 238:10 241:7
  253:14 254:4
**needed** 15:10 98:4
  103:11 177:14 189:14
  209:15 212:17 245:12
**needs** 84:13 101:4
  102:25 224:25 253:3
  253:13 256:23
**negative** 241:22
**negotiated** 24:23,25
  27:22,23,25 42:6,9,11
  109:12 236:20 254:8
**negotiations** 52:4,12,13
  71:18 99:3
**neither** 197:17 229:9
  246:21 247:13
**net** 14:17 190:13
**never** 3:20 5:20 18:22
  20:6 23:9 25:14
  38:17 45:12 47:1
  59:10 72:15 77:6
  82:1 105:23 119:11
  213:4 230:14,15
  254:2
**new** 11:14 21:3,6 22:5
  22:17,20 37:4 44:23
  50:17 53:20 62:2,25
  74:13 97:2 101:6
  111:14 113:5,5
  126:21,22 127:5
  129:5 161:17 204:15
  220:15 235:13 259:11
**newer** 138:15
**newly** 255:6
**newly-formed** 255:1
**Nichols** 27:14 209:10
  212:15
**night** 112:21
**nine** 123:21 138:10
  143:18
**nonbusiness** 182:11
**noncompliance** 158:13
  159:23 160:21 164:16
  174:2,16,20,25 218:3
  218:8 247:11
**noncompliances**
  239:13
**noncompliant** 129:16
  130:6,8,13,18

**nondebtor** 38:20 39:1,2
**nonexistent** 255:2
**nonperformance** 246:3
**nonresponsive** 47:4
**non-methane** 74:12
**noon** 63:11
**normal** 60:3 181:10
**normally** 61:10
**Northern** 1:1 247:6
**note** 50:21 51:8 52:17
  53:1 65:4 118:15
  166:3 179:13 183:17
  183:19 207:16 216:14
  221:6 255:23
**noted** 119:17 255:5
**notes** 97:4 161:11
  217:19
**notice** 46:17,22,24 70:3
  70:21 71:12 73:13,17
  75:1,18 76:8 114:6
  120:3,10 122:9 126:4
  134:2,2,13,19 138:21
  144:12,22 145:2,3,20
  148:25 149:20 151:17
  168:9 171:14 172:25
  173:11 221:22,25
  228:3
**notices** 46:2,14,21
  64:21 100:9 116:3
  120:2 125:19,20
  130:15 159:17 210:4
  210:4,11,16 228:1
**notion** 249:12
**notwithstanding** 39:8
**NOV** 76:14 92:2,5
**November** 94:14
**NOVs** 70:12 71:1 100:1
  103:14,22 114:1
  210:11 248:19
**NSPS** 62:2
**number** 3:10 10:20
  11:4 49:24 58:11,14
  58:20,22 59:17,18
  61:13 67:16 68:1,1
  69:19 74:11 87:20
  88:3,13 102:9 103:7
  117:18 137:17 148:3
  178:6 179:11 192:14
  197:24 206:9,16
  207:2 235:25 249:1
**numbers** 4:7 147:16,20
  147:20 155:20 178:8
  204:13 205:18,21,22
  205:25 249:2

────────

**O**

**oath** 32:22 34:10 177:4
  234:3
**object** 8:6,18 32:13
  38:14 53:23 62:12
  81:19 85:15 135:4,6,9
  152:25 156:4 182:11

232:1,17
**objection** 8:12 9:21,22
18:10 31:4 35:8
39:11 44:4 62:17
64:14,14,20 65:14
68:11 73:23 74:3
77:5,11 79:2 80:24
81:18 82:10,24,25
83:4 90:14,19 94:1,4
94:6 106:21 107:2
108:15 109:1,9,25
110:7 118:9 122:15
126:11 127:6,24
130:1 153:7 154:6
156:22,23 163:22
175:25 246:20
**objections** 64:23
246:23
**obligated** 29:2 43:15
242:11 257:4
**obligation** 7:6 23:24
29:8,10,14 41:14
50:23 51:12 52:18,20
197:3 201:17 231:11
235:17 256:22 257:1
257:5 258:5,7
**obligations** 15:13,15
28:19 45:21 51:12
52:5 60:1 92:9
179:19 189:15 194:10
196:13 200:24 208:16
231:10 249:7 256:16
**observation** 115:10,11
121:4,18 228:8
**observations** 114:11
120:15,19 121:1,6,13
122:4,8
**observe** 70:24 246:18
**observed** 115:5
**obtain** 134:10,10 138:6
161:22 162:11 163:3
163:9,20 191:7
226:24 241:22 242:4
242:5 256:22 257:17
**obtaining** 56:21 132:20
160:14 224:5
**obviated** 156:8
**obvious** 166:18 228:19
**obviously** 8:6,18
207:14 249:21 255:2
**occasion** 58:25 74:21
**occupies** 30:13,16 32:7
32:23
**occur** 210:6
**occurred** 210:18
**October** 142:19,25
143:24 144:2 146:22
177:11 213:6
**offense** 241:20
**offer** 18:23 64:19
160:19 215:20 237:20
237:20

**offered** 14:9 18:22,24
30:6 146:20 197:11
199:24 241:10 253:23
**offering** 189:12 199:10
**offers** 214:6
**office** 88:24 115:4
127:23 130:16 136:22
138:17 141:10 142:4
142:21 143:16,23,24
144:1,5 148:13
154:17 155:12 165:10
177:22 178:9 188:19
222:6
**officer** 7:17 10:25
11:12 21:6 27:18
40:4 97:13 106:7
175:6,10 183:12
227:13 255:9,13,18
**officers** 97:16
**offices** 66:13 70:23
131:14,18 136:15
170:1
**official** 58:6 118:13
121:25 135:24 136:1
136:11 137:4 150:21
151:4 152:1,9,13
246:13
**officials** 119:4 121:6
122:8
**oh** 14:21 25:25 37:8
72:1 90:8 128:8
148:2 177:24 178:3
**oil** 202:10 211:20
233:16 235:2 240:5,6
**okay** 4:25 8:23 10:12
11:11 12:4,11,14,17
13:4 14:1,4,11,14,17
14:21 15:8,21 16:2,10
16:18,21 17:5,13,17
17:21 18:3,19 19:19
19:25 20:3,7,17,22
21:13 22:4,10,15
23:11 28:14 33:13
41:20 47:15,23 50:4,7
50:15,20 52:11 53:11
54:4,8,20 57:16 59:16
60:18 61:21 63:14,18
64:5 65:12 67:9,20
68:7,20 71:5 77:10
88:1 94:11 96:12
97:20 102:3,11,15
103:2 104:22 105:15
107:17 108:19 110:17
123:1 125:9,16 126:9
131:1,24 132:6
135:21 136:13 139:16
139:19 143:12 145:17
146:6 148:9 149:18
149:22 154:4,7,13,24
167:2,15 168:1,14,21
169:8,12 170:1,4,10
170:16 171:3,16,21

172:1 174:13 175:4
175:20 176:22,24
177:17,23 179:6
187:19 189:11 193:12
195:14 197:19,22
202:3,12 205:13
207:23 208:11,13
212:13 213:25 215:25
217:10 218:9 219:9
228:16 232:10 236:15
244:11 245:24 248:21
252:22
**old** 101:12,14 182:4,17
182:20 185:21 243:20
**older** 138:14
**omitted** 220:2
**once** 66:2 72:11 112:3
133:9,21 134:1,13,15
134:18 135:2 144:10
144:13
**ones** 4:22 61:8 117:11
194:24
**one-third** 69:25
**one-time** 79:10
**ongoing** 18:24 29:10
180:10 181:2
**onus** 241:21
**open** 122:18
**opening** 160:16 224:23
**operable** 102:13,16
**operate** 22:12 75:8
81:3 84:6 105:3
107:25 111:21 139:1
154:18 155:7 166:20
175:5,7 184:4,10
187:3 189:10 229:23
247:9 253:3
**operated** 44:19 58:14
59:19 79:21 87:8
120:21 209:22 210:13
**operates** 180:11,12
181:1 213:10
**operating** 20:24 29:4,4
29:12,18,22 58:12
78:2 79:6 85:25
86:11,19,20 105:9,11
137:15,24 139:10
154:19 155:11,14,15
183:8,8 192:15
193:21 202:20 206:5
221:3 222:14,15
224:2 228:9,12 230:3
230:16 241:3 249:5
253:21 255:2,7
256:21
**operation** 20:19 21:7
21:14,18 23:13 39:22
42:22 59:20 69:1
90:12 103:18 105:6
180:25 181:1 202:10
210:19,24 226:18
241:6 247:4

**operational** 23:17
69:25 79:23 81:13
87:5
**operations** 18:21 19:5
19:16 20:5,15 38:5,11
38:20 39:5 89:20
103:15 123:22 126:2
191:16 193:6 205:6
212:19 216:3 238:14
246:24
**operator** 227:12
**operators** 43:4 214:11
**opines** 117:21
**opinion** 4:24 43:25
45:20 62:14 64:24
83:1 94:23 99:10,19
248:3
**opinions** 47:11 120:18
**opportunity** 81:5 179:4
186:1 189:22 250:18
258:7,25 260:19
**opposed** 46:19 114:17
116:21 180:10 184:23
202:21 218:16 226:16
226:17
**opposite** 158:23 202:4
203:16 235:20
**optimistic** 248:6,13
**options** 186:15
**oral** 257:23
**oranges** 161:18
**order** 32:14 58:2 110:9
119:6 134:12 138:6
160:2,8,12 168:23
169:4 170:6,8,12
174:6 178:24 179:20
192:17,19 198:16,22
221:5,7 222:9 225:14
247:18 254:19 257:21
**orders** 103:18 151:9,13
151:18 168:19
**ordinarily** 145:19
190:3
**ordinary** 149:5 184:15
184:23 194:1
**organic** 74:12
**organizations** 232:9
**original** 106:11 129:6
132:8 183:24
**originally** 65:22 85:10
132:6 146:20
**Ottawa** 224:3
**ought** 114:24
**outlined** 11:15 254:9
259:24
**outright** 234:22
**outs** 42:18
**outset** 195:22 240:17
**outside** 78:11 116:7
247:21,24
**outstanding** 35:15
130:15

**outweighed** 119:8
**outweighs** 116:13
**overall** 17:9 64:25 67:6
**overestimated** 207:15
**overrule** 82:9 118:8
156:25
**overruled** 18:12,14
32:17 35:10 44:5
62:17 68:12 74:3
79:4 80:25 109:2,10
110:7 130:1 153:8
163:22
**overruling** 64:23 65:13
**oversight** 63:4
**over-girth** 112:25
173:11
**over-height** 112:24
173:10,14
**owed** 33:19
**owing** 188:18
**owned** 40:2,10 209:9
**owner** 27:20 32:15
46:19 227:12 233:9
255:19
**owners** 3:23,23 14:4,11
43:17,20 44:3,8,9,12
44:18 45:17 46:4,10
46:13 120:4
**ownership** 34:23 36:12
36:13 91:24 128:23
173:7,8
**owning** 30:10
**owns** 27:13 35:6,6 38:2
234:9
**oxygen** 74:9 120:21,23
**O&M** 87:1 207:9
**o'clock** 251:17
**O'Meara** 1:14 8:5,14
8:23 9:4,21 53:22
112:17

**P**

**P** 217:22
**page** 31:18 50:1 67:8
68:5 73:18 88:17
90:4 94:18,18 99:14
141:20 142:6,11
147:24,25 149:25
150:1 152:16,24
169:17 170:11 236:6
**pages** 150:5 152:16,18
**paid** 3:9,14 18:16 29:7
39:8,12 52:7,7 86:22
91:7 242:24 244:4
**palm** 194:21
**Panamerican** 12:8
18:20 30:17 31:1
32:6,8,19 33:1,2 35:7
35:9,15
**Panamericana's** 32:20
**Panamericano** 32:16
32:24 210:1

**paper** 49:8
**paragraph** 50:1,23
  93:16,19 94:11,12
  99:6,9,14,25 169:18
  236:6,17
**parameters** 7:24
**paraphrase** 254:23,24
**pardon** 31:22 34:18
  36:20 181:6
**part** 52:5 66:8 70:17
  78:6 88:15 89:14
  102:4 180:5 217:24
  250:8
**partial** 244:14
**Partially** 95:25 97:15
**participate** 224:23
**participation** 23:25
  182:25
**particular** 117:12
  164:22 168:4 241:20
  249:15 259:18 260:13
**particularly** 193:23
  203:5 208:9 224:10
  255:20
**parties** 3:10 5:20 9:20
  13:25 17:15 24:19
  45:3 50:11 80:21
  134:5 175:5,7 183:25
  186:19 197:6 231:8
  242:7 246:4,8 256:15
**partner** 184:8
**Partners** 30:24 36:7,8
  36:13
**partnership** 27:15
**parts** 239:17,17
**party** 14:24 118:18
  134:21 156:4 173:2
  222:11,15 242:8
**party's** 191:9
**pass** 23:19 199:8
**passed** 148:22 190:18
**Pat** 54:15
**Patrick** 2:7 54:21 55:1
**pause** 117:6 219:12
**pay** 15:18 19:2,8 29:3
  30:21 33:9,14,18 51:7
  51:12 52:19,21,25
  202:15 205:4,6 219:5
  242:14
**payback** 204:18
**payees** 51:7
**paying** 9:16 38:7
  238:16
**payment** 29:21 36:6
  37:20 49:25 50:23
  196:11 252:25 256:9
  256:16 257:17 260:9
**payments** 4:3 6:16
  28:15 53:1 91:21
  190:14 205:4 257:20
**payroll** 3:14,15 222:13
**pays** 237:25 238:3

**pay-down** 205:11
**Pekin** 124:5
**penalties** 103:21,24
  109:7
**penalty** 79:14
**pendency** 139:3 166:4
**pending** 3:25 31:7
  100:25 111:15 242:2
**people** 22:12,12 78:8
  78:15 88:24 110:2
  116:7 121:10,12
  171:23 175:21 187:11
  187:16 190:17 194:23
  197:24 200:6 216:3,6
  216:10,20 222:13
  242:15 250:17,20,23
  251:1,4,6,10,18,20
  252:5,7 253:2 254:8
**Peoria** 1:15 20:8,11
  44:12 56:9,18 57:18
  57:20,20 58:1,4,7,7
  59:12,14,16,18,21,21
  59:22,25 61:18 62:20
  63:7 64:9 65:20 66:8
  66:22,25 67:5 68:21
  69:23 70:14,17 71:6
  71:12,23 72:4,13,19
  73:8,14 75:1,5,6,13
  75:21 76:4,18,24
  77:15,20,23 78:2,6,13
  80:10,18 81:17,25
  82:17 84:3,6,13 85:6
  86:14 87:11 88:2,4,11
  88:15 89:20,22 93:14
  93:21 96:7 99:8
  100:10,12,16,16
  102:12 103:19,25
  104:6,23 106:14
  107:1,8,10,24 108:12
  108:13,21,24 109:7
  109:21 111:9,13,21
  120:9 121:9 127:11
  127:15 129:24 130:20
  132:12 137:9,18
  139:21,23 149:24,25
  155:8,16 156:4,20
  158:21,24 159:1,10
  159:13 163:9 165:14
  165:15 169:14 175:11
  175:25 176:7 177:9
  183:20 190:16 193:1
  194:11 199:3 201:10
  201:17 204:21 213:23
  222:19 223:2 228:5
  238:9 239:10 242:2
  242:21,25 243:8
**Peoria's** 60:20 67:7,21
  107:10 246:20
**perceive** 170:11 202:23
**percent** 15:4,6 16:15
  23:25 24:2,18 25:6,8
  27:11,13 38:1,2 49:24

  50:4 51:12,24,25 79:7
  86:4 87:24 91:25
  120:22 188:8 217:25
  234:9 237:11,12,12
  244:12 250:1,2 256:5
  256:6
**perfect** 233:12
**perfectly** 45:9,12
**perform** 22:22 43:15
  65:1 162:13 187:4
  196:25 229:24 231:20
  239:22 240:7 250:17
  258:19
**performance** 6:14 13:6
  13:7 14:10 43:11,11
  45:15 62:3 74:13
  89:7 90:13 92:22
  93:8 160:18 161:25
  163:7 179:22 199:19
  200:8,9 219:24 220:4
  220:4,18,21 228:3
  230:21 236:14 237:9
  239:8 241:15 246:2,9
  246:15 253:15,23,25
  255:2,7 257:10,15
  258:13,15 260:13
  261:6
**performed** 17:10,11,25
  18:2
**performing** 42:19 45:9
  45:13 86:15,17 239:3
**period** 93:8 134:3,4,9
  134:16,19 135:3
  154:20 166:2 210:12
  211:15 212:10 213:13
  218:25
**periodically** 69:8
**periods** 124:1
**permit** 44:13 56:22,24
  57:11 58:16 60:24
  62:2 63:5 65:19,21
  66:4,15,16,21,23 67:1
  67:6,9,18,22,25,25
  68:2,10 74:23 75:2,5
  75:6 77:4,14 84:6,8
  111:4,8,12,19,20
  113:2,4,5,6,10,17,18
  113:20 116:14 118:22
  122:20 123:24 124:11
  125:2,17 126:5,19,23
  127:4,13,23 128:2,21
  128:22,24 129:5,6,23
  129:23 131:3,4,7,9,13
  131:16,19 132:5,7,11
  132:18,20,23,23,25
  133:11,22,25 134:2,6
  134:7,22,25 135:2,5,5
  135:6,6,9,18,20,21,22
  135:25 136:5,11
  137:5,10 138:7,8,9,10
  138:17,24,25 139:1,3
  139:9,10,11,12,13

  140:17 141:10,24
  143:7,9,9 144:13
  145:25 147:14 148:17
  148:22,22 150:10,17
  150:18,21,25 151:5
  151:17 152:2,3,6,8,14
  152:22 153:2,6,12,13
  153:17,19 154:9,18
  155:2,3,12 156:20
  157:14,15,16 158:10
  158:11,12 159:17,20
  159:21 160:14 161:1
  161:4,12,13,16,17,22
  162:11 164:14,20
  165:18 166:19,21
  167:11,17 170:21,23
  172:4,25 173:19,25
  175:4,6,11,16 176:6,9
  177:10 218:1,11
  221:9 223:4 225:23
  226:4,6,7,17,23 227:5
  227:9,11 240:24
  241:3,4 242:5 244:20
  260:16
**permits** 61:15,22,23
  62:23 66:7,11 67:2,3
  111:24 124:17,18
  125:14 128:15,17
  131:21 136:4 138:2,4
  138:14,15 155:15
  163:10 165:9 166:11
  173:18,22,22 182:14
  217:15 219:1 221:16
  222:15 223:9,23,24
  224:5 226:3,14,22
  230:17
**permitted** 67:17
**permittee** 132:9
**permitting** 60:19
  125:10 127:14 128:13
  129:13 137:23 247:2
**person** 22:12 121:17
  125:16 136:10,23
  137:1,3 151:24 152:5
  152:9 181:25 235:9
**personal** 92:17,20
  132:4 250:12
**personally** 47:25 57:25
**personnel** 20:18 222:25
  223:25
**persons** 43:5
**perspective** 16:24 17:8
  17:24
**persuaded** 257:22
**persuasive** 245:9
**pertaining** 22:18
**Peter** 1:12
**phase** 106:16
**phone** 171:11 213:5
**phrase** 219:23
**physical** 192:7,13
**physically** 167:11

  175:17
**pick** 240:5,12
**pipe** 98:11
**pipes** 84:17 87:4
**place** 31:21 113:17
  128:3 129:24 134:14
  136:5 137:24 153:14
  153:20 154:1 228:8
  228:12 229:4,24
  230:22 239:5,7
**placed** 198:17
**plaintiff** 48:14
**plaintiffs** 13:12,18
**plan** 42:25 43:1 166:13
  210:23 223:16 248:6
  250:21
**planned** 43:9 195:23
**planning** 99:4
**plans** 20:17,22 192:22
  195:6 251:25 252:15
**plant** 21:18 65:20
  67:11 75:3,7 83:19
  94:22 96:24 206:5
  251:13
**plants** 23:14
**plausible** 234:5
**play** 28:2 36:16
**playing** 218:17
**plays** 237:2
**pleading** 48:10
**please** 10:16 33:22
  54:25 123:8 148:3
  164:12 169:9 210:8
**pliers** 216:8
**plus** 95:13 188:6
**point** 3:21 4:14,17 5:5
  43:12 45:7,8 47:6
  57:13 96:5 112:1
  116:22 118:5 127:20
  138:20 145:8,25
  146:3 149:7 162:19
  168:4 188:2 189:11
  200:18,25 201:1
  208:14 210:20 212:13
  236:5 239:12 240:22
  248:21 250:5 253:12
  258:3
**pointed** 243:15
**points** 96:5 200:20
  241:18
**policy** 124:21
**pollution** 66:16
**pooling** 197:24
**poor** 246:4,5
**poorly** 17:1,10,25 22:3
**portion** 19:8 24:6,14
  33:21 35:21 47:4
  102:12 122:21 172:3
  188:6 237:4,5,10
  238:22,23
**position** 3:24 4:2 7:22
  57:17 118:20 122:19

123:23 222:7 253:10
**positive** 210:18
**possession** 209:21
210:19,25 228:13
**possibilities** 98:13
**possible** 53:18 105:7
261:10
**possibly** 8:13 59:15
162:2,3
**post** 55:16 177:22
178:9
**postage** 147:18
**posted** 177:17,20,21
**post-closure** 58:13 60:3
**post-graduate** 55:13,15
55:17
**post-petition** 246:3
**Potemkin** 230:12
**potential** 9:1 66:18
121:21 128:25
**power** 182:23
**powers** 5:11 182:1
184:2 198:7
**practical** 219:25
220:23
**practice** 124:1
**pragmatic** 219:25
220:23
**pre** 246:3
**preamble** 67:13
**precise** 38:16
**precisely** 5:4 87:9
**predated** 62:25
**predicted** 104:23
**predicting** 110:10
**prediction** 89:11,16
**predictions** 101:23
**predicts** 89:21
**prefer** 259:22
**preferable** 107:1
**preference** 97:11
178:21
**preferential** 247:15
**prejudice** 119:9
**prejudicial** 116:12
**preliminary** 117:14
136:16
**premature** 170:21
**premises** 83:24
**prepare** 26:18 56:24
61:1,20 90:15 110:1,3
232:25
**prepared** 61:4,8,14,22
83:7 85:5 88:22
119:4
**preparing** 62:5
**preponderance** 241:11
**present** 54:13 78:15
133:7,25 149:8
256:20 258:25
**presented** 145:8 149:13
197:1 202:5 203:18

241:24 257:7,9
**presently** 258:21
**preserve** 182:12 247:20
**president** 17:6 21:5
22:17 41:20 248:7,9
248:14
**pressed** 196:15
**presumably** 236:8
**presume** 7:22
**Presuming** 142:4
150:24 154:15
**pretax** 204:9
**pretty** 79:6 146:18
198:6 222:3 238:3,18
241:13
**prevent** 41:14 255:4
256:7
**prevented** 163:24
**previous** 73:1 152:8
**previously** 7:25 62:9
177:5 218:17
**pre-bankruptcy** 80:14
**pre-petition** 238:14
**prices** 188:22,25 211:3
211:4,10,15,18 212:2
212:8,23 244:2
**primarily** 61:6,9 71:14
92:11 113:25
**primary** 68:25 79:19
96:9 182:25
**Prime** 219:14 220:11
**principal** 36:6,21 205:4
205:12 257:25 258:1
**principals** 257:24
258:2
**principle** 261:2
**printed** 217:20
**prior** 68:21 77:15,20,24
78:21 80:14 86:4
91:4,16 103:15
138:11,12 145:9,20
160:21 168:24 169:5
174:1 177:17 212:19
213:5,13 214:11
218:3,7 222:6 248:19
**private** 109:16 124:1
**pro** 85:4 102:4,5 105:4
195:7 204:14 207:17
207:20 208:9 237:19
237:21,22 238:5,15
245:17
**proactive** 218:14
**probable** 220:5,9 252:8
**probably** 35:21 56:6,10
58:2 60:16 86:5
87:14 91:11 101:14
141:13,13 153:18
170:11 177:12 245:18
**probative** 116:13 119:8
**problem** 44:14 48:12
68:25 79:10 86:24
102:24 112:16 121:9

168:11 200:4 249:10
252:24 257:25 258:1
260:25
**problematic** 26:12
**problems** 17:18 18:6,9
19:22 44:10,17 45:2
47:20,20,23 68:20,24
69:2,11,23 70:7,9
78:14 83:17 98:16
210:6 212:7 214:3
216:21 218:22 249:12
249:17,19,20,21
250:2,8 260:17
**procedure** 124:21
128:20
**proceed** 180:2 218:12
223:4,13 224:17
225:13
**proceeding** 3:11 5:25
6:5,19 29:3 116:4
185:17,23 186:3
231:25
**proceedings** 1:6 115:19
115:20 156:5 261:13
261:17
**proceeds** 7:5,7 192:1
233:14 236:7,13
257:18
**process** 60:19 129:12
132:20,25 135:10
140:16 161:6,9
172:24 173:19 195:6
231:16
**processing** 227:18
**produce** 87:13 245:16
**produced** 89:9 96:16
190:11 233:1 243:2
243:14
**producers** 211:12
**producing** 87:11,15,23
**production** 105:23
109:19,20 110:6,14
**professional** 55:20,24
247:5
**profit** 182:10 191:15
220:20
**profitability** 211:17
**profitable** 209:14
220:25 232:9 235:3
244:3
**profits** 204:9
**proforma** 86:10,25
87:6,21,25
**program** 62:25 66:21
124:12,16,22 131:4
**programs** 56:7
**progression** 250:4
**project** 16:17,20 57:19
58:1
**projected** 85:5 87:12
223:14
**projecting** 87:25

**projection** 89:19
205:18
**projections** 15:9 86:23
205:15 237:6 245:1
**projects** 20:25 22:7,8
**promise** 189:15 190:9
**promissory** 50:21
52:17 179:13
**promote** 47:17
**proof** 8:7 144:15,18,21
149:12 160:19 161:21
161:23 179:2 227:14
233:18 241:10 248:9
248:15
**proper** 44:15 70:10
183:22
**properly** 18:16 87:7
124:16,22 133:24
**properties** 219:6
**property** 13:1 14:12
16:4,6 128:18 137:16
183:1 188:17 189:18
189:20 247:19,21
249:10
**propose** 185:13
**proposed** 40:14 41:8,16
183:23 191:12 199:13
200:1 253:17 257:18
257:20 259:3 261:6
**proposes** 200:24
**proposing** 199:9,10
**proposition** 103:3
114:23 117:23
**proprietor** 184:8,9
**prosecute** 182:2
**prospective** 227:12
**protect** 182:12 183:9
**Protection** 45:24 56:23
71:7 72:22 75:15
120:13 123:13 133:3
136:2 164:23 168:17
168:23 169:22,22
216:13 218:15
**protects** 139:8
**prove** 160:17 225:5
235:3 241:14
**proven** 144:5
**provide** 51:24,25 58:9
60:3,6 74:8 88:14
94:21 160:17 161:25
162:22 163:6,12
168:2 179:21 181:5
191:8 197:5 198:15
199:20,24 200:5
204:5 212:16 214:7
216:12 224:4 240:19
253:14,17,18,24
254:12 255:21 257:10
**provided** 17:19 18:7,25
19:23 25:14 49:16
57:1,23 95:9 98:25
99:1 126:8 167:23

169:4 172:4 201:8
221:7 222:9 253:25
254:3
**provides** 101:2 115:3
118:1 180:23,24
181:8
**providing** 88:11 254:10
256:15
**proving** 232:3
**provision** 51:6 174:10
180:15 184:5 194:15
226:1 256:13 260:21
261:8
**provisions** 5:15 260:20
**PSM** 102:23
**public** 100:10,16
109:13,14 114:2,9,10
114:13 115:4 134:2,2
134:4,16,18 172:22
172:22,25 173:3,5
**publicly** 190:10
**pull** 26:13,13
**puppet** 235:11
**purchase** 86:1 184:6
211:15 213:23
**purchased** 34:17,19
213:22
**purchasers** 36:7
**purely** 160:15
**purport** 185:4
**purported** 44:20
**purporting** 39:9
**purports** 146:10
**purpose** 14:7 22:4
40:21,23 57:7 95:23
95:25 97:16,17 180:9
182:9,25 196:1,12
200:23 201:14
**purposes** 145:10
199:18 219:24 260:12
**pursuant** 5:14 29:7
115:5,21 195:24
196:4 201:8
**pursue** 48:4
**put** 31:16 44:13,15,20
46:16 59:24 97:12
101:6 154:10 163:1
183:22 185:20 186:8
192:22 196:4 199:15
205:18 206:12,18
216:10 225:7 228:2
229:8 236:2 237:14
241:20 242:20 250:21
250:24 251:18 256:3
**puts** 172:21 251:23
255:21
**putting** 9:14 86:22
176:5 204:15 251:12
**PVC** 60:25
**p.m** 177:16

_____

**Q**

**quality** 57:1,5
**quarter** 15:16 27:5,7
  187:24,25 188:1
**question** 3:18 6:25 8:2
  8:21 25:16 26:5,14
  28:14 31:6,20,23 32:1
  32:4 33:9 34:9,12
  35:11 38:14 51:3
  52:13 64:25 82:13,15
  93:7 94:18 95:1
  99:17 100:25 101:25
  107:4 108:11,13,16
  108:18 113:22 119:2
  128:4,5,7,8,11 129:22
  129:25 130:3 131:15
  136:7 141:16 145:16
  153:12,19,22,23,25
  154:12 156:7,10,23
  157:20 158:8 159:16
  159:16,18,20 160:10
  162:16,23 163:21
  164:10 172:8 174:23
  175:9 176:4 182:3
  183:7 184:22 185:24
  186:9 189:2 194:4
  195:15,20 196:2,5,6,9
  196:10,19,22,24
  197:10 198:12 202:18
  203:2,3 205:14,24
  214:17,17 229:6,8,22
  238:4,9,18,25,25
  239:1,20 245:9
  255:12
**questionable** 197:6
**questioned** 206:11
  242:23
**questioning** 83:2
  156:15 163:25 166:17
  206:16
**questions** 31:17 32:12
  43:10 48:20 53:12
  90:23 105:25 113:24
  114:1 155:23,24
  156:9 157:4 160:5
  165:3 175:25 178:16
  197:14,15 214:18
**quibble** 118:16
**quick** 72:6 176:4
**quite** 50:7 157:24 202:4
  203:15
**quo** 247:20
**quotation** 197:22

_____
          **R**
_____

**R** 1:7
**raise** 9:14
**raised** 3:19 5:20 8:1,21
  185:14 187:15 197:16
  198:11 203:24
**raises** 6:24
**raising** 197:14
**ramifications** 155:11

155:13
**random** 240:13
**range** 91:13 95:5
**rate** 86:1,4 211:15
  240:20 244:5
**rated** 85:25
**rationale** 183:3
**RCRA** 226:3,4,22
  247:14
**reacting** 214:2
**reaction** 214:9
**read** 31:19 33:8,21,23
  34:11 94:17 95:19
  99:13,15 107:6
  112:20 146:15,18
  160:11 170:14 184:1
  197:21 217:23 226:20
  258:11
**reading** 99:24 120:22
  174:5 216:18
**readings** 121:6 122:12
**ready** 178:21
**real** 4:21 6:25 36:11
  72:6 82:10 183:7
  195:25 216:6 233:10
  233:12 235:4 239:20
  239:20 244:16 245:9
**reality** 215:7 221:2
  224:6
**realize** 161:20
**really** 26:11 47:5 107:5
  116:21 119:1 121:8
  143:10 156:13 174:22
  180:20 188:12 203:4
  207:8 208:2,7 214:13
  224:23 228:22 230:1
  230:23 239:1 240:4
  240:14 255:11
**Realty** 13:8
**reason** 10:10 49:11
  50:12 53:23 105:8
  108:24 109:4,6 122:2
  153:9 172:1 188:24
  189:2 239:21 246:19
  252:2
**reasonable** 16:14
  202:10 212:4
**reasonably** 26:23 190:2
**reasons** 212:21 219:22
  259:15
**rebut** 111:5 113:9
  122:21 162:7,20
  179:4 190:19
**rebuts** 113:16 160:12
  162:8
**rebuttal** 54:3 85:18
  110:25 111:2 126:12
  126:14 127:9,25
  128:3 129:21 153:10
  158:18,21 159:24
  160:5,9 162:16
  163:22 176:25 224:13

**rebutted** 191:6
**rebutting** 128:2
**recall** 23:10 27:17,19
  36:23 37:5,24 40:17
  43:13 53:19 68:14
  72:17 75:19 76:10
  77:2,17,25 95:20
  99:23 103:16 203:1
  204:19
**Recalling** 63:16
**recast** 205:17
**receipt** 147:10,16,19
  148:9 177:25 178:5,7
  178:7
**receipts** 146:7,11
**receivable** 28:15
**receive** 14:15 45:3 59:9
  70:13 72:10 73:4
  85:16 100:2,19,20,23
  125:23 134:19
**received** 7:4 36:6 66:6
  71:3 72:15 73:15
  76:16 91:20 100:3
  103:17 108:12,13
  112:19 132:17 135:13
  138:9 139:7,14,18
  141:10 142:5,8,15,22
  142:24 143:1,8 144:1
  144:9 145:14 148:13
  167:13 178:2 179:13
  185:25 197:8 204:24
**receiver** 59:14 150:14
**receiving** 68:15 157:17
**recess** 63:15 116:2,25
  117:1 178:22 179:7
**recipients** 52:25
**recitals** 255:24
**recognized** 79:8
**recollection** 28:1,8
  40:20 72:7
**recommence** 63:19
**recommend** 107:24
**recommendation** 106:6
**reconcile** 137:6
**reconsider** 160:6 259:7
  259:10
**reconstructed** 69:9
**reconvened** 117:2
  179:8
**record** 10:17 33:23
  54:25 62:1 123:8
  133:19 191:15 193:18
  213:23 224:19 225:5
  228:25 229:7
**recorded** 66:12 70:23
  122:3 131:14,17
**records** 65:4 86:19
  90:7,11 114:2,9,13,14
**recourse** 231:3,24
  235:9
**Recovery** 124:4 247:12
  248:24

**RECX** 2:4
**redesignate** 252:20
**redesigning** 97:11
**Redirect** 48:22 106:3
  176:1,2
**REDX** 2:4
**Reed** 2:8 110:25 111:4
  111:18 112:9 113:1
  113:16 116:14 122:21
  123:2,4,7,9 130:21
  148:24 150:10 153:24
  156:11 157:3 159:2,7
  160:5 163:20 166:18
  167:7 176:4,15
  216:15 218:6 221:4
  222:3 225:15 227:1
**Reed's** 112:15,20,22
  116:22 260:16
**refer** 130:20 225:21
**reference** 75:6 219:21
**referenced** 49:23 67:7
**references** 181:22
**referred** 48:25 50:5,10
  57:3 84:25 130:16
  156:2 173:8 189:19
  225:17 226:1 248:23
**referring** 50:12 97:4
  115:13,15 172:24
  191:22
**refers** 225:23 226:3,13
  226:17,21
**refiled** 48:8
**reflect** 121:5 161:11
**reflected** 29:14,15
  117:13
**reflections** 122:12
**reflective** 119:10
**reflects** 121:20 146:25
**refuse** 44:23
**refused** 44:12
**refuted** 245:18
**regard** 12:25 53:20
  64:15 102:3 112:14
  113:9 118:24 121:15
  168:7,8 171:3 203:19
  204:17 207:6 256:1
**regarding** 15:9 20:23
  21:6 22:11 24:14
  25:15 43:25 44:1
  45:2 52:12 56:2 58:4
  60:19 70:14 80:21
  83:7 84:12 85:5
  92:23 93:11 97:10
  99:10 100:1 104:10
  108:4,12,22,25
  109:18 117:19 149:20
  151:10,14,18,22
  152:22 153:2 173:14
  178:21 206:2,18
  243:23 255:21
**regards** 57:18 58:19
  59:12 124:20 164:25

172:5 173:17
**regretted** 213:18
**regulates** 66:17
**regulation** 177:15
**regulations** 46:6,25
  76:19 78:25 94:23
  110:8 131:22 227:6
**regulators** 109:16
**regulatory** 62:9 63:3
  72:14 158:12 159:22
  160:21 164:16,19
**reimburse** 107:8,10
**reissued** 88:25
**reiterate** 248:18
**relate** 118:17 119:6
  217:8
**related** 196:21 198:24
  214:19
**relates** 74:13 156:19
  218:10
**relating** 12:25 103:14
  103:18,22,25 125:10
  172:18 199:18 213:22
**relation** 165:13,15
  244:2
**relationship** 10:23 27:9
  39:25 234:4 246:5,7
**relationships** 195:23
**release** 174:3 218:4
  231:9
**relevance** 18:11 35:8
  64:16,22 80:24 107:2
  116:12
**relevant** 107:16 115:18
  128:3 129:25 153:15
  153:18 227:10
**reliable** 109:20
**rely** 233:24,25 237:15
**relying** 105:12,20
  190:9 226:11
**remain** 96:2 189:20
**remaining** 97:6 205:5
**remains** 7:21
**remanded** 135:7
**remedy** 253:11
**remember** 15:23 40:22
  40:23 64:2 68:6 97:4
  99:24 157:7,11 164:9
  229:19 239:14
**remove** 42:13 253:9
**removed** 79:18 112:23
  112:24 113:19 230:25
  251:23 252:25
**rendering** 39:9 261:3
**renewable** 23:6 138:2,4
**renewal** 68:14,18 77:4
  77:14,19 126:23
  127:16 136:11 138:7
  138:9,18 139:15
  141:3,5,7,9 142:1,21
  143:8,15 144:4,6
  146:11 147:14 148:15

150:10,18,25 151:11
151:15,19 152:23
154:16,17 157:7,13
157:17,20 158:2
167:11 168:24 169:3
169:5 170:23 177:9
**renewals** 138:19,21
154:22
**renewed** 139:11 140:22
151:6
**rent** 30:21 33:9,14,17
33:18
**rents** 33:3
**repair** 81:8 95:11 97:7
98:20
**repaired** 87:7 92:14
**repairs** 69:5,7 94:12,19
94:20 95:10,13,17,18
97:25 98:4 107:11
221:1
**repayment** 256:8
**repeat** 130:2 131:15
164:11 169:1
**repeated** 227:6,13,22
227:24
**replaced** 149:17
**replacing** 98:17
**reply** 222:1
**report** 82:2,3 115:4,7
118:21 122:10 124:25
125:1,4,7 208:1,4
**Reporter** 1:18
**reporting** 62:1 115:11
133:19
**reports** 45:3 62:3 74:8
98:5 115:18 116:6
117:11 118:18,24
121:5 122:7
**repository** 229:16
**represent** 39:9
**representation** 9:19
**representative** 31:10
**representatives** 120:12
120:16,23
**Repurchase** 248:4
**request** 18:20 58:10
134:10,11 151:5,25
152:2 160:10 171:9
171:13,18 173:3
**requested** 167:20
172:12 177:25
**requesting** 165:23
**requests** 25:11 143:14
**require** 101:5 130:10
163:8 227:23 254:16
**required** 55:23 66:22
69:4 81:2 82:4
102:16 108:6 132:21
134:23 151:22 171:20
179:22 183:15 185:18
195:22 196:11 199:25
223:10 260:12

**requirement** 57:6
77:22 107:7 166:10
171:6 175:20 223:8
236:12
**requirements** 18:24
45:23 55:23 56:2
58:3 62:1 92:12
124:24 125:10 129:6
129:11 133:18 164:21
171:7 200:2 259:16
**requires** 4:20 55:24
66:3 74:5 79:5 96:1
101:7 152:1 164:23
194:8 196:12 260:11
**requiring** 66:21
**res** 180:11 182:12
183:9 184:19,20
**rescheduled** 242:3
**research** 118:10 198:11
261:1
**reserve** 29:21 159:11
**reserved** 29:24
**reserves** 236:11
**resign** 37:3
**resigning** 36:25
**resolution** 4:20
**resolve** 3:21 4:17,21
8:21 165:21
**resolved** 3:20 71:22
74:19
**Resource** 1:3 3:2 12:5
38:8,23 39:18,23 43:6
63:16 124:4 131:4
132:9,11 137:18
141:5 175:14,15,21
192:8 247:11 248:24
**resources** 250:15,17
**respect** 45:15 180:1,4
200:4 208:19,22
211:4 216:15 221:4
255:11
**respectfully** 6:22
184:25
**respective** 233:23
**respond** 179:3
**responding** 85:19
**response** 32:11 118:19
120:3 134:24 143:14
172:9 206:15 222:11
228:17
**responses** 82:8 229:21
**responsibilities** 60:18
60:22 122:13
**responsibility** 29:23
225:4
**responsible** 92:9
135:24 136:1,11
137:4 150:20 151:4
152:1,8,13 175:6,10
222:11,15 239:2,7
**responsiveness** 134:24
**rest** 19:10,11 39:7

**restate** 64:14
**result** 41:6 46:4,8,8,9
71:15 119:21 230:9
230:10 249:5,8
**resulted** 92:2 260:24
**resulting** 115:21
246:24
**results** 193:5
**resume** 9:10 63:13,19
164:5
**Resumed** 64:6
**retail** 244:5
**retain** 184:6
**retained** 238:23
**retroactively** 149:15
**return** 147:19 148:5
177:24
**returned** 177:23
**returns** 243:17
**revenue** 23:2,3 85:23
87:6,25 105:7 206:9
**revenues** 238:22 256:8
**reversing** 247:7
**review** 58:15 60:24
61:11,13 65:21 66:7
68:19 70:16 116:25
117:13,16,17 118:11
118:15 120:11 124:18
125:23 127:3 131:9
131:24 133:8,14,15
133:23 135:3 140:2
162:24 164:24 166:4
168:20 171:1 210:3,8
221:5
**reviewed** 15:8 16:17
85:4 140:14
**reviewing** 127:12 134:1
153:4 158:10 159:20
164:14 227:4
**reviews** 154:22
**revoked** 230:25
**RFP** 89:14,15
**Ridge** 224:3
**right** 4:13 6:22 8:21 9:9
9:23 21:9 24:17 27:9
28:22 30:19 31:3
35:5 36:2 39:21
46:11 47:12,17 49:19
50:24 51:9 57:15
67:10,15 83:14 87:16
93:17 98:3 102:10,14
102:18 105:17 116:24
122:23 125:14 144:22
147:1 155:3 157:19
158:7 159:4,11,15
160:1 161:15,20
162:15,18 164:18
167:20 170:21 171:8
172:7,11,14,15,23
173:1,6,12 175:5,18
178:14,15,20 179:24
181:14,17 182:3

187:8,9,15 188:5
191:21 194:6 196:8
197:15 199:20,21
201:22 204:2 205:16
205:19,23,25 206:6
214:1 217:4 220:8
221:8,15,16,24
224:14,16 225:20
227:7,10 230:2 232:4
236:11,16 237:13
238:6,16 240:9
241:16 243:2 251:13
251:16 255:10 258:9
258:10 260:8
**rights** 7:9 43:21,22
58:21 186:5 247:21
247:24 258:8
**ripped** 44:15
**rise** 44:2 211:19
**risen** 70:2
**rising** 188:22 211:3
**Rob** 59:2
**Robbins** 124:3,4
**Robert** 1:14
**role** 16:25 20:14 23:13
28:2 36:16 40:19
59:12
**roles** 124:6
**Room** 1:20
**roughly** 95:6 105:10
**round** 157:6,6,10,13
158:1
**routine** 66:8
**routinely** 66:12 70:16
70:22 88:14 117:15
120:4 131:6,9,13,17
**RPR** 1:18 261:16
**RTC** 3:9 4:4 16:22 17:6
17:19,21 18:4,25
19:20,23 20:15 21:22
27:20,22,25 28:3,7
38:5,11,15,20 39:1,2
39:8,13 43:11,15,18
43:22,25 44:2,7 45:9
45:14,21 46:3,15,18
46:19,25 56:16 57:9
58:12,19,22,24 59:1
60:5,25 61:4 65:20
66:5,25 68:13 69:16
69:21 71:1,21 72:14
72:23 75:7 77:13,23
80:8 81:2,5 89:19,19
90:11 91:4,19,21 92:3
93:20,23 97:12
100:23 101:2 103:8
103:17,25 106:12
108:10 111:4,8,20
113:18,19 127:18
139:12 141:7,9
143:15 146:11 150:25
151:11,24 154:17
155:6 161:12 165:18

165:18 174:16,20,25
176:6 189:9 193:15
209:9 210:19 212:17
214:8,11 222:14
223:3 228:2,9,22,23
229:3 234:12 238:1
238:14 239:8 242,24
244:2,3,4,4 249:5,21
**RTC's** 17:24 39:6 46:4
46:8,9 68:20,22 69:12
75:2 77:3 92:19,22
103:14 120:3 155:1
**rule** 65:5,5 82:4 114:1
114:18 115:1,3,3
116:3 117:9,15,20,21
118:1 119:17,23,24
120:7 121:16
**rules** 193:25 228:4
**ruling** 122:17 160:7
**Rumpelstiltskin**
234:12
**Rumpelstiltskin** 27:10
27:16 40:2,10 209:11
234:11
**run** 87:9 209:12 214:8
**running** 78:9 79:12
96:5 179:18 206:9
216:3
**Rust** 87:14 89:10,13,15
89:21 101:9 104:10
104:15,24 109:22,24
110:13 208:4
**R-e-e-d** 123:10

**S**

**safe** 247:3
**sake** 251:24
**salaries** 238:17
**salary** 35:17,20 38:7
207:11,12 237:25
238:3,7,8
**sale** 233:11,14 244:6,13
**Sales** 247:5
**saloon** 231:2
**Sangamon** 40:15
122:20 199:2 207:21
223:2,4,5 224:5
239:16 240:24 241:4
**sanitary** 227:8,9
**sat** 187:14
**Satisfaction** 246:18
**satisfactory** 149:13
**satisfied** 161:24 162:12
**satisfy** 248:8,15
**save** 174:12 224:12
**saves** 156:14
**saw** 72:8 73:1 85:10
104:7 141:18 236:18
239:13
**saying** 4:23 5:1 74:7
103:7 118:19 194:21
194:22,23 196:19

198:5,23 226:2
241:19 250:5,7
256:11
**says** 25:7 51:23 59:14
96:11 107:10 120:14
146:23 161:9 170:14
211:10 219:22 224:7
232:25 233:3,17
235:20 238:9 244:11
252:19 253:4
**Scattered** 7:5,23 8:15
11:7,12 22:23 24:5,13
24:21,25 25:4,15
40:14,25 41:6 42:7,9
42:21 50:17 51:24
52:7,19,20 183:14
186:10,11 187:8,21
188:4,15,21 189:3,16
189:21 190:19 191:19
194:9 196:3 202:21
211:22,24 213:20,20
229:12,14 230:14
231:5,11,17 232:5
233:7 234:5 235:6
243:22
**Scattered's** 244:13
**schedule** 165:25 172:6
195:24
**scheduled** 130:9
**schemes** 180:20
**Schmetterer** 248:3,5
**Schmidt** 1:12 62:11,21
64:13 65:2 68:11
73:23 77:5 79:2
80:24 81:18,24 82:3,7
82:24 83:5 85:15,20
90:14 91:2 93:10,13
93:15 94:8 99:5,7
100:5,7 104:3,4
105:24 106:1,21
107:2 108:15 109:1,9
109:25 117:4 179:2
206:11
**Schmidt's** 206:16
**science** 55:9
**scientific** 249:2
**scope** 122:13 156:11,17
158:15
**score** 202:18
**scouring** 232:13
**scratch** 241:2
**screen** 130:24 139:23
146:25 181:7 236:3
**scroll** 67:12 72:6
140:25 141:12 147:23
152:18
**scrolled** 236:17
**scrolling** 150:6
**scrutiny** 117:18 216:17
**SCS** 104:18,22
**se** 143:11
**second** 51:1 52:3 81:6

93:20 99:24 106:16
115:16,17,17 181:13
182:5,17,20 185:21
195:15 203:24 214:14
219:10 221:13 251:18
254:20
**Secondary** 69:2
**secondly** 179:14
**Secretary** 183:17
**section** 107:9 116:14,15
118:22,23 123:24
125:2 126:5 138:10
148:17 151:17 152:6
158:11 164:22 167:17
173:23 174:1 180:5
180:13 184:2,11
197:21 200:2 216:15
217:5,10,23,25 218:2
219:24 221:13,13,13
221:15,23 222:18
225:16 236:6 247:8
256:3 260:22
**sections** 124:19 126:6
217:8 221:7,11
**section's** 146:1
**secure** 89:14
**secured** 12:9 50:14
**securities** 28:25 182:20
**security** 184:7 189:12
189:17 191:20
**see** 9:3 53:10,23 82:10
84:16 91:20 93:14
104:9 120:25 126:5
131:1 139:14,18
147:5 152:19 170:14
174:5 181:20 184:3,5
189:22 194:2,15
196:23 198:19 199:6
200:3 210:10 226:12
236:7 240:2,3 257:22
**seeing** 18:16 72:17
75:19 77:2
**seek** 113:4 190:4
**seeking** 118:19 162:14
**seen** 25:22 75:17 76:11
76:12 77:1,6 85:8
89:17 101:18,19,23
146:8 171:21 172:9
221:19 233:5,6
243:15,16,19,20,21
250:19
**sees** 236:12
**sell** 188:16 233:12
**seller** 246:17
**selling** 211:25,25
**semi-annual** 62:2
**senior** 50:14
**sense** 4:14 37:14,15
112:12 152:20 207:1
208:3 249:18
**sent** 66:1 73:4 100:9
147:4,11 181:22

**sentence** 94:20
**separate** 39:14 66:25
67:2,18 180:17 221:7
**separately** 194:3
**September** 56:14
132:16,18
**series** 240:9
**serious** 189:7 193:25
**seriously** 235:15
**served** 47:17
**service** 22:22 47:11,13
206:17,18
**services** 30:6 39:10
58:9 60:7 240:19
253:17 254:11
**set** 3:2 7:14 43:21 50:18
53:20 68:2 118:3
135:21 179:12 184:2
199:15 244:18,24
256:7
**sets** 171:8
**setting** 115:5
**settle** 14:9 44:21
**settlement** 19:7,12
192:9 243:5,7
**settlor** 16:8
**settlors** 16:6 41:12
**seven** 24:14
**sham** 231:13
**shape** 193:15
**shareholder** 11:7,10
21:2 27:12 184:7
**shareholders** 7:22
**shares** 34:17,19,25
35:14,15 234:10
**sheet** 26:22 29:16 193:5
253:22 254:3
**sheets** 233:1 243:16
257:22
**shell** 191:17,25 228:21
228:22 243:10
**shield** 129:24 138:24
138:25,25 139:4,12
139:16 143:7,9,10
148:21 149:14 153:13
153:14,19,20 154:1
**shields** 111:19
**shoestring** 209:4
212:18
**shops** 12:16,18
**shore** 242:5
**short** 112:10
**shortly** 56:10 127:16
**show** 63:7 71:6 72:4
75:13 76:4,24 84:25
89:2 98:5 146:6
162:5,6 163:11 187:3
191:2 195:18 220:9
223:23,24 247:2
250:4 253:16 257:19
**showed** 45:9 96:17
104:14

**showing** 116:17 146:24
162:12 193:5 259:1
**shown** 179:23 189:10
222:5
**shows** 205:1
**shut** 78:2
**sic** 30:24 137:17 223:7
230:22
**side** 3:13 86:25 194:19
235:10
**sides** 254:8
**sign** 44:12 140:5,6
150:18 151:10,15,18
244:21
**signature** 148:11
150:12,12 151:1,23
**signed** 25:4 59:9 97:14
136:11 148:9 150:10
160:2 251:2
**significant** 61:25 127:2
129:2 130:10 165:22
165:24 168:12 173:5
239:12 246:9
**signing** 97:16,17
168:11
**similar** 5:3 117:11
166:20,24
**similarity** 182:13
**similarly** 47:15
**simple** 166:5 253:10
**simply** 26:4 85:19
98:25 159:20 200:18
212:14 214:2
**sincerely** 248:12
**single** 137:9,13,19,21
155:18
**sir** 30:25 31:16 32:22
39:6 45:1 144:24
145:12 154:23
**sit** 31:9 101:15 172:2
176:5 216:21 234:10
234:11
**site** 59:17 60:8 61:5
69:16,23 71:20 78:17
79:17,22 81:8,17
82:17,23 83:8 85:6
87:11,17 92:19
101:22 102:1 103:1
104:1,6,24 105:21
111:21 112:24 113:7
113:11 154:9 165:14
165:15 173:6,7 175:8
175:22 210:6 226:8
228:5 242:21 247:10
248:24
**sites** 17:1,9 19:5 22:5
22:19 23:3,6 46:14
192:22 194:16 196:21
198:25 204:24 207:18
211:25 212:1 224:2
226:22 228:5,6
235:19 255:25

**sitting** 111:23
**situation** 96:21 145:22
196:16,24 201:2
210:23 211:6 222:19
252:25 260:16
**situations** 118:2
**six** 62:3 123:21,25
170:11 241:6 242:15
**size** 66:19,24
**skill** 119:3
**skills** 118:12
**slender** 258:11
**slew** 129:14
**Sloan** 2:7 54:15,21,24
55:1 62:13 63:18
64:8 88:6 106:5
110:18 206:1,8 207:6
210:5 211:1 245:2
**Sloan's** 206:7 207:24
245:11
**smell** 44:23
**smoothly** 249:13
**soil** 70:11 92:17
**sold** 87:19 89:5 102:6
182:20 188:20 189:20
235:2
**sole** 7:17 10:25 11:12
12:9 21:6 27:20
183:12
**solely** 132:11 150:13
196:21
**solid** 58:7 63:1 207:22
251:10
**solve** 98:16
**somebody** 136:10
190:24 201:24
**soon** 21:5 189:1
**sorry** 12:20 26:10 37:8
42:17 55:16 62:11
94:9 101:2 111:6
117:7 128:6 131:8
132:1 141:20 142:5
142:10 161:2 165:13
169:14 175:5 205:12
223:3,19
**sort** 117:23 122:4
133:20 134:8 183:23
193:10 230:15
**sorts** 44:16
**sought** 6:18 117:12
163:7 179:16 191:25
194:10 258:16
**sounds** 57:15
**source** 62:2,25 66:20
66:21 67:5,6,16 74:13
126:8 128:23 129:4,8
130:8 131:20 132:5
132:23 133:11 134:5
137:9,13,14,14,20,21
139:1,5,8 144:10
155:13,18 157:15
164:25 166:1,8,11

220:25 227:4 230:6
237:7 238:7 250:17
256:15
**sources** 22:21 27:2
66:17,18 115:22
116:17 119:18 157:18
157:18 202:6
**South** 1:19 13:1,14
14:12 30:13 31:25
33:15 38:8 39:19,23
175:15 188:16 222:14
**Southern** 219:19
220:14
**space** 30:13,16,19,20
30:21 32:1,7,18,20,24
32:25 33:1,4,10,14,15
33:17,18,20
**speak** 11:19 77:7
**speaks** 115:2
**special** 118:12 119:3
**specific** 13:5,7 14:9
67:9 171:20
**specifically** 63:2 71:3
96:9 159:11 182:1
217:5 226:10 227:3
236:11
**specified** 201:7
**specify** 110:9
**speculate** 110:2 199:11
199:14,22
**speculation** 214:2
237:13
**spell** 10:16 54:25 123:7
171:16
**spelled** 123:9
**spend** 252:23
**spinning** 233:17
**Springfield** 20:8 44:14
61:12 112:23,25
113:2,7,11 161:17
204:21 207:18
**square** 89:18
**squarely** 119:21 120:6
**staff** 125:3,6
**stages** 3:17
**stair** 89:10
**stamp** 141:11,19
146:12 152:16,19
**stamped** 142:14 143:1
150:3
**stamps** 143:5
**stand** 9:14 63:19 128:4
128:7,9 197:16
225:16 227:2 232:16
234:3,23 242:24
**standard** 62:3 128:20
198:7 241:11,12
**standards** 62:25 74:14
246:18
**standing** 64:20
**stands** 155:3
**start** 37:25 62:13 71:5

204:21 240:9 241:19
**started** 88:23 153:4
231:16 242:9
**starts** 238:5
**state** 5:15 10:16 54:24
55:21 91:16 95:4
117:13 123:7,12
124:16 168:9,15
170:8 180:23 181:5,8
181:11 224:2 227:14
**stated** 65:14 219:14
247:8,13 248:6
**statement** 22:15 26:24
27:1 46:7 122:18
160:16 224:23 233:5
254:3,14
**statements** 26:19 27:4
115:19 193:9 233:3
243:16,17 257:23
**states** 1:1 67:15 120:9
140:13 177:15 178:9
182:8
**State's** 183:17
**stating** 168:19
**status** 14:1 68:10,17
71:16 75:23 88:12
93:6 111:12 127:23
128:13 129:4,10
155:1 176:6,8 196:5
247:20
**statute** 5:21 174:10
216:18,23 225:16
236:9
**statutory** 5:15 6:9
260:19
**stay** 237:5 247:7,9
**stayed** 86:4
**Steinberg** 19:19,23
20:4 47:16,20,24
**step** 53:13 110:17
176:14 178:17
**stepped** 117:4 251:1
**stepping** 89:10
**steps** 79:9 80:15
**stipulate** 113:3 240:25
**stipulation** 80:6,17,20
81:1 93:12,18,19
94:16 96:7,11 101:1,2
101:5 102:15 107:6
113:8,22 156:8,13,15
156:25 198:23 199:1
223:5 224:6,9
**stock** 34:17,20
**storage** 226:8,22
**storing** 227:18
**straw** 251:22
**Street** 220:13
**strength** 255:6
**strike** 25:11 26:13 47:4
47:6 57:16 157:20
158:5
**stringently** 117:21

**strong** 186:23 250:10
**strongly** 232:1
**sub** 115:17 260:22
**subject** 6:4,9 26:3
82:11,12 145:21
156:11 248:25
**sublease** 32:5,7,19
**submission** 77:16,20
137:2 169:5
**submissions** 118:18
**submit** 116:8 133:2
151:19 170:13,15
171:23
**submits** 171:6
**submittal** 57:10 77:24
144:11
**submitted** 66:2 68:14
77:13 132:15 134:20
136:22,25 137:3
138:9 139:7 140:19
145:20 149:9 261:9
**submitting** 152:9
163:25
**subparagraph** 94:19
99:11,20
**subscribe** 211:9
**subsection** 217:11
226:13
**subsections** 217:16
**substance** 73:25 133:16
**substandard** 246:24
**substantial** 102:12
117:22 121:23 189:8
195:1,4,8 202:6,11
206:16 207:2 209:1
210:17 212:12 216:5
219:5 249:8,10 254:4
255:20
**substantially** 211:16
212:3 249:7 250:7
**substantive** 153:2
**subtenant** 31:1
**successful** 190:2
**suddenly** 252:3
**sue** 5:24 6:2,23 7:2,19
13:6 186:13,14 187:8
187:9,20 254:11
**sued** 5:24 6:2 7:20 13:5
13:7 48:13 181:9
193:1 253:7
**suffer** 119:9
**suffice** 145:10
**sufficiency** 203:23
205:14
**sufficient** 70:4 81:8
84:1 96:4,18 179:15
191:13 242:12 247:2
257:19
**Sugar** 36:7,8,13 37:6
37:11,13 48:24
188:11
**suggest** 106:25 109:24

112:8 239:23
**suggested** 241:7
**suggesting** 26:8 112:13
212:22
**suggestion** 191:10
**suggestions** 134:7
**suing** 181:9
**suit** 6:15 14:10 185:16
**sum** 43:21
**summarizing** 27:1
**summary** 134:24
222:16
**sums** 189:9
**sunglasses** 10:9,11
**supervisor** 140:7
**supplied** 83:12
**support** 137:16
**suppose** 149:19 236:2
**supposed** 72:10 100:9
199:8 232:23
**sure** 3:12 4:1 6:8,21
16:1 51:2 111:2
112:6 118:7 129:18
133:6,17,24 174:22
175:9 177:24 178:3
190:15 196:19 203:4
207:25 212:11 215:14
236:5 250:1,25
**surface** 239:16 241:2
**surprise** 214:24
**surprising** 215:18
219:4
**susceptible** 181:4
256:10
**suspending** 247:18
**sustain** 154:5
**sustained** 77:11 90:20
126:15 127:8
**sworn** 10:4,13 31:13
54:16,21 123:3,4
177:5
**symbols** 89:18
**system** 21:15 44:11,13
44:22 45:6 57:2
62:24,24 69:2,15,20
73:20,21 75:2,4,8
78:20 79:21 83:17,18
84:13,14,16 87:1,3
88:12 92:12 95:13
97:2,12,13,22 98:1,5
98:6,10,12,16,17,21
101:6 102:17 106:7
106:15,18,25 107:14
107:22 120:20 155:7
247:4
**systems** 63:3 209:13
**Szilagyi** 18:3,19 19:13
215:23
**Szilyagi** 18:7 19:6 48:5
48:9 215:8,9,9
**Szilyagi's** 47:11 215:22
**S-l-o-a-n** 55:1

**T**
**T** 202:13
**tailored** 226:19
**take** 3:23 6:3 7:8 9:6,10
9:18 43:22 44:22
49:25 83:18 116:2,6
116:24 120:2 135:17
154:17 161:20 178:22
200:24 208:20 210:8
217:23 227:5 230:1
234:19 235:15 236:8
241:19
**taken** 10:9 20:14 80:15
138:15 194:3
**takes** 135:10 137:23
**talk** 59:1 180:2 231:4
**talked** 37:21 109:11
170:20 173:21 198:21
206:11 212:19 215:1
216:17 241:18
**talking** 8:17 45:19
58:19 80:5 161:18
174:9 190:23,24
191:24 200:20 207:1
210:14,17 214:2
225:23 235:22,23
238:5 251:12
**tape** 209:6 216:7
**tax** 3:15 30:3,7,10
243:17
**Taylor** 224:3
**team** 78:8 239:4,6,22
**technical** 92:23 124:20
133:14,15
**technically** 163:1
**Technology** 1:3 3:2
12:5 38:8,23 39:19,23
43:7 63:17 131:4
132:10,12 137:18
141:6 175:14,15,21
192:8
**tell** 12:1,4 13:4 19:18
31:14 32:22 33:6,13
40:5 45:8 68:7 78:11
120:18 127:21 132:7
146:12 150:4 177:8
245:7 252:23
**telling** 163:14 256:18
256:24
**tells** 232:22 234:17
**temporal** 93:7
**ten** 20:16 101:12
187:25 208:24,25
230:22 252:7
**tenant** 247:24,25
**tendered** 144:16,18,22
167:19
**tendering** 156:15
**tens** 46:13
**term** 52:2 68:4 157:15
180:19 181:11 215:19

**terminated** 111:14
**terms** 50:1 69:22
  113:20 171:17 183:24
  204:7
**terribly** 233:11
**terrific** 136:4
**test** 46:23
**testified** 3:8 12:25 28:5
  47:19 74:16 79:25
  81:15 91:3 94:2
  100:1 102:22 103:9
  103:21 105:2 106:22
  111:3,7,23 157:5
  161:12 185:8 189:4
  192:6,21 194:12,13
  195:21 210:5 211:2
  215:13,13 218:13
  242:21 243:4,7 245:2
  251:25 252:10,21
**testifies** 201:22
**testify** 10:10 23:23
  50:25 51:2 62:20
  95:15 102:11 110:6
  111:18 113:1 160:20
  162:10 204:20
**testifying** 82:11,12
  105:15 226:14
**testimony** 9:10 25:11
  26:3,9,14 53:24 62:8
  62:15,17 79:3 81:21
  82:16 83:1 84:12
  85:16 94:5,15 95:7
  112:22 113:17 116:22
  121:17 122:22,24
  128:2 129:19 153:2
  157:25 160:13 161:8
  162:8 163:15,20
  164:6 167:10 168:2
  183:11 186:22 187:10
  189:1 190:13 191:9
  194:17 195:12 201:13
  201:16,20,21 202:9
  203:5,16 205:20,22
  206:1,7,18 207:5,7,25
  208:6,8,12 213:16
  214:15 218:6 222:4
  227:1 232:7 233:22
  234:24 240:23 241:14
  242:14,18 244:11
  245:4,5,5,8,11 248:23
  252:16 257:14,24
  260:17
**testing** 133:20
**Texas** 202:11 233:17
  245:20,21
**Thank** 8:23 9:4,24
  16:11 23:19 26:15
  54:14 58:23 62:21
  63:14,22 65:2,15
  67:14,20 72:2,19 75:9
  83:5 85:2,20 106:1
  110:15,19 119:15

124:9 137:8,25
142:16 149:22 164:8
165:6 166:15 167:3
176:10,15,16 179:5
179:24 224:14 225:10
261:12
**Thanks** 248:15,17
**theirs** 241:9
**theory** 189:23
**thing** 133:20 134:8
  140:11 147:5 161:10
  162:7 175:1 223:1
  243:25 248:22 252:15
  253:15
**things** 21:21 44:8 48:1
  167:8 170:7 171:22
  179:23 189:6 190:17
  203:8 205:9 211:19
  214:21 230:4 241:6
  253:24
**think** 3:6,11 4:17,18
  5:22 21:5 25:20,21
  26:1 27:14 31:4
  37:25 38:8 53:7
  61:11 63:10 68:5
  69:18 72:25 74:2
  84:4 102:21 104:7,20
  110:4 111:11 112:9
  112:12,18 113:13
  116:16,20 121:20
  136:3 141:18,23
  145:18,21 154:11
  161:6,7 168:3,8
  170:16 173:23 179:20
  181:21 183:6 185:9
  187:18 188:19,24
  193:13,20 194:13
  199:22,25 200:3
  201:1 203:2,22 206:7
  206:25 207:5 208:19
  209:18,19 210:3
  211:1,18 212:3 213:8
  216:17,24 218:16
  219:13,21 220:10,11
  221:4 222:16 223:17
  224:25 225:15 226:10
  227:19 230:9 232:2
  232:12 233:25 236:22
  238:24 239:14,20,24
  245:11 250:18 252:2
  252:5 253:13 254:20
  255:10 258:11
**thinking** 161:3
**thinks** 225:14
**third** 17:15 27:5,7 81:6
  93:20 96:8,12,19,21
  103:10 105:3 175:5,7
  179:17 197:6
**third-party** 187:6,12
  189:23,24 190:3,5
  199:3 201:10 258:10
**Thirty-nine** 217:12,14

**thoroughly** 260:19
**thought** 51:16,17 52:1
  53:7 93:5 95:19
  141:21 153:9 157:24
  164:3 204:6 225:16
  226:15 227:3 229:3
**thousand** 35:24
**thousands** 46:14
  233:18
**three** 50:23 67:8 74:16
  86:3 105:8,9 123:22
  123:25 126:24 135:17
  135:19 162:4 171:11
  171:22 179:11,22
  181:18,18 200:20
  206:12 207:18 208:9
  220:7 221:6 231:8
  235:19 260:1
**three-to-five** 154:20
  161:5,9
**thrive** 220:20
**throw** 204:10 252:15
**time** 7:12 12:7 14:2
  36:24 41:1 42:14
  54:9 56:20 59:25
  61:11 72:8 73:1
  76:12 79:7,8 80:1
  81:11 83:25 86:5
  89:23 90:2,10,24
  106:13 111:8 127:21
  129:4,10 132:24
  134:3,4,9,14 135:4,10
  143:13 144:14 154:20
  155:10 156:14 158:1
  166:2 169:1 171:2
  172:9 173:11 174:18
  177:12,13,18 187:20
  188:17,25 190:18
  193:6 197:18 205:3,7
  206:24 210:8,12
  211:15 212:21 214:7
  217:23 222:6 232:19
  248:1 252:23 253:14
**timeliness** 118:11
  153:10 177:15
**timely** 108:8,9 139:6
  140:19 144:8,17
  145:11 149:9,14
  150:25 154:15 165:20
  167:12,24 222:7
  244:21 259:14
**times** 21:20,22 48:13
  48:14 81:3 85:9
  214:17 242:4 260:1
**timing** 15:9 195:13
  204:17
**title** 57:6 124:10,11
  131:4 183:1
**titled** 184:16
**today** 38:19 76:12
  155:3 172:2 176:5,8
  185:14 188:3 201:25

238:17 241:25 261:3
**today's** 36:3
**told** 8:14 24:9 87:20
  232:19 234:2
**tomorrow** 188:17
  231:8,22 235:14
  239:6 252:4
**tonight** 231:1,7
**tool** 147:7
**top** 155:21 188:20
  189:8
**total** 15:5 46:23 81:10
  96:16 123:21 204:8
**totally** 211:16
**tough** 215:9
**track** 191:15 193:18
  228:25
**trade** 182:21
**training** 55:17
**transaction** 199:9
  235:4 261:11
**transactions** 261:11
**transcript** 1:6 99:14
  112:18,20 261:17
**transcription** 112:17
**transfer** 113:4,12
  128:21 165:18 173:16
  192:17,19 203:8
**transferable** 128:16,17
  128:22 197:25
**transferred** 173:7,9
  183:15 192:5 193:7
  244:22
**transferring** 11:13
  161:13,16
**trapped** 206:20
**Treasure** 182:15
**treatment** 226:21
**treatments** 247:15
**tree** 87:3,3 97:12 106:7
  106:11
**trend** 249:24
**trial** 8:7 41:9 62:13
  63:17 191:5 233:2
  238:20 242:3 248:25
**tried** 48:3 63:9
**Trinity** 240:6 251:10
**true** 24:7 30:14,25
  33:12 34:16 38:21
  39:6 45:10 92:8,17,22
  94:13 97:13 98:19
  99:9 100:8,20 104:22
  105:19 106:23 108:17
  113:18 114:16 120:17
  121:14 237:19 240:24
  261:16
**trust** 5:6,6,8,9,10,11,14
  5:16,18,23,24 6:1,9
  6:13,23 7:2,3,4,16
  11:4,14 14:24 15:3,22
  16:3,16 21:2 22:5
  25:17 30:2,3,5,8,9

35:6 36:17,19,25 37:1
40:16 41:1,1,7,15,24
42:11,14,19 49:22
51:7,13 52:6,18,21
113:3,12 180:3,3,5,7
180:8,9,16,17,19,21
180:23,25 181:3,9,12
181:24,25 182:11,12
182:15,18,20 183:1,3
183:5,7,10,16 184:5
184:15,16,16,18,23
184:23 185:4,7,15,20
186:2,5,12,19 187:3
191:23 192:12 193:6
194:25 196:6 197:23
198:1,5,6,7,8,17
201:2,3 202:20
203:20 204:9 223:3
229:6,11,16,22
230:12,13,14,25
231:14,15,18,20,21
254:25 256:2,14
257:16 260:3,4,4,8
**trustee** 1:10 3:19 6:3
  7:2,3,8 14:5 18:4
  19:20 21:5 22:16,20
  29:23 30:2 36:25
  37:4 42:14 47:12,17
  47:21 48:8 92:25
  163:2,5 181:9,10,24
  182:2,23 184:2,4,6,19
  185:5,7 186:4,11,14
  186:20 187:1 192:11
  193:24 198:8 209:19
  209:20,22 210:7,13
  210:21 212:10,20
  213:14 214:5,12,20
  214:23 215:3,4,10,15
  224:20 225:6,6 228:9
  231:1 248:20 250:4
  253:10 258:20
**trustees** 16:25 182:23
  249:6
**trustee's** 224:24 242:1
**trusts** 16:6 180:24
  182:7,7,8
**trustworthiness** 115:24
  116:18 119:19 121:7
  121:22,23
**trustworthy** 118:4
**trust's** 182:13
**truth** 31:14 33:13
  64:24 65:10 73:25
  114:4,8,24
**try** 8:20 38:16 218:15
  241:17
**trying** 52:24 73:24
  99:24 147:6 162:19
  195:17 220:8 233:12
  249:16 250:4 256:11
**tune** 107:25
**turn** 42:18 103:13

133:22 203:7 221:12
**turned** 98:11 103:5
**turns** 117:9 187:17
　202:11
**Twenty-five** 24:18
**twice** 112:3,4
**two** 15:23 15:23 24:5
　24:15,19 32:23 33:6
　33:16 41:2 55:25
　56:6 62:9 67:2 71:20
　74:11 85:24 87:24
　88:18 96:9,13,17
　105:6,10 106:20
　113:19 128:25 143:8
　181:18 185:7 188:20
　190:10,13,16,16
　204:7 211:19 217:7,8
　223:12 232:18 234:15
　234:24 241:23 244:15
　245:12,15
**two-thirds** 73:22
**type** 64:15 126:19
　129:9,12,12 137:23
　226:18
**typed** 146:24 147:17
**types** 126:25
**typewritten** 147:20
**typically** 68:4 108:21
　135:17 253:20

**U**

**UCC** 246:13
**ugly** 228:25
**Uh-huh** 36:9
**ultimate** 153:24
**ultimately** 153:18
　185:25 230:5
**umbrella** 67:4
**unbelievable** 188:19
**uncaring** 250:13
**undercut** 208:8
**underlying** 121:12
　166:8
**understand** 3:22 4:2,3
　4:8 41:10,18,19 45:4
　52:22,23 84:16
　145:21 149:4 201:2
**understanding** 5:4 6:1
　10:22 11:6 14:23
　21:23 22:10 23:5
　24:8 50:22 59:11
　79:15 80:7 81:14
　110:5 145:1 149:19
　158:21 167:9 170:19
　173:13 239:25,25
**understands** 215:8
**understood** 47:8
　157:25
**unfortunately** 18:5
　49:10
**unique** 233:11
**unit** 124:12 126:3

132:3 133:12,23
169:25 211:4
**United** 1:1 178:9
**University** 55:10,12
　117:16,17
**unknown** 8:17,17 86:3
**unoperational** 79:1
**unpaid** 91:10,14
**unproven** 116:12
**unrebutted** 191:9
**unrelated** 37:11 46:15
　234:16
**unsecured** 189:15
　190:9,9
**unsupported** 119:10
**untimely** 144:11,13
　148:16,18
**update** 88:11
**updated** 6:7 25:14
　88:25
**upholding** 247:8
**upkeep** 69:3,4
**upper** 89:10
**use** 19:13 22:21 30:10
　32:23 47:13 122:1
　142:10 194:22 196:12
　196:16 201:7 215:19
　216:7 236:6,11,13
　247:19
**useless** 112:17
**uses** 27:2 86:11
**USG** 173:9
**usual** 240:19
**usually** 196:23
**usury** 236:9
**utilization** 195:13
**utilized** 206:22
**utilizes** 67:16
**U.S** 1:19 63:1 134:5
　135:3,4,4 177:21

**V**

**vacuum** 74:8 98:6,9
**valid** 111:4,8 113:17
　119:7 122:20 137:1,7
　152:5 163:3
**validity** 113:10 153:11
**Vallas** 208:25
**Valley** 122:20 199:2
**Vallis** 252:6
**valuable** 204:6
**value** 35:1 41:5 116:13
　116:13 119:8 201:5
　229:2
**valves** 98:10
**vantage** 43:12 45:7,8
**variant** 243:2
**varies** 35:18 83:19
**variety** 152:24
**various** 22:19 45:3 50:8
　85:4 109:18 116:10
　193:19 202:6 212:16

221:14 242:12 244:17
**vary** 83:15
**vast** 228:15
**vegetative** 69:20
**vehicle** 202:20
**vein** 5:3
**vendors** 30:6 82:21
**venture** 233:14 235:13
**verbally** 99:1
**verdict** 54:11
**verify** 57:7 58:16 67:13
　72:7 178:9
**view** 17:2 119:24
　163:18 239:12
**viewed** 246:2
**vigorously** 187:16
**village** 230:12
**Vince** 59:3
**Viola** 224:3
**violated** 46:25
**violation** 46:3,17,21,22
　46:24 64:21 70:3,20
　71:12 73:13 75:1,17
　76:8 78:25 116:4
　120:3,10 121:5 122:6
　122:9 125:19,20
　126:2,3,4 130:15
　139:2 144:12,22
　145:2,3,20 148:25
　149:20 155:14 159:17
　173:11,14 210:4,4,11
　210:16 227:24 228:2
　228:3 248:23
**violations** 46:14 73:17
　73:19 209:24 217:18
　227:6,13,23 228:12
　246:11 248:19,22
　260:24
**visit** 78:6
**VN** 72:11 75:23 144:11
**VNs** 70:12,13,22
　108:12 126:9,13
　248:19
**void** 113:2,19 136:14
**volumes** 249:2
**voluntary** 197:23

**W**

**wait** 14:13 51:1 52:3
　115:16,16,17 152:20
**walk** 93:17 132:19
　231:6
**want** 5:5 8:7 21:11 26:2
　26:8 38:13 50:25
　51:2 54:18 59:8
　100:22 107:18 112:6
　118:20 122:24 148:1
　152:16,19 164:5
　167:7 187:20 195:16
　195:19 196:19 199:22
　200:21 216:2 230:1
　231:12 243:25 248:18

250:24 252:23 258:23
259:13
**wanted** 3:6,12 9:12
　19:9 63:25 181:14
　203:17 216:1
**wants** 94:4 156:10,16
　163:19 171:17 185:5
**wasn't** 3:12 44:24 82:5
　101:25 108:17 173:15
　213:16 226:10 236:17
　249:25
**waste** 45:4 58:7,14 60:2
　60:25 63:1 70:10
　71:20 90:1 99:1
　208:23 226:8,21,21
　240:6 247:10
**wastes** 227:18
**water** 61:9,12
**Watson** 208:25 252:6
**Watts** 173:10
**way** 7:19,24 8:25 9:5
　45:22 46:16 47:21
　52:20 84:18 87:17
　102:25 112:13 113:14
　129:2 163:22 184:10
　186:9 194:19 196:3
　203:9 210:15 211:8
　211:12 218:1 222:13
　228:19 235:13 236:10
　237:14 251:8 260:7
**Wayne** 120:15
**ways** 171:11
**website** 183:18
**WEDOFF** 1:7
**week** 24:10,11 25:3
　52:5,11 60:17 104:7
　170:20
**weekend** 112:18
**weekly** 78:7
**weeks** 32:23 33:6
　208:24 232:19 234:24
　252:6
**weighing** 168:21 169:2
**weight** 119:25
**welfare** 249:11
**wellhead** 120:23
**wellheads** 120:20
**wells** 30:14 31:25 33:15
　60:9,11 69:21,25
　71:13,21 92:13 98:23
　102:12,16 106:17
　206:17 207:2 208:5
　235:3
**well-capitalized** 222:25
**well-financed** 232:9
**went** 117:8 145:20
　213:19 215:6 217:20
　232:10 249:13
**weren't** 90:10 209:15
**West** 30:24
**Westview** 220:12
**we'll** 7:11 63:19 139:19

156:21 175:24 198:12
259:5
**we're** 5:4 8:6,16 50:18
　67:9 105:17 119:21
　136:4 176:23 187:15
　190:24 200:6,20
　228:22 231:15 234:6
　251:2,8,16
**we've** 25:11 61:19
　77:17 82:20 85:8
　103:7 138:15 154:11
　160:16 161:15 176:20
　194:4 220:12 221:19
　230:10 232:11 240:5
　240:6
**whatsoever** 125:13
　232:21
**wherewithal** 243:14
**willing** 49:17 50:17
　113:3 188:8 251:5
**willingness** 53:20
　198:15 240:18
**wind** 252:15
**winning** 186:23
**wisely** 3:12
**withdraw** 99:12,12
　141:16 175:24
**witness** 2:4 10:1,4,13
　11:19,21 18:15 23:20
　25:23 26:8 32:18
　35:11 37:13 39:12,18
　44:6 49:17 51:9,14
　52:9,15,23 53:15,16
　54:16,21 62:14,22
　63:19 68:13 74:4
　77:9 79:3,5 81:1,19
　81:23,25 82:6 83:15
　90:23 93:4,9 94:4
　109:3,11 110:8,19,21
　110:25 113:23 118:22
　123:3,4 128:12 130:2
　130:14 141:18,23
　142:13,18 144:23
　145:12 147:8 149:2,6
　149:11,16 154:3,23
　156:2,7,15 159:7
　160:20 164:11 166:17
　166:22 167:1 176:16
　176:17,20 177:5
　178:19 232:16 234:3
　234:23
**witnessed** 230:10
**witnesses** 54:6 110:22
　159:9,12,12 176:18
　201:13 249:1
**wondering** 13:1
**word** 45:12 47:13 93:2
　184:1 200:6,15
**wording** 78:1
**words** 32:23 157:5,11
　220:17,20,22 226:11
**work** 49:12 55:13,15

56:13 57:12 62:19
63:10 68:20 91:8
124:18 125:24 165:1
175:16,17,21 205:22
210:23 239:2 242:9
252:14
**worked** 61:4 71:20
165:2 215:8
**workers** 209:5 242:14
242:15
**working** 60:15,17 63:8
63:23 73:21 88:24
98:12 106:13 138:21
209:3,4,4 211:12
246:4 250:11 251:13
251:19
**works** 4:2 100:10,16
169:24
**world** 195:9 211:5,13
211:18 212:6 230:8
230:19
**worse** 228:18,19
230:10,23
**worsened** 69:14
**worth** 190:14 213:11
213:11 236:5
**worthwhile** 16:20 43:2
43:3
**wouldn't** 22:3 102:19
118:23 210:20 249:22
259:9
**write** 124:21 134:23
183:24
**writing** 6:7 59:9 71:19
**written** 34:5,15 53:5,8
134:20 147:16 182:24
**wrong** 45:8 74:25
136:10 173:9
**wrote** 89:14 205:21
**www.USPS.gov** 178:10

―――― **X** ――――

**X** 2:1 240:5

―――― **Y** ――――

**Y** 240:5
**yeah** 20:13 51:4 99:23
178:11 206:6 217:13
236:23 251:2
**year** 12:11 15:23 27:6
31:11 56:6 83:21
84:4 86:2,4 109:24
123:25 154:20 161:5
161:9 188:7,13
231:16
**years** 20:16 55:25 56:5
58:2 101:12,14 103:8
105:19 106:15 123:21
123:21,23 135:17,20
157:15,16 162:4
188:20 189:9 190:16
190:16 208:21,24,25

209:22 223:12 230:22
241:23 244:15 246:23
250:20 252:3,5,7
**yesterday** 12:24 64:15
74:17 79:25 102:22
146:20
**York** 220:15

―――― **Z** ――――

**Z** 240:5
**zero** 43:21 250:6

―――― **$** ――――

**$1,250,000** 188:13
205:10
**$1.1** 36:4
**$1.2** 28:24 35:4 232:23
**$1.3** 241:7
**$1.8** 83:20 84:22,23
**$10,000** 14:10 35:19
**$110,000** 207:14
**$14.5** 204:8
**$150,000** 14:16,21 29:5
29:22 189:5 213:11
232:20
**$16** 28:10 213:11
**$200,000** 84:5,5 95:16
**$25,000** 79:16 242:22
243:1,8
**$250,000** 81:16 82:16
97:24
**$3** 15:16 18:25 21:24
42:20 179:12 185:25
188:9 194:8 195:15
195:21,22 199:16
200:22 203:25 205:2
205:2,14 212:25
234:18 235:5 253:6
257:13
**$40,000** 35:2 91:13
207:9,13,13
**$500,000** 95:10,12,16
**$58,333.33** 205:11
**$600,000** 215:20
**$7** 213:24
**$70,000** 207:11
**$700,000** 188:5,21
202:11
**$840,000** 83:19 95:6
96:25 98:24

―――― **0** ――――

**05** 213:6
**06** 15:25 192:17
**07** 192:18
**08** 208:3,4

―――― **1** ――――

**1** 58:11,14,20,22 59:17
59:18 61:13 67:16,22
67:25 68:1 69:19
88:13 131:4 225:21

**1.9** 86:5
**1:30** 63:12
**1:45** 63:13
**10** 2:6 106:17 217:5
221:23
**10-2-2006** 146:24
**10:30** 3:2
**100-acre** 84:19
**101(9)** 180:5 181:12
**1022** 152:17,19
**1024** 149:25
**105** 247:8
**106** 2:7
**11** 18:4 39:13 47:11
73:8 92:25 99:14
120:9 124:17 125:3
193:24 209:19,20,22
210:7,13,21,23
212:10,18,20 213:14
214:5,12,20,23 215:2
215:3,10,15 240:13
247:15,22 248:6,20
250:3
**12** 105:18 106:15
138:12,15 184:11
252:5
**120** 254:21,22 255:17
**123** 2:8
**1246** 182:15
**1247** 182:15
**129** 99:14
**13** 1:5 75:10,14,16
101:14 252:3 261:14
**13th** 132:18
**134** 150:5
**140** 60:10 69:25
**15** 12:23 28:10 31:18
58:2 94:18 208:21
213:10 222:1
**15th** 56:14 90:9 94:14
**150** 84:5 111:24 172:14
**150,000** 242:19
**16** 12:23 76:2,5 169:8
169:10,14 175:25
192:10
**16th** 218:25
**165** 2:9
**166** 219:14,18
**167** 2:8
**176** 2:8
**177** 2:10
**18** 38:1
**1905** 181:19
**1972** 246:13
**1975** 57:23 59:19
**1980** 182:6
**1985** 247:7
**1986** 56:10 220:15
**1990** 117:18
**1994** 219:20
**1995** 60:5 87:14 89:11
89:13 101:24 109:22

222:22
**1996** 60:3 106:12
222:22
**1998** 59:20
**1999** 12:2 57:14 127:19
132:16,18 135:14

―――― **2** ――――

**2** 67:22 68:1 182:15
**2nd** 68:8 76:6 135:23
143:20,24 146:22
177:11
**2.3** 236:6,6
**20** 106:17 152:17 178:6
**200** 30:24 81:16 82:16
141:14
**2000** 12:12 213:6
**2002** 65:25 135:14
**2003** 69:18 71:8 92:25
**2005** 56:14 72:21 73:14
248:3
**2006** 75:16 76:7 142:19
142:24,25 143:25
177:12 192:10 218:25
242:25
**2007** 27:7 68:6,8 94:14
135:23 143:20
**2008** 1:5 105:13,17,21
109:24 110:7,14
205:10 261:15
**2010** 188:18 223:12
**21** 76:22,24 139:21,23
149:24 150:8
**219** 1:19
**22** 93:14 99:8
**22nd** 71:8
**23** 2:6
**246** 245:20,22
**25** 15:4,6 16:15 23:25
24:2 25:6,8 37:25
51:12,24 52:2 256:6
**250,000** 95:6,12
**2500** 239:17
**256** 254:22 255:17
**26** 31:18
**265** 117:14 254:23
**28th** 31:11 34:9,16
35:23 36:2

―――― **3** ――――

**3** 63:7,25 64:9 67:10
130:21 143:19 235:2
246:13
**3.12** 236:23
**30** 38:1 55:24 91:13
134:16
**30(b)(6)** 31:10
**30-day** 134:3,4,9
**300,000** 95:17
**303** 180:13
**33** 88:2,4 117:13
**330** 30:13 31:25 33:15

**332** 182:16 248:4
**336** 248:4
**340,000** 97:6
**343** 248:9
**35** 57:6
**35434** 1:3 3:3
**36** 85:1
**365** 183:22 200:2
**365(b)(1)(C)** 219:21,24
**365(f)** 219:22
**37** 182:5
**38** 117:17
**39** 173:23 216:15
217:11
**39(a)** 225:17
**39(i)** 164:22 225:17,19

―――― **4** ――――

**4** 71:6 72:21
**4th** 142:19,25 144:2
**4(a)** 93:19
**4(b)** 94:11,12
**4(c)** 99:9,11
**4.5** 216:24
**4:30** 177:16
**40** 217:25
**400-percent** 239:18
**401** 13:1 14:4,12
188:16
**403** 119:23,24
**407** 13:14
**415** 174:11 217:1,4,6
221:22
**45** 134:14
**45-day** 135:3
**48** 2:6 197:22
**481** 197:21

―――― **5** ――――

**5** 71:24,25 72:5 182:15
236:6
**5th** 142:24
**5.2** 86:1
**5/1** 181:25
**5/3** 182:1
**5/39** 174:11 216:25
217:2,3
**5/39.5** 217:5 221:23
**50** 27:11,13 49:3,4,22
234:9 237:12
**50/50** 57:22
**500** 86:20 87:23 105:9
239:17
**500,000** 95:14 97:1
**52** 236:1
**54** 2:7
**56** 247:5
**59** 220:13,15

―――― **6** ――――

**6** 94:18
**6.1** 184:2

**6.7** 244:7
**6:00** 251:17
**60** 14:13
**600** 86:21 87:15,23
   102:23 105:10
**60604** 1:20
**661** 1:20
**69** 146:7

---
**7**

**7** 14:3 19:20 29:4,22
   39:14 47:17,21 72:19
   182:5
**7th** 90:10
**7(c)** 99:6
**70** 38:2 146:7 148:3
**700** 87:16
**727** 220:16
**73** 221:6
**74** 220:13
**747** 220:13
**75** 49:24 50:4 51:25
   52:2 87:24 237:12
   244:12 256:5
**75/25** 52:10 53:1
**750,000** 15:17
**753** 247:6
**760** 181:24 182:1
**764** 247:16
**767** 117:17

---
**8**

**800** 85:25 86:13 105:11
**803** 114:2,20,21 115:3
   117:15
**803(8)** 115:4 117:10
   119:22 120:7 121:16
**803(8)(c)** 116:3 117:20
**8038** 65:5
**811** 57:6
**832** 245:20,23
**840,000** 84:21

---
**9**

**9,216** 34:25
**9:30** 1:4 261:15
**90** 237:11
**9014** 82:4
**91** 2:7
**92-7163** 10:20 11:4
**95** 251:24
**99** 1:3 3:3
**993** 219:14,18

# EXHIBIT C

1

<pre>
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3


 4      In re:                          )
                                        )
 5      RESOURCE TECHNOLOGY CORPORATION,) No. 99 B 35434
                                        )
 6                        Debtor.       )
        ------------------------------ )
 7      LEON GREENBLATT, et al.,        )
                                        ) No. 06 A 00072
 8                        Plaintiffs,   )
                                        )
 9                  vs.                 )
                                        )
10      NETWORK ELECTRIC COMPANY,       ) Chicago, Illinois
                                        ) March 5, 2008
11                        Defendant.    ) 10:00 a.m.

12


13                  TRANSCRIPT OF PROCEEDINGS BEFORE THE
                          HONORABLE EUGENE R. WEDOFF
14

15      APPEARANCES:

16      MR. GEORGE APOSTOLIDES
        on behalf of Jay Steinberg;
17
        MR. JAY STEINBERG
18      Chapter 7 trustee;

19      MR. GREGORY JORDAN
        on behalf of Illinois Investment Trust, Illinois
20      Generating Station, Chiplease, Scattered, and Banco;

21      MR. ROBERT O'MEARA
        on behalf of Allied;
22
        MS. LINDA KUJACA
23      on behalf of the City and County of Peoria.

24

25
</pre>

2

1          THE CLERK:  Resource Technology

2    Corporation, 99 B 35434, with related adversary,

3    Leon Goldblatt, Chiplease, and Bank PanAmericano

4    versus Network Electric Company, 06 A 72.

5          MR. APOSTOLIDES:  Good morning, Your

6    Honor.  George Apostolides on behalf of Jay

7    Steinberg.

8          MR. STEINBERG:  Good morning, Your Honor.

9    Jay Steinberg, Chapter 7 trustee.

10          MR. JORDAN:  Gregory Jordan on behalf of

11    Illinois Investment Trust, Illinois Generating

12    Station, Chiplease, Scattered, Banco.

13          MR. O'MEARA:  Robert O'Meara on behalf of

14    Allied, Your Honor.

15          MS. KUJACA:  Good morning, Your Honor.

16    Linda Kujaca on behalf of the City and County of

17    Peoria.

18          THE COURT:  Okay.

19          MR. JORDAN:  First thing with regard to

20    NEC, the motions relating to Network Electronic

21    Company, we would ask that those be continued to

22    next week where the settlement --

23          MR. STEINBERG:  The 11th.

24          MR. JORDAN:  -- is set.  It's the 11th,

25    right.

1               MR. APOSTOLIDES:  Right.

2               MR. STEINBERG:  Yes.

3               THE COURT:  Okay.

4               MR. JORDAN:  And I represented to

5    Mr. Vigano that we would do so, so he is not here

6    today.

7               THE COURT:  3/11 for that.

8                    Now, the matters involving the City

9    of Peoria and Allied have come before the court on a

10   motion to reopen the trial for the filing of

11   additional proof on the issue of whether the

12   trustee's proposed assignee can satisfy its burden

13   under Section 365(b)(1)(C) of the Bankruptcy Code to

14   provide adequate assurance of future performance.

15                    This court held a trial on

16   February 12 and 13, 2008, to hear and consider

17   evidence on the ability of the proposed assignee,

18   Illinois Investment Trust, to operate the landfill

19   gas-to-energy conversion, collection, and control

20   systems at Litchfield, Bloomington, Springfield, and

21   Peoria, Illinois.

22                    At the trial, the burden was on the

23   Chapter 7 trustee to prove that IIT had sufficient

24   resources to carry on the business operations at

25   each of the sites.  This included substantial costs

4

1    to cure RTC's defaults under its agreements.  The

2    parties had agreed that the cure in future

3    performance would require funding of at least

4    $3 million.

5              At the trial then there were three

6    issues to be determined:  One, whether the

7    $3 million was available to IIT and would actually

8    be received by IIT; two, whether $3 million would be

9    sufficient and what contingencies were in place for

10   securing additional funding; and, three, whether

11   IIT's personnel would be able to obtain the

12   necessary permits and otherwise operate the sites in

13   compliance with all applicable regulations.

14             Because the court found that the

15   first issue had to be determined against the

16   trustee's motion, the court found that there was no

17   reason to find the other issues, determine the other

18   issues.

19             The basis for that determination,

20   that the funding had not been shown to be

21   sufficiently available, was multitudinous.  First,

22   IIT offered no financial records whatever.  Its sole

23   source of funding for the operations of the landfill

24   gas facilities was proposed to be a revolving line

25   of credit from Scattered Corporation and Chiplease.

1    Therefore, this loan was absolutely essential to

2    IIT's ability to perform under the contracts.  Yet,

3    the loan agreement offered into evidence provided no

4    effective remedy against the lenders by either IIT

5    or the counterparties to the operating agreement in

6    the event of a breach by the proposed lenders.

7    Thus, there was no assurance of financial

8    performance to support the contractual performance.

9    That rendered the contracts incapable of being

10   assumed by reason of the lack of adequate assurance

11   of performance by the assignee.

12                 There are actually four separate

13   grounds for coming to that conclusion.  First, the

14   loan's promissory note introduced into evidence

15   imposed no obligation on Scattered or Chiplease, the

16   proposed lenders, to make the loan.  It only imposed

17   an obligation on IIT to repay the loans that it

18   received.  Scattered Corporation offered no

19   financial records of its own, and admitted that it

20   did not currently have the funds on hand to meet

21   loan obligations.

22                 Second, there are fundamental

23   structural impediments to enforcement of the

24   proposed loan agreement.  The lenders were the

25   beneficiaries of the trust.  The trust assets are

6

1   revocable, and the beneficiaries could remove the
2   trustee at will.
3                    Third, the loan agreement imposed no
4   affirmative obligation on the part of IIT to use
5   whatever funds were produced pursuant to the loan
6   agreement to operate the facilities in question.
7                    And, fourth, the counterparties had
8   no ability to ensure that the funds actually made
9   available -- would be made available to IIT or that
10  the funds would be used to operate the facilities.
11  There was insufficient evidence presented to support
12  a finding that IIT is a business trust under
13  Illinois law.  And common law trusts are not
14  eligible for involuntary bankruptcy and cannot sue
15  or be sued in their own names.
16                    Thus, the counterparties would have
17  had no recourse if IIT were to default under the
18  contracts even if these contracts were otherwise
19  enforceable.  Accordingly, for all of those reasons,
20  the motion to assume and assign the facility
21  operating agreements was denied.
22                    In the present motion, the Chapter 7
23  trustee seeks to reopen the trial to provide
24  additional assurance of future performance to
25  support assumption and assignment.  The authority

1   relied on for this new proposal is, quote, "the
2   court's invitation to the trust to revise its
3   proposal for showing adequate assurance of future
4   performance."  The court made no such invitation.
5              What I did in commenting on the
6   inadequacy of what was produced as evidence of
7   adequate assurance is to give some idea of what
8   might have been assurance of adequate -- excuse me,
9   adequate assurance of future performance.  I noted
10  the kinds of alternatives that might have given
11  parties assurance that the funds would actually be
12  deposited.  I mentioned an escrow account as a
13  mechanism that might have provided that kind of
14  assurance.  But that was not to say that the court
15  would entertain a motion to reopen the trial to
16  allow the trustee or the proposed assignee to create
17  a new transaction that would satisfy the kinds of
18  requirements that the court indicated.
19             Had there been time to file a new
20  motion to propose a different arrangement than what
21  was proposed at trial, it might very well have been
22  appropriate for such a thing to be proposed.  The
23  problem is that the deadline for assumption and
24  assignment of contracts has long passed.  The only
25  transaction that was proposed within that deadline

8

1   was the one that the court found to be inadequate.

2               So the question here is not whether

3   a different proposal can be approved, but whether

4   the trial of the original proposal can be reopened

5   to allow new evidence to be presented.

6               Specifically, the trustee proposes

7   an irrevocable assignment by IIT to a new entity,

8   Illinois Generating Station No. I, Inc., or, in the

9   alternative, requests an order allowing the estate

10  to assign the contracts directly to Illinois

11  Generating Station.

12              The trustee also seeks to offer

13  revised loan agreements and evidence that the

14  Illinois Generating Station has been sufficiently

15  funded with an initial sum of $500,000 to begin

16  operation.  It appears that this revised transaction

17  came about after the trial and instruction to

18  respond to the court's concerns on the reasons for

19  denying the original motion.

20              Now, a motion to reopen to submit

21  additional proof is generally subject to the sound

22  discretion of the court.  See Zenith Radio

23  Corporation versus Hazetine Research, Inc., 401 U.S.

24  321, 331, 1971, Nanda versus Ford Motor Company, 509

25  F.2d 213, Seventh Circuit, 1974.

9

1           A motion to reopen is intended to

2   revive the prior proceedings.  The Supreme Court has

3   analogized such motions to motions for relief from

4   final judgment under Federal Rule of Civil Procedure

5   60(b).  See Stone versus INS, 514 U.S. 386, 405,

6   1995.  The effect of granting such a motion is to

7   vacate the previous judgment in the case, and that's

8   essentially what the trustee requests in this case.

9           If the motion to reopen were

10  granted, the case would be reinstated and would go

11  forward from this point.  See McCormick versus City

12  of Chicago, 230 F.3d 319, 326, 327, Seventh Circuit,

13  2000.  It is well-established in this circuit,

14  however, that Rule 60(b) is an extraordinary remedy

15  and is granted only in exceptional circumstances,

16  Dickerson versus Board of Education, 32 F.3d 1114,

17  1116, Seventh Circuit, 1994.

18          Courts have an interest in seeing

19  that all of the facts bearing on a judgment are

20  presented at the time of the initial trial.

21  Similarly, litigants have an interest in finality of

22  judgment.  The parties in this case have been

23  litigating the question of assumption and assignment

24  for nearly a year-and-a-half.

25          Therefore, Peoria objects, stating

10

1    that the trustee is essentially seeking a new trial

2    as opposed to reopening the trial to admit

3    additional evidence.  Motions for a new trial are

4    governed by Federal Rule of Civil Procedure 59 and

5    made applicable to bankruptcy cases by Federal Rule

6    of Bankruptcy Procedure 9023.

7                    Peoria argues that by creating a

8    designee corporation after trial, the trustee is

9    seeking relief not contemplated in the original

10   motion to assume and assign.  Under its proposal,

11   IIT is only nominally the assignee, since Illinois

12   Generating Station will be assigned the contract as

13   soon as the favorable order is entered by the court.

14                    Second, Peoria notes Seventh Circuit

15   authority to the effect that new evidence under

16   Rule 59 must have been in existence at the time of

17   the trial.  See Peacock versus Board of School

18   Commissioners, 721 F.2d 210, 213, 214, Seventh

19   Circuit, 1983.  See also 11 Federal Practice &

20   Procedure, Section 2808, quote, "As is true under

21   Rule 60(b)(2), in order to comply with Rule 59, the

22   court must find that the newly discovered evidence

23   itself as well as the facts that it supports were in

24   existence at the time of trial," close quote.

25                    On the merits, Peoria reiterates its

11

1    position at trial that its agreement with RTC

2    terminated under its own terms and thus cannot be

3    assumed or assigned.

4                    Based on all of these

5    considerations, the discretion that the court has to

6    reopen the case will be exercised against reopening.

7    The fact is that the trustee had an ample period of

8    time to propose what the trustee wanted to propose

9    as an appropriate assignee for the gas rights

10    agreements that were involved in this trial.  The

11    parties spent a substantial amount of time preparing

12    for that trial.  The court spent a substantial

13    amount of time hearing it and ruling on it.

14                    As I indicated earlier, the evidence

15    presented at trial was plainly insufficient to

16    establish the trustee's obligation, burden of proof.

17    To show adequate assurance of future performance and

18    to allow a new proposal to be presented after the

19    court made the ruling and well after the deadline

20    for making motions to assume or assign had passed

21    would not be appropriate.  The court's discretion

22    then being exercised against, the motion will be

23    denied.

24                    MR. JORDAN:  Your Honor, just to clarify,

25    Your Honor's recollection of what occurred is not

12

1  correct.  Your Honor did say -- I said you indicated
2  what would be needed, and I indicated that should --
3  we can file a motion to reconsider, to which you
4  responded, no, what you should do is file a motion
5  for change of circumstances.  And we have
6  provided --
7          THE COURT:  Do you have a --
8          MR. JORDAN:  -- and met --
9          THE COURT:  - transcript?
10         MR. JORDAN:  -- all of those --
11         THE COURT:  Do you have a transcript?
12         MR. JORDAN:  We have ordered the
13 transcript.  We haven't --
14         THE COURT:  All right.  I'll continue
15 this to review that transcript.  But even if I told
16 you to do something which in further review turns
17 out to have been improvident, I don't think that
18 changes anything.
19         The fact of the matter is that we
20 had the trial.  You presented the evidence that you
21 thought would support assumption or assignment.  I
22 found that that evidence was insufficient to
23 establish adequate assurance.  If I told you that
24 you might be able to file a motion to reconsider
25 that, sobeit, you filed the motion.  But I didn't

13

1    indicate that I would grant the motion.  I had not

2    had any argument from the other side.  How could I

3    have done that?

4              MR. O'MEARA:  If I may be heard, Your

5    Honor?  Robert O'Meara on behalf of Allied.  Two

6    points.  In regards to Mr. Jordan's point that the

7    court invited or allowed a motion for

8    reconsideration, my recollection is different.  The

9    transcript I think will prove it.  He mentioned

10   bringing a motion under Rule 59, and you said

11   absolutely not, that would be improper.  You need to

12   file a new motion.  That's my recollection, and

13   we'll let the transcript prove that up.

14             THE COURT:  Well, let me interrupt you on

15   that point because that's essentially what is the

16   distinction that I made right now.  If the time for

17   filing a motion to assume or assign had not expired,

18   certainly you'd be free to make another motion with

19   a different assignee, which is essentially what

20   you're doing right now.  But if the time for doing

21   that has expired, then you have an obstacle.

22             What's your second point?

23             MR. O'MEARA:  My second point, Your

24   Honor, is you mentioned Peoria's objection in

25   reading your opinion.  I just wanted to clarify or

14

1   make sure that that applied to Allied's cites as
2   well.
3          THE COURT:  Of course.  The issues that
4   I've raised here are identical because the question
5   of adequate assurance is identical.  We're
6   dealing --
7          MR. O'MEARA:  I thought so.
8          THE COURT:  -- with the same assignee.
9          MR. O'MEARA:  I just wanted to put that
10  on the record.  Thank you very much.
11         MR. JORDAN:  Are we going to continue
12  this for another hearing, or should we just go ahead
13  and file our appeal?
14         MR. O'MEARA:  I don't think another --
15         MR. JORDAN:  I would like --
16         MR. O'MEARA:  -- extension is necessary.
17         MR. JORDAN:  -- another hearing
18  personally because I know what Your Honor said, and
19  it's important to me that I act in accordance with
20  Your Honor's --
21         THE COURT:  Well, let me do this:  Why
22  don't you present the transcript.  I'll review the
23  transcript.  If there's anything in the transcript
24  that causes me to reconsider what I've done today,
25  I'll give you -- we'll have the benefit of that to

15

1   allow me to do it.  I don't think that's going to be

2   the case.  But by all means, prepare the transcript

3   and let me see what I said.

4            MR. JORDAN:  Are we going to continue

5   this to another date or --

6            THE COURT:  Do you have a date from the

7   court reporter as to --

8            MR. O'MEARA:  Tomorrow.

9            MR. JORDAN:  I don't have --

10           THE COURT:  -- when the transcript --

11           MR. JORDAN:  I don't have --

12           THE COURT:  -- will be available?

13           MR. STEINBERG:  -- a date from the court

14  reporter.  And I had a miscommunication with my

15  assistant where I asked the closing be expedited,

16  and she -- and I asked everything else.  So --

17           MR. O'MEARA:  My understanding is the

18  closing is going to be ready tomorrow.  My paralegal

19  talked to the court reporter yesterday.  The

20  closing, which is when this came up, it's supposed

21  to be ready Thursday.

22           MR. JORDAN:  Well, then let's do it next

23  week so I'll have the opportunity to review it --

24           MR. STEINBERG:  Do it the 11th.

25           MR. JORDAN:  -- and Your Honor will have

16

1   the opportunity to review it, and Mr. O'Meara, if
2   he'd like to review it.
3                   But, you know, it's particularly
4   important in all of the cases in the world and this
5   case that, in addition to everything else, when I'm
6   acting, you know, I'm not trying to pull anything
7   and I'm not trying to --
8                   THE COURT:  Oh --
9                   MR. JORDAN:  -- bend the rules or
10  anything.
11                  THE COURT:  -- no, Mr. Jordan.  Let me
12  make that clear.  I am not faulting you at all for
13  filing this motion.  And certainly there have been
14  other events in this case where an initial filing
15  was inadequate and it was corrected by a subsequent
16  filing.
17                  The difficulty here is that the
18  deadline for making motions of this sort has passed.
19  I take it that you have filed this in complete good
20  faith, and I have no problem with that at all.  The
21  problem I have here is simply that I think it's
22  untimely.  I think it is effectively a new motion.
23  I think the grounds for reconsideration or reopening
24  the evidence as to the original motion are
25  inadequate.  But I will look at the transcript.  If

17

1   there's anything in the transcript that causes me to

2   look at the situation differently, you'll have the

3   benefit of that review.

4                   If you can get me the transcript as

5   soon as it's available, I'll be able to review it.

6   And we'll set this for March 11 at 10:00 o'clock.

7                   MR. JORDAN:  Very good, Your Honor.

8                   MR. O'MEARA:  Is this for status, Your

9   Honor?  I mean, this will be your order, that it

10  take effect, or are we continuing it?

11                  THE COURT:  This is continued.

12                  MR. O'MEARA:  Okay.

13                  MR. APOSTOLIDES:  Judge, one

14  clarification.  The motion as to NEC is set for 9:30

15  on the 11th.

16                  THE COURT:  Yeah?

17                  MR. APOSTOLIDES:  Do you want to just

18  move everything to 10:00 o'clock?

19                  THE COURT:  Yeah, that would be fine.

20                  MR. APOSTOLIDES:  Great.  Thank you.

21                  THE COURT:  Okay.

22                  MR. STEINBERG:  Thank you, Your Honor.

23                  MR. JORDAN:  Thank you.

24                  MR. O'MEARA:  Thank you, Your Honor.

25

18

1                              (Which were all the proceedings
                               had in the above-entitled cause,
2                              March 5, 2008.)

3

4    I, GARY SCHNEIDER, CSR, RPR, DO HEREBY CERTIFY THAT
     THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
5    PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

1

| | |
|---|---|
| 1 | IN THE UNITED STATES BANKRUPTCY COURT |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 3   In re:                           )
                                      )
 4   RESOURCE TECHNOLOGY CORPORATION,) No. 99 B 35434
                                      )
 5                   Debtor.          )
     -----------------------------)
 6   LEON GREENBLATT, et al.,         )
                                      ) No. 06 A 00072
 7                   Plaintiffs,      )
                                      )
 8            vs.                     )
                                      )
 9   NETWORK ELECTRIC COMPANY,        ) Chicago, Illinois
                                      ) March 11, 2008
10                   Defendant.       ) 10:00 a.m.

11          TRANSCRIPT OF PROCEEDINGS BEFORE THE
                HONORABLE EUGENE R. WEDOFF
12

13   APPEARANCES:

14   MS. GRETCHEN SILVER
     on behalf of the U.S. Trustee;
15
     MR. GENE GEEKIE
16   on behalf of Network Electric;

17   MR. JAY STEINBERG
     Chapter 7 trustee;
18
     MR. GEORGE APOSTOLIDES
19   on behalf of Jay Steinberg as trustee;

20   MR. GREGORY JORDAN
     on behalf of Chiplease, Banco, Greenblatt, Illinois
21   Investment Trust, and Illinois Generating Station;

22   MR. LOUIS BERNSTEIN
     on behalf of the receiver, Harry Henderson;
23
     MS. LINDA KUJACA
24   on behalf of the City and County of Peoria;

25   MR. DAVID BOHAN
     on behalf of Allied.
```

2

```
 1            THE CLERK:  Resource Technology
 2   Corporation, 99 B 35434, with related adversary,
 3   Leon Greenblatt and Banco PanAmericano versus
 4   Network Electronic Company, 06 A 72.
 5            MS. SILVER:  Gretchen Silver from the
 6   U.S. Trustee's Office.
 7            MR. GEEKIE:  Gene Geekie for Network
 8   Electric.
 9            MR. STEINBERG:  Jay Steinberg, Chapter 7
10   trustee.
11            MR. APOSTOLIDES:  George Apostolides on
12   behalf of Jay Steinberg as trustee.
13            MR. JORDAN:  Gregory Jordan on behalf of
14   Chiplease, Banco, Greenblatt, and Illinois
15   Investment Trust, and Illinois Generating Station.
16            MR. BERNSTEIN:  Good morning, Your Honor.
17   Louis Bernstein on behalf of the receiver, Harry
18   Henderson.
19            MS. KUJACA:  Linda Kujaca on behalf of
20   the City and County of Peoria.
21            MR. BOHAN:  Good morning, Your Honor.
22   David Bohan on behalf of Allied.
23            THE COURT:  Okay.  Mr. Jordan, I had
24   continued the proceeding to allow a review of the
25   transcript to determine whether I had misled you
```

3

1  into believing that I would consider the merits of

2  any motion that you might file with a new and

3  different arrangement for the assumption and

4  assignment of the landfill gas conversion agreements

5  that were at issue here.  And I have had an

6  opportunity to review the transcript, and I believe

7  I've isolated the relevant portions that bear on

8  this question.

9            On page 22 of the transcript, you

10  had suggested that you might be able to make changes

11  in the status of the entities that were going to be

12  the assignees.  And I said, "Well, see, this is a

13  little bit like Let's Make a Deal.  What I'm

14  supposed to do here is to pass on whether the

15  transaction that you're proposing, the assignee that

16  you're proposing is offering adequate assurance,

17  rather than to speculate about what might be

18  adequate assurance or in lieu of what or in addition

19  to what's actually being proposed.

20            "I could speculate that it might be

21  much better if you set up an escrow account and put

22  $3 million into the escrow account and had some kind

23  of agreement that money could only be drawn out of

24  the escrow account for purposes relating to

25  performance under this agreement.  That would be

4

1   better than what we have right now.  It might

2   provide more adequate assurance than what we have

3   right now.

4                "But I don't think I want to

5   speculate with you on what alternatives to what's

6   being offered now would provide adequate assurance.

7   I think what I'm required to do is make a

8   determination as to whether what is being proposed

9   now meets the requirements of Section 365 or not."

10               The other portion of the transcript

11   that might bear on this question is at the end in

12   the colloquy that we had during the closing,

13   starting at page 79 of the transcript, where I said,

14   "I'm concerned about the ability of the trust to

15   enforce the loan agreement against the parties who

16   are providing the only source of payment for the

17   obligations that are going to be assumed and

18   assigned.  And what I am telling you is that, based

19   on everything I've heard, I've come to the

20   conclusion that that assurance is not present here,

21   that we have an entity with no operating history and

22   no enforceable obligation to obtain the funds that

23   it needs to comply with these agreements.

24               "Now, you're telling me I could

25   impose conditions that might change that

5

1 | circumstance.  That's not an obligation of the
2 | court."
3 | And then after a brief interruption,
4 | I said, "The obligation of the court is to look at
5 | the agreement -- excuse me, to look at the
6 | circumstances that are presented by the proposed
7 | assignee and make a determination as to whether
8 | those circumstances as presented to the court
9 | provide adequate assurance of future performance,
10 | and what I have found here is that the circumstances
11 | do not."
12 | Finally at page 81, I said, "Now, if
13 | you want to come up with some other arrangement, it
14 | may be that you have the opportunity to do that, and
15 | you can present that to the court.  But there has
16 | not been a showing of adequate assurance that would
17 | enable me to allow the assignment that's now being
18 | proposed."
19 | You said, "And perhaps what we'll do
20 | is come up with a different arrangement and file a
21 | motion to reconsider."
22 | And I interrupted to say, "It
23 | wouldn't be a motion to reconsider.  It would be a
24 | motion to consider a new arrangement."
25 | You said, "That's fine."

6

1          And I said, "And if you want to do

2    that and if that's timely, I will certainly consider

3    that.  But this arrangement, for the reasons I have

4    just given, does not meet the requirements."

5          Now, I did not in any way suggest

6    that a motion to propose a new arrangement would be

7    timely.  I said I would consider it if it were

8    timely.  And as we discussed the last time the case

9    was before me, the time for proposing assumption or

10   assignment of these contracts expired some time ago.

11   A new arrangement cannot timely be presented to the

12   court, and therefore, entirely consistent with the

13   discussion that we had at trial itself, I do not

14   believe that this current motion to come up with a

15   new arrangement is timely or can be considered by

16   the court on its merits.

17          MR. JORDAN:  Well, Your Honor, just for

18   the record, at the end you indicated -- on page 83

19   starting at line 20, you said, "But the principle

20   and the basis on which I'm rendering my decision

21   today is that the counterparties to this contract,

22   these contracts, have no ability to assure that the

23   funds necessary for performance by the proposed

24   assignee actually be made available.  And if another

25   provision, another arrangement were submitted to the

7

1    court that gave those kinds of assurances, it's

2    possible that this transaction, these transactions,

3    could be approved."  So --

4                 THE COURT:  Consistent with what I --

5                 MR. JORDAN:  So I --

6                 THE COURT:  -- said earlier --

7                 MR. JORDAN:  -- filed --

8                 THE COURT:  -- it would have to be

9    timely.

10                MR. JORDAN:  So I filed my motion.  Now,

11   Your Honor can deny the motion.  But I filed the

12   motion because you indicated that if another

13   alternative arrangement were presented, you could

14   consider it.  You didn't say you'd approve it.  And

15   I'm not saying, Your Honor, you told me you would

16   approve this.  I'm saying that I followed what I

17   understand to be your ruling and addressed the

18   specific items that you indicated were lacking

19   through the client, gave, you know, the --

20                THE COURT:  Okay.  Mr. Jordan, the

21   question is simple, did I in any way indicate to you

22   that an untimely motion for assumption and

23   assignment would be considered by the court on the

24   merits, and I did not.  I made it very clear on

25   page 82 that any such new motion would have to be

1    timely.  I was not aware at the time that I had that

2    colloquy with you what deadlines were in place as

3    far as filing a motion to assume or reject.  And it

4    turns out that the time for filing such a motion had

5    passed some time ago.  So the motion is not timely,

6    and that's the basis on which I'm denying it, and

7    that is consistent with the discussion that we had

8    on the record.

9             MR. JORDAN:  Thank you, Your Honor.

10            THE COURT:  Okay.  Is there anything else

11   that needs to be discussed?  Oh, yes, we have to

12   approve the NEC sale -- settlement --

13            MR. JORDAN:  Settlement.

14            THE COURT:  -- today.  There's been no

15   objection to that settlement and --

16            MR. STEINBERG:  No objection, Judge.

17            THE COURT:  -- it will be approved.

18            MR. JORDAN:  We've tendered our signed

19   documents to the trustee, and I believe we've seen

20   the PDF, the signed documents, from --

21            MR. STEINBERG:  And I think you got --

22            MR. JORDAN:  -- NEC.

23            MR. STEINBERG:  -- a draft order there.

24            THE COURT:  The draft order will be

25   entered.

9

1              MR. STEINBERG:  Thank you, Your Honor.

2              MR. BERNSTEIN:  Your Honor, the only

3     question I had is I was curious how this order with

4     the secured creditor, Mr. Jordan's client, how that

5     affects the receivership and the permits that are

6     pending in the Circuit Court of Cook County before

7     Judge Hall.

8              THE COURT:  Well, I'm not speculating on

9     that.

10             MR. JORDAN:  That's --

11             THE COURT:  That's not a matter that's

12    before me.

13             MR. BERNSTEIN:  Okay.

14             MR. JORDAN:  Thank you for your time,

15    Your Honor.

16

17                      (Which were all the proceedings
                         had in the above-entitled cause,
18                       March 11, 2008.)

19

20    I, GARY SCHNEIDER, CSR, RPR, DO HEREBY CERTIFY THAT
      THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
21    PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.

22

23

24

25

# EXHIBIT E

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

In re:

RESOURCE TECHNOLOGY CORPORATION,

Debtor.

Chapter 7

Case No. 99 B 35434

Hon. Eugene R. Wedoff

**Agreed Order Extending the Deadline for the Trustee
To Assume or Reject Executory Contracts and Unexpired Leases
With American Disposal Services, Inc. and Allied Waste Industries, Inc.**

This matter coming before the Court on the Motions of Chapter 7 Trustee (not individually but solely as representative of the Estate of Resource Technology Corporation ("Trustee")) For An Order To Extend Time To Assume Or Reject Executory Contracts And Unexpired Leases Of Nonresidential Real Property filed on November 8, 2005 and November 16, 2005, and any supplemental filings thereto  (the "Motions"), American Disposal Services, Inc. and Allied Waste Industries, Inc. (collectively "Allied"), as the owner of certain landfills identified in those Motions, and the Trustee hereby stipulate and agree to the following terms of this Order; the Court finding notice of the Motions to be appropriate and being otherwise fully advised in the premises,

THE PARTIES HEREBY STIPULATE TO AND IT IS HEREBY ORDERED that:

1.     In regards to the December 21, 1995 contract involving the Pontiac Landfill site (a/k/a Livingston Landfill),  Allied agrees to extend the time by which the Trustee can move to assume or reject the Pontiac Landfill portion of that contract until January 31, 2006.

2.     In regards to that portion of the December 21, 1995 contract involving the Wheatland, Clarion and Wyandot landfill sites (the "Disputed Contract Sites"), and only to the extent RTC possesses any contract rights to or at the Disputed Contract Sites (which Allied disputes), Allied agrees to extend the time by which the Trustee can move to assume or reject the Disputed Contract Sites portion of the contract to January 31, 2006. This stipulation shall not be deemed and shall not constitute an admission by Allied that RTC possesses any contract rights to or at the Disputed Contract Sites and, furthermore, nothing in this stipulation shall be deemed to be a release or waiver of any right, claim or cause of action of any kind that Allied has that the Disputed Contract Sites portions of the December 21, 1995 contract were validly terminated by Allied prior to the date of this Order.

3.    In regards to the Bloomington, Litchfield, and Sangamon (a/k/a Springfield) landfill sites, and only to the extent RTC possesses any contract rights to or at the Bloomington[1], Sangamon[2] and Litchfield[3] landfill sites, Allied agrees to extend the time by which the Trustee can move to assume or reject such contracts between RTC and Allied (and/or any Allied subsidiary) to January 31, 2006 provided, however, that nothing in this stipulation shall extend the right to assume or reject any contract that has already expired or been terminated and nothing in this stipulation shall be deemed to be a release or waiver of any right, claim or cause of action of any kind that Allied (and/or any Allied subsidiary) may have that any such contracts have expired or been terminated prior to the date of this Order.

Dated: _____          ENTERED:


_____
U.S. Bankruptcy Judge

Agreed:

Jay A. Steinberg, not individually but
solely as Chapter 7 Trustee for the Estate
of Resource Technology Corporation

By: _____
        One of his Attorneys

American Disposal Services, Inc.

By: _____
        One of its Attorneys

Allied Waste Industries, Inc.

By: _____
        One of its Attorneys

1021155_2

---

[1] This Order specifically includes the agreement between the Debtor and Secton relating to the Bloomington site.
[2] This Order specifically includes the agreement between the Debtor and ESG Watts relating to the Springfield/Sangamon site.
[3] This Order specifically includes the agreement between the Debtor and Liberty Waste Services relating to the Litchfield site.

3.    In regards to the Bloomington, Litchfield, and Sangamon (a/k/a Springfield) landfill sites, and only to the extent RTC possesses any contract rights to or at the Bloomington[1], Sangamon[2] and Litchfield[3] landfill sites, Allied agrees to extend the time by which the Trustee can move to assume or reject such contracts between RTC and Allied (and/or any Allied subsidiary) to January 31, 2006 provided, however, that nothing in this stipulation shall extend the right to assume or reject any contract that has already expired or been terminated and nothing in this stipulation shall be deemed to be a release or waiver of any right, claim or cause of action of any kind that Allied (and/or any Allied subsidiary) may have that any such contracts have expired or been terminated prior to the date of this Order.

Dated: 11/30/05                      ENTERED:

                                     U.S. Bankruptcy Judge

Agreed:

Jay A. Steinberg, not individually but
solely as Chapter 7 Trustee for the Estate
of Resource Technology Corporation

By: _____
        One of his Attorneys

American Disposal Services, Inc.

By: _____
        One of its Attorneys

Allied Waste Industries, Inc.

By: _____
        One of its Attorneys

1021155_2

---

[1] This Order specifically includes the agreement between the Debtor and Secton relating to the Bloomington site.
[2] This Order specifically includes the agreement between the Debtor and ESG Watts relating to the Springfield/Sangamon site.
[3] This Order specifically includes the agreement between the Debtor and Liberty Waste Services relating to the Litchfield site.

# EXHIBIT F

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
*EASTERN DIVISION***

In re:

RESOURCE TECHNOLOGY
CORPORATION,

            Debtor.

Chapter 7
Case No. 99 B 35434

Hon. Eugene R. Wedoff

Hearing Date: January 24, 2006
Hearing Time: 10:00 a.m.

**FOURTH MOTION OF CHAPTER 7 TRUSTEE FOR AN ORDER TO EXTEND
TIME TO ASSUME OR REJECT CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY**

Jay A. Steinberg, not individually, but solely as the Chapter 7 Trustee for the estate of Resource Technology Corporation case (the "Trustee"), pursuant to Section 365,[1] respectfully moves this Court for entry of an order to further extend time to assume or reject certain executory contracts and unexpired leases of nonresidential real property, as listed on the attached <u>Exhibit A</u> to February 28, 2006. In support of this Motion, the Trustee respectfully represents as follows:

**<u>BACKGROUND</u>**

1.      On November 15, 1999, (the "Petition Date"), an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed against Resource Technology Corporation (the "Debtor").

2.      An order for relief was entered on January 18, 2000, at which time the case was converted to one under Chapter 11.

3.      Thereafter, Gregg E. Szilagy was appointed as the Chapter 11 Trustee.

---

[1] Unless otherwise noted, references to "Section __" are to the United States Bankruptcy Code 11 U.S.C., §§101 through 1330.

4.    On September 14, 2005, creditors of the Debtor's estate moved to convert the case to Chapter 7.  On September 21, 2005, this court entered an order converting this case to Chapter 7.

5.    Thereafter, Trustee was appointed as the Interim Chapter 7 Trustee.  On November 4, 2005, the § 341 meeting of creditors was held and concluded.  Trustee is now the permanent Trustee herein.

6.    The Debtor is in the business of collecting and selling methane gas from landfills.  As such, the Debtor is a party to numerous landfill agreements.

## JURISDICTION

7.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.    The Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this case in this District is appropriate under 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

8.    On November 8, 2005, the Trustee filed a Motion to extend time to assume or reject certain executory contracts and unexpired leases listed in that motion. The Court granted the motion in part with respect to some leases and contracts, and entered and continued the motion with respect to others.

9.    In supplemental motions, the Trustee sought to further extend the time to assume or reject, through and including January 31, 2006.

10.    By this Motion, the Trustee is seeking similar relief – to extend the time to assume or reject executory contracts and unexpired leases pursuant to section 365(d) of the Bankruptcy Code – with respect to other leases and contracts entered into by the Debtor.  The subject contracts and leases to this Motion are listed on the attached

<u>Exhibit A</u> (collectively, the "Agreements"). The Trustee is seeking to extend the deadline to February 28, 2006.

## <u>LEGAL AUTHORITY</u>

11. Section 365(d)(1) provides:

> In a case under chapter 7 of this title, if the Trustee does not assume or reject an executory contract or unexpired lease…within 60 days after the order for relief, or within such additional time as the court, for cause  within such 60 day period, fixes, then such contract or lease is deemed rejected.

11 U.S.C. § 365(d)(1). Further, Section 365(d)(4) provides:

> Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, <u>or within such additional time as the court, for cause, within such 60-day period, fixes</u>, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d)(4) (emphasis added).

12. Upon a showing of cause by a Trustee, courts may grant extensions of the time period by which a Trustee must either assume or reject unexpired leases on nonresidential real property. <u>See</u> <u>e.g.</u>, <u>In the Matter of James Wilson Associates</u>, 965 F.2d 160, 164 (7th Cir. 1992) (affirming bankruptcy judge's power to extend time for election by debtor in possession to assume or reject an unexpired lease of nonresidential real property); <u>In re Bon Ton Restaurant and Pastry Shop, Inc.</u>, 52 B.R. 850, 855 (Bankr. N.D.Ill. 1985) (granting extension of the debtor's time to assume or reject leases); <u>see</u> <u>also</u> <u>In re Burger Boys</u>, 94 F.3d 755, 761 (2d Cir. 1996) (affirming extensions of time to assume or reject lease when cause is established).

13. The Trustee anticipates closing the sale of assets to DTE Biomass Energy, Inc., or such higher bidder (the "Closing") on or about February 6, 2006.

14.    The sale of assets to DTE requires the rejection of certain contracts. However, until the sale is approved and closes, the Trustee is not in a position to either assume or reject the Agreements.

15.    There is ample cause for this Court to extend the time within which the Trustee may assume or reject the Agreements to February 28, 2006, without prejudice to the Trustee's right to request additional extensions, if necessary.

16.    It is in the best interest of all creditors of the Debtor's estate, to extend the time for the Trustee to assume or reject the Agreements to February 28, 2006.

### NOTICE

17.    Notice of this Motion has been given to: (a) all lessors and parties to  the Agreements; (b) the Office of the United States Trustee; (c) the Debtor's 20 largest unsecured creditors; and (d) other parties in interest who have requested service.  In light of the nature of the relief requested herein, the Trustee submits that no further notice is required.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an order (i) extending the time to assume or reject the Agreements through February 28, 2006; and (ii) granting such other and further relief as the Court deems just and proper.

Dated:  January 18, 2006

**JAY STEINBERG, not individually, but solely as the CHAPTER 7 TRUSTEE FOR THE ESTATE OF RESOURCE TECHNOLOGY CORPORATION**

By:  /s/ Joy E. Levy
      One of his Attorneys

Barry A. Chatz
Miriam R. Stein
Joy E. Levy
ARNSTEIN & LEHR LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL 60606
Phone: (312) 876-7100 / Fax: (312) 876-0288

26157.0003/1032705_1

## EXHIBIT A

## Executory Contracts and/or Unexpired Leases

| SITE/FACILITY | DATE OF AGREEMENT (if avail.) | PARTY(IES) TO AGREEMENT(S) | EXTENSION DATE |
|---|---|---|---|
| Belvidere | 08/11/1993 | Mineral Resource, Inc. | February 28, 2006 |
| Bi-State | 10/27/1995 | Noble Earth Corporation<br>Erma Knoeppner | February 28, 2006 |
| Bloomington | 12/29/1995 | Sexton Contractors<br>Allied Waste Industries | February 28, 2006 |
| Brimfield | | CILCO/Commonwealth Edison (Power<br>   Purchase Agreement) | February 28, 2006 |
| Clarion | 12/21/1995 | American Disposal Services, Inc.<br>Allied Waste Industries | February 28, 2006 |
| Columbus | 08/15/1995 | City of Columbus, GA | February 28, 2006 |
| Corpus Cristi (Elliott) | 11/26/1996 | City of Corpus Christi<br>Texas Energy Transfer (Gas Sales<br>   Agreement) | February 28, 2006 |
| Danville | 10/10/1994 | Thomas 12th Street Disposal | February 28, 2006 |
| Fort Dodge | 10/28/1994 | North Central Iowa Regional Solid Waste<br>   Agency | February 28, 2006 |
| Gary | 12/26/1996 | City of Gary, Indiana<br>Texas Energy Transfer (Gas Sales<br>   Agreement) | February 28, 2006 |
| GNOL | 09/18/1996 | Southern Recovery Management | February 28, 2006 |
| Hillside | | Commonwealth Edison (Power Purchase<br>   Agreement) | February 28, 2006 |
| Kewanee | | National Closure Corporation | February 28, 2006 |
| Lansing | 04/24/1995 | John Sexton Contractors<br>Sexton Companies<br>Commonwealth Edison (Power Purchase<br>   Agreement)<br>National Closure Corporation | February 28, 2006 |
| Litchfield | 12/30/1996 | Liberty Waste Services of Ohio<br>Allied Waste Industries | February 28, 2006 |

| SITE/FACILITY | DATE OF AGREEMENT (if avail.) | PARTY(IES) TO AGREEMENT(S) | EXTENSION DATE |
|---|---|---|---|
| Lyons/McCook | 12/27/1995 | American Grading Company Commonwealth Edison (Power Purchase Agreement) Run Energy (O&M Agreement) | February 28, 2006 |
| Mobile, AL | | Texas Energy Transfer / Mobile Gas (Gas Sales Agreement) | February 28, 2006 |
| New Haven | 12/31/1996 | City of New Haven | February 28, 2006 |
| New Orleans | | Texas Energy Transfer (Gas Sales Agreement) | February 28, 2006 |
| Ottawa | 04/15/1997 | States Land Improvement Corp. | February 28, 2006 |
| Paxton | 12/21/1995 | Stryker International, Inc. | February 28, 2006 |
| Peoria | 11/30/1995 | City and County of Peoria CILCO (Power Purchase Agreement) | February 28, 2006 |
| Pontiac | 12/21/1995 | Solar Turbines (O&M Agreement) Commonwealth Edison (Power Purchase Agreement) Nicor Gas | February 28, 2006 |
| Rosencranse | 12/31/1996 | Rosencranse Corporation | February 28, 2006 |
| Sangamon (Springfield) | 05/26/1995 | ESG Watts, Inc. Commonwealth Edison/CILCO (Power Purchase Agreement) Allied Waste Industries | February 28, 2006 |
| Shelton | 04/10/1994 | Connecticut Resources Recovery United Illuminating Co. | February 28, 2006 |
| Taylor Ridge | 05/26/1995 | ESG Watts, Inc. | February 28, 2006 |
| Viola | 08/01/1996 | ESG Watts, Inc. | February 28, 2006 |
| Wheatland | 12/21/1995 | American Disposal Services, Inc. Allied Waste Industries | February 28, 2006 |
| Wyandot | 12/21/1995 | American Disposal Services, Inc. Allied Waste Industries | February 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Green Gas Delaware Statutory Trust | February 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Green Gas Delaware Statutory Trust | February 28, 2006 |
| O&M Agreements (ALL SITES) | | Green Gas Delaware Statutory Trust | February 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Pontiac Business Trust | February 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Pontiac Business Trust | February 28, 2006 |

| SITE/FACILITY | DATE OF AGREEMENT (if avail.) | PARTY(IES) TO AGREEMENT(S) | EXTENSION DATE |
|---|---|---|---|
| O&M Agreements (ALL SITES) | | Pontiac Business Trust | February 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | AECC Pontiac LLC | February 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | AECC Pontiac LLC | February 28, 2006 |
| O&M Agreements (ALL SITES) | | AECC Pontiac LLC | February 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Red Gas, LLC | February 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Red Gas, LLC | February 28, 2006 |
| O&M Agreements (ALL SITES) | | Red Gas, LLC | February 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Archimedes Gas & Electric, Inc. | February 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Archimedes Gas & Electric, Inc. | February 28, 2006 |
| O&M Agreements (ALL SITES) | | Archimedes Gas & Electric, Inc. | February 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Voltaire Gas & Electric, Inc. | February 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Voltaire Gas & Electric, Inc. | February 28, 2006 |
| O&M Agreements (ALL SITES) | | Voltaire Gas & Electric, Inc. | February 28, 2006 |
| Multi-site Environmental Permitting/Monitoring | | Trinity Consultants | February 28, 2006 |
| Waste Condensate Disposal | | RS Used Oil | February 28, 2006 |
| Environmental Monitoring Software | | Enviance, Inc. | February 28, 2006 |
| Credit Agreement between RTC and Aquila Energy Capital | 4/10/2002 | Aquila Energy Capital Corporation | February 28, 2006 |

| SITE/FACILITY | DATE OF AGREEMENT (if avail.) | PARTY(IES) TO AGREEMENT(S) | EXTENSION DATE |
|---|---|---|---|
| AGC Document No 415 Standard Form of Design Build Agreement (Beecher) | 08/09/2000 | Network Electric | February 28, 2006 |
| Construction Loan Agreement ($513,592.06) (Beecher) | 12/08/2000 | Network Electric | February 28, 2006 |
| Construction Loan Agreement ($2,721,507.94) (Beecher) | 12/08/2000 | Network Electric | February 28, 2006 |
| Equipment Lease Agreement (Beecher) | 12/08/2000 | Network Electric | February 28, 2006 |
| Performance Bond issued by Federal Insurance Company ($7MM) (Beecher) | 03/2001 | Network Electric | February 28, 2006 |
| Payment Bond issued by Federal Insurance Company ($7MM) (Beecher) | 03/2001 | Network Electric | February 28, 2006 |
| Confidentiality Agreement (Beecher) | 04/11/2000 | Network Electric | February 28, 2006 |
| Letter Agreement (Beecher) | 04/16/2000 | Network Electric | February 28, 2006 |
| Participation Agreement (Beecher) | 06/2000 | Network Electric | February 28, 2006 |
| Plant Upgrading Loan Agreement (Beecher) | 08/11/2000 | Network Electric | February 28, 2006 |
| Phone/Internet Service | | Loop Telecommunications | February 28, 2006 |
| Headquarters | | RN Realty (Office Rent) | February 28, 2006 |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
*EASTERN DIVISION***

| | |
|---|---|
| In re:<br><br>RESOURCE TECHNOLOGY<br>CORPORATION,<br><br><div align="center">Debtor.</div> | Chapter 7<br>Case No. 99 B 35434<br><br>Hon. Eugene R. Wedoff |

**ORDER FURTHER EXTENDING TIME FOR TRUSTEE TO
ASSUME OR REJECT EXECUTORY CONTRACTS AND UNEXPIRED
LEASES OF NON-RESIDENTIAL REAL PROPERTY**

This matter coming before the Court on the Second Motion of Jay A. Steinberg, not individually but solely as the Chapter 7 Trustee of Resource Technology Corporation for an Order Further Extending the Time for the Trustee to Assume or Reject Executory Contracts and Unexpired Leases of Nonresidential Real Property (the "Motion"); the Court having reviewed the Motion, finding notice to be sufficient and being otherwise fully informed in the premises,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED.

2      The Trustee's time to assume or reject the executory contracts and unexpired leases of nonresidential real property listed on the attached <u>Exhibit A</u> (the "Agreements") is hereby extended to February 28, 2006.

3.      This Order shall not prejudice the right of the Trustee to seek additional extensions of time to assume or reject the estate's executory contracts and unexpired leases of nonresidential real property, including the Agreements.

Dated:_____           ENTERED:


                                      _____
                                      United States Bankruptcy Judge

# EXHIBIT G

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
*EASTERN DIVISION*

In re:

RESOURCE TECHNOLOGY
CORPORATION,

Debtor.

Chapter 7
Case No. 99 B 35434

Hon. Eugene R. Wedoff

## ORDER FURTHER EXTENDING TIME FOR TRUSTEE TO
## ASSUME OR REJECT EXECUTORY CONTRACTS AND UNEXPIRED
## LEASES OF NON-RESIDENTIAL REAL PROPERTY

This matter coming before the Court on the Fifth Motion of Jay A. Steinberg, not individually but solely as the Chapter 7 Trustee of Resource Technology Corporation for an Order Further Extending the Time for the Trustee to Assume or Reject Executory Contracts and Unexpired Leases of Nonresidential Real Property (the "Motion"); the Court having reviewed the Motion, finding notice to be sufficient and being otherwise fully informed in the premises,

**IT IS HEREBY ORDERED THAT:**

1.      With respect to certain landfills identified on Exhibit A which are owned by American Disposal Services, Inc. and Allied Waste Industries, Inc. (collectively, along with its respective subsidiaries and affiliates, "Allied"):

(a)      In regards to that portion of the December 21, 1995 contract involving the Wheatland, Clarion and Wyandot landfill sites (the "Disputed Contract Sites"), and only to the extent RTC possesses any contract rights to or at the Disputed Contract Sites (which Allied disputes), the time by which the Trustee can move to assume or reject the Disputed Contract Site portion of the contract is extended to April 28, 2006.

(b)      In regards to the Bloomington, Litchfield, and Sangamon (a/k/a Springfield) landfill sites, and only to the extent RTC possesses any contract rights to or at the Bloomington [1], Sangamon [2] and Litchfield [3] landfill sites, the time

---

[1] This Order specifically includes the agreement between the Debtor and Sexton relating to the Bloomington site.

1

for the Trustee to move to assume or reject such contracts is extended to April 28, 2006.

2.    The time for the Trustee to assume or reject all other executory contracts and/or unexpired leases of nonresidential real property listed on the attached <u>Exhibit A</u> is hereby extended to April 28, 2006.

3.    Nothing in this Order shall extend the right to assume or reject any contract that has already expired or been terminated and nothing in this Order shall be deemed to be a release or waiver of any right, claim or cause of action of any kind that any party (and/or its affiliates and subsidiaries) to such contracts may have that such contracts have expired and/or been terminated prior to the date of this Order.

4.    This Order shall not prejudice the right of the Trustee to seek additional extensions of time to assume or reject the estate's executory contracts and unexpired leases of nonresidential real property, including the Agreements.

Dated:_____ MAR 1 6 2006

ENTERED:

_____
United States Bankruptcy Judge

---

[2] This Order specifically includes the agreement between the Debtor and ESG Watts relating to the Springfield/Sangamon site.
[3] This Order specifically includes the agreement between the Debtor and Liberty Waste Services relating to the Litchfield site.

## EXHIBIT A

### Executory Contracts and/or Unexpired Leases

| SITE/FACILITY | DATE OF AGREEMENT (if avail.) | PARTY(IES) TO AGREEMENT(S) | EXTENSION DATE |
|---|---|---|---|
| Belvidere | 08/11/1993 | Mineral Resource, Inc. | April 28, 2006 |
| Bi-State | 10/27/1995 | Noble Earth Corporation<br>Erma Knoeppner | April 28, 2006 |
| Bloomington | 12/29/1995 | Sexton Contractors<br>Allied Waste Industries | April 28, 2006 |
| Brimfield | | CILCO/Commonwealth Edison (Power<br>Purchase Agreement) | April 28, 2006 |
| Clarion | 12/21/1995 | American Disposal Services, Inc.<br>Allied Waste Industries | April 28, 2006 |
| Danville | 10/10/1994 | Thomas 12th Street Disposal | April 28, 2006 |
| Fort Dodge | 10/28/1994 | North Central Iowa Regional Solid Waste<br>Agency | April 28, 2006 |
| Gary | 12/26/1996 | City of Gary, Indiana<br>Texas Energy Transfer (Gas Sales Agreement) | April 28, 2006 |
| GNOL | 09/18/1996 | Southern Recovery Management | April 28, 2006 |
| Hillside | | Commonwealth Edison (Power Purchase Agreement) | April 28, 2006 |
| Kewanee | | National Closure Corporation | April 28, 2006 |
| Lansing | 04/24/1995 | John Sexton Contractors<br>Sexton Companies<br>Commonwealth Edison (Power Purchase Agreement)<br>National Closure Corporation | April 28, 2006 |
| Litchfield | 12/30/1996 | Liberty Waste Services of Ohio<br>Allied Waste Industries | April 28, 2006 |

3

| SITE/FACILITY | DATE OF AGREEMENT (if avail.) | PARTY(IES) TO AGREEMENT(S) | EXTENSION DATE |
|---|---|---|---|
| Lyons/McCook | 12/27/1995 | American Grading Company<br>Commonwealth Edison (Power Purchase<br>    Agreement)<br>Run Energy (O&M Agreement) | April 28, 2006 |
| Mobile, AL | | Texas Energy Transfer / Mobile Gas (Gas<br>    Sales Agreement) | April 28, 2006 |
| New Haven | 12/31/1996 | City of New Haven | April 28, 2006 |
| New Orleans | | Texas Energy Transfer (Gas Sales<br>    Agreement) | April 28, 2006 |
| Ottawa | 04/15/1997 | States Land Improvement Corp. | April 28, 2006 |
| Peoria | 11/30/1995 | City and County of Peoria<br>CILCO (Power Purchase<br>    Agreement) | April 28, 2006 |
| Pontiac | 12/21/1995 | Solar Turbines (O&M Agreement)<br>Commonwealth Edison (Power Purchase<br>    Agreement)<br>Nicor Gas | April 28, 2006 |
| Sangamon (Springfield) | 05/26/1995 | ESG Watts, Inc.<br>Commonwealth Edison/CILCO (Power<br>    Purchase Agreement)<br>Allied Waste Industries | April 28, 2006 |
| Taylor Ridge | 05/26/1995 | ESG Watts, Inc. | April 28, 2006 |
| Viola | 08/01/1996 | ESG Watts, Inc. | April 28, 2006 |
| Wheatland | 12/21/1995 | American Disposal Services, Inc.<br>Allied Waste Industries | April 28, 2006 |
| Wyandot | 12/21/1995 | American Disposal Services, Inc.<br>Allied Waste Industries | April 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Green Gas Delaware Statutory Trust | April 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Green Gas Delaware Statutory Trust | April 28, 2006 |
| O&M Agreements (ALL SITES) | | Green Gas Delaware Statutory Trust | April 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Pontiac Business Trust | April 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Pontiac Business Trust | April 28, 2006 |

| SITE/FACILITY | DATE OF AGREEMENT (if avail.) | PARTY(IES) TO AGREEMENT(S) | EXTENSION DATE |
|---|---|---|---|
| O&M Agreements (ALL SITES) | | Pontiac Business Trust | April 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | AECC Pontiac LLC | April 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | AECC Pontiac LLC | April 28, 2006 |
| O&M Agreements (ALL SITES) | | AECC Pontiac LLC | April 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Red Gas, LLC | April 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Red Gas, LLC | April 28, 2006 |
| O&M Agreements (ALL SITES) | | Red Gas, LLC | April 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Archimedes Gas & Electric, Inc. | April 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Archimedes Gas & Electric, Inc. | April 28, 2006 |
| O&M Agreements (ALL SITES) | | Archimedes Gas & Electric, Inc. | April 28, 2006 |
| Gas Rights and Collection Facilities Lease (ALL SITES) | | Voltaire Gas & Electric, Inc. | April 28, 2006 |
| Gas Sales Agreement (ALL SITES) | | Voltaire Gas & Electric, Inc. | April 28, 2006 |
| O&M Agreements (ALL SITES) | | Voltaire Gas & Electric, Inc. | April 28, 2006 |
| Multi-site Environmental Permitting/Monitoring | | Trinity Consultants | April 28, 2006 |
| Waste Condensate Disposal | | RS Used Oil | April 28, 2006 |
| Environmental Monitoring Software | | Enviance, Inc. | April 28, 2006 |

| Credit Agreement between RTC and Aquila Energy Capital | 4/10/2002 | Aquila Energy Capital Corporation | April 28, 2006 |

| SITE/FACILITY | DATE OF AGREEMENT (if avail.) | PARTY(IES) TO AGREEMENT(S) | EXTENSION DATE |
| --- | --- | --- | --- |
| AGC Document No 415 Standard Form of Design Build Agreement (Beecher) | 08/09/2000 | Network Electric | April 28, 2006 |
| Construction Loan Agreement ($513,592.06) (Beecher) | 12/08/2000 | Network Electric | April 28, 2006 |
| Construction Loan Agreement ($2,721,507.94) (Beecher) | 12/08/2000 | Network Electric | April 28, 2006 |
| Equipment Lease Agreement (Beecher) | 12/08/2000 | Network Electric | April 28, 2006 |
| Performance Bond issued by Federal Insurance Company ($7MM) (Beecher) | 03/2001 | Network Electric | April 28, 2006 |
| Payment Bond issued by Federal Insurance Company ($7MM) (Beecher) | 03/2001 | Network Electric | April 28, 2006 |
| Confidentiality Agreement (Beecher) | 04/11/2000 | Network Electric | April 28, 2006 |
| Letter Agreement (Beecher) | 04/16/2000 | Network Electric | April 28, 2006 |
| Participation Agreement (Beecher) | 06/2000 | Network Electric | April 28, 2006 |
| Plant Upgrading Loan Agreement (Beecher) | 08/11/2000 | Network Electric | April 28, 2006 |

# EXHIBIT H

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 Proceeding |
| | ) | |
| RESOURCE TECHNOLOGY | ) | |
| CORPORATION, | ) | Case No. 99 B 35434 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | |

## NOTICE OF MOTION

To:    See Attached Service List

Please Be Advised that on January 18, 2007 at 9:30 a.m., Illinois Investment Trust No. 92-7163 as Designee of the Rights of Chiplease, Inc. and Scattered Corporation, Allied Waste Industries, Inc., American Disposal Services of Illinois, Inc. and Sangamon Valley Landfill, Inc. will appear by counsel before the Honorable Eugene R. Wedoff, or any judge presiding in his stead in Courtroom 744, 219 S. Dearborn St., Chicago, Illinois, and shall then and there present their Joint Motion To Extend Trial Date, a copy of which is attached hereto.

Respectfully submitted,
**Illinois Investment Trust No. 92-7163 as Designee of the Rights of Chiplease, Inc. and Scattered Corporation**

BY:    /s/ Gregory J. Jordan
One of Their Attorneys

Gregory J. Jordan (ARDC #6205510)
Peter J. Schmidt (ARDC #6256638)
Dykema Gossett PLLC
10 S. Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 876-1700
(312) 876-1155 (Telecopier)

David C. Bohan (ARDC # 3122194)
Robert S. O'Meara (ARDC # 6256472)
Sachnoff & Weaver, Ltd.
10 S. Wacker Drive, 40th Floor
Chicago, IL 60606
(312) 207-1000 Telephone
(312) 207-6400 Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I, Gregory J. Jordan, certify that on January 15, 2007, I served this Notice of Motion, and the document referred to herein, on the persons listed on the attached service list, by electronically filing the same with the United States Bankruptcy Court and by facsimile on any parties not receiving electronic notice.

_____/s/ Gregory J. Jordan_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Proceeding |
| | ) | |
| RESOURCE TECHNOLOGY CORPORATION | ) | Case No. 99-35434 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | |

## SERVICE LIST

Jay A. Steinberg
321 North Clark Street
Suite 2800
Chicago, IL 60610-4764
Fax Number: (312) 832-4700

Barry A. Chatz
Arnstein & Lehr LLP
120 South Riverside Plaza
Suite 1200
Chicago IL 60606
Fax Number: (312) 876-0288

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 Proceeding |
| | ) | |
| RESOURCE TECHNOLOGY | ) | |
| CORPORATION, | ) | Case No. 99 B 35434 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | |

## JOINT MOTION TO EXTEND TRIAL DATE

Illinois Investment Trust No. 92-7163 as Designee of the Rights of Chiplease, Inc. and Scattered Corporation ("IIT") by and through Gregory J. Jordan and Peter J. Schmidt, its counsel, and Allied Waste Industries, Inc., American Disposal Services of Illinois, Inc. and Sangamon Valley Landfill, Inc. (collectively "Allied") by and through David Bohan and Robert O'Meara, their counsel, together move this court for an extension of discovery and the trial dates related to the Litchfield, Illinois Landfill, the Bloomington, Illinois Landfill, and the Springfield, Illinois Landfill, and is support thereof state as follows:

1.  This Court has set a trial to be conducted on February 5-7, 2007 (the "Trial") relating to certain agreements identified in the Motion of Chapter 7 Trustee Pursuant to Court's Order Compelling Trustee to Assume and Assign Certain Executory Contracts Subject to Court Approval of (1) Demonstration by the Purchasers of the Ability to Pay Cure Costs; (2) Demonstration by the Purchasers of Adequate Assurance of Future Performance; (3) Assumption; and (4) Assignment (the "Motion to Assume").

2.  Specifically, the Trial concerns certain issues relating to the proposed assumption and assignment of the following three contracts into which the Debtor has entered:

a.  An agreement with ESG Watts relating the Springfield landfill entitled "Agreement", which is dated May 26, 1995. Allied Waste Industries, Inc., and Sangamon Valley Landfill, Inc. are the assignees of the rights of ESG Watts under that agreement;

b.  An agreement with Allied Waste Industries, Inc. and American Disposal Services of Illinois, Inc. relating to the Litchfield landfill entitled "Agreement", which is dated December 30, 1996; and

c.  An agreement with Liberty Waste of Ohio relating to the Bloomington landfill entitled "Agreement" dated December 30, 1995 by and between the DEBTOR and Liberty Waste of Ohio. Allied Waste Industries, Inc. and American Disposal Services of Illinois, Inc. are the assignee of the rights of Liberty Waste of Ohio under that agreement.

3.  IIT and Allied have commenced discussions that focus on reaching an agreement concerning the issues to be addressed at the Trial. The parties seek an extension of the discovery and of the trial dates to allow them sufficient time to reach a consensual resolution.

4.  IIT and Allied jointly request that the discovery cut-off and the trial date be extended for at least thirty days to allow the parties to have sufficient time to resolve the issues by consent.

WHEREFORE, Illinois Investment Trust No. 92-7163 as Designee of the Rights of Chiplease, Inc. and Scattered Corporation, Allied Waste Industries, Inc., American Disposal

Services of Illinois, Inc. and Sangamon Valley Landfill, Inc. respectfully request that this Court

extend the close of discovery and reschedule the trial currently set for February 5, 6 and 7, 2007,

and grant the parties such other and further relief as this Court deems just and equitable.


**ILLINOIS INVESTMENT TRUST**
**NO. 92-7163 AS DESIGNEE OF THE**
**RIGHTS OF CHIPLEASE, INC.**
**AND SCATTERED CORPORATION**

By: ____/s/ Gregory J. Jordan_____
          One of Its Attorneys

Gregory J. Jordan (ARDC # 6205510)
Peter J. Schmidt (ARDC # 6256638)
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606
(312) 627-2171 Telephone
(866) 698-0830 Facsimile

**ALLIED WASTE INDUSTRIES, INC.,**
**AMERICAN DISPOSAL SERVICES**
**OF ILLINOIS, INC. AND SANGAMON**
**VALLEY LANDFILL, INC.**

By: ____/s/ David C. Bohan_____
          One of Their Attorneys

David C. Bohan (ARDC # 3122194)
Robert S. O'Meara (ARDC # 6256472)
Sachnoff & Weaver, Ltd.
10 S. Wacker Drive, 40th Floor
Chicago, IL 60606
(312) 207-1000 Telephone
(312) 207-6400 Facsimile

# EXHIBIT I

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Chapter 7 Proceeding |
| | ) | |
| Resource Technology Corporation, | ) | No. 99 B 35434 |
| | ) | |
| Debtor. | ) | Judge Eugene R. Wedoff |
| | ) | |

## ORDER ON JOINT MOTION TO EXTEND TRIAL DATE

This proceeding having come before the Court on the Joint Motion to Extend Trial Date (the "Joint Motion") filed by Illinois Investment Trust No. 92-7163, Allied Waste Industries, Inc., American Disposal Services of Illinois, Inc. and Sangamon Valley Landfill, Inc., due notice having been given and the Court being fully advised, it is hereby ordered:

1.  The Joint Motion is granted.  The Court's Trial Order of September 18, 2006 regarding the Bloomington, Litchfield and Sangamon sites (Docket No. 3583) is vacated and the February 5 through February 9, 2007 trial dates are stricken.

2.  The parties shall notice discovery, so that they will complete all discovery on or before February 19, 2007.

3.  The parties shall exchange witness and exhibit lists and file the lists with the Court on or before February 21, 2007.  All exhibits shall be identified by the numbers proposed to be used at trial.

4.  The parties shall not use large format demonstrative evidence if the information can be provided on 8½" x 11" paper.

5.  Motions in limine or objections to the admission of exhibits shall be filed on or before February 23, 2007.

6.  The Court will rule on any such motions on February 26, 2007 at 9:30 a.m.

7.  No later than 4:30 p.m. on the day before the trial, all parties shall submit copies of their exhibits to the Court.  If the hard copies of a party's exhibits can be contained in a single 3-inch ring binder, the party may submit the exhibits in that manner, with one binder for the judge and a separate binder for the law clerk.  If the exhibits cannot be contained in a single 3-inch ring binder, then the party must submit the exhibits on a CD-ROM, in PDF format, with each exhibit as a separate document, and with bookmarks for major divisions and for any attachments to the exhibit.  A party may submit a CD-ROM rather than a binder even where the volume of exhibits would not require submission of a CD-ROM.  Two copies of each CD-ROM must be submitted. Each CD-ROM shall be labeled with the name of the case and the party on whose behalf it is submitted.

8.    Any listed exhibits as to which there is no objection will be admitted into evidence at the outset of the hearing.

9.    Absent extraordinary circumstances, the examination of each witness shall be limited to direct, cross-examination and re-direct.

10.    The trial in this matter shall commence on February 26, 2007 at 9:30 a.m. To the extent necessary, the trial in this matter shall re-commence on February 27, 2007 at 10:30 a.m.

Dated:  January _____, 2007                 ENTER:

_____

Hon. Eugene R. Wedoff
Chief Bankruptcy Judge

JAN 1 9 2007

- 2 -