UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 08-cv-2425 |
| | ) | (Consolidated) |
| RESOURCE TECHNOLOGY CORP., | ) | Hon. Matthew Kennelly |
| | ) | |
| Debtor. | ) | |

**APPELLANT ILLINOIS INVESTMENT TRUST NO. 92-7163'S**
<u>**REPLY BRIEF IN SUPPORT OF APPEAL**</u>

Louis D. Bernstein (ARDC # 6192379)
Colleen E. McManus(ARDC # 06243473)
**Much Shelist Denenberg Ament & Rubenstein, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
Phone: (312) 521-2000
Fax:  (312) 521-2595
cmcmanus@muchshelist.com

*Attorneys for Appellant*

# TABLE OF CONTENTS

I.   Allied's standing is ripe for objection…………………………………………………3

    A.   The Trust challenged Allied's standing before the Bankruptcy Court…………..3

    B.   Allied offers only superficial indications that it is the real party in interest……..3

II.  The Trust did satisfy its burden under Section 365(f)………………………….…...4

    A.   The Trust's funding and experienced personnel constitute adequate assurance of future performance……………………………………………………………..…4

        1.   The Trust had adequate funding in place………………………………...5

        2.   The Trust had competent, experienced personnel in place………………6

    B.   There is no heightened standard for assignment of the Landfill Agreements……7

    C.   Peoria and Allied are not entitled to new, improved Landfill Agreements………8

    D.   Allied and Peoria highly exaggerate RTC's past compliance issues……………..9

    E.   The Trust and its lenders have assets sufficient to demonstrate adequate assurance of future performance……………………………….………………..…..10

III. Justice demands that the Trust be granted a new trial………………….…………..11

IV.  The Trust's witnesses testified without impeachment or contradiction………….…13

V.   Conclusion……………………………………………………………………….14

## TABLE OF AUTHORITIES

*Henley v. FMC Corp.*, 189 F.R.D. 340 (S.D. W.Va. 1999)……………………………………….13

*In re Brentano's, Inc.*, 29 B.R. 881 (Bankr. S.D.N.Y. 1983)……………………………………8

*In re General Oil Distributors, Inc.*, 18 B.R. 654 (Bankr. E.D.N.Y. 1982)……………………7

*In re Texas Health Enterprises, Inc.*, 2003 WL 21770822 (5th Cir.)……………………………9

*In re Westview 75th Street Drug Corp.*, 59 B.R. 747 (Bankr. S.D.N.Y. 1986)……………..…4

*Knezevic v. Ashcroft*, 367 F.3d 1206 (9th Cir. 2004)……………………………………………13

**Legal Argument**

I.  **Allied's standing is ripe for objection.**

This appeal is <u>not</u> the first time the Trust argued that Allied has no standing. But this appeal is yet another lost opportunity for Allied to prove its standing.

    A.  **The Trust challenged Allied's standing before the Bankruptcy Court**.

At the outset of the trial, prior counsel for the Trust challenged Allied's standing--not for the first time--as follows:

> With regard to Springfield, that was an operating site, and what it was was an agreement between ESG Watts and RTC entered into on May 26th, 1995. *As we have indicated to Allied previously*, we're not aware of what interest Allied has in the Sangamon Valley Landfill. I'm sure that they can put on some sort of evidence showing that they, in fact, have an interest in the Springfield landfill by assignment from ESG Watts because we're not aware of that, and I think *we've alerted the court and Allied to that a long time ago*.

(Tr. Part 1 at 13-14) (Emphasis added.)

Allied would have this Court believe that the Trust never raised an objection to Allied standing when it is apparent from the foregoing paragraph that the Trust repeatedly challenged Allied's standing. The Bankruptcy Court simply did not rule on the issue. The Trust has not waived this objection, and Allied's citations to waiver cases thus are not applicable.

    B.  **Allied offers only superficial indications that it is the real party in interest**.

Conspicuously absent from Allied's voluminous brief and appendices is any piece of paper indicating that Allied is the real party in interest with respect to the Landfill Agreement for Springfield. Allied argues that it has standing essentially because its name appears on a bunch of other pieces of paper.

Although the March 13, 2007 stipulation (docket no. 3875) refers to Allied, a closer look reveals two reasons why the Trust did not waive the standing argument, at least with respect to

3

Springfield. First, the stipulation does not address cure costs at the Springfield site stemming from RTC's May 26, 1995 contract with ESG Watts, Inc. Second, the stipulation did not constitute the parties' final say in the matter, other than as to cure costs, because the stipulation was, by its own terms, contingent upon assignment of the Landfill Agreements (with the exception of Peoria) to the Trust. The Trust's objection to Allied's standing is still ripe for this Court's determination.

## II.     The Trust did satisfy its burden under Section 365(f).

Responding to Allied's and Peoria's objections to assignment of the Landfill Agreements is a bit like doing the Olympic high jump: Each time the Trust proves it can leap over the bar, the parties raise the bar slightly higher. Even in their response briefs, Allied and Peoria continue to add requirements to Section 365(f). For example, Allied and Peoria now maintain that the Trust should have entered a financial statement into evidence; the Trust should not employ any personnel related to RTC; the standard for assuming and assigning the Landfill Agreements is higher than the standard for assuming and assigning other contracts and leases; the Trust does not have sufficient assets—no, wait, the Trust's lenders do not have sufficient assets; and on and on. The Trust explains below how it mets its burden and how Allied's and Peoria's new conditions are inappropriate under Section 365(f).

### A.     The Trust's funding and experienced personnel constitute adequate assurance of future performance.

In its opening appellate brief, the Trust explained that courts have interpreted the phrase "adequate assurance of future performance" to mean just that—"adequate." The phrase does <u>not</u> mean absolute insurance that the debtor or its assignee will thrive and make a profit. *In re Westview 75th Street Drug Corp.*, 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986).

4

## 1. **The Trust had adequate funding in place**.

The promissory notes and loan and security agreements between the Trust, Chiplease and Scattered indicate that the latter were committed to lending $3 million to the Trust upon assignment of the Landfills Agreements to it. (Trial Exhibits 49-52) At trial, these exhibits were admitted and were not rebutted. And as highlighted further below, Scattered in particular has accessible assets.

Allied argues that Messrs. Greenblatt and Jahelka could not "get their stories straight" as to which lender was lending how much. But their testimony was not contradictory at all and was actually favorable to the Trust's case. Mr. Jahelka testified that, if necessary, Scattered itself could lend the entire $3 million. (Tr. Part 1 at 40) Moreover, Mr. Jahelka expressed a willingness to lend more funds to the Trust so long as it was meeting its projections. (Tr. Part 1 at 41-42) Mr. Greenblatt did not contradict Mr. Jahelka. Mr. Greenblatt testified that Chiplease agreed to loan up to 25 percent of the $3 million "or other amount as we might agree to of the total amount" and clarified that he and Mr. Jahelka recently had negotiated as to Chiplease loaning 25 percent of the $3 million. (Tr. Part 2 at 15, 24-25)

Similarly, John Connolly testified that the financing arrangement was, in essence, a "cash flow mortgage" whereby the Trust was not required to pay the lenders a precise amount every month; that is, if the Trust had a bad month, it would not have to pay the lenders but still could draw on the line of credit. (Tr. Part 1 at 160-61) This financing mechanism effectively prevents a default from occurring, and thus, is eminently advantageous to the Trust.

Moreover, the Trust, Chiplease and Scattered were all prepared to pay the cure costs associated with the Landfill Agreements and the RTC estate's stipulations regarding the same. (Tr. Part 1 at 96-99, 114-122) If assignment to the Trust had been approved, Scattered would

5

have been able to advance the Trust $60,000 to pay the cure costs due under the Peoria Landfill Agreement within 16 days. (Tr. Part 1 at 66-67)

In the face of this unrebutted evidence, Allied and Peoria nevertheless cry out for a financial statement. The Trust submits that there is very little difference between submitting no financial statement and submitting a financial statement that, admittedly, shows little financial history. Finally, the Trust notes that in none of the cases cited in Allied's brief did the court hold that a financial statement was a prerequisite to assignment under Section 365(f).

**2.    The Trust had competent, experienced personnel in place.**

Besides a more-than-adequate funding commitment, the Trust demonstrated the operational experience and preparation that qualify it to take assignment of the Landfill Agreements, for instance:

\*    John Connolly's and Robert Fortelka's experience with gas collection and control systems and gas conversion systems total 19 and 17 years, respectively. (Tr. Part 1 at 95-96)

\*    Connolly assembled an experienced team of construction managers (both of whom worked with Connolly for 11 years), a field maintenance technician and an environmental compliance manager. (Tr. Part 1 at 78-80)

\*    Connolly has filed 50-100 applications for construction permits in connection with proposed work on landfills and never had one denied. (Tr. Part 1 at 105)

\*    Connolly has applied for seven Clean Air Act Program Permits in connection with proposed work on landfills and never had one denied. (Tr. Part 1 at 106-07)

Allied would have this Court believe Section 365(f) contains some sort of insider-prohibition. But Allied fails to cite any cases that prohibit assignment to an entity whose personnel was involved with the debtor. (If the Trust did not have any former RTC personnel on

6

its staff, Allied probably would argue that the Trust lacked experience and knowledge of landfill gas-to-energy projects.)

In sum, the Trust demonstrated <u>adequate</u> assurance of future performance by showing sufficient loan commitments and experienced personnel who already have taken real steps to perform under the Landfill Agreements.

### B.      There is no heightened standard for assignment of the Landfill Agreements.

Neither Section 365(f) nor relevant case law delineate separate standards depending on the type of executory contract or unexpired lease being proposed for assumption and assignment.

Incredibly, Allied likens itself to the City of New York by analogizing *In re General Oil Distributors, Inc*., 18 B.R. 654 (Bankr. E.D.N.Y. 1982) to this case. In that case, the debtor maintained an executory contract to supply fuel oil to the City of New York. *Id*. at 657. The debtor moved to assume the contract, and the City objected. In deciding whether the debtor had established adequate assurance of future performance, the court pointed out that the debtor defaulted on past deliveries and recently ran out of both oil and money. Id. at 658. The court then said it could not ignore the significance of the City as a party to the contract. *Id*. Finally, the court noted that the need to maintain vital public services demanded a higher standard under Section 365(b). *Id*.

Allied's reliance on *General Oil* is misplaced, at best. Allied mischaracterizes the New York court's higher standard. The court emphasized that the higher standard was warranted for a public service contract where the City needed vital resources. By contrast, this case features a contract between two private businesses—not a governmental entity in need of a vital resource. And unlike General Oil, the Trust has not run out of money or electricity; in fact, it has the $3 million loan, which the debtor in *General Oil* did not have.

7

Similarly, although Allied may distinguish the facts of certain assumption and assignment cases, the bankruptcy courts' holdings do not support a higher standard for executory contracts than for unexpired leases. The Trust urges this Court to apply the standard set forth in Section 365(f) and applicable case law.

### C.    Peoria and Allied are not entitled to new, improved Landfill Agreements.

The crucial question under Section 365(f) is whether the Trust is likely to perform under the Landfill Agreements. While true that the non-debtor party to an executory contract is entitled to the benefit of its bargain, an assignee's assurance of performance need only be "adequate" and need not ensure compliance with each and every term of the contract. *In re Brentano's, Inc*., 29 B.R. 881 (Bankr. S.D.N.Y. 1983) (authorizing assignment of leasehold interest).

Here, the Landfill Agreements <u>required nothing of RTC in the way of security or assurance</u>: They contain no guaranties, no security deposits, and no letters of credit to be posted. (*See* Landfill Agreements, Trial Exhibits 43-46)

Even Peoria's and the Trust's pre-trial stipulation as to cure costs did not require a performance bond or other security. (Trial Exhibit 48; Tr. Part 1 at 120) The absence of this additional security is telling because Section 365(b) requires the cure of all monetary and non-monetary defaults prior to assumption and assignment of an executory contract, and the stipulation was Peoria's last chance to spell out all defaults. Asking for heightened security under the Landfill Agreements now is yet another example of the parties' transparent attempts to elasticize Section 365(f).

8

      **D.**      **Allied and Peoria highly exaggerate RTC's past compliance issues**.

Allied and Peoria argue that a non-debtor party to a contract should not be forced to accept another default and return to bankruptcy. In *In re Texas Health Enterprises, Inc.*, 2003 WL 21770822 *3 (5th Cir.), the debtor argued against this so-called presumption of guilt. The court explained that evidence of prior defaults is probative of a debtor's ability to perform in the future. *Id*. But in that case, the debtor itself was not a different company, was attempting to assume the contract under Section 365(b) and the debtor did have a history of defaults.

To the extent it is relevant because of the Trust's staff's connection to RTC, the historical performance of RTC is mischaracterized as fraught with non-compliance. A closer review of the trial transcript indicates that the complaints of RTC's performance were exaggerated and unsubstantiated by Allied and Peoria.

First, Mr. Sloan (on behalf of Peoria) testified about RTC's performance as follows:

> Q: Were any NOVs issued relating to RTC's operations prior to the bankruptcy case?
> A: I do not recall.
> Q: Do you know if RTC ever received any enforcement orders relating to its operations at Peoria:
> A: I am not aware of any.
> Q: Now, you testified that penalties can be assessed relating to NOVs, correct?
> A: That is correct.
> Q: Are you aware of any penalties that are being assessed against RTC relating to the Peoria site?
> A: No.

(Tr. Part 2 p. 103, line 14 – p. 104, line 2)

Similarly, Michael Reed of the Illinois Environmental Protection Agency testified about RTC's performance as follows:

> Q: There has not been an adjudication of noncompliance against RTC, has there been?
> A: To my knowledge there has not been anything adjudicated at this time.

9

>    Q:  And there has not been an adjudication of noncompliance against any employee of RTC, has there been?
>    A:  I am not really sure how to answer that question.
>    Q:  You don't know of any adjudication of noncompliance against any employee of RTC?
>    A:  The only thing I know if is –
>    Q:  I'm asking for adjudications.
>    A:  Not to my knowledge, no.

(Tr. Part 2 at p. 174, line 15 – p. 175, line 3)

Third, John Connolly testified that RTC was never the subject of any enforcement actions. (Tr. Part 1 at 273)

Fourth, Mr. Sloan also testified that RTC's performance at the Peoria landfill declined <u>after</u> the Chapter 11 trustee's appointment in 2003 (Tr. part 2 at 92-93)  This followed John Connolly's testimony that certain of the expenditures the Trust would have to make at the sites arose from problems occurring during the bankruptcy trustees' administrations and their inability to fund the necessary expenses.  (Tr. Part 1 at 132-33, 141-42)  (Chiplease offered to fund RTC the Chapter 11 operations at the time, but the Chapter 11 trustee declined.  (Tr. Part 2 at 18-19))

Finally, Allied and Peoria naturally fail to acknowledge that notices of violation could be attributable to actions by the landfill owners and not necessarily RTC.  (Tr. Part 2 at 46)  The Trust cannot be held responsible for imaginary non-compliance at the landfills.

    **E.**  **The Trust and its lenders have assets sufficient to demonstrate adequate assurance of future performance.**

The testimony reveals assets of Scattered, in particular, that are available for recovery in the event of a breach, for example:

- Scattered's current assets are $15-16 million (Tr. Part 2 at 12); it has an 85 percent interest in a partnership that owns real property located at 330 South Wells in

>   Chicago, Illinois, in which property there is $3-4 million of equity (Tr. Part 1 at 30-31); and

- Scattered receives approximately $700,000 of "free cash flow" per month from its interest in H&M Oil & Gas, LLC, over which it has financial control (Tr. Part 1 at 32-33); and

The Bankruptcy Court, Allied and Peoria ignore the fact that Scattered and Chiplease are incentivized--more than another lender would be--to ensure that the Trust has the funding necessary to succeed under the Landfill Agreements because they are the beneficiaries of the Trust. (Memorandum Of Beneficiary Designation between Chiplease, Scattered and the Trust, Trial Ex. 2)

Additionally, the Trust owns assets that are susceptible to collection by virtue of Chiplease assigning to it the physical assets that RTC assigned to Chiplease in the March 2006 settlement agreement. (Dkt. No. 3170; *see also*, Memorandum Of Beneficiary Designation between Chiplease, Scattered and the Trust, Trial Ex. 2)

Peoria and Allied continue to seek absolute assurance of future performance by Chiplease and Scattered, as well as the Trust, and are ignoring the unrebutted evidence at trial.

**III.    Justice demands that the Trust be granted a new trial**.

Allied and Peoria argue that the Trust proposed new arguments but no new evidence justifying a new trial under Fed. R. Civ. P. 59. They refuse to acknowledge that at the conclusion of the trial on the Motion To Assign, the Bankruptcy Court denied the Motion To Assign <u>but invited</u> the Chapter 7 Trustee and the Trust to propose another arrangement for assumption and assignment of the Landfill Agreements. (Tr. Part 2 at 258-59) For the

11

Bankruptcy Court to invite an alternative and the Trust rely on that invitation--only to have the court deny the Motion To Reconsider as failing to offer new evidence--defies justice.

To reiterate briefly, the additional evidence that the Trust offered in the Motion To Consider was:

* The Trust's proposed irrevocable assignment of its rights under the Landfill Agreements to Illinois Generating Station #1 Inc., designed to alleviate the Bankruptcy Court's concern that the Trust, which the court believed not to be a business trust under Illinois law, could not be forced into bankruptcy by its creditors.  (Dkt. No. 4182 at 6; Dkt. No. 4188 at Ex. 2-4; Dkt. No. 4199 at Ex. 9-12)

* Illinois Generating Station #1 Inc.'s appointment of John Connolly as sole director and officer and signed him to an employment agreement, which would alleviate the Bankruptcy Court's concern that the Trust could never be the subject of a suit for personal liability by its creditors.  (Dkt. No. 4182 at 6; Dkt. No. 4188 at Ex. 5-6)

* Illinois Generating Station #1 Inc.'s entry into loan agreements with Chiplease and Scattered, requiring that the funds to be loaned be used only to fund operations under the Landfill Agreements; the revised loan agreements provided the counterparties to the Landfill Agreements with rights, as third-party beneficiaries, to compel Scattered and Chiplease to fund under the loan agreements in order to satisfy the obligations under the stipulations between the Trust and the contracting parties, thereby alleviating the Bankruptcy Court's concern that the contracting parties had no remedies in the event the funds were not loaned to the Trust.  (Dkt. # at 7-8; Dkt. # at 1, 5-6)

  * Scattered's and Chiplease's delivery of $500,000.00 to Illinois Generating Station #1 Inc. for use in funding the obligations under the Landfill Agreements. (Dkt. # at 8; Dkt. # at Ex. 7)

  This new evidence satisfied the requirements of Rule 59 because it was (i) discovered post-trial, after the Bankruptcy Court's invitation; (ii) material and likely would have changed the outcome at trial insofar as it addressed the problems the court idenfitied in connection with assignment of the Landfill Agreements; and (iii) not merely cumulative or impeaching—it made an affirmative showing of adequate assurance of future performance. *See Henley v. FMC Corp.*, 189 F.R.D. 340, 349-50 (S.D. W.Va. 1999) (granting new trial where newly discovered evidence would supplant weak testimony and rebut previously detrimental testimony). The Bankruptcy Court should have granted the Trust a new trial based on the foregoing new evidence. Failure to do so was an abuse of discretion.

**IV. The Trust's witnesses testified without impeachment or contradiction.**

  State and federal case law urge that a court should accept unrebutted testimony as true where it has not made an adverse finding of credibility. *Knezevic v. Ashcroft*, 367 F.3d 1206, 1209 (9th Cir. 2004). Allied and Peoria continue to harbor suspicions about the Trust's witnesses but cannot cite anywhere in the trial transcripts where the witnesses were impeached or rebutted by other testimony or evidence.

  The Bankruptcy Court did not provide any rationale or make any finding that the testimony of the Trust's witnesses strayed beyond belief or was inherently improbable. In disregardings unrebutted, uncontroverted evidence, the Bankruptcy Court committed reversible error.

**V.      Conclusion**

Based upon the evidence at trial and the foregoing legal precedent, the Trust submits that this Court should enter an order reversing the orders of the Bankruptcy Court and remanding for a new trial under Section 365(f) and upon the additional circumstances presented in connection with the Chapter 7 Trustee's assumption and assignment of the Landfill Agreements to the Trust.

**ILLINOIS INVESTMENT TRUST NO. 92-7163**

By: /s/ Colleen E. McManus
       One of its attorneys

Louis D. Bernstein (ARDC # 6192379)
Colleen E. McManus(ARDC # 06243473)
Much Shelist Denenberg Ament
    & Rubenstein, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, IL  60606
Phone:  312-521-2000
Fax:  312-521-2100
cmcmanus@muchshelist.com

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on September 5, 2008, she caused the parties listed below to be served electronically with this reply brief, each of whom is registered to receive electronic notices in this case.


Linda M. Kujaca
P.O. Box 254
Wood Dale, IL  60191
Counsel for City of Peoria and County
    of Peoria, Illinois


Robert S. O'Meara
Ann E. Pille
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606
Counsel for Allied Waste Industries,
    American Disposal Service of Illinois, Inc.
    and Sangamon Valley Landfill, Inc.


George P. Apostolides
Arnstein & Lehr LLP
120 S. Riverside Plaza, Suite 1200
Chicago IL 60606
Counsel for Jay A. Steinberg, not individually but
    as Chapter 7 Trustee for the Estate of Resource
    Technology Corporation


                                    /s/ Colleen E. McManus